The Deposition of

# ANDREW VANCHIERE - VOLUME 1

In the Matter of

# EAUX HOLDINGS, LLC

vs

# SCOTTSDALE INS. CO.

Taken On

# AUGUST 06, 2021



Exhibit 4

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION


EAUX HOLDINGS, LLC

VS.                              CIVIL CASE NO.
                                 2:20-CV-01582
SCOTTSDALE INSURANCE CO.


* * * * * * * * * * * * * * * * * * * * * * * * * *

          The videotaped deposition of ANDREW

VANCHIERE, VOLUME I, appearing remotely via

videoconference from Washington, D.C., taken in

connection with the captioned cause pursuant to the

following stipulations before RITA A. DEROUEN, Certified

Court Reporter, appearing remotely from Baton Rouge,

Louisiana, on August 6, 2021, beginning at 9:59 a.m.

Eastern Time.

```
 1    REMOTE APPEARANCES:

 2    REPRESENTING THE PLAINTIFF:

 3     COX, COX, FILO, CAMEL & WILSON, LLC
       BY:   SOMER G. BROWN, ESQ.
 4     723 Broad Street
       Lake Charles, Louisiana  70601
 5     337-436-6611
       somer@coxatty.com
 6

 7
       REPRESENTING THE DEFENDANT:
 8
        KEOGH, COX & WILSON, LTD.
 9      BY:   CHELSEA A. PAYNE, ESQ.
        BY:   JOHN P. WOLFF, III, ESQ.
10      701 Main Street
        Baton Rouge, Louisiana  70821
11      225-383-3796
        cpayne@keoghcox.com
12      jwolff@keoghcox.com

13
       Also Present:
14
              Will Rain, Videographer
15            Steve Duplantis

16
       Reported by:
17
              Rita A. DeRouen, Certified
18            Court Reporter No. 2014018
              in and for the State of
19            Louisiana

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                                                    Page

 3   STIPULATION                                        4
     REPORTER'S PAGE                                  123
 4   REPORTER'S CERTIFICATE                           124

 5   EXAMINATION
          BY MS. PAYNE                                 6
 6

 7                     *  *  *  *  *

 8                   List of Exhibits

 9   Exhibit #1                                         7
          (Notice of Deposition of Andrew Vanchiere
10        and FRCP Rule 45 Request for Documents)

11   Exhibit #2                                         8
          (Opinion of Value, 620 Esplanade Street,
12        Lake Charles, LA, 3-16-21, 112 - 112.14)

13   Exhibit #3                                        22
          (Listing Contract for Lease of Commercial
14        Property, 7 - 7.05)

15   Exhibit #5                                        34
          (Spreadsheet, 19 - 19.02)
16
     Exhibit #6                                        35
17        (Contract of Lease, 122- 122.09)

18   Exhibit #7                                        37
          (E-mail chain, last date 11-13-19, 583)
19
     Exhibit #19                                       41
20        (E-mail, 11-18-20, 246)

21   Exhibit #23                                       53
          (E-mail chain, last date 4-28-21, 597)
22

23

24

25
```

1                    S T I P U L A T I O N

2

3        It is hereby stipulated by and among counsel for

4    plaintiff and counsel for defense that the deposition of

5                    ANDREW VANCHIERE

6    be taken before RITA A. DEROUEN, Certified Court

7    Reporter, for all purposes, pursuant to notice and to

8    the provisions of the appropriate statutes of the

9    Federal Rules of Civil Procedure, Rules 26, 34, 45.

10       The parties hereto reserve all formalities in

11   connection with the taking of said deposition and the

12   reading and signing thereof, except the swearing of the

13   witness, and the reduction of the questions and answers

14   to typewriting.

15

16

17                         *   *   *

18

19

20

21

22

23

24

25

```
 1          REPORTED REMOTELY FROM BATON ROUGE, LOUISIANA
 2               THE VIDEOGRAPHER:  We are now on the
 3    record for the video deposition of Andrew Vanchiere.
 4    The date is August 6, 2021.  The time is 9:59 a.m.
 5    Eastern Time.  The witness is appearing remotely from
 6    Washington, D.C.
 7               This is the matter of Eaux Holdings, LLC,
 8    versus Scottsdale Insurance Company.  This is filed in
 9    the United States District Court for the Western
10    District of Louisiana, Lake Charles Division.
11               The court reporter is Rita DeRouen.  The
12    videographer is Will Rain.  Both are representing goDEPO
13    court reporting.
14               And now will counsel please state your
15    appearances for the record.
16               MS. BROWN:  Somer Brown is here virtually
17    from Lake Charles, Louisiana, on behalf of the
18    plaintiff, Eaux Holdings.
19               MS. PAYNE:  Chelsea Payne is here in
20    Baton Rouge, Louisiana, on behalf of Scottsdale
21    Insurance Company.
22               MR. WOLFF:  John Wolff.  I'll be
23    observing, not participating, on behalf of Scottsdale
24    Insurance Company.
25               THE COURT REPORTER:  Okay.  And I will go
```

1    ahead and swear you in now, if you could raise your

2    right hand.

3                           ANDREW VANCHIERE,

4    having been first duly sworn, was examined and testified

5    as follows:

6                           EXAMINATION

7    BY MS. PAYNE:

8        Q.    Good morning.  Before we get started, how do

9    you pronounce your last name?

10       A.    Yes.  Last name is pronounced Vanchiere.

11       Q.    Vanchiere.

12             Good morning.  My name is Chelsea Payne, and I

13   represent Scottsdale Insurance Company in this matter.

14   We will be taking your deposition today.

15             Have you ever given a deposition before?

16       A.    Yes, ma'am, I have.

17       Q.    So I'll just lay out some ground rules.  If you

18   don't understand my question, just ask me to repeat it

19   or clarify.  I'll try to rephrase it.  If you do answer

20   my question, I'll assume that you understood it.  Is

21   that fair?

22       A.    Fair enough.

23       Q.    And make sure you give all your answers

24   verbally instead of just nodding your head so we can

25   make sure we get a good record.  And if you need a break

```
 1   at any time, just let me know.

 2        A.    That sounds great, Chelsea.  Thank you.

 3        Q.    Thank you.

 4              MS. PAYNE:  I want to start off -- Rita, I

 5   wanted to attach -- when I attach exhibits, do you want

 6   me to just send them to you later and identify them when

 7   I --

 8              THE COURT REPORTER:  That's fine, whatever

 9   works best for you is fine with me.

10   BY MS. PAYNE:

11        Q.    So I wanted to start off by attaching the

12   notice of deposition.  I will share my screen.

13              (Exhibit 1, remotely introduced and

14              provided electronically to the reporter.)

15   BY MS. PAYNE:

16        Q.    This is the notice of deposition for this

17   matter.  Have you seen this, Andrew?

18        A.    I have.  And I've read it.

19        Q.    Okay.

20              MS. PAYNE:  So we will attach this as

21   Exhibit 1.

22              MS. BROWN:  And, Chelsea, just to the

23   extent it may save you some time, Andrew has the

24   documents.

25              MS. PAYNE:  Okay.
```

```
 1              MS. BROWN:  So you don't necessarily have
 2    to share the screen unless you need to for some reason.
 3              MS. PAYNE:  Okay.
 4       A.   And, yes, I received your FileShare link with
 5    28 folders, I guess --
 6    BY MS. PAYNE:
 7       Q.   Okay.
 8       A.   -- with the documents previously sent as part
 9    of the subpoena from June or early July.
10       Q.   Okay.  Good.  That should save us some time,
11    then, good.
12       A.   I looked at a few of the samples.  Realized
13    that they were all Bates stamped.  And so I've got them
14    at my fingertips, to look at them as you call them.
15       Q.   Okay.  And for the record, you mentioned we
16    issued a subpoena to Latter & Blum, and we received
17    responses.  And as you noted, we Bates-labeled those
18    documents.  So when I refer to a document number, that's
19    a Bates label that we put on there.  But they were
20    produced by Latter & Blum.
21       A.   Understood.
22       Q.   Okay.  And while we're talking about the
23    subpoena, I'm going to go ahead and attach as Exhibit 2
24    the subpoena -- which, Andrew, I believe that's Tab B.
25              (Exhibit 2, remotely introduced and
```

```
 1                  provided electronically to the reporter.)
 2        A.   Okay.
 3   BY MS. PAYNE:
 4        Q.   Okay.  So could you state your full legal name
 5   for the record, please?
 6        A.   Andrew Warren Vanchiere.
 7        Q.   And your date of birth?
 8        A.   July 25, 1970.
 9        Q.   And where do you live?
10        A.   I live in Lake Charles, Louisiana.
11        Q.   Okay.  And the court reporter mentioned that
12   you were remotely in Washington, D.C.?
13        A.   I am.
14        Q.   Is anybody else in the room with you during
15   this deposition?
16        A.   Not at this -- not at this time.  There may be
17   one person that passes behind me to go upstairs.  So
18   this is the quietest place in the house.
19        Q.   Okay.  And were you born and raised in
20   Lake Charles?
21        A.   I was actually born up at Fort Polk in -- we
22   were living in Beauregard Parish, outside of DeRidder,
23   and then we moved to Lake Charles.  So place of birth is
24   Fort Polk, Louisiana.
25        Q.   Okay.  And as far as your education, where did
```

```
 1   you go to high school?
 2       A.   I attended St. Louis High School in
 3   Lake Charles, graduated there in 1988, and then attended
 4   LSU for about 18 months, and then cooking school.  I had
 5   a career as a chef and restaurant operator, catering
 6   operator for many years, before starting a career in
 7   commercial real estate 20 years ago.
 8       Q.   So did you obtain a degree from LSU or any
 9   other college?
10       A.   I did not.  I completed basic and intermediate
11   cuisine at the Cordon Bleu in Ottawa, Canada.  It's not
12   a degree but a certificate.
13       Q.   Okay.  And we'll go into your employment
14   history, but you mentioned you were at LSU and then you
15   went to Cordon Bleu cooking school.
16            Where was your first job after school?
17       A.   Cafe Margot in Lake Charles.  I cooked there
18   for two and a half years.  As well as in the same time
19   frame, I did some work at Memorial Hospital in the
20   emergency room, in ICU, as a -- basically, for lack of a
21   better term, an orderly.
22       Q.   Okay.  And so about what year are we at right
23   now?  You said you graduated high school in '88,
24   attended LSU for about two years.  How long was cooking
25   school?
```

```
 1      A.   Cooking school was a year.  And I had cooked
 2  for about five years before going to cooking school, so
 3  this is -- say August of '94 -- 1994, I attended Cordon
 4  Bleu in Ottawa, Canada.  About a year later, I was back
 5  home.  Worked for two and a half years for a catering
 6  company.  And then in early 1998, I started my own
 7  catering -- 1997, I started my own catering business,
 8  which I ran for about eight year before selling it.
 9      Q.   Okay.  So we're in the mid-2000s.  You sell
10  your catering business and then what?
11      A.   Prior to that, in about 2001, I started buying
12  commercial real estate.  And my primary purpose at the
13  time was to find a home for my catering business.
14          We bought -- I bought a large former church
15  complex, which could more than -- had more than enough
16  room to hold the catering business.  And then I began to
17  start leasing out the secondary space, office space.
18          And in that time frame, 2001 to 2004, I did
19  about four state leases -- state government office
20  leases at multiple properties.
21      Q.   What do you mean, you did four state government
22  leases?
23      A.   I bought properties, bid state government
24  office lease projects, renovated to suit their needs,
25  and then ended up, you know, leasing office space to the
```

