The 30(b)(6) Deposition of

# Encore, Inc.

Through

# EVAN MONHEISER

In the Matter of

# EAUX HOLDINGS, LLC

vs

# SCOTTSDALE INS. CO.

Taken On

# AUGUST 05, 2021



Exhibit 6

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

EAUX HOLDINGS, LLC

|  |  |
|---|---|
| | CIVIL CASE NO. 2:20-CV-01582 |
| VERSUS | JUDGE:  JAMES CAIN |
| | MAG:  KATHLEEN KAY |

SCOTTSDALE INSURANCE CO.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


VIDEOTAPED 30(b)6 DEPOSITION OF

ENCORE, INC., BY REPRESENTATIVE EVAN MONHEISER


(DAY 1 OF 2)

The videotaped 30(b)6 deposition of ENCORE, INC., BY

REPRESENTATIVE EVAN MONHEISER appearing remotely via

videoconference from Lake Charles, Louisiana was

taken in the above entitled cause, pursuant to the

following stipulation, before Deborah Villien,

Certified Court Reporter, appearing remotely from

Lafayette, Louisiana, on the 5th day of August 2021,

beginning at 9:08 a.m.

```
 1                    REMOTE APPEARANCES

 2   FOR THE PLAINTIFFS: EAUX HOLDINGS, LLC

 3

 4   COX, COX, FILO, CAMEL & WILSON, LLC
     MR. MICHAEL K. COX
 5   723 BROAD STREET
     LAKE CHARLES, LOUISIANA 70601
 6   337-436-6611
     mike@coxatty.com
 7

 8   FOR THE DEFENDANTS: SCOTTSDALE INSURANCE CO.

 9

10   KEOGH, COX & WILSON, LTD
     MS. MARY ANNE WOLF
11   MR. JOHN P. WOLFF, II
     701 MAIN STREET
12   BATON ROUGE, LOUISIANA  70802
     225-383-3796
13   mwolf@keoghcox.com

14

15   ALSO PRESENT:

16   MR. CHARLIE QUIROZ, VIDEOGRAPHER

17   MR. GRANGER STUCK

18   MR. STEVE DUPLANTIS

19

20

21

22

23

24

25
```

```
 1                           I-N-D-E-X

 2

 3   EXAMINATION:

 4   BY MS. WOLF  ......................................6

 5

 6   EXHIBITS:

 7   EXHIBIT 1   (STATE LICENSING BOARD LETTER .......92
                   AUGUST 3, 2020)
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    S-T-I-P-U-L-A-T-I-O-N
 2        It is stipulated that the videotaped 30(b)6
 3   deposition of ENCORE, INC., BY REPRESENTATIVE EVAN
 4   MONHEISER via videoconference is taken on the 5th day
 5   of August 2021, before Deborah Henderson Villien,
 6   Certified Court Reporter.
 7        The deposition is being taken pursuant to notice
 8   and the Federal Rules of Civil Procedure.
 9        The parties hereto waive all formalities in
10   connection with the taking of said deposition, except
11   the swearing of the witness, and the reduction of the
12   questions and answers to typewriting.
13        Counsel for all parties reserve all objections,
14   except as to the form of the question and
15   responsiveness of the answer, at the time of taking
16   said deposition, but they also reserve the right to
17   make objections at the time said deposition or any
18   part thereof may be offered in evidence, with the
19   same rights as if the testimony had been taken and
20   given in Open Court.
21        Before the completion of the deposition, the
22   deponent and/or a party did not request to review the
23   transcript.
24
25
```

```
 1        REPORTED REMOTELY FROM LAFAYETTE, LOUISIANA
 2             Thursday, August 05, 2021 9:08 AM
 3                  THE VIDEOGRAPHER:  We are now on the
 4             record.  Please note that the recordings
 5             will continue until all parties agree to
 6             go off the record.  My name is Charlie
 7             Quiroz.  The date today is August 5, 2021,
 8             and the time is approximately 9:08.  The
 9             name of the witness is Evan Monheiser.  At
10             this time, I would like to ask the
11             attorneys to please identify themselves
12             and the parties that they represent.
13                  MR. COX:  This is Michael Cox.  I
14             represent the plaintiff in the matter,
15             Eaux Holdings.
16                  MS. WOLF:  This is Mary Anne Wolf.  I
17             represent the defendant, Scottsdale
18             Insurance.
19                  MR. WOLFF:  This is John Wolff along
20             with Mary Anne.  I will not be handling
21             the deposition, Mary Anne will, but I am
22             present.
23                  THE VIDEOGRAPHER:  Our court
24             reporter, Debbie Villien, will swear in
25             the witness and we can proceed.
```

1  EVAN MONHEISER, called as a witness at the instance

2  of the defendants, after having been duly sworn, was

3  examined and testified as follows:

4                    COURT REPORTER:  Thank you.  I'll

5               need you to speak up just a tad bit, since

6               you're kind away from the microphone.

7               Perfect.  Thank you.

8                    EXAMINATION

9  BY MS. WOLF:

10     Q.    Good morning, Mr. Monheiser.  Again, my

11  name is Mary Anne Wolf, and I represent Scottsdale.

12  Before we get started, I want to just go through

13  just a couple of housekeeping matters.  You've

14  already said that you have got the two deposition

15  notebooks with binders in front of you.  Throughout

16  this deposition, I will refer to the tabs.  If you

17  notice, there are tabs there.  Those are nothing

18  more than just to help us get to the document.  So

19  there's --

20     A.    Okay.

21     Q.    -- I might say book one or book two or

22  volume one, volume two, and tell you the tab.

23  Inside those tabs it's -- mostly the documents,

24  almost all of them, are the documents that Encore

25  produced.  And in the top right will be what we call

1    a Bates number.  So for the record, since we're all

2    remote, and to make sure the record is clear as to

3    what documents we are referring to, I will always be

4    calling out those numbers.  Also, have you ever

5    given a deposition before?

6         A.    No, ma'am.

7         Q.    Okay.  So some ground rules to help this

8    work well.  I will be asking questions.  I will tell

9    you upfront sometimes it takes me a while to get all

10   the way to the question mark, finished with my

11   question.  Please wait for me to finish, because

12   that makes a cleaner record for the court reporter.

13   She can't take down both your talking and my

14   talking.

15              And then, by the same token, I will then

16   give you a chance to answer.  And I will try not to

17   talk over the top of you.  Sometimes you anticipate

18   what I'm going to ask, and to try to speed things

19   along, you might be, you know, willing to answer

20   before I finish.  But we have to wait for each other

21   to finish questions and answers, okay?

22        A.    Okay.

23        Q.    The other thing is, if I ask a question

24   that you don't understand, please don't answer that

25   question.  Instead let me know that it's not a clear

1  question, and I will try to rephrase it, or clarify

2  it, so that we are on the same page.  Is that -- is

3  that good?

4       A.    Yep.

5       Q.    And the other thing is, and you've

6  already done a very good job, is nodding heads one

7  way or the other isn't going to show up.  It will

8  show up on the video, but it won't show up in the

9  transcript.  So make sure that you respond with a

10 yes, or a no, or some other words, rather than just

11 nodding heads or saying uh-huh.  Is that clear?

12      A.    Okay.  Yes.

13      Q.    Let me start with the deposition notice.

14 If you would go to that first volume, Tab A is what

15 we call the notice of deposition of Encore.  Have

16 you reviewed this deposition notice?

17      A.    Yes.

18      Q.    You understand that you are the witness

19 designated to speak on behalf of Encore today?

20      A.    I'm sorry.  You kind of cut out there

21 right in the middle of that.  Could you repeat that?

22      Q.    Yes.  Do you understand that you are the

23 representative that's been designated by Encore to

24 speak to each of these topics?

25      A.    Yes.

1     Q.    Okay.  You're prepared to do that today?

2     A.    Yes.

3     Q.    All right.  Also if you notice at the --

4  on page 8, we had a request for documents asking

5  essentially to the extent that you had not already

6  produced your entire file related to this matter,

7  meaning the 620 Esplanade property and that project,

8  that you produce documents.  You did give us the

9  natives of the schedules that we had asked for.  And

10  I thank you for that.

11         My question is, are there any other

12  Encore documents related to this lawsuit, or related

13  to the property that's at issue here, 620 Esplanade,

14  the Eaux Holdings property, that you have not yet

15  produced?

16     A.    No.  Everything is in that file.

17     Q.    Okay.  And I ask that because -- and

18  we'll get through -- when we go to the documents,

19  I'll ask -- I might ask you that again.  But I

20  couldn't tell if substantial completion had been

21  reached, or if there were other inspection

22  documents, or perhaps daily logs, that picked up

23  after this date where you may need to supplement.

24         And I understand your answer now is, no,

25  you believe you've given us everything.  But I may,

1    when we get into the documents, ask you if there's

2    something else that you might be able to produce.

3    Do you understand?

4         A.    Yes, ma'am.

5         Q.    But as -- for right now, you don't know

6    of any other documents that you have not produced?

7         A.    I'm not aware of any.

8         Q.    All right.  So let me get some background

9    first.  Can you tell me briefly starting from high

10   school where did you go to high school, and what

11   year did you graduate?

12        A.    I went to Blue Springs High School for

13   two-and-a-half years.  And then I transferred in the

14   middle of my junior year to St. Mary's High School.

15   And I graduated in 2006.

16        Q.    Where is that?  What town is that in?

17        A.    Independence, Missouri.

18        Q.    Okay.  And after high school, did you go

19   to college, or did you start work, or both?

20        A.    I went Kansas City, Kansas Community

21   College for 2 years.  And then I went to University

22   of Central Missouri for 3 years.

23        Q.    Okay.  Do you have a degree from there?

24        A.    Pardon?

25        Q.    Do you have a degree?

 1        A.     No.

 2        Q.     Okay.  And then after you left Central

 3    Missouri, was that the end of your education?

 4        A.     Yes, ma'am.

 5        Q.     Okay.  And what did you do after you left

 6    there?

 7        A.     I became -- I started working some

 8    part-time work doing some trim carpentry, doing

 9    remodels for houses.  And then started working part

10    time for Encore during a job that they needed some

11    assistance on.  And then I think around between 2013

12    and '15, I became a full-time employee working as a

13    demo supervisor, then as a remediation supervisor.

14    And then I started working running jobs all by

15    myself probably around 2016.

16        Q.     Okay.  When you started there in 2013

17    until 2015, what was your title?

18        A.     Anything they could put me up to.

19    Cleaning, labor, supervisor, just small demo,

20    usually rehab teams of demo.  And so I would run a

21    team of six demo guys.  And I just supervised, make

22    sure that if anything is going wrong, I'd report it,

23    everything is going right, I'd report it.

24        Q.     In 2016 did your position or title change

25    with Encore?

1      A.     Yeah, I guess.  I just started doing -- I

2  started running jobs essentially as a

3  superintendent.

4      Q.     Is that -- what is your position with

5  Encore today?

6      A.     Depending.  I'm a superintendent, project

7  manager, and could classify as a project director.

8      Q.     So in the last, say, 2 years that you

9  have been engaged with Encore, can you give me a

10  brief description of what your job responsibilities

11  are?

12      A.     Estimating and direct oversight of

13  superintendents.

14      Q.     All right.  So that means that when a --

15  when there's a job that Encore is interested in

16  submitting a proposal or a bid on, you are an

17  estimator?

18      A.     Yes.

19      Q.     So that means that you get pricing from

20  subcontractors and put that together with insurance

21  costs, bond costs, overhead profit, you figure out

22  how much Encore is going to charge for that

23  particular job; is that correct?

24      A.     Can you repeat that?

25      Q.     Yes.  So as far -- what I'm trying to do

```
 1   is just in a nutshell say what your job is as
 2   estimating.  You get pricing from prospective
 3   subcontractors, and then add into that all the costs
 4   of the job, like bonding, and insurance, and
 5   Encore's overhead and profit, any work that Encore
 6   is going to self perform, and you determine how much
 7   Encore is going to submit as a price for that work?
 8   Is that generally what estimating means?
 9        A.    Yeah.  Yes.
10        Q.    And then you said you are director over
11   the superintendents?
12        A.    I'm a project manager.  I run -- I may
13   run two jobs.  I may run three jobs.  I may, you
14   know, there maybe three jobs with three
15   superintendents that I just -- I have an oversight,
16   and I usually have communications with on a
17   day-to-day basis.  I'm usually not the one that is
18   on site, depending on the job.
19        Q.    For this particular job, the Eaux
20   Holdings project at 620 Esplanade, throughout this
21   deposition, can I just call it the project and we'll
22   understand that we are talking about the Eaux
23   Holdings 620 --
24        A.    Yes.
25        Q.    -- Esplanade property, right?
```

1       A.    Yep.

2       Q.    Or I might say this project --

3       A.    Yes.

4       Q.    -- just for short.  So for this

5  particular project, were you the superintendent, or

6  were you the project manager overseeing a separate

7  superintendent?

8       A.    I actually was both.  I was my own

9  super -- I was my own project manager and my own

10 superintendent.

11      Q.    Okay.  And did you also estimate this

12 particular project?

13      A.    Yes, ma'am.

14      Q.    Before I move away from your work

15 history.  Have you worked for any other companies,

16 firms, other than Encore?

17      A.    No.

18      Q.    Okay.  And you said you started with them

19 in 2013, or did you actually start prior to that?

20      A.    It was around 2013.  I can't remember the

21 date.

22      Q.    Do you have any type of -- do you hold

23 any license or certifications of any type?

24      A.    Can you repeat the question?

25      Q.    Yes.  Do you have any type of

1  certifications, or licenses, something issued by a
2  state agency?  I'm trying to figure out, just in
3  general, what all your areas of expertise are.  And
4  in particular any licenses or certificates?
5      A.    Encore holds a general contracting
6  license in Louisiana.
7      Q.    Does Encore operate in other states as
8  well?
9      A.    Yes, ma'am.
10      Q.    And what other states?
11      A.    Kansas City, Missouri -- sorry.
12  Missouri, Kansas, North Carolina, Texas, and
13  Louisiana, I believe.
14      Q.    Does that mean that Encore has a
15  contractor's license in each of those states?
16      A.    I'm not sure of that.  But as far as
17  having a contractor's license, I'm pretty sure it's
18  Missouri, Kansas City, and North Carolina, and
19  Louisiana.
20      Q.    Okay.  And are you the qualifying party
21  for any of those licenses that Encore holds?
22      A.    I am not.
23      Q.    Okay.  So back to -- I just want to find
24  out for you personally, do you take any type of
25  continuing education or seminars?

