The 30(b)(6) Deposition of

# ENCORE, INC. - Day 2

Through

# EVAN  MONHEISER

In the Matter of

# EAUX HOLDINGS, LLC

versus

# SCOTTSDALE INSURANCE CO.

Taken On

# AUGUST 06, 2021



Exhibit 7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

EAUX HOLDINGS, LLC

VERSUS                        CIVIL CASE NO. 2:20-CV-01582
                              JUDGE:  JAMES CAIN
                              MAG:  KATHLEEN KAY

SCOTTSDALE INSURANCE CO.


*****************************************************


VIDEOTAPED 30(b)6 DEPOSITION OF

ENCORE, INC., BY REPRESENTATIVE EVAN MONHEISER


(CONTINUATION - DAY 2 OF 2)

The continuation of the videotaped 30(b)6 deposition
of ENCORE, INC., BY REPRESENTATIVE EVAN MONHEISER
appearing remotely via videoconference from Lake
Charles, Louisiana was taken in the above entitled
cause, pursuant to the following stipulation, before
Deborah Villien, Certified Court Reporter, appearing
remotely from Lafayette, Louisiana, on the 6th day
of August 2021, beginning at 9:08 a.m.

```
 1                    REMOTE APPEARANCES

 2   FOR THE PLAINTIFFS: EAUX HOLDINGS, LLC

 3

 4   COX COX FILO CAMEL & WILSON, LLC
     MR. MICHAEL K. COX
 5   723 BROAD STREET
     LAKE CHARLES, LOUISIANA 70601
 6   337-436-6611
     mike@coxatty.com
 7

 8   FOR THE DEFENDANTS: SCOTTSDALE INSURANCE CO.

 9

10   KEOGH, COX & WILSON, LTD
     MS. MARY ANNE WOLF
11   MR. JOHN P. WOLFF, II
     701 MAIN STREET
12   BATON ROUGE, LOUISIANA  70802
     225-383-3796
13   mwolf@keoghcox.com

14

15   ALSO PRESENT:

16   MR. CHARLIE QUIROZ, VIDEOGRAPHER

17   MR. GRANGER STUCK

18

19

20

21

22

23

24

25
```

```
 1                      I-N-D-E-X

 2

 3   EXAMINATION CONTINUING FROM AUGUST 5, 2021:

 4   BY MS. WOLF (Continued) ..........................5
     BY MR. COX .....................................195
 5   BY MS. WOLF (Continued) ........................228

 6

 7   EXHIBITS:

 8   EXHIBIT 2   (STATE LICENSING BOARD LETTER ......190
                  AUGUST 6, 2021)
 9   EXHIBIT ENCORE P-1(ILLUSTRATION) ...............211

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              S-T-I-P-U-L-A-T-I-O-N
 2        It is stipulated that the continuation of the
 3   videotaped 30(b)6 deposition of ENCORE, INC., BY
 4   REPRESENTATIVE EVAN MONHEISER via videoconference is
 5   taken on the 6th day of August 2021, before Deborah
 6   Henderson Villien, Certified Court Reporter.
 7        The deposition is being taken pursuant to notice
 8   and the Federal Rules of Civil Procedure.
 9        The parties hereto waive all formalities in
10   connection with the taking of said deposition, except
11   the swearing of the witness, and the reduction of the
12   questions and answers to typewriting.
13        Before the completion of the deposition, the
14   deponent and/or a party did not request to review the
15   transcript.
16
17
18
19
20
21
22
23
24
25
```

1    REPORTED REMOTELY FROM LAFAYETTE, LOUISIANA

2         (DEPOSITION RESUMED - DAY 2 OF 2)

3          Friday, August 06, 2021 9:42 AM

4              THE VIDEOGRAPHER:  We are now on the

5          record.  This deposition is a continuation

6          of August 5.  Today is August 6, 2021, and

7          the time 9:42 a.m.

8    EVAN MONHEISER, called as a witness at the instance

9    of the defendants, after having been duly sworn on

10   August 5, 2021, continued examination and testimony

11   as follows:

12              CONTINUATION OF EXAMINATION

13   BY MS. WOLF:

14       Q.   Good morning, Mr. Monheiser.  Would you

15   turn to the Tab M in the binder that I provided, and

16   let's go --

17              THE WITNESS:  I'm sorry.  Do I say

18          continue?

19              MR. COX:  Yeah, hit continue.

20              THE WITNESS:  Sorry.

21              MS. WOLF:  That's fine.

22   BY MS. WOLF:

23       Q.   Go to tab M1.  What I'm going to do is go

24   through Encore's invoices and payment.

25       A.   Okay.

1      Q.    So if you're at Tab 1, you should see
2   Encore 60; is that what you have?
3      A.    Yes, ma'am.
4      Q.    All right.   And this is Encore's first
5   invoice, correct?
6      A.    Yes.
7      Q.    And it's dated October 28, 2020, correct?
8      A.    Yes, ma'am.
9      Q.    This is before Encore had obtained its
10  Louisiana license, right?
11     A.    Yes, ma'am.
12     Q.    And this work, if you look down in the
13  description of work, is for submittals, project
14  management, mobilization, mitigation, and
15  engineering, correct?
16     A.    Yes, ma'am.
17     Q.    And the amount is 24,927.50; is that
18  right?
19     A.    Yes, ma'am.
20     Q.    And so at this point, you had gotten the
21  go-ahead from the owner for this work, right, and
22  actually performed the work, correct?
23     A.    Yes.
24     Q.    Is this amount, the almost 25,000, is
25  that included in the $1.36 million contract sum?

1      A.     Some of this is.  The other would be a
2  change order.  I think 9, item 4 would be the change
3  order from Hurricane Delta.
4      Q.     Okay.  Are you saying -- oh, some of this
5  is Hurricane Delta change order?
6      A.     Just the mitigation portion.
7      Q.     Mitigation.  Okay.  And the rest of it
8  was included in the $1.36 million contract sum?
9      A.     I think so.
10     Q.     Did all of this -- other than the
11 Hurricane Delta, is all of this within the insurance
12 scope for this project for the Hurricane Laura
13 project, or do you know?
14     A.     I'm not 100 percent sure.  This, I think,
15 was just a basic -- just based off, like, a three
16 month deal.  And so we probably put some numbers in
17 there.  But, yeah, I mean it's -- I'm not
18 100 percent sure if they meet up exactly.
19     Q.     All right.  And this -- the owner paid
20 this amount, right?  If you look at Tab number 8,
21 Encore 61, there is a check in there for this
22 amount.  So this was paid on November 4, correct?
23     A.     Yes, ma'am.
24     Q.     All right.  Let's move on to Tab 2, which
25 is invoice number 2.  Are you there?

1        A.      Yep.

2        Q.      That's Encore 62.  This is invoice

3   number 2 in the amount of $100,000 correct?

4        A.      You mean Encore 64?

5        Q.      It should be Encore 62 is the invoice.

6   Do you have 62?  It should be under Tab number 2.

7        A.      I just have a payout that says Encore

8   0064.

9        Q.      All right.  Let me see if perhaps I can

10  pull this up for us.  Okay.  I have it opened on my

11  screen, so I will do a screen share, since it's not

12  in your binder.  Can you see Encore 62 on my screen?

13       A.      Yes.

14       Q.      This is -- it's dated --

15       A.      That's a statement.  That's a billing

16  statement.

17       Q.      Okay.  I was going by this right here

18  where it says invoice 995-02, 100,000 --

19       A.      Yes.

20       Q.      -- so a billing statement or an invoice,

21  same thing, right?

22       A.      Yes.

23       Q.      And it's dated December 24, 2020; is that

24  right?

25       A.      Correct.

1    Q.    And this is -- this correlates to that

2  initial payment that was called for in your contract

3  with the owner.  Do you recall that from yesterday,

4  that we looked at the payment schedule and the

5  contract, and it called for $100,000 initial

6  payment?

7    A.    Yes.

8    Q.    And that's what this is, correct?

9    A.    Yes.

10    Q.    All right.  Let's look at -- I believe

11  you said that you do have in your notebook Encore

12  64-64.02 which is the pay application, right?

13    A.    Yes.

14    Q.    So that pay application goes along with

15  invoice number 2, right?  It's also dated

16  December 24, and it shows an amount owed of

17  $100,000.  Right?

18    A.    Correct.

19    Q.    Okay.  So at this point -- and again, I'm

20  looking at Encore 64, the first page of your pay

21  application.  It shows the original contract sum of

22  $1.36 million, right?

23    A.    Correct.

24    Q.    I'm reading item one, original contract

25  sum.  And then item two for $6,340 is change order

```
 1   number 1 for Hurricane Delta work.  We looked at
 2   that yesterday.  Do you recall?
 3        A.    Correct.
 4                  COURT REPORTER:  I'm sorry, Ms. Mary
 5            Anne, the numbers cut out.  Could you
 6            repeat that number for me, please?
 7                  MS. WOLF:  Yes.  $6,340 for change
 8            order number 1, Hurricane Delta.
 9   BY MS. WOLF:
10        Q.    And Mr. Monheiser, you have confirmed
11   that that's what that amount is for, right?
12        A.    Correct.
13        Q.    Okay.  If you look at sheet 2, the
14   continuation sheet of the payout.  At the scheduled
15   value, it doesn't show $1.36 million, right, it
16   shows $561,802.49, correct?
17        A.    Correct.
18        Q.    But typically on a pay application, you
19   would have outlined all the description of work, and
20   the scheduled value would add up to the contract
21   sum; is that right?
22        A.    Yes.
23        Q.    Why doesn't this -- why doesn't page 2 of
24   the payout match page 1?
25        A.    I'm not sure.  Maybe just a common
```

1    mistake.

2        Q.    You agree that the way it would typically

3    work is all the scheduled values would be listed in

4    column C, and would add up to the contract sum,

5    correct?

6        A.    Correct.  But the invoice -- let me see

7    here -- I mean, it says it on the front portion of

8    it.  We may have just left it off the back.

9        Q.    So at this point what page 2 of the pay

10   application is showing is a balance to finish of

11   $443,214.99.  Do you see that in column H?

12       A.    Yes.  And that's for -- that's only for

13   divisions 1 through 7.

14       Q.    Okay.  So we've established that page 2

15   of the payout doesn't match page 1, because it

16   doesn't account for the full contract value, right?

17       A.    Correct.

18       Q.    Okay.  Do you -- does Encore do projects

19   where a lender is involved, and the lender is

20   reviewing pay applications?

21       A.    Not that I'm aware of.

22       Q.    Okay.  And how about do you ever have a

23   surety involved where your surety is reviewing pay

24   applications?

25       A.    Not that I'm aware of.

1       Q.     Do you ever do projects where there is an
2   architect or an engineer of record who reviews pay
3   applications?
4       A.     I'm sure we have, but I'm not -- I don't
5   know when.
6       Q.     Okay.  And, in fact, page 1 of the pay
7   application has a blank for the design professional
8   of record to actually certify the payment; is that
9   right?
10      A.     Correct.
11      Q.     But in this case, in this particular
12  project, as you testify to yesterday, there was no
13  design professional of record who was reviewing
14  Encore's pay applications; is that correct?
15      A.     Correct.
16      Q.     And the only certification on here is
17  your signature under contractor?
18      A.     Correct.
19      Q.     The owner paid the $100,000, correct?  We
20  can -- if you want to look at Tab 8 at Encore 63,
21  there's a check in there for $100,000?
22      A.     Yes.
23      Q.     And that was paid on December 29, 2020,
24  correct?
25      A.     Yes.

1    Q.   Do you recall ever submitting a pay
2    application like this where page 2 doesn't match
3    page 1, and having it rejected by any party who is
4    reviewing it?
5    A.   It's a common mistake.  I mean, I
6    don't -- I don't remember anything happening like
7    that.
8    Q.   Let's look at the next tab, which is
9    Tab 3.  You should have Encore 65 in there, which is
10   invoice number 3.
11   A.   I've got Encore 67.
12   Q.   Pay application.  If you turn --
13   A.   I'm sorry, I got this.  Yes.  I've got
14   this, it's the next one.
15   Q.   Okay.  So you have Encore 65, and that is
16   invoice number 3, correct?
17   A.   Yes.  It's a billing statement.
18   Q.   Okay.  And it's dated January 27, 2021,
19   right?
20   A.   Yes.
21   Q.   And the amount is 250,000; is that right?
22   $250,000?
23   A.   Yes.
24   Q.   And that is -- that corresponds to the
25   progress payment that we looked at yesterday from

1    Encore and the owner's contract; is that right?

2        A.    Yes.

3        Q.    And the owner paid that $250,000 on

4    February 3, if you look, please, at Tab 8.  That

5    should be Encore 66.

6        A.    Yes.

7        Q.    Let's look at the pay application, which

8    is Encore 67 and 67.02.  This is pay application

9    number 3; is that right?

10       A.    Yes.

11       Q.    And it's dated January 27, 2021, correct?

12       A.    Yes.

13       Q.    You see it has a contract date of

14   December 11; do you see that?

15       A.    What was that?

16       Q.    There's a -- under contract date, it says

17   December 11, 2020.  Do you see where I'm reading

18   that up at the top, right?

19       A.    Yes.

20       Q.    Was there a contract that Encore entered

21   into with the owner on --

22       A.    No, that's -- again, I think that's just

23   a common mistake.  At this point, I was actually

24   sending him pay apps and invoices as well, just in

25   regular form upon his request.  And those aren't in

```
 1   here.
 2        Q.    So is --
 3        A.    They were in my folder that I turned
 4   over.
 5        Q.    What's not in there?
 6        A.    My invoices to him, the ones that he
 7   requested, they are of the same amounts, it's just
 8   not in the pay app.
 9        Q.    Okay.  Is that we just looked at, Encore
10   65?
11        A.    No.
12        Q.    Okay.  So back to Encore 67, the pay
13   application.  Again, if you look at page 2 of the
14   pay application, under column C, the scheduled
15   value, what's shown here is a number, $955,819.27.
16   Correct?
17        A.    Correct.
18        Q.    And so that's not the full contract value
19   that's shown on page 1 of the pay application,
20   right?
21        A.    Correct.
22        Q.    And so that means that the balance to
23   finish in column H of $607 -- $607,486.30 that
24   number is not correct?  That's not the balance to
25   finish this project?
```

1    A.    Correct.  That's not the balance to

2  finish the project.

3    Q.    And what's your explanation for why

4  page 2 of the pay application doesn't match page 1?

5    A.    It just -- I think -- it looks like maybe

6  we were just putting in at that point what we were

7  working on, and not the full out estimated values.

8  That's what it looks like.

9    Q.    Okay.  Let's look at Tab 4.  And let's

10 look at the invoice first, which is Encore 68, or

11 the billing statement.  Are you there?

12   A.    Yep.

13   Q.    All right.  So it's dated March 22, 2021,

14 correct?

15   A.    Correct.

16   Q.    And the amount on this invoice is

17 $315,000; is that right?  That's the amount shown as

18 the balance, and the amount that Encore is billing

19 the owner for, right?

20   A.    Correct.

21   Q.    And if we look at Encore 71 and 71.02,

22 that's the corresponding pay application, correct?

23 It's got the same date on it?

24   A.    Yes.

25   Q.    And we talked about this yesterday, but

1   Encore is billing the owner another payment, even

2   though, as we saw in the contract, Encore had not

3   yet reached the point where it could request a final

4   payment because the project wasn't completed, or

5   accepted, and lien free, all the stuff we looked at

6   yesterday in the contract?

7       A.   Can you repeat the question?

8       Q.   Yes.  What I'm asking is.  At this point

9   Encore is submitting an invoice, a billing

10  statement, to the owner for $315,000.  But this

11  progress payment isn't called for in Encore's

12  contract with the owner, correct?

