UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| EAUX HOLDINGS, LLC | CIVIL CASE NO. 2:20-CV-01582<br>*Jury Trial* |
| VERSUS | |
| | JUDGE JAMES CAIN |
| SCOTTSDALE INSURANCE CO. | MAG. JUDGE KATHLEEN KAY |

**AFFIDAVIT OF LOUIS FEY**

**STATE OF MISSISSIPPI**

**LAFAYETTE COUNTY**

Before me, the undersigned notary public, personally came and appeared:

**LOUIS FEY**

1. I have forty (40) years of practical experience handling complex insurance claims and related litigation, directing and overseeing insurance company defense counsel, managing and directing claims, underwriting, and agency operations.

2. In my role at Fey Consulting LLC, I advise clients (insureds, insurance agents, brokers, and insurance companies) and consult with their respective attorneys where appropriate. I assist with insurance claims, coverage issues or disputes, and improper denials. I evaluate and provide litigation support and/or expert testimony addressing claim handling, allegations of errors and omissions, underwriting disputes, and a variety of other insurance related issues.



Exhibit 3

3. My curriculum vitae is attached to Exhibit A, pages 24-39.
4. I was retained by counsel for Scottsdale Insurance Company to evaluate its handling and payment of Eaux Holding, LLC's property insurance claim.
5. On August 13, 2021, I prepared an expert report, attached as Exhibit A.
6. I hereby adopt and incorporate herein all of the opinions, statements and analysis in the August 13, 2021 report, attached Exhibit A.
7. All of my opinions are expressed with a reasonable degree of professional certainty based upon the use of a reliable methodology, which includes applying my 40 years of experience and training in insurance as a licensed insurance adjuster and insurance producer, as well as a claim, underwriting, and risk, manager, to my review of the depositions and documents listed below, and by then comparing my findings to the applicable industry standards and customs that apply to insurance claim handling.

Louis Fey

SWORN AND SUBSCRIBED before me, notary Public, on this 7 day of September, 2021.

Notary Public

STATE OF MISSISSIPPI NOTARY PUBLIC ID # 229331 RANDALL P. RANKIN Commission Expires July 30, 2024 LAFAYETTE COUNTY

# EXPERT REPORT OF
# LOUIS G. FEY JR, CPCU, CIC, CRM, AIC
# FEY CONSULTING LLC

August 13, 2021

EAUX HOLDINGS LLC,

PLAINTIFF,

V.

SCOTTSDALE INSURANCE CO,

DEFENDANT.

---

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

CIVIL ACTION NO. 2:20-CV-01582-JDC-KK

1. I will act as an expert witness regarding the insurance industry standards, customs, and practices applicable to insurance claim handling. Specifically, I have been retained by counsel for Scottsdale Insurance Company ("Scottsdale") to evaluate its handling and payment of Eaux Holding LLC's ("Eaux") property insurance claim ("the claim"). In doing so, I am comparing Scottsdale's claim handling to the universally accepted insurance industry standards and practice that apply to such matters.

2. I have been asked, based upon my review, and with the benefit of my qualifications and expertise, whether I have certain opinions, as will be more fully set forth below. Where such an opinion is stated, it is based upon information provided to me that I consider reliable and which is the type of information reasonably relied upon by one in my profession. All of my opinions are expressed with a reasonable degree of professional certainty based upon the use of a reliable methodology, which includes applying my 40 years of experience and training in insurance as a licensed insurance adjuster and insurance producer, as well as a claim, underwriting, and risk, manager, to my review of the depositions and documents listed below, and by then comparing my findings to the applicable industry standards and customs that apply to insurance claim handling. I have previously been found qualified (many times – see a partial list on exhibit A) to testify as an expert on insurance industry custom and practice in both Federal and State courts. I offer this report in compliance with F.R.C.P. 26(a)(2)(B), the Federal Rules of Civil Procedure, which I have read and which I understand.

MY QUALIFICATIONS IN THE FIELD OF INSURANCE:

3. Attached as "Exhibit A" to this opinion is my curriculum vitae, which contains my work history, positions held on various state boards, accomplishments in the field of insurance, continuing education, a partial list of courts in which I have been deemed qualified to testify on insurance matters, a partial list of seminars I have given, and a complete list of my past testimonies over the past four years.

4. I have forty (40) years of practical experience handling complex claims and related litigation, directing, and overseeing insurance company defense counsel, managing, and directing claims, underwriting, and agency operations. As Vice President of Risk Management at the 2nd largest bank owned U.S. insurance agency, I assist insurance carriers and insured entities by intervening and/or advising on complex or problematic situations or issues. I assist insurance producers with insurance coverage analysis, insurance program analysis, and the management of corporate and personal risk. I have also spent many years instructing and training insurance company and insurance agency personnel. My opinions are also based upon information contained in industry textbooks I have studied, have used to teach other adjusters, and which I refer to often. A partial list of those textbooks may be found on Exhibit A. Where I rely on a specific passage from these textbooks, I so indicate by footnote or otherwise, as reflected in Exhibit B.

5. In my role at Fey Consulting LLC, I advise clients (insureds, insurance agents, brokers, and insurance companies) and consult with their respective attorneys where appropriate. I assist with insurance claims, coverage issues or disputes, and improper denials. I evaluate and provide litigation support and/or expert testimony addressing claim handling, allegations of errors and

omissions, underwriting disputes, and a variety of other insurance related issues. I also regularly advise industry representatives and legislative authorities on insurance matters, and I am deeply involved in legislative initiatives related to the Insurance industry on both the state and federal level. I regularly conduct seminars for the insurance industry, which are recognized for continuing education credits, including seminars at the request of the Louisiana Department of Insurance at Southern University.

6. The summer 2009 edition of the ABA Tort Trial Insurance Practice Insurance Coverage Litigation Committee Newsletter contained an article entitled "The Use of Experts in Insurance Bad Faith Litigation." The article concludes that the most effective experts are those who are qualified by true experience in the insurance industry and who support their position with case facts. I have ample industry experience, and I base all my opinions on the documented facts of the case, coupled with my experience.

## BASIS OF MY OPINIONS

7. My Opinion(s) are based on my review of the following documents:

- The Skyline claim submission, books 1 – 4
- Scottsdale Policy No. CPS3344220 ("the policy")
- The Complaint
- The Scottsdale Activity Log through June 11, 2021 (Redacted)
- The Scottsdale Claim file
- Eaux's Disaster Protocol Initial Discovery Responses
- Scottsdale's Disclosure Information Pursuant to Case Management Order No. 1, Ex. A, Part 3(3) (R. Doc. 4-1)
- ISO index responses 1 – 6
- 18 email strings between the parties marked as New Mail
- A large quantity of photos provided by Skyline via four September 18, 2020 emails
- The Case Management Order
- Scottsdale's Answer
- The Poole Roofing estimate and payment schedule

- Scottsdale's First Notice of Loss
- Scottsdale's August 30, 2021 claim acknowledgement letter
- Poole Roofing Payment of May 26, 2021
- Industrial Refrigeration Invoice May 7, 2021
- JS Held Repair Estimate Comparison
- SIC's Initial Disclosure
- Plaintiff's Initial Disclosures
- Eaux - Four O - Odom Discovery Responses
- Various Skyline email strings
- The Deposition testimony of Joseph Odom
- Encore Exhibit 1

8. My opinions are based upon a broad spectrum of education, training, research, and over four (4) decades of experience. I have access to various industry resources in addition to the above, such as Sage, Silver Plume, FC&S, and IRMI. I research industry writings, white papers, and textbooks daily. I apply and draw from my actual multi-line claim handling, underwriting, agency, and insurance management experience in arriving at my conclusions.

**INDUSTRY STANDARDS**

9. These industry standards can be seen in various industry documents, books, and white papers. For a further discussion of the insurance industry standards that apply to adjusters and claim handling, see Exhibit B.

10. To be clear, where I comment on coverage in this report, I do so only to discuss the industry intent behind coverage forms or exclusions, or to illustrate the application of industry standards to an adjuster's evaluation of coverage from a claim perspective. To the extent that there are any coverage disputes in this matter, my opinion should not be viewed as an attempt to declare or disclaim coverage for the underlying claim, as that will be for the court to determine, as will the applicability of any legal standards or state statutes. The discussion of coverage is merely to evaluate and explore whether the actions and coverage positions taken by MUSIC in handling the underlying claim were reasonable and in keeping with insurance industry standards and common practice.

**OPINION**

- Scottsdale handled this claim in a professional manner;
- Scottsdale's claim file clearly reflects the events that took place;
- Scottsdale's claim handling can easily be reconstructed from its claim file documentation in accordance with insurance industry standards;
- Scottsdale's claim file reflects ample management oversight and involvement in the claim;
- Scottsdale employed the proper qualified experts promptly as they became necessary;
- Scottsdale paid the undisputed loss within the 30-day time frame allowed by the policy and as called for by the policy's Louisiana Amendatory Endorsement;
- While Collisson was later criticized by Skyline, and while his opinions were different from those of J. S. Held, he appears to be qualified, and was properly vetted by Scottsdale prior to being retained;
- Collisson reportedly had prior experience in estimating damage to police departments and DHS offices, and was familiar with the *"additional requirements and the added complexity such risks present"*;
- Scottsdale had no reason to question Collisson's experience and abilities;
- Scottsdale's use of experts and reliance upon their opinions was reasonable and in accordance with insurance industry standard practice;
- Scottsdale paid all undisputed amounts timely;
- The time frame to pay undisputed amounts begins to run once Scottsdale received its building consultants estimate and had an opportunity to review it, not from the date Skyline provided it with its four-volume claim submission;
- Scottsdale's claim handling was prompt and thorough;
- Scottsdale's dispute of Eaux's claim was reasonable, and was based upon the advice of its experts upon whom it is entitled to rely;
- This dispute is over the scope of damage, the cost and methods of repair, and has been complicated by an excessive claim submission by Eaux;
- Scottsdale had a legitimate reason to question Eaux's claim submission

- Since the building at issue was insured for $2,000,000 under the Scottsdale policy, and was subject to an 80% coinsurance requirement, Skyline's claim submission of $2,882,184.60 in damage was a red flag;

- There are numerous red flags on this claim;

- Eaux's Public Adjuster's estimate was $1,086,093.60 higher than J.S. Held's final number;

- Since Collisson disagreed with Skyline and J.S. Held with regard to the exterior repair methodology, and since all of the roof replacement estimates varied dramatically, Collisson was $879,598.92 lower than J.S. Held's final number, after factoring out the remediation costs which were not included, and which Collisson was not asked to evaluate;

- While Collisson's estimate turned out to be inaccurate, he was much closer to the actual repair cost than Skyline. Adjusting Collisson's numbers for the alternative exterior repair methodology would result in a fairly accurate estimate[1] as compared to Skyline's estimate;

- The difference in Collisson's estimate can be mostly accounted for by the difference of opinion over the extent of damage to the exterior panels, and the cost and method of repair;

- Collison felt that the exterior panels could be repair and painted without being removed;

- Collison felt the roof replacement estimates submitted were extremely high, which proved to be accurate;

- While J.S. Held agreed with Skyline that the exterior panels would need to be removed, it also agreed with Collisson's finding of pre-existing damage, also noting that **Skyline's estimate included uncovered upgrades;**

- The roof estimate from Crest Exteriors submitted by Skyline was $305,306.74 higher than J.S. Held's final estimate for roof repairs;

- The roof estimate from Crest Exteriors submitted by Skyline was $195,000 higher than Skyline's own estimate;

- Skyline's roof estimate was approximately $110,306.74 higher than J.S. Held's final estimate;

- Poole Roofing's estimate was $158,751 higher than J.S. Held's final replacement cost;

[1] $882,456.65 v $2,391,043.60 after deduction of the remediation invoice that Collisson was not asked to address.

- Poole Roofing's estimate was $48,444.26 higher than Skyline's own estimate;
- The disagreement over the building's exterior finish accounts for $311,444 of the total claim;
- As one can easily see, disagreements over cost, scope and methods of repair are common in property insurance claims;
- Scottsdale was unable to pay the sums sought by Eaux until the cost of repair was confirmed by its experts;
- Scottsdale continued to handle the claim even after suit was filed;
- Once a dispute arose, Scottsdale appropriately employed additional experts and obtained a second opinion with regard to the scope, cost, and method of repair from J.S. Held;
- After receiving J.S. Held's estimate, Scottsdale promptly paid the recommended additional cost without any deduction for depreciation or even the policy's deductible;
- This was a complex and unique claim involving factory manufactured exterior panels, inflated estimates, claim submissions and a legitimate disagreement over the scope of damage and method of repair;
- Scottsdale's handling of this complex claim was reasonable and well done;
- Scottsdale's handling of this complex claim was in accordance with all applicable insurance industry standards and practice;
- While both sides initial estimates were way off, and while Eaux accuses Scottsdale of bad faith, Scottsdale's initial evaluation, in reality, was closer to the actual damage than Eaux's claim submission;
- Each time Scottsdale received new recommendations from its experts, it promptly paid any additional amounts, timely;
- The repair of the structure was not delayed by Scottsdale's claim handling;
- An insured presenting a claim under a property insurance policy has a duty to be forthright and cannot inflate claims;
- Insureds are responsible for the actions and representations of those assisting them with the claim submission;
- An inflated claim under a property insurance policy can be deemed a material misrepresentation that violates the policy's conditions;

- The policy provides that a material misrepresentation of a claim voids coverage; and
- I found numerous red flags during my review of the claim.