1    State of Louisiana, primarily, early on.

2        Q.    And about how many properties did you purchase

3    between 2001 and 2004?

4        A.    Four.

5        Q.    Four total properties -- is that in addition to

6    the church?

7        A.    No.  It includes the church.

8        Q.    Includes the church.  Okay.

9              So four properties between 2001 and 2004.

10       A.    Yes, ma'am.

11       Q.    You said you had bid leases out to the State of

12   Louisiana --

13       A.    That's correct.

14       Q.    -- and renovated like spec outs or whatever

15   they needed.

16       A.    That's correct.

17       Q.    And so that brings us to 2004.

18       A.    Okay.  And then in 2004 or '5, I got my -- my

19   real estate sales license as an agent.  And somewhere in

20   that frame -- I don't remember exactly when; it was

21   '04 -- I sold my catering business and then moved into

22   commercial real estate development as well as sales and

23   leasing full-time.

24       Q.    And when you moved into commercial real estate,

25   did you have -- like work for a company, or were you

1   doing this on your own?

2        A.   Some of the development was on my own.  But my

3   sales license, as an agent, I had to place my license

4   with a broker, and my broker was Matt Redd with Redd

5   Properties.  Matt Redd ended up selling his brokerage

6   firm to Latter & Blum, I want to say, in 2014.

7             So I worked for Redd Properties, and then

8   Latter & Blum as the successor to Redd Properties, for

9   the last 16, 17 years.

10       Q.   So from 2000- -- around 2005 to 2014, it was

11  for Matt Redd.  And then once they sold it to

12  Latter & Blum, you've been at Latter & Blum since 2014?

13       A.   Yes.

14       Q.   Okay.  So you hold -- you currently hold a real

15  estate sales license?

16       A.   That is correct.

17       Q.   Okay.  And what did you have to do to obtain a

18  real estate sales license?

19       A.   I have -- there's an educational requirement to

20  get the sales license.  At the time, it was an 80-hour

21  requirement of education, with a subsequent 12 hours of

22  continuing education credit on an annual basis.

23            In addition to my license, I hold two

24  commercial real estate designations.  They're not

25  required; these are elective, if you would call it

1    that -- "selective," actually, is the better term --

2    based upon certain production requirements and

3    educational courses.  I was designated as a CCIM, which

4    stands for certified commercial investment member.

5        Q.   And so what kind of courses did you have to

6    take to become a certified commercial investment member?

7        A.   I took four courses, each about 40 hours long,

8    that are focused on investment real estate analysis,

9    looking at it from an owner perspective or a user

10   perspective, an investor perspective.

11       Q.   And what year did you obtain that

12   certification?

13       A.   I received my CCIM designation in 2005.

14       Q.   2005?

15       A.   April of 2005, yes, ma'am.

16       Q.   And do you have continuing education for this

17   certification as well as your real estate license?

18       A.   It's not required -- there's not a requirement

19   to maintain the designation, not yet.  I think it's

20   coming.

21       Q.   Okay.  So is that the only certification you

22   have, certified commercial investment member?

23       A.   The second designation is through the Society

24   of Industrial and Office Realtors.  SIOR is the

25   designation.  And that is a minimum education

1   requirement plus certain production levels either in the

2   industrial market sector or in the office market sector.

3   My focus and my designation came by my production in the

4   office market.

5       Q.   And what -- can you explain what you mean by

6   production?

7       A.   A certain -- a minimum threshold of

8   commission -- commissions earned, allocated -- you know,

9   70 percent of some threshold allocated to the office

10  market-generated commission, so from sales and leasing

11  of office properties.

12      Q.   Do you recall what that minimum threshold is

13  for you to obtain that?

14      A.   I want to say it was about $250,000 a year for

15  three of a -- three years of a five-year period.  And of

16  that, 70 percent of that gross commission had to be

17  derived from either office or industrial activity.  And

18  so my -- my ability to earn that designation was based

19  upon my office productivity.

20      Q.   Okay.  And when did you obtain that

21  certification?

22      A.   I believe in 2010, somewhere in there.

23      Q.   Okay.  And so there's no -- there was no

24  educational requirements.  That's solely based on your

25  production?

1      A.    Primarily.  There was a couple of half-day

2  courses, maybe some ethics training, as well as maybe

3  one other minimal course.  Not like the CCIM

4  designation.  That was five days per class for a total

5  of four classes.

6      Q.    Okay.

7      A.    Much more production driven.

8      Q.    Okay.  All right.  So we've covered all of your

9  professional and work history up to this point?

10     A.    Yes, ma'am.

11     Q.    Okay.  And so you're -- now you're solely a

12  real estate agent.  Do you still have your catering

13  company or do anything else on the side?

14     A.    Occasionally, I cook a -- do a cooking class or

15  a dinner here and there, but it's more fun and family

16  than anything else.  So my professional efforts are

17  directed exclusively to commercial real estate, on

18  clients' behalf exclusively.

19     Q.    Okay.  What did you do today to prepare for

20  this deposition?

21     A.    I reviewed -- I reviewed primarily the report I

22  had been engaged to prepare a couple of months ago on

23  behalf of Eaux Holdings, which was my -- I think it was

24  a 14-page summary report.

25             I am -- just to give you a little bit of

1    background on that, I am extremely involved in the

2    office market in Southwest Louisiana.  I know it

3    extremely well.  I have been engaged by no less than

4    three, maybe even four, real estate firms to help them

5    with their office requirements for their own needs.

6        Q.   And what do you mean by that, you were engaged

7    by three or four real estate firms?

8        A.   Yes, ma'am.  So I was hired by Bricks & Mortar

9    Real Estate, for example, which is a local brokerage

10   firm, primarily residential, but they do some commercial

11   work.

12           They were looking for a new location, as their

13   property -- the property where they operated out of was

14   destroyed in Hurricane Laura.  So I helped them find

15   their replacement property where they're going to build.

16       Q.   The real estate company itself, or you're

17   engaged by another Realtor -- okay.  So a real estate

18   company and the property that they need to run their

19   business?

20       A.   That's right.

21       Q.   Okay.

22       A.   And then I've done lease analysis for a

23   brokerage company who was trying to -- or, no, for a

24   property owner that was -- that was renegotiating a

25   lease with a brokerage company.  And then most recently,

1  trying to help the local Keller Williams firm find new

2  office space.  I have been working with them for about

3  six months.