1        A.     I do for restoration.

2        Q.     Restoration?

3        A.     Yes.

4        Q.     Okay.  And in a particular year, how many

5    hours of continuing education or seminars do you

6    get?

7        A.     For the past 2 years, I have not had any.

8    But, I mean, before that, it was just classes,

9    three-day classes.

10       Q.     Was that something that was required by

11   any state agency, or by your -- by Encore, or just

12   something that you wanted to do to learn more?

13       A.     It was just something that I needed to

14   learn more.

15       Q.     Okay.  And what is the last seminar or

16   continuing education class that you have taken, what

17   year?

18       A.     I can't remember.

19       Q.     Okay.  Who are the owners of Encore?

20       A.     That would be Don Payne.

21       Q.     All right.  Who are the -- if you know,

22   who's the qualifying party for Encore's Louisiana

23   license?

24       A.     I'm not sure.

25       Q.     All right.  Who do you report to

```
1   directly?  In the last 2 years, who has been your
2   supervisor?
3         A.    That would be Aden Monheiser and Don
4   Payne.
5         Q.    I'm sorry, the first name?
6         A.    Aden.
7         Q.    Aden.
8         A.    Monheiser.
9         Q.    And how is that person related to you?
10        A.    That is my brother.
11        Q.    All right.  Who is Sean Mahoney?
12        A.    He is a project manager for my boss'
13   other company.
14        Q.    What company is that?
15        A.    Purdum Construction.
16        Q.    Say it again, please?
17        A.    Purdum.
18        Q.    Spell it.
19        A.    P-u-r-d-u-m.
20        Q.    Do you ever work with Sean Mahoney?
21        A.    I do not.
22        Q.    Okay.  Who is -- first name is C, the
23   initial is C, and last name is Shoemaker?
24        A.    That is my administrator, Christy.
25        Q.    Okay.  And she works for Encore?
```

1     A.    Yes, ma'am.

2     Q.    And what does the administrator do?

3     A.    A lot of paperwork.  She may be doing

4 closeouts as far as collecting warranty information,

5 lien releases.  She may be reaching out keeping

6 track of W-9s, COIs.  She may be filling out

7 estimates for me, or estimate work order sheets.

8 Just kind of a variety of paperwork items.

9     Q.    Okay.  How many employees does Encore

10 have currently?

11     A.    Around 8 to 10.

12     Q.    And are they located in Kansas, or

13 somewhere else?

14     A.    They are located in Missouri.

15     Q.    Missouri.  Okay.  Is that where Encore's

16 main office is, in Missouri?

17     A.    Yeah.  Our -- I think our registered is

18 in Kansas, but my office is in Missouri.

19     Q.    Does Encore have an office in Louisiana?

20     A.    No.

21     Q.    Has Encore ever had an office in

22 Louisiana?

23     A.    Not that I'm aware of.

24     Q.    I saw the name on the letterhead, Encore,

25 Inc. Insurance Restoration and General Construction.

1   Is that the name that Encore goes by?

2       A.   Yes.

3       Q.   Okay.  And can you tell me what is

4   Encore's business?  What does that mean, insurance

5   restoration and general construction?

6       A.   We handle -- we handle commercial

7   restoration as far as drying, demo, and general

8   construction.

9       Q.   Does that mean that the jobs that Encore

10  takes, for example, you're not going to bid a

11  brand-new construction from ground up?

12      A.   No, we do.

13      Q.   You do.  Okay.  So do you do any -- do

14  you do commercial work for brand-new builds?

15      A.   Yes.

16      Q.   Okay.  You do design, bid, build type of

17  jobs?

18      A.   Yeah.

19      Q.   Okay.  And do you do that for government

20  agencies?  Do you do any of those kind of projects,

21  or is it all --

22      A.   Not necessarily.  I mean, it depends.  I

23  don't know if they are, and/or if some of them have

24  been or not.  I'm not sure.

25      Q.   Okay.  And so the restoration, insurance

1  restoration part of it, we know here for this

2  particular project, that this was a hurricane

3  restoration.  Is it -- is it hurricane restorations

4  that Encore does a lot of, or what other type of

5  restorations is it?

6      A.   It -- it depends.  I mean, it's not just

7  catastrophe restoration.  It's -- I mean, really any

8  type.  Could be overflowed -- overflowing sinks, it

9  could be --

10     Q.   I'm sorry.  I didn't understand that

11 word.  What did you say?

12     A.   It could be overflowing sinks.  Anything

13 from overflowing sinks to, you know, fire lines

14 busting -- freezing and busting.

15     Q.   Okay.  In Hurricane Laura -- when

16 Hurricane Laura hit, how many other projects did --

17 for restoration of Hurricane Laura damage did Encore

18 handle, other than this project?

19     A.   None.

20     Q.   Okay.  What about Hurricane Delta?  Did

21 Encore have any Hurricane Delta projects?

22     A.   No.  Just -- we were just at Eaux, or

23 Four-O.

24     Q.   Okay.  Did Encore attempt to get other

25 Hurricane Laura or Hurricane Delta projects?  In

```
 1  other words, did you bid them, or contact owners, to
 2  give estimates?
 3          A.   I did not.
 4          Q.   Do you know if Encore did?
 5          A.   No.  I'm not aware of.
 6          Q.   Okay.  When you were working on this
 7  particular project, when you were the project
 8  manager/superintendent, were you working any other
 9  jobs in Louisiana in the 2020 through today time
10  frame?
11          A.   No.  Not that I'm aware of.
12          Q.   Okay.  This was your only project Monday
13  through Friday all day?
14          A.   Yes.
15          Q.   So I want to have you walk through and
16  just explain what the restoration construction
17  process is.  And start with, for example, in this
18  particular case, there was a hurricane.  How did you
19  come to meet Joey Odom, or find out about this
20  particular project?  I guess let's start there.
21          A.   It was a referral.
22          Q.   By whom?
23          A.   I don't remember the order that was -- it
24  was either by SRP and/or Skyline.  I wasn't the one
25  that initiated that -- that talk.
```

```
 1        Q.     Okay.  What is SRP?  Who is that?
 2        A.     It's a referral company.
 3        Q.     Where are they located?
 4        A.     I don't know.
 5        Q.     All right.  How do you first become aware
 6   of this Eaux Holdings -- sometimes I call it Eaux
 7   Holdings, sometimes Four-O.
 8        A.     It's okay.  I got you.
 9        Q.     Again, we're talking about the same
10   thing.
11        A.     Yes.
12        Q.     So how did you first come to know about
13   this Eaux Holdings projects?
14        A.     I got -- Aden Monheiser contacted me.
15   One of my bosses contacted me about it.
16        Q.     Okay.  And at that time -- where do you
17   live?
18        A.     Kansas City.
19        Q.     Okay.  Can you give us your home address,
20   please?
21        A.     It is 4313 Eastland Center Drive,
22   apartment 712, Independence, Missouri, 64055.
23        Q.     All right.  So you were there, and your
24   boss contacted you about this particular project; is
25   that right?
```

```
 1        A.    I don't remember my exact whereabouts,
 2   but I should have been around the area.
 3        Q.    Okay.  So were you working another
 4   project at the time?
 5        A.    I don't remember.
 6        Q.    Okay.  And what was your instruction?
 7        A.    They just gave me a call about the job.
 8   Said that Aden was going to go down there.  And if I
 9   could reach out to Skyline to see what they thought,
10   and see if it was a good job for us.
11        Q.    Who was your contact at Skyline?
12        A.    Jeff Major.
13        Q.    Did you ever talk with anybody else about
14   this job, or this project, at Skyline, other than
15   Jeff Major?
16        A.    Yes.
17        Q.    Who?  Who did you talk to?
18        A.    Jim Collins, Jade Bentz.
19        Q.    Say that last name again.
20        A.    Jim Collins and Jade Bentz.
21        Q.    Jade?  Is it Jade?
22        A.    J-a-d-e.
23        Q.    Okay.  And what -- so who did you talk to
24   initially about this project, Jeff Majors?
25        A.    Yes, ma'am.
```

```
 1        Q.    What was that conversation?
 2        A.    I can't exactly remember.  It's just
 3   basic details about the building, about the project,
 4   about the owner.  From what I remember, it was
 5   pretty quick.  Basically because Aden was going to
 6   go down there.
 7        Q.    Okay.  And do you, or Aden, have any
 8   notes on those initial meetings with Skyline?
 9        A.    No.
10        Q.    Do you have --
11        A.    They were just phone conversations.
12        Q.    Just conversations.  Do you have anything
13   in writing from SRP, the referral company, about
14   this particular project?
15        A.    No.  They were just phone conversations.
16        Q.    Okay.  So what was the next step after
17   Aden came down to Louisiana?  Did you come here, as
18   well?
19        A.    I did not.  He actually -- he actually
20   FaceTimed me once he got here.  And so just the
21   FaceTime once he got inside the building.  And just
22   kind of looking around at damages and what needed to
23   be done.  If this would be a job that we would be
24   interested in taking.
25        Q.    Okay.  I want to back off from a minute
```

1   for -- from this particular project and just talk

2   about what the process for Encore is in general on a

3   restoration project.  If you could start from that

4   point when you're there at the site, and you're

5   going to walk the site, and determine what the

6   damage is, and whether or not you are going to take

7   the job.  Can you just fill me in on what those

8   steps are in general?

9        A.   I mean, there is always -- there is

10  always an assessment, moisture readings are taken.

11  I mean, you know, obviously depending on the job,

12  you know, moisture readings are taken essentially to

13  see how much, you know, would be taken out.

14  Estimating for the amount of equipment.  And, you

15  know, I mean, honestly usually it does start with a

16  commitment from the building owner.  And we usually

17  give a rundown of how the process is going to go

18  from start to end.

19          And then usually once that commitment is

20  made, we will spend about a day or so moisture

21  mapping, making demo plans, trying to account for

22  where everything is at, and how it's going back

23  together.  And so we want to make it -- make it easy

24  for us and/or somebody else that may come in to

25  rebuild.  We want to make it easy for them to be

1  able to put everything back together.  So we do make

2  a -- some sort of demo plans.

3          And about, you know, the day or so after

4  that, we do bring -- start to bring in equipment.

5  Again, this is just kind of a generalized schedule.

6  Bring in drying equipment, bring in a demo crew, and

7  bring in a cleaning crew right past -- right behind

8  them.  Usually demo timeline -- there is not

9  necessarily a timeline, depending on how big the job

10 is.  You know, everything is -- once all demo is

11 done, cleaned up, everything is dried, we do, like,

12 dry logs.  We do moisture maps.  Kind of submit

13 everything in a nice little packet and send it off

14 to the owner.

15     Q.    Okay.  And that package that has the

16 drying logs, the moisture maps, did you say demo

17 plans are included there?

18     A.    Yes.

19     Q.    Okay.  Was that provided in this case to

20 the owner of Eaux Holdings?

21     A.    Not that I'm aware.

22     Q.    No, it was not?

23     A.    Not that I'm aware.  We didn't do it, so

24 I don't -- I'm not sure what was provided to him.

25     Q.    Okay.  So what you're discussing there,

1  would that fall into the category of mitigation?  In

2  other words, initially after the loss of the

3  hurricane, or the flood, or whatever it is, you go

4  in and do some cleanup?

5      A.    Yes.

6      Q.    Okay.  So you -- Encore did not have that

7  mitigation aspect for this particular Eaux Holdings

8  project; is that what you're saying?

9      A.    Correct.

10      Q.    Then going back to just in general what

11  Encore steps are.  After you get the commitment from

12  the owner, and you prepare this package for the

13  owner, what is the next step?

14      A.    Again, that's the moisture mapping,

15  identifying walls that need to be removed, how much

16  of that wall needs to be removed.  Whether it's --

17  again, documenting what kind of wall that it is.

18  All of those things are figured out by colors on

19  blueprints, or whether you're sketching the room

20  out, or the building out, yourself.

21           And so it's really -- after that it's

22  demo and documentation and drying.  You are making

23  sure that whenever you put things back, or if

24  somebody else is going to put things back, it's

25  going back the same way that it was originally --

1   it's going back the same way that it was originally

2   before the damage.

3        Q.    Okay.  And when you are -- when Encore is

4   doing this work, are you cognizant of the fact that

5   a lot of times there is going to be insurance

6   coverage involved for whatever the loss is?

7        A.    Depending.

8        Q.    And does that play into your decisions

9   about putting things back the way they were

10  originally, as opposed to, you know, tearing

11  something out and doing something different?  Are

12  you cognizant --

13       A.    Those aren't -- those aren't decisions

14  that are left to me or anybody in our company.

15       Q.    Okay.  So now you are to the point in the

16  process where you have done demo, all the demo that

17  you've determined is necessary, and things are dried

18  out.  So what is the next step to start the

19  reconstruction?  What is Encore's next step after

20  the mitigation part is done?

21       A.    I guess you would say that there's also a

22  drying in factor.  You usually like to dry in while

23  you're drying out.  There's no point in drying if

24  it's going to get wet again.  So, you know, you want

25  to make sure that your building is dried in.  And

1  depending on damages, it might go from tarping a

2  roof to Saran wrap an exterior, setting up a -- some

3  sort of exterior perimeter for -- to limit water

4  coming in.

5          And so usually after that step, we do

6  start to -- if the owner is interested in having us

7  do the estimate, we will start some preliminary

8  requirements at that point.  Reaching out to the

9  owner to see if they have design professionals that

10  they would prefer to use.

11     Q.    Okay.  So the step that you just talked

12  about there is -- in addition to the drying out, is

13  starting to do what you have described as temporary

14  waterproofing measures around the envelope, the roof

15  and the walls, to make sure more water is not coming

16  in.  But those are temporary measures, correct?

17     A.    Yes.  That would be -- that would

18  technically be the drying in phase.  I mean, if it's

19  something easy, you can fix it, if it's not, then

20  you need to take temporary measurements.