13      A.   It isn't called for, but it's also

14  stating that we wouldn't submit another one.

15      Q.   But at this point, Encore had not

16  complied with the part of the contract under

17  3.2.2 -- this is on Encore 55 and 55.02 -- the

18  contract between Encore and the owner, Section 3.2.2

19  final payment.  Encore had not yet complied with the

20  four items that I read through yesterday, final

21  written approval, a lien release, turned over

22  manufacturer warranties, and owners received payment

23  for depreciation from the insurance company.  Those

24  four items at this point have not been fulfilled; is

25  that correct?

```
 1        A.    Give me one second here.

 2        Q.    I'm sorry.  I didn't hear you.

 3        A.    I'm sorry.  Give me one second here.

 4              Right.  But I don't think that the --

 5   this isn't the final invoice, so it doesn't -- it's

 6   not relevant.

 7        Q.    Okay.  I understand your position.  But

 8   when this invoice was submitted, and this pay

 9   application on March 22, 2021, I am correct in

10   saying that Encore had not yet complied with the

11   provisions of 3.2.2 of its contract.  That's a

12   correct statement, right?

13        A.    But we wouldn't comply because it's not

14   the final invoice.

15        Q.    I understand your explanation.  But I

16   just want to make -- I just need an answer for the

17   record that I am --

18        A.    That's my answer.

19        Q.    So I think it's yes or no.  At this point

20   on March 22, 2021, had Encore fulfilled the

21   requirements set out in 3.2.2 of its contract?

22        A.    I have a question.  Why would I comply

23   with that, if this isn't the final invoice?  It

24   states that that's going to happen during the final

25   invoice.  This is not the final invoice.  So why
```

```
 1   would I have to comply with that?
 2        Q.   Okay.  I understand your question, but at
 3   this point --
 4        A.   It's not a yes-or-no answer.
 5        Q.   On March 22, 2021, Encore had not, as you
 6   said, complied with 3.2.2, those four items on
 7   there?
 8        A.   Correct.
 9        Q.   Does Encore's schedule of values, looking
10   at part B, description of work, does it include that
11   $50,000 contingency, or where is that in there?
12        A.   It is actually in the schedule values,
13   it's in each division.
14        Q.   Meaning -- does that mean that the
15   $50,000 contingency is dispersed among the various
16   items --
17        A.   Correct.
18        Q.   -- it's not one lump sum contingency
19   $50,000?
20        A.   Yes.  I mean, it's dispersed around
21   through each division.
22        Q.   Okay.  All right.  Let's move on to Tab 5
23   and look at -- let's look at the invoice first,
24   that's Encore 72.  Do you have that?
25        A.   Yes.
```

1    Q.    All right.  So Encore is billing the

2  owner for, at this point, it is carrying over the

3  $315,000 plus there's an additional amount of

4  $375,102.42, correct?

5    A.    Yes.

6    Q.    Okay.  And then there are two monthly

7  interest payments in there, each totaling $1890; is

8  that right?

9    A.    Yes.

10    Q.    Why was Encore charging the owner

11  interest?

12    A.    Because he couldn't pay the invoice.

13    Q.    The $315,000 invoice?

14    A.    Correct.

15    Q.    Has the owner ever agreed to pay that

16  interest?

17    A.    Yes.

18    Q.    Has it been paid?

19    A.    Pardon?

20    Q.    Has it been paid, the interest?

21    A.    Depending on how you delegate the

22  payments that he's paid us.

23    Q.    The owner has agreed to pay you these two

24  interest payments, each of $1890?

25    A.    Yes.  It's a -- it was an agreement in

 1   the contract.

 2        Q.    There was an agreement in the contract

 3   for interest on any amounts that were overdue,

 4   right?

 5        A.    Correct.

 6        Q.    Has the owner ever disputed that the

 7   interest was owed by saying that those payments were

 8   not overdue because they were not owed yet under the

 9   contract?

10        A.    Can you repeat that question?

11        Q.    Has the owner ever taken the position

12   that it does not owe the interest because under the

13   contract, Encore was not yet entitled to those

14   payments, the 315,000?

15        A.    Why wouldn't I be entitled to that

16   315,000?

17        Q.    I'm asking if the owner has ever taken

18   that position or ever --

19        A.    No, we have not.

20        Q.    I'm sorry.  We talked over the top of

21   each other.  So my question --

22        A.    Sorry.

23        Q.    I'm asking whether or not the owner has

24   ever disputed the interest?

25        A.    No.

1    Q.    And is there more interest that was
2  charged, or just these two monthly interest payments
3  on the 315,000?
4    A.    I think this -- just these two on that
5  amount.
6    Q.    That's the only interest that Encore has
7  charged the owner, is these two monthly interest
8  payments on the --
9    A.    On that payment, on that $315,000
10  payment.
11    Q.    Okay.  Has -- are there more -- was there
12  more interest charged to the owner for anything
13  else?
14    A.    Going to the next invoices, if he can't
15  pay them.
16    Q.    Okay.  Well we'll look at those.  All
17  right.  So if you look at Tab 8, there was a payment
18  made on June 3, the owner paid $550,000 right?
19  That's Encore 70.
20    A.    Correct.
21    Q.    And that -- how have you applied that,
22  does that cover 315,000?
23    A.    Yes.  It's covering the 315 and some of
24  the previous -- or the next invoice that I sent in.
25    Q.    And actually let me go back to Tab 5.

```
1   Because I don't think I talked about the pay
2   application for that.  Yeah.  So that's Encore 74
3   and 74.02; do you have that?
4        A.    Yes.
5        Q.    All right.  If we look at the change
6   order amount, now it's $101,520 correct?
7        A.    Correct.
8        Q.    And that includes change order number 1
9   that was the Hurricane Delta change order.  And I
10  believe change order number 4.  If you remember,
11  change order number 4 -- if you look on page 2 of
12  your pay application, you'll see that was the VRF
13  change order for phase one?
14       A.    Correct.
15       Q.    All right.  So that sum is $95,180 for
16  change order number 4, correct?
17       A.    Correct.
18       Q.    And so those two things added together
19  give you the change order number that's in item
20  number 2, correct?
21       A.    Correct.
22       Q.    This one's not -- you haven't signed this
23  one.  Has this been submitted to the owner?  Was it
24  submitted on May 6, 2021?
25       A.    I'm not sure.  I'd have to find when I
```

```
 1  sent this.
 2       Q.    Okay.  So that payment that we looked at
 3  under Tab 8 that was $550,000 on June 3, that would
 4  be for -- that would cover the $315,000 invoice
 5  number 4, and part of invoice number 5 that was for
 6  $375,102.42 correct?
 7       A.    Correct.
 8       Q.    Why hasn't the owner paid invoice
 9  number 5 in full?
10       A.    I wouldn't know.  You'd have to ask him
11  that.
12       Q.    Have you asked him?
13       A.    We've had discussions about payments.
14       Q.    So this invoice number 5 and pay
15  application number 5, the one I'm looking at that's
16  not signed, has a date of May 6.  So between May 6
17  and today, August 6, 3 months, how many
18  conversations have you had with the owner, with Joey
19  Odom, about payment of this invoice?
20       A.    Maybe two times.  I don't remember.
21       Q.    What has he told you about the reason he
22  hasn't paid invoice number 5?
23       A.    I honestly do not remember.  I think -- I
24  can't remember the exact words that he used.
25       Q.    Can you tell us in general what his
```

```
 1  position is?
 2       A.    I have no idea.  Again, I can't speak for
 3  him.  I can tell you what he -- maybe, possibly in a
 4  abbreviated, that he didn't have funding for it.
 5       Q.    So Joey Odom told you -- what's the most
 6  recent time you talked to Joey Odom about payment of
 7  invoice number 5 or, in fact, payment for any of the
 8  other work that Encore has not yet been paid for?
 9       A.    Probably that conversation that him and I
10  had about -- about the -- the splitting of the
11  invoice.
12       Q.    Splitting of which invoice?
13       A.    Not splitting.  Essentially to -- the
14  check being cut for both of these, but him not being
15  able to pay both of them.
16       Q.    Have you talked to anybody, other than
17  Joey Odom, about payment for Encore's invoices?
18       A.    Not that I recall.
19       Q.    Did you have any discussions with
20  Skyline, or with Jeff Majors, about payment to
21  Encore?
22       A.    Not that I recall.
23       Q.    Specifically have you had any
24  conversations with Jeff Majors, or with Skyline,
25  about when Encore will be paid the remainder that
```

1    it's owed for the work that it's done?

2         A.    No.

3         Q.    Did you have any conversations with

4    anybody else, other than Joey Odom, about when

5    Encore is going to receive payment?

6         A.    I'm sure I have.

7         Q.    Who would that be?

8         A.    Maybe my boss, Aden.  Yeah.  Yeah, that's

9    probably one of -- a couple of them.  But again

10   it's -- once that invoice was paid, just general

11   conversations about when we would get paid next.

12        Q.    All right.  So in total, what I have as

13   checks here is 550, 250,000 -- I'm sorry.  550,000,

14   250,000, 100,000.  That's 900,000.  Plus there was

15   that almost 25,000.  So you've gotten a little over

16   900,000.  Does Encore consider it paid in full at

17   this point?

18        A.    No.

19        Q.    Are you saying that Encore is entitled to

20   the full 1.36 million?

21        A.    Yes.  We are entitled to the full

22   1.36 million.

23        Q.    And let's look at -- let's look at the

24   next pay application, which is under Tab 6 --

25   actually Tab 7.  This is Encore 75 and 75.02; do you

```
 1   have that?
 2        A.    Under Tab 7.  I'm sorry.  Yeah.
 3        Q.    This one is also numbered pay application
 4   number 5, and this one is signed.  So if you would
 5   go back to Tab 5, that's Encore 74.
 6        A.    What's the date -- what is -- what is the
 7   label of my folder that this is in?
 8        Q.    The label of your folder?
 9        A.    Yes.  Not the folder, but what's the --
10   what's the -- the invoice number?
11        Q.    I probably can pull that up, but let me
12   ask my question first to make sure that you need it.
13   I guess you are saying you need that in order to
14   answer my question.  So let me ask my question
15   first.
16             Compare Encore 74 and Encore 75, all
17   right, both of them are numbered pay application
18   number 5, correct?
19        A.    Yes.
20        Q.    All right.  Encore 74 is dated May 6,
21   2021, correct?
22        A.    May 6.
23        Q.    I'm looking at the date where you signed
24   it -- or actually the date filled in, but you didn't
25   sign it.
```

```
 1        A.    Correct.  5/6.

 2        Q.    And then if you look at Encore 75, this

 3   one you did sign, and it's dated June 10, 2021,

 4   correct?

 5        A.    Correct.

 6        Q.    So is this a typo and this second one is

 7   supposed to be application number 6, or did this

 8   application number 5 that is signed take the place

 9   of the prior one?  I'm just trying to figure out why

10   there were two pay application number 5s?

11        A.    I need to know the title of the document

12   that I named it, and what folder it's in, if it's in

13   the same pay application folder.  Because I don't

14   think I had even sent this one in.  Typically

15   sometimes when we are getting ready to submit an

16   invoice, you know, we just copy and paste the folder

17   and just rename the folder in our dropbox.  And I

18   will start the process.  Sometimes I like to

19   pre-make an invoice.  So if this one -- I don't

20   think this one was ever submitted.  I was pre-making

21   invoices.

22        Q.    Are you saying Encore 74 in the amount of

23   $375,102.42 the one that's not signed, that was the

24   one that may not have been submitted?

25        A.    No, 75.  Encore 75.  That one -- that one
```

1    was probably a premade.  That one looks like it's a

2    premade invoice.

3         Q.    Okay.  So you --

4         A.    I've never -- I've never submitted it.

5         Q.    Okay.  So back to Encore 74, that's the

6    unsigned payout from May 6, that one -- you do

7    believe you submitted that one for 375,000 plus?

8         A.    I know I submitted that one.

9         Q.    Okay.  And then so back to Encore 75.

10        A.    I got -- I mean, if you have this, you

11   are leaving out documents here that are in my folder

12   that I gave you guys.

13        Q.    Did you bring your documents with you on

14   your computer?

15        A.    Yes.  I've got -- I'm on another computer

16   right now.  This isn't -- this could be a copy and

17   paste of a previous folder.  And so, I mean, I

18   haven't sent this invoice in yet.

19        Q.    You're referring to Encore 75, the one --

20        A.    Correct.  Encore 75.

21        Q.    Encore 75, the pay application that's

22   dated June 10, 2021, and signed, in the amount of

23   200,000 -- $200,731.50 has not yet been submitted?

24        A.    Correct.

25        Q.    Why hasn't -- has this work been done,

1  the $200,000 worth of work, has it been done?

2      A.    Yeah, probably.  Yeah, I would say all of

3  it.  Yeah.

4      Q.    If the work's been done, and you are

5  ready to certify this as work that's done, and was

6  in fact done in June, why has Encore not submitted

7  this invoice to the owner for payment?

8      A.    I wouldn't -- I do not know.

9      Q.    Who for Encore can answer the question as

10 to why Encore has not submitted --

11     A.    It would be me.  You know, again,

12 sometimes if I -- I haven't submitted this invoice.

13 I submit all these invoices to Joey.

14     Q.    Let me ask my question.  I'm sorry.  I

15 hadn't formulated it yet.  And then you can answer

16 it, okay.

17           So I thought I understood that you said

18 you didn't know why Encore had not yet submitted a

19 $200,000 plus invoice for work that's been done

20 since June 10.  Do you know why Encore has not yet

21 submitted this invoice for payment, or this pay

22 application?

23     A.    We just -- I just haven't submitted it

24 yet.

25     Q.    Why?

1    A.    I have not submitted it yet.  There's no,

2 like -- I just haven't submitted it.

3    Q.    As contractor, have you paid these subs

4 who did this work?  Have you paid them yet?

5    A.    You have the checks that we have sent to

6 subcontractors.

7    Q.    Do you know whether or not you have paid

8 your subcontractors who did this $200,000 worth of

9 work?

10    A.    What was that?

11    Q.    Do you know, without looking at your

12 documents, whether or not you are holding payment to

13 these subcontractors who did this $200,000 worth of

14 work, or whether or not you have paid them?  Do you

15 know?

16    A.    Not off the top of my head.  I have to

17 look at my documents.

18    Q.    Do you have subcontractors asking you for

19 payment right now for work done before June 10?

20    A.    I think I -- I think we have paid a

21 majority of invoices.  So nobody has asked me for

22 anything.  I've actually had to ask for them to

23 invoice me for the work.

24    Q.    All right.  Is this -- this Encore 75,

25 which hasn't yet been submitted, this won't be the

1  final pay application, right, because there is still
2  work remaining shown on here in column H, balance to
3  finish of 195,758.58 correct?
4       A.    Yes, correct.
5       Q.    So Encore still has this pay application
6  to submit to the owner, and then a final, or do you
7  know if there's going to be other pay applications
8  after this one goes out?
9       A.    From -- we are -- I would say that I'm in
10  the midst of working on the full out window
11  estimate.  So yes, I mean, I would want to -- there
12  would be some additions or subtractions depending on
13  the second floor tenant finish, if he selects to do
14  so, or whenever the windows get put in.
15      Q.    How much retainage is the owner entitled
16  to hold out?  What percentage?
17      A.    I did not hear.
18      Q.    It's in column I, right, column I is for
19  the retainage on the pay app?
20      A.    Retainage is number 5 on my pay app.  Are
21  you talking about on this side?  Yes, it is in
22  column I.
23      Q.    Okay.  And so from the payout, whether
24  you're looking at page 1 or page 2, there is no
25  retainage withheld; is that right?