**THE POLICY**

11. Scottsdale Insurance Company (hereinafter "Scottsdale") insured Eaux Holdings, LLC's building located at 620 Esplanade Street, Lake Charles, LA 70607 under Policy No. CPS3344220, effective March 8, 202 to March 8, 2021 ("the policy"). This was a lessor's risk subject to a $2,000,000 policy limit covering Eaux's building. The policy does not provide Loss of Rents coverage. The policy provides a $10,000 sub-limit for Ordinance or Law coverage for code upgrades. The policy is subject to a $1,000 deductible and is subject to an 80% coinsurance requirement. The policy is constructed using the ISO standard Building Property Coverage Form CP 00 10 10 12 and the ISO Special Causes of Loss Form CP 10 30 09 17. Since Scottsdale did not dispute coverage, I will not spend a lot of time rehashing the policy, other than to point out the following Loss Payment provision:

Found on Page 11 of 16 of form CP 00 10 10 12:

*4. Loss Payment*

*b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.*

*g. loss or damage*

***30 days after we receive the sworn proof of loss,*** *if you have complied with all of the terms of this Coverage Part,* ***and:***

***(1) We have reached agreement with you on the amount of loss****;* ***or***

***(2) An appraisal award has been made.***

*LOUISIANA AMENDATORY ENDORSEMENT (WHEN LOSS PAYABLE)*
*Form FS-23 (1-90)*

*The "When Loss Payable" provision is amended to read as follows:*

*The amount of loss for which this Company may be liable shall be payable thirty days after proof of loss, as herein provided, is received by this Company* ***and ascertainment of the loss is made either by agreement between the insured and this Company expressed in writing or by the filing with this Company of an award as herein provided.***

12. Note that the 30-day payment requirement is not triggered by the insured's submission of satisfactory proof of loss, **the 30 days begins to run from the time the insurer agrees to a certain undisputed amount of damage[2].** Scottsdale paid the undisputed loss within this 30-day time frame.

## BACKGROUND

13. On August 27, 2020, Hurricane Laura damaged the insured structure causing significant damage and water intrusion. After being presented with a 4-volume claim submission by Eaux's Public Adjusters,[3] **Scottsdale[4] retained a building expert consultant to estimate the damage.**

14. This is a dispute arising from differing views regarding the scope of damage, the cost of repairs, and repair methodologies. The main areas of disagreement centered on the exterior cement panels, the cost of roof replacement, and the cost to mitigate the interior water damage after the loss.

15. To be clear, **an insurance company is entitled to question damages claimed by an insured, and should not, and in fact cannot just pay claims without definitively verifying the cost of repairs.** It also needs to be emphasized that while Collisson's estimate may have been too low based upon J. S. Held's final determination, Skyline' claim submission was also way too high. Had Scottsdale buckled under the criticism it received for resisting Eaux's demands, it would have severely overpaid the claim.

## CLAIM HANDLING

16. After Eaux submitted its claim to Scottsdale within three days of the storm, even though insurers have 30 days to initiate claim handling following catastrophe events such as Hurricane Laura, Scottsdale responded by acknowledging the claim that very same day. Scottsdale informed Eaux by letter that it had assigned Claim No. 01980195 and that the claim would be handled by its Catastrophe ("CAT") Team. Scottsdale also provided Eaux with the Team's contact information.[5] In keeping with the handling of such matters, Scottsdale's CAT Team assigned the claim to Alacrity, an independent adjusting firm, to inspect the damage. After Alacrity was presented with Skyline's voluminous claim submission[6] during its inspection of the loss on September 15, 2020, it became evident that this was a complex claim requiring the services of a building consultant.

17. In a catastrophic claim setting, due to the sheer volume of claims, coupled with the time it takes to estimate severe and complex losses (not to mention the expertise involved), most field adjusters are ill equipped to complete such an estimate. The initial inspection is just that, an initial evaluation to assess how bad the claim is, and to evaluate the need for experts should the adjuster be unqualified to scope the loss. The insurance industry standard practice in complex

---

[2] The insurance industry refers to an agreed upon amount of loss as the undisputed claim or loss.
[3] Skyline
[4] In accordance with insurance industry standards and practice.
[5] See Scottsdale claim acknowledgement letter dated August 30, 2020.
[6] 4 books ("volumes") containing over 800 pages.

and large claim settings is to employ building consultants that specialize in estimating construction costs and who are experts in construction means and methods. In keeping with this standard practice, once Scottsdale was informed that the loss was large and complex by Alacrity, it retained the services of Louis Collisson ("Collisson") of Grecco Construction Consultants ("Grecco"). To give the reader some insight into just how bad Hurricane Laura was, consider the following from the Louisiana Department of Insurance (emphasis added).[7]

> *Insurance companies have now reported* ***<u>$10 billion for claims in Louisiana from hurricanes Laura, Delta and Zeta</u>*** *through June 30, according to the latest round of information from insurers quantifying paid and reserved-to-pay losses for those hurricanes.*
>
> ***<u>Policyholders have filed 316,879 claims</u>*** *of all types from the three storms through the second quarter of this year. Of those, 205,554 claims, or 65%, were closed with payment as of June 30, garnering $7.8 billion in payments for damage caused by the three hurricanes. Insurers have reserved an additional $2.2 billion to pay on those claims.*
>
> *Policyholders have filed 175,160 claims from Hurricane Laura, which struck Southwest Louisiana on August 27 with the strongest winds accompanying a hurricane in our state in over 150 years. As of June 30, insurers had closed 86% of the claims from Hurricane Laura, 68% of which were closed with payment. Total paid losses plus reserves on reported claims for Hurricane Laura as of the end of June were $8.6 billion, accounting for the vast majority of damage from the historic 2020 hurricane season in Louisiana.*

18. Now consider the following initial claim report and file note entries from Scottsdale's claim file:

> Scottsdale Claim Development Report ("CDR") dated September 30, 2018:
>
> ***<u>Due to the specialty nature of the construction the adjuster was not able to complete an estimate of repairs.</u>***
>
> ***<u>The building has specialty concrete panel exterior walls and a flat roof system.</u>***
>
> ***<u>The first-floor interior finishes consist of multiple security features</u>*** *to accommodate the tenant, The Department of Homeland Security.*
>
> ***<u>The public adjuster has provided an estimate in the amount of $2,882,184.60</u>*** *including $491,141.79 for water mitigation and $47,000 for the temporary roof covering.*
>
> And:
>
> *PA physically handed their hard copy estimate to the IA. The majority of the docs are photos. They have copies of the stripped-down wall diagrams.* ***<u>IA doesn't know where the</u>***

[7] August 5, 2021 Commissioner Donelon Updates 2020 Hurricane Data Through June 30, 2021

> ***<u>PA's repair numbers came from. The documents provided to IA are 800 pages and consist of 4 books.</u>***
>
> *I agreed to email IA directly, and he will forward me everything he has that can be sent via email. He said that he was not able to a particularly thorough inspection when he was there due to the lack of electricity and the size of the involved area.*
> *-Adam Lock (09/17/2020 2:18 PM)*
>
> *docs rec'd from PA. Rec'd multiple emails from PA.*
> *They provided some lease docs that will require some review to determine the insured's interest in the tenant's improvements*
> *They have provided some photos and a video.*
> *They provided roof shrink-wrap estimate for $45k plus $2k in edge flashing Crest Exteriors*
> *They provided a roof estimate from Crest Exteriors in the amount of $436,100.74*
> *They do not have a copy of the water mitigation estimate yet.*
> *They provided an Xactimate line item estimate but it does not include a summary page with a total. It is 151pages and would take some time to add up each section manually.*
> *-Adam Lock (09/21/2020 2:01 PM)*
>
> *Handling*
> *Reviewed insured's interest w/ TRC Mackenzie. The insured has an interest in whatever have been made a part of the building aside from any specific trade fixtures.*
> *Because we now have some photos and the PA's line-item estimate, as well as a roof bid and roof tarping invoice,* ***I'm going to send assignment request to Grecco Construction Consultants to assist in evaluating the cost of repairs.***
> ***-Adam Lock (09/21/2020 5:47 PM)***

19. Since contractors, insureds, and their representatives sometimes inflate claim submissions, **<u>the mere submission of a demand package[8] does not trigger the 30-payment requirement.</u>** Scottsdale was entitled to retain a building expert, and assuming that expert has been properly vetted, rely upon that expert's advice before agreeing to an undisputed amount of loss. Importantly, Scottsdale's claim file documents that it properly vetted Collisson to ensure that he was qualified prior to retaining him. Consider the following Scottsdale claim file note (emphasis added):

> *Contact w/ consultant*
> *Rec'd call from the assigned consultant from Grecco, Louis Collisson ph: 215-205-9752 email: lcollisson@greccoonline.com*
> *Louis says that* ***<u>he has been involved in estimating for police departments and DHS offices in the past and is familiar with the additional requirements that add complexity to this estimate.</u>***
> *I explained that I will have a box.com link sent to him so he can download the documents available to us so far. I explained my understanding that the PA is going to provide a*

[8] Such as the 4-volume submission by Skyline in this claim

*thumb-drive with additional documents. I will ask that the PA also sends those documents to him as well. Louis will be putting together his budget to submit for approval*
*-Adam Lock (09/22/2020 10:20 AM)*

20. And the following file note **documents Scottsdale's claim management oversight**, an industry standard practice that provides a second set of eyes on claims, and which acts as a check and balance to ensure that claims are being properly handled (emphasis added):

***Conf file with CP.*** *Reviewed photos from PA and PA bid/invoices for temp repairs/roof repairs.* ***CP has assigned Building consultant that specializes in Gov't builds*** *due to govt tenant in building.* ***Approve advance of $250,000 based on mitigation/roof wrap costs and temp repairs to building.***
*-Jennifer Vick (09/22/2020 2:26 PM)*

21. While not required to do so, on September 23, 2020, still well within the 30-day time period **to merely begin an investigation**, and just after Alacrity's initial inspection that was cut short by a lack of electricity in the building, Scottsdale advanced Eaux $250,000 while waiting for Collisson's estimate. Here is Scottsdale's analysis of Skyline's initial claim submission while it was waiting for Collisson's estimate (emphasis added):

*Handling*
*Received email from PA w/ water mitigation invoice of $491,141.79 along with supporting docs for the water mitigation. Water mitigation was not included in the initial estimate provided by PA. In addition to their line-item estimate,* ***PA has also submitted a roof estimate from Crest Exteriors that comes to $436,100.74, which is about $195k more than the line items used for roofing in the PA estimate.*** *If the original roof amount is subtracted from the PA estimate and the contractor roof bid added in,* ***the total amount in estimates, including mitigation, submitted by contractor at this time is $2,882,184.60 Of note - $616,317.41 of the PA's estimate is for exterior wall cladding,*** *which is a cementitious panel, at $53.00 per sf. This price seems very high. When I pulled tax record to confirm owner of the building, I noted that* ***there are a few overview pictures in the online statement that show cracking of the exterior cladding prior to this loss. It's possible that some of the damage to wall cladding is unrelated.*** *I will contact agent to see if they performed an UW inspection that may also have some additional photos of the exterior wall cladding.*

*The PA estimate also include a single line item for "Market conditions if incurred" in the amount of $261,500.00.* ***It's possible that once a thorough review is completed, the estimate may come in under the limit, however, will await additional documentation from PA and review from building consultant.***
***-Adam Lock (09/23/2020 9:55 AM)***

22. The above file note reflects a thorough review of Skyline's claim submission by the Scottsdale adjuster, and highlights some of the more glaring concerns identified.