4     Q.   Okay.  And when you said you did a lease

5  analysis for a property owner, can you give me a little

6  bit more detail on that?

7     A.   Sure.  The owner of the property needed

8  comparables -- market comparables for what similar

9  office properties were leasing for.  I looked at a

10  number of different factors, of type of office space,

11  single tenant versus multi-tenant, what geographic area

12  in the market are they, is the property in a flood zone

13  or not.

14        So helped delineate down to some very specific

15  market data points to advise what an appropriate rental

16  rate should be for the property that they had.

17     Q.   Okay.  And so you said you had three or four --

18  you mean, like, right now at this time, people that

19  you're assisting with relocation?  Is this specific to

20  Hurricane Laura or --

21     A.   Those are just real estate companies.  So I

22  guess the reason I mentioned that is these are people

23  that are in the same line of work that I am, but yet

24  they're calling me to help them figure out their office

25  needs for their locations.

1        Outside of those three or four agencies, I

2   currently have 17 transactions, probably half of them

3   sale and half of them lease, that are either under

4   contract or lease pending.  I've got a pipeline of, I

5   think, another 15 transactions beyond that.

6       Q.   You said about 50 percent of your transactions

7   are solely lease and about 50 are sales?

8       A.   Yes, ma'am.

9       Q.   And so back to what you reviewed to prepare for

10  this deposition, you said you reviewed your report.

11       Did you review any of the documents?

12       A.   I primarily wanted to make sure that I had

13  reviewed the basis of the report that I put together.

14  I'm certainly familiar with the other documents.  I did

15  not look at every single e-mail, but I'm prepared.

16       Q.   That's fair enough.

17       Okay.  So you have been identified as an expert

18  for plaintiffs in this case and you prepared a report,

19  and we'll get to that in a little bit.

20       I wanted to go over a little background of how

21  you became involved with this property.  And I'll go

22  ahead and say when I say "property," do you understand

23  that I'm talking about 620 Esplanade in Lake Charles?

24       A.   I do, 620 Esplanade Street, Lake Charles,

25  Louisiana 70607, I believe.

```
 1       Q.   Okay.  So how did you first become involved
 2  with this property?
 3       A.   So I was approached by Joey Odom, who is the
 4  managing member -- fills certain excess title of Eaux
 5  Holdings -- "Eaux" spelled E-A -- E-A-U-X, Eaux
 6  Holdings, LLC -- which owns the property at 620
 7  Esplanade Street, probably about two years ago.  Joey
 8  had --
 9                    (Interruption in audio.)
10                    MS. PAYNE:  Hold on one second.
11                    THE WITNESS:  -- to help him lease up the
12  second floor of his office building at 620 Esplanade
13  Street --
14                    (Interruption in audio.)
15                    (Court reporter disconnected from Zoom.)
16                    (A break was taken from 10:21 a.m. to
17                    10:25 a.m.)
18                    THE VIDEOGRAPHER:  We are back on the
19  record at 10:25 a.m.
20  BY MS. PAYNE:
21       Q.   Okay, Andrew.  So before we went off the
22  record, we were discussing your involvement with the
23  subject property, and I believe you said you were
24  approached by Joey Odom about two years ago to help him
25  lease up the second floor.
```

```
 1        A.    That's correct.

 2        Q.    Okay.  And did you know Joey Odom before this?

 3        A.    I had met him on maybe one or two occasions.

 4   But not that well.

 5        Q.    You didn't have any other professional or other

 6   friendship with Joey Odom prior to your involvement with

 7   the subject property?

 8        A.    Acquaintance at best.  But not for -- no,

 9   ma'am.

10        Q.    Okay.  So he approached you to help him lease

11   up the second floor.  There was already a tenant on the

12   first floor of the building?

13        A.    There was a tenant on the first floor, and that

14   tenant is technically the General Services

15   Administrative for the State of -- for United States of

16   America government.  They, GSA -- also known as GSA --

17   will execute a lease on behalf of some government

18   agency.  This one in particular is the Immigration and

19   Customs Enforcement agency, as a part of the Department

20   of Homeland Security.

21              So they were -- they were a tenant in that

22   building on the ground floor up until Hurricane Laura

23   damaged the building.  And I can keep going, but if you

24   want me to stop -- I recognize that there's more to

25   explain, so...
```

```
 1        Q.    We'll stick to right when you first became

 2   involved in the property.

 3        A.    Sure.

 4        Q.    The purpose was to lease just the second floor,

 5   correct?

 6        A.    That is correct.

 7        Q.    And I will go ahead -- I'll be

 8   referencing -- this is in Tab C, Latter & Blum 7.  This

 9   is the listing contract.

10                   (Exhibit 3, remotely introduced and

11                   provided electronically to the reporter.)

12   BY MS. PAYNE:

13        Q.    And so it -- the listing contract states that

14   Latter & Blum will be the owner's exclusive agent; is

15   that correct?

16        A.    That is correct.

17        Q.    Okay.  And the contract itself doesn't really

18   distinguish between the first or the second floor, but

19   was it understood that you would only be providing

20   services to lease the second floor, or does this

21   encompass the entire building?

22        A.    At the time, the consideration was that it was

23   just going to be the second floor.

24        Q.    Okay.  And Mr. Odom testified that there was

25   potentially another real estate agent that was involved,
```

1    Jody Guidry.

2          Do you -- was he involved prior to your

3    involvement?

4        A.   I believe that Joey was working with Mr. Guidry

5    prior to my involvement.  Yes.

6        Q.   Okay.  So before your involvement, he was

7    working with a different real estate agent.  And then in

8    2019 -- so this listing agreement was signed --

9        A.   June 5th, I believe.

10       Q.   June 5, 2019, correct?

11       A.   Yes, ma'am.

12       Q.   Okay.  So at that point in time, you became his

13   sole and exclusive agent and you were the one that had

14   any dealings with any leases on the first or second

15   floor?

16       A.   Yes, ma'am, that is correct.

17       Q.   Okay.  And so as a part of this listing

18   agreement, what -- what were your roles and

19   responsibilities?  What were you expected to do?

20       A.   One, I was -- I was asked to review the

21   operational expenses associated with the property at

22   620 Esplanade Street to ensure that -- as we looked at

23   other market data, to ensure that whatever rate we

24   determined was reflective of all the operating expenses

25   associated with the property.

1          At that point in time, and still -- and

2    continued on, the federal government lease on the ground

3    floor is a -- it's a hybrid of a fixed rate, but there

4    is some annual adjustment for operating expenses, but

5    not all operating expenses.

6          So what I tried to help Joey do is understand

7    what are reasonable operating expense assumptions going

8    forward based upon historical performance.  And to

9    ensure that as we developed a marketing strategy that we

10   made allowance that from time to time, operating

11   expenses are going to change.

12   Q.   And could you outline in detail what exactly

13   operating expenses you're referring to?

14   A.   Yes, ma'am.  Operating expenses associated with

15   a commercial property include but are not limited to

16   annual property taxes; annual insurance expense of

17   property and casualty coverage, possibly flood coverage

18   if you elect to have it, general liability coverage;

19   grounds upkeep, cutting the grass, washing windows, snow

20   removal, on the freak chance that we get a winter ice

21   storm or something like that; janitorial services for

22   the building, if it's a full service or modified gross

23   lease.  And I can further define those in -- subsequent

24   to me finishing answering this question.

25          Striping the parking lot; vacuuming; emptying

1   the external trash; et cetera, et cetera.  Those,

2   generally speaking, are the operating expenses

3   associated with a commercial property.

4       Q.   Okay.  So once you signed this agreement in

5   June 2019, you listed the second floor of the property,

6   it was ready to be leased?

7       A.   At the time, it was ready to be leased, with

8   minimal -- a little bit of cleanup.  But

9   fairly -- fairly ready to lease, yes.

10      Q.   Okay.  And so it was in good condition.  A

11  tenant could have come in and moved in right then and

12  there in 2019?

13      A.   Yes.

14      Q.   Yes?  Okay.

15           But it wasn't -- I'll use this term, "specced

16  out."  It was just -- if a tenant wanted to add its own

17  improvements or needed certain things, that would have

18  had to be done.  But other than it being -- you know, it

19  wasn't specced out to a particular tenant, it was in

20  good condition and ready to be --

21      A.   It was in decent condition.  It had walls and

22  doors that provided for eight or ten office spaces --

23  private office spaces.  It would have -- you know, a

24  tenant could have requested new paint, could have

25  requested new carpet, maybe some new ceiling tiles here

1  and there.

2       But overall, it was in -- it was in a -- the

3  status of it, it could have been moved into in a

4  relatively short period of time.

5    Q.   Okay.  You said "decent condition."  Is that

6  referring to the fact that it could have used some new

7  paint and carpet?  Or was there another reason you're

8  referring to it as in decent condition?

9    A.   I think, you know, tenants -- tenants typically

10  want the sun and the moon, and so I'm -- I'm making

11  allowance for, no, it was not grand and opulent.