21     Q.    Okay.  And when you are doing this work

22  all the way -- the initial mitigation and the drying

23  in factor, do you itemize and break down this scope

24  of work with pricing?  Is that something that you do

25  and give to the owner so they know exactly what the

```
 1   tasks are, and how much is this -- how much cost is
 2   assigned to each task?
 3        A.    Can you repeat that?  There was lot in
 4   the beginning of that.
 5        Q.    Yes.  So we are now talking about the,
 6   you know, the mitigation phase and the drying in
 7   phase.  Do -- does Encore itemize this work, and the
 8   associated cost for that work, like on a piece of
 9   paper or something to give to the owner to say, this
10   is what we're going to do, and this is how much it's
11   going to cost?
12        A.    For -- is this -- is this part of the
13   drying out?
14        Q.    Yes.  The initial mitigation and the
15   drying out.
16        A.    It depends.  Large jobs, they are
17   difficult to estimate.  Smaller jobs you can kind of
18   give a rough amount.  But, I mean, usually depending
19   on the insurance situation, you know, the client may
20   ask for an estimate.  Which again, they can take a
21   while to get those -- that kind of estimate in.  Or,
22   you know, it's assigned and, you know, as much as we
23   want to -- you use the right stuff, you use the
24   right equipment, you are not going to have problems
25   with insurance companies as far as fight back on
```

```
 1  costs.
 2           So they are aware of -- typically aware
 3  of, you know, the cost for equipment, cost for
 4  manpower.  We will submit a -- usually a rate sheet
 5  for our restoration work.  And so they have a
 6  generalized estimate of how much labor costs, how
 7  much equipment costs.
 8       Q.    Okay.  So what is the next step after
 9  drying in?  You mentioned that now you are to the
10  place where you have to decide if the owner has
11  certain design professionals that they want to use
12  to prepare plans and specs for the restoration or
13  the rebuild work, or whether or not they want you to
14  handle that; is that right?
15       A.    Usually it's them.  Again, you -- we want
16  to make sure that if they have somebody that's in --
17  that they would prefer to use, then we would prefer
18  them to use the -- their own design professionals.
19       Q.    Okay.  So once you got the design
20  professionals on board -- of course, it's going to
21  take some time for those design professionals.  They
22  have to come back and bid, correct, and then prepare
23  the plans and specs for the rebuild; is that right?
24       A.    Yes.
25       Q.    Okay.  And then -- so tell me if I'm
```

1  wrong here.  I'm assuming that you're not just

2  waiting around for the design professionals to give

3  you a final set of stamped plans.  That during that

4  part of the work, you are also estimating and trying

5  to get subs lined up; is that correct?

6       A.    Yes.

7       Q.    Okay.  So those two things can happen

8  simultaneous, but you have to have -- that's a yes,

9  right?

10      A.    Yes.

11      Q.    But in order to actually go out and build

12 the work, you do need a design professional to

13 complete the plans and specs, right?

14      A.    Not necessarily.  Depending on what you

15 are doing.  There's, again, design professionals

16 range from architects to interior designers.  Items

17 may be strictly, you know, like, putting up drywall

18 or, you know, items like that, they may not require

19 anything.  But, you know, you want to have the paint

20 color.  So, you know, in those circumstances, I

21 mean, it wouldn't -- you know, you don't need any

22 some sort of approval from anybody to do those.

23      Q.    Okay.  And so what you just said is

24 you're obviously going to have the owner and the

25 tenants that have to give their final approval of

```
 1   selections of materials, whether --

 2        A.    Yes.

 3        Q.    -- it's colors, all of that has to happen

 4   in order for you to order the materials, correct?

 5        A.    Yes.

 6        Q.    You leave time for all of that?

 7        A.    Yes.

 8        Q.    Do you have to get -- submit the work to

 9   the authority having jurisdiction, whether it's, in

10   our case in Louisiana, it's a parish.  Does Encore

11   handle getting the approvals and the permits from

12   the parish, or the authority having jurisdiction?

13        A.    Again, it depends on scenarios.

14        Q.    All right.  Let's go to this particular

15   project, the Eaux Holdings project.  Did Encore

16   handle submissions to the parish approvals and

17   permits?

18        A.    No.

19        Q.    Okay.  Who handled that aspect of it?

20        A.    I don't think anybody did.

21        Q.    Was the -- the work that was done at the

22   Eaux Holdings project, did any of it require

23   submission and approval to the authority having

24   jurisdiction?

25        A.    At the beginning, no.
```

1      Q.      And then at some point, did that change

2    and submissions to the government agency were

3    required?

4      A.      It depends on the item, the itemized --

5    it depends on the item that you are completing.

6      Q.      So, for example, in the Eaux Holdings

7    project, there was ADG, the engineer, redesigned

8    some of the air conditioning system, put their stamp

9    on the plans, they issued a preliminary set, and a

10   final set.  Did that work have to go for approval

11   from the parish?

12     A.      That did not go to approval due to the

13   fact that we started it before they were done with

14   their -- with stamped drawings.

15     Q.      So you're saying the stamped plans that

16   ADG did for air conditioning were never submitted to

17   any of -- any government agency for approval?

18     A.      We started the work before the work --

19   before we got that -- their stamped drawings.

20     Q.      Okay.  And how did that happen?  Were you

21   getting -- were you basing it on their preliminary

22   design?

23     A.      They had a sketch out, yes.  And we

24   reached out to the subcontractor which handled the

25   majority of this.  Reached out to Mitsubishi, and

1   Mitsubishi overrode a lot of the things that the
2   engineer -- from what I could see from one
3   submittal, that Mitsubishi versus ADG wrote.  There
4   were differences.  And it looked like the
5   subcontractor went based upon the submittals that
6   were submitted by Mitsubishi.
7        Q.    When you were saying the word submittal
8   there, you're talking about shop drawings, right?
9        A.    Submittals, equipment.  You know, we're
10  going to use a three ton or a one ton ceiling
11  cassette versus a one-and-a-half ton ceiling
12  cassette.
13       Q.    Let me have you look in book one, or
14  volume one at Tab -- I believe it's Tab E3.  Yeah.
15  Okay.  So this is Encore -- the Bates number is
16  Encore 103.  Do you see that at the top right?
17       A.    Yes.
18       Q.    And actually for the record, let me go
19  ahead and call out the entire Bates number.  It's
20  Encore 103 through 103.08.  This is a proposal by
21  BE-CI, correct?
22       A.    Yes.
23       Q.    Did Encore contract with BE-CI?
24       A.    Yes, we did.
25       Q.    And what was their scope of work?

1      A.    Exterior work.

2      Q.    Did that include exterior walls?

3      A.    Yes.  It included elevations and windows.

4      Q.    All right.  So this is dated October 16,

5  2020, correct?

6      A.    Yes.

7      Q.    All right.  And it says, Dear

8  Mr. Monheiser, thank you for the opportunity to

9  provide a proposal for your project -- referring to

10  the Four-O -- or the Eaux Holdings project.  Do you

11  see down in the third paragraph, it says, BE-CI they

12  are prepared to schedule their services after

13  receiving an executed agreement or a notice to

14  proceed.  Do you see that?

15      A.    Yes.

16      Q.    It's in the third paragraph?

17      A.    Yes, I'm sorry.  I see it, yes.

18      Q.    Look at the next page, which is Encore

19  103.02.  Under 1.2 it says, BE-CI will perform a

20  visual nondestructive survey of the exterior walls

21  and windows of all four elevations.  Did BE-CI do

22  that?

23      A.    Yes.

24      Q.    And then under --

25      A.    I believe yes.

```
 1        Q.    Okay.  Under 1.3, they said they were
 2   going to develop restoration documents.  And they
 3   did that?
 4        A.    That's a broad term.
 5        Q.    Well you're right.  Let's look down at
 6   their scope, 1.3.1 and 1.3.2 under -- it's A, B, and
 7   C.  It says you're going to -- their scope included
 8   removal and replacement of the exterior wall
 9   cladding; is that correct?
10        A.    Yes.
11        Q.    All right.  Removal and replacement of
12   damaged windows; is that correct?
13        A.    Yes.
14        Q.    And removal and replacement of exterior
15   perimeter sealants at the windows; is that correct?
16        A.    Yes.
17        Q.    They developed a set of construction
18   plans that discussed these three items; is that
19   right?
20        A.    Yes.
21        Q.    Is all that work done as of today?
22        A.    Parts of it.
23        Q.    What's not done?
24        A.    The -- I would guess that the -- it
25   changed.
```

1    Q.    Okay.  What -- then tell me what did
2 BE-CI, what was their original plan, and how did it
3 change?
4    A.    The original plans were to attempt to --
5 this has to do with the windows -- to attempt to
6 find components that we could use to make -- I guess
7 to serve as substitutions for what was there.  And
8 that's the item that changed.
9    Q.    Okay.  Let me back up a minute.  And I
10 understand that Hurricane Laura caused broken glass,
11 broken panes from the exterior windows, correct?
12    A.    Yes, there were broken windows.
13    Q.    Do you know about how many?
14    A.    Could you define broken?  Would you call
15 cracked broken?
16    Q.    Yeah.
17    A.    Okay.  Maybe seven or eight.  I'm not
18 exactly -- seven, eight.
19    Q.    That's fine.  I was just trying to get a
20 ballpark.
21    A.    Yeah.
22    Q.    So there were cracked and broken glass.
23 Was there other damage from Hurricane Laura to the
24 exterior -- to the windows?
25    A.    Yes.

1    Q.    Okay.  And what was the Hurricane Laura

2  damage to the windows, other than the broken glass?

3    A.    The portion of the roof that blew off of

4  the building scraped down the side -- I guess, I

5  think it's the west side of the building -- and

6  scratched all the components, including the glass

7  and components.  And there were areas where the

8  mullions, the vertical mullions, the little black

9  pieces that you see that are from the outside, those

10  were dented in.

11         And there was a area that was on the west

12  side of the building.  And I believe it's kind of

13  the north end of that where the windows at a mullion

14  were pushed in at the top.  I -- again, I would say

15  the cap flashing, head flashing, a lot of those

16  items were bent, scratched.  Yeah, I think that's --

17    Q.    Okay.  So back to BE-CI's original plans

18  that they issued.  I see that there was a 90 percent

19  draft issued on November 24.  Does that sound right?

20    A.    I'm not sure of the exact date, but that

21  sounds right.

22    Q.    So what was that original set that BE-CI

23  came up with?  What were they going to do with the

24  windows?

25    A.    It was essentially begin to try to find

1  components to replace parts of the windows.  There
2  were missing components on the inside of the
3  building.
4      Q.    And do you know if the parts that were
5  missing on the inside of the building, was that
6  Hurricane Laura damage, or was that from something
7  else, if you know?
8      A.    I have no idea.
9      Q.    Okay.  So just because I called out that
10  date, if you would look at Tab F3.  This is Bates
11  number Encore 49.  It's just the first page of their
12  specs.  I'm sure we didn't print them all,
13  Mr. Monheiser, because it was such a large --
14      A.    Yes, it's fine.  You just didn't get the
15  submittals.
16      Q.    Right.  And I think that was the whole
17  point, was just as a placeholder --
18      A.    Yeah.
19      Q.    -- and not print the whole thing.  But
20  this is dated November 24, 2020, correct?
21      A.    November 24, 2020, this one is.
22      Q.    Okay.  And it's a draft 90 percent set,
23  correct?
24      A.    Yes, ma'am.
25      Q.    All right.  So at this point, the

```
 1   engineer -- are they architects or engineers; do you
 2   know?
 3        A.    Dorsey is an engineer.
 4        Q.    Okay.  So at this point the engineer had
 5   not completed a set for construction for the
 6   exterior walls and windows, correct?
 7        A.    Correct.
 8        Q.    Which mean that didn't -- you couldn't
 9   order any materials at this point, right?
10        A.    I mean, not necessarily.
11        Q.    Did you have the information you needed
12   from BE-CI to -- if they had not yet finalized the
13   design for the windows and the walls, did you --
14   were you able to order anything?
15        A.    Yeah.  We knew the products that we were
16   going to use and the quantities of product that we
17   were going to use.
18        Q.    Okay.  So at this point on November 24,
19   you knew the product that BE-CI had chosen?
20        A.    It was -- it was our product.  It was a
21   product that the owner and I discussed.
22        Q.    Okay.  That's what I'm trying to figure
23   out is, did BE-CI, did their plans and specs ever
24   show what actually is built, or what's getting built
25   out there today?
```

```
 1        A.     Yeah.  Yes.
 2        Q.     Okay.  And so is the current plan -- tell
 3   me, is it to keep -- essentially keep the window
 4   system the way it is, or is it a replacement of the
 5   window?
 6        A.     Replacement of the window system.
 7        Q.     Okay.  And did -- when you started out
 8   with that work, was it to just replace certain
 9   mullions and glass?
10        A.     It was to replace, yeah, mullions, stops,
11   caps, and, yeah, wet seal interior and out.
12        Q.     That was the original scope?
13        A.     Yes.
14        Q.     Okay.  And I just want to make sure I
15   understand.  I'm certainly not trying to put words
16   in your mouth.  But I'm trying to visualize
17   something that you know very well, and I'm
18   struggling to try to --
19        A.     That's okay.
20        Q.     -- move ahead.
21               Originally the scope was to replace
22   cracked broken glass, scratched glass, dented
23   mullions, scratched mullions, but essentially keep
24   the same system, but just replace all the damaged
25   components.  But that changed to a full replacement
```

1   of the window system; is that --

2        A.    Yes.  In a way it did.

3        Q.    Okay.  Can you --

4        A.    In broad terms, yeah.  There's a lot more

5   to it than just saying you're fixing parts.

6        Q.    Okay.  And then since I -- says it sounds

7   like I didn't say it exactly correctly, but I wasn't

8   wrong either, would you -- rather than me putting

9   words in your mouth, would you tell me what the

10  original plan was for BE-CI, or for anybody?  What

11  was the original scope of work for the windows, and

12  what is that -- how did it change?  What are you

13  going to do today?

14       A.    It -- we basically we're working around

15  making the exterior paneling system -- we were

16  basing the design around the fact of being able to

17  take the panels off to replace the windows at some

18  point.  And we'll call this, you know, Path A and

19  Path B.  And so at -- some of these items we were

20  already gearing towards a Path B of trying to make

21  things work.

22            And so that's what -- that's where we

23  went with that, was trying to find window components

24  that we could exchange.  And essentially where that

25  changed was whenever I think I -- I can reference

1  the fact whenever I was discussing the window

2  damages at the project.  The west side had an area

3  where it was pushed in, it was maybe a 3-foot area.

4  I can't exactly remember.  But there is a CMU wall,

5  a cinderblock wall, that is behind there.  So we

6  have to repair that -- that window.

7              But we can't get to the window because

8  there is a cinderblock wall there because there are

9  holding cells behind there.  These -- this is a

10  horizontal ribbon window system.  You take the

11  components out from the inside of the building.  So

12  there is no way for us to get to that to move it --

13  you know, to back out, unless we had to break a

14  window.  And then once we break a window, then we

15  have no way of replacing the window because there is

16  a cinderblock wall behind there.

17              We had to take out door -- the window

18  stops, which are also located on the inside.  So

19  once we took out -- once we broke the window, fixed

20  it, we had no way of replacing that window.  So we

21  ended up taking about 15 or -- I think about 10

22  windows out and actually putting -- framing in.  And

23  that was -- at that point, we realized that there is

24  not a lot that we can do with the existing window

25  system.