1        A.      Correct.

2        Q.      So looking at -- I'll call it the

3    June 10, 2021, pay application, there is a balance

4    to finish of $195,758.58 correct?

5        A.      Which pay app was that?

6        Q.      The one dated June 10, 2021, Encore 75.

7        A.      Can you repeat that question, please?

8        Q.      Yes.  If you look at Encore 75, the pay

9    application dated June 10, 2021, the balance to

10   finish this project is $195,758.50.  Correct?

11   That's in column H, balance to finish.

12       A.      That's what it looks like, yes.

13       Q.      So as of June 10, the remaining work was

14   just under 200,000.  And in that time from June 10

15   to today, the last 2 months, what percentage of that

16   $200,000 remaining has Encore done?

17       A.      I'm not 100 percent sure.  I'd have to go

18   over this to be able to answer that.  I'm not

19   100 percent sure.  I know because there is work that

20   hasn't been completed, and some of the window items

21   as well.  So additions and subtractions.  So I

22   wouldn't -- I'm not 100 percent sure at this moment.

23       Q.      Would you be able to give a rough

24   estimate?  Are you about halfway finished with the

25   work that was remaining on June 10, or more than

1    halfway finished?

2          A.    Around there.

3          Q.    Okay.  And can you generally itemize as

4    of today's date what are the remaining items on your

5    to do list to finish out this project?  What do you

6    need to do?

7          A.    Windows, and any selected tenant finishes

8    that I named off yesterday.

9          Q.    Okay.  And for windows, what -- that's

10   the window replacement?

11         A.    Yes.

12         Q.    Okay.  And remind me.  Is that -- I mean,

13   from your perspective, is that an upgrade, or do you

14   have an opinion on whether or not the window

15   replacement is an upgrade or --

16         A.    Can you repeat that question?  I'm sorry.

17   You were kind of cutting out.

18         Q.    Yes.  The window replacement, is that an

19   upgrade, an improvement to the building?

20         A.    No, that's storm damage.

21         Q.    Okay.  Have you ever called that window

22   replacement a cosmetic upgrade?

23         A.    The full window system?

24         Q.    Yes.  The window replacement that's going

25   to be done under your contract, you --

1      A.     Not that I'm aware of.

2      Q.     I'm sorry.  We talked over the top of

3  each other.  Have you ever called that a cosmetic

4  upgrade?

5      A.     Not that I'm aware of.

6      Q.     Do you know if anybody --

7      A.     It's not a cosmetic upgrade.

8      Q.     It's not?

9      A.     No.

10      Q.     And then I didn't understand item two

11  that you said was remaining.  I heard the word

12  selected.  What else is on your list?  What was the

13  second --

14      A.     I'm sorry.  Selected tenant finishes.

15      Q.     Tinted finishes?

16      A.     Tenant finishes.

17      Q.     Oh, tenant.

18      A.     The items that we talked about yesterday.

19      Q.     For the second floor?

20      A.     Yes, ma'am.

21      Q.     And do you need a tenant before you can

22  select the finishes?

23      A.     I guess they would be the ones that

24  select them.  He would need a tenant.  Again, if he

25  wanted to do something, finish it out right now,

1  then they come in and they want to change stuff up.

2       Q.    Okay.  So you are on hold on second floor

3  finishes until there is a tenant that selects the

4  finishes?

5       A.    Correct.

6       Q.    All right.  And what else is on your to

7  do list?

8       A.    I wouldn't -- I mean, just demobilization

9  stuff, getting my trailer out of there, dumpster,

10 lifts, little things like that.

11      Q.    All right.  So the window replacement,

12 and what's the status of that?  Are y'all ready to

13 go with it?  I think --

14      A.    I was actually supposed to have a meeting

15 this morning with that with the engineers.

16      Q.    With the engineers.  That's BE-CI?

17      A.    Correct.

18      Q.    Okay.  And what was the meeting supposed

19 to be about?

20      A.    Their proposals for site visits, and

21 consulting, and water testing.

22      Q.    Okay.  What's the water testing for?

23      A.    What it would sound like.

24      Q.    You mean, they are going to water test

25 the windows that are in there now?

```
 1        A.    No, the new -- the new ones.
 2        Q.    Okay.  Maybe I misunderstood.  I thought
 3   the windows had not yet been replaced?
 4        A.    It's consulting, site visits, and water
 5   testing during the installation.
 6        Q.    Okay.  So when it's being -- after it's
 7   installed, BE-CI is going to do water testing?
 8        A.    I don't exactly -- that's what we were
 9   going over.
10        Q.    Okay.
11        A.    You know, whenever they show up, are they
12   doing water testing when they show up?  Are they
13   doing it afterwards?  You know, I don't -- those are
14   the things that I'm not really sure, that need to be
15   clarified with him.
16        Q.    Okay.  So you had a meeting scheduled
17   today at 620 Esplanade?
18        A.    No, it was a -- it was a conference.
19        Q.    Okay.  So a remote conference with BE-CI
20   engineers?
21        A.    Correct.
22        Q.    Okay.  And who at BE-CI were you going to
23   conference with?
24        A.    I'm not sure.  There's quite a few people
25   that are in there.
```

1      Q.    Okay.  It's all BE-CI people?

2      A.    Yes.

3      Q.    Do you have an e-mail from them?

4      A.    Yes.

5      Q.    So I guess since the last date on your

6   subpoena return, all the documents that you gave to

7   us, you have been continuing to work on this

8   project.  So if I asked you to give us an update

9   from that last date of whenever you produced

10  everything to today, you can provide that

11  information, all your e-mails?

12     A.    Everything should be in that folder.

13     Q.    Right.  But you gave us the folder

14  sometime back.  Maybe it's been a month or so.  I'm

15  not really sure.  So we --

16     A.    Right.

17     Q.    I want a supplement is what I'm asking

18  for, of anything that's happened since you gave us

19  your documents.

20     A.    Yeah.  Again, I think everything has, you

21  know, been added to the folder since.  We just

22  continue to add stuff to that folder.

23     Q.    Okay.  Well, I will send a request, and

24  I'm asking for it now, for Encore to supplement its

25  documents with any, you know, e-mails, invoices, all

1  communications with subcontractors, with BE-CI.

2  I'll look at the date -- you know, it's not really

3  the date you produced it to us, it would have been

4  the date you captured it.  So from that date to

5  today I need a supplement from you.  And also did

6  you use texts on this project with anybody?  Did you

7  text people?

8      A.    I'm sure I have.

9      Q.    Okay.  Who would you text on this

10 project?

11     A.    I don't -- I can't recall exactly each

12 individual.

13     Q.    So you think it may be a lot of people

14 that you have in your texts that you talk to about

15 this project?

16     A.    I couldn't tell you.

17     Q.    What about Joey Odom?  Did you use texts

18 to talk to him?

19     A.    Not really.  I was -- again, I was right

20 across his -- right across the hallway from his

21 office.  So anything that we needed to discuss, I

22 just went over there to talk about it.

23     Q.    What about Jeff Majors?  Did you text

24 with him?

25     A.    Possibly.  I'm not 100 percent sure.

1      Q.     Who were your other main contacts on this
2  project?  What about Aden Monheiser?  Did you --
3      A.     Aden was pretty much done with the
4  project at the beginning.
5      Q.     Okay.  Let me ask you at this point to
6  make sure -- do you still have the same phone that
7  you used starting last year in September 2020?
8      A.     Yes.
9      Q.     Okay.  Make sure that you don't delete
10  any texts, keep those.  And I will ask you for -- to
11  produce texts with Jeff Majors.  And if there's
12  anybody else on this project that you had
13  substantive communications with via text, I'd like
14  to get those starting from September, I guess --
15  what was your date of first involvement in this
16  project?
17      A.     It was around September, mid September,
18  October-ish.  Again, I'm not -- I don't have the
19  exact date that I was down there.
20      Q.     Okay.  So going back to about
21  September 15, 2021.  So you know you had texts with
22  Jeff Major, we'll ask for those, and anything with
23  Joey Odom.  And if you had any other substantive
24  texts with anybody about this project, I'll ask for
25  those starting on September 15.  So please don't

```
 1  delete any of those.
 2            MR. WOLFF:  Mary Anne, can we
 3        actually make that August 28.  Because
 4        there were some indication of very early
 5        contact.
 6            MS. WOLF:  Absolutely.  Yeah.
 7  BY MS. WOLF:
 8     Q.   So just looking at Encore 75, that's,
 9  again, the June 10 pay application.  That's our last
10  pay application that we have.  If you look page 2,
11  the scheduled values, it's got a grand total of
12  $1,455,180.  Correct?
13     A.   What was that?
14     Q.   Yeah.  Look at Encore 75, the second
15  page.  Are you there?
16     A.   Is this the second folder?  I'm sorry.
17     Q.   We're on --
18     A.   Sorry, Encore 75.  I got you.  I see.
19  I've got to use my tabs.
20     Q.   This is the June 10 pay application,
21  page 2, scheduled values grand total $1,455,180.
22  Correct?
23     A.   Correct.
24     Q.   And that is the contract amount of
25  1.36 million, plus a change order amount, a net
```

1   change order amount of $95,180 correct?

2       A.    Correct.

3       Q.    We got that from page 1 --

4       A.    Yep.

5       Q.    -- on the change order.

6             So that amount, 1. -- let me round off to

7   1.5 million, it's actually 1.455 million, when

8   Encore is completely finished, that building will be

9   back to its pre-Hurricane Laura condition, plus some

10  improvements, right, for that sum of money?

11      A.    Yes.  Minus -- I mean, not improvements,

12  but which should be additional with the windows, as

13  well.

14      Q.    We talked about improvements.  You have

15  told us at least you know of the items that you used

16  change orders to track.  Those are improvements or

17  upgrades over --

18      A.    Okay.  Yes.  I got you.  Yes.

19      Q.    And of course you have said that this

20  amount excludes the roof, correct?

21      A.    Correct.

22      Q.    That's not in Encore's price.  And it

23  excludes any of the initial mitigation which was not

24  within Encore's scope, correct?

25      A.    Right.

```
1         Q.    And you may have touched on this, but I
2   just want to point out, or ask the question, that
3   the change order amount for change order number 4
4   changed between the two pay applications.  It was --
5         A.    But I haven't submitted this pay
6   application.  I'm looking at the folder that I
7   turned over to you guys.  That pay application,
8   looking in your folder, is labeled 995-06.
9         Q.    Okay.  And you're saying the one that is
10  Encore --
11        A.    The one you're talking about right now
12  has not been submitted.
13        Q.    Got it.  Okay.
14        A.    I do apologize.  But, again, if I have
15  the context of the label and my file name it's easy
16  for me to decipher.
17        Q.    I understand.
18              MS. WOLF:  The next thing I'm going
19              to do is start the data logs.  But this is
20              a good time for a short break, like, a
21              five minute break.  Is that okay?
22              MR. COX:  Sure.
23              MS. WOLF:  All right.  We'll get back
24              in 5 minutes.
25              THE VIDEOGRAPHER:  Going off the
```

```
 1              record.  The time is 10:43.
 2                     (OFF THE RECORD)
 3                 THE VIDEOGRAPHER:  We are now on the
 4              record.  The time is 10:57.
 5   BY MS. WOLF:
 6         Q.    Mr. Monheiser, I did have a couple of
 7   more questions about invoices.  If you look at
 8   book 2 please, and go to Tab N.  N is going to be
 9   the first tab in the book, and go to 24.  Let me
10   know when you're there.
11         A.    24?
12         Q.    24.  It should be Encore 12.0690 and
13   0691.  Is that what you see?
14         A.    Yes, ma'am.
15         Q.    All right.  So this is an e-mail from you
16   to Mr. Odom on December 24, 2020.  Please see
17   attached invoice and current statement for the
18   construction work at 620 Esplanade Street.
19              If you turn the page, you'll see an
20   invoice and it references a subcontractor, Ryan
21   Crane -- Ryan Crane and Acoustical Specialties,
22   right?  Do you see that?
23         A.    Yes.
24         Q.    And this amount was $11,761.05 correct?
25         A.    Yes.
```

1      Q.     What was this work?

2      A.     This is a subcontractor estimate.  This

3  is actually an order form for the Nichiha panels.

4      Q.     For what panels?

5      A.     The Nichiha panels on the outside of the

6  building.  This is the supplier.

7      Q.     Okay.  Is this an invoice that is

8  submitted to Mr. Odom for payment?

9      A.     No.  This is -- I don't really know what

10  this would be.  I may have meant -- sent this as a

11  mistake.  This is what -- you could probably

12  reference this with a check that have we cut for

13  Nichiha.  But, yeah, I don't know why I would send

14  this.  All this is, it is a subcontractor estimate

15  submittal form.  And this is not an invoice.  This

16  is what I sent to order materials from Acoustical

17  Specialties.  They are a supplier of the Nichiha

18  panels.

19      Q.     Are those the panels that are being used

20  on the outside of the building?

21      A.     Yes, ma'am.

22      Q.     If you go back to the first page, and

23  it's -- the subject line is invoice.  The attachment

24  says invoice 995-02.  And it says.

25             Joey, please see attached invoice and

```
 1   current statement for the construction work at 620
 2   Esplanade Street.  With tomorrow being Christmas,
 3   you do not have to worry about the seven days.
 4        A.    Okay.
 5        Q.    Is that asking him to pay this invoice?
 6        A.    This isn't an invoice.
 7        Q.    It's called an invoice in your e-mail,
 8   right?
 9        A.    The sheet says subcontractor estimate
10   submittal form.
11        Q.    Right.  I got that part.  Now I'm asking
12   you about Encore 12.0690, your e-mail to Mr. Odom.
13   The subject line says invoice --
14        A.    I'm sorry, Mary Anne.  You were kind of
15   muffled there, right there.  I'm sorry.
16        Q.    Go back to Encore 12.0690.  That is your
17   e-mail to Mr. Odom, correct?
18        A.    Yes, ma'am.
19        Q.    All right.  The subject line says,
20   invoice, correct?
21        A.    Yes.
22        Q.    If you look at the attachments, it says
23   invoice 995-02, correct?
24        A.    Correct.
25        Q.    And if you see the subject, it says.
```

```
 1              Joey, please see attached invoice.
 2    Correct?
 3         A.    Correct.
 4         Q.    And then it says.
 5              With tomorrow being Christmas, you don't
 6    have to worry about the seven days.
 7              Isn't that a reference to seven days to
 8    pay it?
 9         A.    Correct.
10         Q.    So when you sent this e-mail, your intent
11    was to have Mr. Odom pay this as an invoice,
12    correct?
13         A.    No.  This isn't -- this isn't an invoice.
14    The invoice that I would be referencing said, please
15    see attached invoice for construction work at --
16    yeah, I mean, that would be the title of the
17    document is 995-02, that's the invoice.  This is not
18    that invoice.
19         Q.    Okay.  So the attached invoice is
20    referring to the invoices that we have looked at
21    previously?
22         A.    I don't know what this invoice -- this is
23    not an invoice.  When have never talked about this
24    sheet before.
25         Q.    Right.  I'm talking about where it says
```

1  attachment, invoice 995-02, we talked about that,

2  that's what we just talked about --

3       A.    Yes.

4       Q.    -- so that's what's attached?

5       A.    Yes.

6       Q.    Okay.  And so what was the point of

7  sending Mr. Odom the contractor estimate?  What

8  did -- why did he want that?

9       A.    I wouldn't know.  I mean, maybe I sent it

10  to him just to show him the prices of the panels.

11  Or maybe I just -- I sent it to him on accident and

12  it was just one of those that was up.  But, yeah,

13  this is a -- this is a subcontractor estimate form.

14  Essentially I use this as an order form to order

15  panels.

16       Q.    All right.  So let's go to Tab 42, and

17  look at Encore 12.0930.  Are you there?