23. After receiving Collisson's estimate of repairs[9] on or about October 23, 2020, Scottsdale issued a check for $218,192.53 on November 22, 2020, within the 30-day time requirement, and less than 90 days after the loss. While it has been suggested that Scottsdale deduction of its $250,000 advance from Collisson's ACV estimate was somehow inappropriate, **that is exactly what Scottsdale was supposed to do**. The November 22, 2020 payment was based upon the undisputed ACV of the loss[10] pending actual repairs and the submission of receipts documenting the actual cost actually incurred the insured to effect repairs, versus merely the **estimated** costs. As Skyline itself admitted, an estimate is merely an estimated cost of repairs and is not the actual cost.[11] **Depreciation is always withheld from claim payments until the actual repairs are completed and the actual cost documented.**

> ***From:*** *Jade Bentz <jbentz@skylineadjusters.com>*
> ***Sent:*** *Thursday, May 6, 2021 6:10 PM*
> ***To:*** *Granger Stuck <gstuck@jsheld.com>*
> ***Cc:*** *Jeffrey Major <jmajor@skylineadjusters.com>*
> ***Subject:*** *Re: Four-O LLC , Recoverable Depreciation, Claim# 01980195*
>
> *CAUTION EXTERNAL*
>
> *Good Evening Granger,*
>
> *Per the below, please see attached a workbook that should assist with the consolidated claim. Please note this is for discussion and to help summarize where we see the components and their values. The Skyline estimate was proffered to document the initial scope of the loss and to estimate an RCV, and subsequent ACV for funding for repairs while the claim was adjusted.* ***It is and was only an estimate,*** *however the scope was used as a detailed guide to the damages, which Encore ultimately repaired under their contract.* ***The true cost is only actually realized when the repairs and/or replacement is complete.*** *Additionally, indemnification under the policy must be considered when determining the scope of said repair or replacement.*
>
> *Hope this helps. Please let us know your questions, and feel free to give either of us a call if easier to discuss.*
>
> *Thanks,*
> *Jade*
>
> ***Jade Bentz***
> ***VP of Claims***

24. The Scottsdale file notes document an in-depth analysis and breakdown of the damage as well as management oversight and senior management approval of the amount paid. While I won't recreate the analysis, here is the Scottsdale Claim Manager's review:

> *Adam,*

---

[9] Collisson's estimated RCV was $600,087.78 and ACV was $466,491.36.

[10] $468,192.53 - $250,000 = $218,192.53 with $137,260.55 in recoverable depreciation withheld

[11] Skyline-00242-001

*As we discussed I put in authority to at least get undisputed ACV to the insured/PA based on Engineer's estimate once he corrects a few things we discussed.* ***Let PA know this is <u>undisputed</u> and we are still reviewing for additional supplements as well as the mitigation. I reviewed the PA estimate and apprx $429,330.41 is for the cement panels, his pricing is showing cost of $8 compared to BC of $4.*** *So not as far off as we thought. Please set up a meeting with Brian so we can go over the estimate and prepare for authority request to John.*

*Also, please check in with Wardlaw on the review of mitigation invoices.*

*Thanks*
*Jenn*
*Jennifer Vick*
***Sr. Specialty Claim Manager***

***Conf file with CP and reviewed the BC estimate. Corrections needed however approve issuing undisputed payment while we continue to investigate.*** *CP to f/u with BC to corrections to estimate, issue undisputed to PA, f/u with Wardlaw on mitigation review and set conf with TRC to discuss further.*
*-Jennifer Vick (10/23/2020 6:13 PM)*

25. The industry standard practice, and the process outlined by property insurance policies written on a replacement cost coverage ("RCV") basis, is for the insurer to pay the depreciated loss (the actual cash value "ACV") unless or until the repairs are actually complete. **<u>It is also standard practice to apply any advanced payment as a credit towards the subsequent undisputed ACV claim payment once the damage has been estimated. A failure to take an offset of any advance would result in an overpayment.</u>** Since this has always been the standard practice, and since only the undisputed ACV is owed by an insurer, I am surprised that Scottsdale's deduction of the advance payment from its ACV undisputed loss payment has become an issue.

26. While there was obvious disagreement between Collisson and Skyline, in keeping with the insurance industry standard practice, Scottsdale continued to try to work through these various disagreements over scope, pricing and pre-existing damage even after Eaux filed suit.

27. Since the remediation contractor invoiced $491,141.79, almost 25% of the full policy limit, and since remediation costs are not typically evaluated by a building consultant, Scottsdale also took the appropriate step to have those charges evaluated by Wardlaw Claim Services. While Wardlaw had some trouble inspecting the loss, it concluded that remediation should have cost only $124,731.98 rather than the $491,141.79 invoiced, resulting in a $366,409.81 dispute.

28. On January 8, 2021, Scottsdale issued a third payment of $177,731.98 for a total of $645,924.51. After adding in the $1,000 deductible and the $137,260.55 in recoverable depreciation, Scottsdale's initial claim evaluation on an RCV basis was $784,185.06 versus Eaux's initial claim submission of $2,882,184.60. In view of the Held reconciliation and the

Encore repair contract, we now know that Eaux was off by $1,086,093.60 and Scottsdale was off by $1,011,905.94. While Eaux accuses Scottsdale of bad faith, Scottsdale in reality was slightly closer to the mark, and both estimates were way off. Regardless, a large part of Scottsdale's deviation can be explained by the disagreement over the extent, cost and method of the exterior panel repairs.

29. While an insurance company has an obligation to promptly investigate a loss, Collisson's work was prompt and a appeared to be thorough. Scottsdale did not need to push Collisson for his estimate and Collisson inspected the building within 5 days of his retention, working on a Sunday to do so, and he completed his estimate and submitted it to Scottsdale promptly. Once Scottsdale received Collisson's estimate, in keeping with insurance industry standards and practice, Scottsdale thoroughly reviewed it, escalated the claim to senior management for approval, and issued its undisputed ACV loss payment promptly.

30. While Eaux alleges that Scottsdale was provided with sufficient proof of loss via its own inspection and the Eaux loss submission submitted by Skyline on September 15, 2020, Scottsdale does not owe whatever amount Eaux claimed, only the undisputed amount of loss after it had an opportunity to inspect and estimate the damage. In short, Scottsdale handle the initial claim properly and paid what it owed timely.

31. While legitimate disputes over damage are common, so are exaggerated claims and what has become known in the industry as reverse bad faith, where an insured attempts to profit from a loss. While a determination of the reasonableness of Eaux and its public adjuster's claim submission is not an issue for me to address, I think it important to recognize some of the issues that create claim handling disputes, and to point out that both sides were initially incapable of accurately estimating the damage due to the complexity and size of the loss. Disputes can also arise due to disagreements over depreciation, wear and tear, pre-existing damage, upgrades, coinsurance penalties, and uncovered loss, some of the things that are at issue in this case. It is also important to note that numerous disputes arose in the after math of Hurricane Laura since claim handling was complicated by multiple Hurricanes causing additional damage to the same structures.

*COMMERCIAL PROPERTY CONDITIONS - Form CP 00 90 07 88*

*A. CONCEALMENT, MISREPRESENTATION OR FRAUD*

***This Coverage Part is void in any case of fraud by*** *you as it relates to this Coverage Part at any time.*

***It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:***
*1. This Coverage Part;*
*2. The Covered Property;*
*3. Your interest in the Covered Property; or*
***4. A claim under this Coverage Part.***

Consider the following red flags that I identified during my review:

- While the policy limit was $2,000,000, Eaux submitted a claim for $2,882,184.60.

- While Eaux submitted a claim for $2,882,184.60, its contract with Encore for repairs, a contract that included uncovered improvements, totaled only $1,360,000.[12]

- While the Encore contact did not include roof replacement or the remediation expense, it gives us a pretty good ceiling on the loss. With the mitigation charge being reduced from $491,142 to $312,039 by J.S. Held and the roof replacement cost being reduced from $285,545 to $130,794, we have a total claim of less than $1,702,833,[13] resulting in a possible $87,000 over payment.

- When asked about the upgrades included in the Encore contract, Odom admitted that there was a $100,000 upgrade to the first floor HVAC system, but *"drew a blank"* regarding other upgrades.[14]

- While Eaux's Joseph Odom testified that he was not attempting to use the insurance proceeds to make the building better,[15] his September 5, 2020 email to Stacie Welte of GSA says that it was his goal *"to make it a much better space."*[16]

- Even though Odom was the one dealing with the GSA, and even though Odom informed the GSA that he intended to repair the building from the outset and was involved in having the GSA pick out colors, he suggested in his deposition that he delayed repairs because he couldn't decide if he wanted to rebuild due his alleged uncertainty surrounding Scottsdale's claim handling.[17]

- While Eaux stated in its Answers to Interrogatories that it lost an opportunity to rent its vacant space via a *"very lucrative long-term lease"* because of Scottsdale's claim handling, that was not accurate. In fact, the GSA signed a 15 – 17-year lease[18] to stay in the building *("that's considered gold in the rental industry"[19])* and the 2nd floor, while vacant at the time of the Hurricane,[20] is in the process of being leased by a Louisiana State agency;

- While Eaux, through its representative alleged that it was losing $1,000 a day in rental losses[21], that was not the case;

[12] Deposition testimony of Joseph Odom Page 102; 7 -25, Page 103; 22 – 25, Page 124; 18 – Page 125; 14, Page 143; 14 – Page 144; 3
[13] We know that the Encore scope of work include upgrades of over $100,000.
[14] Deposition testimony of Joseph Odom Page 79; 17 -25, Page 83; 2 - 22
[15] Deposition testimony of Joseph Odom Page 56; 20 - 25
[16] (Eaux-Odom-FourO 0000283.023.)
[17] Deposition testimony of Joseph Odom Page 63; 10 – Page 64; 25, Page 72; 2 – 25
[18] Deposition testimony of Joseph Odom Page 55; 2 - 16
[19] Deposition testimony of Joseph Odom Page 167; 16 – 2 Page 168; 3
[20] Deposition testimony of Joseph Odom Page 44; 2 - 4
[21] Jeff Major's October 1, 2020 email to Adam Locke (Skyline-00172-002).

- While Eaux, through its representative alleged that Scottsdale's claim handling delayed Eaux's ability to lease the vacant second floor, we know that as early as September 16, 2020 Eaux represented to the GSA that its *"top floor available. Approximately 7,500 sqft if you have other agencies interested*,"[22] and that the second floor was in the process of being leased by the State of Louisiana's Department of Health and Hospitals[23] at the time of his deposition.

- The remediation contractor invoiced $491,141.79, almost 25% of the full policy limit;

- While Eaux, through its representative alleged that Scottsdale's claim handling delayed the repairs, we know that the Encore contract was sign on December 20, 2020 and that Encore was not even licensed to do business in Louisiana until November 19, 2020, almost 90 days after the loss.[24] We also know that Eaux was *"diligently working on solidifying a timeline for the plan and working to get a new roof ASAP"* by as early as September 18, 2020.[25]

- While Eaux, through its representative alleged that Scottsdale's claim handling delayed the repairs, we know that as early as September 10, 2020 Eaux was asking the GSA for its choice as of carpet and paint colors since Eaux was *"putting the final touches on the rebuild bid package."*[26]

- While Eaux, through its representative alleged that Scottsdale's claim handling delayed the repairs, we know that Encore was given 60 days by the GSA to submit its plan for restoring the property after the loss and that Eaux *"also agreed to provide the government a reasonable time to review the plan and schedule for approval."*[27]

- While Eaux, through its representative, alleged that Scottsdale's claim handling delayed the repairs, we know that by as early September 5, 2020, Eaux was working with the GSA *"in accordance with the Fire and Casualty cause per the lease…"*[28]

- While Eaux, through its representatives informed Scottsdale that the roof had been replaced and requested payment of the $137,260.55 in deprecation hold back on April 11, 2021[29], we know that Held reported that the roof had not been replaced at that point in time.