12       So, you know, tenants always -- and depending

13  upon the market condition, tenants want, want, want, and

14  landlords want, want, want, so sometimes you have to

15  figure out a way to meet them in the middle.

16    Q.   Okay.  And so under this agreement, you

17  testified that you were, you know, reviewing the

18  operating expenses and whatnot.

19       What else were you expected to do under this

20  agreement?

21    A.   To take a look at the market dynamics of what

22  else is in the market that we would be competing against

23  for tenant demand, primarily.

24    Q.   Okay.

25    A.   And then lastly, you know, lease comparables,

1    what has leased in the -- in the recent past and what do
2    those rates look like from a comparable standpoint.
3         Q.   Okay.  And so you put the second floor on the
4    market.  Did you get any interest initially?
5         A.   At the time, no, we did not get very much
6    interest.  We did get some interest from a company
7    called Gophr, which was a startup company.  They were in
8    the market looking for space.  We talked with them for a
9    few weeks.  But it did not turn into a lease
10   transaction.  They ended up looking for something
11   shorter term than we were willing to do.  Just didn't
12   make sense to pursue it.
13        Q.   Okay.  And for the Gophr app, you said they
14   were looking for a shorter term.  Were you guys
15   agreeable on the lease price?  Were there any other
16   reasons that these negotiations fell through?
17        A.   I think, at the end of the day, they ended up
18   finding something shorter term at a property in downtown
19   Lake Charles for probably next to nothing, maybe on the
20   order of 2 or $3,000 a month, that we just couldn't
21   compete with.  I think our operating expenses were
22   probably more expensive than that.
23        Q.   Okay.  Do you recall what the operating
24   expenses were at that time?
25        A.   I can't recall off the top of my head, but I

```
 1   can look real quick.  I want to say they were probably
 2   in the 5 to $6 a square foot range across the entirety
 3   of the property.
 4       Q.   Okay.  All right.  And so the Gophr app
 5   negotiations on the second floor, you know, fell
 6   through.  Did you have any interest initially -- and
 7   right now we'll talk about before Hurricane Laura.  Was
 8   there any other interest in the second floor?
 9       A.   Not that stands out.  Let me just look.  Not
10   that stands out, Ms. Payne.
11       Q.   And at the time, you said the first floor was
12   leased out by GSA.
13       A.   That's correct.
14       Q.   And then when was that -- when you became
15   involved in 2019, it was already leased out.  Was there
16   expiration of that lease?
17       A.   Yes.  There was an expiration of the GSA lease
18   in March of 2022.
19       Q.   And did you assist Eaux Holdings in attempting
20   to extend that GSA lease?
21       A.   Yes, I did.
22       Q.   Okay.  And at the time of Hurricane Laura, was
23   the signed lease on the GSA -- the first floor of the
24   GSA, was that ready to go?  Was it extended at that
25   time --
```

```
 1        A.    No, ma'am.

 2        Q.    -- or were you still negotiating?

 3        A.    We had -- we were still negotiating.

 4        Q.    Okay.  What about today?

 5        A.    We -- that lease has been signed and was

 6   signed, I believe, in May.

 7        Q.    In May of 2021?

 8        A.    Of 2021.

 9        Q.    And you said -- you mentioned earlier that the

10   lease was a -- I believe you said a modified gross.  I

11   guess we could take the opportunity to go through those

12   definitions now, and then you can kind of explain the

13   current GSA lease.

14        A.    Yes.  So modified gross -- let me get out of

15   this and get back to -- I'm trying to get back to Zoom.

16   Can you see me?

17        Q.    Yes.

18        A.    Okay.  There we go.

19             Modified gross is where -- is a lease term

20   whereby the lessor, or the owner, charges a rent amount

21   which includes some operating expenses but not all of

22   the operating expenses.  A full-service lease is where

23   the owner or lessor leases a space to a tenant.  And in

24   that rental rate, all the operating expenses are

25   included.
```

1          And then conversely, a net lease or triple net

2     lease or absolute net lease is where a landlord -- a

3     lessor or an owner charges a base rent plus operating

4     expenses to the tenant as -- payable as additional rent.

5          Now, to your question -- or to your point, the

6     federal GSA lease is a modified gross lease.  They will

7     enter into a lease agreement where the owner will state

8     a lease rate that includes property taxes and insurance,

9     fixed.  And then the other operating expenses, of

10    utilities, janitorial, snow blowing, grass cutting,

11    window washing, change from year to year with an annual

12    adjustment.

13        Q.   Okay.  And so for the GSA lease, what exactly

14    operating expenses are included in the lease -- in the

15    rental price?  Do you know off the top of your head?

16        A.   We included all of them.  Property taxes,

17    insurance, grounds upkeep, a maintenance reserve, grass

18    cutting, window washing, et cetera.  So all of them are

19    included in the numbers that we quoted to the GSA.

20        Q.   Okay.

21        A.   But we will not get annual adjustment based

22    upon insurance or -- primarily insurance.

23        Q.   Do you recall what the lease -- like the square

24    footage, the price that GSA has for the first floor?

25        A.   The GSA, their lease -- let's see.  They have

1    about 7500 square feet, more or less.  Bear with me.

2    They rank somewhere in the $26 per square foot range

3    for -- is there a specific reference point you want me

4    to look at on your FileShare, or do you want me just to

5    dig?

6        Q.   No.  I mean, I was just asking you off the top

7    of your head.  So you said about $26 a square foot?

8        A.   Somewhere in that range, yes, ma'am.

9        Q.   Okay.  And so that lease -- this modified gross

10   lease at about $26 a square foot, that's been extended

11   and it's a 15-year term, correct?

12       A.   It's a 17-year term with 15 years' firm term.

13   So after 15 years, they can -- they can move out.  They

14   generally will do a firm term short of the total term to

15   give themselves time to strategize on new bid

16   specifications, et cetera.

17       Q.   Okay.  And in your industry, this lease with

18   the GSA, that's a pretty good deal, right?

19       A.   Yes, ma'am.

20       Q.   It's a 15- to 17-year term?

21       A.   Yes, ma'am.

22       Q.   With a governmental agency, that's a good

23   lease?

24       A.   It is.

25       Q.   Okay.  So for the second floor -- and again,

1  we're still talking about pre-Hurricane Laura.  So you

2  had the interest with the Gophr app that didn't go

3  through, and you said you can't recall any other

4  interest.

5          Is there a reason that you think the space

6  wasn't leasing and there wasn't much interest in it?

7      A.   I think that at the time we probably had too

8  much supply in the market, primarily, and not

9  enough -- you know, simple economics:  Too much supply,

10 not enough demand at the moment.

11         Our area economy had gone through a bit of a

12 downturn.  Fiscal year 2018 was the high water mark for

13 the local economy in terms of retail sales across

14 Calcasieu Parish.  The 2015 total retail sales number

15 for Calcasieu Parish was a little over $5 billion.  In

16 fiscal year 2018, it grew to $8 1/2 billion.  And then

17 in fiscal year 2020, it flattened back down to

18 $5.5 billion.  So we had a bit of a softening in the

19 economy.

20     Q.   So what about the rate that you were seeking on

21 the second floor?  Was the rate comparable?  Do you

22 recall what it was listed for?

23     A.   It was -- we listed for $4,800 a month plus

24 operating expenses, give or take a few bucks.  We were

25 aggressive in the market.  We were willing to try to get

1   some -- some interest in the property, try to get the

2   tenants -- try to get the space filled up.

3       Q.   And when you say that you were aggressive in

4   the market, does that mean it was priced low?

5       A.   Lower than the market comparables, to try to

6   attract interest.

7       Q.   And then you said when Gophr app, you think

8   they found something considerably cheaper, do you recall

9   how off you were in the lease comparables there?

10      A.   I don't recall.  I believe the -- the

11  motivating factor on that at the time, I believe the

12  person that they ended up leasing from may have been an

13  investor in their operation, and it was a startup

14  company.  So it -- it may have been -- there was more

15  than one financial consideration that drove them to make

16  that decision, I believe.

17      Q.   Okay.  I want to look at -- just so I can

18  understand some of these numbers, I want to look at

19  Latter & Blum 19.  I believe this is Tab E.

20              THE COURT REPORTER:  And just for my

21  purposes for the record, does the tab number correspond

22  with the exhibit number, like E would be 5?  Does that

23  make sense?