1           I also spent -- geez, maybe a week --
2   probably 40 to 60 hours on trying to find window
3   components, calling aluminum warehouses,
4   manufacturers, trying to find something that is
5   similar in design to the stops and the components
6   and the mullions.  And we couldn't find anything.
7           We had Lake City Glass stop by.  They had
8   the mullions and the stops for a couple of weeks.
9   They called said we can't find them.  I think
10  Colonial Glass stopped by and said something
11  similar.  And so at that point, we knew that there
12  is no way that we could repair the areas.  And so I
13  actually ended up buying flat -- aluminum flat stock
14  and caulking it over the damaged mullions to
15  suffice.
16          Q.    Okay.
17          A.    Until all of these -- until everything
18  kind of worked itself out, and we actually to able
19  to have time to work out on a window system that
20  would suit the building.
21          Q.    All right.  So --
22          A.    That's when it turned.  And I apologize
23  for the long explanation.  It's just there's a lot
24  more to it than even that.
25          Q.    Okay.  So with that explanation of the

1  attempts to replace the damaged component, and have
2  the building back the way it was before, I think
3  what you're saying is that became not workable, or
4  not feasible.  So tell me then what happened.  Was
5  there a decision to make a full window replacement
6  of the entire system and go to a different system?
7       A.   Yes.  And that was in the middle of a --
8  that was in the middle of the construction of doing
9  our exterior paneling work.  And so I -- again I was
10  assisting with Dorsey with how we were going to
11  arrange the panels, how we were stacking the panels
12  on the outside.
13           On the building, if you go there, you may
14  realize that there are some face fasteners that are
15  underneath the windows and above the windows that
16  hold up some of the panels of the design that
17  Nichiha provides themselves.  I used that for those
18  areas so that we could take those panels off, we
19  wouldn't have to use clips.  And so that we could
20  take those panels off to change out the windows.
21           I was always under the impression that --
22  I had a gut feeling that we were not going to be
23  able to change out those components.  But at that
24  point, we were going to try anything that we could
25  do to change those out.

1       Q.     Okay.   Who is Dorsey?   I don't know who

2   Dorsey is, or who Dorsey works for?   You said the

3   name Dorsey.

4       A.     I'm sorry.   She's the engineer.   I'm

5   sorry.   She's the engineer.

6       Q.     Okay.   So I got it that the decision was

7   made to replace the window system.   Can you just

8   tell me what system are you going with?   What is it?

9       A.     The -- I think it's an EFCO FX45, that's

10   the name of it.

11       Q.     That's the system.   And do you know if in

12   your document production you have given us the

13   submittals or shop drawings that show that window

14   system?

15       A.     We have submittals of that window system,

16   and they are in your documents.

17       Q.     And is that also -- did BE-CI wind up

18   putting that system, that window system, in their

19   final documents?

20       A.     Yes.

21       Q.     Okay.   And what is the status of that

22   work?   Is that -- are the new -- is the new window

23   system on order, or it's been delivered?

24       A.     No.   It is not -- we are -- we are still

25   designing -- again, it goes beyond the -- this is

1   the design, and we're going to order the components.

2   These things are built on site, coordination with

3   our -- with the tenants.  But there is also a

4   variety of components that come with each of these

5   windows.

6          And we have to have -- we have to make

7   sure that the caps that go on the bottom are the

8   right dimensions to go over the panels.  We have to

9   have extended -- essentially extended mullions.  We

10  need to figure out sizes.  The building has pillars

11  25 feet on center.  And we need to be able to stop

12  with mullions at those pillars and start.  So we

13  can't necessarily have prefabricated windows.  And,

14  you know, there's a lot more to it than here is

15  windows, here are the drawings, here you go.

16          A lot of this stuff is fabricated on the

17  job site.  And so those are the little items that we

18  want to make sure that, you know, if we -- we may

19  not -- one of the windows, instead of being 4-foot

20  10, it may be -- have to be 5 feet, or it may have

21  to be 4-foot, or 4-foot 8.  And so we have to have

22  those components.  And, you know, if we have to put

23  up a piece of plywood to cover that up until we can

24  get the glass in stock, then, you know, those are

25  items that we're going to have to do.  So it just

1  takes quite a bit of planning.

2      Q.    All right.  So what you have described is

3  a pretty complex design process where there is a lot

4  of back-and-forth in the field between the

5  contractor, that's you, and the designer.  As you

6  said, it's more than just speccing out a new window

7  system.  There's a lot to try to make sure these

8  components are going to go together, and that it can

9  be retrofitted to this building, this 1976 building,

10  right?

11      A.    Correct.

12      Q.    Okay.  And --

13      A.    Any the building pillars.

14      Q.    Right.  Okay.  And is this -- has any of

15  the work actually started in the field, or you said

16  y'all have not even ordered the system yet, right?

17      A.    No.  We have not ordered the system.

18      Q.    Okay.  But what's there now is all dried

19  in, and the windows are done?  I mean, there's no

20  tarp or anything over the windows?  There is windows

21  there now?

22      A.    Correct.

23      Q.    Okay.  Is changing out this window

24  system, is the first floor tenant aware that that

25  work is going to happen?

1      A.     Yes, ma'am.

2      Q.     And the first floor tenant is there now,

3  they have moved back into the building, right?

4      A.     Yes, ma'am.

5      Q.     Okay.  And that's not going to impact --

6  when Encore does that work and changes out those

7  window systems, that first floor tenant is going to

8  be able to remain in the building?

9      A.     We have had discussions with them about

10  what would have to be done.  The coordination with

11  that is, we would like to do it 25 -- again, the

12  pillars are 25 feet on center.  So we would like to

13  accomplish 25 feet first floor and second floor in

14  between each pillar at a time.  And so, you know,

15  they may have to move over to another office, you

16  know.  There's -- yeah, so in coordinating they will

17  be able to work there.

18      Q.     Okay.  And do you know if changing out

19  the window system to a new system, is there any

20  impact to the owner being able to lease out the

21  second floor?

22      A.     Other that the missing components that

23  don't look the same on the inside.

24      Q.     Do you know of any tenant who -- on the

25  second floor, any prospective tenant, who did not

1  sign a lease because the windows were going to be

2  replaced to a new system?

3       A.    I have no -- I don't know.

4       Q.    Is there --

5       A.    I haven't had discussions with them on

6  that.

7       Q.    Okay.  There's no reason why a second

8  floor tenant couldn't make the same type of

9  accommodations that the first floor tenant is going

10 to make when Encore goes to do the window

11 replacement, right?

12      A.    Correct.

13      Q.    I saw that the final set of plans through

14 BE-CI came in on June 24.  Does that sound right?

15 And you can look at Tab F6.  And for the record, let

16 me go ahead and say Tab F6 is Encore 50, which

17 again, is the first page of the specifications.

18 Because the specifications are a very large set of

19 documents.  That Encore 50 is dated March 26, 2021,

20 correct?

21      A.    March -- yes.

22      Q.    All right.  And is this the final, or the

23 last, set of specifications you got from BE-CI on

24 this?

25      A.    Let me see here.  I'm not -- I'm not sure

```
 1  exactly.
 2        Q.    Okay.  Well --
 3        A.    It looks like it.  I'm not 100 percent
 4  sure.
 5        Q.    Okay.  But Encore has produced all of its
 6  documents.  So whatever is latest set is in your --
 7        A.    Yes, it should be in there.
 8        Q.    All right.  And if you turn to the next
 9  page in Tab F6.  I know it's very difficult to read
10  the Bates number, but it's Encore 50.82.  That is
11  the set of stamped plans from BE-CI, that's the
12  first page.  And if you look -- I know you're not
13  going to be able to see it, but there's a stamp in
14  the bottom right.  I don't know if you can tell.  I
15  blew it up in a PDF, so that date is June 24, 2021.
16  Can you see that?
17        A.    What was that stamp?  What was that date?
18        Q.    Yes.  On the first page of the plans, the
19  exterior restoration plans, by BE-CI?
20        A.    Yeah.
21        Q.    If you look at the bottom right there is
22  a stamp from the design professional.
23        A.    What's the heading of -- what did you
24  guys label that document as?
25        Q.    It's Encore 50.82.  You have to look for
```

```
 1   that Bates number in the top left.  It's very small.
 2   Turn back to the first page that has the picture,
 3   the birdseye view of the building.  There is a
 4   bigger date if you go to sheet A1.  The plan
 5   sheet --
 6        A.    I see A2.
 7        Q.    Yeah, any of those.  You'll see that the
 8   date on this is June 15, 2021, right?  Over in the
 9   title block.
10        A.    Let me see here.
11        Q.    Are you looking at the BE-CI set of
12   plans?
13        A.    Yes.  I'm look at the document labeled
14   50.82.
15        Q.    Oh, okay.  That's the first page of the
16   plans.  So if you look at the bottom right, you'll
17   see the engineer stamp.
18        A.    Yes.
19        Q.    I don't know if you can read it.  But
20   he's got a date on his stamp, and it's June 24,
21   2021.
22        A.    Yeah, maybe.  Yeah.
23        Q.    How about flip the page to the page A1
24   and you can see in the title block the date there is
25   June 15, 2021, right?  Down right where the page A1
```

1  is, right above it, there is a date.

2      A.   Yes.

3      Q.   Right.  So that was less than 2 months

4  ago.  Do you recall getting this as the final set of

5  plans from BE-CI for the exterior restoration?

6      A.   Yeah.  I -- yeah.

7      Q.   And this is what you're working from,

8  this set of plans?

9      A.   Yes.

10     Q.   Okay.  So for the record, that's

11 Encore -- the first page is Encore 50.82 through --

12     A.    Or whatever their last -- their last

13 plans that were submitted.

14     Q.   Okay.

15     A.    And it should be -- whatever their last

16 one is, that's the ones that we work off of.

17              MS. WOLF:  Okay.  So for the record,

18          what the witness is looking at, and what

19          we have been referring to, is Encore 50.82

20          through Encore 50.91.  That is a

21          construction set by -- produced by BE-CI

22          for the exterior restoration.  And it's

23          dated June 2021.

24 BY MS. WOLF:

25     Q.   I think you said this already.  Encore

1    contracted with BE-CI, correct?

2         A.    Yes, ma'am.

3         Q.    And have -- have you paid all of their

4    invoices to date?

5         A.    Yes, ma'am.

6         Q.    Have you produced all invoices for any

7    consultant or subcontractor that Encore used on this

8    project?  Have you produced all contracts and all

9    invoices?

10        A.    That -- all invoices and contracts that

11   they sent me, I believe that I have.  Hard to

12   believe that I have to beg for people to send me an

13   invoice, but I do.

14        Q.    Okay.  We talked a lot about the windows.

15   I'm hoping that the exterior wall panels won't be as

16   long of an explanation for you.  But essentially my

17   understanding is that the exterior wall panels, that

18   there were some of them that were damaged by the

19   hurricane.  But the decision was that all exterior

20   panels on all four exterior walls needed to be

21   replaced; is that right?

22        A.    Yes.

23        Q.    Okay.  And did that work occur?

24        A.    Yes.

25        Q.    It's done?

1    A.    Yes.

2    Q.    All right.  It's been accepted by the

3  owner as finished?

4    A.    I believe so, yes.

5    Q.    So I want to look at F -- Tab F4 and talk

6  about Associated Design Group for just a second.

7  Did Encore contract with Associated Design Group, or

8  ADG?

9    A.    What was that tab?  Can you repeat that,

10  please?

11    Q.    It's F4.

12    A.    Yes.

13    Q.    All right.  So my question was.  Did

14  Encore contract with ADG?

15    A.    Yes.

16    Q.    What was their scope when they were

17  originally hired?

18    A.    I can't remember.  I think it was four or

19  five -- a number of individual offices having a mini

20  split unit.

21    Q.    I'm sorry.  So let me back up a minute.

22  Maybe I didn't ask a good question.  What Hurricane

23  Laura damage was there to the HVAC system?

24    A.    I'm not sure.  I'm not a mechanical guy.

25  I'm not 100 percent sure what damage was caused.

1      Q.     Okay.  Why did Encore hire ADG, a

2  mechanical engineer?  Were they hired to look at the

3  HVAC system?

4      A.     They were hired to design a portion of a

5  new system.

6      Q.     Okay.  And so the new system was not a

7  replacement for hurricane damage, it was a separate

8  improvement, or upgrade, that the owner wanted?

9      A.     Yes, ma'am.

10     Q.     Okay.  So I think that I understand that

11  the entire first floor HVAC system was replaced; is

12  that right?

13     A.     No.

14     Q.     No.  So what -- tell me what work ADG

15  did.  What was the design scope?

16     A.     It was a -- originally started out with

17  ten -- again, a certain amount of ceiling set units.

18  And then it did expand into more -- we discussed

19  splitting it up into phases.  And it was around the

20  time that we started discussing about how to split

21  this thing up into phases.  That's when the

22  mechanical contractor stepped in.  And I think they

23  sent him a handful of drawings and equipment.  And

24  so, again, I think it was maybe ten ceiling cassette

25  units.

1      Q.    Okay.  Let me --

2      A.    And then it went to 13.

3      Q.    All right.  So who was the mechanical

4  subcontractor?  Who was your sub?

5      A.    Industrial Refrigerant Corporation.

6      Q.    All right.  These plans that we're

7  looking at in F4 are dated February 2021.  And

8  again, for the record, that's Encore 40-40.09.

9            And you said Encore hired ADG, and this

10  was to do a redesign of the HVAC system, correct?

11      A.    Yes.  In phases.

12      Q.    In phases.  Was it for both the first and

13  second floors?

14      A.    Is varied depending on topic.  But, yeah,

15  it was a -- it was eventually going to take out the

16  entire building.

17      Q.    And it was separate from any insurance

18  damage.  This was an upgrade that the owner wanted

19  to the HVAC system, correct?

20      A.    Yes.

21      Q.    All right.  So the cost for ADG as a

22  designer to do this work isn't something that the

23  owner would be looking for its insurance company to

24  pay for, that's your understanding, right?

25      A.    I can't speak for them.

1      Q.     But you are telling me that this was done

2   as an improvement that the owner wanted, not to put

3   the HVAC system back the way it was before, correct?

4      A.     Correct.

5      Q.     Did Encore track the costs for things

6   that were not going to be sent to the insurance

7   company separately from the things that were?   In

8   other words, covered versus non-covered -- insurance

9   covered items?