18       A.    12.0930, yes, ma'am.

19       Q.    Okay.  So this is -- I'm reading at the

20  top right, 995.  That's your job number for this

21  project right, 995?

22       A.    Yes, ma'am.

23       Q.    All right.  And this is a change order

24  log, which we talked about yesterday.  It's dated

25  February 1, 2021.  And it lists out -- essentially

1    lists out nine change orders, correct?

2         A.    Yes.

3         Q.    And has a total of $55,819.92 correct?

4         A.    Correct.

5         Q.    And I'll go ahead and assume that the

6    answer is, that based on your testimony yesterday,

7    this wasn't an invoice for the owner to pay.  This

8    was a way to track things that you considered to be

9    improvements to the building; is that right?

10        A.    Yes.

11        Q.    It has a payment received date of

12   January 3, 2021, next to three of the items.  What

13   does that payment -- what does that correspond to?

14   Is it one of the checks that we have looked at

15   earlier?

16        A.    Yes, I think it's just referring to the

17   fact that he has paid that.  And we may be able to

18   go back and figure out when everything was finished

19   up with these three items.  But, yeah, that's

20   whenever he -- it's just referencing that he has

21   paid that.

22        Q.    Okay.  And about the interest.  We looked

23   at the invoices, and I only saw those two interest

24   payments that we talked about for the 315,000.  I

25   didn't see any invoice from Encore to the owner that

1  states any other interest payments.  Do you have

2  any?

3       A.    No.  I -- that -- whatever -- that was

4  the possible last invoice that I sent him

5  referencing to that, I think 05.

6       Q.    You've given us all of the invoices?

7       A.    Yes.  I mean, everything that I sent him.

8  Again, but there's -- I -- sometimes I feel

9  ambitious and I start -- just start making stuff

10  ahead of time.  So that's -- again, there are some

11  things that are in there that I, you know, may have

12  not even sent.  I just put them in there

13  experimenting with different ways to do stuff.

14       Q.    All right.  So now we can go to Tab G,

15  which is the daily logs.  That's going to be in your

16  first binder.

17       A.    I'm sorry.  Did you say G?

18       Q.    G, yes.  So I think you told us yesterday

19  that these were -- you created these daily logs; is

20  that correct?

21       A.    Yes, ma'am.

22       Q.    And, in fact, if you look -- and I'm

23  looking, for the record, at Encore 11 through 11.05.

24  And if you look at the left-hand column called added

25  by, all of the names are your name, right?

1          A.     Yes.
2          Q.     Would you describe these as detailed logs
3    and notes of the progress and status of the project?
4          A.     Just generalized notes just in case
5    somebody needs to step in.  If I'm gone, that they
6    would know what's going on.  Some of them are
7    specific, some of them aren't.  Yeah.
8          Q.     When you were keeping these logs, were
9    you intentionally leaving any topics out?
10         A.     I would have no reason to.
11         Q.     Okay.  And were you -- was there anything
12   specifically that you were told to track, or to make
13   sure that you captured, in these logs?  Did anybody
14   else give you any input as to what went in them?
15         A.     No.  These are my logs.  I don't know
16   why --
17         Q.     Nobody gave --
18         A.     I keep the same logs for every single job
19   that I've got, just marking down general dates,
20   general conversations with people.  So, no.
21         Q.     And no one gave you any specific
22   instruction to include anything in particular in
23   these logs?
24         A.     No.
25         Q.     So they start -- if you go to Encore

1    11.05, the first entry date is September 15, 2020,
2    correct?
3          A.    Let's see here.  Yes.  It says job
4    created -- I'm sorry -- preliminary schedule has
5    been submitted.  9/15/20 is the first actual item
6    that I posted.
7          Q.    Okay.  And the last date on it is
8    June 23, 2021, correct?  It's on the first page.
9          A.    Yes, ma'am.
10         Q.    So have you made any entries into your
11   daily log after June 23, 2021?
12         A.    I don't think I've made any logs since
13   then.
14         Q.    Is there a reason why you stopped keeping
15   track in your daily logs of the progress of the job
16   on June 23, 2021?
17         A.    Not anything specific.  Not until I have
18   a majority of the items taken care of.  We haven't
19   really had -- there's been no work that's been going
20   on that's been out there, nor has there been any
21   significant items that I should put in there.
22         Q.    Okay.  So the first item -- let's go to
23   September on Encore 11.05.  The very first entry is
24   job created September 21, 2020, correct?
25         A.    Yes.

1    Q.    And at that point when you created that
2 job, it was, what, to provide an estimate to the
3 owner?
4    A.    No, it's just whenever I have added the
5 folder to Dropbox.  And so we were just tracking
6 that job.
7    Q.    Okay.  And next entry is job created, no
8 official estimate can be submitted?
9    A.    Correct.
10    Q.    At that point, you couldn't bid the job
11 or give an official estimate because Encore wasn't
12 yet licensed in the state, correct?
13    A.    I couldn't submit an estimate, correct.
14    Q.    All right.  Next is 9/15 you submitted a
15 preliminary schedule to the owner, that means Joey
16 Odom?
17    A.    Yes.
18    Q.    Is that the preliminary schedules that we
19 looked at yesterday, the three schedules that we
20 looked at in your folder?
21    A.    That's not the three schedules, it says
22 preliminary schedule.
23    Q.    Okay.  Was one of those schedules the
24 schedule that you submitted to the owner?
25    A.    It could have been.  I'm not sure,

1  whatever I -- what I submitted to him as the
2  preliminary schedule because it wasn't labeled, my
3  label.
4      Q.    All right.  I have a e-mail, we'll look
5  at it in a minute.  We'll go through the daily logs.
6  But I have an e-mail dated September 15 with an
7  attached schedule.  So we'll look at that.  But you
8  did give a schedule?  Based on this entry right
9  here, you did give a schedule?
10     A.    Yes.  Yeah, I gave some sort of schedule.
11  I just don't know which one it would be.
12     Q.    And then you wrote in here.
13          This is just on the inside, no exterior
14  work, need updates on available funding.
15          What does that entry mean?
16     A.    Which day are you talking about?
17     Q.    I'm on the third item from the bottom
18  where it talks about the preliminary schedule.
19     A.    Okay.  I see it.  Sorry.  I guess, I
20  mean, we just want to know that -- possibly the
21  status of where Joey is that with insurance or
22  funding.
23     Q.    And when you wrote in here that schedule
24  that we're going to look at from September 15, you
25  make a note that this is inside only, no exterior

1  work is included in that schedule, correct?

2      A.   Correct.

3      Q.   And that information was conveyed to the

4  owner?

5      A.   Depending on what was in the e-mail.  If

6  I stated that in the e-mail or not, I wouldn't know?

7      Q.   Did you tell him?  Did you keep him

8  apprised of what you were putting in the schedule?

9      A.   Whatever was in the e-mail is what I

10 would tell him.

11     Q.   Okay.  I think you have testified that

12 you've had -- you had multiple conversations with

13 him since your desk was set up right by his, or on

14 the same floor, correct?

15     A.   Yes.  But, again, looking at the date,

16 again, I wasn't -- I may have not been there

17 whenever I submitted some of these items.

18     Q.   Were you also submitting the schedule to

19 Skyline, or Jeff Majors?

20     A.   Yes, I believe.

21     Q.   Okay.  And so did you have communications

22 with Jeff Majors where they asked you to give them a

23 schedule?

24     A.   I can't remember who asked me to give the

25 schedule.  It was just -- it may have even been in

1    an e-mail.  Somebody asked me to give a schedule.

2         Q.    Okay.  And you told them it was a

3    preliminary schedule?

4         A.    Yes, ma'am.

5         Q.    All right.  So let's go up to the 9 --

6    the September 19 entry.  Job folder has been created

7    in Dropbox, plans of DHS have been uploaded.

8    Waiting on plans for second floor.  So at this

9    point, that's when they're giving you the plans for

10   the building so that you could start to use those

11   for your estimate, correct?

12        A.    Let me see here.  Sorry.  What was that

13   date?

14        Q.    September 19.

15        A.    Okay.  Sorry.  I got it.  September 19.

16   And where are you referencing this to?

17        Q.    Job folder has been created in Dropbox.

18   Plans of DHS have been uploaded to plans folder.

19   Still waiting on plans for the second floor.

20        A.    Yes.

21        Q.    Okay.  Let's move on to the October

22   entries.  I noticed that there is no entries from

23   September 19 through October 11.  And googling, I

24   see that Hurricane Delta was on October 9.  Do you

25   know why you don't have any entries from

1   September 19 to October 11?

2        A.    I may have not been there.  I came down,

3   left, and then came back down, like, the day before

4   Hurricane Delta.

5        Q.    Before -- did you say before?

6        A.    Yes, ma'am.

7        Q.    So you were in Louisiana and in Lake

8   Charles for Hurricane Delta?

9        A.    Yes.  Well actually I was in -- I wasn't

10  actually in Lake Charles.  I was around the area.

11       Q.    Did you go and assess Hurricane Delta

12  damage at 620 Esplanade?

13       A.    I don't think I -- I didn't assess.  I

14  just -- I walked the building.  Yeah, I guess you

15  could say assessed the damage.

16       Q.    Was there damage from Hurricane Delta?

17       A.    No.  Just minor leaks.  Nothing that

18  wasn't there before.  There was no demo.  There was

19  no -- nothing that was additionally added.  Actually

20  held up pretty well.

21       Q.    Okay.  There were some leaks from

22  Hurricane Delta?

23       A.    Yeah, from the damage that was caused by

24  Hurricane Laura.

25       Q.    Okay.

```
 1        A.    The windows that were busted out, they
 2   had plywood on them.  The -- again, kind of walking
 3   around the site, I don't know the exact locations
 4   where this was at.  But you can see where there
 5   was -- where there were leaks that were happening
 6   underneath windows that didn't have good sheathing.
 7   Some of the panels that were missing, those kinds of
 8   items.  I think -- you know, but again, there was --
 9   I think I set up a minimal amount of equipment in
10   there, but no demo was done.
11        Q.    All right.  So if we look at the
12   October 11 entry, you have on there post-storm
13   inspection, and that's referring to Hurricane Delta,
14   correct?
15        A.    Uh-huh.
16        Q.    A quarter of the temp roof blew off,
17   correct?
18        A.    Yes.
19        Q.    No serious leaks or remediation needs?
20        A.    Yep.
21        Q.    And then if you keep reading down, it
22   says there's going to be a new temporary roof put on
23   on November 12, right?
24        A.    Let me see here.  Yes.
25        Q.    Generator was delivered and hooked up,
```

1  trailer will be here October 11.  What trailer is

2  that referring to?

3      A.    That's my trailer.

4      Q.    So you had a trailer on site starting on

5  October 11?

6      A.    Around there depending on when it

7  actually got here.

8      Q.    Okay.  That's part of mobilization to the

9  site to do work?

10     A.    Yes.

11     Q.    So at this point, you had gotten enough

12 of a go-ahead from the owner to start mobilization?

13     A.    Not -- he -- yeah, I think I would

14 probably have some sort of go-ahead to be able to do

15 something here.  But depending on where our trailer

16 was at, I might have just shipped it to here.

17     Q.    So the rest of your entry is, walked site

18 and marked windows for replacement, inspected the

19 exterior, looked at specific wall details to

20 determine appropriate replacement, HVAC contractor

21 will have to be local.  Will need some electrical

22 attention before build back starts.

23          Those were your notes as of that date,

24 correct?  That was your assessment of the building?

25     A.    Yes.

1      Q.    All right.  And next it says.

2            Building structure is in good condition.

3   Main issues are windows, 50 will need to be

4   replaced, siding will need to be replaced.  Some

5   curtain walls will need attention.

6            That, too, was your assessment as of the

7   October 11 date, correct?

8      A.    Yes.

9      Q.    On the October 11 date, just above that

10  one, you set up ten dehumidifiers and fans, power

11  came back on, met potential HVAC, Industrial

12  Refrigeration Corporation.  So you met with the HVAC

13  subcontractor on that date?

14     A.    Yeah, I met -- let me see here -- yes, I

15  met him on that date.

16     Q.    Okay.  And that's the one that eventually

17  got the contract to do the work, correct?

18     A.    Yes, eventually.  He got -- he got a part

19  of it.

20     Q.    Okay.  You had more than mechanical sub?

21     A.    Yes.  Not -- I had Dubois Sheet Metal,

22  they did -- they ran all the ducts.

23     Q.    Okay.  Some of these -- the entries are

24  all small font.  So I apologize --

25     A.    That's fine.

1        Q.     -- it takes me a while to read them.

2               So on -- I'm looking at the date of -- so

3    look at the date for October 29.  And you actually

4    have two entries, so look at the first one.  Have

5    you got that one?

6        A.     Yes, ma'am.

7        Q.     Phone call with Patrick Rooney for

8    Priority Floors?

9        A.     Yes.

10       Q.     Priority Floors is the subcontractor that

11   you used for the flooring?

12       A.     Yes.

13       Q.     All right.  And then you write, they will

14   be the flooring company for this job.  So as of

15   October 29, you had selected a flooring

16   subcontractor, correct?

17       A.     Let me see here.  Yes.

18       Q.     All right.  Will start to collect W-9 and

19   write up contract for them.  And of course, the hold

20   up there is you can't actually contract with them

21   until Encore gets its license, correct?

22       A.     Correct.

23       Q.     And then the next sentence says.

24              There is an understanding that the

25   flooring may change depending on DHS sign off on the

```
 1  flooring.
 2       A.    Yes.   There -- GSA has requirements for
 3  carpet.
 4       Q.    Okay.  So that was -- and, in fact, if
 5  you keep reading, it says.
 6            To make sure there is no delay, I
 7  provided the designer with GSA preapproved flooring
 8  selections.
 9            So you were having to wait for both the
10  designer to do its job, plus DHS to give sign off,
11  before you could order any materials, correct?
12       A.    Let me see here.  What date was this?
13       Q.    October 29.
14       A.    Okay.  Let me see here.  I'm sorry.  I
15  want to make sure that I understand your question
16  and reference.  Are you saying that I had not
17  received?
18       Q.    So I'll ask my question again.
19       A.    Yes.  I'm sorry.
20       Q.    Are you on the October 29 --
21       A.    Yes, ma'am.
22       Q.    -- phone call with Patrick Rooney?
23       A.    Yes, sir.  Yes, ma'am.
24       Q.    Okay.  So let's go down.  It says.
25            There is an understanding that the
```

```
 1   flooring may change depending on DHS sign off on the
 2   flooring.
 3            So as of this date, you did not have DHS
 4   sign off on the flooring, correct?
 5       A.   Correct.  But I did have it from the
 6   designer.
 7       Q.   Okay.  Did you use Ducote HVAC and
 8   Electrical for this job?
 9       A.   No.
10       Q.   Okay.  All right.  Let's look at some of
11   the -- let's move into November now, and look at
12   some of the November dates.  On 11/24, so this was
13   that notice to proceed date in your contract, right,
14   the 11/24 date?  Do you remember that?
15       A.   Yes.
16       Q.   All right.  So on November 24 you note
17   that there were two electricians on site at
18   7:00 a.m. working on first floor demo to make it
19   safe.  So as of that date that the owner said you
20   could start, and this is before you entered into the
21   contract, you actually had electricians under
22   contract, and they did show up on site to start work
23   at 7:00 a.m., correct?
24       A.   They were -- they were there.  I don't
25   think I had them under contract.
```

1    Q.    So you're saying you had not signed a

2 written contract, but you had hired them to come do

3 the work?  They were under your scope?

4    A.    Yes.  Again, I may not -- I'm not really

5 sure exactly how that's framed.  But, yeah, I mean,

6 they may not have had a signed contract at that

7 point.