> ***From:*** *Jade Bentz <jbentz@skylineadjusters.com>*
> ***Sent:*** *Sunday, April 11, 2021 10:21 AM*
> ***To:*** *Zallnick, Tammy J <t.zallnick@nationwide.com>*
> ***Cc:*** *SIC, Claim Prop <CLMSPROP@nationwide.com>; Somer Brown*

[22] Odom email to Michael Harvey at GSA dated September 16, 2020 (Eaux-Odom-FourO 0000277.021.)
[23] Deposition testimony of Joseph Odom Page 86; 22 – Page 87; 11
[24] Exhibit Encore 1.
[25] Odom email to Michael Harvey at GSA dated September 18, 2020. 2020 (Eaux-Odom-FourO 0000277.020).
[26] Odom - Michael Harvey email chain dated September 9, 2020. 2020 (Eaux-Odom-FourO 0000277.024 – 25 & 77 - 78).
[27] GSA's Michael Harvey email to Joey Odom dated September 17, 2020 (Eaux-Odom-FourO 0000277.021.).
[28] (Eaux-Odom-FourO 0000283.023.)
[29] Eaux-Odom-FourO 0000242.013 - 14

*<Somer@coxatty.com>; jwolff@keoghcox.com*
***Subject:*** *[EXTERNAL] Four-O LLC , Recoverable Depreciation, Claim# 01980195*

***Nationwide Information Security Warning:*** *This is an* ***EXTERNAL*** *email. Use* ***CAUTION*** *before clicking on links, opening attachments, or responding. (****Sender:*** *jbentz@skylineadjusters.com)*

*Good Afternoon Tammy,*

*We are all set with a site visit with Granger Stuck on Monday 4/19. Thank you for getting that assigned.*

*As you know there was a recoverable depreciation withheld on the undisputed in the amount of $137,260.55. Holding aside the differences we have on the RCV for this loss, we'd like to request this depreciation be released at this time.* ***The roof has been completed for an amount of $289,545,*** *and the GC's billings to date, exclusive of the roof, exceed Scottsdale's total repair RCV of $605,453.08.*

*Please let me know if you need any additional information or have any questions in order to process this to the insured.*

*Thank you,*
*Jade*

***Jade Bentz***
***VP of Claims***

And here is Scottsdale response:

*On Apr 27, 2021, at 11:22 AM, Zallnick, Tammy J <t.zallnick@nationwide.com> wrote:*

*Jade:*

*Regarding the withheld depreciation on the roof.* ***I have discussed the current roof in place on the building with Granger Stuck with J S Held.*** *Based on his visual inspection at the building, he advises that the roof currently in place on the insured's building appears to be the work outlined in the scope of the estimate from Poole Roofing labeled estimate 1445 and is dated October 19, 2020.* ***It appears that the work outlined in the Poole Roofing estimate 1446 dated October 19, 2020 has not yet been completed.***

*Please provide paid invoices for roofing work to date and proof of payment by the insured. I will work to obtain the Grecco estimate in the Xactimate format showing line item depreciation so that once paid amounts for roofing can be documented, I will be able to release the withheld depreciation for the roofing portion of the loss.*

*I will ask that Granger review the $10,000 code limit request based on the Martin Insulation invoice as well as the Capstone invoice and determine the appropriateness of each.*

*Granger: The Capstone invoice is attached above. I am not sure is was part of the original file materials I send you.*

*Thank you*

- While Eaux and its representatives have been claiming that Scottsdale claim handling has hindered repairs in some way, that has not been the case and Eaux has never missed a payment with regard to construction.[30]

- While Eaux also has pursue a Hurricane Delta claim, when asked about additional damage caused by Hurricane Delta, Odom's memory was *"fuzzy"* and he couldn't *"recall any specifically."*[31]

32. Due to the severity and sheer volume of claims resulting from the five Hurricanes that struck Louisiana in 2020, there was not only a lack of qualified adjusters, there were wild material and labor price fluctuations, making it even more difficult than usual to concretely estimate repairs. Faced with these complications, insurers had an up-hill battle trying to appease insureds asserting Hurricane Laura claims. In short, there are many reasons for claim disputes, claim disputes are common, and just because an insurer disagrees with an insured's public adjuster's[32] scope, cost, and repair means and methods does not mean that the insurer deviated from insurance industry standards or mishandled the claim. As stated, the mere submission of an estimate does not trigger an insurer's obligation to pay the amount claimed, legitimate claim disputes happen, and are OK.

33. Here, in Collisson's opinion, and as documented by his photos, Eaux failed to properly caulk or maintain the joints between the exterior panels prior to the loss which allowed water to infiltrate Eaux's building. Since Collisson's inspection was not long after the storm, he was capable of reaching these conclusions and concretely documented the pre-existing damage. Collisson also reported and documented missing and deteriorated plywood sheathing, rust on wall studs, and disputed Skyline's position that building required special factory finished panels. While J.S. Held subsequently disagreed with Collisson, Scottsdale had every right to rely upon Collisson's opinion until it was discredited. To its credit, after the matter deteriorated, Scottsdale retained the services of J.S. Held to reevaluate the claim and to try to reconcile the differences between the various estimates and the Encore contract. Once Held rendered its opinion, Scottsdale promptly paid the additional sums Held recommended without deduction for depreciation or even the policy deductible.

34. In fact, even before retaining Held, after the initial dispute arose over the exterior panels in September 2020, in keeping with insurance industry standards, Scottsdale started to

[30] Deposition testimony of Joseph Odom Page 95; 12 – Page 96; 12
[31] Deposition testimony of Joseph Odom Page 167; 7 - 14
[32] Jade Bentz & Monte Jones, Skyline Adjusters.

send out an engineer to inspect.[33] However, after Skyline indicated that it felt that an engineer would not be beneficial, Scottsdale cancelled the request. Importantly, Scottsdale's response regarding the engineer clearly documents that **this was a *"legitimate disagreement regarding the necessary cope and cost of repairs."*** (Skyline-00172-001)*:*

**Subject:** RE: Re: Re: Four-O LLC #01980195 - Requested Documents
**From:** "Lock, Adam" <LOCKA1@nationwide.com>
**To:** Jeffrey Major <jmajor@skylineadjusters.com>
**Cc:** "SIC, Claims Reports" <CLMSRPTS@nationwide.com>, Jade Bentz <jbentz@skylineadjusters.com>, Jim Collins <jcollins@skylineadjusters.com>, Louis Collisson <lcollisson@greccoonline.com>
**Sent:** Thu, 1 Oct 2020 19:37:56 +0000

Hi Jeff,

I agree that there are a number of panels damaged by the storm. I reviewed a bit more and I agree that a structural engineer is not going to add much in terms of determining what damage was caused by the storm and what cracks were pre-existing. The difference between the two areas of damage are pretty clear. As such, I am cancelling the engineer request.

However, I do believe that we have a genuine disagreement regarding the necessary scope and cost of repairs. The consultant, Louis, is out of town for a few days, however, my understanding of the damage to exterior cladding is that he felt it was repairable and did not warrant full replacement. I will provide you with a copy of his repair estimate once it is available to me.

Thank You,

35. To recap, Scottsdale retained three properly vetted experts to evaluate the claim and suggested that it send out an engineer to address the dispute. Scottsdale took the appropriate steps to adjust the claim and was entitled to rely upon the advice of these experts as long as there was nothing to suggest that they were unqualified or otherwise incapable of providing the services requested. The issues raised by Collisson were legitimate concerns, and while the final payment may have been much higher than the amount he initially recommended, Scottsdale continued to evaluate the claim and retained an additional expert to try to reconcile the dispute. Scottsdale cannot simply ignore its experts and has a dual responsibility to all insureds to try to keep premiums reasonable and to protect Scottsdale's liquidity. Overpaying claims just because an insured or its representatives complain and attempt to pressure the insurer into paying more than owed, is not a sound claim practice, and Scottsdale took the appropriate steps by retaining J.S. Held to continue its evaluation of the loss.

36. Importantly, Scottsdale had at least 5 adjusters, managers and senior management involved in this claim along with five of its clerical staff, in addition to Alacrity Solutions, Grecco, Wardlaw, and J.S. Held. The claim file and claim file notes reflect regular escalation of the claim to senior management, a standard practice, and that the claim received proper attention and management oversight. While there was clearly disagreement over the damage, the claim was handled properly, and in my view, **this claim could be used to teach adjusters how to properly handle complex and difficult claims. Criticisms of Scottsdale handling of this claim has no merit.**

[33] Skyline-00172-001- 002, & 006 - 008

37. Notably, while there was no delay in the handling of the claim with the possible exception of Wardlaw's inspection, suit was filed just over 4 months post loss, after which, there were no less than 5 emails sent by Skyline criticizing Collisson:

12/08/2020 – Suit is filed

Post suit emails complaining about Collison:

- December 8, 2020
- December 13, 2020
- December 20, 2020
- December 22, 2020
- December 24, 2020

38. It is notable that while there is no evidence prior to suit being filed of any unreasonable delays or questions of Collisson's competence, these emails began the day suit was filed. Clearly Skyline disagreed with Collisson, however that doesn't make him incompetent.

39. After it was discovered during litigation that a few invoices had not been paid, Scottsdale quickly issued a check for an additional $29,440 on March 17, 2021. This appears to have been merely an oversight, and once identified, these invoices were quickly paid. Additionally, after Eaux made a claim for loss of rents, the loss of rents claim was quickly denied since the policy does not provide loss of rents coverage. As mentioned, Scottsdale subsequently retained the services J.S. Held ("Held") to do a comparative estimate in April 2021. After having a May 17, 2021 discussion with Held, even prior to receiving Held's written position, Scottsdale quickly issued an additional payment of $1,120,726.49 on May 18, 2021.

40. This claim was well handled with multiple tiers of supervision and oversight. The file reflects consideration and analysis of the amounts submitted with the appropriately vetted and qualified experts retained to evaluate the damages as compared to the claim submitted. The dispute over the actual loss value, which appears to have been resolved by J.S. Held's estimate, mostly stemmed from Skyline's inflated claim submission, the scope, cost and method necessary to repair or replace the exterior panels, the cost to replace the roof, as well as a dispute over the remediation contractor's invoice. From a 1,000-foot view, Eaux and Skyline were essentially asserting that the building was a total loss and were claiming damage that exceeded the policy limit by almost $1,000,000. However, here is a post loss photo of the building's exterior:




PENSKE
SIC_000050

43. My compensation is based on an hourly rate. My hourly compensation is $395 per hour.

44. I reserve the right to supplement this disclosure with additional opinions, or to update these opinions to the extent new information is discovered or disclosed. I reserve the right to rebut the opinions and testimony of other experts and witnesses presented at trial.

August 13, 2021
Date:

Louis G. Fey Jr.
Louis G. Fey Jr. CPCU, CIC, AIC

# CURRICULUM VITAE

**LOUIS G. FEY JR, CPCU, CIC, CRM, AIC** **FEY CONSULTING LLC**

Address: 2136 N Woodchase Court
Baton Rouge, Louisiana 70808
(225) 362-0018
Lfeyjr@yahoo.com

## BUSINESS

Insurance consulting, expert testimony, litigation support, licensed insurance producer and adjuster

- Industry practice (claims, underwriting, agency and company operations), standards, means, methods, errors and omissions
- Coverage expert
- Multi-line claim issues and disputes
- Business Interruption Coverage
- Fair Claim Handling Standards and Practice
- Insurance Industry Standards and Practice
- Insurance Underwriting Standards and Practice
- Defense strategy with regard to insurance issues
- Contractual provisions and CRT analysis as it relates to insurance as well as additional insured concepts
- Insurance Agency Errors and Omissions

## EDUCATION

1981 **B.B.A. Bachelors of Business Administration –** University of Cincinnati

1985 **Certificate in General Insurance -** INS

1994 **Associate in Claims -** AIC

1995 **Chartered Property Casualty Underwriter -** CPCU

2003 **Certified Insurance Counselor –** CIC

2014 **Certified Risk Manager** – CRM

Each of the above designations is the result of countless hours of study and classroom participation. For example, the Chartered Property and Casualty Underwriter (CPCU) designation is awarded upon completion of ten (10) courses of study covering every facet of the property casualty insurance industry. The classes are very comprehensive

and the CPCU designation is the highest and most respected designation in the industry. The Certified Insurance Counselor (CIC) designation is a five (5)-course program encompassing very technically advanced studies of commercial property and casualty insurance coverage and agency operations. The Associate in Claims (AIC) designation is a multi-course program whose course work includes property and casualty coverage and claim handling. Lastly, the Certified Risk Manager (CRM) designation is a five (5)-course program covering every facet of the Risk Management Process. These are all graduate level studies and each course is approximately 20 hours in length. These designations are granted only after the successful completion of all courses and the related examinations. These programs have been recognized as graduate level studies by major universities.

**EXPERIENCE:**

2007 – Present **FEY CONSULTING LLC**

- Consultation on Risk Management opportunities
- Assist clients on claim, coverage, and insurance disputes
- Act as a liaison and consultant for insureds and insurers
- Contractual Risk Management and CRT assistance
- Technical resource for producers, insureds, and insurance companies
- Expert witness testimony
- Litigation strategy
- Mediation assistance and negotiation

2007 – Present **BancorpSouth Insurance Services, Inc., Baton Rouge, LA**
**Vice President of Risk Management**

- Consultation on Risk Management opportunities
- Licensed P&C and L&H producer
- Assist clients on claim, coverage, and insurance issues
- Act as a liaison and consultant for clients and carriers
- Contractual Risk Management and CRT assistance
- Technical resource for producers, clients, and carriers
- Agency E&O Risk Management resource

Plaintiff's expert on bad faith, unfair claim practices, proper investigation, the use of experts. (Deposition June 2021)

- Cyber Practice Leader

2000 – 2007 **St. Paul/Travelers Insurance, Atlanta, GA**
**Director of Major Case – Construction Claims Services**

- Handled very large exposure and complex liability cases
- Mentored, directed, and oversaw multiple Construction Claim Regions
- Directed investigation and litigation, negotiated settlements, attended trials and mediation; coverage and contract analysis and interpretation

1996 – 2000 **Lumber Mutual Ins. Co., Greer, SC**
**Regional Claims and Underwriting Manager, Southern Region**

- Trained, organized, and implemented this start-up claims operation
- Oversaw claims for Southern Region
- Oversaw Underwriting Department in the Southern Region
- Managed a staff of over 40 people
- Handled large exposure cases, all lines
- Handled large exposure lawsuits; including mediations, negotiations, and trials
- Negotiated and implemented managed care program
- Implemented a WC telephonic nurse program for in-house managed care
- Developed a triage program to reduce the frequency of surgery on W.C. claims

1981 – 1996 **Ohio Casualty Ins. Co., Hamilton, OH**
**Senior Claims Supervisor**

- Oversaw litigation and claims in both Home Office and Branch Office settings
- Oversaw Hurricane Andrew cleanup
- Developed and implemented training for adjusters
- Conducted various instructional seminars for adjuster training
- Member of the company's "Swat Team" (Cleanup of distressed offices)

While with Travelers and Lumber Mutual, I personally handled all major case liability claims for the Southeast United States which included complex losses involving catastrophic injuries and property damage. While at Ohio Casualty, I was a member of the company's "SWAT" team charged with cleaning up distressed claim offices across the country, instituting sound claims practices based upon industry standards, re-training the staff, and returning those claim operations to acceptable levels of

operation in compliance with those industry standards. While at Travelers, I was also responsible for mentoring, overseeing, and training the claim staff.