24              MS. PAYNE:  Yeah, we could just do it like

25  that.  That way, when I send you the documents, I can

```
 1   send you the tab.  This is -- the tab number
 2   corresponded with like an electronic notebook.  But we
 3   can just do it with a tab number for the exhibits.
 4                 (Discussion off the record.)
 5                 MS. PAYNE:  Let's go ahead and mark it
 6   with the tab number.
 7                    THE COURT REPORTER:  Okay.
 8                    (Exhibit 5, remotely introduced and
 9                    provided electronically to the reporter.)
10      A.   Ms. Payne, you stated folder E; is that
11   correct?
12   BY MS. PAYNE:
13      Q.   Yes.
14      A.   Okay.
15      Q.   And the Bates Number is Latter & Blum 19.
16      A.   Yes, ma'am.  Okay.  I see it.
17      Q.   Okay.  So this appears to be an Excel
18   spreadsheet.  Is this something that you prepared?
19      A.   Yes, ma'am.
20      Q.   Okay.  And it's a -- I believe like a
21   comparable with what the potential lessee offered and
22   what the counteroffer is; is that correct?
23      A.   Yes, ma'am.
24      Q.   Okay.  And if we look on the, you know, first
25   few columns, it comes out the average rate per year.
```

1    That would be $10.37.  Do you know, is that net modified

2    gross?

3         A.   That would be modified gross.  We were not

4    going to include janitorial, but that was going to

5    include property taxes and insurance.

6         Q.   Okay.  So the potential lessee, their offer was

7    about $10 a square foot a year?

8         A.   Yes, ma'am.

9         Q.   Okay.  And your recommended counteroffer was

10   about $13 a square foot per year?

11        A.   Yes, ma'am.

12        Q.   And again, that's on a modified gross.  And

13   janitorial would have been the only thing that was not

14   included?

15        A.   Correct, except for we were going to reevaluate

16   electrical consumption after six months.

17        Q.   Okay.  Okay.  I just wanted to make sure I

18   understood some of those numbers there.

19             And then if you will look at Tab F.  This is

20   Latter & Blum 122.

21                  (Exhibit 6, remotely introduced and

22                   provided electronically to the reporter.)

23        A.   Yes.

24   BY MS. PAYNE:

25        Q.   This looks to be like a draft of a lease

1    contract?

2        A.   Yes, ma'am.

3        Q.   Okay.  And if you look at Section 1, Term.

4    "The term of this lease shall be for a period of

5    36 months beginning on September 15, 2019, or upon

6    completion of lessor repairs."

7             Do you recall what those lessor repairs would

8    have been?

9        A.   I think they wanted -- let me look.  I believe

10   they -- from what I recall, I think they

11   wanted -- actually, I don't know -- I don't recall

12   exactly what they wanted, Ms. Payne.  I apologize.

13       Q.   No problem.  But they were requesting some

14   repairs?

15       A.   Repairs or improvements.

16       Q.   Or improvement.  Okay.

17            Sorry.  I'm looking at this.

18            Okay.  So prior to Hurricane Laura, the only

19   real interest or negotiations for the second floor was

20   this Gophr app which fell through.  And there

21   was -- wasn't any other interest on the second floor

22   prior to Hurricane Laura; is that correct?

23       A.   That's correct.

24       Q.   Okay.  And after Hurricane Laura, did you start

25   getting interest in leasing the second floor?

```
 1        A.    Yes, ma'am, we did.

 2        Q.    I'm sorry.  I'm going to back up one second.

 3   Prior to Hurricane Laura, did you ever reduce the price

 4   of the listing?

 5        A.    I don't believe we -- no, actually, we did.  I

 6   think we lowered it.  I don't recall specifically what.

 7   But I think maybe in conversation, we talked about

 8   lowering the price.  I don't recall if we -- if we

 9   signed anything.  It may have just been verbal.

10        Q.    Can you look at Tab G?

11              (Exhibit 7, remotely introduced and

12               provided electronically to the reporter.)

13   BY MS. PAYNE:

14        Q.    This is Latter & Blum 583.

15        A.    Okay.

16        Q.    And this is an e-mail from November 2019, so

17   this was a few months after you initially listed it in

18   June 2019.

19        A.    There you go.  Yep.

20        Q.    And so when you offered her a one-year rate of

21   5500 with no janitorial included, do you know what that

22   correlates to of like square footage price?  We talked

23   earlier about, you know, $14 a square foot or $10 a

24   square foot.  Do you know what that correlates to?

25        A.    66 -- 66,000 -- $9.50 a foot, ballpark.
```

```
 1      Q.   And that would have been a modified gross?

 2      A.   Yes, ma'am.

 3      Q.   So it was on the market for about $9.50 a

 4 square foot with no janitorial included --

 5      A.   That's correct.

 6      Q.   -- in November 2019?

 7      A.   That's correct.

 8      Q.   Okay.  So let me go back.  So after Hurricane

 9 Laura, you said you had some interest in the property at

10 that point?

11      A.   Yes, ma'am.

12      Q.   And is that -- you mentioned one of the issues

13 was the market, too much supply and not enough demand

14 pre-Hurricane Laura.  So post-Hurricane Laura, I

15 understand there was a lot of properties damaged in the

16 hurricane?

17      A.   That's correct.  We -- our multi-tenant office

18 market pre-Hurricane Laura was a little over

19 850,000 square feet of total -- total space.  As a

20 result of Hurricane Laura, we lost about 40 or

21 45 percent of the total inventory of multi-tenant office

22 properties over 5,000 square feet.

23      Q.   Okay.  And -- so right -- Hurricane Laura

24 occurred in August 2020.

25      A.   Yes, ma'am.
```

1    Q.   When was your first interest in the second

2   floor?

3    A.   Within a few weeks.  We had interest from a

4   behavioral health group called BHG specific to that

5   building.  We can talk about that specific inquiry and

6   subsequent correspondence after this.

7        But generally speaking, after BHG, there

8   was -- I was fielding calls for different state

9   agencies -- state government agencies looking for office

10   space.  They weren't quite as aggressive as private

11   enterprise at the moment.  We had been in contact with

12   some representatives of GSA, at a very general level, of

13   trying to assess what they might need in the market and

14   how that might intersect with Esplanade Street as well

15   as other listings -- other office listings that I had in

16   the market.

17    Q.   So you obviously, like you said, you had about

18   17 to 20 transactions at a time.  You had other areas --

19   other buildings that you were also offering and trying

20   to lease out as well as 620 Esplanade, correct?

21    A.   That's correct.

22    Q.   Okay.  And we believe the behavioral health

23   group -- and I think we'll discuss that when we get into

24   your report, because you attached that correspondence as

25   an exhibit.  But other than behavioral health group, you

```
 1   said you spoke with some state agencies, spoke with GSA
 2   on a general level.
 3          Were there any -- you know, was there any
 4   interest, you know, letters of intent, anything like
 5   that --
 6   A.   There was some interest from a company called
 7   Richard Industrial Design.  I showed them the property.
 8   They ended up leasing at another office location that I
 9   had listed.
10   Q.   Okay.  And what were they -- what was the
11   square footage they were looking for?
12   A.   In a perfect world, they were looking for about
13   10,000 square feet of office space.  They ended up
14   leasing 7,000 square feet on a three-year lease at
15   814 West McNeese Street.
16               THE COURT REPORTER:  What was the name of
17   the street?
18               THE WITNESS:  814 West McNeese Street.
19               THE COURT REPORTER:  Thanks.
20   BY MS. PAYNE:
21   Q.   And that's a property you were handling as
22   well, the West McNeese Street?
23   A.   Yes, ma'am.
24   Q.   Okay.  And -- so you showed them the property
25   at 620 Esplanade.  They were interested in 10,000 square
```

1  feet.  And I understand the second floor at

2  620 Esplanade is about 7,000, 6,000?

3      A.   It's about 7,000.  That's correct.

4      Q.   Okay.  So you showed them the property.  What

5  happened after that?  Did you have any other

6  communications, any other -- did they make an offer?

7      A.   Richard Design ended up moving into the

8  814 West McNeese Street because they could get into it

9  sooner than we could ultimately deliver at -- at

10  Esplanade.  We had -- we had comparable square footage

11  of what they ended up leasing.  We had adequate parking.

12          Ultimately, Richard needed to be in

13  something -- in office space in as short a time frame as

14  possible, and they ended up going with the McNeese

15  Street option.

16      Q.   Do you know when they moved into the McNeese

17  Street property?

18      A.   I want to say December or January.

19      Q.   I'm going to get you to look at Tab S.

20      A.   Let me clarify.  December 2020 or January 2021,

21  just so we're not vague.

22      Q.   If you could look at Tab S.

23              (Exhibit 19, remotely introduced and

24               provided electronically to the reporter.)

25  BY MS. PAYNE:

1    Q.   And this is an e-mail from you to Joey Odom in

2    November of 2020.

3    A.   Uh-huh.

4    Q.   And you say, "Good afternoon, Joey.  In regards

5    to potential tenants for the second floor or the

6    entirety of the building, please see highlights below."

7         And number one, you have Richard Design Group,

8    and you say that they expressed an interest in leasing

9    the entirety of the building.

10        So were they only interested in 620 Esplanade

11   if they could rent the entire building?

12   A.   At the time.  Their primary focus was trying to

13   get into at least 10 now square feet.  Their -- after

14   this, they reduced their requirement and were willing to

15   live with 7,000 square feet.

16   Q.   Okay.  It wasn't an option for them to lease

17   the entirety of the building at 620 Esplanade, correct?