10     A.     Yeah.   I did it in a way to attempt to

11  keep track of -- I did it in change orders on a

12  change order sheet.   And so I think I had separate

13  items for some insulation items, which those are all

14  referable in to the project folder.

15     Q.     I'm sorry.   You cut out a little bit.

16  You said they're all in the project folder?

17     A.     Yes, ma'am.

18     Q.     Okay.   So if I want to see how Encore

19  tracted items of work covered by insurance, or that

20  you thought that were covered by insurance, versus

21  those that you knew were not covered by insurance,

22  that is all done through looking at the change

23  orders?

24     A.     I don't track insurance versus non.   I

25  bid the job.

1        Q.     Okay.

2        A.     I was asked if I could split out items

3   that were not insurance related, so that's what I

4   did.

5        Q.     Okay.  And who asked you to do that?

6        A.     I can't remember.

7        Q.     Was it in -- was the request in writing

8   or something verbal?

9        A.     It was verbal.

10        Q.     Do you know if it came from the owner, or

11   from Skyline, or from somebody else?

12        A.     I honestly cannot remember.  It was just

13   a discussion of if we want to do this.  It may have

14   been with the owner.  But I am not sure.  I can't --

15   I can't remember.  And maybe discussions were to do

16   some insulation, and then I would just make a change

17   order for the difference.  Again, I can't remember

18   exactly how everything went down.

19        Q.     You're talking about insulation.  Are you

20   talking about insulation on duct work, or the roof,

21   or the walls, or what?

22        A.     On walls.  That's the first one I had

23   reference to.

24        Q.     Walls?

25        A.     Yes.

1        Q.     Because there was an upgrade to the
2   insulation in the walls, right?
3        A.     Depending -- some walls, yes, other
4   walls, no.
5        Q.     Okay.
6        A.     It was in between rooms where we added
7   insulation on the center part.
8        Q.     So if I understand your testimony
9   correctly, Encore did not officially track, or keep
10  an accounting of, insurance covered scope versus non
11  insurance covered scope?
12       A.     No.  I did not bid the job based upon
13  insurance items.
14       Q.     Okay.  But, for example, the cost for
15  ADG, the engineer to design the upgraded HVAC
16  system, you would agree that that is something that
17  should be broken out, if it's not going to be
18  covered by insurance, right, if it's an HVAC
19  upgrade?
20       A.     I don't -- that sounds right.  I don't
21  know.
22       Q.     Okay.  Do you know if your -- if the cost
23  for ADG, the engineer who designed the upgraded HVAC
24  system, is that included in any of your change
25  orders where you were tracking some of those items?

1      A.    I'm not sure.  It was probably added at

2  some point.  I can't remember.  It's accounted for

3  one way or the other.

4      Q.    All right.  And then lets look at Tab F5,

5  which is the ADG set of plans, that's what they call

6  their construction documents.  Do you see that?  So

7  Tab F4 was the design development set, that was in

8  February of this year.  And Tab F5 is the

9  construction set dated April 2021.  Do you see that?

10      A.    I've got 43.008 as the next one F5-- or,

11  sorry, I guess it would be F6.  It's less than -- I

12  don't have -- there is no coverage sheet on it.

13      Q.    Are you looking at Tab F5?

14      A.    Yes.

15      Q.    Okay.  What I have in my book is dated

16  April 2021.  And it's the cover page for a set of

17  plans called construction documents for HVAC

18  replacement.  And the Bates number is Encore

19  43-43.014.  Is that what you have?

20      A.    No, I do not.

21      Q.    That might be a mistake between our two

22  books.  Some kind of way what you got may not

23  look -- are you sure you're looking at Tab F5?

24      A.    Yes.  I've got Encore 040.

25              MR. WOLFF:  I think my tab -- the

```
 1              tab, what's behind it.
 2      A.     Yeah.  And then this one says Encore
 3  43.008.
 4  BY MS. WOLF:
 5      Q.     Okay.  The best I can tell that is --
 6  seems like a mistake between our two books.  So I
 7  will skip on to something else.  You don't have the
 8  same tab --
 9              MR. COX:  Let me take a look at it
10              and see if I can help him out.
11              THE WITNESS:  She is looking for the
12              cover page that's on this one.  There,
13              that's their -- but it's not on that.
14              MS. WOLF:  Michael, I sent over
15              yesterday a link, a share file link, that
16              has all of these documents in it
17              electronically.  Did either one of you get
18              a chance to download it?  Mr. Monheiser,
19              did you get a chance to download those
20              docs?
21              THE WITNESS:  Yes, I did.  I don't
22              have my computer open right now.
23              MS. WOLF:  Okay.  I think we are okay
24              for now, but maybe in a break, especially
25              when we take that 11:00 break, if you
```

```
 1              could, you know, get your computer
 2              running.  I did send those documents just
 3              for this kind of reason.  Sometimes there
 4              are little mistakes in what gets printed.
 5              That way if we come across a document like
 6              this, I might be able to have you pull up
 7              and open the electronic version, if that's
 8              okay.
 9                   THE WITNESS:  Yeah.
10                   MR. COX:  Is that separate from the
11              printed out binders that we have?  We have
12              two binders.
13                   MS. WOLF:  The electronic version is
14              a duplicate of the binders plus some
15              documents that were simply too big to
16              print.
17                   MR. COX:  Okay.  Can you tell me --
18              just so we know it's not in these printed
19              binders, can you tell me what you're
20              looking for, and I'm going to look for it
21              real quick?
22                   MS. WOLF:  Yes.  It is -- as a matter
23              fact, I might even be able to send this by
24              e-mail.  But Tab F5 in my book is supposed
25              to be a set of plans called construction
```

```
 1              documents prepared by ADG of the HVAC
 2              replacement dated April 2021.  And it is
 3              Encore 43-43.014.
 4                   MR. COX:  Our Tab 5 starts with
 5              Encore 43.008.
 6                   MS. WOLF:  Right.  Yeah, I think
 7              that -- it sounds like there's just a
 8              mistake.  Somebody printed the wrong thing
 9              for your book.  But it's not that big of
10              deal.  I'll either e-mail it over to you,
11              or if Mr. Monheiser can turn his computer
12              on.  I'll come back to it and ask him to
13              identify that document.  I've made a note
14              of it.
15    BY MS. WOLF:
16         Q.   So Mr. Monheiser, what we've been talking
17    about is all of the steps that are required for
18    Encore to get ready to actually do the work just in
19    general and in this project in particular.  Is there
20    anything else that we haven't discussed already?
21              You know, we have discussed getting the
22    engineering design, getting the owner selections.
23    We discussed whether or not you might need the
24    authority having jurisdiction to -- you know, to get
25    a permit to start construction.  You had to scope
```

1    the job.  What else was missing or needed to be done

2    before Encore could start this particular project

3    for Eaux Holdings?

4         A.    Subcontractors.

5         Q.    Okay.  And you were working on getting

6    subcontractors lined up to do the work?

7         A.    Yes, ma'am.

8         Q.    You were working on that from the time,

9    say, in September 2020 that you became involved in

10   this project?

11        A.    Around that time, yes.

12        Q.    Okay.  And we can go through some of the

13   daily logs, which might prompt some of the

14   specifics.

15        A.    Yeah.

16        Q.    In general from September 2020 to the

17   time you contracted with the owner on December -- in

18   December 2020, during that timeframe, you were

19   working with the engineers, you were working to get

20   subs lined up, you were working to get the scope,

21   working to get the owner selections, the tenant

22   selections for what was going to go back in there.

23   We have talked about whether or not a permit was

24   required.  Is there anything else in that list of

25   things that Encore needed to do before it could

```
 1  actually enter into the contract and start the work?
 2       A.    I think -- generalized, I think you've
 3  got everything covered.
 4       Q.    Okay.  I think I know the answer but just
 5  let me make sure.  You -- did you know Joey Odom, or
 6  have any involvement with any of his companies,
 7  prior to this project in Hurricane Laura?
 8       A.    No.
 9       Q.    Had you done any work in Louisiana prior
10  to this particular project?
11       A.    Not that I'm aware of.  The past 3 years,
12  I'm not sure.
13       Q.    You met with Joey Odom at some point to
14  discuss this project?
15       A.    Pardon?
16       Q.    Did you meet with Joey Odom at some point
17  to discuss this project?
18       A.    Did I meet with him?  Yes, multiple
19  times.
20       Q.    Tell me about your first meeting with
21  Joey Odom.  Where did y'all meet?  Who was there?
22  Where did that occur?
23       A.    I don't exactly know the date.  He was --
24  he was carrying something either into the building,
25  or out of the building.  And I didn't -- I didn't
```

```
 1   know him, and I just introduced myself.  I don't
 2   know the exact dates, but it was -- it was maybe
 3   mid-September.  I'm not sure.
 4        Q.    When you --
 5        A.    That's my first encounter with him and it
 6   only lasted about ten seconds, and he was busy.
 7        Q.    Okay.  And at that point, had he already
 8   engaged Encore to do the reconstruction work?
 9        A.    No.  There was -- I think maybe one of my
10   trips that I started off down there.  There was
11   still contractors stopping by to bid the job, I
12   think, you know.  So he had -- he was not contracted
13   to us at all.
14        Q.    So when you first met him in
15   mid-September, your understanding was at that point
16   Encore didn't -- had not been the favored one, or
17   chosen yet to do the job, and that the owner, Joey
18   Odom, was still entertaining different pricing bids?
19              MR. COX:  Let me -- let me enter an
20         objection.  And I'm objecting because of
21         the use favored one, it's a compound
22         question.  If you could, please, rephrase
23         the question.
24              MS. WOLF:  Yes, I'll rephrase.
25   BY MS. WOLF:
```

```
 1        Q.    So my question is.  When you first met
 2   Joey Odom in around mid-September, at that point
 3   your understanding was that Encore was still working
 4   on submitting a proposal or a bid to the owner, that
 5   Encore had not yet been chosen by the owner to do
 6   the restoration work?
 7        A.    Correct.
 8        Q.    Okay.  What was your understanding of
 9   what Encore needed to give the owner for the owner
10   to select Encore to do the work?
11        A.    I guess -- I mean, I'm not sure what --
12   it depends on clients.  They're all -- some of them,
13   it's a discussion, some of them it's a number.
14        Q.    Were you asked to come up with a number
15   that Encore was going to charge to do a certain
16   scope of work?
17        A.    I gave him a estimate of -- I gave him a
18   budgeted amount.  I think -- I can't remember the
19   amounts, but it was -- I'd say the minimum would be
20   this, maximum would be that.
21        Q.    Is that in writing?
22        A.    No.  They were just verbal.
23        Q.    At that point, did you have an assessment
24   or written scope based on your walk throughs?
25        A.    Yeah, I guess.  Again, I don't know the
```

```
 1  exact time.  But, you know, I think I gave him -- it
 2  was -- I can't remember that exact time whenever I
 3  gave him that number.
 4       Q.    I guess so my question is.  You verbally
 5  gave Mr. Odom a range, a minimum and a maximum
 6  amount, to do the work.  That was tied to a specific
 7  scope, right?
 8       A.    Yeah, it was.  And was it -- not
 9  specific.  Because nothing is exactly specific.
10  It's a range because I did not know everything that
11  needed to happen at that point.  I had a -- just a
12  summary, and a knowledge of costs of things, and
13  generalized cost of things and how they go together.
14            And so, again, I think it was a fairly
15  wide range.  But, yeah, that's how I think I wrote
16  some items down.  I may have even started estimating
17  it whenever I told him.  I get all my components
18  into an estimate, you know, I can kind of give a
19  range.
20       Q.    Okay.  It's just something a little bit
21  funny with the sound system.  You're clear.  I'm
22  pretty sure you're talking clearly, but sometimes
23  the words get muffled.  So I want to make sure I
24  understood what you said.
25            At the time that you gave Mr. Odom the
```

1   minimum and maximum range for this, did you have

2   some type of written scope?

3        A.   I had component items that I had written

4   out.

5        Q.   Okay.  And have you produced that

6   document where you wrote out --

7        A.   My estimate, yes.

8        Q.   Your estimate.  Where do we find the

9   estimate?  What do you call that?

10       A.   It's estimate.  CSI code estimate,

11   formatted estimate.  I'm not exactly.  It may have

12   been maybe labeled Four-O estimate, client estimate.

13       Q.   And was that -- your initial estimate,

14   the document where you started pulling all the

15   components together, did you base that on your own

16   site observations?

17       A.   Yeah, and generalized input from the

18   owner.

19       Q.   What input did you get from the owner?

20       A.   Just generalized item, what he wanted to

21   go back with.

22       Q.   Do you have any of that in writing, any

23   of the owners general input and what items he wanted

24   to go back with?

25       A.   If I do, they are in the project folder.

1   But I'm -- I was right across the hall from his

2   office.  So I would go over there and have general

3   discussions with him about this and just put it in

4   the computer.

5          Q.    Okay.  So you were working on site.  You

6   had your computer.  And you were getting input from

7   the owner, and from your own site assessments, to

8   start to come up with what these components were --

9          A.    Yes.

10          Q.    -- and what the scope of work was?

11          A.    Yes.

12          Q.    Did you meet with the first floor tenant

13   to get any input from them in order to determine

14   your initial estimate?

15          A.    I don't remember that.  At some point, I

16   did submit submittals to them.  And maps of carpet

17   layout.  And where everything was going back

18   together.

19          Q.    Okay.  And I believe I've seen those.

20   We'll get to your contract and there is a proposal

21   in there that includes a lot of that stuff.  So it

22   sounds like it was sort of an iterative process of

23   continuous -- you know, continuous input of

24   information, and you refining your estimate?

25          A.    Preliminary requirements, yes.

1    Q.    Okay.  And that process continued all the

2  way up to the point where you had $1.36 million

3  number that was going to go in the contract?

4    A.    Yes.

5    Q.    And you have a -- do you have a list of

6  every -- all the scope of work that adds up to the

7  $1.36 million?

8    A.    That's -- it's, like, a couple of dollars

9  off.  It's a round number.  1.36 is around number.

10    Q.    Okay.  But you have a document, your

11  estimate, when you've added up all the scope, and it

12  adds up to about $1.36 million?

13    A.    Yes, ma'am.

14    Q.    Okay.  So other than your site

15  assessments, and input from the owner, and I believe

16  you said you did talk to the first floor tenant at

17  some point and get their input about scope, right?

18    A.    Yes.  I didn't get their input.  I

19  submitted a submittal.

20    Q.    Okay.

21    A.    And I think that's -- I gave them the

22  submittals and actually I may have asked for their

23  approval.  The owner or myself did.  I can't

24  remember how that exactly went down.  But that

25  should be in writing.