8    Q.    The two electricians that were there as

9 preparatory work to make the building safe so you

10 could start your work, those -- that electrician was

11 hired by Encore, correct?

12   A.    Yes.

13   Q.    All right.  Let's move on to see what's

14 happening in December.  So on December 7, if you

15 look at that entry, you've got four electricians on

16 site.  And then it says.

17         Martin Insulation stopped by for prep

18 material to spray foam roof deck.

19   A.    Yep.

20   Q.    And I asked you about this yesterday.

21 Was Martin Insulation one of Encore's

22 subcontractors?

23   A.    Yes.

24   Q.    And was -- did Martin Insulation do this

25 spray foam deck -- roof deck work?

```
 1        A.    Pardon?
 2        Q.    Did Martin Insulation do prep work for --
 3   or spray foam work on the roof deck?
 4        A.    That's what the notes say.
 5        Q.    Was that work that Martin Insulation did
 6   under Encore's contract?
 7        A.    The roof deck?
 8        Q.    This work right here, Martin Insulation
 9   stopped by for prep material to spray foam roof
10   deck.  Was that under Encore --
11        A.    No.  That was not under my -- sorry, I
12   don't mean to interrupt.  No, that was not under my
13   contract.
14        Q.    So does that mean that Martin Insulation
15   was under contract with Encore for a certain scope,
16   but also did a scope that was outside of Encore's
17   scope?
18        A.    That was not -- they did not -- they were
19   not contracted with me to do the roof deck.
20        Q.    What about any prep work for the spray
21   foam roof deck?  Did they do --
22        A.    No.  They had nothing to do -- I had
23   nothing to do with the roof, the roof deck, any prep
24   for the roof, or the roof deck, anything that was
25   sprayed on it, no, I did not.
```

1      Q.    Okay.  So what I am trying -- I just want
2   to make sure is that Martin Insulation worked for
3   Encore as a subcontractor, but also worked
4   separately, and did this work outside of Encore's
5   scope?
6      A.    Yes.
7      Q.    Who did they contract with to do that
8   work?
9      A.    I don't -- that would be the owner that
10  paid them.
11     Q.    Okay.  Did Martin Insulation do the
12  drywall and painting?
13     A.    Yes.  They did -- they did the drywall,
14  and then their foreman did the painting.
15     Q.    Okay.  So if you look at the December 10
16  entry, here you mention that the owner is not ready
17  to sign the contract yet.  This is ten days before
18  the contract is actually signed, right?
19     A.    What date is this?
20     Q.    December 10.  And the contract date is
21  December 20.  So we are at ten days before the owner
22  signs the contract, correct?
23     A.    Correct.
24     Q.    So at this point, the owner hasn't signed
25  the contract, but gave you the go-ahead on

 1  November 24 to start work.  At this point, you have

 2  been getting design, getting subcontractor pricing,

 3  you have actually retained, or hired, some of the

 4  subcontractors to start some of the preparatory

 5  work, you've been doing demo and electrical work.

 6  And all of that has occurred up to December 10,

 7  correct?

 8          A.    Correct.

 9          Q.    If you look at this December 10 entry, it

10  says -- and I'm picking up in the last line, or the

11  second to last line.

12              I am still hedging for him on the DHS

13  updates.  Not sure how long I can continue to delay

14  before the subs get busy with other work, which will

15  only add to the job duration.

16              So let me ask you about that statement, I

17  am still hedging for him on the DHS updates.  What

18  is that referring to when it says DHS updates?

19          A.    The phone calls.  I'm hedging for Joey on

20  the phone calls with DHS.

21          Q.    Did DHS call you directly?

22          A.    They set up a conference line.

23          Q.    Okay.  And you were on those conference

24  calls?

25          A.    Yes, ma'am.

1      Q.     And who was it with DHS?  Do you remember

2   any of the names, or who was the head person that

3   you were talking to?

4      A.     Michael Harvey.

5      Q.     All right.  And so what were Mr. Harvey's

6   questions on those conference calls?

7      A.     Basic -- basic items, how we're coming

8   along, what we're planning on doing.  Basic -- at

9   that point, I have already submitted to them the

10  submittals on the interior, had some discussions

11  about the exterior items.  And essentially telling

12  them that -- that -- how everything is going.  What

13  the building looks like.  How everything is going.

14     Q.     Did you give a schedule to DHS?  One of

15  those schedules that we looked at that has the bars

16  on it?

17     A.     Yeah, I do remember submitting some

18  schedule to them.

19     Q.     Okay.  And when you say hedging for him,

20  the him is Mr. Odom, correct?

21     A.     Yes, ma'am.

22     Q.     All right.  And so what does that mean

23  exactly that you're hedging Mr. Odom on the DHS

24  updates?

25     A.     I was hedging for him to -- between the

1   DHS and Joey Odom to make sure that -- I mean,
2   essentially there was a contract for a long-term
3   rental.  And so Joey didn't want to lose his tenant,
4   so I was hedging for him.
5       Q.    And what you mean by hedging?  What were
6   you -- what does that mean that you were doing?
7       A.    I was highlighting the good things about
8   the building.
9       Q.    And what were those?
10      A.    That it will be done.  That we're in
11  contact with subcontractors and -- yeah.
12      Q.    Did you give DHS that specific target
13  date or completion date in December, by the end of
14  December 2020?
15      A.    I don't remember.  I think I gave -- I
16  think I sent a preliminary schedule to Joey, and
17  then Joey sent it to them.  I think that's why I
18  submitted some schedules early on.  Again, and that
19  was -- that was to show an estimated finish date.
20      Q.    By the end of December?
21      A.    Yes.
22      Q.    I have -- I'll ask you about that in a
23  minute because I think I have the e-mail and the
24  schedule, so we might as well be looking at that
25  when I ask you some questions about it.

1          If we keep going here, like, this

2    December 19 entry, you have got six exterior workers

3    on site from 7:00 a.m. to 6:00 p.m.  That's a full

4    day for a contractor, right?

5          A.    Yeah.  I mean, whatever it takes to get

6    it -- whatever they are willing to work.  It's

7    usually I just identify when they are there and when

8    they leave.

9          Q.    Removed panels and rotted plywood on

10   first and second floor.  There was some items like

11   that where rotted plywood, for example, is not going

12   to be something that's covered by insurance; is that

13   right?

14         A.    That's in my change orders.

15         Q.    But that's a correct statement, things

16   like rotted plywood --

17         A.    Right.  Yeah.  Yeah.

18         Q.    Let me just finish just to be clear.  You

19   knew that that item wasn't something that would be

20   charged to the insurance company, correct?

21         A.    Correct.

22         Q.    In the December 20 entry, that's the date

23   that you entered into the contract with the owner.

24   Is there any entry on December 20, or December 21,

25   noting that you now have a written contract signed

1  with the owner?

2      A.      No.

3      Q.      That December 20 entry mentions WRB

4  Prosoco R-Guard Cat 5.  What is that material?  What

5  does that refer to?

6      A.      That is a water and air barrier.  It's a

7  liquid applied water and air barrier.

8      Q.      Okay.  So something that was required for

9  waterproofing of the exterior walls?

10     A.      Yes.

11     Q.      All right.  And that work is underway on

12 December 20th, correct?

13     A.      Yes.

14     Q.      So you do note percent completions in

15 here.  I'm looking at one for December 22, where,

16 again, you've got 8 exterior workers on site from

17 7:00 a.m. to 7:00 p.m.  So that's a full-day, right?

18     A.      Yes.

19     Q.      And at the end of that entry you say, to

20 date they are 30 percent completed with demo, and

21 25 percent completed with waterproofing.  That was a

22 correct entry on your part?

23     A.      I guess.  Yeah.

24     Q.      All right.  So on December 28, you've got

25 6 exterior workers arriving at 7:00 a.m. and leaving

1   at 7:00 p.m.  So you have a full day of work going

2   on there for the exterior, correct?

3       A.    Yes.

4       Q.    And if you keep reading, you say.

5           The building is 65 percent completed with

6   demo and 50 percent completed with sheathing

7   replacement and water proofing.  Correct?

8       A.    Yes.

9       Q.    And then you've got two electricians that

10   start at 8:00 a.m. and finish at 3:00 p.m., correct?

11       A.    Correct.

12       Q.    And the last item says demo drywall on

13   inside for spray foam insulation application.  This

14   is for the exterior walls?

15       A.    Correct.

16       Q.    Was that spray foam insulation applied in

17   the exterior walls, was that an upgrade?

18       A.    Yes.  That is also in my change orders.

19       Q.    Okay.  As well as the demoing the drywall

20   and replacing it, or did the drywall have to be

21   demoed anyway?

22       A.    They drywall is going have to be demoed

23   anyway.

24       Q.    Now I don't -- you known, I don't want to

25   take up our time with reading every one of these

1  entries.  But just to confirm.  Where you have

2  noted, say, for example on January 4, 2021, 8

3  exterior workers on site from 6:00 a.m. to 6:00 p.m.

4  And where you note the percent completed, like, on

5  this date, demo is 90 percent completed, sheathing

6  is 80 percent completed, and waterproofing is

7  70 percent completed.  These are all accurate

8  statements, correct, about the progress of the

9  construction?

10      A.    Yes.

11      Q.    They are all accurate, right?

12      A.    Yeah.  I mean, they're -- it's a

13  guesstimate.  I mean, I'm not doing exact

14  percentages.  It's just a -- they are done with the

15  west side of the building, I would say that's 25

16  percent.

17      Q.    Okay.

18      A.    Like that.

19      Q.    Go to 12 -- the entry for December 18.

20  And it says.

21          Spoke with Jerry on the phone from

22  Associated Waterproofing.  He will be bringing a

23  crew out tomorrow to start the exterior.

24      A.    Yes.

25      Q.    So on that date, two days before the

1  owner signed the contract, you've got Associated
2  Waterproofing lined up to come out and start the
3  next day, correct?
4          A.    Yeah.   But I had had them lined up --
5          Q.    Okay.
6          A.    -- before that.   I had them lined up
7  before that.   I can't remember the first day that I
8  met with them.   But it was pretty much within about
9  two to -- about two weeks we had discussions about
10  doing -- even doing interior work.   And I was even
11  thinking about using them for drywall and ceiling
12  work, having it all into one contractor.   I do
13  remember those specific items.   But I did not decide
14  to go with them, because they were a little
15  expensive on some of the items that I was thinking.
16  But -- so, yeah, I mean, I had them lined up ready
17  to go on 11/24 -- by 11/24.
18          Q.    Okay.
19          A.    And I was coaxing them out there by 12/6.
20  That first week in December I was -- I was making
21  daily calls trying to get them out there.   And then
22  by 12/16, he called me and said we're on our way.
23          Q.    Now after this date -- after the 12/18
24  going forward all the way to June, I didn't see any
25  further comments that had anything to do with delay

1  in the project related to insurance payments.

2       A.    Because I was on another path at that

3  point.

4       Q.    Okay.  So whatever is in these logs, you

5  stopped on that date, on 12/18, putting any entries

6  in there about delay to the project caused by

7  delayed insurance payments?  You agree with that

8  statement?

9       A.    Yeah.  One, I probably stopped having

10 discussions with the owner about some of this stuff.

11 And again, we were -- in passing in discussions with

12 Skyline, there was just an over and over again

13 dialect about the fact that they will pay.  And so

14 we did not really have any -- we didn't have very

15 many discussions about this, the payments.  And

16 again, I had a lot of other things going on at that

17 time.  So I was mainly talking about what was going

18 on at the -- on the job versus payments.

19      Q.    When you say you had other things going

20 on, are you talking about busy with this work on

21 this project?

22      A.    Yeah.  Yeah.  We were -- we were

23 scrambling.

24                THE WITNESS:  Would it be okay if we

25           took a five minute break?  I've got to go

1          to the bathroom.
2               MR. COX:  Let me suggest this.  We're
3          almost at noon.  I'd like to take a lunch
4          break until 1:00 and we can resume.
5               MS. WOLF:  If we're going to break
6          now, which I have no problem with doing
7          lunch right now, since we're breaking
8          anyway.  Just to make sure that we get
9          finished at a reasonable time today, can
10         we start back at a quarter till --
11         actually even 12:30?  Can we start back at
12         12:30.
13              MR. COX:  I have some things I have
14         to do.  I don't think I'll be done by
15         12:30, but I can do 12:45.
16              MS. WOLF:  Okay.  Let's do 12:45.
17         We're going break now for lunch.
18              THE VIDEOGRAPHER:  Going off the
19         record.  The time is 11:48.
20                  (OFF THE RECORD)
21              THE VIDEOGRAPHER:  We are now on the
22         record.  The time is 12:47.
23   BY MS. WOLF:
24       Q.   All right.  Mr. Monheiser, I want -- when
25   we first started talking about this daily log under

1  the September 15 entry, there was an entry that you
2  made for preliminary schedule has been submitted to
3  owner.  I want to see if we can identify that
4  schedule.  And you produced your folder, and it's
5  got some schedules in it.  I believe you have them.
6  Can you tell me which schedule was created on 9/15?
7  Do you have a copy of it?
8         A.    I do -- let me see here.
9         Q.    Actually I have -- I've got one pulled
10 up.  I'm going to share my screen and show it you
11 and then --
12        A.    Yeah.  It's just -- it should be labeled
13 preliminary schedule.
14        Q.    Okay.  So I'm going to show you what I've
15 got.  Okay.  You can see that?
16        A.    Yes.
17        Q.    So you say it should be labeled
18 preliminary schedule.  Where would we look for that?
19        A.    In the e-mail that it's in.
20        Q.    Okay.  The one we're looking at, for the
21 record, we got this out of the owners documents
22 indicating that the owner had it.  That's
23 Eaux-Odom-FourO 96 through 96.03.  So let me ask you
24 about this one first.  It shows on line 63, a
25 certificate of occupancy date of December 22, 2020.

1    Do you see that?

2         A.    Yes.

3         Q.    So does this look like the kind of

4    schedules you were preparing for the owner and for

5    this job?

6         A.    It does.

7         Q.    Okay.  And you see that it's got a start

8    date of September 15th on it, correct?

9         A.    Correct.

10         Q.    So we can look at -- let me show you the

11    e-mail.  For the record, this is Eaux-Odom-FourO 95

12    and 95.02.

13         A.    Okay.

14         Q.    All right.  So this is an a e-mail from

15    Aden Monheiser to Joey Odom with a cc to Jeff Major

16    and Jade Bentz.  And it has as an attachment, rough

17    draft schedule 9/15/2020.  You see that?

18         A.    Yep.

19         Q.    All right.  He says -- Mr. Monheiser,

20    Aden, says.

21              Joey, I know the Department of Homeland

22    Security is leaning on you for a schedule, so maybe

23    this is something you can share with them to hold

24    them over.  Attached is a very rough draft of our

25    construction schedule with some very basic figures

```
1   attached to the draw schedule.  We will tighten all
2   this up as we get closer to actual estimates from
3   subs.  Let me know what you think.  Aden.
4           This is referencing, it's got attached a
5   9/15 schedule.  Is this the same schedule that you
6   are referring to in your daily logs?
7       A.   Yes, that would -- that would probably be
8   it.
9       Q.   Okay.  And so you prepared the schedule,
10  right?
11      A.   Yes.
12      Q.   And you gave it to Aden.  And I suppose
13  he sent it on to the owner?
14      A.   Yes.
15      Q.   And you were aware that you were
16  preparing this for the owner?
17      A.   Yes.
18      Q.   And that it was provided to the owner?
19      A.   Yes.
20      Q.   All right.  And this schedule represents
21  a completion date of December 22, 2020; is that
22  correct?  That's what you see here on this schedule,
23  correct?
24      A.   Correct.
25      Q.   And as we discussed yesterday, and
```

1   actually let's go back to the first page.  If you
2   start to scroll down the start dates of
3   September 15, October 1, November 2, there are a lot
4   of dates prior to November 19.  In fact, most of the
5   dates on this page are prior to November 19 when
6   Encore got its license, correct?
7       A.    Correct.
8       Q.    So at this point, it would not have been
9   feasible, or even legally possible, for Encore to
10  start any of the work prior to being licensed,
11  correct?
12      A.    Can you please repeat that question?
13      Q.    Right.  It wasn't legally possible for
14  Encore to start or perform any of this work prior to
15  November 19, correct?
16      A.    Correct.
17      Q.    And Mr. Odom was aware of that, right?
18  He was aware of the prohibition about -- of Encore
19  even performing the work prior to November 19,
20  right?
21      A.    Yes.
22      Q.    I want to look at some of the information
23  below in this e-mail.  And again I'm looking at
24  Eaux-Odom-FourO 95.  And this is from Aden Monheiser
25  to Joey.  I want to go through some of this.  Item

1    number 1, I have our designer involved to get some

2    schedule boards on finishes for GSA.