**RELATED EXPERIENCE**

- Chairman of the State of Louisiana Property Casualty Insurance Commission
- Member of the State of Louisiana Insurance Commissioner's Advisory Council
- Member of The State of Louisiana Cyber Security Commission
- Member of the State of Louisiana Auto Insurance Task Force
- Past President the Professional Insurance Agents of Louisiana (PIA)
- Chairman of the Governmental Affairs Committee of the PIA of Louisiana
- Named PIA of Louisiana's Agent of the Year 2013/2014
- Licensed Adjuster for over 40 years
- Licensed Property Casualty Producer
- Licensed Life & Health Producer
- FEMA/NFIP Licensed Flood Adjuster
- Certified WIND Umpire
- Faculty (former) - The National Alliance for Insurance Education and Research
- Assisted in authoring the Claims Manual for Ohio Casualty's Claim Department in the mid 1980's
- Assisted in authoring various coverage endorsements for Lumber Mutual Insurance and Travelers Insurance
- Participated on the Louisiana Citizen's subcommittee which addressed numerous operational and claim processes within that operation and offered recommendations for improvements.

I have been acting as an insurance consultant and expert witness since September 2007 and have evenly balanced my litigation support efforts between insurance defense, and plaintiff's work. Much of my efforts have been as a claim consultant on both litigated and non-litigated matters assisting both clients and insurers with coverage interpretation, claim handling, defense strategy, negotiations, contract interpretation, insurance underwriting, policy placement, procurement, and agency operations.

**Seminars given on insurance coverage and related issues**

- Commercial General Liability Coverage –CGL Coverage, Conditions, Exclusions and Endorsements
- Occurrence Law – Various Jurisdictional Interpretations and Their Effect on CGL Coverage
- Occurrence Law – Manifestation, Multiple or Continuous Triggers
- Additional Insured Endorsements and Related Issues
- Certificate of Insurance Issues
- Contractual Defense and Indemnity Provisions, The Anti-Indemnity Statutes of Various Jurisdictions and How They Interact With The Contractual Related Provisions of The CGL Policy
- Contractual Provisions to Look for: What To Include in Contracts and How They Impact One's Liability Exposure and Insurance Coverage
- Waiver of Subrogation Contractual Provisions and Policy Endorsements
- Professional Liability Endorsements
- WC Immunity, The Statutes Regarding Statutory Employer Status; How They are Treated in Various Jurisdictions and their Impact on CGL Coverage
- Excess/Umbrella Coverage and Related Issues
- Litigation Management
- Negotiations and Mediation
- Claim Operation Policy and Procedures – Fair Claims Practice
- Business Interruption issues and considerations
- Louisiana Indemnity

- Effectively Managing The Claims Process
- Perils & Pitfalls with Additional Insured (AI) Endorsements
- Coverage "Gaps" and "Traps" – August 19, 2013 – Jackson Mississippi
- Cyber Liability: Could You Be At Risk? June 6,2013 – Baton Rouge, Louisiana
- Professional Liability Insurance for Engineers – Engineering Law Seminar – Half Moon Education – June 20, 2013 - Baton Rouge, Louisiana
- Managing Cyber Risks, Threats & Insurance Implications – April 30, 2013 – Gulfport Mississippi
- Do You Have A Cyber Liability Exposure? June 6, 2013 - Baton Rouge, Louisiana
- Agent's Duty – August 8, 2013 – Jackson, Mississippi
- Cyber Liability: What You Need to Know – November 14, 2013 – Webinar
- Certificates of Insurance – February 26, 2013 – Baton Rouge, Louisiana
- Employee Leasing: A Construction Industry Perspective (For the ABC – New Orleans, Louisiana)
- Cyber Liability: What You Need To Know (Jackson Ms.)
- Contractual Indemnification and Additional Insured Issues (Jackson Ms.)
- Insurance For Vetrepreneurs – LSU Entrepreneurship Boot Camp For Veterans With Disabilities – Stephenson Entrepreneurship Institute
- Essentials of Cyber Insurance
- No Driver No Pilot, Who Can We Sue?
- Agent's E&O – (For the Louisiana Department of Insurance & Southern University) (August 2018)
- Cyber Insurance - A Growing Concern

**ARTICLES**

- IRMI Update: Risk Management & Insurance Commentary, Tips, and Tactics February 6, 2013 I Issue 287 I ISSN: 1530-7980 - "Don't Use ATIMA in Builders Risk Policies"
- Droning On About Drones – The Agent's Voice - Vol. XLII. No. 10 December 2015
- What Has Happened to the Insurance Industry? PIA Agents Voice December 2007, republished by the CPCU Society (CLEW), and by InsuranceCommentary.com
- The Case for Paying COVID BII Claims - InsuranceThoughtLeadership.com

**CONTINUNG EDUCATION**

- Life and Health Institute
- Agency Management Institute
- Commercial Property Institute
- Personal Lines Institute
- Ruble Graduate Seminar 11/6/2004
- Ruble Graduate Seminar 8/16/2006
- Commercial Casualty Institute
- Principles of Risk Management
- Practice of Risk Management
- So you want to be an expert witness?
- Insuring Defective Construction
- Contractual Liability, What's Covered and What's Not?
- Commercial Property Insurance and Risk Management
- Commercial Liability Insurance and Risk Management
- Principles of Risk Management and Insurance
- Issues in Insurance
- Insurance Economics
- Insurance Company Operations
- Insurance Issues and Professional Ethics
- Insurance Accounting and Finance
- Insurance Company Management
- Commercial Underwriting: Principles and Property
- Principles of Suretyship
- Liability Claim Practices
- Property Loss Adjusting
- Principles of Insurance – Liability Claims Adjusting

- Principles of Insurance – Property Loss Adjusting
- Casualty Insurance
- Property Insurance
- Louisiana Life and Health Pre-licensing
- Solutions to Disagreements over Time Element Claims
- Surprise and the Other Three "S" Words That Result in Time Element Disagreements
- Everyday Ethics
- Calculating Business Interruption
- The Law after Katrina: The Good, the Bad and the Ugly
- Practical Application of Ethics
- Wind Umpire Certification 11th Annual Windstorm Insurance Conference 2010
- National Flood Insurance Program Adjusters Certification
- Gulf Coast Case Law Update: Louisiana, Texas, Mississippi
- Florida Property Insurance Law Update
- Evaluating Storm Losses
- Disarming the Bad Faith Bomb
- Documenting the Claim
- A Claim Professional's Guide to "Outside the Box" Thinking
- Time Element Claims
- Director's Officer's Liability/Cyber Liability
- Property Insurance for Contractors
- A Detailed Review of Provisions of the CGL
- Personal Lines QA
- 2010 Insurance Coverage Update
- Insurance Coverage Issues in the CGL Policy - Emerging Issues for the next Decade
- Environmental Risk Management and Insurance Strategies
- How to Be an Agent Advocate at Claim Time
- The Insurance Industry: Today's Trends, Tomorrow's Opportunities
- Workmanship "Occurrence"
- Position Yourself as an Insurance / Risk Management Expert
- Directors and Officers Liability
- Estate Planning Techniques: Gifts, Trusts and Family Limited Partnerships
- National Health Care Reform
- Navigating Marine Workers Compensation
- Intangible Property Risk Management For Business Enterprises
- Cyber Liability Insurance: What It Covers and Who Needs It
- Flood: Levee and Rising Water
- The Internet

- Principles of Risk Management
- Analysis of Risk
- Control of Risk
- Financing of Risk
- Practice of Risk Management
- Introduction to Implementing and Monitoring the Risk Management Process
- The Risk Manager
- Building the Risk Management Team
- Information and Technology for Risk Managers
- Allocating Cost of Risk
- Due Diligence During Organizational Change
- Executive Risk Management
- Enterprise Risk Management
- Reputation and Brand Management
- NFIP Adjuster Certification – 2014
- Wage & Hour /Other Issues
- Introduction to Directors and Officers Liability Insurance
- Introduction to Employment Practices Liability
- Understanding Cyber Liability
- An Introduction to Errors and Omissions Liability
- Retaining Top Talent
- Rewards and Recognition
- Team Dynamics
- Work / Life Balance
- Coaching & Counseling
- D&O: A Dozen Dangerous Details
- Conflict Resolution
- Commercial Crime
- Arson and the Insurance Contract
- Fiduciary Liability, ERISA Fidelity, and Employee Benefits Liability Exposures And Coverage

**GENERAL INFORMATION**

Louis G. Fey Jr. is a second-generation insurance professional living in Baton Rouge, Louisiana, the son of an attorney and claims manager.

**EXPERT TESTIMONY IN THE LAST FOUR YEARS**

Rigsby V State Farm – United States District Court Mississippi Southern District, 1:2007CV00075. Plaintiff's Insurance Expert Witness – Claim handling, proper investigation, processes and procedure: insurance industry custom and practice – (Deposition and trial testimony) (Trial was April 2013 – case is still pending)

Brian P. Waldrop V USAA In the State Court for The County of Fulton State of Georgia No: 2010EV010377B Defense expert on bad faith, Fair Claims Practices, proper claim handling, policy limited time limited demands

(Deposition April 2014 – Case still pending)

Mark Martin, Plaintiff, vs. Thomas D. Chasteen, d/b/a Chasteen Insurance Agency, Defendant. In the State Court of Athens-Clarke County, State of Georgia, Civil File No. ST16CV0429. Plaintiff's expert on an agent's duty, Special relationship, Consultative Brokers, agency E&O. (Deposition testimony November 2017)

Antoine M. Saacks, Jr. & Kim Saacks, Plaintiffs Versus Privilege Underwriters Reciprocal Exchange, Defendant. United States District Court Eastern District of Louisiana, Civil Action No. 16-01149. Defense expert on bad faith, industry standards, red flags, fraud indicators involved in the handling of 3rd party liability and UM/UIM claims. (Trial testimony February 2017)

Robert Davis Thompson & Patsy Thompson Plaintiffs vs. The Travelers Home and Marine Insurance Defendant, In the Court Of Common Pleas State Of South Carolina, County of Florence, Civil Action No. 2015-CP-21-2867 Plaintiff's expert on bad faith, red flags, arson investigation, unfair claim practices (Deposition March 2017)

ACE American Insurance Company, Plaintiff, v. Valleycrest Companies, Now Known as Brightview TCH Companies, LLC; Erika Hernandez-Ortiz, Individually and As Administrator of The Estate of Rafael Menchaca-Delgado, Deceased; And John Doe, Defendants. In the United States District Court for The Northern District of Georgia Atlanta Division Civil Action No. 1:16-CV-02988 – Defense Expert - Bad Faith, unfair claims handling practices, UM coverage, operation of state law, UM selection rejection forms (Deposition May 2017)

Janet Lynn Gerald Vs. Liberty Mutual Fire Insurance Company, Et Al. 19th Judicial District Court Parish of East Baton Rouge State Of Louisiana Suit No.: 624,150 Section: 25– Plaintiff's Expert - Bad Faith, unfair claims handling practices. (Deposition August 2017)

Betty Ann Breaux Defiore Versus Huntington Ingalls Incorporated, CNA As Successc Fidelity & Casualty Company Of New York, Et Al Civil District Court For The Parish C Orleans State Of Louisiana No. 2016-10800 Division "J" Section: 5 Defense Expert o Policy Limits and the "Comprehensive Insurance Rating Plan" ("the Plan") used durin World War II, for War Time Projects (Deposition August 2017), Defense expert on asbestosis long term exposure case

Berman Bros. Iron & Metal Co., Inc. D/B/A Bermco V. Harmon-Dennis-Bradshaw In the Circuit Court of Jefferson County, State Of Alabama Case No. 01-CV-2015-902698.00 – Plaintiff's expert on Equipment Breakdown / Boiler and Machinery Insurance Coverage, an agent's duty, Special relationship, Consultative Brokers, agency E&O. (Deposition and trial testimony August 2017)

Americas Insurance Company Plaintiffs, Versus Billie J. Haynes And Delvese D. Haynes, Defendant United States District Court Eastern District of Louisiana Civil Action No.: 2:15-CV-06232 - Defense expert on the industry standards, red flags, fraud indicators involved in the handling of property insurance claims (Deposition testimony December 2017)