18   A.   That's correct.

19   Q.   The first floor was already leased out by GSA?

20   A.   The first floor was leased, and it was under a

21   tolling agreement where -- we can get into that in

22   another time frame when you're ready.  But there was a

23   commitment for the GSA space that -- for the first-floor

24   space that kept us, at the time, from leasing the first

25   floor to anybody else.

1    Q.   Okay.  And Richard Design Group, do you know

2   what the rate was when they moved into McNeese Street?

3    A.   $27 a square feet.

4    Q.   Is the McNeese Street property comparable to

5   the 620 Esplanade property?

6    A.   It's a little nicer.  Doesn't have quite

7   the -- all of the parking that 620 Esplanade has.

8   Three-story building.  Yes, it is a little bit nicer

9   than Esplanade at the time.

10    Q.   And the McNeese Street property, was it damaged

11   during the hurricane?

12    A.   Very, very minor, nothing that --

13    Q.   Minor damage?

14    A.   Very minor, nothing that prohibited tenants

15   from being able to function in the space.

16    Q.   And that McNeese Street, there was no tenant at

17   that space prior to Hurricane Laura that Richard Design

18   Group moved into?

19    A.   There was a tenant there on a month-to-month

20   basis that was -- was wanting to get out.

21    Q.   Okay.  And so we'll go through the rest of this

22   e-mail where you lay out potential tenants.

23        And I'm sorry.  One more thing with Richard

24   Design Group.  Were there any letters of intent or do

25   you have any communications with Richard Design Group

1    regarding their decision to go with another property?

2        A.   There was no letter of intent.  And I don't

3    believe I have -- let me look.  No, ma'am, not that I

4    recall.

5        Q.   So no documentation to show that they

6    wanted -- that they could not lease the 620 Esplanade

7    because of the timing?

8        A.   Not that I recall, Ms. Payne.

9        Q.   Okay.  And in your e-mail you also say, "I will

10   go back and capture e-mails and texts to substantiate

11   the leads."

12          Do you do a lot of your communications on

13   potential leases through text messaging?

14       A.   Not very often, but these were kind of unusual

15   times.  We were -- we were -- our office was displaced.

16   I was helping other clients navigate insurance matters

17   and recovery matters.  So I wasn't constantly at

18   my -- at my desk.

19       Q.   As a part of the subpoena that Scottsdale

20   issued to Latter & Blum, did you go back and check

21   through your text messages to see if you had any

22   responsive information there?

23       A.   No, ma'am.

24       Q.   Would you still have any text messages from

25   this time period?

1        A.    Absolutely.

2        Q.    Okay.  If I could ask you to go back and look

3    through those and see if you have anything responsive to

4    our subpoena, because the subpoena requested all

5    communications regarding, you know, proposed leases at

6    the property.  If you have any text messages, we would

7    ask that you provide those to us.  You don't have to do

8    it right now.

9        A.    Sure.  Understood.

10       Q.    Okay.  Okay.  So Number 2 on this e-mail was

11   GSA/bureau of environmental safety?

12       A.    Yes, ma'am.

13       Q.    Could you tell me about this potential tenant?

14       A.    Bureau of environmental safety, I believe they

15   were actually the previous -- they had previously been

16   upstairs on the second floor, and I want to say that

17   they ended up going to -- they did not submit an offer

18   to us to lease.  Well, let me -- hang on.  Let me walk

19   that back.

20            So they were wanting a short-term lease.  We

21   were -- we were trying to get longer-term commitments

22   for the space.  Given the damage in the market, GSA's

23   normal bid solicitation and request for leases can take

24   a year or two.  They were not willing to go outside of

25   their procurement code, which says if they go out for

1    long -- you know, for a longer-term commitment, it has

2    to be based upon bid specifications submitted to market

3    participants that meet the minimum requirements.

4         Short of that, for emergency leases, they were

5    only willing to do anywhere from 15- to 24-month leases

6    firm term.  And we were more inclined to try to find a

7    longer-term tenant for that second-floor space.

8         Q.   Okay.  So Mr. Odom was not interested in a

9    short-term lease, which is the only thing these

10   governmental, GSA entities were offering at the time?

11        A.   At the time, yes, ma'am.

12        Q.   Okay.  And so again, there was no offers or

13   letters of intent for the GSA/BESE, and there was no

14   interest on Mr. Odom's part in leasing for a short time

15   period?

16        A.   That's correct.

17        Q.   Okay.

18        A.   At the time.

19        Q.   So does the same thing apply for Number 3,

20   GSA/DOD, armed services recruitment center?

21        A.   Yeah, they were wanting short-term.

22        Q.   Again, a 12- to 15-month lease?

23        A.   24 months tops.

24        Q.   Okay.  And Mr. Odom was not interested in a

25   short-term lease for the second floor at that time?

1    A.    I think things were moving so quickly that they
2    ended up solving their own problem -- their own needs
3    before we could even --
4    Q.    The GSA/DOD potential tenant?
5    A.    Yes, ma'am.
6    Q.    Okay.
7    A.    They had previously been in a retail setting on
8    Ryan Street in a grocery-anchored strip center.
9    Q.    Okay.  And the GSA/BESE, you have in here that
10   they were a previous Cap One tenant.  Is that the
11   Capital One building?
12   A.    Yes, ma'am.
13   Q.    And that's in downtown Lake Charles?
14   A.    Still is.  Yes.
15   Q.    Is that building -- pre-Hurricane Laura, is
16   that building comparable to 620 Esplanade?
17   A.    No, no.  Capital One Tower is a -- was -- well,
18   it's still standing but not in commerce.  It's a
19   21-story, 354,000-square-foot, multi-tenant office
20   tower.
21   Q.    Okay.  Okay.  And again, I think we'll get
22   into -- the last one on this list is the Behavioral
23   Health Group, and we will get into that when we get to
24   your expert report since you attached that
25   correspondence as an exhibit.

1          Okay.  So what about right now?  Is there any

2     interest in leasing the second floor today?

3          A.   There is from a -- a state government

4     office -- a state -- State of Louisiana, Department of

5     Health and Hospitals.

6          Q.   Okay.  And what -- is it in negotiations right

7     now?  What's the status of this particular lease?

8          A.   It's in negotiations.  The State of Louisiana

9     does not do letters of intent.  They take salient lease

10     data, and then they process their own forms for what

11     they'll call an RL2, which is a request to lease, or

12     RL2A.  I don't know exactly the terminology but close

13     enough.

14          And so they prepare -- at the Department of

15     Health level, they prepare those internal documents to

16     work up to their department executive branch.  And from

17     there, once that RL2 is approved, then it goes to the

18     office of facility planning to construct a lease

19     document.

20          Q.   Okay.  And how far are you -- I'm sorry.  Go

21     ahead.

22          A.   The RL2 I do not believe has been signed off on

23     by Department of Health and Hospitals yet but should be

24     in fairly short time frame and then sent to office

25     facility planning.

1    Q.   Okay.  And what are the lease terms for this

2  tenant?  You said Department of Health and Hospitals,

3  correct?

4    A.   That's correct.

5    Q.   Okay.  What are the lease terms?

6    A.   What we've discussed is a two-year lease term

7  with a few three-month options to extend to a maximum of

8  three years.  And that is at a gross rental rate

9  of -- we've still been working on that.  What was

10  submitted is an annual rent of $167,499, an approximate

11  total rate of $21.75 a foot.

12    Q.   And that's gross, not modified gross, so that

13  means everything is included in this 21.75?

14    A.   Yes, ma'am.

15    Q.   Okay.

16    A.   And the operating expenses are $8.54 a foot.

17    Q.   Okay.

18    A.   With a net rentable square footage of

19  7700 square feet.

20    Q.   And what are you looking at right now to give

21  me that information?

22    A.   I am looking at a -- the worksheet they have

23  that I had finished last week.

24    Q.   That you finished last week, you said?

25    A.   Yes, ma'am.

1      Q.   Okay.  Could we get a copy of that worksheet,
2  please?
3      A.   I'd be happy to send it to you.  I'll e-mail it
4  to the group.  Is that fair?
5      Q.   Yes, yes.  And so how long do you anticipate
6  that final process going, of the RL2A being approved by
7  the office of facility services?
8      A.   I would hope that inside of a week to ten days
9  that the RL2 would have made it to the office of
10  facility planning.  And probably a week after that, hope
11  to have a lease document for --
12      Q.   And when do you anticipate a move-in date?
13      A.   Probably 15 to 30 days from lease execution.
14      Q.   15 to 30 days?
15      A.   Yes, ma'am.
16      Q.   And is any work being done on the second floor
17  right now that is particular to this tenant?  Have they
18  requested any modifications?
19      A.   They requested an additional bathroom, but
20  that's -- we haven't started that work.  We're not going
21  to start the work until we know we have a signed
22  agreement.
23      Q.   They requested an additional bathroom on the
24  second floor?
25      A.   Yes, ma'am.

1    Q.    Right now is there only one restroom?

2    A.    There's two public restrooms.  They've asked

3    for an employee restroom inside the lease space.