1    Q.    Did you use -- at any point did you get a
2    copy of Skyline damage estimate and use that at all
3    in your pricing?
4    A.    I do have a copy of it.  No, I -- I don't
5    use Xactimate to estimate jobs.
6    Q.    Did you review the Skyline damage
7    estimate?
8    A.    Partially, yeah.  But I -- some of those
9    items are -- it's Xactimate format.  It's not --
10   it's hard to use for larger jobs.  So it's -- they
11   don't take any measurements.  Xactimate doesn't
12   estimate a job the right way.  So I don't really use
13   it.
14   Q.    Okay.  So if I asked you if you had
15   checked Skyline's scope and their prices, your
16   answer is no?  You didn't verify the Skyline damage
17   estimate?
18   A.    No.
19   Q.    Okay.  Did you ever walk the site with
20   anybody from Skyline?
21   A.    Yes.
22   Q.    Who did you walk with?
23   A.    Jeff Major.
24   Q.    How many times?
25   A.    I can't remember.

1      Q.     More than once?

2      A.     Yes.

3      Q.     More than a dozen?

4      A.     No.  I don't think so.  I can't remember.

5      Q.     I'm just trying to get, you know, a

6  ballpark.  Do you think it was --

7      A.     Yeah, I mean, I would say five times.

8      Q.     Five times?

9      A.     Just a, you know, as a general number.

10      Q.     And when you walked the site with Jeff

11  Majors, how long were y'all together?

12      A.     Twenty minutes maybe, ten minutes.

13  Probably varied depending on what we were looking

14  at.

15      Q.     Okay.  And what -- generally what were

16  those discussions?  What was Jeff Majors -- what did

17  he -- what information did he want to convey to you

18  about this project?

19      A.     He was asking me questions.

20      Q.     Okay.  And what were those questions?

21      A.     Some items -- bringing some items up as

22  far as ceiling tiles.  And a -- whenever I do review

23  an estimate, I may look at a cost of an item to make

24  sure that it's correct.  And so ceiling tiles, I

25  know that was not a correct item.  And so we were

1  going over just to look at the -- how to identify

2  the ceiling tiles and what they actually were so

3  that they could be correctly identified and scopes

4  of work.

5           Looking at identifying the panel numbers

6  on the back of the panels, looking at identifying

7  just general items, window components, you know,

8  those kinds of deals.  And what actually goes on the

9  ultra or kind of reviewing the radio barriers that

10  are inside the building on the first floor.

11      Q.   Can I interrupt for just a second?

12  Because you're using a lot of terminology that I

13  need to make sure I understand.  When you were

14  talking about panels just now, were you talking

15  about electrical panels, or something else?

16      A.   Yeah, the exterior panels.

17      Q.   Oh, the exterior panels.  Okay.  And then

18  that last thing you just talking about on the first

19  floor, I think you used the word barrier?

20      A.   It's an ultra -- it's a -- it's a -- it's

21  called a SCIF barrier.  It's a frequency blocker

22  that DHS uses for protection of their equipment.

23      Q.    Is that something on the windows, or the

24  walls, or what?

25      A.    It's on the interior walls of the center

1  portion of the building.

2      Q.    Okay.  And I wanted to ask you about DHS,

3  the first floor tenant.  Did they ask for anything

4  that was an upgrade from what they had, or were

5  they -- you know, I assume there is all kinds of

6  special items with security.  And I saw the word

7  ballistic film, something on the windows.  Was all

8  of that that the first floor tenant was asking for,

9  or that you needed as scope for the first floor

10  tenant, was it putting back exactly what they had,

11  or was there any of their scope where they wanted to

12  change something, or add something?

13      A.    DHS?

14      Q.    Yes.

15      A.    I wouldn't have known that.  It would

16  have come -- that would have come from the owner.

17      Q.    Okay.  So anything that DHS wanted that

18  was, you know, special for their requirements, the

19  owner gave you that, but you weren't privy to

20  whether or not it was something that was a

21  replacement in kind or an upgrade?  Did I say that

22  right?

23      A.    I think so.  I think so.  I understand

24  what you're saying.

25      Q.    And so you are not able to say what, if

```
 1   anything, went back in the first floor for the first
 2   floor tenant that was an upgrade?  You don't know?
 3        A.    I'm not sure.
 4        Q.    Okay.  You did not track that?
 5        A.    No, I did not.
 6        Q.    Okay.
 7        A.    I had a base scope on their plans, the
 8   original plans, that the owner had of the building.
 9        Q.    The owner had plans of what the first
10   floor -- are those the 2011 plans from a prior
11   renovation?
12        A.    I think so.  It sounds about right.  I'm
13   not 100 percent sure.
14        Q.    Is that what you based those the first
15   floor on, you went back with what was in those
16   plans?
17        A.    Yes.
18              MS. WOLF:  Michael, now is a good
19         time for a break.
20              MR. COX:  Sure.
21              MS. WOLF:  It's six minutes to 11:00,
22         which I think is when your status
23         conference is.
24              MR. COX:  I had someone cover it, so
25         I'm fine.  But we can take a break.
```

```
 1            MS. WOLF:  Yeah.  How about if we
 2        come back at five minutes after 11:00?
 3            MR. COX:  That sounds good.  Taking a
 4        break.
 5            THE VIDEOGRAPHER:  Going off the
 6        record.  The time is 10:54.
 7                (OFF THE RECORD)
 8            THE VIDEOGRAPHER:  We are now on the
 9        record.  The time is 11:06.
10  BY MS. WOLF:
11      Q.   Mr. Monheiser, I wanted to see if I can
12  share a screen with you.  If you recall a little bit
13  earlier in your testimony, I wanted you to go to
14  what I thought was Tab F5, the HVAC replacement
15  documents that ADG prepared.  But you didn't have
16  that document in front of you.  So I'm going to
17  share my screen and see if you can see it.  Okay.  I
18  do not see the screen that I thought I checked.
19  What do y'all see?
20            MR. COX:  Construction documents for
21        existing office building HVAC replacement.
22            MS. WOLF:  Oh, good.
23            MR. COX:  Dated April 2021.
24            MS. WOLF:  All right.  Excellent.
25  BY MS. WOLF:
```

1    Q.    So back to that question that I had asked

2  you, Mr. Monheiser.  This is Encore 43.  This is the

3  first page.  This is a set of plans for the HVAC

4  replacement, correct?

5    A.    Yes.  I think so.

6    Q.    All right.  And there's -- it's a stamped

7  set of plans.  Do you see the stamp down in the

8  bottom right?

9    A.    Yes, ma'am.

10    Q.    All right.  And this is the -- so this is

11  the final set, I believe, that we pulled from your

12  production that ADG prepared.  You had contracted

13  with ADG to prepare this.  And this is the upgraded

14  HVAC replacement system, correct?

15    A.    Yes, ma'am.

16    Q.    All right.  And that means they were

17  finished with this work.  With the design work, I'm

18  going to try to blow it up -- I don't know if y'all

19  can see it when I blow it up -- to get the date.

20  The actual date is April 1, 2020.  Do you see that

21  on the stamp?

22              MR. COX:  Where is the date?

23  BY MS. WOLF:

24    Q.    Let me blow it up a little bit more.  I

25  don't know if you can see my cursor.  But down here

 1  in the bottom right where the engineer stamps the

 2  plans, he puts the date, April 1, 2021.  Do you see

 3  that?

 4      A.    Correct.

 5      Q.    All right.  I also wanted to show you

 6  what I think -- on the break I went and pulled an

 7  estimate.  Can you see my screen there, that says

 8  Encore 13 up in the top right?

 9      A.    I can't see the 13.  I just see -- yeah,

10  there you go.  Yes.

11      Q.    Okay.  So this is -- it's a three-page

12  PDF, Encore 13-13.03.  And I pulled it out of a

13  folder called estimates.  Is that how you kept your

14  estimates in a folder called estimates?

15      A.    Yes, ma'am.

16      Q.    So I found this one document.  That

17  doesn't mean there's not more there, because

18  obviously it was a short break.  But this is what I

19  found, and it's dated June 25, 2021.  So that was

20  just a few weeks ago, right, month before last?

21      A.    Whenever you open it up, it automatically

22  updates.

23      Q.    Okay.  So when you opened it to convert

24  it to a PDF, or whatever, to produce it, that date

25  of June 25 got put on there automatically?

1        A.    Yes.

2        Q.    Are you able to say when you prepared

3    this document?

4        A.    In probably -- I don't exactly know.  It

5    was before -- it was before the -- before Christmas

6    of 2020.  It was -- it was an evolving estimate.

7        Q.    All right.  And this -- what program do

8    you use to prepare your estimates?

9        A.    I use a CSI coded format on Excel.

10        Q.    All right.  Is there more to the estimate

11    than what we see here?  Is there -- are there

12    supporting documents?  Are there other spreadsheets

13    were you input everything, or is this three-page

14    document the sum total of your estimate?

15        A.    It's the sum total.  There's a -- there

16    is drop down boxes for selection of items.

17        Q.    Okay.  And for the items that are going

18    to be done by all these subs, did you have written

19    proposals and quotes from all of them with the scope

20    and the cost?

21        A.    Yes.

22        Q.    Okay.  And you have produced all of that?

23        A.    Yeah.  They were in these subcontractors

24    documents.

25        Q.    Okay.  Do you know if you had written

1  signed contracts with each subcontractor?

2      A.    Yeah.   We had signed -- we had a couple

3  of them.   I think I had one that, you know, this

4  labor guy that was doing some cleaning that, you

5  know, just paid cash to.   But, I mean, not really.

6  I think everybody should have a signed one.

7      Q.    Okay.   And so I'm looking at page 3 of

8  this estimate, Encore 13.   And the total is

9  $1,359,985.70, right?

10     A.    Yes.

11     Q.    And that was the basis for the written

12 contract that you entered into with the owner for

13 this project, right?

14     A.    Correct.

15     Q.    So everything that's listed on these

16 three pages is the scope for that cost, right?

17     A.    Yes.

18     Q.    So when you -- just in general when a

19 contractor issues an invoice, or a pay application,

20 you include a document that has the schedule of

21 values, right?

22     A.    Typically.

23     Q.    Typically, correct.   And you did that for

24 this project, right?   You submitted pay applications

25 that had the schedule of values listed, correct?

 1       A.    I did both.  I submitted just a regular

 2  invoice and a AIA formatted pay app.

 3       Q.    Okay.  And we'll look at those in a

 4  minute.  The schedule of values, is that essentially

 5  what we see here on the left, the breakdown under

 6  general requirements, existing conditions, wood and

 7  plastics, et cetera, that is the breakdown, or what

 8  they call the schedule of values?

 9       A.    Yes.

10       Q.    Okay.  And that way you can track pay

11  application to pay application exactly what work has

12  been done, and what amount is owed for the work

13  that's been done, correct?

14       A.    Not exactly.  But in generalized, yes.

15       Q.    Okay.  Why not exactly?

16       A.    I mean, nothing is an exact science.

17  It's not -- you know, say, this is what we have

18  done.  Because when I'm submitting the invoice, the

19  work is already done.  So I mean, it depends.

20  There's not a -- it depends on the work.  And it

21  depends on if I'm planning on ordering something the

22  next day, those kinds of items.  So it's not work

23  that's just been done.  It's if I see something that

24  I'm going to submit, that I'm going to have a larger

25  expense for the next day, I may add that on there.

1      Q.    Got it.  So the not exact science part is
2  if you're talking about how much painting is done,
3  you estimate about 40 percent?
4      A.    Yeah, you just -- throwing in a number.
5      Q.    Right.  So on this particular job, was
6  there anyone that came and verified Encore's work?
7  Meaning the amount that was actually -- the value of
8  the work actually done?
9      A.    The owner.
10     Q.    Okay.  That was Joey Odom?
11     A.    Yes, ma'am.
12     Q.    So there was nobody with the lender who
13 came out and did site inspections, or checks, and
14 compared it to the payouts?  Nobody from the lender
15 did that?
16     A.    I don't know.
17     Q.    Okay.  And the engineers that you hired,
18 ADG, and BE-CI, they didn't have site observation
19 responsibility, right --
20     A.    No.
21     Q.    -- side, right?
22     A.    Correct.
23     Q.    And the -- how about city inspections?
24 Did you have to have any city inspections of the
25 work?

1      A.     No.

2      Q.     Okay.  So other than Joey Odom, nobody

3 reviewed Encore's pay applications to verify the

4 amount of work done, and the cost that was being

5 assigned to that work?

6      A.     I don't -- I don't know.  That's -- I

7 submit it, he pays it or he doesn't.

8      Q.     You submitted it and what?  I'm sorry.

9      A.     I said I submit it, and then he pays it

10 or he doesn't.  You know, I don't know who verified

11 it.

12      Q.     Okay.  Did Encore do any work for any of

13 the other properties in Lake Charles owned by Joey

14 Odom, or any of his companies?

15      A.     No.

16      Q.     Did -- on this particular project, the

17 Eaux Holdings 620 Esplanade project, did the owner

18 handle or segregate out any of the work to handle

19 himself and take it out of Encore's scope?

20      A.     Yes.

21      Q.     Okay.  What did the owner handle?

22      A.     The roof.

23      Q.     Anything else?

24      A.     I -- probably a handful of items.  I

25 can't remember.

1          Q.     So the owner hired the roofing
2     subcontractor?
3          A.     Correct.
4          Q.     Does that mean that the owner was
5     essentially acting as general contractor for the
6     work?
7          A.     I don't know.
8          Q.     Do you know why the owner segregated out
9     the roof to handle that outside of Encore's scope?
10         A.     I didn't -- we didn't want to do the
11    roof.
12         Q.     Just to -- I just want to verify what you
13    said.  Encore did not want to handle the roof?
14         A.     Correct.
15         Q.     Okay.  Why is that?
16         A.     Multitude -- or multiple things.  It's
17    not the roof that was previously on the building.
18    And going to a local roofer is a lot better than
19    going through somebody who is coming out of town.
20    So we were always pushing toward, I guess, trying to
21    replace the roof as it -- as it was.  It was given
22    maybe two days of discussion before Joey decided to
23    go with the local roofer.  And so -- but our stance
24    was that we were going to do -- it we were going to
25    do it, we needed to do it the same way.  And so the

1  roof that's on the building isn't the same roof that

2  was -- that it had before the storm.

3      Q.    And do you consider the roof that went

4  back on the building to be an upgrade from what was

5  there?

6      A.    It's cheaper.

7      Q.    It's cheaper.  Did it have any of the

8  components that were upgraded over what had been

9  there before?