3            So at this point, you were providing

4    information to the first floor tenant, right?

5        A.    We weren't providing any information.

6    It's just we have a designer.

7        Q.    So you had engaged a designer for the

8    purpose of determining a schedule of finishes for

9    the first floor tenant at this point in September,

10   correct?

11       A.    Yes.

12       Q.    And item number 2.  We have a rep from

13   STO dropping by tomorrow, weather permitting, to

14   inspect the project.  Who is STO?

15       A.    It's STO, it's a exterior cladding

16   company.

17       Q.    Okay.  And what part of the system does

18   item number 2 refer to?  What component of the

19   building?

20       A.    That would be the exterior panels.

21       Q.    Okay.  And number 3, we should have a

22   schedule out to you by tomorrow.  We are basing

23   everything on an October 1 start time.  That's item

24   number 3, correct?

25       A.    Correct.

1    Q.    And, of course, on October 1 you wouldn't

2   have actually been able to start anything as far

3   estimating or starting construction of the project,

4   correct?

5    A.    Correct.

6    Q.    For number 4, it says.

7         We've submitted a scope of work to our

8   subs, and have lots of interest in the project.  We

9   should have more than enough help to get this done

10  in a timely fashion.  That being said, it all is

11  based on finishing schedules and product

12  availability.

13        So one of the things that you -- that

14  could impact the schedule is the ability to be able

15  to get the products, right?

16   A.    Yes.

17   Q.    For example, you keep going here.  If the

18  carpet you prefer is on backorder, you know, that

19  could be a problem unless they switch to something

20  else, right?  So you're pointing out the problem

21  with availability of the materials, correct?

22   A.    Yes.

23   Q.    And actually that's what you wrap up --

24  well -- I'm sorry, this is Aden Monheiser.  You

25  were -- you were privy to this information --

1      A.    Yes.

2      Q.    -- as well?  The information that's

3  outlined in 1 through 5?

4      A.    Yes.

5      Q.    Okay.  So on number 4 wraps up.  With

6  extended lead times and product availability are

7  things that can drag out the process.  So you were

8  aware of that, that delays can be caused by lead

9  times and product availability, correct?

10     A.    Yes.

11     Q.    All right.

12     A.    Again, this is just basic information

13  about any job at any point in time.  That we want to

14  make sure we are trying to push the owner to select

15  some materials.

16     Q.    So you were aware that the owner was

17  going to provide this information to the Department

18  of Homeland Security?

19     A.    Yes.

20     Q.    Including the schedule?

21     A.    Yes.

22     Q.    Including the representation on the

23  schedule that the job could be completed before the

24  end of December?

25     A.    That's why it says a very rough draft.

1  And we wanted to implement that.  And again, and

2  depending -- a lot of this stuff, as far as you are

3  looking at, yes, it does depend on materials, it

4  does depend on that.  This is a very rough draft

5  schedule.  Which we were implementing hard because

6  of start time, and because of the material -- time

7  to get materials, selections, you know, all those

8  different things.

9       Q.    Did you ever tell the first floor tenant,

10 Department of Homeland Security, that the schedule

11 was actually dependent on Encore getting its license

12 before the work could start?

13      A.    No.  I don't remember.

14      Q.    Do you know if the owner told the

15 Department of Homeland Security that one of the

16 factors that would influence that schedule was

17 Encore getting its license?

18      A.    I have no clue.

19      Q.    When you prepared the schedule that we

20 see on Encore 96, did you have an understanding, or

21 were you aware, that this schedule was going to be

22 submitted to the insurance company in connection

23 with making some type of delay claim?

24      A.    No.  We -- if they asked me if they're --

25 if I'm okay with submitting a schedule, I'm fine

1  with them submitting a schedule.  Again, this is

2  a -- it's a templated schedule.  You just enter

3  dates.  We've -- at that point, it's 9 -- I don't

4  know what that date was 9/15.  And so, I mean, I

5  haven't -- I may not have even been to that job at

6  that point.  And so this is a templated schedule

7  about the average time that it takes to perform

8  work.

9      Q.    Who all did you distribute this, or any

10 similar preliminary schedule, to, other than the

11 owner?

12     A.    Anybody.  That would be on e-mails,

13 Skyline, Joey.  That's really it.  I think that's

14 the only people that I would want to submit a

15 schedule for that early on.

16     Q.    Did you give a copy to Andrew Vanchiere

17 with Latter & Blum?

18     A.    I don't remember.  I don't remember

19 actually having his contact information.  Until

20 possibly the discussions about the second floor

21 tenant, which, again, I don't really know when that

22 was.  But it would be around that time whenever I

23 would get a -- when I was in contact with him.

24     Q.    Do you know if anybody else gave it to

25 Andrew Vanchiere with Latter & Blum?

1      A.    I do not.

2      Q.    Okay.  All right.  I have another one I

3  wanted to ask you about.  Can you see this one?

4  It's Encore 12.0166.  Do you see that?

5      A.    Yes.

6      Q.    And this is actually -- it's in your

7  notebook as well, so you don't have to look at it on

8  the screen.  This would be under Tab N, number 5.

9  You have it?

10     A.    Yes.

11     Q.    All right.  So this is an e-mail from you

12  to Jeff Major with a cc to Jade Bentz.  Who is Jade

13  Bentz?

14     A.    She is a -- she works for Skyline.

15     Q.    What is her position?

16     A.    I would say operations.

17     Q.    All right.  So this date on here is

18  September 29, 2020.  And it's got an attachment with

19  the September 28, 2020, schedule and an image.  I'm

20  not sure what the image is.  And it says.

21          Jeff, I have attached a schedule for the

22  Four-O DHS property on 620 Esplanade Street.  I have

23  a start date scheduled for the 1st week of October,

24  and the deadline for the completion of this job.  I

25  have outlined dates on this schedule that we are

1   approaching and/or already behind on.  Every week

2   that we get delayed is going to cost more.  The

3   following list is going to have to be accounted for

4   if we continue to delay.

5           Do you recall preparing and sending this

6   e-mail to Mr. Major?

7       A.    Yes.  Let me see here.  Maybe not in

8   specific, but, yeah.

9       Q.    What prompted you to prepare and send

10  this e-mail to Skyline on September 29?

11      A.    Just to share a schedule with them.

12      Q.    As far as the schedule, the way you gave

13  us your e-mails were all, like, a 1200 page PDF.

14  And this is the e-mail -- what you are seeing on

15  your screen are those e-mails, 1216 of them.  And so

16  we have this e-mail, but we don't have the

17  attachment.  But I understand from your testimony

18  that you can pull your schedule from your schedules

19  folder.  And what I want to know is, what was this

20  attachment, this 9/28/2020 schedule, that was

21  attached?  Is it the same as the September 15, or is

22  it something different?

23      A.    Yeah, it could be.  Again, I make a

24  variety of schedules for a variety of different jobs

25  and reasons.  So let me see here.

```
 1        Q.    Are you looking right now in your folder
 2   called schedules?
 3        A.    I'm looking in the project folder.
 4        Q.    Okay.
 5        A.    No, it is not.  It's not in there.
 6        Q.    Okay.  Does that mean that the one that
 7   we looked at prior, this Encore 96 with the start
 8   date of September 15, is that the schedule that's
 9   named 9/28/2020 schedule, or would there be
10   something else?
11        A.    That could be -- that could be the one.
12   I'm not 100 percent sure.
13        Q.    Do you see in your folder called schedule
14   something called Four-O 9/28/2020 schedule, a PDF?
15        A.    No.
16        Q.    All right.  So you would be able to go
17   back to your e-mails from last September and pull up
18   the actual native e-mail and provide that to us with
19   the attachment, correct?
20        A.    Yes.
21        Q.    All right.  I will ask you to do that.
22   And we're talking about two weeks after this
23   schedule that's dated Eaux-Odom-FourO 96 was
24   prepared, right?
25        A.    Yes.
```

1      Q.    All right.  So what I want to do, since

2  we don't have that schedule, and there is just a two

3  week differential, do you have any reason to think

4  that this 9/28 schedule is -- if it's any different,

5  is substantially different from this one we are

6  looking at here on the screen?

7      A.    Things may have changed.  I mean, I

8  really do not know.  I mean, having substantial

9  items taken care of would be very specific.  Again

10  with the e-mail, there are items where we want to

11  make sure that -- that are accounted for.  You know,

12  sometimes even sending stuff to Joey, making sure

13  that they are staying on track with a deadline for

14  selecting materials.  We want to make sure --

15  because, again, we don't have first contact with the

16  insurance company.  So there are times where we want

17  to make sure that we are getting our point across

18  that these items need to be taken care of, and need

19  to be accounted for and/or if they are accounted

20  for.

21      Q.    Let me ask you this.  Did Mr. Major ask

22  you to send him this e-mail?

23      A.    No.

24      Q.    You prepared it on your own with

25  nobody --

1     A.     Nobody asks me to e-mail anything, other
2 than if I need to, you know, ask certain questions
3 for, you know, any specific reasons.  But, no, this
4 would not -- I don't know why anybody would ask me
5 to e-mail this.  This is just us trying to figure
6 out where the -- their scope is at, and accounting
7 for certain items.
8          And so, again, like, we're wanting to
9 make sure that everybody -- during certain hurricane
10 situations there's a lot going on.  There's a lot of
11 people doing a lot of things.  We want to make sure
12 that Skyline is staying on this job and accounting
13 for stuff on this job.  So, you know, at points,
14 yes, we would -- we would put emphasis on, we need
15 to get this taken care on.  What is it accounting
16 for?  You know, how much is the owner getting?  You
17 know, those kinds of situations, like, you know,
18 what's the questions that they're asking so that we
19 can possibly give them some answers.
20          I don't like to do very much argument as
21 far as arguing damages.  If its damage, its damage,
22 if it's not, it's not.  And so I just need to know
23 where it's at to see if we need to do any more
24 specific work.  So these e-mails, again, it's just a
25 representation to make sure that they are

```
 1  communicating with people that they need to
 2  communicate with, and if they return an e-mail.
 3       Q.   Okay.  In the e-mail where you say, I
 4  have outlined dates on the schedule that we are
 5  approaching, and/or are already behind on.  Are you
 6  referring to any of the dates that would require --
 7  that involve bidding, or contracting, or estimating?
 8       A.   I couldn't tell you.
 9       Q.   Those things you were not able to do
10  prior to November 19, correct?
11       A.   Correct.
12       Q.   So any of the items on the task list, any
13  of these task named items that fall into the
14  category of estimating, bidding, or contracting, you
15  couldn't do on any date here, you couldn't start it
16  prior to November 19, correct?
17       A.   Correct.
18       Q.   All right.  It says, the following list
19  is going to have to be accounted for, if we continue
20  to delay.  Now at this point, have you even worked
21  up the $1.36 million cost?
22       A.   No.  So if you're -- if you kind of
23  reference back to some of the items.  Whenever
24  there's a storm, people get -- they pretty much
25  accept too much work.  So again, those things start
```

1  to get delayed.  I can -- there's one thing that I

2  know.  Is I can pull people from Kansas City to come

3  help -- to come to work.  You know, whether it's

4  working 24 hours a day, we've done it, we have been

5  there.  You know, I -- at this point, I am not

6  100 percent aware of very much of the insurance

7  stuff that's going on.

8        So -- but from what I possibly did know,

9  I needed to know if I was going to have to account

10 for more money to bring subs down.  And again it's

11 just the generic item where I'm trying to figure out

12 where I'm going to have to pull subs from, and to

13 bring them down, or if I can get local guys there.

14     Q.   Okay.  But with all of that, you still

15 can't enter into a contract with any of them until

16 after November 19, correct?

17     A.   At this time, yes.  But at that time, we

18 didn't know when we could.

19     Q.   But you knew that you couldn't do it on

20 September 29 --

21     A.   There was a very -- I'm sorry.  I didn't

22 mean to interrupt you.  I'm sorry.

23        I could have -- we could have gotten our

24 license the next day.  They could have given us the

25 next day, or two weeks from then, or -- but again,

1  looking back at it at this point, yes, it couldn't
2  have been until the 19th.  Which, again, we could
3  have accounted for that.
4      Q.    Right.  On September 29 when the e-mail
5  was sent, on that day, you knew you were not yet
6  licensed, correct?
7      A.    Yes.  And again, you know, I am preparing
8  to -- at any point in time to be able to have that.
9      Q.    All right.  If we look down at the
10  following list is going to have to be accounted for,
11  if we continue to delay.  One is freight cost to
12  expedite material orders on windows and exterior
13  cladding.  And again, you can't order the windows or
14  the exterior cladding until, one, you have an
15  engineer or your design professional selected, and
16  then, two, the owner approved it?
17      A.    Hold on.  We -- we selected the exterior
18  cladding.  We went to the design professional to --
19  Nichiha is a broad product that I was well aware of
20  before the -- before this job.  I mean just panels
21  in general.  And she had panels before.  So we
22  wanted to stick with the paneling product.  And so,
23  I mean, I pretty much started researching the -- you
24  know, just an average panel for -- for a -- for a
25  building pretty much off the bat, along with

1    contacting STO.

2         So, you know, again, I get to -- we know

3    that material.  We know that we -- I know the

4    material.  I know -- I think I was getting --

5    there's probably some e-mails about Nichiha sending

6    us some samples.

7         Q.   Okay.  So let me ask as -- let me ask

8    this question on the exterior cladding.  That was

9    what BE-CI was hired to do.  And at this point, they

10   had not yet been out to do their inspections, or

11   prepared any of their plans and specs, correct?

12        A.   Correct.  Yeah.  But we already knew who

13   they were going to -- or what -- around this time,

14   is whenever we started figuring out the product that

15   we were wanting to use.

16        Q.   All right.  But at this point on

17   September 29, you couldn't have ordered windows or

18   cladding material, because you weren't yet licensed,

19   correct?

20        A.   I could have.  I could have ordered

21   anything for any specific reason.