Bradley W. Smith, Plaintiff versus Shelter Insurance Company, Defendant in the United States District Court Middle District Of Louisiana Civil Action No. 15-Cv-357 Plaintiff's expert on Bad Faith, unfair claims handling practices. (Deposition March 2018)

NAZ, LLC Plaintiff, v. United National Insurance Company Defendant. United States District Court Eastern District of Louisiana, Civil Action: 17:5697 SECTION "H" (1) Plaintiff's expert on Bad Faith, unfair claims handling practices. (Deposition June 2018)

Elizabeth Benton, Individually, And Bruce W. Benton, Jr., Individually, And Bruce W. Benton, Jr., as the Personal Administrator Of The Estate Of Chase Palmer Benton, Plaintiffs, v. Steven Landress And Bradd Landress, Individually And D/B/A Landress Trucking, David Greeson, Individually And D/B/A as Greeson Hauling And David Greeson Hauling, Kerby Grading, Inc., Boatwright Construction, LLC, The Hartford Construction Group, LLC, In The State Court Of Dekalb County State Of Georgia, In Case No: 07A69635-6. Plaintiff's Expert on the proper underwriting of Motor Carriers (July 2018 Deposition)

J. Caldarera & Co., Inc. Versus Ernest N. Morial Exhibition Hall Authority and Melvin J. Rodrigue In His Official Capacity as President of The Ernest N. Morial Exhibition Hall Authority Board, In The Civil District Court For The Parish Of Orleans State Of Louisiana No. 18-3204 Division "M-13". Defense expert on the proper procedures related to procurement of Project Bid Bonds (Deposition May 2018)

Zydeco's II, LLC, Zydeco's Corp, Dustin Gainey and Rosemarie Gainey vs. Certain Underwriters at Lloyd's London, et al 29th Judicial District Court Parish of St. Charles State of Louisiana Case No. 82255 Plaintiff's expert on Bad Faith, unfair claims handling practices. (Deposition & Trial testimony March 2019)

Amy Dunn, Individually and As the Natural Parent of Danielle Demonbreun, James Dunn And Ronald Curtis Patterson, Plaintiffs, V. Columbia National Insurance Company, Defendants. In the United States District Court For The Northern District Of Georgia Gainesville Division, Civil Action No. 2: 1 7 -CV -00246-R WS Plaintiff's expert on Bad Faith, unfair claims handling practices. (Deposition testimony – Dec. 2-18)

Dr. Mary Maitland Deland V Bankers Insurance Company, Et Al24th Judicial District Court Parish Of Jefferson State Of Louisiana Docket No. 774-127 Division

"B" Plaintiff's expert on Bad Faith, fair claim practices, NFIP claims, NFIP coverage restrictions, Agency E&O, failure to procure, the standards applicable to a consultative broker, and the availability of insurance in the market (Deposition January 2019)

Darnell Harris and Stella Harris, Plaintiffs v. US Xpress, Inc., Ozaki Robinson, Leon Parker, Defendants Civil District Court - Parish of Orleans Docket No.: 2016-12685, Defense expert on fraud indicators or red flags when investigation insurance claims. (Deposition January 2019)

Stephen Lee McMillan, Jr. And Holly L. McMillan, Plaintiff, Verses Southern Fidelity Insurance Company, Defendant. State Of South Carolina In The Court Of Common Pleas Fifteenth Judicial Circuit County Of Horry Civil Action No. 2018-CP-26-03281. Plaintiffs expert on Insurance Claim Handling standards and practice, Bad Faith, Unfair Claim Practices (Deposition March 2019)

Albert Carter and Deborah Carter Versus Rebeka Guidry and USAA Casualty Insurance Company CIVIL SUIT NO.: 251,845, 9th Judicial District Court Parish of Rapides State of Louisiana. Plaintiffs expert on Insurance Claim Handling standards and practice, Bad Faith, Unfair Claim Practices involving Underinsured Motorist claims (Deposition and Trial testimony July 2019)

Christina Curry V Equity Partners Insurance Services, Inc. 22nd Judicial District Court Parish Of St. Tammany, State Of Louisiana Case No. 2018-14625 H. Defense expert on Insurance Industry usage of the term customer in the Broker – retail agent relationship, the usage of non-compete agreements. (Deposition testimony August 2019)

Harris, Parker, et al v. U.S. Xpress, Inc. United States District Court Eastern District of Louisiana, Civil Action No. 2:17-cv-17945 Defense expert on insurance claim handling industry standards, fraud investigation, red flags, fraud indicators (Deposition testimony ) Defense expert insurance industry claim investigation standards, red flags, fraud indicators. (Deposition testimony 2019)

United States of America ex rel. Cori Rigsby and Kerri Rigsby Relators/Counter-Defendants V. State Farm Fire and Casualty Company Defendant/Counter-Plaintiff. In the United States District Court for the Southern District of Mississippi Southern Division, Case No. 1:06CV433-HSO-RHW Qui Tam Plaintiffs expert on the value of insurance documents, if insurance documents are trade secrets, computer system security, the use of independent adjusters, insurance professional and adjuster ethics (Deposition testimony October 2019)

Ken Hamilton, v. Allstate Insurance Company. In the United States District Court Southern District Of Texas Corpus Christi Division. Civil Action No. 2:18-cv-00347. Plaintiffs expert on the NFIP, NFIP claim handling standards, and property

insurance claim handling standards and practice, elevated verse non elevated structures, the application of coverage restrictions. (Deposition January 2020)

McGriff, Seibels & Williams, Inc. D/B/A McGriff, Seibels & Williams Of Louisiana, Inc., Plaintiff, vs. Michael E. Madden Defendant. United States District Court Eastern District Of Louisiana. Civil Action No. 18-06084 Defense expert on trade secrets, client retention, non-compete agreements (Deposition January 2020)

Chandra Furca Plaintiff vs. American Strategic Insurance Corporation, Defendant. United States District Court Middle District Of Louisiana, Civil Action No. 3:17-CV-01467-JWD-RLB. Plaintiffs expert on the NFIP, NFIP claim handling standards, and property insurance claim handling standards and practice. (Deposition April 2020)

Richard Helm Plaintiff, vs. Allstate Insurance Company Defendants. United States District Court, Middle District Of Louisiana Civil Action No. 3:17-Cv-00841-Jwd-Rlb. Plaintiffs expert on the NFIP, NFIP claim handling standards, and property insurance claim handling standards and practice. (Deposition April 2020)

Terry And Rosaline Kozero Plaintiff, vs. American National Property And Casualty Company Defendants. United States District Court Middle District Of Louisiana Civil Action No. 3:17-Cv-01129-BAJ-RLB. Plaintiffs expert on the NFIP, NFIP claim handling standards, and property insurance claim handling standards and practice. (Deposition April 2020)

Brian D. And Lauren Winters Plaintiff, vs. American Strategic Insurance Corporation Defendants. United States District Court Middle District Of Louisiana Civil Action No. 3:17-CV-01292-JWD-RLB. Plaintiffs expert on the NFIP, NFIP claim handling standards, and property insurance claim handling standards and practice. (Deposition April 2020)

Annie Skinner, as Assignee of Andrew Poston., Plaintiff, V. Horace Mann Insurance Company, Defendant. In The United States District Court For The District of South Carolina Florence Division. Case No.: 4:18-CV-00922-RBH Plaintiffs expert on Insurance Claim Handling standards and practice, Bad Faith, Policy limit demands (Deposition June 2020)

Gustave J. Labarre, Et Al., Plaintiffs vs. Occidental Chemical Company, Vulcan Materials Companys, Texas Brine Corporation, Et Al., Defendants. In The Circuit Court For The Twenty-Third Judicial District Court Parish Of Assumption State Of Louisiana Case No.: 33,796, Division "A" Defense expert on bad faith, unfair claim handling practices, insurance industry standards and practice, insured contracts, CGL coverage, the handling of conflict claims “Chinese Wall” and independent counsel, litigation management, and legal bill audit

Susan Russo Marchand, Et Al. Vs Occidental Chemical Company, Vulcan

Materials Companys, Texas Brine Corporation, Et Al., In The Circuit Court For The Twenty-Third Judicial District Court Parish Of Assumption State Of Louisiana Case No.: 34,270 Division "A" Defense expert on bad faith, unfair claim handling practices, insurance industry standards and practice, insured contracts, CGL coverage, the handling of conflict claims “Chinese Wall” and independent counsel, litigation management, and legal bill audit

Texas Brine Corporation In The Arbitration Proceedings with Occidental Chemical Company, LLC, In AAA Arbitration No. 69 20 1300 0129 Defense expert on bad faith, unfair claim handling practices, insurance industry standards and practice, insured contracts, CGL coverage, the handling of conflict claims “Chinese Wall” and independent counsel, litigation management, and legal bill audit

Dr. Mary Maitland Deland V Bankers Insurance Company, Et Al24th Judicial District Court Parish Of Jefferson State Of Louisiana Docket No. 774-127 Division "B" Plaintiff’s expert on Bad Faith, fair claim practices, NFIP claims, NFIP coverage restrictions, Agency E&O, failure to procure, the standards applicable to a consultative broker, and the availability of insurance in the market (Deposition October 2020)

Jeffrey S. Salter Plaintiff, vs. Carlisle Walker Limehouse, Jr., Laurie A. Larson, UNUM Insurance Company, UNUM Life Insurance Company of America, Tailwind Reinsurance Company, Provident, Life and Accident Insurance Company, UnumProvident Corporation, Unum Group, ET. AL. Defendants State Of South Carolina In The Court Of Common Pleas Fifth Judicial Circuit County Of Richland Case No. 2017-CP-38-05631 Plaintiff’s expert on Bad Faith, fair claim practices in handling Disability Claims, improper denial of benefits (Deposition February 2021)

L N Parkwood Company, Plaintiff vs. Texas Farmers Insurance Company, Defendant United States District Court Southern District Of Texas Civil Action No. 4:18-CV-04219 Plaintiffs expert on the NFIP, NFIP claim handling standards, and property insurance claim handling standards and practice. (Deposition February 2021)

Ace American Insurance Company, Plaintiff, V. Orion Restoration-Storm Division, LLC, Defendant And Third-Party Plaintiff, V. Maydelin Martell Agency, Inc. And Angel Gonzalez, Third-Party Defendants. In The State Court Of Henry County State Of Georgia Civil Action No. 16SV253EDB. Defense expert of agency E&O, the Risk Management Best Practices applicable issuance and vetting Certificates of insurance. (Deposition February 2021)

Ashley And Benjamin Remick, Plaintiff(s), Versus Travelers Home And Marine Insurance Company, Defendant(s). In The United States District Court For The District Of South Carolina Spartanburg Division C.A. NO.: 7:19-CV-02524-BHH Plaintiff’s expert on Bad Faith, fair claim practices, property claim handling, improper denial of benefits (Deposition March 2021)

Lancer Insurance Company, Plaintiff, V. Jet Executive Limousine Service, Inc.; Philadelphia Indemnity Insurance Company; United States Liability Insurance Company; Cooper-Global Chauffeured Transportation, Inc.; Hennessy Transportation, Inc.; Steven Hoppenbrouwer; Kent Plowman; Steven Taylor; Rick Tomcho; Thomas Matthesen; Sahil Raina; Robin Raina; Wesley Hudson; Stephen Farrar; Georganna Gullia; Joseph Best; Jessica Barnes; John Mason; Kenny Strickler; Tim Sheehy; Scott Armstrong; Brian Dill; Alan Cooling; And Ray Shreyas, Defendants. United States District Court Southern District Of Georgia Augusta Division Case 1:18-CV-00136-JRH-BKE. Defense expert on bad faith, unfair claim practices, Auto insurance coverage. (Deposition April 2021)

Conure Telecom Services, LLC, Plaintiff, V. American Trust Administrators, Inc., Companion Life Insurance Company, Laurie Upchurch and Associates, LLC, and Laurie Upchurch, Individually, Defendants. In The Superior Court of Fulton County, State of Georgia, Civil Action No: 1:19-CV-2019CV317999. Plaintiff's expert on the duties and responsibilities of a Third Party Administrator (TPA), agency E&O, Self-Insured Health Benefits Insurance programs with stop loss coverage. (Deposition April 2021)

Rap Indy LLC And MSI Lyndhurst Indianapolis Grocery LLC, Plaintiffs, Vs. Zurich American Insurance Company And The Travelers Indemnity Company, Defendants. Indiana Commercial Court In The Marion Superior Court, County Of Marion, State Of Indiana, Cause No. 49001-1910-PL-044570. Plaintiff's expert on bad faith, unfair claim practices, red flags, proper investigation, an insured's obligation to trigger coverage. (Deposition May 2021)

Day Enterprises, Inc., Plaintiff, v. Pennsylvania Lumbermens Mutual Insurance Company; And Brown & Brown of Oklahoma, Inc., Defendants. In The District Court of Creek County State of Oklahoma Case No C J 2020-138. Plaintiff's expert on bad faith, unfair claim practices, proper investigation, the use of experts. (Deposition June 2021)

New Orleans Equity, L.L.C. D/B/A Galatoire's Restaurant and Galatoire's 33 Bar & Steak Plaintiffs, v. U.S. Specialty Insurance Company Defendants. United States District Court Eastern District of Louisiana Civil Action 20-1935. Plaintiff's expert on bad faith, unfair claim practices, improper investigation. (Deposition June 2021)

# EXPERT REPORT OF
# LOUIS G. FEY JR, CPCU, CIC, CRM, AIC
# FEY CONSULTING LLC

## INDUSTRY STANDARDS

1. With regard to the origins of insurance industry standards, these are standards that have been developed by the industry over many years that apply to claim handling in all jurisdictions. These standards are generally accepted industry principles all adjusters and insurers are expected to follow, understand, and apply to their everyday claim practice. While state statutes will sometimes impact these standards, and these standards must always comply with such statutes, invariably, these well-founded standards are at least as stringent as those placed upon the industry by each individual state. Some standards weredeveloped as reasonable methods of addressing insurance matters through years of industry study, discussion, and practice, while others were developed over time as a result of court decisions or other industry developments impacting common practice. All state unfair claim practice standards are in line with these industry standards. Obviously, insurers must have a justifiable reason to deny a claim and must treat an insured's interests with at least the same regard as its own. An insurer must handle claims in accordance with these standards.