4    Q.    Okay.  Is that the only request that they've

5    had?

6    A.    Putting up one -- one wall and a doorway to

7    turn one room into two smaller interview rooms.

8    Q.    And these are all expenses that Eaux Holdings

9    would have to undertake to deliver this space under this

10   lease; is that correct?

11   A.    Yes, ma'am.

12   Q.    The additional restroom and the adding of the

13   doorway?

14   A.    Yes, ma'am.

15   Q.    Do you recall the cost of these expenses?

16   A.    I believe, all in, in the 50 to $60,000 range,

17   was the budget estimate.

18   Q.    Is there a potential -- I know you said the

19   lease term was, you know, max three years.  With these

20   types of governmental entities, is there potential for

21   them to renew at the end of that lease period?

22   A.    They'll have to go -- because they're over

23   5,000 square feet, they would have to go out to public

24   bid.  The state procurement code for leasing, if the

25   request is for more than 5,000 square feet, it has to go

1   out for public bid.  If it's less than 5,000 square

2   feet, it can be a negotiated lease.

3       Q.   Okay.  And so is it out for bid right now?  Is

4   that how Eaux Holdings received this?

5       A.   No.  This is going to be procured through an

6   emergency procurement allowance based upon the damage of

7   Hurricane Laura and Delta.

8       Q.   Okay.  And so when was your first contact with

9   DHH on this -- the lease of the second floor?

10      A.   I had spoken with the director of the office of

11  facility planning, who is now retired, but his name is

12  Randy Janies.  And I've known Randy for 20 years in

13  working on multiple state leases.

14          He had reached out to me in a phone call

15  to -- responding to my call to him.  Excuse me.  He

16  returned my call.  And let him know that if he had

17  agencies that were needing space, to please keep me in

18  mind, call me if they needed something.

19          And so he -- I believe he directed Rebecca

20  Harris, with Department of Health and Hospitals,

21  Medicaid eligibility, to me probably in mid-spring of

22  this year, 2021.

23      Q.   So mid-spring, about what month?  March?

24  April?

25      A.   March or April.

1     Q.   And you've been in negotiations with them from
2  March/April through today?
3     A.   Conversations, yes.
4     Q.   Okay.
5     A.   And subsequent negotiations in the last few
6  weeks.
7     Q.   Okay.
8     A.   Last month and a half.
9     Q.   If you could look at Tab W.
10               (Exhibit 23, remotely introduced and
11               provided electronically to the reporter.)
12     A.   All right.  Which number?
13  BY MS. PAYNE:
14     Q.   I'm sorry.  One second.  597.
15          This is an e-mail to you from Deryl Cresie.
16     A.   That's correct.
17     Q.   Okay.  And it says, "DCFS...Esplanade Street
18  floor plan is to remain as presented and we can do $23 a
19  square foot.  The building modifications requested were
20  exorbitant and not practical."
21          What does that mean?  Is DCFS the same thing as
22  the DHH lease, or is this a separate entity?
23     A.   This is separate.
24     Q.   Okay.  And so what is this one about?
25     A.   This particular DCFS agency -- DCFS had two

1  locations looking for office space.  One, they were

2  looking for an eight- or nine-month lease agreement.

3  And then the other, at the time, they were looking for

4  up to two years.  And needed to get into something as

5  quick as possible.  They ended up going to a property in

6  Sulphur -- south of Sulphur at $23 a square foot.

7      Q.   So this e-mail in April -- the end of

8  April 2021, when you're saying the modifications

9  that -- is it the modifications that DCFS requested were

10  exorbitant and not practical?

11     A.   That's right, as it relates to DCFS.

12     Q.   So they were still in the market in April of

13  2021, but what they were asking for -- is that what

14  we're saying, the modifications to the second floor, as

15  far as a floor plan or adding a bathroom or something to

16  that effect?

17     A.   That's correct, at that moment in time, yes.

18     Q.   Do you recall what modifications they were

19  requesting?

20     A.   I don't recall.

21     Q.   And so this potential tenant fell through

22  because Mr. Odom wasn't willing to give the

23  modifications that DCFS were requesting?

24     A.   And primarily because of the term.  We were

25  still trying to get a longer-term commitment.

1       Q.   Okay.

2                  MS. PAYNE:  Before we get into your expert

3       report, I think we can take a quick restroom break.

4                  THE WITNESS:  Okay.  Fair enough.

5                  THE VIDEOGRAPHER:  We are off record,

6       11:21 a.m.

7                  (A break was taken from 11:21 a.m. to

8                  11:29 a.m.)

9                  THE VIDEOGRAPHER:  We are back on the

10      record at 11:29 a.m.

11      BY MS. PAYNE:

12      Q.   And so, Andrew, back to the second-floor lease

13      with the DHH.  You said you started negotiating in March

14      or April of this year.  And to date, we are August, you

15      still don't have a signed lease.

16                  Is that because the process in getting a lease

17      with a state agency just takes a long time, or were

18      there other issues?

19      A.   It typically takes a long -- takes a little bit

20      of time.  It can take two to three months to get

21      to -- to get from discussion of terms to occupancy or

22      lease execution.

23                  We did a -- we did one for another property

24      owner for a lease that was less than 5,000 square feet,

25      and that went a little quicker just because of the

1    different set of constraints on something less than
2    5,000 feet.
3        Q.    Okay.  Okay.  We will get into your expert
4    report now.
5              Have you ever testified as an expert in any
6    lawsuit?
7        A.    I have.  It wasn't a real estate matter, but I
8    have testified as an expert witness before, yes, ma'am.
9        Q.    Okay.  And what was your expertise in?
10       A.    It was in catering at the time, from my
11   previous career.
12       Q.    Catering.  That's interesting expert -- expert
13   report there.
14       A.    Yeah.
15       Q.    Okay.  So that's the only time that you've ever
16   testified as an expert?
17       A.    Yes, ma'am.
18       Q.    And that would have been -- I believe you got
19   out of the catering business about 2004, so that would
20   have been prior to that date?
21       A.    Somewhere between 2000 and 2004, yes, ma'am.
22       Q.    Okay.  So you've never testified as an expert
23   in real estate?
24       A.    No, huh-uh.
25       Q.    Have you ever been consulted as an expert in a

1    lawsuit for real estate?

2         A.   No, ma'am.

3         Q.   Okay.  Are you a licensed appraiser?

4         A.   No, ma'am.

5         Q.   Okay.  Your expert report is dated March 16,

6    2021.  And this is going to be Tab C, Bates Number 112.

7    So in the opening of your report, you said that you have

8    researched market data --

9         A.   I'm sorry.  Say that one more time.  You said

10   Tab -- you said file C?

11        Q.   Yes.

12        A.   Okay.  What I have in C is the listing

13   agreement.

14        Q.   One second.  I'm sorry.  Tab B.  And this is

15   Bates Number Latter & Blum 112.

16        A.   Correct.

17        Q.   Which is dated March 16, 2021, correct?

18        A.   Yes, ma'am.

19        Q.   And in your report, you say that you researched

20   market data regarding professional office lease space in

21   the Southwest Louisiana region in order to measure the

22   missed opportunity for the subject property in the

23   aftermath of Hurricane Laura.

24             Can you explain what you mean by "missed

25   opportunity"?

1        A.    Early on, in the days and weeks after Hurricane

2    Laura, in talking with Joey, we were trying to

3    accurately assess when we could get the property

4    restored and back in commerce so that we could try to

5    capture a decent length of term lease commitment,

6    hopefully a five-year lease, maybe no less than a four-,

7    maybe as much as a seven- to ten-year lease.

8              There was a lot of movement in the market of

9    tenants trying to solidify a physical presence, a

10   physical address, so that they could have employees come

11   back to work.

12             And in those -- and in those weeks in September

13   and October and into November of last year, we were

14   unclear as to -- and that continued on, but the

15   uncertainty, the lack of clarity was when are we going

16   to be able to get the property restoration and rebuild?

17   And there was concerns that we would not be able

18   to -- not have the resources to complete the repairs to

19   get tenants in in a timely fashion.

20        Q.    Okay.  So whenever you say "missed

21   opportunity," then, you're referring to getting the

22   property back in commerce after Hurricane Laura?

23        A.    Can you repeat your question, please?

24        Q.    Whenever you refer in your report that you're

25   measuring the missed opportunity, you're referring to

```
 1   getting the property rebuilt and back in commerce

 2   following Hurricane Laura?

 3        A.   Back in commerce and leased, yes.

 4        Q.   Okay.  And so with this report, what

 5   assumptions are you making as to when the property could

 6   have been back in commerce?

 7        A.   Early in September of 2020, mid-September,

 8   maybe even into early October, the hope and the thoughts

 9   were that we could potentially get renovations completed

10   by December, early -- December 2020, early January 2021.

11   And as time --

12        Q.   And -- I'm sorry.  Go ahead.

13        A.   No, that's -- I'm good.

14        Q.   Okay.  And so where did -- where were those

15   hopes and thoughts coming from to be completed by

16   January 2021?  Where were you getting that information

17   from?

18        A.   Conversation with Joey, conversation with a

19   potential contractor, dialog with Joey regarding where

20   he was on the insurance claim, was he going to have the

21   resources to fix everything he needed to fix, the funds

22   to get through the claim process quickly so that we

23   could get the property rebuilt, restored.

24        Q.   Okay.  So when you say conversations with Joey,

25   so Mr. Odom advised that the building could have been
```

1    completed by December or January -- December 2020 or

2    January 2021?

3         A.   That was the -- the belief we held in

4    September, early October of 2020, was that we had the

5    resources.  We could potentially -- it could be

6    restored.