10     A.    No.  It had -- they had less components.

11     Q.    Did they add insulation to the roof

12 because it was a code requirement?

13     A.    That's a broad question.

14     Q.    Well at some point was the roof scope out

15 of your hands --

16     A.    Yes.

17     Q.    -- Encore's.  So would it be fair to say

18 that exactly the decisions made, once Encore stepped

19 back and wasn't going to contract for the roof,

20 that -- would it be fair to say that you are not the

21 person to ask the questions to about this roof

22 compared to the one that was there before?

23     A.    Correct.

24     Q.    Okay.  Is there some reason why Encore

25 couldn't hire a local roofer?

1      A.     Again, it happened within, like, a two

2   day period, the owner just made that decision.

3      Q.     Who made that decision?

4      A.     The owner.

5      Q.     Okay.  You mentioned that Encore is a

6   Louisiana licensed contractor, right?

7      A.     Correct.

8      Q.     And you were aware that in Louisiana a

9   license is required for commercial work that exceeds

10  $50,000 correct?

11     A.     Correct.

12     Q.     And you knew that before a contractor

13  could perform the work, and, in fact, before a

14  contractor could even bid or enter into a contract

15  for the work, that the contractor had to be

16  licensed, right?

17     A.     Correct.

18     Q.     So in this particular project, Encore

19  could not legally enter into a contract with the

20  owner for this project until after it obtained a

21  Louisiana license, correct?

22     A.     Correct.

23     Q.     I have, from the records that I looked

24  at, that Encore became licensed on November 19,

25  2020.  Does that sound right?  Is that correct?

1          A.     Around that date.

2          Q.     Okay.  And you could produce your license

3    showing the date?

4          A.     Yes.

5          Q.     I have -- let me show you this.  So this

6    is a letter that I obtained from the State Licensing

7    Board dated August 3 -- actually I think that's a

8    typo, I just it got a couple of days ago -- 2021.

9    It wasn't in 2020.  So this was in response to a for

10   your request asking for your license.  And if you

11   see down at the bullet point, it says Encore holds

12   commercial license 70948, which was issued on

13   November 19, 2020.  Do you believe that to be a

14   correct statement by the licensing board?

15         A.     I think so, yes.

16         Q.     As a matter of fact, I'll ask you for a

17   copy of your certificate that the State Licensing

18   Board gives saying that you're licensed and showing

19   the date.  I'll ask you for that, to produce it.  Is

20   that all right?

21         A.     That's fine.

22         Q.     Okay.

23                 MS. WOLF:  I was going to offer,

24             file, and introduce this particular letter

25             in the record.  But I think what I'm going

```
 1          to do, because they put the wrong date on
 2          the top, just to avoid any confusion, I am
 3          going to ask them to submit a corrected
 4          letter, and I'll send it over to you,
 5          Michael.  But I don't really want to
 6          attach this one to this deposition because
 7          I find that confusing.  Even though he
 8          looked at it -- if that's okay.  Even
 9          though he looked at it on the record -- I
10          mean, I'm okay with attaching it, if you
11          find that confusing.  But I would prefer
12          to get a corrected letter.  Do you have
13          any --
14               MR. COX:  That's fine either way.
15               MR. WOLFF:  Mary Anne --
16               MR. COX:  We would stipulate that
17          that date is incorrect.  I mean, it's
18          obviously.
19               MS. WOLF:  All right.  In that case,
20          let me do that and I'll just get a
21          corrected version and send that over after
22          the fact.  But let me offer, file, and
23          introduce this August 3, it's supposed to
24          be 2021 letter that I got from the State
25          Licensing Board.  Let me attach this as
```

```
 1              Exhibit 1.
 2              (EXHIBIT NO. 1 IDENTIFIED)
 3                   MR. COX:  Okay.  That's good.
 4                   MS. WOLF:  And I will -- and just
 5              logistically, Ms. Villien -- to you when
 6              we're done.
 7                   [UPON AGREEMENT OF ALL COUNSEL,
 8              MR. WOLFF'S UNINTENDED UN-MUTED
 9              CONVERSATION ON UNRELATED TOPIC IS NOT
10              INCLUDED IN THIS RECORD]
11                   MS. WOLF:  John?
12                   MR. WOLFF:  Yeah.
13                   MS. WOLF:  We can hear you even
14              though you're muted.
15                   MR. WOLFF:  I wonder why.
16                   MS. WOLF:  I don't know.  But your --
17              the symbol showed muted, and yet we could
18              hear everything you were saying.
19                   MR. WOLFF:  I fixed it.  I apologize.
20                   MS. WOLF:  Okay.  Thank you.
21                   All right.  So just to -- Ms.
22              Villien, do I just e-mail you this
23              document when we're done, and you attach
24              it as Exhibit 1?
25                   COURT REPORTER:  Yes, ma'am.  That's
```

```
 1              fine.  I will put my e-mail in the chat,
 2              if that's good for you.
 3                   MS. WOLF:  Yes, that's good.
 4                   MR. WOLFF:  And, Ms. Court Reporter,
 5              anything I said, please don't include
 6              that.  That was not meant to be part of
 7              the record.  It was an off record
 8              conversation with something unrelated.  If
 9              that's okay with you, Mike?
10                   MR. COX:  Yeah.  Absolutely that's
11              okay.
12                   MR. WOLFF:  Thank you, sir.
13                   COURT REPORTER:  Ms. Mary Anne, I
14              assume that that's okay with you?
15                   MS. WOLF:  Absolutely.
16                   COURT REPORTER:  I just needed to
17              have everybody agree that it was to be
18              left off.
19                   MS. WOLF:  Correct.
20 BY MS. WOLF:
21     Q.   Mr. Monheiser, you were forthcoming with
22 the owner about Encore's license status?
23     A.   Pardon?
24     Q.   Did you advise the owner of Encore's
25 license status in Louisiana?
```

1          A.    Yes, ma'am.

2          Q.    Okay.  So the owner was aware of when you

3    got licensed --

4          A.    Yes.

5          Q.    -- and that you couldn't contract prior

6    to that point?

7          A.    Yes.

8          Q.    And what about Skyline?  Were they aware

9    of your license status?

10         A.    I -- I don't know.

11         Q.    You do not?

12         A.    I don't know.

13         Q.    And, in fact, the date on Encore's

14   contract with the owner is December 20, 2020,

15   correct?

16         A.    Yes.  I think so.

17         Q.    We can look at it.  As a matter fact,

18   let's go first to the proposal which is Tab E1.

19   Tell me when you're there.

20         A.    What would that be?

21         Q.    Tab E1.

22         A.    I don't have a Tab E.  I've got a Tab E,

23   but it's blank.  There's nothing in it.

24         Q.    Okay.  Then go to 1.

25         A.    Nothing in it.  I see a proposal.  Is it

1   Encore 057?

2       Q.    Yes.  You have it?

3       A.    Yes.

4       Q.    Okay.  So let's go ahead for the record

5   and state what we are looking at here is Encore's

6   proposal.  It's Bates numbered Encore 57 through 57.

7   Well, actually hold on -- 57.14.  All right.  So

8   it's dated December 13, 2020, correct?

9       A.    Yes.

10      Q.    All right.  And, in fact, that proposal

11  is after Encore became licensed, right?

12      A.    Correct.

13      Q.    At this point in December, mid-December,

14  you have come up with the contract price of

15  $1.36 million, right?  You see it in the middle of

16  the page?

17      A.    Correct.

18      Q.    And that's based on -- in your first

19  paragraph you say, it's based on the exterior plans

20  dated December 1, 2020, and interior design

21  submittals dated November 7, 2020, correct?

22      A.    Correct.

23      Q.    You have got a couple of -- you've got

24  three, actually, exhibits attached to the proposal

25  which identify the scope of work, right?

1      A.    Yes.

2      Q.    Okay.  Well we can read it to make sure.

3  Exhibit A following this letter lists our

4  inclusions, exclusions, clarifications, and

5  assumptions.  Exhibit B is a draft set of plans that

6  identifies our exterior working.  And Exhibit C is a

7  list of interior selections and submittals.  Right?

8      A.    Yes.

9      Q.    Mr. Monheiser, were you aware of -- well,

10  are you aware what RCV, or replacement cost value,

11  means in insurance coverage?

12      A.    Not fully.  I don't fully understand the

13  value.

14      Q.    Okay.  Did you have an understanding that

15  some of the insurance dollars were contingent upon

16  work actually being done and shown before the -- the

17  depreciation of the replacement cost value component

18  was owed?

19      A.    Can you repeat that question?

20      Q.    Yeah.  Were you -- did you have any kind

21  of understanding that the insurance policy in this

22  particular case had a component, a replacement cost

23  component that --

24      A.    Yes.

25      Q.    -- the owner to do the work prior to

1  becoming entitled to payment for the work?

2       A.    Yes.

3       Q.    Meaning -- you understood that.  Did you

4  have an understanding that Encore's documents, since

5  you were the one doing the work, would then be used

6  to submit to the insurance company to show that that

7  work was, in fact, done, and what the cost was?

8       A.    I don't have contact with the insurance.

9  So, like, that's not my job.  My contract is with

10 Joey Odom, Four-O.

11      Q.    Okay.  Well that's a question I didn't

12 ask, I don't think, but I need to ask that.  Did you

13 have any communication -- did Encore, or anybody

14 with Encore, have direct communication with the

15 owner's insurance company related to this matter at

16 any time?

17      A.    Not that I remember.

18      Q.    Okay.  Your communication was primarily

19 with whom on this project?

20      A.    The owner.

21      Q.    Joey Odom?

22      A.    Yes, ma'am.

23      Q.    And then the half a dozen or so times

24 that you talked to Jeff Major and walked the site

25 with him?

```
 1          A.     Yes, ma'am.
 2          Q.     Okay.  That was actually site visits.
 3   What about e-mails?  Did you have any e-mails with
 4   Skyline about this project?
 5          A.     Throughout at the beginning, yeah.  But
 6   the -- you know, maybe one or two throughout.
 7          Q.     Okay.  And what about phone calls?  How
 8   often would you talk with Jeff Major, or anybody
 9   with Skyline, about this -- throughout this entire
10   project?
11          A.     Yeah, they were -- I mean, there were
12   phone calls.
13          Q.     What was that?
14          A.     I said, yes, there were phone calls.
15          Q.     Okay.  And do you know how many you had
16   with him?
17          A.     No.
18          Q.     Did you have any discussions with the
19   owner about tracking the information that was needed
20   to submit to the insurance company for the
21   replacement cost value?
22          A.     Not that I remember.
23          Q.     How about any kind of conversations like
24   that with Skyline?
25          A.     I mean, materials, I guess, yeah.  I
```

1  mean, those are always -- Jeff would ask about

2  material costs.  So, yeah, those kind of items they

3  would ask.

4       Q.    Meanings what you talked about before, as

5  an example, ceiling tile costs?

6       A.    Yes, ma'am.  Yes, ma'am.

7       Q.    Was the general purpose of those

8  communications, was Jeff Majors trying to track the

9  cost to see if, you know, if costs were high, or

10  just what they were?  Do you know why he was asking

11  those questions?

12       A.    Because his -- it all comes down to

13  Xactimate.  Xactimate pricing is incorrect.

14       Q.    Was it your understanding that he was

15  using the data -- or the pricing that y'all talked

16  about to create his Xactimate estimate, or had it

17  already been done and he was curious to see if it --

18  you know, how the prices compared to reality?

19       A.    I'm not sure whenever his estimate was

20  done or his survey was done.

21       Q.    Okay.  Who determined if something that

22  was going back in scope -- in your scope was a

23  replacement in kind, or improvement?  Did you have

24  any obligations to make those kind of decisions?

25       A.    No.

```
 1            MR. WOLFF:  Mary Anne, do you want to
 2       stop share on that document?
 3            MS. WOLF:  Sure.  All right.  So do
 4       y'all see anything?  Did I stop it?
 5            MR. COX:  We still see the State of
 6       Louisiana document.
 7            MR. WOLFF:  Look on the bottom bar
 8       where -- next to chat.
 9            MS. WOLF:  Okay.
10            MR. WOLFF:  And it should say stop
11       share.
12            MS. WOLF:  It says new share.  I see
13       it.  Okay.  Thank you.  Is that better?
14 BY MS. WOLF:
15     Q.   Just to give me an idea of where you are
16 in the process.  Is the first floor -- let me ask it
17 this way.  Is Encore's contract with the owner
18 completed, or you're still doing work out there?
19     A.   I guess we are -- we are still doing work
20 out there, yes.
21     Q.   Is it more than the BE-CI window
22 component?  Is there more going on than the window
23 replacement?
24     A.   Yeah.  I mean, little items.  And more
25 specific to tenant issues than anything else that
```

1    would be required.

2         Q.    Okay.  So I heard you say window

3    replacement and then little items tenant related.

4    So can we be specific?  On the first floor, what

5    remains to be done for Encore?

6         A.    That's -- nothing on the first floor.

7         Q.    Okay.  So you're done?

8         A.    Yes.

9         Q.    And it's been accepted by the tenant and

10   by the owner, correct?

11        A.    Correct.

12        Q.    When did that -- was there some kind of

13   acceptance, or substantial certificate document, or

14   anything to document the date when it was done?

15        A.    That would -- yes, I think so, and the

16   owner would have that.

17        Q.    What would the owner have?

18        A.    I don't know.  A document saying they are

19   paying rent, or something of that sort.

20        Q.    Okay.  There's a certificate of occupancy

21   that's been issued for the first floor?

22        A.    Yes.

23        Q.    Okay.  And everything on the punch list

24   for the first floor is completed?

25        A.    Yes.

1     Q.    So --

2     A.    I think so.

3     Q.    Has Encore been paid in full, then, for

4  the first floor work, or how did you break that up?

5     A.    I didn't exactly break it up into floor.

6  It's by trade.  It's by division.

7     Q.    Okay.  So what remains to be done on the

8  second floor?

9     A.    That's tenant specific items.

10    Q.    Okay.  And what tenant?  Is there a

11 particular tenant that you're working towards to get

12 back in there?

13    A.    I don't know.  It's just a specific --

14 there are specific tenant items.  I don't --

15 whatever, or whoever, becomes a tenant, up there.

16 They're just tenant specific items, like, how the

17 kitchen is set up, data cables, those kinds of

18 items.

19    Q.    Okay.  Has Encore been provided with a

20 set of plans and/or specifications showing how to

21 layout the second floor?

22    A.    I've created variable amounts of sketches

23 for the second floor.  We have some possible

24 additions, I think, from an architect for an

25 addition of a bathroom.