22        Q.   It's your position that, as an unlicensed

23   contractor, you could order -- you could order

24   supplies for a project that you are not even

25   contracted on as general contractor?

```
 1        A.     No.  It's just a general phrase that I'm
 2   saying.  But, yeah, I mean, again, as this date is
 3   approaching, you know, we need to make sure that we
 4   have everything selected and -- and ordered by a
 5   certain date.  And again, that's -- I'm just
 6   referencing this as if at any point in time we could
 7   have our license put through.
 8        Q.     Right.  But at this point on
 9   September 29, not having the -- Encore not having
10   its state license was a legal prohibition against
11   Encore moving forward with contracting with the
12   owner, or any supplier, or subcontractor, on this
13   project, correct?
14        A.     Correct.  And let me put it to you this
15   way.  I'm preparing to have my license the next day.
16   At any point in time from October to, you know,
17   November, I am preparing for -- once I have that,
18   that specific date, I'm ready to go.  It doesn't
19   matter, you know, when it is, I want to make sure
20   that I am as prepared as I can for the owner.
21             Because I know that if I provide a date,
22   that I -- you know, if we have this license at this
23   point, we can go.  And that's what I'm trying to
24   prepare for.  We don't -- it doesn't take me a whole
25   bunch of time to do preparations.  It doesn't take
```

1  me whole bunch of time to -- you know, we are in
2  remediation work.  We do it all the time.  We show
3  up at 12:00 at night.  And we are done by -- in two
4  days with construction and all that.
5          So again, I understand where this is.
6  But again, I am preparing myself to get my license
7  and that -- that the next day.  I'm preparing.
8  Because that's what we do.  But again, obviously it
9  wasn't until November.  But at the time of this, I'm
10 preparing.
11     Q.    Okay.  Did you tell Jeff Majors that?
12 Did you keep him fully apprised of the licensing
13 issue?
14     A.    I can't remember.
15     Q.    Did Encore have any type of agreements
16 with Skyline, or do you have any --
17     A.    No.
18     Q.    -- agreements with Skyline?
19          I asked you this yesterday about how
20 Encore became involved with Skyline.  I believe you
21 said Aden Monheiser handled that part of it; is that
22 correct?
23     A.    Monheiser.
24     Q.    Yeah, Monheiser, Aden.
25     A.    Yes.

1    Q.    Okay.  So you're not able to address or

2  give testimony as to Encore's involvement, or how

3  they became involved with Skyline?  You don't know

4  that information?

5    A.    I mean, I do know information about it,

6  yes.

7    Q.    Okay.  So tell me how is it that Encore

8  became involved with Skyline?

9    A.    We've done work with them in the past.

10    Q.    All right.  How far in the past?  When's

11  the first time you did any work with Skyline?

12    A.    3 years ago.

13    Q.    Okay.  What type of -- what were those

14  projects that you did with Skyline 3 years ago?

15    A.    It's just a -- it's an insurance job.

16    Q.    Okay.  How many?

17    A.    One.

18    Q.    So other than this particular job that we

19  are talking about at 620 Esplanade, Encore has done

20  one other job with Skyline?

21    A.    Yes.

22    Q.    And are you currently doing any other

23  jobs with Skyline?

24    A.    No.

25    Q.    And who did -- who did Encore work with

1  at Skyline on this job 3 years ago?

2       A.    Jeff Major.

3       Q.    Did he call you up after Hurricane Laura

4  and tell you about this particular project?

5       A.    I mean, he called me after Hurricane

6  Laura, yes.  But again, I think that's once we

7  already had contact with -- we knew that we were --

8  had the possibility of getting this job.  They're a

9  good company.  We like working with them.  Whenever

10  you have adjusters that -- that -- I jokingly say

11  that Xactimate is a quantity surveying application.

12  Because it's not an estimating format.  And they

13  agree with me on that.

14            So again, the relation -- they have an

15  understanding.  They do ask for input in on some --

16  on certain things because they know that estimating

17  does not -- it's not represented in Xactimate.  And

18  I do not like using Xactimate.  And so we -- they

19  are a great company to work with because they take

20  our work and my estimating format into

21  consideration.  And so we don't typically like to

22  work with outside -- outside people on jobs.

23       Q.    Let me ask you this.  Can you explain to

24  me what -- when you say exact Xactimate doesn't do a

25  good job of estimating, tell me what do you consider

1  to be the flaws with Xactimate?

2      A.    It doesn't -- so if you are going to

3  measure for drywall, Xactimate is going to give you

4  a square footage price, okay, it's going to give you

5  a per square footage price.  And that's not how

6  that's -- it's done.  That's not how a contractor --

7  somebody who bids drywall does it.  If you look at

8  my measurements with, I think, Martin Insulation

9  you'll look -- we measure by boards.

10              So if you have a wall that's 8-foot by

11  8-foot -- or 8-foot wide, you know, and 10 feet

12  tall, it's -- they count it, so there's 1, 2, 3 -- 3

13  sheets of 4 by 8.  And so that's how they do that

14  calculation.  And it's very difficult to get that

15  price into Xactimate and account for it to be

16  accurate.

17              Also it doesn't take into account

18  material updates daily.  I think back in December,

19  or maybe it was, like, February, I started looking

20  at sheeting, an estimate in Xactimate it was still

21  at, like, $35.  And if you go to Lowe's it's, like,

22  60 bucks.  It doesn't -- it's a good product for a

23  small job.  I just don't like how it separates.

24  Painters don't paint by the square foot of a wall.

25  They paint by the square foot of the footprint of

1    the building.

2           You know, like, that's what -- they

3    will -- a lot of the bids that we do get, that's how

4    they do it.  There's no such thing as, you know,

5    painting, you know, trim, or any of that.  It's just

6    a basic estimating.  Is too complicated to look at.

7    Which, again, for insurance purposes, it might be

8    good.  It's just not realistic --

9        Q.    Okay.

10       A.    -- for construction jobs.

11       Q.    All right.  Did you discuss -- ever

12   discuss with Jeff Major establishing a delay claim

13   against the insurance company?

14       A.    No.

15       Q.    So this e-mail that we looked at at

16   Encore 12.0166 where on September 29, you are

17   telling Mr. Major that every week that we get

18   delayed is going to cost more.  And than you use the

19   word delay again in the next sentence --

20       A.    I'm --

21       Q.    That -- hold on.  Let me -- let me finish

22   my sentence -- that is this -- is this a discussion

23   with Mr. Major about trying to establish a delay

24   claim against the insurance company?

25       A.    I'm trying to hold Skyline accountable to

1    make sure they are on top of doing their job.

2        Q.    Did you think in relaying this

3    information to Mr. Major, that it would have been an

4    important detail to tell him that Encore was working

5    on getting a license, but did not yet have the

6    license to start the work?

7        A.    It's -- none of that has anything to do

8    with the e-mail.  Again, I am not from Louisiana.  I

9    don't know Louisiana.  I know where you are going

10   with this.  And I understand.  You know, it makes

11   sense.  But again, like, this is September.  Like, I

12   have other jobs that I'm working on.

13           Like, I am trying to get information

14   about this specific job to make sure that, you know,

15   if I can -- when I can start, and if I can start.

16   And if the owner will have appropriate funding for

17   that.  That's general information that I would, you

18   know, give to see anybody, subcontractors.  You

19   know, I need this done by Friday.

20           You know, I may say that quite often, you

21   know.  And when in all reality, I'm really counting

22   on them saying, you know, Friday, they'll show up on

23   Tuesday or Wednesday or a week later.  Again, this

24   is just a generic.  I want to make sure that they

25   know that I'm on top of my stuff, and they need to

1    get on -- they need to be on top of their stuff.

2         Q.    Okay.  Let me ask this.  Did you prepare

3    the submissions to the Louisiana licensing board for

4    the contractor's license, or did somebody else with

5    Encore handle that?

6         A.    I did.  I think I did.  And Christie may

7    have.

8         Q.    Did the qualifying party have to take a

9    test?

10        A.    Yeah, he had to take a business test.

11        Q.    Okay.  And do you know when he took that

12   test?

13        A.    Sometime in -- I'm not sure.  I could

14   probably get you that information.

15        Q.    Okay.  So the date the test was taken,

16   and then the date the application was submitted?

17        A.    Yep.

18        Q.    I'll put that on my list.

19        A.    Okay.  I'll put that on my list.

20        Q.    Okay.  Let me go back and finish up.  We

21   had started talking about daily logs.

22        A.    I do apologize.  Just to go back to that

23   licensing deal.  It was -- we had a reciprocity

24   agreement with North Carolina.  That's why he only

25   had to take that business test.

1    Q.    So let me look at some of the dates in

2 January.  And this -- again, this is going to be

3 Tab G.  In January -- this is on Encore 11.04 at the

4 top, date is January 5, 2021.  Let me let you get

5 there first.

6    A.    Could you repeat that?  I'm sorry.

7    Q.    You're in Tab G?  And that's in the first

8 book.

9    A.    Oh, I'm sorry.  Okay.

10    Q.    All right.  This is on Encore 11.04, and

11 the date of the entry is January 5.  It's at the top

12 of the page.  And the entry that I wanted to ask you

13 about says, removed access overflow concrete on the

14 window openings from the 2011 remodel.  What does

15 that mean?

16    A.    Let me see here.  What was this date?

17    Q.    January 5.

18    A.    Removed excess overflow concrete on the

19 windows.  That is the area where the -- there is

20 holding cells on the opposite side of that wall.  I

21 do believe that I have photos of it that may be able

22 to explain a little bit better.  There is his

23 horizontal ribbon window system, that's windows,

24 then you have a CMU wall that's right behind that.

25 And that was in the area where the windows were

1  actually pushed in.  The frames were pushed in at

2  the time.

3          So -- and there was a cracked window

4  on -- the very first or second window on that west

5  side was cracked.  So we had to fix that part, and

6  also fix that window, which obviously we couldn't

7  fix it because it -- appropriately because we had to

8  replace it from the inside.  And we couldn't access

9  that from the inside.

10     Q.    Okay.  So what is the access overflow

11 concrete?  What is that?

12     A.    From the -- the -- whenever they put

13 cement into the cinderblocks, they had to -- it was

14 kind of coming out of the sides of the CMU block.

15     Q.    And you're saying you had to remove that

16 access overflow concrete?

17     A.    Yes, excess overflow.  It was -- it was

18 to put studs in.

19     Q.    Okay.  So the word should be excess

20 overflow concrete?

21     A.    Yes.  I'm sorry.  Excess.

22     Q.    Okay.  And you had to remove the excess

23 overflow concrete that was there from the 2011

24 remodel.  Why did you have to remove it?

25     A.    Because we were going to put studs in.

```
 1        Q.    Okay.  And did you put studs in?
 2        A.    Yes, there's photos.
 3        Q.    Okay.  Look at the --
 4        A.    Framed that in because we couldn't put
 5   windows back there, because, again, obviously that
 6   CMU wall is there.  So we just made a wall.
 7        Q.    Okay.  So go to the entry for January 12.
 8   Are you there?
 9        A.    Yes.
10        Q.    All right.  So on this day you've got
11   eight exterior workers on site from 7:00 a.m. to
12   6:00 p.m.  You set two more windows, you're
13   performing corrections to WRB, and working on
14   sheathing to concrete sealant detail.  You've got
15   four insulations on worker on site from 8:00 a.m. to
16   4:00 p.m. starting sound insulation between rooms on
17   the first floor.  Was that sound insulation between
18   the rooms on the first floor something that was an
19   upgrade, or was that there prior to Hurricane Laura?
20        A.    That was an upgrade.
21        Q.    Okay.  And then the rest of the work on
22   that day, you've got four drywall installers on site
23   from 8:00 a.m. to 2:00 p.m. preparing for drywall
24   installation, and you've got two electricians on
25   site for exterior lighting connections.  So what you
```

1  have done on this particular date, as you did for

2  the rest of the log, is you note what work is

3  happening on a particular day, correct?

4      A.    Yes.

5      Q.    All right.  And then go to the January 15

6  entry.

7      A.    Yep.

8      Q.    All right.  So on this day, you've got

9  four exterior workers on site, you are working on

10  flashing details, you have got two workers dedicated

11  to working on metal break for head flashing, no work

12  on interiors due to FHO inspections from GSA.

13  Inspection went well.  No issues were brought up

14  about exterior details, and no water infiltration

15  was present.  So on this particular day, GSA was

16  doing an inspection of their space on the first

17  floor?

18      A.    Yeah, I don't know what they were -- what

19  they were doing.  There was -- is it HOA that I --

20  hold on.

21      Q.    HO.

22      A.    Yes.  Yeah, that was -- that was their

23  inspectors.  I think that was on a -- even on a

24  Friday or Thursday.  Yes, I remember this.

25      Q.    Were you present?

1       A.     For half of it, yes.

2       Q.     And according to your notes, it went

3   well, correct?

4       A.     Yes.

5       Q.     Look at the entry for January 22.  It

6   says.

7              No exterior work due to rain.

8   January 25, no work on exterior due to rain.  And

9   January 29, six exterior guys on site for half day

10  due to rain.

11             So you would note when you had -- that

12  affected or impacted the work, correct?

13      A.     Can you repeat that, please?

14      Q.     You -- in your daily logs, you kept track

15  of weather delays, correct?

16      A.     Yes.

17      Q.     When you had any kind of delays like this

18  caused by weather, or any other event, did you --

19  and I haven't seen this, this is why I'm asking --

20  did you ever put in for a change order request for

21  an extension of the contract time?

22      A.     No.

23      Q.     Why not?

24      A.     I'm not sure.  I don't know why.  Because

25  I mean, I was, you know, kind of comparing things to

1    the -- to a budget.  I mean, I wasn't there yet.  So

2    I may not have had to, if I'm still at a decent

3    budget, then, I mean, I'm not going to submit

4    anything.  Again, and that's why there are times

5    that I do add those contingencies in there to make

6    it that -- make up for.

7         Q.    Okay.  When you're talking about budget,

8    are you talking about a monetary budget, or a time

9    budget?

10        A.    Just, you know, just seeing what I've got

11   in my estimate for any specific item, and kind of

12   see where I'm at.

13        Q.    Are you familiar with the concept that,

14   if a contractor has a contract in place for a

15   specific price, and to meet a specific deadline, and

16   the contractor feels that they are entitled to an

17   extra cost or more time, they can use a change order

18   to request that; is that right?

19        A.    Correct.

20        Q.    Right.  And so I see you -- I see you

21   putting in change orders for additional costs, like

22   with Hurricane Delta, and with the changes to the

23   HVAC system.  And I saw a request for an extension

24   of time based on HVAC.  But that's the only request

25   for extension of time that you asked for through a

1  change order, correct?

2      A.    Right.  Because, again, I was still

3  within budget.

4      Q.    Within time budget you're talking about?

5      A.    With my -- with my estimate budget.

6      Q.    So you're talking about money?

7      A.    Of man hours for myself.

8      Q.    Okay.  You're using the word budget, and

9  I'm just talking about, you have a deadline in your

10  contract to meet for final completion, right?

11      A.    Yes.  And that was based upon Path A.

12      Q.    Okay.  And I'm talking about in general

13  now.  You were aware that you could seek an

14  extension of the contract time, if something

15  happened outside of your control, correct?

16      A.    That is correct.

17      Q.    But you didn't.  The only change order

18  you asked for for an extension of time was for the

19  additional HVAC work, correct?