2. These industry standards can be seen in various documents and books. Many insurers have internal Best Practices that are protected from general circulation and are only produced through court order subject to confidentiality agreements. Some can be found posted on the Internet, such as "State Farm's Claim Handling Standards", and some can be found in industry textbooks and related study guides created for teaching these standardsto adjusters. The National Association of Insurance Commissioners (NAIC) has also created a formal list of minimum fair claim practice standards, developed from common practice and these often-cited industry standards.

3. I have helped to develop these standards for insurers over the years, and I have also been able to review many different insurer claim standards and or Best Practices through my work as an expert witness. While protected by confidentiality agreements, I can state that these standards are all essentially the same. While some are more comprehensive than others, it should be pointed out that there is a tendency in the industry to either not publish these standards at all, or to only put in writing very general guidelines which are closely protected so they cannot be used against the insurer during litigation.

4. Adjusters are taught to be honest and forthright when handling claims and to treat the interests of the insured with at least the same regard as the interests of his or her employer's (the insurance company). Just as one would need to understand the training and expectations of other professionals (for example doctors, lawyers, and accountants) in order to be able to evaluate their actions, one must also be able to understand the expectations and training received by adjusters in order to be able to evaluate how they

should act, as compared to how they have acted in handling a claim. Likewise, adjusters are trained with regard to the insurance industry principles applied to coverage interpretation. In order to understand if an insurer has acted reasonably in its coverage determination or claim handling, one must understand the parameters within which an adjuster works, and the principles that must be applied.

5. Where I comment on coverage, I do so only to discuss the industry intent behind coverage forms, or to illustrate the application of industry standards to an adjuster's evaluation of coverage from a claim perspective. To be clear, to the extent that there are any coverage disputes in this matter, my opinion should not be viewed as an attempt to declare or disclaim coverage for the underlying claim(s) as the court will of course determine coverage where applicable and apply any applicable legal standard or statute to the case at hand. While parts of applicable statutes might be somewhat similar to someof the insurance industry standards I discuss, there are differences. These insurance industry standards are broader, and encompass additional issues not addressed by such statutes. In short, these standards set the tone for how insurers are supposed to approach and handle claims.

6. For example, in the James J. Markham book, The Claims Environment, used in the Associate in Claims curriculum, the author outlines some of the following well-founded and long-standing industry standards (emphasis added):

   *Page vii - "Claims representatives….are the people responsible for fulfilling the insurance company's promise."*

   *Page 5 - "A special relationship is formed between the insurance buyer and the insurance company in an insurance transaction."*

   *Page 6 - "When a covered loss occurs**, the insurance company's obligation under its promise to pay** is triggered. The claim function should ensure the **prompt, fair, and efficient delivery of this promise."***

   *Page 9 -* "*. . .* ***the primary function of a claim representative is to pay promptly and fairly . . .***"

   *Page 13 - "*"*The primary duty of the claim representative is to deliver the promise topay. Therefore, **the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims**." "Because of the personal relationship formed in an insurance transaction, the insurance company should not place its interests above the insured's*." *"The claim professional handling claims should honor the company's obligations under the implied covenant of good faith and fair dealings."*

   *Page 17 - "No honest and reputable insurer has either explicit or implicit "standing orders" to its claim department to delay or underpay claims."*

*Page 18* - "*It is to the insured that the insurance company owes the contractual obligation of utmost good faith and fair dealing*."

*Page 19* - "*Claim representatives handling first-party losses should promptly pay all amounts they know the insurer owes and should negotiate in a forthright, honest, andflexible manner over any amounts that are in dispute*."

*Page 29* - ***"An investigation must often be undertaken to fully develop the facts needed to determine coverage. Good faith claim practices require that this investigation be objective, thorough, and timely."***

*Page 270 – An insurer that fails to properly investigate, evaluate, negotiate, and settle third-party claims exposes its insured to excess verdicts and exposes itself to bad faith claims.*

*Page 274 – 278 "When an insurance company fails to pay claims it owes or engages in other wrongful practices, contractual damages are inadequate. It is hardly a penalty to require an insurer to pay the insured what it owed all along."… "All insurance contracts contain a covenant of good faith and fair dealing."… "If bad faith is a tort in a third-party claim, it should be a tort in a first-party claim as well."… "Insurance is a matter of public interest and deserves special consideration by the courts to protect the public."… "Insurance contracts are not like other contracts because insurers have an advantage in bargaining power. Insurers should therefore be held to a higher standard of care."… "Recovery for breach of an insurance contract should not be limited to payment of the original claim."… "The public's expectations are elevated by insurers' advertising, slogans, and promises which give policyholders the impressions that they will be taken care of no matter what happens." "Policyholders buy peace of mind and are not seeking commercial advantage when they buy a policy. In addition, they are vulnerable at the time of the loss."… "Policy language is sometimes difficult to understand. The benefit of interpretation should be given to the policyholder."…*

*Page 300 - "Upper management also has a responsibility to maintain proper claim-handling standards and practices."*

7. In the Second Edition of The Claims Environment, (Doris Hoopes, 2000, Insurance Institute of America, AICPCU/IIA, page 10.7) the author explains some of the requirements of good faith claim handling, such as an unbiased investigation:

   *"Claim representatives should investigate in an unbiased way,* ***pursuing all relevant evidence, especially that which establishes the legitimacy of a claim****. Claim representatives should avoid using leading questions that might slant the answers. In addition, they should work with service providers that are unbiased…Investigations should seek to discover the facts* ***and consider all sides of the story. Claim representatives should not appear to be looking for a way out of the claim or for evidence to support only one side."***

8. And on Page 9.2:

> "*Insureds purchase insurance to pay for losses, for peace of mind, and tobenefit society by reducing social burdens. When insurers do not providethose benefits of insurance , they cause just the opposite: unpaid losses, great stress, and burdens on society*."

9. Below is an excerpt from an International Risk Management Institute, Inc. (IRMI) article on the subject:

> *"Utmost good faith, honesty, openness, and mutual assistance benefit both parties inthe long run. An open discussion of policy benefits is consistent with this principle.* ***Preserving the integrity of insurance as a public policy objective is obstructed not advanced, in an atmosphere of secrecy, deception, and exploitation of the other party's inexperience or ignorance. To overcome this "Gotcha!" threat, from a public policy perspective, the public interest element implies that an altruistic motive lies behind the insurance mechanism. Consistent with this notion, some observers see a fiduciary relationship in the public interest quality of the insurance mechanism, while others describe it as at least quasi-fiduciary. Either is supportive of an insured's "right to know" the benefits of the bargain."*** [1]

10. And as Jessica Wynn and Andrea McIntyre explained in their joint dissertation on adjuster ethics:[2]

> ***I. Ethics in Claims Handling***
>
> ***The work of adjusting insurance claims engages the public trust. Accordingly, claim adjusters are held to a high ethical standard.*** *Adjusters must put the duty for fair and honest treatment of the claimant above the adjuster's own interests in every instance. As the Florida Supreme Court eloquently stated:*
>
> *An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement,* ***then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.***

---

[1] International Risk Management Institute ("IRMI") - Current Trends and Issues September 2008 Tim Ryles
[2] Ethical Rules and Responsibilities for Claim Adjusters

11. The industry requires that all claim files be constructed in a manner such that all investigation, coverage evaluations, damage evaluations, negotiations, settlements, payments, communications and correspondence are documented in a way to allow the reproduction of claim handling by any auditor, a newly assigned adjuster, or claim management. Each claim file must contain reports and file notes documenting all significant activities, interactions or events, reflect prompt and professional claim handling with reasonable evaluations, adequate reserves, attempts at resolution or at least reflect a reasonable resolution strategy.

12. As mentioned, the National Association of Insurance Commissioners has promulgated a set of minimum standards based upon the insurance industry's custom and practice. These standards were developed with input from, and in consultation with, not only various state insurance commissioners from across the country, but also representatives from the insurance industry. These standards are used to train adjusters, are the part of adjuster training curriculum, and are the standards applied by insurance departments across the country when evaluating insurer compliance. They are considered minimum standards of behavior which most reputable insurers strive to exceed. These standards are referred to as the NAIC "Unfair Claims Settlement Practices." Section 4. Of the Act define Unfair Claims Practices as[1]:

*A. Knowingly misrepresenting to claimants and insureds relevant facts or policyprovisions relating to coverages at issue;*

*B. Failing to acknowledge with reasonable promptness pertinent communicationswith respect to claims arising under its policies;*

*C. Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies;*

*D. Not attempting in good faith to effectuate prompt, fair and equitable settlement ofclaims submitted in which liability has become reasonably clear;*

*E. Compelling insureds or beneficiaries to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them;*

*F. Refusing to pay claims without conducting a reasonable investigation;*

*G. Failing to affirm or deny coverage of claims within a reasonable time afterhaving completed its investigation related to such claim or claims;*

*H. Attempting to settle or settling claims for less than the amount that a reasonableperson would believe the insured or beneficiary was entitled by reference to writtenor printed advertising material accompanying or made part of an application;*

*I. Attempting to settle or settling claims on the basis of an application that wasmaterially altered without notice to, or knowledge or consent of, the insured;*

[1] NAIC Model Laws, Regulations, Guidelines and Other Resources—January 1997 © 1997 National Association of Insurance Commissioners

*J. Making claims payments to an insured or beneficiary without indicating thecoverage under which each payment is being made;*

*K. Unreasonably delaying the investigation or payment of claims by requiring both aformal proof of loss form and subsequent verification that would result in duplication of information and verification appearing in the formal proof of lossform;*

*L. Failing in the case of claims denials or offers of compromise settlement to promptly provide a reasonable and accurate explanation of the basis for suchactions;*

*M. Failing to provide forms necessary to present claims within fifteen (15) calendardays of a request with reasonable explanations regarding their use;*

*N. Failing to adopt and implement reasonable standards to assure that the repairs ofa repairer owned by or required to be used by the insurer are performed in a workmanlike manner.*

13. Since insurance companies are expected to comply with these national insurance industry standards along with any applicable state requirements, I use these standards to evaluate the handling of claims, along with consideration of the insured's obligations in the claim process, outlined in the insurance contract, the most important of which are to promptly report all claims, to cooperate, and to be forthcoming.

**CLAIM HANDLING**

14. Typical claims-handling functions include:

- To investigate the existence of all relevant policies;
- To avoid any appearance of a conflict of interest;
- In a first party property setting, to investigate the efficient proximate cause of loss;
- To investigate contributing factors that lead to damage or injury;
- In a third-party claim, to identify, evaluate and quantify theculpability of all involved;
- To gather and evaluate facts to verify coverage;
- To try to find a reasonable path towards coverage;
- To thoroughly evaluate all damages;
- To obtain a non-waiver agreement and to fully disclose any coverage defense to the insured immediately upon identification, and prior to continuing the claim investigation;
- Drafting and issuing complete and accurate reservation of rights and denial letters to policyholders, but only when necessary or where a reasonable path to coverage cannot be identified, and only as a last resort;

- Setting loss reserves and revising them to reflect the insurance company'sprobable exposure relating to the claim;
- In a first party setting, to pay all undisputed amounts promptly;
- In a third-party setting, to negotiate and settle claims promptly, once liability has become reasonably clear;
- To evaluate subrogation potential and to pursue recovery; and
- To monitoring, oversee and direct the defense of liability claims or coverage litigation.