7         Q.   Okay.  And what was that based on -- what was

8    the belief based on -- putting the resources aside, but

9    what was the belief based on that the property could

10   have been competed by December 2020 or January of 2021?

11        A.   In talking with contractors.

12        Q.   Okay.  And do you recall the contractor?

13        A.   We had conversations with a couple.  We had

14   conversation with Ratcliff Construction out of

15   Alexandria and then through a restoration company, Evan

16   Monheiser with -- I forget his company name.

17        Q.   Encore?

18        A.   Encore.  Encore ended up being the general

19   contractor that Joey went with to complete the work.

20        Q.   And so in your conversations with Encore, are

21   you saying that Encore advised they could have the

22   property completed by December 2020, January 2021?

23        A.   My conversations were primarily with Joey.

24        Q.   Okay.  So you were relying on what Joey was

25   relaying from the contractor?

1      A.   Yes, ma'am.

2      Q.   So in preparing this report, you're relying on

3   the assumption that the property could have been

4   completed in December 2020; is that correct?

5      A.   January 2021 at the latest.

6      Q.   At the latest.  Okay.

7           And you're relying -- that assumption was

8   relying on conversations with Joey Odom as to when the

9   property could have been restored from a construction

10  standpoint?

11     A.   That along with talking with him about what

12  resources did he have at his disposal that could -- if

13  he was -- did he have the means to start full

14  restoration without full benefit of insurance proceeds.

15  And he just -- that was not an option at the time.

16     Q.   Okay.  But your assumption in this report, that

17  the property could have been completed by January 2021

18  at the latest, is based on the construction component,

19  correct, like when physically could the property have

20  been restored?

21     A.   That's correct.

22     Q.   Aside from insurance proceeds or whether Joey

23  had enough money to do it without the insurance

24  proceeds, what your assumption is -- on this report is

25  based on, that the property could have been rebuilt by

1    January 2021 at the latest?

2        A.    Built by -- rebuilt by January 2021 at the

3    latest.

4        Q.    Okay.  And the contractor -- you mentioned the

5    contractor, Encore, who actually performed the

6    construction.

7            Were you aware that Encore was not a Louisiana

8    contracting company?

9        A.    I knew that they were coming from out of state.

10       Q.    Okay.  Were you aware that they initially did

11   not have a Louisiana contracting license?

12       A.    I was not aware of that.

13       Q.    Were you aware that they did not have a

14   Louisiana contracting license until November 19, 2020?

15       A.    I did not know that that -- I don't know that

16   for fact.  But if you're telling me that, then okay.

17       Q.    Okay.  And if they didn't have a Louisiana

18   contractors license until November 2020, they couldn't

19   have started any work on the property at least until

20   November 2020 --

21           MS. BROWN:  I'm going to object -- I'm

22   going to object to the form.

23   BY MS. PAYNE:

24       Q.    So I'll represent to you that under Louisiana

25   law, an out-of-state contracting company cannot work as

```
 1    a general contractor on a project over $50,000 unless
 2    they have a Louisiana contractors license.
 3              And if Encore did not have a Louisiana
 4    contractors license until November 2020, you understand
 5    that they could not have started work on the property
 6    until then, correct?
 7                   MS. BROWN:  I'm going to object to the
 8    form.  It calls for a legal conclusion and it's outside
 9    of his expertise.
10    BY MS. PAYNE:
11        Q.   You can still answer the question.
12        A.   What I'll say is that there were other work
13    items.  There was a roof -- roof -- temporary roof work
14    needed to get done, which was a progress -- a process of
15    using temporary roofing that's going to become part of a
16    permanent solution.  And then there was moisture
17    remediation work that was very lengthy.  And so that
18    there were some other things going on other than waiting
19    for a general contractor.  There were pieces of -- lines
20    of work that were going on.
21        Q.   Were you ever provided a construction schedule
22    from Joey Odom that would show you when construction
23    could have been completed?
24        A.   Not that I recall.
25        Q.   So you were just relying on Joey's statements
```

1   that the contractors advised him that the work could

2   have been completed by January 2021?

3       A.   Pretty much, yes.

4       Q.   Okay.  So we're still on the first paragraph,

5   policies.  You say when you measured the missed

6   opportunity for the subject property.

7            Have you ever been asked to measure a missed

8   opportunity for another client?

9       A.   I measure opportunity all the time.  Whether it

10  is -- whether it comes to fruition or not is whether

11  it's a go or no-go decision.  But I do -- I do

12  calculations of opportunity all the time.  This one just

13  happened to be in the absence of getting a deal done.

14      Q.   Okay.  And so have you prepared this type of

15  analysis and provided these types of exhibits that are

16  attached to this report as a part of these missed

17  opportunities that you've analyzed before?

18      A.   Yes.  I mean, I've put together

19  valuations -- yes.  I've done valuation work before.

20      Q.   Okay.  Now we'll finally move on to the second

21  paragraph.  And you state that a net rent rate of 13.81

22  per square foot should be the baseline for a

23  pre-hurricane perspective, and you cite Exhibit B.

24           And if we could go through Exhibit B --

25      A.   Yes, ma'am.

1     Q.    -- which is Latter & Blum 112.06.

2     A.    Correct.

3     Q.    And this is an exhibit labeled "Market

4  Reconciliation of Lease Variables."

5     A.    Uh-huh.

6     Q.    And you have a lease comparables, Lake Charles,

7  Louisiana --

8     A.    That's correct.

9     Q.    -- June 24, 2020.

10     A.    That's correct.

11     Q.    So did you prepare this document in June of

12  2020?

13     A.    That document was prepared in June of 2020 for

14  an owner of a building leased to a real estate company

15  that I had referenced in a -- earlier in this

16  deposition.  So, yes, this is a -- indicative of a

17  report I had prepared 14 months ago.

18     Q.    And prepared separately and not with regards to

19  this litigation?

20     A.    That's correct.  But some of the

21  comparables -- the comparables used, for the most part,

22  are -- would be comparables I'd use in -- in other

23  assignments.  They're fairly reflective of a

24  widespread -- wide range of the market, from older

25  properties to nicer, newer properties.

1      Q.    Okay.  So the property that you prepared this

2   Exhibit B for, it was comparable to 620 Esplanade?

3      A.    The comparables are, yes.

4      Q.    Okay.  And so this Exhibit B you prepared in

5   June of 2020, prior to Hurricane Laura?

6      A.    Uh-huh.

7      Q.    Okay.  And what did you rely on in preparing

8   this document in June 2020?

9      A.    Exhibit A and then 15 years of experience.

10      Q.    Okay.  We'll go through Exhibit A next, but

11   we'll finish going through this one first.

12           And so you go through the -- the first section

13   is lease comparables, and it lists different addresses

14   and square footage and rental rates, correct?

15      A.    That's correct.

16      Q.    And so these -- for example, 3101 Lake Street,

17   this property is comparable to 620 Esplanade?

18      A.    Yes.

19      Q.    It's in a similar part of town, with similar

20   quality of construction?

21      A.    For this market, yes.  I mean, they're not

22   right next door to one another, but they are in more

23   desired parts of the greater Lake Charles MSA.  They're

24   both two stories -- two-story construction.  3101 Lake

25   Street, at the time, I think had two tenants in it.  So

1    in there, I have that as a single tenant.  It's two

2    tenants.

3         Q.    Okay.  And the rest of the properties on here

4    as well, 805 Bayou Pines, 807 Bayou Pines, are all of

5    these comparable to 620 Esplanade?

6         A.    Yes.  I mean, for our office market, yes.

7         Q.    And you said a second ago that both were in a

8    desirable location.  So 620 Esplanade is in a desirable

9    location in Lake Charles for a commercial business?

10        A.    It's commercially viable.  It's not in a

11   high-crime area.  It's well situated.

12        Q.    And so the first section gives effective rates,

13   which some of them I note are full service gross,

14   modified gross, NNN.

15             So these numbers are all a little bit

16   different, but it's because the type of lease is

17   different, right?

18        A.    That's right, that's right.

19        Q.    And this section, the column, Commencement

20   Date, what does that mean?

21        A.    These are actual -- these aren't just market

22   snapshots.  These are based upon actual transactions

23   that -- that I'm familiar with in -- over the course of

24   my practice here.

25        Q.    Okay.  For all of these properties on this