1      Q.    Okay.  So let me clarify.  This is

2  outside of Encore's original contract scope, the

3  1.36 million didn't include actually finishing out

4  the second tenant space for a particular tenant, or

5  did it?

6      A.    It did.  It just -- there was no tenant

7  up there to begin with.

8      Q.    Right.

9      A.    So, again, giving a generalized number to

10 it.  Yeah, you know, usually whenever you have a

11 tenant, there's specific tenant finishes, unless

12 it's an emergency.

13     Q.    Okay.  So now I'm a little a bit

14 confused.  So let me see.  Did you have an amount of

15 money in the $1.36 million to do walls and finish

16 out scope for the second floor?

17     A.    Yes.

18     Q.    Okay.  And was that a -- was it set aside

19 as an allowance, or a contingency, or what?

20     A.    It was set -- I mean, in the -- you know,

21 hanging up sheetrock, insulation, all those things,

22 those were -- those were finishes.  It's really

23 small items.  Like, I guess you could say that

24 the -- how the kitchen or the break room is going to

25 be set up.  That's a tenant specific item.  They may

1  want it set up a different way.  Or where they want

2  their data cables to be ran.  Do they -- are they

3  going off of a mainline, or are they going off of

4  servers?  Is there going to be a server room?  If

5  there is a server room, there's a dedicated HVAC

6  system for that server room.  So on and so forth.

7  So there are specific items that I don't want to --

8  we don't want to do unless there is a tenant

9  specifying it.

10      Q.    But you're saying there's an allowance in

11  the $1.36 million to do those tenant specific items?

12      A.    Some of them, yes.

13      Q.    Okay.  But as of right now, you are not

14  doing that actual work because you haven't been

15  given the specific information you need to finish

16  the second floor; is that right?

17      A.    Yeah.

18      Q.    Okay.  Does that mean that Encore's

19  contract is just open?  You have the obligation to

20  go back to the second floor and finish it out for a

21  specific tenant at some point in time when they get

22  one?

23      A.    Yeah.  In a way, yes.  But again, going

24  throughout the window process, we will still be

25  here, so.

```
 1        Q.    Okay.  Have you talked to any specific
 2   prospective second floor tenants?
 3        A.    I think -- I have talked to a couple
 4   of -- yeah, one of them.
 5        Q.    Who is it?
 6        A.    I can't -- I can't remember.  They are
 7   all government agencies that I've -- that has been
 8   going up there.  I met with one in specific.  I
 9   can't remember their title.
10        Q.    When you say government agencies, state
11   government agency?
12        A.    I'm not sure.
13        Q.    Okay.  Did you speak directly with
14   anybody with this prospective tenant when they went
15   to the second floor, or came to see it?
16        A.    Can you repeat that question?
17        Q.    Yes.  Have you talked to anybody who is a
18   prospective tenant for the second floor?  Have you
19   personally and directly talked to any prospective --
20        A.    Yes.
21        Q.    Okay.  And you can only think of one
22   right now, or more?
23        A.    That I have actually had a personal
24   conversations with, yes.
25        Q.    Okay.  And did you get a business card or
```

```
 1    e-mail with the name of anybody on it?
 2         A.    No.  I think a lot of that went through
 3    Andrew.
 4         Q.    Andrew Vanchiere?
 5         A.    Actually I don't know his last name.
 6         Q.    With Latter & Blum?
 7         A.    I just know his name is Andrew.  He was
 8    the guy that handled Joey's leasing stuff.
 9         Q.    Okay.  A Latter & Blum realtor?
10         A.    Maybe.
11         Q.    Okay.  His first name is Andrew, and
12    that's what you know --
13         A.    Yes.
14         Q.    -- and that he handles Mr. Odom's
15    leasing?
16         A.    Yes.
17         Q.    Okay.  Were you involved in any
18    conversations where there was a discussion about
19    losing any prospective tenants for the second floor
20    for any reason?
21         A.    This was in passing.  I don't know
22    specific details.
23         Q.    Okay.  What do you -- what did you hear
24    in passing?
25         A.    Just about trying to get that second
```

1  floor finished.  There was questions asked, like,
2  how quickly could you do it?  And then, again, kind
3  of relating it just in passing conversations and
4  people visiting the job and walking upstairs.
5      Q.    And the work you're talking about is
6  what, the air-conditioning replacement?
7      A.    No.  It's -- I mean, it's drywall.  It's
8  everything.  A lot of these discussions happened at
9  the very beginning of the job even before I was --
10 had a signed contract.
11     Q.    Okay.  So before you had the signed
12 contract?
13     A.    There were people going in and out of
14 that second floor.
15     Q.    And just so that I understand this
16 correctly.  What you are saying is, that you can't
17 actually finish the second floor with the tenant
18 specific items until there is a tenant?  Because
19 they tell you what it is they want with all those
20 things that you mentioned, where they want the
21 server room?  How many offices?  How do they want
22 the break room?  So you have to have the tenant to
23 finish it, right?
24     A.    In a way, yes.  Usually whenever you have
25 a 27,000 square-foot building, and you've got a

1   tenant that's usually -- I mean, there's got to be
2   15, people -- 15, 20 people.  You usually try and do
3   some sort of specific tenant finish for that, yes.
4       Q.    Okay.  So is there any work that you can
5   do that you need to do, or can do, right now on the
6   second floor without a specific tenant?  Because
7   you've already said, I can't do the tenant specific
8   until there's a tenant.  And the HVAC work is
9   underway, right, the improvements to the HVAC
10  system?
11      A.    No.  That's not being done on the second
12  floor right now.
13      Q.    Okay.  So there's no HVAC improvements
14  going on on the second floor?
15      A.    Correct.
16      Q.    Is that still in discussion?
17      A.    Yes.
18      Q.    Okay.  Is that the floor that had
19  something, like, 17 air handler -- air handling
20  units running off of one condenser?
21      A.    The entire building was going off of --
22  not technically a condenser.  There's two units that
23  run the refrigerant.  But there's 18 -- I think when
24  I got there, 18 or 19 air handling units that were
25  running off of a condensing unit.

1    Q.    Okay.  And did ADG, the engineer,

2  recommend that that be -- the second floor HVAC

3  system be replaced, for that or any other reason?

4    A.    No.  I mean, it's a -- it's a precursor

5  to mini split units.  It's a -- the system works

6  fine.  There was a couple of air handling units that

7  had some issue.  But I mean, the compressor worked

8  fine.

9    Q.    Is there currently under consideration

10  the option to replace the HVAC system on the second

11  floor just like was done on the first floor?  Is

12  that currently being considered?

13    A.    Yes.

14    Q.    Do you know where the first floor

15  tenant -- we've been saying DHS, I think that's

16  Department of Homeland Security, or GSA, Government

17  Security Administration -- I'm guessing at these

18  acronyms.  Do you know what they mean, DHS?

19    A.    Yeah, the Department of Homeland

20  Security.  GSA, I'm not sure.

21    Q.    Okay.  That is a first floor tenant that

22  was in there when Hurricane Laura hit, right?

23    A.    One of those -- yeah, one of those two.

24    Q.    Do you know where they moved?  They had

25  to move out of the building because of damage from

```
 1  the hurricane; is that right?
 2       A.    Yes.
 3       Q.    Do you know where they went?
 4       A.    No clue.
 5       Q.    Let me go back to this proposal that we
 6  were looking at.  Again that's Encore 57 through
 7  57.14 for the record.  This proposal was
 8  incorporated into, and became part of, Encore's
 9  contract with the owner, right?
10       A.    Yes.
11       Q.    If you look at Part 8, it says, if owner
12  terminates the work after commencement of the 620
13  Esplanade Plaza Building -- are you with me?
14       A.    Yep.
15       Q.    Encore shall be paid an amount calculated
16  as follows.  Take the cost of the work incurred plus
17  a reasonable cost to stop and demobilize the work,
18  add the fixed fee of 20 percent.  I read that
19  correctly?
20       A.    Yes.
21       Q.    All right.  So the owner had a
22  termination provision in its contract with Encore
23  that allowed it to terminate for any reason, right?
24       A.    Correct.
25       Q.    And if the owner were to terminate the
```

1  contract, the owner would not have to pay the entire

2  $1.36 million, right, unless that's the amount of

3  work that was done, correct?

4      A.    Possibly.

5      Q.    So let's say if the owner terminated this

6  contract, you would take the cost of the work

7  incurred, that would be the amount of work that

8  Encore had done up to the point of termination,

9  right?

10     A.    Yes.

11     Q.    And then you would determine a reasonable

12 cost to stop and demobilize, and I'm assuming Encore

13 would then present the owner with a bill saying this

14 is how much it cost us to demobilize, right?

15     A.    Correct.

16     Q.    Any idea what that number would be?

17     A.    Not off the top of my head right now.

18     Q.    Okay.  And then you add a fixed fee of

19 20 percent.  So 20 percent of what?

20     A.    That's overhead profit.

21     Q.    What's that?

22     A.    Overhead profit ten and ten.

23     Q.    Okay.  So you would take the cost of the

24 work and add 20 percent for Encore's overhead and

25 profit?

1          A.     Correct.

2          Q.     Okay.  So the owner would have to pay for

3     the work done to date, and then pay a cost to

4     demobilize, if the owner had terminated this

5     contract, right?

6          A.     Correct.

7          Q.     In Section 11 it talks about a $50,000

8     contingency sum, and actually itemizes the things

9     that that can be used for.

10         A.     It's not specifically itemizing, it's

11    guesstimating.  It's a guess of what items it can be

12    used for.

13         Q.     Okay.  Did Encore use all of that $50,000

14    contingency in this project?

15         A.     I'm not sure.

16         Q.     Okay.  And then if you look down where it

17    says, funds from the construction contingency -- do

18    you see where I'm reading?

19         A.     Yes, ma'am.

20         Q.     Are not expected to be available for the

21    following items, which will be reimbursed out of the

22    overall project contingency.  Is that overall

23    project contingency a separate pot of money separate

24    from the 50,000?

25         A.     No.  It's the same 50,000.

```
 1        Q.    Okay.  So there weren't two contingency
 2  funds, it was --
 3        A.    No.
 4        Q.    -- one contingency fund?
 5              All right.  Let's move on to look at the
 6  contract, which is your Tab E2.  Tell me when you
 7  get there.
 8        A.    Okay.
 9        Q.    All right.  So for the record, we are
10  looking at something that's entitled construction
11  contract.  It is Bates numbered Encore 55 through
12  55.08.  Go ahead and look at the last page for me,
13  which is page 8 of 8.  This contract is signed by
14  Joey Odom a member of Eaux Holdings, LLC, correct?
15        A.    Correct.
16        Q.    And signed -- that would be your
17  signature Evan --
18        A.    Yes.
19        Q.    -- for Encore, correct?
20        A.    Yes.
21        Q.    The date of the contract is December 20,
22  2020, correct?
23        A.    Correct.
24        Q.    And the next paragraph is where it states
25  that Exhibit A, the proposal, is incorporated into
```

1   this contract.  Do you see that?

2       A.    Yes.

3       Q.    Okay.  Let's look at Section 1,

4   contractor's work.  It says.

5             Contractor shall perform all work and

6   shall furnish all supervision, labor, materials,

7   equipment, supplies, and all other things necessary

8   for the completion of the work described in Exhibit

9   A, and work incidental thereto in strict accordance

10  with manufacturer specifications, applicable codes,

11  and regulations, and the terms of this contract to

12  the satisfaction of the owner.

13            I read that correctly?

14      A.    Yes.

15      Q.    That was Encore's obligation under this

16  contract, correct?

17      A.    Yes.

18      Q.    And other than the items that you have

19  explained to us that are remaining, is it your

20  testimony that Encore has, in fact, complied with

21  this section?

22      A.    To the best of my knowledge.

23      Q.    Okay.  Let's look at Section 3, the

24  contract sum.  We've already mentioned it before.

25  The agreement was for Encore to do the scope of work

```
 1  for $1,360,000.  Correct?
 2       A.    Sorry.  You kind of got muffled there for
 3  a second.  I couldn't --
 4       Q.    Okay.  Let's look at section three, the
 5  contract sum.
 6       A.    Yes.
 7       Q.    The contract sum for this project was
 8  $1,360,000.  Correct?
 9       A.    Yes.
10       Q.    All right.  And let's look at payments.
11  So the first payment, initial payment, is seven days
12  after execution of this contract, and the owner is
13  to pay Encore $100,000.  Correct?
14       A.    The amount of $100,000.
15       Q.    I'm sorry, maybe -- did I say that wrong?
16       A.    I heard 400.
17       Q.    I think I said 100,000.
18       A.    Yes.  Yes.  100,000.
19       Q.    And the owner, in fact, paid that, right?
20       A.    Yes.
21       Q.    All right.  And then next is a progress
22  payment of 250,000 will be made by the owner to the
23  contractor 30 days after the initial payment is due.
24  Do you see that?
25       A.    Correct.
```

1      Q.    All right.  So that's the progress

2  payment.  And the owner did, in fact, make that

3  payment, correct?

4      A.    Correct.

5      Q.    And then the next section is 3.2.2 which

6  is the final payment.  And the final payment, which

7  is the contract sum plus any change orders, and less

8  the initial payment, and less the progress payment,

9  subject to holdings permitted hereunder shall be due

10 within 30 days of the last of the following to

11 occur.  So there are four items there.  One, the

12 final written approval of the work performed has

13 been provided by the owner, right?

14     A.    Correct.

15     Q.    Number two, the contractor has fulfilled

16 the requirements of Section 12.2 of this contract

17 which is the lien release section.  You can look at,

18 if you'd like to to verify that.  That's correct?

19     A.    Yes.

20     Q.    And number three, the contractor has

21 provided owner with any and all written manufacturer

22 warranties, correct?

23     A.    Correct.

24     Q.    And number four, the owner has received

25 total payments for depreciation held by the

```
 1   insurance company, right?
 2        A.    Correct.
 3        Q.    So these were -- this was a specific
 4   provision written into Encore's contract with the
 5   owner, right?
 6        A.    Correct.
 7        Q.    The final payment doesn't happen until
 8   after all four of these items are done, right?
 9        A.    Yes.
10        Q.    Did Encore have any separate written
11   agreements with the owner outside of this proposal
12   and this contract, and, of course, the written
13   change orders which you have produced?  Is there any
14   other separate agreement related to payment, or is
15   this it?
16        A.    That -- that's it.
17        Q.    Okay.  So you've gotten final written
18   approval of the work from the owner for the first
19   floor?
20        A.    Correct.
21        Q.    Not the second floor, and not the
22   exterior, right?
23        A.    Correct.
24        Q.    And have you given a lien release at this
25   point?
```