20      A.    Yes.  So I'm going to go back to this.

21  During the beginning, and all these items, I mean,

22  in the background, you know.  Joey Odom is a guy

23  that -- and him and I -- him and I had conversations

24  about it.  We wouldn't need a contract with him.  We

25  wouldn't -- you know, if he's satisfied, and if

```
 1   you're doing the work that you are supposed to do,
 2   he's paying you.
 3            Probably one of the better clients that I
 4   have had.  I am directly across the hall from him.
 5   Okay.  I would just go over say, hey, Joey this is
 6   where we're at today.  And this is what we have got.
 7   This is where, you know, where I'm having issues
 8   with.  But again, he was -- he was very well aware
 9   of the path that we went off of, and the path that
10   we were currently on.
11            And again, if he had any questions, he
12   would just walk 10 feet over to my office and say,
13   hey, you know, what can we do?  And where are we at?
14   Again, it's just a, you know, just conversations.
15   It wasn't like I was 10 miles away at another
16   office.  I mean, I saw him every single day.
17       Q.    So are you saying that the reason why you
18   didn't submit contract -- change order requests for
19   an extension of the contract time was because you
20   were having these informal discussions with
21   Mr. Odom, and you didn't feel like you had to have a
22   signed change to the contract?  Is that what --
23       A.    No, we didn't have to have -- I didn't
24   have to have a signed contract with him.  You know,
25   if I -- if he knew -- I was -- I was transparent
```

1  with Joey Odom from day one, with my estimates, with
2  my contingencies.  I showed him the estimate.  I
3  showed him items, you know, even talking with the
4  subcontractors where I started with them and where I
5  ended with them.
6          You know, we were, you know, 15,000 or
7  10,000 dollars cheaper on drywall than Xactimate
8  was.  We were $15,000 cheaper than painting was than
9  Xactimate prices.  Panels are going to be more
10  expenses.  Again, you know, he knew the
11  contingencies.  He knew of every single thing.  It
12  was a very transparent deal.  And if he need proof,
13  hey, this is what it looks like.
14          So again, as much as informal, and in
15  lawyer discussions, you don't like informal.  But he
16  is a good guy.  I was right across the door from
17  him.  And he had all the faith in me to do this.
18  And I had all the faith in him that, you know, if we
19  didn't even have a signed contract, he would pay me.
20  That's what he would do, because that's -- he's just
21  a wholesome guy.  So again, there's informal and
22  formal things in this.
23          And I want to make sure that it's clear
24  that none of it had to be formal with him, because
25  he just took it.  And he trusted what we were doing.

1    And I trusted him, that, hey, you know, I may not

2    have to send you an invoice on this date at this

3    time.  But I'm going to send you an invoice, and

4    you're going to pay for it.  And he was -- he'd be

5    fully 110 percent fine with it.  So, yes, it was an

6    informal.

7            I went in there, we had discussions.

8    Because none of this -- this whole thing was not

9    formal from the time I gave submittals.  And from

10   the time that we were having discussions with

11   Skyline and Joey, Skyline stating that we would

12   have -- there's no way that they're going to pay,

13   that they are not going to pay.  There is no way

14   possible that they are not going to pay.

15           That's why I was there.  And so again,

16   going -- all these conversations and all these

17   informal things, I keep logs for my company so that

18   they have -- if I'm gone, then somebody can step in,

19   they could have some sort of knowledge.  And I do it

20   also is a personal thing so that they know what they

21   are walking into.  So, yeah, there are some of these

22   deals where you -- I mean, we were late, but Joey

23   knew where we were at every single way.

24       Q.    So let me ask you this.  In all of your

25   informal discussions with Mr. Odom, when did you

1  tell him you were going to submit these pay

2  applications that you are holding back on?

3       A.   I'm not -- again, I'm not holding -- I

4  haven't had that discussion with him.  I just -- I

5  have not given him an -- he knows that -- that he's

6  going to have these invoices.  I am actually still

7  working on some of the items, as far as the windows

8  and trying to see if there is, you know, leftovers.

9           How much exactly is left over in that

10 window estimate that I got on, you know, that I was

11 planning on doing.  How much money I've got left

12 over.  So again, like, I don't know exactly what the

13 final invoice would be, because there's work on that

14 that we didn't do.  And so I wouldn't know those

15 exact numbers.

16      Q.   But you do have that one invoice where

17 you had done the $200,000 worth from June, and

18 haven't submitted that that?  And you're --

19      A.   Again, but it's not -- it's not finished.

20 I haven't finished the invoice.  So it's labeled --

21 it's labeled wrong.  It's in the 06 folder, the

22 project folder that you guys have.  That's what it's

23 labeled as.  So, you know, if you think that I'm

24 holding that because I'm not going to invoice, you

25 would be completely wrong.

1      Q.    Is there any --

2      A.    -- like that's where you're getting at

3  with it.  And again, like, you know, sometimes it's

4  easier just to ask the question.

5      Q.    I would prefer it if you would answer my

6  question, rather than trying to think of where I'm

7  going with it.

8            Is there any outstanding amount right now

9  that the owner owns Encore or that --

10     A.    That he -- yes, there is 130 something

11 thousand, I think, that he owes.

12     Q.    So he owes --

13     A.    He didn't pay my full invoice.

14     Q.    So the owner owes about $130,000?

15     A.    Yes.  Whatever the 500,000 -- 550 that he

16 paid us.  And if you add the two, the 05 and 04

17 invoice together.  Again, I'm not exactly sure what

18 that -- that cost would be.

19     Q.    Are you charging the owner every month

20 the .06 percent interest that the contract calls

21 for?

22     A.    Yes.

23     Q.    And he knows that?

24     A.    Yes.

25     Q.    Do you know why he hasn't paid?

1      A.    I don't know his financial situation, so
2  I don't know.
3      Q.    He hasn't told you how much the insurance
4  company gave him?
5      A.    I know that, yes.
6      Q.    So he did tell you?
7      A.    I don't know his financial situation.
8      Q.    Did he tell you how much money -- when
9  insurance checks would come in, did he tell you that
10 the insurance company had paid, and how much?
11     A.    I would know what the insurance paid,
12 yes.
13     Q.    Okay.  And you recall that I asked you
14 whether or not there were any other invoices.  The
15 only invoice we have shows two interest payments on
16 the 315,000 for two months.  So there -- I think
17 what you told me was, that's it, that's the only
18 interest you're looking for from the owner is what's
19 shown in those invoices; is that correct?
20     A.    No, you misstated what I said.
21     Q.    Okay.  Tell me -- the invoice --
22     A.    I mean, since I have invoiced so far,
23 that's what -- that's the only interest on the
24 invoices at that point in time.  Every day that goes
25 past -- or every month that goes past that 30 days,

1  then he owes 6 -- .6 percent, or whatever it was on

2  the deal, you know, for every 30 days.  So I mean,

3  the leftover money that he's got right now, you

4  know, that he owes, he would be paying .6 percent

5  interest on.

6       Q.    Okay.  Let's go back to the daily logs,

7  see if we can finish this up.  If you look in

8  February.  February 15 through the 24th appear to

9  be weather delays from a winter storm where there

10  was a complete stoppage of work.  I just want to see

11  if I've got that right.  Look at the entry for

12  February 15.  It says, no work due to weather, no

13  power, no Internet, no water.  And then it says,

14  delayed tile delivery, exterior component delivery

15  is delayed.  Correct?  That's the entry --

16       A.    Yes.

17       Q.    All right.  And on the 16th, February 16,

18  and again, I'm reading from Encore 11.03.  The entry

19  is, no work due to weather, power was -- it says

20  one, but I think that might be on -- from 11:00 a.m.

21  from 8:00 a.m. to 11:00 p.m.  Is that power was out,

22  or power was on, from 8:00 a.m. to 11:00 p.m.?

23       A.    Yeah, I think it was on in the morning.

24       Q.    Well this is 8:00 a.m. to 11:00 p.m.  So

25  that would be into the night.  You think you meant

1    to write on?

2         A.    Yes.   Yes.   Yes.

3         Q.    No running water, still no contact with

4    suppliers out of Houston or Dallas.   If you keep

5    reading it says, but the current status of delivery

6    is unknown, ceiling tiles will not be delivered as

7    scheduled.   And then on February 17, it says no work

8    due to weather.   We still do not have consistent

9    power at the building.   Still no running water.

10        Then if you go to February 18, it says,

11   no work due to lack of consistent power supply.

12   Still no running water.   And you can read more about

13   freezing temps, and rain, and delays on ceiling tile

14   deliveries.   That's what your entry is for the 18th,

15   correct, you are documenting that?

16        A.    Yep.

17        Q.    Yes?

18        A.    Yes.

19        Q.    All right.   And on the 19th of February,

20   you have a supply update.   Received soft date on

21   ceiling tiles of February 26.   Delayed ten days from

22   expected date due to storm, et cetera.   I don't -- I

23   don't think we need to read all of this into the

24   record.   And then on the 24th of February, it says

25   work resumes after storm, correct?

1      A.     Yes.

2      Q.     So based on this entry from February 15

3  through February 24, it looks like it was almost a

4  complete shutdown, or a complete work stoppage

5  because of this winter storm?

6      A.     Correct.

7      Q.     And then, of course, that -- after the

8  storm delayed delivery of some the items that you

9  have been waiting for, correct?

10     A.     Correct.

11     Q.     Other than the entries that you have in

12  your daily logs where you note impacts or delays,

13  did you track any specific number of days past the

14  contract completion date caused by any of these

15  things?

16     A.     Yeah.  I may -- I may have just in

17  e-mails over to GSA.  But no, not in, like, any

18  informal -- or informal as far as my logs.

19     Q.     Well what I want to know is, did you do

20  an actual -- when the project was over at any point,

21  figure out an actual causation, number of days of

22  delay, meaning past the contract completion date,

23  caused by weather, number of days past contract

24  completion caused by labor shortage, number of days

25  caused by any funding issues?  Did you break it up

```
 1  like that, say you can assign X days to any
 2  particular cause?
 3       A.    No.
 4       Q.    You didn't do that.  And to date, you
 5  have not done; is that right?
 6       A.    Correct.
 7       Q.    And nobody has asked you to do that?
 8       A.    No.
 9       Q.    Right.  You've not been asked to testify
10  at trial about how many days of delay was caused by
11  any particular impact or delay; is that right?
12                 MR. COX:  Object.  That's a not a
13             question he can answer.  He doesn't know
14             what we're going to ask him at trial.
15                 MS. WOLF:  I'm asking if he's been
16             engaged to do that, to give that testimony
17             at this point --
18                 MR. COX:  He has not been engaged by
19             us.  I don't know if he's been engaged by
20             a nonparty.  I guess, he can't have been
21             engaged by you guys.  But he's a fact
22             witness.
23                 MS. WOLF:  Right.
24  BY MS. WOLF:
25       Q.    And so, that's what I'm asking you about
```

```
 1   are facts.  As of today, you have already testified
 2   that you have done no calculation to say the number
 3   of days past contract completion associated with any
 4   particular cause, right?  You have not done that
 5   calculation?
 6        A.    Correct.
 7        Q.    There's nothing in your documents, and
 8   nothing in your head right now, where if somebody
 9   asked you, how many days past the contract
10   completion date did you go because of a weather
11   delay, or labor shortage, or funding issue, you do
12   not have that answer, correct?
13        A.    I've probably got an approximate amount.
14   But, I mean, again, after December, I mean,
15   everything -- everything was on another path.  So it
16   doesn't -- so it doesn't -- I kept track of -- you
17   could probably add this stuff up, as far as rain
18   delays.  But again, so I don't -- anything that's
19   happened from the original time that we were looking
20   at finishing to now, no, I have not.
21        Q.    Okay.  And you're aware -- you know what
22   the word concurrent delay means?  You've heard of
23   that term?
24        A.    Could you define it for me, please?
25        Q.    I'm asking you if know --
```

```
 1        A.    No, I do not.
 2        Q.    Okay.  All right.  That's all the
 3   questions I have about that.  So let's look at --
 4   let's look at February 22.  Actually, I'm sorry,
 5   start with February 17.
 6        A.    Hold on one second.  February 17.
 7        Q.    February 17.
 8        A.    Yes.
 9        Q.    All right.  So if you go over it says,
10   Wade with IRC stopped by to work on the broken AHU.
11   So that's -- Wade is with Industrial Refrigeration,
12   correct?
13        A.    Yes.
14        Q.    And he stopped by because the air
15   handling units were broken, right?
16        A.    Yes.  That is in the log.  But it's a
17   long story about that, the AHU, the air handling
18   units, but continue.
19        Q.    Okay.  So it says they cannot be fixed
20   due to regulations?
21        A.    Correct.
22        Q.    -- to be replaced.  So in a nutshell,
23   what does that mean?
24        A.    They are R22 refrigerant.
25        Q.    So because of code regulations, they had
```

1   to be upgraded?

2        A.    They could not be fixed.

3        Q.    Okay.  So they had to be replaced?

4        A.    Yes.

5        Q.    All right.  And then go to -- go to the

6   entry for February 22.  It says, owner working on

7   financial.  He has approved of full phase one

8   installation of VRF.  Is that a reference to the

9   owner approving the HVAC replacement work on the

10  first floor?

11       A.    It could.  I'm not quite sure.  I would

12  guess, because I would have witnessed -- or I would

13  have said Wade.  But, yeah, he has approved a full

14  phase installation of VRF.

15       Q.    So on or about that date, because you

16  have it in your log, is when the owner approved the

17  work to replace the HVAC system on the first floor,

18  correct?

19       A.    Part of the HVAC system on the first

20  floor.

21       Q.    Okay.  Is it correct to say that the

22  first floor tenant cannot move in and occupy the

23  first floor until they have air conditioning?

24       A.    They did have air conditioning.  They

25  just got -- each -- each office got ceiling

1    cassettes.  But again, the entire office is still
2    operating on the old system.  It's just there are
3    certain rooms that we have selected for the VRF
4    system to go into.
5          Q.    On the first floor?
6          A.    Yes, ma'am.
7          Q.    Okay.  So part -- you're saying that part
8    of the HVAC system on the first floor was replaced
9    or upgraded, not the entire thing?
10         A.    The main corridor are still ran by the
11   main unit.  The individual -- the center offices are
12   still ran off of the main unit.  A couple -- I think
13   the conference room, and again, a couple of other
14   offices are ran off of the main system.
15         Q.    When GSA moved back into the first floor,
16   had all the HVAC work that was being done on the
17   first floor been completed?
18         A.    No.
19         Q.    So when they moved in, there was still
20   work to be done?
21         A.    There is still work to be done.  And that
22   would be phase two of the HVAC.
23         Q.    Okay.  So all the work that had been
24   approved and designed at that point had been done
25   before they moved in?

1      A.    Phase one of it, yes.

2      Q.    Okay.  Phase two, as of right now, has

3  not been approved?

4      A.    It has been approved, it just has not

5  been completed yet.

6      Q.    Okay.

7            MS. WOLF:  Can we take about a five

8       minute break, come back in a couple

9       minutes after 2:00?

10            MR. COX:  Sure.

11            MS. WOLF:  Thank you.

12            THE VIDEOGRAPHER:  Going off the

13       record.  The time is 1:58.

14              (OFF THE RECORD)

15            THE VIDEOGRAPHER:  We are now on the

16       record.  The time is 2:07.

17  BY MS. WOLF:

18      Q.    All right.  Mr. Monheiser -- I'm sorry if

19  I'm saying your name wrong.  I hear the way you're

20  saying it.

21      A.    You can just call me Evan.  If that's

22  okay, you can just call me Evan.

23      Q.    Tell me one more time how you say your

24  last name?

25      A.    Monheiser.

```
 1        Q.     Okay.  I don't think I --
 2        A.     -- make that Meheiser.
 3        Q.     If we go to the March entries for the
 4   daily log, I have a few questions for you there.
 5        A.     March?
 6        Q.     So we're going to be on Encore 11.02
 7   starting down the bottom of the page with the
 8   March 1 entry.  And actually what I'm going to do,
 9   is just ask you to verify that you have entered in
10   on these particular days that there were rain
11   delays.  On March 1, you say no exterior work due to
12   rain, correct?
13        A.     Correct.
14        Q.     March 4, the same.  March 5, the same.
15   March 19, no exterior work due to rain, no interior
16   work.  And on the 23rd, no exterior work in the
17   morning due to heavy rain last night.  All those
18   were correct dates?
19        A.     Yes, for exterior work.  And then -- yes,
20   for exterior work.
21        Q.     Okay.  And on March 19th where you
22   wrote no interior work, are you saying that's not
23   related to the rain event, that's something else?
24        A.     I was just naming that those are the
25   dates -- all those dates that you named, the one
```