15. An adjusters duties include:

- Conducting claim investigations in a diligent search for facts as promptly as possible;
- Giving a prompt, courteous, and forthright explanation to each claimant as to the Company's position with respect to his/her claim;
- To conclude each claim on the basis of its own merits in the light of facts, the law, and the coverage afforded;
- Pay meritorious claims promptly;
- To ensure that the insured receives all benefits available under the policy;
- At the management level, carefully supervise and direct all claim activity to ensure compliance with all claim handling standards.
- To listen, be fair, be open, and carry out the insurer's part of the bargain under the contract in good faith, and to deal fairly with all claimants;
- To be familiar and in compliance with those laws and regulations that apply to claims in the applicable jurisdiction;
- Explain all relevant coverage under the policy. Encourage policyholders to report all losses and to avail themselves of all policy benefits;
- To diligently investigate the facts to determine if a claim is valid, to reasonably evaluate the claim and to act promptly in resolving it. If it is necessary to reject a claim for any reason, it should be done promptly and courteously, with a thorough an accurate explanation of the decision; and
- To make an objective evaluation of the facts and circumstances supporting a policyholders' claim.

**BURDEN OF PROOF[2]**

16. *In an insurance contract, the insured must show that an event or circumstance falls within an insuring agreement. This initial* ***burden of persuasion*** *is merely being able to show that* ***the existence of a fact is more probable than not.*** *Once the insured accomplishes this task,* ***the onus of proving the applicability of an exclusion or other coverage limitation shifts to the insurance company.***

[2] https://www.irmi.com/online/bkhowtodraft/chap08/insuring-agreements.aspx © 2000-2021 International Risk Management Institute, Inc. (IRMI). All rights reserved.

**SPECIFIC RULES FOR INSURANCE POLICIES**[3]

17. *Insurance policies are particular kinds of contracts that are made in a special relationship between the insurer and the policyholder. They have a unique structure and format which is different than other contracts…*

*Coverage Grants Construed Broadly*

18. *The first special rule of contract interpretation that is specifically applicable to insurance policies is that the provisions in an insuring agreement are to be construed liberally or expansively in favor of the policyholder.*

*Burden of Proof as to Coverage Is on the Insured*

19. *The relationship of the parties under an insurance policy is different than the relationship between the parties under other kinds of contracts. Essentially, an insurance policy is a promise by the insurer to pay for covered claims under the stated terms and conditions if and when they should occur. The insurer is not going to know if and when the policyholder suffers a loss that may be covered under the policy. When that happens,* ***it is incumbent on the policyholder as the only party with knowledge of the loss to initiate the claim process.*** *Certainly, the unknowing insurer will not do it for him.*

20. *There is an old saying in the law that he who alleges must prove. If the policyholder is the one who must notify the insurer of a loss and allege that the loss is covered under the policy, the burden of proof will be on the policyholder to marshal the evidence necessary to sustain his claim. The policyholder can do this by, among other things, submitting oral or written statements, giving a deposition, and hiring experts to give a report to the insurer. The policy's proof of loss provisions provide some ground rules for the policyholder to follow when trying to carry his burden of proof so that the process will be somewhat uniform for all issued policies.*

21. *For first-party policies providing named-perils coverage, the policyholder's evidentiary burden means that he must submit proof that the loss was caused by one of the enumerated perils. If his evidence is not convincing enough, the insurer need not respond to the claim at all, but merely deny it on the basis that the proof was insufficient. If necessary, the parties can submit the question of whether or not the policyholder's proof is sufficient to establish that the loss was caused by a covered peril to a jury to decide.*

22. ***The insured's burden is significantly less for first-party policies providing "all risks" or "open perils" coverage. These kinds of policies cover all losses that are not specifically excluded. What this means is that the policyholder must merely prove that a loss happened. After that, the burden automatically shifts to the insurer to prove that the loss is somehow excluded.***

*Exclusions Construed Strictly*

23. ***Whereas insuring agreements granting coverage are construed liberally and expansively, exclusions from that coverage are construed strictly and restrictively.*** *Again, the idea is to*

[3] https://www.irmi.com/online/bkinslaw/07-policy-construction-rules.aspx © 2000-2021 International Risk Management Institute, Inc. (IRMI). All rights reserved.

*maximize the utility of an insurance policy as a means to protect the average consumer from catastrophic losses…*

*Burden of Proof as to Exclusions Is on the Insurer*

24. *If he who alleges must prove, then it follows that insurers who allege that a loss is excluded should bear the burden of proving it. Insurers can do this in a number of ways. They can hire investigators or other experts to accumulate evidence and give reports. They can take recorded statements or depositions of the insured. They can submit documents, like blueprints or photographs, for the court's consideration.* ***All the burden and expense of proving the application of an exclusion must be borne by the insurer.***

## NON-WAIVER AGREEMENTS AND RESERVATION OF RIGHTS[5]

*II. COVERAGE QUESTIONS PROCEDURES – OVERVIEW*

***After a claim is presented, we may obtain information indicating a coverage question exists. A coverage question may exist when the facts indicate the claim may not be covered under the policy.*** *Coverage questions may also involve violations of policy conditions. Acts of the insured at the time of policy application may also affect coverage.*

***A claim specialist aware of a coverage question must be careful to avoid forfeiting the insured's and the Company's rights by speaking or acting improperly. The rights of the insured and the rights of the Company may be influenced by the doctrines of waiver and estoppel.***

*…*

*To avoid waiver or estoppel, the insured is put on notice that a coverage question ispresent. The most common method to effect this notice is to obtain a non-waiver agreement from the insured or send a Reservation of Rights letter.*
*You need to know the law on waiver and estoppel in your jurisdiction.*

*Ill. NON-WAIVER AGREEMENT – DESCRIPTION*

*A non-waiver agreement is a* ***document that puts the insured on notice of the potential of non-coverage. The document also reflects an agreement between theinsured and the Company. The insured agrees that the non-waiver allows the Company to continue the claim-handling process.*** *Action taken in investigating, negotiating, settling, denying, defending, or ascertaining the amount of loss or damage will not waive any rights of the Company, including the right to deny coverage. The Company agrees that theinsured's rights under the policy are not waived.*

[4] IRMI publication date June 2010
[5] State Farm's Operations Guide

*IV. NON-WAIVER PROCEDURES*

*A. When to Take a Non-Waiver*

*1. First-Party Claim*

*In a first-party claim, we are responding to a claim made by our insured. The insured is requesting that we investigate all aspects of the claim including the issueof coverage. By investigating the coverage issue, we are not waiving any of our rights. In fact, we are taking the action that we are obligated to take by our contract.*

***We still have to be aware of the doctrine of estoppel and make sure our actions orwords do not lead the insured to reasonably believe that there is coverage when there is not.***

***A non-waiver should be taken if there will be a protracted time period between theinitial investigation and the decision concerning coverage, or if the facts of the claim indicate that securing a non-waiver is prudent.***

***Consult management if there is any question whether or not a non-waiver shouldbe obtained.***

*B. From Whom to Take a Non-Waiver*

*A non-waiver should be taken from every person claiming rights under the policy where the person's status as an insured would be affected by the coverage question.*

*C. Additional Defenses*

***If additional policy defenses are discovered during the course of the investigation, an additional non-waiver should be secured.*** *The new non-waiver should include all previous policy defenses still applicable, plus any new policy defenses.*

*D. How to Take a Non-Waiver*

***Obtaining the non-waiver in person is the preferred method to notify the insured of coverage questions.*** *This method provides the opportunity of meeting with the insured or any other party seeking protection under the policy and explaining why the non-waiver is necessary. We can show the policy to the insured and explain where the non-waiver language was obtained. The insured has an opportunity to ask questions. It should be emphasized to the insured that they are not waiving any rights under the policy by signing the non-waiver agreement. It is the responsibility of the claim specialist to obtain the non-waiver.*

*V. RESERVATION OF RIGHTS LETTERS*

***If the insured refuses to sign the non-waiver*** *or if it is not feasible, the claim specialist should do the following depending on the nature of claim involved.*

*A. First-Party Claim*

*Inform the insured that the investigation will continue and they will receive a Reservation of Rights letter. Notify the TM who will be responsible for issuance of aReservation of Rights letter, which will have the same effect as a nonwaiver.*

*...*

*The non-waiver should be worded in such a manner the insured can readily identify the appropriate policy language involved. Indicated below is .an illustrative list of reasons for obtaining the non-waiver.*

*...*

*When sending a Reservation of Rights letter, the exact policy language should also be quoted.*

25. A Reservation of rights (ROR) letter outlining all coverage defenses is required prior to continuing any investigation or taking any other action on a claim once a coverage defense is identified. Here is what the industry teaches its adjusters with regard to RORs[4]:

***Claims Operations: A Practical Guide***

*© 2000-2015 International Risk Management Institute, Inc. (IRMI). All rights reserved.*

*Reservation of Rights Letter*

*A reservation of rights letter (sometimes referred to as an "R of R letter") reserves the insurer's right to deny coverage and/or withdraw from the defense of the claim at a future date. The letters should be comprehensive and cite* ***all the applicable policy language****, including the insuring agreement, definitions, exclusions, exceptions, and conditions. The letters should always be sent certified mail, return receipt requested, with a separate letter to the named insured, along with a copy to the insurance agent or broker as well as the applicable additional insureds requesting coverage under the policy, if that's the case.* ***The reservation of rights letter should be sent as soon as the adjuster is in a position to formulate a coverage opinion. This should be no longer than 30 days from the initial claim report date*** *or receipt of the summons and complaint. Be careful in the issuance of reservation of rights letters and know the jurisdiction and state laws. Here are some important points relative to reservation of rights letters:*

- ***Failure to cite the applicable policy language, or issuance of an ineffective letter, may result in a flawed defensible coverage position, resulting in the waiver of coverage defenses and being estopped from raising any other future coverage defenses.***
- ***A late reservation of rights letter could result in a waiver of any policy defenses.***
- *In some states, a reservation of rights letter triggers the insured's right to retain its own counsel to defend the insured for the non-covered causes of action, i.e., detailed allegations within a writ, petition, or complaint.*

[4] Claims Operations: A Practical Guide © 2000-2015 International Risk Management Institute, Inc. (IRMI). All rights reserved.

…

26. As one example, here is how a typical insurer instructs it adjusters with regard to conducting a coverage evaluation, and what to do when a coverage defense is identified.

*B. Coverage*

*1. All Lines*

*It is* ***<u>the primary responsibility</u>*** *of the claim handler* ***<u>to correctly verify, analyze and apply coverage.</u>*** *Every claim should have a comment* ***<u>in the initial file notes</u>*** *regarding the applicability of coverage or any known coverage questions. When appropriate, a written coverage analysis should be placed in the file. Comments should include not only why there may be no coverage, but also why coverage exists.* ***<u>It is the duty of the claim handler to attempt to find coverage for the insured.</u>***

*Coverage questions should be discussed with a manager or Vice President.* ***<u>The insured and producer should be promptly informed of any coverage questions. This should be followed up with a Reservation of Rights and/or a Non-Waiver document;</u>*** *and these documents should be approved by the manager prior to issuance.* ***All coverage questions should be resolved as quickly as possible while keeping both the insured and producer informed. Failure to promptly and properly address coverage questions could result in the payment of losses that are not covered or non-payment of covered losses.*** *A claim manager should approve any referrals to outside legal counsel for a coverage opinion. Written coverage denials must have the approval of a claim manager and Claim VP prior to the denial being issued.* ***All denials should be sent to the insured with a copy faxed or emailed to the producer, after prior phone discussion with the producer.*** *Claim officer approval is also required prior to filing any Declaratory Judgment actions.*

27. Obtaining a non-waiver agreement and/or reserving rights under a policy prior to conducting any additional investigation once a coverage issue is discovered is one of the most basic and important insurance industry claim handling standards.

28. Reservation of rights letters should be concise and clearly explain all coverage defenses identified and explain how those defenses apply to the claim at issue. Superfluous exclusions and limitations that the insurer has no intention of asserting or that do not apply should not be included. A ROR should not be a regurgitation of the entire policy, and the ROR is required to be error free, well thought-out, and effectual. Ineffectual or confusing ROR's containing superfluous policy provisions may result in a waiver of all policy defenses in certain jurisdictions. Reserving rights under a policy of insurance may also trigger an insurer's obligation to provide its insured with independent counsel (of the insured's own choosing) to defend any third-party lawsuit due to the conflict of interest such letters can create. If an insurer has no intention of disputing coverage, reserving rights is ill advised.

**<u>DENIALS</u>**

29. A denial should only be issued as a last resort, and only after attempting to read-in coverage. A denial should never be considered unless or until a prompt, full and thorough investigation has been conducted under a reservation of rights. If after conducting a full and thorough investigation, there is no reasonable path to coverage, a clear, concise and accurate written denial letter should be issued timely, citing all basis. As with ROR letters, any applicable policy defense not cited in the denial letter that an insurer knew or should have

known applied at the time of its denial, may later be deemed waived.