IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

EAUX HOLDINGS, LLC        *  Docket No. 2:20-cv-1582
                       *
                       *
VERSUS                      *  March 7, 2022
                       *
                       *
SCOTTSDALE INSURANCE CO.     *  Lafayette, Louisiana

****************************************************************

OFFICIAL TRANSCRIPT OF JURY TRIAL DAY 1 OF 4
BEFORE THE HONORABLE JAMES D. CAIN, JR.,
UNITED STATES DISTRICT JUDGE

****************************************************************

**A P P E A R A N C E S**

FOR THE PLAINTIFF:     SOMER GEORGE BROWN
                   MICHAEL K. COX
                   Cox, Cox, Filo, Camel & Wilson
                   723 Broad Street
                   Lake Charles, Louisiana 70601

FOR THE DEFENDANT:     JOHN POWERS WOLFF, II
                   MARY ANNE WOLF
                   CHELSEA ACOSTA PAYNE
                   FABIAN EDWARDS
                   Keogh, Cox & Wilson
                   P.O. Box 1151
                   Baton Rouge, LA 70821

REPORTED BY:           DEIDRE D. JURANKA, CRR
                   USDC - Western District of LA
                   P.O. Box 13271
                   Lake Charles, LA 70612

# I N D E X

                                                      **PAGE**

CHAMBERS CONFERENCE.............................   3
COURT PROCEEDINGS...............................  15
OPENING STATEMENTS
     MR. COX....................................  15
     MR. WOLFF..................................  27
ADAM LOCK
     DIRECT EXAMINATION BY MS. BROWN.............  39

**CHAMBERS CONFERENCE**

1

2     THE COURT:  Okay.  I've looked at the cases on

3     this.  We delved into it.  You can't use the chart.  The

4     federal jurisprudence is very clear on the reserve

5     thing.  The case is right on point.  Reserves are --

6     here it is.  It says right here, reserve -- sorry.  The

7     Court does not equate reserves with undisputed amounts.

8     To that end, in this case the Court finds it would be

9     overly prejudicial and confusing to a jury with respect

10    to a bad faith claim to allow testimony concerning

11    specific amounts of reserves.

12     So this is -- I do see how it could be very

13    confusing for a jury because the reserves are not --

14    they're there for accounting purposes.  They're not

15    there for, really, the claims adjusting.  And I think

16    the way y'all are going about it, I could see maybe

17    where you could thread the needle; but that chart, no.

18    I think the chart's misleading.

19     MR. COX:  So is the ruling, Your Honor, that we can

20    never talk about reserves.

21     THE COURT:  No.  I think you could probably get

22    somebody to testify about what reserves are, some of

23    that to an extent.  But the chart, the way it's

24    presented, I think basically you're trying to -- that

25    chart has a couple of problems.  You probably could fix

1    one or two, but that reserve thing I think is an issue.

2         MR. COX:  If I take the reserves out and make the

3    other changes, though, I can use it?

4         THE COURT:  Can you do that?

5         MR. COX:  Yeah, just white it out.  I'm going to

6    get a thing, copy it and white it out, or she's going to

7    take it out.

8         THE COURT:  The way it's presented in the chart

9    you're trying to say, "We set the reserves for this, but

10   you didn't pay us for six months later on this."  You're

11   trying to say they're in bad faith because they set the

12   reserves.  The reserves are not what -- reserves are for

13   accounting purposes.  I think that's where the confusion

14   is.  If you would have, "This is what our adjustment

15   was.  This is what they paid us.  It took too long.

16   They ultimately owed us this," that's bad faith.  Them

17   setting the reserves at a particular amount, I just

18   don't think you can use that to say they're in bad faith

19   based on how they set their reserves.  There's two or

20   three cases on this point and, you know --

21        MR. COX:  We'll take it out of the chart and make

22   the other changes you talked about.

23        THE COURT:  I think you can go about it in a

24   different way, but I think the chart can be confusing

25   and misleading.

1      MR. WOLFF:  Just to clarify, I didn't get a

2  response.  I don't anticipate a problem.  The before and

3  after picture, any objection to show the building before

4  and after?

5      MS. BROWN:  (Shakes head side to side.)

6      MR. COX:  So you want to just right now, because I

7  anticipate --

8      THE COURT:  Only reason I want to do all this

9  now --

10     MR. WOLFF:  I haven't seen any of this so --

11     MR. COX:  You've seen it all, but I anticipate

12  you'll object to all of it.  Do you object to a picture

13  of the building?

14     MR. WOLFF:  Well, depends on --

15     MS. BROWN:  He just asked me if he could put in the

16  picture.

17     MR. WOLFF:  I don't have a problem with the

18  picture.

19     MR. COX:  Picture of the damage to Lake Charles?

20     MR. WOLFF:  So this is what we had --

21     MR. COX:  Our client's going to testify this is

22  what he saw when he came back.

23     MR. WOLFF:  But what relevance does it have to this

24  property?  And they know all about the hurricane.  And

25  you said you ain't letting them run with too much leash,

1       but you might let them have some --

2            THE COURT:  What's the relevance of that?  I mean,

3       we all lived in Lake Charles.

4            MS. BROWN:  But we have to put the evidence in the

5       record.

6            THE COURT:  Right.  But you got to put evidence of

7       your building, not what happened downtown Lake Charles.

8       You want to come over to my house?  I mean, you don't

9       want to put on what happened at my house.

10           MR. COX:  Let me ask this, Judge.  There's no issue

11      in this case that the hurricane hit Lake Charles and

12      that the building was damaged by the hurricane.  They've

13      never raised that.  And if that's not an issue, I

14      don't --

15           MR. WOLFF:  No.  That's why we paid 1.8 million.

16           MR. COX:  Damages to the building.  These are all

17      photos of damage to the building.

18           THE COURT:  Certainly.  I mean, what do you think,

19      Mr. Wolff?

20           MR. WOLFF:  I have no problem with that.

21           MR. COX:  This is the Eaux Holdings estimate, last

22      page, summary page.

23           MS. BROWN:  The Skyline estimate.

24           MR. WOLFF:  Yeah, see, this is the problem that we

25      have.  It's a threshold question.  That estimate is a

1      nothing because --
2          THE COURT:  That's what you say it is.  They're
3      going to say this is what the evidence is going to show,
4      that that estimate's valid.
5          MR. WOLFF:  No.  They actually have moved down on
6      that.  They gave an overall estimate, which if you add
7      all the things up it was about 2.8 million.  When you
8      add --
9          MR. COX:  Disagree.
10         MR. WOLFF:  Excuse me.  When you add the mitigation
11     and when you add their overall estimate with everything,
12     it comes to about 2.8.  And it's moved down, down, down.
13     And he said, "Look, that was just an estimate.  It's not
14     the actual damage.  What was actually there is what was
15     there."
16         And then the other thing is and our problem with it
17     is --
18         MR. COX:  That's the last page of his estimate,
19     Judge.
20         MR. WOLFF:  Excuse me.  The problem is he never
21     gave an actual cash value.  That's our problem.
22         MR. COX:  Which you're not required to do.
23         MR. WOLFF:  That is the subject of the motion, and
24     you said in response to the motion that upon timely
25     objection at trial you will consider it.

1      THE COURT:  Here's what I'm going to tell you on

2   this.  I'm going to let him use the exhibit because it's

3   his argument of what the evidence is purported to show.

4   Let me tell you, if he don't prove that the jury's going

5   to hammer him because they're going to look at it him

6   and go, "Well, you didn't prove what you said you were

7   going to prove."

8      MR. COX:  We've talked about the changes.

9      THE COURT:  Yeah, you got to change that if you

10  want to use that.

11     MR. COX:  This is out of their property report that

12  shows the policy limits, 2 million, 10,000, and 25,000.

13     MR. WOLFF:  It is what it is.

14     MR. COX:  I can't use the reserves.  I get it.  Or

15  can I tell them what --

16     THE COURT:  No.  Here's what you're going to have

17  to do on the reserve.  You're going to have to lay a

18  foundation through a witness for a very specific narrow

19  issue.  You'll have to lay a foundation.  We'll have to

20  deal with it.

21     MR. WOLFF:  I got a 403 claim big time at that

22  point.  He's trying to thread the needle for what.  It's

23  going to have --

24     THE COURT:  We'll see.  Maybe he'll surprise us.

25  Yes, what is that?

1       MR. COX:  The next one is one we've argued ad

2   nauseam about.  It's what we intend to prove the actual

3   costs are.  We've sent them a revised --

4       THE COURT:  That's what the evidence -- hey, look,

5   I'm going to let you use it; but you're going to have to

6   prove that that's what it is.  Again, this is a road map

7   to what you're going to prove.

8       MR. COX:  I'm going to take off the logos.  I'm

9   going to take of Nationwide for you.

10       MR. WOLFF:  Then no problem.

11       MR. COX:  I'm going to try to do that on all of

12   them, taking off the Nationwide, taking off the logos.

13   This is what we ultimately claim, policy limits less

14   what they've paid.  We're claiming that's what's owed.

15       THE COURT:  That's what you're purporting the

16   evidence will show.

17       MR. COX:  That's the picture you want to use, too.

18   That's the building.

19       MR. WOLFF:  Clean all that up for me.

20       THE COURT:  Blue tarp.  Oh, my gosh.

21       MR. COX:  This is their letterhead and a motion

22   alleging misrepresentation by Mr. Odom.

23       MR. WOLFF:  Oh, no.  No, no, no.

24       THE COURT:  Let me see what -- what is this about?

25       MR. WOLFF:  That's our -- one of our defenses that

```
 1   we raised.  It depends what the evidence is.
 2        THE COURT:  I've already ruled on this, haven't I?
 3   What'd I do, deferred it to the merits?
 4        MR. WOLFF:  You did, but here's the problem.
 5        THE COURT:  I said you would have an opportunity to
 6   prove at trial if he misrepresented something to y'all
 7   or something.  That's certainly within your prerogative
 8   to try to establish at trial.
 9        MR. COX:  This is just a pleading, Your Honor.
10        MR. WOLFF:  Well, wait.  This came up in the
11   context of that 1973 claim.  In response to that, they
12   dismissed it.  This is opening all kinds of doors and --
13        THE COURT:  What's the purpose of this, Mike?
14        MR. COX:  They're claiming he made
15   misrepresentations under the policy and it's a nonsense
16   claim, and that's how they've defended this claim.
17        THE COURT:  You're saying that's an affirmative
18   defense they've asserted?
19        MR. COX:  They've gone on the offense, and we want
20   to be able to say what they've done.
21        THE COURT:  Well --
22        MS. BROWN:  This is essentially inoculating the
23   jury to what he's going to get up and say.
24        THE COURT:  What are you going to say, Mr. Wolff?
25        MR. WOLFF:  It depends on --
```

1       THE COURT:  Are you going to say he misrepresented

2   facts to y'all in your opening statement or he

3   misrepresented stuff to you?  I mean, you can.

4       MR. WOLFF:  I'm going to --

5       THE COURT:  Because again, the opening statement is

6   for y'all both to lay out what you think the evidence is

7   going to prove.  And if you think the evidence is going

8   to prove and you can establish he misrepresented

9   information to your client, you can certainly go out

10  there.

11      MR. WOLFF:  So in answer to your question, I'm

12  going to ask the question did we get full and fair

13  disclosure of all the issues.  I'm not going to call

14  him -- I'm not going to say he lied or that there was a

15  material misrepresentation.  My plan is not even to

16  raise that defense in opening.

17      MR. COX:  Is that a defense they're dropping?

18      MR. WOLFF:  No.

19      THE COURT:  No.  I don't take what -- I take what

20  Mr. Wolff as saying is he is going to articulate it in a

21  very delicate way.

22      MR. WOLFF:  And see what the evidence does.

23      MR. COX:  Talk about their defenses.

24      THE COURT:  Here's my problem.  It's your burden of

25  proof on what you're going to prove.  You're trying to

1    now in your opening -- I get what you're trying to do.

2    I would do it sometimes.  I would try, you know,

3    "They're going to say my client ran the red light, but

4    we're going to tell you he didn't run the red light."  I

5    hear what you're saying.

6        MR. COX:  He's going to testify he did not

7    misrepresent anything, and they're going to wonder why

8    are you even talking about it because they're making it

9    an issue.

10       MR. WOLFF:  No.  Actually, the evidence can come in

11   on several things.  One is that they were not --

12       THE COURT:  Mr. Wolff, here's the thing.  Just like

13   in any civil case, I mean, the plaintiff can try to head

14   off any kind of adverse claims against him, affirmative

15   defenses.  You know, let's just take a personal injury

16   case like I was using earlier and somebody -- you know,

17   y'all are going to -- the defense is going to attack the

18   liability of it by saying, you know, like I said, "He

19   ran the red light."  "No.  They're going to say he was

20   speeding and he ran the red light.  We're going to prove

21   to you that he did not speed and he did not run the red

22   light."  That's fair game in opening statement if that's

23   an affirmative defense.  If you're going to say that he

24   misrepresented facts, they can address it in opening

25   statement, "I think the evidence will prove that he did

1     not misrepresent."

2         MR. WOLFF:  I think they can argue that, but

3     putting our names as the attorneys down there that

4     they're attacking us and saying, "The attorneys are bad.

5     They're calling him liars" --

6         THE COURT:  I do think that part of it I don't

7     like.  I think using the pleading the way you're using

8     it is probably a little too much.  I think what you can

9     do is get up there and certainly address to the jury

10    that, "Scottsdale's going to say he misrepresented.

11    We're going to show you he did not."  But I think he's

12    right a little bit.  I just don't think you should be

13    putting the pleading like this on there, the lawyers

14    names.  I mean, if you want to take this part off, then

15    you can use it.  Just take the lawyers names off,

16    because you're trying to make it too personal.

17        MR. COX:  Fair enough.

18        THE COURT:  Trying to make Mr. Wolff look bad.

19        MR. COX:  This trial unfortunately --

20        THE COURT:  Well, the motion for summary judgment

21    stuff --

22        MR. COX:  -- just like Mr. Wolff has said, they've

23    got a job to do.  It's going to get personal.  It is.

24        THE COURT:  I get that.

25        MR. COX:  It's the nature of these cases.

1       THE COURT:  Take the lawyers' names -- wipe the

2   lawyers' names.

3       MR. WOLFF:  And the summary judgment, too.  He's

4   got quotes from the summary judgment itself.  If we do

5   that, then we open up that they had a whole 'nother

6   claim they had to dismiss.  I thought we weren't going

7   there.

8       MR. COX:  I don't need to show it, Judge.  I'll

9   just say it.

10       MR. WOLFF:  Yeah, you can say that's one of their

11   defenses, you know, "They delay, deny, and now they want

12   to fight."

13       MR. COX:  Yep.

14       THE COURT:  I think if you had a cleaner exhibit to

15   say, hey, they've alleged he misrepresented; but you've

16   got the lawyers' names.  I've ruled -- the summary

17   judgment is for me to rule on, not the jury.  But I

18   deferred it.  I realize that.  I deferred it because I

19   felt like this was a question of fact for them, not for

20   me.  There was enough factual dispute on both sides.  I

21   think you'd be safer not to use that.

22       MR. COX:  Okay.

23       THE COURT:  I mean, if I would have been in your

24   shoes, I would have tried too.

25       MR. COX:  May I ask you this?  I'll ask all of

```
 1    y'all this.
 2         THE COURT:  You pushed it as far as you could go.
 3         MR. COX:  Where's a quick place to get lunch that's
 4    decent right around the courthouse?
 5              (Off the record discussion.)
 6                     COURT PROCEEDINGS
 7              (Jury enters courtroom.)
 8         THE COURT:  Okay.  Plaintiffs ready to begin with
 9    their opening statements?
10         MR. COX:  Yes, sir.
11         THE COURT:  First of all, y'all have a good lunch?
12    Did they take care of you?  Okay.  Let me know if y'all
13    need anything.
14         Okay.  Mr. Cox, you may proceed.
15                     OPENING STATEMENTS
16         MR. COX:  Thank you, Your Honor.  First of all, I'd
17    like to thank y'all for being here.  I know it is
18    inconvenient, but it's very important.  I'll echo
19    everything that Judge Cain told you both on behalf of us
20    and on behalf of my client, Joey Odom, and his wife,
21    Lydia.
22         In 2018 Mr. Odom made the biggest investment of his
23    life.  He bought a commercial building for $2 million
24    and he borrowed the entire amount to buy it.  It was his
25    biggest investment.  And he got insurance on it through
```

1    Scottsdale Insurance Company trusting that if he paid

2    his premiums, 100 percent of his premiums, and he paid

3    them on time that if he ever had a claim his biggest

4    investment would be protected and Scottsdale would pay

5    the claim fairly and promptly.  Scottsdale didn't do

6    that.  They broke that promise.  They have underpaid the

7    claim by over $200,000 to date and what they did pay

8    they paid way beyond the legal deadline in Louisiana.

9         We all know that August 27th, 2020 Hurricane Laura

10   came in as a category four storm and devastated Lake

11   Charles.  Before the storm, Joey evacuated his family to

12   Arkansas.  As soon as it was safe to do so, he and his

13   son drove back from Arkansas to protect his most

14   valuable investments, his home, his commercial building.

15   This commercial building is about a 15,000-square foot

16   building, two floors.  The first floor, as you heard,

17   housed before the storm the Department of Homeland

18   Security.  The second floor was vacant.  When he came

19   back to Lake Charles he discovered devastation not only

20   to the city, trees were down, power lines were down, the

21   windows were out of tall buildings, roofs were damaged

22   everywhere.  The city was hardly recognizable.  His

23   building was no exception.

24        The building sustained massive damage to the roof,

25   had holes in the roof with water coming in.  There was a

1    lot of rain with Hurricane Laura.  The rain damaged the

2    interior of the building throughout the first and second

3    floor.  Essentially, it had to be gutted.  In fact, when

4    the adjuster for Scottsdale, Monte Jones, came on

5    September 15th he thought that the building would need

6    to be possibly torn down and rebuilt.  He said that

7    might be a better way.

8         So Joey did everything that he could to protect his

9    investment.  He did everything he was required to do

10   under his policy.  Again, he had paid 100 percent of his

11   premium, not 12 percent, 100 percent, and he paid it on

12   time.  And he did that knowing that if he was a day late

13   he would be canceled or if he paid only 12 percent or

14   90 percent they would cancel him and he would get zero

15   payment in the event of a disaster.  So he did what he

16   was supposed to do before the storm, and then when he

17   got back he did everything he could to protect that

18   building.

19        He hired a company called Crest Exteriors to put a

20   temporary roof on the building right away.  He also

21   hired a mitigation company called All Clear.  All Clear

22   basically tried to secure the rest of the building, the

23   windows that were broken, and to tear out all the things

24   that were wet and dry out the rest.  And it was

25   expensive.  All Clear billed 491,000.  That was later

1   negotiated by Mr. Odom's attorney down to 330,000.  Not

2   only that, he took some extraordinary measures.

3        It kept raining and then we had Hurricane Delta,

4   but as it rained the temporary roof wasn't doing its

5   job.  So Joey and his son went to Lowe's and purchased

6   PVC and Visquine and built these really large containers

7   to capture the rain water and pump it out of the

8   building, and at times they spent the night in that

9   building to protect this building.

10        He did everything he could.  He gave the insurance

11   company prompt notice of the claim.  He gave them full

12   access to the building and he cooperated fully with

13   anything that they needed.  He saw the scale of this

14   thing and he said, "Look, I need a public adjuster to

15   help me."  Jeffrey Major, who's in the courtroom, showed

16   up and Joey spoke to him.  Jeff explained that he had

17   over 30 years of experience.  He'd handled over a

18   thousand commercial claims.  He had vast experience

19   helping insureds, policy holders, prepare what's called

20   a proof of loss.  So Joey hired him.  He hired him the

21   day after the storm.

22        Jeff meticulously prepared a proof of loss,

23   meticulously prepared a four-volume proof of loss.  It

24   took him 18 days to do so.  It was prepared by

25   September 15th.  On September 15th he handed this proof

1      of loss to the adjuster that was sent there by
2      Scottsdale, Monte Jones, and he intended it as a proof
3      of loss.  You will see that in Louisiana, the judge is
4      going to instruct you on the law, but there's nothing
5      magical or technical about a proof of loss, nothing
6      magical or technical.  An individual could do it on
7      their own.  In fact, in some cases it's enough if the
8      adjuster just has access to the property and inspects
9      the property.  It's a very flexible requirement, nothing
10     formal.  But this is about as good as it gets.  This was
11     Jeff Major's best attempt with 30 years experience to
12     give a proof of loss.  You're going to find out that
13     Scottsdale doesn't accept even that as a proof of loss.
14     They're going to tell you that's not a proof of loss.
15     Scottsdale's adjuster also looked at it.  He didn't
16     prepare a proof of loss.  He just took -- he gave what's
17     called a rough order of magnitude, a shot from the hip.
18          If I may, I'd like to show you some pictures.  This
19     is the building and what it looked like before Hurricane
20     Laura.  It's off Common Street.  It is near Petro Bowl.
21     These are photos of the extensive damage to the
22     building, to the roof and all areas of the building,
23     really.  And this is Page 152 of Jeff Major's estimate.
24     And if you add the two numbers together, Jeff's estimate
25     was $2,196,188.79.  That estimate did not even include

1    the All Clear bill of 491,000.

2         In this case the policy limit is $2,035,000,

3    2 million on the building, 10,000 increased cost of

4    construction, and $25,000 debris removal.  So it was

5    readily apparent, it was obvious to Jeff, that the

6    building had more damage and would cost more to repair

7    than the policy limit.  And that's the proof of loss

8    that he gave to the insurance company.

9         Monte Jones said that he hadn't run the numbers but

10   he thought it might be worth tearing down the building

11   and starting over.  He said that he thought the loss was

12   at least, at least $1.5 million.

13        And so what did Scottsdale do?  So you'll see that

14   on September 23rd, 2020, Scottsdale paid $250,000.  In

15   their claims file they wrote that that entire payment

16   was for mitigation and temporary roofing.  In other

17   words, they paid zero toward the repair of the building,

18   zero.  And that's after Monte Jones said that he thought

19   it was at least a $1.5 million loss and after the proof

20   of loss from Jeff Major said over the policy limit.

21   There were other payments later in time.  And

22   eventually, by May, seven months too late, Scottsdale

23   made a payment of $1,120,726 for a grand total of

24   $1,796,090.51.  Again, that's below the policy limit by

25   about $238,000.

1          So the big issue in the case that you're going to

2     have to decide is whether the payment of zero, 250,000

3     but all for mitigation, whether that payment is a

4     realistic reasonable estimate of the damages to Joey's

5     building or whether that was mistreatment of Joey.

6     That's about less than one-eighth of the policy limit.

7     It's about 12 percent of Jeff Major's proof of loss, the

8     payment that was made.

9          You're going to learn in Louisiana that there are

10    duties that insurance companies have to follow also.

11    The policy holder has to pay the premium on time and do

12    other things under the policy, and Joey did.  The

13    insurance company has to make a written offer to settle

14    the claim within 30 days of proof of loss.  They will

15    admit that they did not make a written offer to settle

16    the case within 30 days of Jeff Major's estimate.  The

17    second thing is they have to make payments promptly.

18    They have to adjust the claim promptly and that is they

19    have to pay the full amount of the loss, actual cash

20    value, within 30 days of satisfactory proof of loss; and

21    they did not do that in this case.  In fact, they made

22    no payment toward the repair of the building within 30

23    days of this date.

24         We don't have to guess in this case whether Jeff

25    Major did a good estimate, whether his estimate was

1     reasonable and accurate.  We don't have to guess because

2     the work, almost all of the work, has been done now.  If

3     we could go to the costs to repair the building, these

4     are actual costs that Mr. Odom has incurred to repair

5     the building.  And we now know that they are right about

6     the exact amount of the policy limit.  2,033,000.  The

7     policy limit's 2,035,000.  So Mr. Major had a very

8     accurate estimate.  The $250,000 was grossly

9     insufficient, grossly inaccurate.  We're going to go

10    through and show each and every one of these bills and

11    what was spent on this building, what the charges were

12    to repair this building; and all of these charges will

13    be related to the damages caused by Hurricane Laura.

14         Could we put the chart on, please.  That's how much

15    was still owed, the 238.  And this chart which you're

16    going to see throughout the trial shows the redline at

17    the top, the policy limit, $2,035,000.  It shows in the

18    first column on the left what Eaux's public adjuster,

19    Jeff Major, estimated to be the damage; and that was

20    without even the mitigation bill.  It then shows

21    Scottsdale's field adjuster, Monte Jones, and he said he

22    thought it was at least 1.5 million.  He didn't do a

23    detailed estimate like Mr. Major.  Mr. Major used a tool

24    that's used by the insurance company, the industry in

25    this case.  He used a thing called Xactimate.  Every

1    little item in the building that needs to be repaired or

2    replaced is itemized and there's a cost associated with

3    it.  That's the insurance company software.  He used it

4    and came up with a number.  Monte Jones just shot from

5    the hip, thought the building was totalled, knew or

6    believed it was over $1.5 million loss; but Scottsdale

7    decides only to pay $250,000 seven days after Monte

8    Jones has this estimate.

9         But we know, the green column, we know how much it

10   actually cost now.  And we know that Mr. Major's

11   estimate was good and that the Scottsdale payment of

12   $250,000 was grossly inadequate and unreasonable.  And

13   we know, finally, what they eventually paid.  They made

14   their first payment that's at the chart at the very

15   bottom by 9/23/20.  All of the other payments were

16   untimely in this case.  And the last one, the biggest

17   one, was May 18th, seven months too late.

18        The issue in this case is whether insurance

19   companies should also be held accountable for what the

20   laws are and what the duties under the law for them are,

21   not just the policy holder, but it goes both ways.  They

22   too have to follow the law.  The judge is going to

23   instruct you that if you find that they paid that

24   payment late, after the 30 days after proof of loss, and

25   if they did it arbitrarily, capriciously, or without

1     probable cause then they're responsible for penalties

2     also.  What's that mean, arbitrary, capricious, or

3     without probable cause?  The judge is going to tell you,

4     but basically means they have to have a good excuse for

5     not doing it.  It has to be reasonable.  In this case

6     the evidence is going to show that there was no

7     reasonable good excuse.  The knowledge they had within

8     that first 30 days was enough, and they should have paid

9     fairly under this policy.

10     Scottsdale has some nonsense excuses.  First,

11     they're going to say that this doesn't count as proof of

12     loss.  I'll submit to you it would be hard to do a

13     better one.  They don't want to count anything as proof

14     of loss because it starts their legal clock ticking.

15     They then have 30 days.

16     Their next excuse is, well, there were a lot of

17     disasters.  You're going to hear from Mr. Lock, who's

18     here.  We're going to call him as the first witness.

19     He's their desk adjuster.  He's going to tell you,

20     "There were a lot of disasters that year.  We were

21     really busy.  It was the holidays.  We needed more

22     resources.  We needed more adjusters, more people like

23     me."  But that's not a valid legal excuse.  That would

24     be like the insured saying, "You know, it was the

25     holidays.  Finances were tight.  I had a lot of things

1    to do, some family get-togethers.  So I didn't pay my

2    premium.  I didn't pay it on time.  I didn't pay the

3    full premium."  That's not an excuse.  These are legal

4    obligations that must be fulfilled.

5        Next, Scottsdale's going to say, well, Mr. Odom's

6    building looks better than it looked before.  This is a

7    replacement cost value policy and that's what this kind

8    of policy does.  Once you do the work, they have to pay

9    you for the work.  Sort of like a homeowner's insurance

10   policy, if your roof gets blown off on your home and

11   your home was built and roofed in 1976, like his

12   building, and the roof gets blown off and you have a

13   replacement cost value and you pay 25,000 for that new

14   roof, you get a new roof.  Of course it looks better

15   than the one that was on there from 1976 because that's

16   what your premium paid for.  That's what you paid for.

17   That's what Scottsdale promised to give.  They can't go

18   back and put a 45-year-old roof on.  It's not available.

19   They have to put a new roof.  So in some respects his

20   building does look a little bit better because that's

21   what the policy is designed to do.  That's what he paid

22   for.

23       Scottsdale, though, they didn't just come in and

24   not pay his full amount of his claim and not pay it in a

25   timely manner like they were supposed to do under

1    Louisiana law.  Instead, they have -- they have asserted
2    that Mr. Odom has made misrepresentations which would
3    void his policy, misrepresentations of fact.  If that's
4    true, taken to the logical extension, they're accusing
5    him of insurance fraud which is a serious crime that can
6    send people to the penitentiary.  That's their approach.
7    He goes out.  He does everything he's supposed to do
8    under the policy.  He hires a public adjuster to do the
9    best he can presenting this claim.  And they say, "You
10    misrepresented it.  That voids your policy."
11    And they have litigated this thing fiercely.  Joey
12    hired lawyers in November, November 11th.  He would not
13    have been paid in this case.  You will find that the
14    payments came after he hired a lawyer.  Most of the
15    payments, the big ones, came after a lawyer and after a
16    lawsuit was filed.  That's unfortunate that he had to do
17    that.  It's unfortunate that they've taken it all the
18    way here.
19    As a jury, at the end of this thing, we're going to
20    ask you to give Joey 100 percent compensation under his
21    policy, the full payment that he's entitled to, and to
22    send a message to Scottsdale that they have to follow
23    the law too and they have to pay on time.  Thank you
24    very much.
25    THE COURT:  Mr. Wolff.

1          MR. WOLFF:  Thank you, Your Honor.  Good afternoon.

2    Appreciate your time.  I will say this.  We're going to

3    try to be as brief as we can.  And please understand in

4    doing that, if we don't say everything we want to say,

5    that you all will know that we've got more to say.  We

6    can make this longer; but we've got to respect your time

7    and so we're going to try to make this brief, as brief

8    as we can.  But there are issues.  This is a complex

9    claim.  As I said, this is the first one that's come to

10   court.

11         And why are we here?  Why are you here?  You're

12   here to judge the facts.  And we have a dispute.  I

13   didn't object when I heard some things.  I don't agree

14   with much of what was said, but I agree with some of it.

15   Why are we here?  We agree that Scottsdale issued a

16   policy.  We agree that Scottsdale needs to pay what is

17   owed.  We agree that Scottsdale paid 1.78 or 9 million.

18   We agree to all of that.  What we're disagreeing about

19   is whether or not we were reasonable in asking questions

20   and getting answers before we paid and whether this

21   process got complicated because we didn't get answers,

22   reasonable answers about important things during the

23   process.  And we also disagree about how the process

24   actually lays out.

25         But, you know, you saw all of that up there.  None

1      of that's evidence.  None of what I tell you is
2      evidence.  It's just supposed to be a road map of what
3      we plan to show.  And you saw that up there.  If we put
4      something up there, we need to prove it.  You need to
5      hold us all to it.  If we say we're going to prove
6      something, then we need to prove it.  If we don't, then
7      that's a problem.
8           So the plaintiff has the burden here.  The
9      plaintiff has to show all of the things that they talked
10     about.  And in this case they have to prove that
11     Scottsdale was unreasonable in paying what it paid and
12     that it was fully apprised of everything it needed to
13     make those payments timely and that its payments were
14     unjustified, unreasonable, without cause.  The judge is
15     going to instruct you all of that.  But the questions
16     that we've got to look at, the road map we've got to
17     look at, is why are we here, why are these litigants
18     here, why have most of the other cases resolved, and why
19     is this one here and we have a big difference.
20          Now, first off, Mr. Odom has nothing to do with
21     this claim.  He is not the policy holder.  He did not
22     pay premiums.  He is not making a claim.  They told you
23     Joey did this, Joey did that.  You'll see the policy.
24     Joey Odom is not the policy holder.  The actual policy
25     holder was Four-O, that's F-O-U-R dash O, but then

1    through some complicated transactions of a 1031

2    exchange, one of Mr. Odom's companies, Eaux Holdings,

3    did this tax arrangement and got this building.  And

4    that is the actual claimant here, is Eaux Holdings.  So

5    you've got to hold Mr. Cox to it.  It's not Mr. Odom at

6    all.  It's Eaux Holdings.  It's an LLC.

7        Now, you'll learn that Mr. Odom has many, many,

8    many companies.  He's got all kinds of property.  And

9    it's not really relevant what-all he's got, but it is

10   relevant that you know that the actual claimant is Eaux

11   Holdings.

12       And it's also relevant to know about this building.

13   It was purchased in 2018.  It was not a new building.  I

14   think all the evidence will show that it was built in

15   1976.  One of the questions that will come up, so why is

16   that important.  One of those questions is had it been

17   well maintained.  Were there problems there before,

18   before the hurricane, that would impact the replacement.

19       Actually, also had an interesting component to it

20   because it had the Department of Homeland Security in it

21   and that required some special issues that the building

22   actually didn't have.  You're going to learn and I'll

23   suggest that we did not know but you're going to learn

24   that the goal of Eaux Holdings was to make this a better

25   building and to get a long-term contract for the

1    Department of Homeland Security.  And you'll see that

2    1.789 million was paid.  The building's up.  Department

3    of Homeland Security is there and they've got a 15-year

4    fixed lease that could go 17 years.  Mr. Odom will say

5    in the rental business that's like gold for a tenant.

6        So the question that we're really looking at is was

7    Scottsdale unreasonable in the way that it adjusted this

8    loss and made those payments.  Now, we talked about this

9    during the voir dire.  Everyone's talked about it.

10   Unfortunately, all of you or most of you or close

11   relatives have had to deal with the tragedy of

12   hurricanes and insurance so you know.  But you'll see

13   it's a contract, and Scottsdale certainly agreed that it

14   has to pay what's owed in the policy.  No one disputes

15   that.  But by the same token, the insured also has to be

16   forthcoming when questions come up and has to give that

17   information in a proper way so that the loss can be

18   adjusted.  Otherwise, it gets complicated.  And we're

19   going to suggest that that's what the evidence is going

20   to show here.

21       And you may recall there was some discussion about

22   what does a policy provide.  There's two levels of it,

23   actual cash value policy and then replacement cost.

24   Actual cash value, as you hear -- you'll hear this, it's

25   an amount less depreciation that the carrier, the

1    insurance company, will pay and then as you move forward
2    with replacement it needs to pay that; and that's what
3    Scottsdale was doing.
4         And while there was a suggestion that Mr. Odom for
5    Four -- excuse me.  Not Four-O, now it's Eaux
6    Holdings -- had to go out and hire a public adjuster.
7    What you're going to hear is August 27th, the tragedy,
8    August 28th, Mr. Major is in Lafayette -- I mean, in
9    Lake Charles with a contract before any claim is made
10   and gets signatures to move forward.  So they were
11   moving forward with a public adjustment before there was
12   any question about what's going to be paid, is it late.
13   Started with that.
14        And then you saw those books.  What's in those
15   books?  What's not in those books?  You're going to hear
16   that Mr. Major went to Mr. Odom and was looking at the
17   policies and he actually was looking at the wrong policy
18   and he said, "I don't think there's much here.  This
19   building is not in great shape.  I don't think there's
20   much help I can give you."  So they went over it and
21   ultimately he signed up Four-O or Eaux Holdings.
22        So than he moves forward to submit this big thing.
23   They want to say it's a proof of loss, but it's an
24   estimate.  And if you really add it all up, if you take
25   that plus that 400 -- over $450,000 cleanup bill which

1    everybody agrees, including Eaux Holdings, everyone

2    agrees that that was completely unreasonable, you start

3    adding all that up, it's over 2.8 million or right at

4    2.8 million.  And so they come to Scottsdale and say,

5    you know, we need an advance.  So Scottsdale advanced

6    250,000.  And they sent out an adjuster.

7         Monte Jones went out there.  When he got out there,

8    there were no lights.  He couldn't see.  He knew there

9    were issues, but there was no way to determine the full

10   extent of it.  In fact, he came back and said, "This is

11   complicated.  There are problems.  We need to get

12   another expert."  And you'll see that Scottsdale then

13   hired Grecco which is an outfit that told Mr. Lock that

14   they had experience in government buildings and

15   leaseholds and whatnot.  So they went out, they came

16   back, they gave a number, and we moved forward.

17        During that time, you'll see that questions start

18   coming up.  Has this building been well maintained?

19   Were there pre-existing problems?  Mr. Major, whom

20   you'll again hear, said when he first looked at it,

21   "This thing's old and highly depreciated."  When

22   Scottsdale asked Mr. Major says, "We understand that the

23   building was well maintained."  And yet, then we get

24   Mr. Grecco -- excuse me, Grecco's estimate from

25   Mr. Collisson that says, wait, there was leaking

1    paneling, there was water intrusion, there were

2    pre-existing issues all around this thing, damages not

3    related to the storm.  Why are they telling us it was

4    well maintained?

5         Mr. Major's books, one of the questions we're going

6    to ask you is why wasn't the 2018 inspection report

7    about that building in that set of books.  We didn't get

8    it till after we paid the 1.798 million.  But we'll show

9    that to you and you'll see that there were

10   recommendations for repair and replacement of all kinds

11   of things on that building.  Why wasn't that disclosed?

12        So the process moved on and they said, "Look, we're

13   encountering some issues during the repair."  So we're

14   away from the actual cash value side to the repair side,

15   the replacement cost value, and we're working with them.

16   And they ask for a specialty expert to come look at it

17   because they were having problems, and you're going to

18   see that J.S. Held sent out Mr. Granger Stuck.  And

19   he'll testify.  This guy's got lots of experience all

20   over the world with big time commercial issues, and he

21   walked through it and worked with them.  And he's going

22   to show you the actual cost, what actually is out of

23   pocket for Eaux Holdings, and that number is actually

24   less than what was paid.  And one of the things that

25   we're going to want to have you look at is that chart

1    they showed you.  Are those really actual costs or not?
2    Was Mr. Major's original proof of loss or estimate
3    really on the mark or not?
4         We are going to walk you through all of that; but
5    one of the things that Eaux Holdings is going to have to
6    establish is that they gave us the full scope of what
7    was going on, that they answered the questions fully and
8    didn't conceal and completely forthcoming.  Were they or
9    were they not?  Are you fully apprised of something if
10   there's not full disclosure?  So the first step they'd
11   have to say is, "Oh, yeah, we provided them everything."
12   And then they want you all to say, "Oh, Scottsdale
13   shouldn't have done any of this.  You need to make them
14   pay."  They have to show to the decision that you all
15   make that we did not have a reasonable position, that we
16   weren't justified in questioning the claims that were
17   submitted, and we weren't justified in asking why are
18   the numbers all over everywhere, why is all of this
19   happening.  They've got to prove that.
20        Now, like I said, there are some things that we can
21   agree upon and that is that Scottsdale has paid
22   significant dollars.  I've got a chart here.  Let me
23   find that if I can.  We all agree that this money was
24   paid.  That's a lot of money.  And there's not going to
25   be dispute about that.  The question that they're going

1       to have is were some of those payments untimely.
2       They've got to prove that.  We're going to say no, of
3       course not, because we worked with them along the
4       process and had problems getting important information.
5       Then they're going to have to say that that money was
6       not sufficient to put Eaux Holdings back in a position
7       at least as good as it was in.
8            I think you'll find that the evidence will show
9       that the building is in much better shape as Eaux
10      Holdings wanted to do from the very beginning.  That was
11      planned.  It's now got that gold tenant.  It's making
12      15,000 a month off of that tenant.  It's got a second
13      floor that was vacant, but you'll find it was vacant
14      before.
15           At the end of the day insurance company does
16      contracts, does take premiums, and does make payments.
17      But the question is was it unreasonable here to pay this
18      and not pay the demands that they've made, and we'll be
19      asking you to look at that evidence and see if you can
20      resolve the dispute that we've got.  And we appreciate
21      your time and thank you.
22           THE COURT:  Mr. Cox, you ready to call your first
23      witness?
24           MS. BROWN:  I am.
25           MR. COX:  Yes, Your Honor.

1    THE COURT:  Ms. Brown, are you ready to call your

2    first witness?

3    MS. BROWN:  Your Honor, plaintiffs will call Adam

4    Lock.

5    THE COURT:  As he's coming up -- come on up,

6    Mr. Lock.  The deputy clerk will swear you in.  Let me

7    see counsel for a second on the record.

8                         **BENCH CONFERENCE**

9    THE COURT:  Just a reminder, I'm going to keep you

10   on the clock as I told you before so this thing moves

11   along.  I just want to remind everyone that I haven't

12   forgotten.

13   MR. WOLFF:  Did I go over?

14   THE COURT:  You didn't.  We're going to finish this

15   trial this week.  Depositions and stuff, that's going to

16   be --

17   MS. BROWN:  No worries.

18   MR. WOLFF:  Judge, I didn't object.  I'm going to

19   tell you, I'm wanting to.

20   THE COURT:  You could have.  I probably would have

21   overruled it but --

22   MR. WOLFF:  I wanted this on.  The policy holder is

23   Eaux Holdings.  It's inappropriate to suggest that it's

24   Mr. Odom doing anything on that policy.  It's Eaux

25   Holdings.  So I didn't object, but that was not

1    accurate.

2         MR. COX:  I stipulate to it.

3         THE COURT:  I understand what you're saying, but at

4    the end of the day they're going to put him on the stand

5    and he's going to say he's the sole owner of that LLC.

6         MR. WOLFF:  But I really don't --

7         THE COURT:  I understand.  He's technically not the

8    policy holder.

9         MR. WOLFF:  I left it alone, but I'm just saying I

10   counted.  It was over 20 times that -- never once was it

11   mentioned that the actual policy holder was Four-O and

12   then it was switched to Eaux Holdings.  That's all fine,

13   but it's not Mr. Odom.

14        MR. COX:  I'll clear it up.  I don't disagree with

15   you.

16        MR. WOLFF:  Okay.  I want to keep this running

17   smoothly.  I don't want to object.  "Let's send a

18   message" was in there.  That was another issue.  This is

19   why I raise this.  It's not -- this is not anything

20   other than what's on this policy.  And to have this jury

21   be corralled in and worked up to make this company pay

22   for the tragedy that hit Lake Charles is not

23   appropriate.  It's this policy, these facts.

24        THE COURT:  I'm not sure what you're referring to

25   there because I don't remember him really saying too

1   much about the -- I mean, we all know a hurricane hit
2   the town.
3       MR. WOLFF:  He said "send a message."  I'm just
4   putting it on the table.  This is exactly why I filed
5   that motion.  Fifth Circuit's clear.  I'm trying to set
6   parameters here so we don't have a bunch of this.
7       THE COURT:  I understand.  You know, we're going to
8   probably be right back here in closing arguments and
9   everybody's going to get --
10      MR. WOLFF:  I thought --
11      THE COURT:  -- you know, so, look, the objection's
12  noted for the record.  They know the rules and the
13  parameters.  But, you know, when you get to closing
14  arguments, I don't know what he's going to say.  I can't
15  imagine him saying something like that, but we'll just
16  have to address it as we get there.  Okay.
17      MR. WOLFF:  Yes, Your Honor.
18      MS. BROWN:  At the end of the day will we get a
19  tally of how much time we have used?
20      THE COURT:  Lisa's keeping the clock.
21      MR. COX:  Pressure's on.
22      THE COURT:  She's keeping the clock.
23      MS. BROWN:  (Inaudible.)
24      THE COURT:  That won't count towards you.  I'm
25  talking about now we're on trial time.  If y'all want to

1    spend five hours cross-examining the witness, that's on

2    you.  But at the end of the day we're wrapping this

3    thing up this week.

4                        ADAM LOCK,

5    after being first duly cautioned and sworn to tell the truth,

6    the whole truth and nothing but the truth, did testify on

7    oath as follows:

8                    DIRECT EXAMINATION

9    BY MS. BROWN:

10        Q.   Good afternoon, Mr. Lock.  Could you tell the jury

11   who you are and where you're from.

12        A.   My name is Adam Lock.  I'm a claims adjuster for

13   Scottsdale Insurance Company, I was for the handling of this

14   claim.  I'm located in Scottsdale, Arizona.

15        Q.   In Arizona.  Okay.  Is this the first time you've

16   been back to Louisiana since Hurricane Laura?

17        A.   I wasn't here for Hurricane Laura.

18        Q.   I guess that's a better question.  You didn't

19   actually come down and adjust on the ground here in

20   Louisiana.  You were I guess what we have come to know as the

21   term desk adjuster.  Is that what you were?

22        A.   Yes, ma'am.

23        Q.   Did you get a chance to check Lake Charles out

24   while you were down for trial?

25        A.   I came in last night.

1    **Q.**    Did you come into Lake Charles or Lafayette?

2    **A.**    Lafayette.

3    **Q.**    Okay.  You understand the case that we're here on

4    today is the first Hurricane Laura trial to be tried, period?

5    **A.**    I wasn't aware of that until opening statements.

6    **Q.**    Okay.  You just heard that this morning for the

7    first time.  You agree that Hurricane Laura was a category

8    four hurricane that hit Lake Charles, Louisiana in August

9    of 2020?

10   **A.**    I don't recall the category; but, yeah, it was a

11   hurricane that hit Lake Charles, yes, ma'am.

12   **Q.**    Okay.  You worked on the claim, but you don't know

13   the strength of the storm that hit?

14   **A.**    Well, the strength of the storm, knowing the exact

15   wind speed, doesn't change my handling of the claim.

16   **Q.**    Okay.

17   **A.**    We're going to handle the claim based on the

18   damages that we see and what needs to be done to put it back.

19   **Q.**    Okay.  Were you aware at any point in the handling

20   of your claim that this was the worst natural disaster to hit

21   southwest Louisiana in modern history?

22   **A.**    I think so, yeah.

23   **Q.**    Well, did you know that?

24   **A.**    I am aware of that, yes, ma'am.

25   **Q.**    Okay.  You would agree with me that hurricanes like

1    Hurricane Laura are the very type of disaster that property

2    owners in southwest Louisiana insure their properties

3    against?

4        A.    Yeah, I would agree that's one of the reasons

5    people buy insurance.  Yes, ma'am.

6        Q.    And Scottsdale sells policies of insurance to

7    property owners in southwest Louisiana, which is a high

8    hurricane risk area?

9        A.    They do.

10       Q.    Okay.  There is no question that there was coverage

11   under the Scottsdale policy for hurricane damage to the

12   building at 620 Esplanade, correct?

13       A.    Correct.

14       Q.    And there's also no question that there was

15   extensive damage from the hurricane to the building at 620

16   Esplanade?

17       A.    There was damage from the hurricane, yes, ma'am.

18       Q.    And we heard Scottsdale's own attorney say this

19   morning that they've paid a lot of money.  So, I mean, there

20   was extensive damage to this building as a result of the

21   hurricane, correct?

22       A.    Yeah.  Yeah.  I mean, extensive is, you know, in

23   the eye of the beholder.  But yeah, I would say it was

24   extensive.  Yes, ma'am.

25            MS. BROWN:  Okay.  I'm going to offer Exhibit 106

1          which is the Scottsdale insurance policy.

2               MR. WOLFF:  No objection.

3               THE COURT:  It'll be admitted.  Everybody, before

4          you publish to the jury, be sure it's in evidence.  I

5          know this has been admitted.  Just a warning going

6          forward.

7               MS. BROWN:  Okay.

8     BY MS. BROWN:

9          Q.   I'll have you look at Exhibit 106 on your screen.

10    You're familiar with the policy covering the claim here?

11         A.   Yes, ma'am.

12              THE COURT:  Can you see it right there on the

13         screen, sir?

14              THE WITNESS:  I can.

15              THE COURT:  Ladies and gentlemen, your screen's on?

16         Sometimes they turn off.  Okay.  Perfect.

17    BY MS. BROWN:

18         Q.   And you understand that the building at 620

19    Esplanade was a property that housed Homeland Security?

20         A.   Yes, ma'am.

21         Q.   And it had some specialized construction because

22    there was actually a jail, a small jail, inside this building

23    that they used to hold ICE detainees?

24         A.   Yes.

25         Q.   Let's talk about this policy.  If I could go to

1  Page 4 of the PDF, please.  Were you in the room this morning

2  for the voir dire of the jury?

3      A.   For the jury selection?  No, ma'am.

4      Q.   Okay.  We had some discussion and I think I heard

5  it in openings as well about premiums so I want to start

6  there and ask you about -- I just want to ask you if this is

7  the premiums that Mr. Odom paid on behalf of Eaux Holdings

8  for coverage for the building at 620 Esplanade.

9      A.   This looks like the premium charged.

10     Q.   And am I correct that the premiums are based on the

11  amount of insurance that he's purchasing from Scottsdale?

12     A.   That's one of the criteria, yes, ma'am.

13     Q.   Okay.  And there's no dispute in this case that the

14  premiums on behalf of Eaux Holdings were paid, correct?

15     A.   No, ma'am, there's no dispute over that.

16     Q.   Okay.  And we know they were paid because if they

17  were not paid the policy would have been canceled, correct?

18     A.   I believe so.

19     Q.   And I think -- can we go to Page 7 of the PDF.  We

20  see right here, actually, the policy itself says that if the

21  cancellation is for non-payment of premiums it will be ten

22  days after the premium is not received, right?

23     A.   That's what it says, yes, ma'am.

24     Q.   And that's what happens at Scottsdale, correct?

25     A.   I don't handle the cancellations, but I would

1    imagine if the policy says it that's how it's handled.

2        Q.    You're not aware of anything in the policy that

3    gives a policy holder like Eaux Holdings the ability to make

4    a partial premium payment, are you?

5        A.    I'm not aware of such a provision, no.

6        Q.    And in exchange for payment of the premium, Eaux

7    Holdings was purchasing an agreement by Scottsdale, who sold

8    the policy, that they would pay, subject to the limitations

9    in the policy, for damage caused by Hurricane Laura to the

10   building at 620 Esplanade?

11       A.    Yes.

12            MS. BROWN:  Okay.  I'm going to offer plaintiffs'

13       Exhibit 14.

14            MR. WOLFF:  Your Honor, we have an objection.

15            THE COURT:  You do?

16            MR. WOLFF:  Yes, Your Honor.

17            THE COURT:  Here's what I need.  I need to know

18       what the exhibit is and I need to know what the

19       objection is.

20            MR. WOLFF:  May I approach the bench?

21            THE COURT:  Yes, on the record.

22            MS. BROWN:  False alarm.  I'm not to 14 yet.  Hold

23       that objection.

24            THE COURT:  Let me ask you just so we can -- you

25       have access to their exhibits so when she refers to an

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1      exhibit you can quickly pull it up?  I'm a paper guy.  I

2      used to go hand those, paper version.  I'm not used to

3      all this electronic stuff.

4           MR. WOLFF:  I'm getting old enough to keep my ears

5      going so I can't multitask on that.

6           THE COURT:  Me neither.

7           MR. WOLFF:  Oh, we do not have a paper copy.

8           THE COURT:  I just want you to be able -- if she

9      says 14, you can look at it quickly and say whether or

10     not you have an objection to it or not.

11          MS. WOLF:  Your Honor, we actually have a chart

12     already made.  So when she calls out an exhibit number,

13     if we have an objection, we know.

14          THE COURT:  Perfect.  Thank you.  I understand.

15     Okay.  I'm sorry, Ms. Brown.  Please go ahead.

16          MS. BROWN:  I'm sorry for all the confusion.

17          THE COURT:  I just wanted to be sure.

18 BY MS. BROWN:

19     Q.   This particular policy had limits of 2,035,000 that

20 was the total limit for property damage, correct?

21     A.   It's not pulled up in front of me, but that sounds

22 right.  I'd refer back to what it says; but yeah, that sounds

23 right.

24     Q.   Okay.  I'm going to find it.  I'll show you a

25 document that we have just for demonstrative purposes.  I'm

1    actually going to show you.  Does that refresh your memory

2    just that the policy was 2,035,000?

3         A.   No, ma'am, the policy's not 2,035,000.  The policy

4    limit is 2 million and there are provisions in the policy

5    that provide additional coverage up to 10,000 for increased

6    cost of construction, 25,000 for debris removal.

7         Q.   Okay.

8         A.   Ultimately, if the building was a total loss, we

9    paid out everything that could be paid, the 2,035,000 is the

10   amount; but that extra 10 and the extra 25 aren't technically

11   part of the policy limit.

12        Q.   Okay.  Go back to the policy, Page 77.  This

13   morning when we were talking with the jury we had the

14   discussion about the mutual obligations under the insurance

15   policy, obligations of Scottsdale, obligations of Eaux

16   Holdings.  So I want to go through some of those from the

17   policy with you.  Right -- it starts at the bottom here,

18   duties in the event of loss or damage.  If you can just

19   scroll.  We're going to look at them in more detail.  I just

20   want to -- okay.  So these eight enumerated items, we're

21   going to go through each; but those are the duties -- what

22   Scottsdale expects of its insured in the event of a loss like

23   Hurricane Laura?

24        A.   Yes.

25        Q.   Okay.  What I've done is taken that and I want to

```
 1    go through each one of these with you.  The first duty in the
 2    event of a loss is notify the police if a law may have been
 3    broken.  We can agree that one doesn't apply here, correct?
 4         A.   I would agree.
 5         Q.   No. 2, "Give us prompt notice of the loss or damage
 6    including a description of the property involved."  And you
 7    would agree with me that Mr. Odom, on behalf of Eaux
 8    Holdings, gave prompt notice of this loss, correct?
 9         A.   I agree.
10         Q.   Okay.
11              MS. BROWN:  And just to be clear, I'm going to
12         offer Exhibits 1 and 2.
13              MR. WOLFF:  No objection, Your Honor.
14              THE COURT:  It'll be admitted.
15              MS. BROWN:  And those are -- easier for me to just
16         go to paper.
17              THE COURT:  Paper never fails.
18              MS. BROWN:  Keep making everybody have to toggle
19         and find things.
20    BY MS. BROWN:
21         Q.   Exhibit 1 is a letter on August 30th of 2020
22    acknowledging receipt of a report for the claim on behalf of
23    Eaux Holdings, correct?
24         A.   Yes.
25         Q.   So the claim was made prior to August 30th of 2020?
```

1      A.   It appears so, yes.

2      Q.   And just so there's no confusion, since we've been

3  saying that this claim is against Scottsdale Insurance, I see

4  a Nationwide logo on this letter; and can you tell me why the

5  letter would have come from Nationwide?

6      A.   Scottsdale Insurance is a division of Nationwide.

7      Q.   Okay.  And then just to round out the prompt notice

8  issue, this is a document that was provided to us, Exhibit 2

9  entitled "Property Loss Notice."  And again, it shows that

10  the claim was reported by e-mail by someone named Jade Bentz

11  on August 30th of 2020 --

12      A.   Yes.

13      Q.   -- is that correct?

14      Okay.  So we can agree that Eaux Holdings complied with

15  No. 2?

16      A.   Yes.

17      Q.   Okay.  No. 4 is "Take all reasonable steps to

18  protect the covered property from further damage."  You're

19  aware that Mr. Odom, on behalf of Eaux Holdings, went to the

20  property and took measures for temporary repairs, he had the

21  roof shrink wrapped, things of that nature to protect it from

22  further damage?

23      A.   I'm aware that temporary repairs were done to

24  protect the building.

25      Q.   Okay.  You're also aware that he hired a mitigation

1    company?

2        A.    I am.

3        Q.    Okay.  Continuing on with what would have been Eaux

4    Holdings' duties, No. 5 says, "At our request, give us

5    complete inventories of the damaged and undamaged property

6    including quantities, costs, values."  I read that to pertain

7    more to, like, personal property; but you tell me if

8    that's --

9        A.    I think it could be considered either way.

10       Q.    Okay.  And in this case we looked at these books --

11       A.    By either way I mean whether it's personal property

12   or real property.  That's what you were asking, right?

13       Q.    Right.  But within a couple of weeks of the

14   hurricane Mr. Odom did provide Scottsdale with this estimate

15   of damages which we're going to get into, but he did provide

16   this four-volume set itemizing line by line the damage to the

17   property with photographs?

18       A.    They provided those books to the independent

19   adjuster we sent out, Monte Jones.

20       Q.    Okay.  No. 6, "As often as reasonably required,

21   permit us to inspect the property."  Nobody from Scottsdale

22   has ever been denied access to this property, correct?

23       A.    Not to my knowledge.

24       Q.    And you sent several different adjusters out there

25   over the course of the claim?

1      A.    Well, we sent several different experts out there.

2  They weren't necessarily adjusters.  I think the first person

3  we sent out was Monte Jones.  He was an independent adjuster.

4  Other folks we sent out were, you know, experts in their --

5  you know, construction and different things.

6      Q.    Okay.  But you would agree that Eaux Holdings has

7  permitted inspection of the property every time it was

8  requested?

9      A.    Yes, ma'am.

10     Q.    Okay.  No. 7 says, "Send us a signed sworn proof of

11  loss containing the information we request to investigate the

12  claim."  We've talked a little bit and we're going to come

13  back to this proof of loss that was provided; but this

14  requirement is not consistent with Louisiana law, right?

15  That's not actually required for claims in Louisiana?

16     A.    No.  I think the Louisiana guidelines are

17  different.

18     Q.    Okay.  And then No. 8, "Cooperate with us in the

19  investigation or settlement of the claim."  Again, Eaux

20  Holdings -- if Scottsdale asked, Eaux Holdings accommodated

21  whatever was requested in trying to get this claim adjusted?

22     A.    I can't think of anything specifically that they

23  said no to.

24     Q.    And that's another point.  No. 7, while we're going

25  to get into what's required in Louisiana, it does say that

```
 1    this requirement must be done within 60 days after it was
 2    requested.  And Scottsdale never requested Eaux Holdings to
 3    submit any sort of signed sworn proof of loss?
 4         A.   Not during the time that I was assigned to the
 5    claim.
 6         Q.   And you're not aware of it having been done?
 7         A.   I'm not aware of them ever sending one, no, ma'am.
 8         Q.   Okay.  So in addition to paying his premiums, which
 9    we've established that he did, Mr. Odom, on behalf of Eaux
10    Holdings, also complied with these eight duties in the event
11    of a loss, correct, that we just went through?
12         A.   Yeah.  The ones we went through, yes, ma'am.
13         Q.   How many claims were you handling in Louisiana
14    after Hurricane Laura?
15         A.   I don't recall.  I don't recall.
16         Q.   Roughly, ten, a hundred, 500?
17         A.   Probably -- I really don't remember.  It's been a
18    year and a half.
19         Q.   Okay.  You don't know if it was more or less than a
20    hundred?
21         A.   I think I had less than a hundred.
22         Q.   Okay.  And as part of adjusting claims in
23    Louisiana, you're familiar with the Louisiana law that
24    applies to insurance companies adjusting these sort of
25    claims, correct?
```

1     **A.**   Yes, ma'am.

2     **Q.**   Okay.  And you would agree with me that those laws

3  provide some of the obligations that Scottsdale would owe

4  Eaux Holdings?

5     **A.**   Yeah, I think so.

6     **Q.**   So I want to look at --

7     **A.**   I'm not a lawyer; but yeah, that sounds like my

8  understanding of it.  Yes, ma'am.

9     **Q.**   Certainly.  But as the desk adjuster on these

10  dozens of claims from Hurricane Laura in Louisiana, you are

11  responsible for ensuring that Scottsdale complies with the

12  Louisiana law governing that process?

13     **A.**   Yes, ma'am.

14     MR. WOLFF:  May we approach, Your Honor?

15     THE COURT:  Yeah, please.

16                 **BENCH CONFERENCE**

17     MR. WOLFF:  She wants to show without publishing

18    the exhibit the law, and I understood you were going to

19    give that law; but wherever the guidelines on this --

20     THE COURT:  Well, I mean, you know, they have a bad

21    faith claim so they have to articulate it somehow.  I'm

22    going to instruct them on what the law is.  I guess, you

23    know, what you really are focussed on, was it a timely

24    payment.

25     MS. BROWN:  Correct.  That's why I'm going to

1    try --

2        THE COURT:  I mean, she has to say that they have

3    so many days.  Then y'all are going to have to put on

4    evidence whether you made the payment timely or not.

5        MR. WOLFF:  No doubt, but to have the witness talk

6    about what is satisfactory proof of loss or --

7        THE COURT:  Here's where I approach that.  You can

8    ask him if he thinks that's satisfactory proof of loss.

9    He can say yes or no.  He knows or he doesn't.  If he

10    doesn't know, you know, I don't know.

11        MS. BROWN:  Well, that's why I laid the foundation

12    of --

13        THE COURT:  Here's the thing, it's not fair to ask

14    him, like, a legal conclusion.  You can't ask him do you

15    agree under the law of Louisiana this is -- that is --

16    you know, you can't ask it like that.

17        MS. BROWN:  Don't intend to.  This is going to be,

18    like, a handful of questions and then I'm moving on.

19        THE COURT:  He's -- at some point he's got to say

20    whether that's -- the company thinks that's satisfactory

21    proof of loss or not.  Now, whether it complies with

22    Louisiana law, that's for the jury to decide.

23        MR. WOLFF:  Okay.

24        THE COURT:  I mean, he's got to decide whether for

25    him -- for the company whether that's --

```
 1            MR. COX:  May I just throw something out?
 2            THE COURT:  Sure.
 3            MR. COX:  We've researched it and it's acceptable
 4      for the judge to instruct the jury on the law any time
 5      in the trial.  It doesn't have to be done as ordinarily
 6      it is, like before they deliberate.
 7            THE COURT:  I don't disagree with that.
 8            MR. COX:  That's a biggie.  This proof of loss
 9      thing is a biggie in this case, and the jury doesn't
10      know what it is.  We don't want to misstate it.  We'd
11      rather you state it.
12            MR. WOLFF:  If you're going to put it up, put it
13      up.  I just want to know.  I don't want to get up and
14      object, but I need to know where this is going.  So this
15      is why --
16            MS. BROWN:  At this point I need to ask him if he's
17      aware --
18            THE COURT:  Let me ask you --
19            MS. BROWN:  -- of what the law says.
20            THE COURT:  He's correct.  I can instruct the jury
21      technically any time but --
22            MR. WOLFF:  Right in the middle of my guy's
23      testimony, I object.
24            THE COURT:  Yeah, I don't think that's really fair
25      at this point to him to do that.  Only reason I'm saying
```

1    it is if you wanted some limiting instruction to the

2    jury, I'd be open to it; but I don't really know what

3    I'd tell them.  I mean, she's going to -- to put it in

4    context, she's got to lay some foundation and she's

5    going to have to refer to the statute.

6         MR. WOLFF:  I understand.

7         THE COURT:  I'm going to instruct them on the law

8    as to what that statute means and how you apply it, and

9    they'll apply it to the facts.  You know, that's the

10   problem with this whole statutory penalty thing.  It's a

11   legal question but there's a factual issue so, you know,

12   it kind of crosses the line between me and -- because I

13   decide, you know, part of it.  If the jury determines

14   Scottsdale's in bad faith then, you know, I'm going to

15   do the bulk of the calculations on that, not the jury.

16   We'll just have to do it.

17        I don't think there's been a lot of trials on this,

18   to be quite honest with you.  There's cases out there,

19   but I don't know how many's really went to trial.

20        Hey, look, if you feel like you need to object,

21   object.  Put it on the record.

22        MR. WOLFF:  I just don't --

23        THE COURT:  No, I understand.

24                    PROCEEDINGS CONTINUED

25        THE COURT:  Let me ask you this, what you're fixing

1      to show, has it been marked?

2              MS. BROWN:  I don't intend --

3              THE COURT:  It's just demonstrative?

4              MS. BROWN:  It is, yes.

5              THE COURT:  You okay with it?  You've seen it?

6              MR. WOLFF:  Yes, sir.

7              THE COURT:  I hate that screen.  We're going to get

8      that thing out of here before long.  All right.  Go

9      ahead.

10  BY MS. BROWN:

11      Q.    All right.  Mr. Lock, I was asking about your

12  familiarity with the laws governing adjustment of claims in

13  Louisiana.  So what I've got here in front of you is

14  Louisiana Revised Statute 22:1892 and what it says -- it was

15  written by lawyers.  It has a lot of words in it, but what

16  I've highlighted is the important parts that I want to ask

17  you about.  It says, "All insurers shall pay the amount of

18  any claim due any insured within 30 days after receipt of

19  satisfactory proof of loss from the insured or any party in

20  interest."  Were you familiar with this statute when you were

21  adjusting claims after Hurricane Laura?

22      A.    Yes, ma'am.

23      Q.    And you were aware of that 30-day deadline

24  contained in the statute?

25      A.    Yes, ma'am.

1      **Q.**   Okay.  As far as satisfactory proof of loss, were

2   you -- we talked about this a little bit earlier when we

3   talked about the signed sworn proof of loss.  You understand

4   in Louisiana the satisfactory proof of loss is a flexible

5   requirement?

6      **A.**   Yes.

7      **Q.**   Okay.  And it doesn't have to come in a specific

8   form.  It can come from your adjuster.  It can come from the

9   insured.  It can come from all sorts of different things.

10  Right?

11     **A.**   Yes, ma'am.

12     **Q.**   It's just as long as the insurance company has

13  enough information to act on the claim, that's satisfactory

14  proof of loss under Louisiana law?

15     **A.**   Yes, ma'am.

16     **Q.**   Okay.  Can I look at the next part of this statute.

17  And the second part of the statute says that the failure to

18  make such payment within 30 days after receipt of such

19  satisfactory written proof and demand therefor or the failure

20  to make a written offer to settle a property damage claim,

21  then there's a lot of legalese, when that failure is found to

22  be arbitrary, capricious, or without probable cause shall

23  subject the insurer to a penalty.  And you were aware when

24  you were adjusting claims after Hurricane Laura that the

25  failure to make timely payment under the statute could result

1    in a penalty in addition to the amount of the loss of

2    50 percent?

3         A.   I didn't recall the percentage; but I was aware

4    that it could result in a penalty, yes, ma'am.

5         Q.   Okay.  You're also aware that the obligations of

6    Scottsdale contained in the Louisiana bad faith statute

7    continue after litigation is filed?

8         A.   I'm sorry.  Please say that again.

9         Q.   Scottsdale's obligations to continue to adjust the

10   claim properly continue even if Eaux Holdings files suit,

11   correct?

12        A.   I would assume so, yeah.  I don't have specific

13   knowledge of that.  I mean, we need to continue handling the

14   claim until it's concluded.

15        Q.   Okay.  Let's talk about the claim now.  I want to

16   look at some of the photos of the damage to the property now.

17   These four volumes from Skyline, to be fair, a lot of them

18   are photographs of damage to the property, correct?  We're

19   going to look at some in detail, but I'm just --

20        A.   They're mostly photos, yeah.

21        Q.   Okay.

22        A.   They're not labeled, as I recall; but I never

23   actually got to see the books.  They were sent to me

24   digitally eventually.

25        Q.   Okay.  What you saw you looked at digitally on your

1   computer?

2       A.   Yes, ma'am.

3           MS. BROWN:  Okay.  I'm going to offer and would

4       like to offer all at one time Exhibits 70 through 81.

5       They're all photographs.

6           MR. WOLFF:  No objection, Your Honor.

7           THE COURT:  It'll be admitted.

8   BY MS. BROWN:

9       Q.   And so what I'd like to do now, Mr. Lock, is I'm

10  going to scroll through some photographs of damage to the

11  property and just have you refresh yourself with the claim

12  and then I'll ask you some questions.  Okay.

13      A.   Okay.

14      Q.   It's a little awkward doing it this way.  You

15  ready?  Okay.  And I think that one -- on Exhibit 72, I think

16  that might be to the side.  Those look like ceiling tiles.

17  But in this picture here, Exhibit 73, you recognize that as a

18  crack in the exterior paneling?

19      A.   Yes, ma'am.

20      Q.   Okay.

21      A.   I think so.  Not very -- I mean, can you zoom out

22  on the picture?  Yeah.  Yeah.  That's -- yeah, right above

23  the window.  Yes, ma'am.

24      Q.   And Photo 74, this is just a picture inside one of

25  the offices in the building; is that right?

1     A.   It looks like it, yes, ma'am.

2     Q.   Okay.  And we can see the water damage on the

3  ceiling and things of that nature; is that right?

4     A.   Yes.

5     Q.   And this is another -- Exhibit 75 is another

6  picture of water damaged ceiling and looks like light

7  fixtures as well?

8     A.   Yes.

9     Q.   Looks like an up-close of some exterior cracking?

10     A.   It does, yes.

11     Q.   Okay.  Broken window?

12     A.   Yep.

13     Q.   Another broken window?

14     A.   (No audible response.)

15     Q.   This is one of the sides of the building; is that

16  right?

17     A.   Looks like it, yeah.

18     Q.   One more.  This is another interior photo; is that

19  right?

20     A.   (No audible response.)

21     Q.   Now what I'd like to do is walk through a timeline

22  on this claim and see if you and I can agree on some things.

23          MS. BROWN:  At this point I would like to offer

24       Exhibits 4 through 7 which are the four volumes of the

25       Skyline estimate.

1      MR. WOLFF:  We need to approach, Your Honor.

2      THE COURT:  Okay.  Sorry, ladies and gentlemen.

3                  **BENCH CONFERENCE**

4      THE COURT:  What's the problem?  We'll find out.

5      MS. BROWN:  Is this coming out of my time?

6      THE COURT:  The clock's on pause.

7      MR. WOLFF:  So here we are right where I thought

8  we'd be.  This is an estimate.  There's no RCV

9  calculation here.  They've referred to it consistently

10  as a proof of loss.  The foundation needs to be laid by

11  Major and not this witness.  So there are a number of

12  statements in there that we're going to object to

13  singularly.  So to just put the whole thing in evidence

14  is essentially letting Major put all of that stuff in.

15  Plenty of it to object.  So I don't know how to go

16  through the --

17      MS. BROWN:  Your Honor, Lock received that four-

18  volume set as part of the claims file.  It's what he

19  received --

20      THE COURT:  Let's just --

21      MS. BROWN:  -- whether they like what's in it or

22  not.

23      THE COURT:  What's your base -- what's the

24  objection to what's in it, I mean, in terms of

25  statements?

```
 1            MR. WOLFF:  Well, there's multiple books.  There
 2     are -- I don't have any problem with the photos.  No
 3     problems there.  It's the statements from Major about
 4     this being proof of loss, which it's not.
 5            THE COURT:  That's what the jury's going to decide.
 6            MR. WOLFF:  Well, there's a summary of evidence.
 7     They've got to lay a foundation here with him.  They
 8     can't do that.  They can say he received a bunch of
 9     material but --
10            THE COURT:  I'm tending to agree this is probably
11     not the right way unless you agree to let him put it in.
12            MR. WOLFF:  I don't.
13            THE COURT:  I'm going to just tell you that they'll
14     get it in with the expert.
15            MS. WOLF:  That's why we kind of have -- because
16     you've already ruled on this, Your Honor, that Major
17     cannot refer to it as a proof of loss which is what
18     he --
19            THE COURT:  I don't think that's what I ruled.  I
20     said he can't give legal opinions.  I never said he
21     couldn't --
22            MS. WOLF:  What I recall is --
23            THE COURT:  I'd have to go back and read my --
24            MS. WOLF:  Every time he referred to it in his
25     deposition he calls it proof of loss.  If the jury hears
```

1      that all day long, he --

2           THE COURT:  That's his opinion.

3           MS. WOLF:  Under Louisiana law, he cannot do that.

4           THE COURT:  I disagree with you.

5           MR. WOLFF:  Listen --

6           THE COURT:  I disagree with you.  The question

7      before this jury is going to be did they give

8      satisfactory proof of loss and did your client pay on

9      time.  That's the bottom line.  This expert can get up

10     here and say, "Hey, I went through this.  This, to me,

11     meets the satisfactory proof of loss."  That's his

12     opinion.

13          MR. WOLFF:  He can't say --

14          THE COURT:  You know, we can cross that bridge; but

15     I think he can probably say it's -- we'll get there in a

16     minute but --

17          MR. WOLFF:  So he -- I think to lay the foundation

18     he needs to be the one --

19          THE COURT:  I agree, I think, to put this in.  This

20     witness, he didn't write this, he didn't produce it, he

21     didn't create this.

22          MS. BROWN:  Even though he received it and made

23     it --

24          THE COURT:  It doesn't matter.  He can't

25     authenticate it.  He can't lay the foundation for this.

1        He didn't have anything to do with creating it, writing
2        it, preparing it.  He just reviewed it.  Hell, I can
3        review it but doesn't mean it comes in.
4            MS. BROWN:  But I can ask him about it?
5            THE COURT:  You can ask him if he received it.  I
6        guess you can ask him if he looked at it.  I guess you
7        can ask him if he relied on it.  But again, he's not the
8        right one to put it in.  I know it seems trivial because
9        I think it's going to come in at some point, but that's
10       the point.
11           MS. BROWN:  I got you.
12           THE COURT:  If we're going to go through the rules
13       of evidence, he's probably not the right one.
14           MS. BROWN:  Okay.
15           MR. WOLFF:  Thank y'all.
16                    **PROCEEDINGS CONTINUED**
17   BY MS. BROWN:
18       Q.   Okay.  So what I'd like to do -- we heard some
19   discussion in opening statements about a timeline of
20   information that Scottsdale had and so what I'd like to do is
21   you and I are going to create a timeline to see if we can
22   agree to some things.  We talked about this four-volume
23   estimate that I have sitting here from Skyline.  And you
24   would agree that Scottsdale received this -- its adjuster,
25   Monte Jones, received this on September 23rd of 2020?

1          MR. COX:  15th.

2     BY MS. BROWN:

3          **Q.**   September 15th of 2020.

4          **A.**   I'd have to see the date of my notes, but that does

5     sound correct.

6          THE COURT:  Are y'all okay?  Y'all need a restroom

7          break?  Okay.

8          MS. BROWN:  Okay.  I'm going to offer Exhibit 27,

9          which is the claims notes.

10         MR. WOLFF:  No objection.

11         THE COURT:  You know what, Ms. Brown, while you're

12         doing that, I'm going to ask the jury to step out for a

13         minute so we can have a discussion, if y'all don't mind.

14         I think it might speed things up.  Ladies and gentlemen,

15         let's take a ten minute break.  Y'all go to the

16         restroom.  Okay.  All rise for the jury.

17                   (Jury exits courtroom.)

18         THE COURT:  Let's talk about this.  Here's the

19         dilemma, Mr. Wolff, Ms. Brown.  The term "satisfactory

20         proof of loss" is a term of art under the statute.

21         Okay.  The jury is going to be instructed at the end of

22         this trial by me as to the law on the statute and as to

23         the law as to what that term means.  Okay.  So as I'm

24         sitting here thinking after our objection and our

25         sidebar, I think the appropriate approach is that is an

1      estimate, Ms. Brown.  That four-volume set is an

2      estimate, correct?

3           MS. BROWN:  Correct.

4           THE COURT:  It is going to be for this jury to

5      decide whether that estimate constitutes satisfactory

6      proof of loss.  That is their -- that is in their

7      purview, not mine, after I instruct them on the law.

8      Are we on the same page?

9           MR. WOLFF:  If that's properly admissible.

10          THE COURT:  We're going to get there, Mr. Wolff.

11          MR. WOLFF:  I know.

12          THE COURT:  You're putting the cart before the

13     horse.

14          MR. WOLFF:  Sorry.

15          THE COURT:  So what I'm telling y'all is this, as

16     we've discussed on the side at the sidebar.  Again, I

17     think it's going to be their job to decide whether that

18     is satisfactory proof of loss.  Ms. Brown, during

19     closing arguments, whatever, Mr. Cox, you, y'all can

20     argue and say all day long to this jury that is.  I'm

21     sure you're going to say it isn't.  I don't know.

22     Doesn't matter to me.  So in that context, that's how

23     we're going to approach this.  Okay.

24          Again, I think the more I thought about it,

25     Mr. Major should not get up here and say in his opinion

 1          that's a -- I think that's a legal conclusion which he's

 2          not, as an expert, allowed to give.  That will be for

 3          the jury to decide.  He can say, "It's a complete

 4          estimate, encompasses all the damages."  And you can

 5          argue in closing arguments, "We believe under the law as

 6          the judge will instruct you that this met the

 7          satisfactory proof of loss requirement."

 8               I just want to get us on the same page as we go

 9          through this.  Mr. Cox, you want to -- any issue with

10          that?  Ms. Brown?  Mr. Wolff?

11               MS. BROWN:  None.

12               MR. WOLFF:  No, Your Honor.

13               THE COURT:  Okay.  I think that -- because I don't

14          want all these sidebars about this back and forth.

15          While we're at it, while they're out, what is the

16          argument on whether -- on the admissibility of this?  I

17          don't think I've ruled on that.  I think all I've ruled

18          on was Mr. Major cannot give a legal opinion, which no

19          expert can give a legal opinion.

20               MR. COX:  Judge, I'll suggest this.  If you rule

21          that that estimate isn't admissible --

22               THE COURT:  I'm not saying that.

23               MR. COX:  -- you can dismiss 3,000 cases.

24               THE COURT:  I never said it was inadmissible,

25          Mr. Cox.  You're getting ahead of yourself.  All I said

1    was they have an argument that there are things

2    contained in that estimate that are buried in there that

3    may be inadmissible, and I'm trying to vet this now

4    before we get there.  I don't think I had a motion in

5    limine on this, did I?

6         MR. WOLFF:  As to the estimate, the whole thing

7    is -- you said it's irrelevant.

8         THE COURT:  No, it's not irrelevant, Mr. Wolff.  It

9    is an estimate of damages of this property by their

10   expert.  It is not irrelevant.  Don't waste my time with

11   that.  Now, the question's going to be is there a

12   portion of it -- I'm hearing your argument that you

13   think there's some stuff in there that's not admissible.

14   What is not admissible?

15        MR. WOLFF:  I think, first off, he's got to

16   establish that he was authorized to act as a public

17   adjuster; and I don't know that he can do that, number

18   one.  Number two, he doesn't provide actual cash value

19   ever.  And number --

20        THE COURT:  Well, you'll pick him apart on

21   cross-examination on that point.

22        MR. WOLFF:  Right, but first he's got to

23   authenticate and we're there.

24        THE COURT:  He can authenticate.

25        MR. WOLFF:  Secondly, he's got to prove that he's

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1      authorized to submit all of that; and I don't know that

2      he can do that.

3            THE COURT:  I'm not following where you're going

4      with that.  Are you trying to get into the public

5      adjuster statute?

6            MR. WOLFF:  Yes.

7            THE COURT:  I think one of the exceptions under the

8      public adjuster statute is if he's retained by counsel,

9      if counsel's involved.  I can't remember.  I got to go

10     back and look at that statute.

11           MR. WOLFF:  Counsel was not involved.  Counsel

12     didn't get involved until -- I believe it was in

13     November and this occurred on the day after the

14     hurricane.

15           THE COURT:  I've ruled on this issue before in

16     another case.  I just can't quite remember the

17     parameters of my ruling on it.  I'll find it, trust me,

18     because I'll be consistent.

19           MS. BROWN:  The fact of the matter is, Your Honor,

20     as we said --

21           THE COURT:  Beyond that, I mean, forget all this

22     about whether he's a public adjuster or not.  Is

23     there -- what is it in there -- I mean, it's an

24     estimate.  I know you don't agree with it, but you're

25     saying there's stuff in there.  I'm trying to get to the

1      point here.  What's in there?

2          MR. WOLFF:  I've got to go through, to go page by

3      page.  I cannot do that right now.  I can do that before

4      his testimony --

5          THE COURT:  I'm sure you deposed the guy.

6          MR. WOLFF:  No.  Mary Ann did.

7          THE COURT:  I know Ms. Wolf did a tedious job

8      deposing this guy.

9          MR. WOLFF:  She did.  We can go articulate -- I

10     just think it's appropriate to have it authenticated and

11     then go from there.

12         THE COURT:  No, no, no.  I'm with you.  That's why

13     I said a minute ago he's not the proper witness to put

14     it in.  He's not.  He can't authenticate it.  But I'm

15     just trying while I have the jury out -- it's so much

16     easier than having the sidebars.  I'm trying to get

17     to -- trying to find the meat on the bone here,

18     Mr. Wolff.

19         MR. WOLFF:  I understand a hundred percent, and I

20     think we're charting new territory on all of this going

21     Delta.  And I appreciate the position everyone's in,

22     particularly you having to make rulings that are going

23     to guide everything else, so I'm just taking it slowly

24     and methodically.  And I think we're learning that he

25     can't give legal opinions just like he's not going to

```
 1          give -- so we're good there.  Get it authenticated.
 2          I've got challenges to Mr. Major.  That's not a secret.
 3                THE COURT:  I don't remember a Daubert motion on
 4          him.
 5                MR. WOLFF:  Oh, no, I filed plenty of Daubert
 6          motions, yeah.
 7                THE COURT:  Yeah, but what I'm saying is I think
 8          I -- I deferred those to the merits, did I not?
 9                MR. WOLFF:  Yes, you did.
10                THE COURT:  But this thing about a public adjuster,
11          I'm trying to get -- I get some of you don't like his
12          opinions and all that, but what is this issue about him
13          being a public adjuster?  I'm trying to get -- what are
14          you talking about?
15                MR. WOLFF:  He's got to have authority to do all
16          that.  He's got to follow the public adjuster statute.
17          I don't think he did.  I don't think he did.
18                THE COURT:  Well, you thinking he didn't is not
19          enough.  I mean, you know, I don't care what you think.
20          I mean, you've got to prove it.  I think you're going to
21          have to cross-examine him on it.
22                MR. WOLFF:  That's what I was going to do, Your
23          Honor.
24                THE COURT:  There's so many public -- I've ruled on
25          this whole public adjuster thing before and I've got to
```

1    go back and see what I did on it, but there's some

2    exceptions to that whole public adjuster statute.  It's

3    another one of those statutes that probably needs to be

4    tweaked.  You know, it's kind of pretty vague but -- all

5    right.  We'll cross that bridge when we get to

6    Mr. Major.

7         MR. WOLFF:  Right.

8         THE COURT:  Okay.  She's going to question him

9    about it.  As we discussed, you can't put it in.  You're

10   not going to be able to show any of it to the jury until

11   it's admissible.  I guess you showed a couple of the

12   pictures.  You okay with the pictures right now?

13        MR. WOLFF:  No problem at all.

14        THE COURT:  You can show the pictures out of it.

15   Does that make sense?

16        MS. BROWN:  Well, it makes sense.

17        THE COURT:  I know you want to put it in, but you

18   can't put it in with him.

19        MS. BROWN:  The total, the amount of this estimate,

20   was a number that he had at a certain point in time that

21   goes --

22        THE COURT:  You can ask him did he receive it, did

23   he look at it, does he remember this from it.  If he

24   remembers, he remembers.  I doubt very seriously he

25   brought his file with him.

1      MR. WOLFF:  That's part of the foundation, that

2    estimate.  It's as if he's going to come in as a

3    construction expert.  He's got to lay that foundation to

4    put that estimate --

5          THE COURT:  Yeah, but your guy here received it --

6          MR. WOLFF:  I agree.

7          THE COURT:  -- and he looked at it.

8          MR. WOLFF:  Agreed.

9          THE COURT:  So he can testify about what he saw,

10   what he read.

11         MR. WOLFF:  Yes, sir.

12         THE COURT:  So if that's -- you know, he doesn't

13   necessarily have to have that in evidence.  Because he

14   put it in his file, he can testify about what he

15   recalls.

16         MR. WOLFF:  Yes, sir.

17         THE COURT:  But you're technically correct on the

18   admissibility of the document.

19         MS. BROWN:  Understood.

20         THE COURT:  He's technically right.  Okay.  Anybody

21   want to go run and take a quick break?  Okay.  DD, my

22   court reporter, needs a quick break.  Every take about

23   five minutes.  We'll come right back.

24                    (Recess is taken.)

25         THE COURT:  We're going to vet this out because we

```
 1          need to -- Mr. Major's going to be called, I assume,
 2          pretty soon?
 3                  MS. BROWN:  Yes, sir.
 4                  THE COURT:  Okay.  Mr. Wolff, let's just go ahead
 5          and we're going to deal with his admissibility right
 6          now.
 7                  MR. WOLFF:  All right.
 8                  THE COURT:  So what is your specific objection to
 9          Mr. Major?  He wrote this, did he not?
10                  MS. BROWN:  Yes, sir.
11                  THE COURT:  What's your objection?
12                  MR. WOLFF:  I don't think he was authorized to
13          serve as public adjuster in this case because he did not
14          have a contract that authorized him to do it.
15                  THE COURT:  What kind of contract does he need?
16                  MR. WOLFF:  One that authorizes him to
17          specifically --
18                  THE COURT:  You're saying he's not licensed in
19          Louisiana?
20                  MR. WOLFF:  I don't think he had a contract in this
21          case.
22                  THE COURT:  I'm still not following you, what
23          you're talking about.
24                  MR. WOLFF:  His contract doesn't authorize him to
25          do work for this claim against this carrier.
```

1   THE COURT:  Why does one need a contract?

2   MS. BROWN:  He does actually have a contract.

3   MR. WOLFF:  Not for this claim and not for this

4 carrier.  And the --

5   THE COURT:  What do you mean not this carrier?  He

6 doesn't work for you.

7   MR. WOLFF:  He has to have a contract -- under 1407

8 he has to have a written contract with very specific

9 details.  I don't think he has it.

10   THE COURT:  What's 1407?

11   MR. WOLFF:  If I may, Your Honor, so under 22:1691

12 it specifies the duties and restrictions.

13   THE COURT:  Go ahead.

14   MR. WOLFF:  In 1700, 22:1700(A) -- actually, I'm

15 sorry, they must -- under 22:1703(A) they have to

16 have -- they cannot have a contingent --

17   THE COURT:  I agree they can't have a contingency

18 contract.  I agree with that a hundred percent.

19   MR. WOLFF:  I think he does.  But aside from that,

20 under 1704 he's got to have a written contract.

21   THE COURT:  Under which one?

22   MR. WOLFF:  1704.  22:1704.

23   THE COURT:  Maybe he does.  He has a written

24 contract.  She's got one right there.

25   MR. WOLFF:  Not on this claim.

```
1              THE COURT:  What do you mean "not on this claim"?
2              MS. BROWN:  Would you like me to put it up, Judge?
3              THE COURT:  Let me ask you:  Who's the contract
4       with, then?
5              MR. WOLFF:  It's with --
6              MS. BROWN:  Four Eaux, LLC, J. Odom, and against
7       Scottsdale Insurance.
8              THE COURT:  Where is the property?  620 Esplanade.
9              MR. WOLFF:  Where is that?  No, no.  I don't have
10      this document.
11             MS. BROWN:  We've provided it as one of our
12      exhibits.  We provided it.  And it was also produced in
13      Skyline's subpoena.
14             MR. WOLFF:  Okay.  Now I really have a problem
15      because the -- oh, wow.  So --
16             THE COURT:  Enlighten me, Mr. Wolff.
17             MR. WOLFF:  So I need another document.
18             MS. BROWN:  And I can probably go ahead and tell
19      you what he's going to show you and explain why it
20      exists.
21             THE COURT:  Let him whip it out.
22             MR. WOLFF:  Well, no, here's the problem, Your
23      Honor.  We got notification letters, and I'll let you
24      look at these.  They've been altered.
25             THE COURT:  They've been what?
```

1          MS. BROWN:  Said they've been altered.

2          MR. WOLFF:  I think they have.  I'm fine for you to

3     rule on this now because --

4          THE COURT:  Well, I think I have to because this

5     whole case is hinging on, I think, this whole

6     four-volume set as well as Mr. Major being able to put

7     it on.  That's a serious accusation.

8          MR. WOLFF:  I don't know.  I needed to ask because

9     I saw this when I was preparing.  I have a notification

10    letter that relates to that claim number which isn't our

11    claim number.  Okay.  And then I have another

12    notification letter that relates to our policy.  But the

13    problem is, and you can do this yourself, it's been

14    copied over and things are added.

15         THE COURT:  Let me see it.

16         MS. BROWN:  If I may, Your Honor, when Mr. Major,

17    and he'll testify to this, came to town --

18         THE COURT:  I'm sure --

19         MS. BROWN:  -- the day after the hurricane Mr. Odom

20    owned multiple properties.  He gave him a different

21    policy, thought it was the policy for this property.

22    They signed a new contract.  He has a valid contract

23    since 8/28/20 for this property and this claim.  And I

24    am offended by the accusation.

25         MR. WOLFF:  Well, I need to understand what's going

1    on.

2          MS. BROWN:  Well, you should have asked before now.

3          MR. WOLFF:  It's been copied over.  If you hold

4    those up to the light, Your Honor, there's no way the

5    signatures on one of them is original.  One of them's

6    been copied over and things changed.

7          THE COURT:  I don't see that, Mr. Wolff.

8          MR. WOLFF:  Hold them up to the light.

9          THE COURT:  I'm not holding it up to the light.  I

10   don't see it.  You better have some good proof that this

11   has been altered.  That's a serious accusation.  I don't

12   see that that's been altered.  All I see is there was

13   added of E-A-U behind -- on the top line.  That's all I

14   see that's changed on those two and it was probably a

15   clarification.  That's the way I see that.

16         MR. WOLFF:  If that's what it is, then that's what

17   it is; but these documents are the same signatures --

18   I'm sorry.

19         THE COURT:  Listen, you want to do this?  Here's

20   what we're going to do.  When he gets on the stand you

21   can confront him with both of them.  You can ask him if

22   it's been altered.  You can ask him if he signed two of

23   them.  You can ask him anything you want about it.  But

24   as we sit right here there's no proof to me that there's

25   been anything altered on that document other than there

1    has been, to me, a clarification behind the top line

2    where they put in parentheses "Eaux," E-A-U-X.  That's

3    it.

4         MR. WOLFF:  I understand, and if that's --

5         THE COURT:  And I'm going to tell you he can

6    testify under the law as a public adjuster because under

7    22:1693, just so we can have it on the record, under

8    Section E, notwithstanding Subsections A through D of

9    this section, a license as a public adjuster shall not

10   be required of any of the following.  No. 2 is a person

11   employed only for the purposes of obtaining facts

12   surrounding a loss or furnishing technical assistance to

13   a licensed public adjuster or a licensed attorney.

14   Licensed attorney.

15        MR. WOLFF:  They hadn't retained him.

16        THE COURT:  Doesn't matter.  He's offering

17   technical assistance.  Doesn't say he has to retain

18   them.  Says has to be offering technical assistance to a

19   licensed attorney.  So he can testify.

20        MR. WOLFF:  And I understand.  I appreciate your

21   ruling, Your Honor.  But the issue is this was all

22   submitted before their attorney was involved.

23        THE COURT:  Listen, Mr. Wolff, let's talk

24   practicalities here.  Okay.  There were public adjusters

25   floating around Lake Charles like bees on a flowering

1    honey tree.  Okay.

2         MR. WOLFF:  Yes, sir.

3         THE COURT:  And a lot of these guys generated

4    reports and then subsequently lawsuits were filed.

5    Attorneys then retained these people for their technical

6    expertise.  I think that's perfectly okay under the

7    statute.  I mean, that's just the way it is and that's

8    the way it all fell out.  I mean, I don't think it says

9    he has to be retained before or after.  That's not what

10   the statute says.  As I said earlier, these statutes,

11   poorly written.  But you know me, Mr. Wolff, you've said

12   it before, I'm a constitutionalist and I'm a textualist.

13   It says what it says.

14        MR. WOLFF:  I appreciate your ruling.  Got that

15   down.  And I'll --

16        THE COURT:  Okay.  You can make your objections and

17   they're noted for the record here --

18        MR. WOLFF:  Fine.

19        THE COURT:  -- but he's going to be allowed to

20   testify as a public adjuster and he will be -- and then

21   you can make -- here's what I would ask.  I think you

22   need to redact out of those four volumes anywhere where

23   he talks about satisfactory proof of loss, that's a

24   legal conclusion, if you're going to put that in

25   evidence.

```
1              MS. BROWN:  I don't think there's anything in there
2       that says that.  I think it's an estimate and
3       photographs.
4              THE COURT:  Then we're fine.
5              MS. BROWN:  If you have something specific you'd
6       like to point me to this evening, I'm happy to look at
7       it.
8              MR. WOLFF:  It's mostly an estimate.  I do object
9       to it as an estimate, but I appreciate your ruling.
10             THE COURT:  One man's estimate is another man's --
11             MS. BROWN:  Satisfactory proof of loss.
12             THE COURT:  Okay.  I appreciate -- hey, you're
13      doing a diligent job, Mr. Wolff.  I commend you, but I
14      don't agree with you --
15             MR. WOLFF:  I understand.
16             THE COURT:  -- on this one.  Okay.
17             MR. WOLFF:  I got it.  Thank you.
18             THE COURT:  I just wanted us to deal with it now.
19      I don't want to be bringing the jury in and out.  I
20      think we have a better feel of the lay of the land.
21      Okay.
22             MR. WOLFF:  Thank you, Your Honor.
23             THE COURT:  Are we ready to bring the jury back in?
24      Okay.  We can get the jury now.
25                     (Jury enters courtroom.)
```

1          THE COURT:  Thank you, ladies and gentlemen.  All

2      right.  Ms. Brown, please proceed.

3  BY MS. BROWN:

4      Q.   Mr. Lock, I'll try to move us along.  We were

5  talking about the Skyline estimate here that I have on the

6  podium and when you received it.  You would agree this

7  estimate was provided to Scottsdale's independent adjuster,

8  Monte Jones, at his inspection in September 2020?

9      A.   That is correct.

10     Q.   Okay.  And I want to talk to you a little bit just

11  about -- you eventually received these volumes from Mr. Jones

12  and from Skyline, correct?

13     A.   I never received physical copies.  I received

14  digital copies of files from the public adjuster's assistant

15  about a week or so maybe after we started asking for digital

16  copies.

17     Q.   Okay.  So did you review those digital copies?

18     A.   I did.

19     Q.   Okay.  And the estimate that's contained in the

20  first volume of these four is -- you're familiar with the

21  software program Xactimate?

22     A.   Yes, ma'am.  I'm a level two certified Xactimate

23  user.

24     Q.   What is Xactimate for the jury?

25     A.   Xactimate is a computer program that allows

```
 1   somebody to create a repair estimate for a building.  It's
 2   generally -- you can look up any ole thing that needs to be
 3   done to a building.  Right.  So you can say shingles and it
 4   says, "Okay.  What kind of shingles?  You want them
 5   individually?  You want them by the bundle?  You want them
 6   with felt?  You want them without felt?  You want just the
 7   materials?  You want just the labor?"  It's a very good
 8   program when used correctly.  Most insurance companies use
 9   it.
10       Q.   Scottsdale -- I'm sorry.  Scottsdale uses it,
11   correct?
12       A.   That's correct.
13       Q.   And it provides some level of consistency in your
14   preparation of estimates?
15       A.   Uh-huh.
16       Q.   And Xactimate is the program that Skyline used in
17   the estimate that you were provided, correct?
18       A.   Yes.
19       Q.   And do you recall that was a 152-page estimate that
20   you got from Skyline?
21       A.   That sounds about right.  I'd have to see the page
22   number to say for sure, but that sounds about right.
23       Q.   Okay.  Do you recall it had over 1800 line items of
24   damage?
25       A.   I don't recall a specific number, but it was
```

1    lengthy.

2         Q.   Okay.  Do you recall the ultimate estimate of

3    damage being $2,196,188.79?

4         A.   That sounds about right.

5         Q.   Okay.  So we're going to say -- Monte Jones went to

6    the property on December 15th; is that what you recall?

7         A.   That sounds right, yes.

8         Q.   So I'm going to put 9/15/20.  Oh.  I'm sorry.  Can

9    I be on this machine?

10        Now, just before we took our break I believe that I

11   offered Exhibit 27, the claims log.  I want to ask you about

12   your conversation with Monte Jones regarding his inspection.

13   Am I correct, the claims log, these notes that we're going to

14   look at, these are entries?  Every time something significant

15   happens in the file you, Adam Lock, will put the date and the

16   time and a summary of what you did in the file; is that fair?

17        A.   I'm sorry.  Say it again.

18        Q.   Okay.  So the claims log, just so the jury knows

19   what we're about to look at, is a computer program at

20   Scottsdale?

21        A.   Yes.

22        Q.   You input -- every time you do something of any

23   substance on the claim you or anyone -- I mean, there's other

24   people that worked on the claim.  But you would put your name

25   as here, Adam Lock, on September 17th of 2020 at 2:18 p.m.

1    and then the entry above that is what you did on that date

2    and time; is that right?

3         A.   That's correct.

4         Q.   So we have to work backwards a little bit.  So now

5    I want to look at what you did on September 17th, 2020, at

6    2:18.  This is a long entry so I got to go back two pages,

7    and I'm on Page 12 of the claims log at Exhibit 27.  I want

8    to start -- this is the beginning of that entry and it says,

9    "Called IA, Monte Jones."  That's the independent adjuster

10   hired by Scottsdale to inspect the property?

11        A.   Correct.

12        Q.   And on the 17th, this would have been a phone call

13   with him after his inspection?

14        A.   Yes.

15        Q.   Okay.  Very first thing, the public adjuster,

16   that's Skyline, provided him with 800 pages of documents.

17   That's what we just established, correct?

18        A.   Yes, ma'am.

19        Q.   He goes on to tell you about the tenant on the

20   first floor being Homeland Security, which we talked about,

21   correct?

22        A.   Yes.

23        Q.   Now, tell me what -- I'm going to have you read

24   that first paragraph for the jury about what Monte Jones told

25   you about the damage to the property after his inspection.

1      A.    You said the first line?

2      Q.    Yes, please.

3      A.    It says, "The roof is heavily damaged and the

4  interior was damaged by rainwater.  All upper levels and

5  lower levels will have to be taken down to studs to do the

6  repairs.  He hasn't run the numbers but thinks it might be

7  worth tearing down the building and starting over."

8      Q.    Now, you would not have typed this into the claims

9  log if someone had not told you this information, correct?

10     A.    Correct.

11     Q.    You did not make this up?

12     A.    No, ma'am.

13     Q.    This came to you from Monte Jones?

14     A.    This is what Monte Jones told me, yes, ma'am.

15     Q.    Okay.  And then there's some more details about the

16 property, but I want to go down to the next highlighted area.

17 The PA, again, that's the public adjuster, that's Skyline,

18 told IA, that's Monte Jones, correct?  Is that correct?

19     A.    Yes.

20     Q.    So Skyline told Monte Jones that they believe the

21 cost of repairs will exceed 2 million?

22     A.    That's what was reported to me.

23     Q.    And that's consistent with the estimate that they

24 provided, that Skyline provided?

25     A.    Yes.

1     **Q.**   Okay.  The IA, now, again, that's the independent
2     adjuster, Monte Jones, for Scottsdale, correct, IA?
3     **A.**   Yes.
4     **Q.**   "IA recommends we retain a consultant that can
5     assist with putting together a legitimate estimate.  IA
6     thinks the loss is at least 1.5 million."  Did I read that
7     correctly?
8     **A.**   That's what it says, yes.
9     **Q.**   Again, Monte Jones told you that information and
10    that is why it is in the claims log, correct?
11    **A.**   Yes.
12    **Q.**   Again, you didn't make that up?
13    **A.**   No, ma'am.
14    **Q.**   Okay.  So let's go back to this little timeline
15    we're keeping.  I'll say on 9/17, that's when you talked to
16    Monte Jones.  Monte Jones.  And he said at least 1.5 million.
17    But if I put 1.5 million here, it's consistent with what he
18    thought on that date?
19    **A.**   Yeah.  My understanding was that it was an
20    off-the-cuff number; but yes, ma'am, that's what he told me.
21    **Q.**   Now, at this point no payments had been made to
22    Eaux Holdings, correct?
23    **A.**   That's correct.
24    **Q.**   The first payment -- while we're looking at
25    Exhibit 27, tell me who Jennifer Vick is.

1      **A.**    That is my manager at the time that I was working

2   on this claim.

3      **Q.**    So on Page 11 of the claims log we have an entry by

4   Jennifer Vick, who was your supervisor at the time, on 9/22

5   of '20 and she is approving an advance of $250,000 based on

6   mitigation roof wrap costs and temporary repairs to building?

7      **A.**    That's what it says.

8      **Q.**    Add to this timeline 9/22/20.  This one's a

9   payment, 250-K, mitigation.

10     **A.**    No, that's not just for mitigation.  That's an

11  advance toward the overall amount we owe on the claim.

12     **Q.**    Okay.  Look at what your boss said.  She said

13  advance of 250,000 based on mitigation roof wrap costs and

14  temporary repairs to building.

15     **A.**    Based on the documentation that we had at that

16  time, we felt comfortable advancing at least $250,000 toward

17  the ultimate settlement of the claim.

18     **Q.**    Okay.  Let's talk about the document you had at

19  that time.  I'm going to offer exhibit -- no, I'm not.  I've

20  already offered it.  I'm going to show you Page 10.  So

21  Jennifer Vick's entry references an advance for mitigation

22  and that's based on what we see at Page 10 of your claims

23  log, Page 10 of Exhibit 27.  You had an invoice at that time

24  for mitigation of over $490,000 just in mitigation, correct?

25     **A.**    That's correct.

1      **Q.**   And that was in addition to more than 50,000 in

2   temporary roof repairs, correct?

3      **A.**   That's correct.

4      **Q.**   Okay.  And based on those invoices that you had for

5   costs that had already been incurred on that date, Jennifer

6   Vick approved a $250,000 advance?

7      **A.**   No.  The advance is not based on we got bills,

8   we're going to pay them.  The advance is based on, okay,

9   well, look at the information we have, we feel comfortable

10  issuing a payment of 250,000 right now while we sort the rest

11  of it out.

12     **Q.**   Mr. Lock, the advance was based on mitigation roof

13  wrap costs and temporary repairs.  That's what your boss

14  said.

15     **A.**   Yeah, but I'm -- I work with her every day.  I know

16  when I send an authority request to my manager, you know,

17  it's not based on a specific amount.  If it was based on

18  mitigation it would be for the amount -- a very specific

19  amount that we thought we owed specifically for mitigation.

20  It's a nice round number because it's an advance towards the

21  ultimate settlement of the claim.

22     **Q.**   Is your boss putting inaccurate information in the

23  claims file?

24     **A.**   No.  I think you're interpreting it differently

25  than the way she meant it.  I worked with her for five years.

1    I know how she meant it.

2        Q.   I wasn't interpreting it.  Did I read it correctly?

3    Did I read the words that she --

4        A.   You read the words, yes, ma'am.

5        Q.   Okay.

6        A.   This is a note-taking system where people use

7    shorthand --

8        Q.   I understand.

9        A.   -- in a note.

10       Q.   Now I want to ask you:  What is a reserve?

11       A.   A reserve is -- a reserve is essentially when the

12   insurance company takes into account of what they think a

13   claim may cost so that they can use that essentially as an

14   accounting function.  You know, when a claim is opened, as

15   early as possible in a claim we try and get a best guess at

16   what we think the most the claim might cost.  And after we do

17   our best to come up with the most that the claim may cost,

18   then we enter that as what's called a reserve in the system.

19   And how that's used by insurance company is the accounting

20   department can then use that to determine part of their

21   projected profits and losses for a given period of time.

22       Q.   They can use that --

23       A.   It's something that's required of the claims

24   department, but its ultimate purpose is more of an accounting

25   issue.

1    **Q.**   And the company uses that to take -- to show losses

2    for tax purposes, too, don't they?

3    **A.**   I'm not an accountant.

4    **Q.**   Okay.  You said that -- and correct me if I'm

5    wrong.  You said that the reserve is the most that you might

6    ever pay on a claim?

7    **A.**   No.

8    **Q.**   Is that what you said?

9    **A.**   I did say that, yes, ma'am.

10   **Q.**   Okay.  I'm going to offer --

11   **A.**   Because the reason is because I don't want to go

12   back to my manager twice for them to bump it up.  You know,

13   claims handling 101 is that you don't what's called

14   stair-step the reserves.  You don't put them up and then put

15   them up and then put them up.  You put them up to where you

16   think -- you know, the worst case scenario.  The biggest

17   amount that we may have to pay, that's what you try to get

18   them up to.  You know, it's not money out the door.  It's

19   money that the accounting department is trying to figure out

20   that they might be able to consider towards their profit and

21   losses.

22   **Q.**   Why wouldn't you always just set it at the policy

23   limits, then, if it's the most you may ever have to pay?

24   **A.**   Because there are a lot of claims that obviously

25   don't have to be settled for the policy limits.

1    **Q.**   I offer --

2    **A.**   And that would provide a really poor accounting

3    function if you had your accounting department saying that

4    every single claim that we paid was for the policy limits.

5    You'd never know what your actual profits and losses were.

6    **Q.**   So the number is actually not the most you may ever

7    pay, it's what you think you are actually going to pay on the

8    claim?

9    **A.**   It's what we think the most the claim would have to

10   settle for based on what we know at this time.

11   **Q.**   Going to offer --

12   **A.**   And I can go through that if you like.

13   **Q.**   We're about to.

14        MS. BROWN:   I'm going to offer Exhibit 105.

15        MR. WOLFF:   Your Honor, we have to approach.

16                        **BENCH CONFERENCE**

17        MR. WOLFF:   Before we get to that, in light of your

18   ruling, you might as well put that in if you need it,

19   the estimate, because you're going to let it in.

20        THE COURT:   I'm going to let it in with Mr. Major

21   at some point.  I think it's admissible for him.  But I

22   agree with you, it's not technically admissible unless

23   you agree to it.

24        MS. BROWN:   I'm going to do it the technical way,

25   John.

1        MR. WOLFF:  I'm just saying I don't agree with --

2        MS. BROWN:  I don't --

3               (All speaking at once.)

4        MS. BROWN:  I know, but it may not -- I don't want

5    to go back to that right now.

6        MR. WOLFF:  Here's the problem.  So on reserve,

7    this is exactly what we talked about.  This is the

8    *Southwest Louisiana Convention*.  It says reserves are

9    put up based on what the company feels its liability may

10   be.  Right.  And it says very clearly -- the court says

11   the court will sustain a motion to exclude the evidence.

12   The court is aware of the -- (unintelligible) -- the

13   Court feels strongly that it should not be admissible

14   and gives -- (unintelligible) -- to determine the amount

15   of the actual loss meaning more than a plaintiffs' offer

16   to settle a case is significantly less than amount that

17   they take at trial.

18        THE COURT:  I tend to agree with him.

19        MS. BROWN:  That's not my --

20        MR. WYGANT:  Can I say something real quick?

21        THE COURT:  Sure.

22        MR. WYGANT:  I didn't get a chance to -- I got

23   locked out of the last one.  If you rule -- so first of

24   all, the exact language of it right here says that the

25   reserves are not admissible, need to determine the

1     amount of actual loss.  Right.  So that's what we're

2     talking about first meaning had, like, not for the

3     amount of the actual loss, not for a disputed amount.

4         Now, she's about to point out something and I'm

5     grateful she did because here this same decision has a

6     discussion of the *First National Bank of Louisiana -- or

7     Louisville.*  And in this decision the Court is quoting

8     what one of the parties is saying in saying that the

9     reserves is relevant to state of mind in relation to

10    claims settlement practices, right, to state of mind for

11    claims settlement practices, not the amount of loss.

12    What the exact actual ruling of this one was that it's

13    not relevant for amount of loss.  If you go and read

14    this case, the *First National Bank of Louisville,* I can

15    pull it up --

16        THE COURT:  I'm not going to read it on your phone

17    so don't even --

18        MR. WYGANT:  What it says is that it is relevant to

19    state of mind.

20        THE COURT:  Well --

21        MR. WYGANT:  -- like six cases and I can give you

22    20 more right now.

23        THE COURT:  I don't need 20 cases.  Here's the

24    deal.  She's been questioning him about it, how they did

25    it.  I think that's all very appropriate.  You asked him

1   what the reserves were, didn't you?

2        MS. BROWN:  Not yet.  I didn't because of your

3   ruling.

4        THE COURT:  No, I agree.  I think you can talk

5   about -- again, the reserves are an accounting function.

6   They have nothing to really do with --

7        MS. BROWN:  Their handbook says that they're

8   supposed to calculate it to be the ultimate probable

9   outcome.  He has it.  He's defining it as the most we

10  may ever pay.  That's not right.

11       MS. WOLF:  It's not relevant to --

12       THE COURT:  Well, it's still.

13       MS. BROWN:  It's relevant to what he calculated the

14  ultimate probable loss to be way back in October.

15       MS. WOLF:  They're again trying to tie it back --

16       THE COURT:  Here's my problem with all this.  Why

17  don't you just look at the adjustment they did on this

18  claim and say they under adjusted it?  Why do you keep

19  going to the reserves?  The reserves are something that

20  he goes and reports to his accounting department.

21       MS. BROWN:  Because for my bad faith claim I've got

22  to prove all the points in time where they knew it was a

23  policy limits case.

24            (All speaking at once.)

25       THE COURT:  Why don't you go to the --

1          MS. BROWN:  It's highlighted.

2          THE COURT:  Why don't you just go to the adjustment

3     of the claim that he used to set the reserves at?  I

4     mean, he had to have something to set the reserves.

5          MS. BROWN:  I'm going to go there, too.  I mean, to

6     me the bad faith is because they were many points in

7     time where they knew this was a policy limits case.

8          THE COURT:  Seems to me you have an adjuster who

9     submits something to this guy, he calls his department

10    says here's what we set the reserves at.  I guess I'm

11    not really following why you need to get into reserves

12    when you can go and say, hey, he had this adjustment --

13         MS. BROWN:  Because they set the reserves and then

14    didn't make any payment anywhere near that.

15         THE COURT:  They don't make the payments based on

16    the reserves.  I think that's the problem.  The reserves

17    are not there for them to be utilizing to make the

18    determination we got to make a payment.  The reserves

19    are there for them to be sure they have enough money set

20    aside down the road --

21         MS. BROWN:  Their definition says it's the most

22    likely exposure, not the highest exposure.

23         THE COURT:  You can ask him that, but I'm not going

24    to let you get into all this reserve stuff.  I just

25    think it's not -- because you're quoting the reserves

1    that they knew -- based on the reserves they said they

2    owed that much money, and that's not actually accurate.

3    I know you want it to be accurate, but that's really not

4    what the reserves are about.  It's an accounting

5    function.  That's why the cases all consistently don't

6    let you --

7         MR. COX:  Can we hear their definition of the

8    reserves, please.

9         THE COURT:  I don't know --

10              (All speaking at once.)

11        MR. COX:  He obviously did.  Where is the

12   definition?  Is this the definition?

13        MS. BROWN:  Yes.

14        THE COURT:  Reserves on an individual claim should

15   be set at the ultimate probable loss cost to ensure that

16   the individual reserve is adequate to pay the loss.  I

17   think that's what he said.  He didn't say it like this,

18   but that's to me what he said.  UPLC is an assessment of

19   the most likely exposure on a file based on the facts of

20   the particular claim.

21        MS. BROWN:  That's not what he said.  He said it's

22   the most we may ever have to pay.

23        THE COURT:  Why don't you ask him this?  I mean,

24   you can ask him that.  Here's the bottom line.

25        MS. BROWN:  -- don't know what he did with it.

1          THE COURT:  You can ask him -- again, the reserves

2     are not what the claim is based on.  The claim is based

3     on the adjusting estimate.

4          MS. BROWN:  I do understand that.

5          MR. COX:  Maybe, Judge, at the end of the day --

6          MS. BROWN:  Can we proffer?

7          MR. COX:  -- when the jury's gone we can proffer

8     it.

9          MR. WOLFF:  It gets to 403.  That's the problem.

10    And that's what the *Shelter* case is talking about where

11    it says the Court finds it would be overly prejudicial

12    and confusing --

13         THE COURT:  Reserves are just so different than

14    what this claim is about.  I mean, there's no -- it

15    takes some information from adjusters and then it just

16    kind of gives you a ballpark.  It's a ballpark.

17                    (All speaking at once.)

18         MR. WYGANT:  So it is true a reserve is not equated

19    with an undisputed amount.  Go down to the rest of this

20    paragraph.  However, with respect to allegation, the

21    amount of reserves might affect bonuses, employees --

22                    (All speaking at once.)

23         THE COURT:  Not getting into that.  I'm done.  I

24    ruled.

25                    **PROCEEDINGS CONTINUED**

```
 1            THE COURT:  Mr. Wolff, she was offering Exhibit 27,
 2       the claims log.  Any objection?
 3            MR. WOLFF:  No, we do not object to Exhibit 27.
 4            THE COURT:  It'll be admitted.  Sorry about that,
 5       ladies and gentlemen.  I apologize for the sidebars, but
 6       occasionally we have to have a few discussions.  I do
 7       apologize that it delays us, but it's necessary
 8       unfortunately.  You know lawyers.  They like to talk.
 9            Okay.  Ms. Brown, go right ahead.
10            MS. BROWN:  Did I get Exhibit 27 admitted?
11            THE COURT:  27's in.
12            MS. BROWN:  Okay.  Thank you.
13  BY MS. BROWN:
14       Q.   I want to move on now, Mr. Lock, to what has
15  actually been spent to repair this building and the invoices
16  that were submitted to you.
17            MS. BROWN:  I'm going to offer Exhibits 30 to 32.
18            MR. WOLFF:  No objection, Your Honor.
19            THE COURT:  It'll be admitted.
20  BY MS. BROWN:
21       Q.   I'm going to show you a series of estimates from
22  Crest Exteriors that were submitted to you along with the
23  Skyline estimate back in September.  Do you recall these?
24       A.   Yes, ma'am.
25       Q.   Okay.  And I think Exhibit 31 actually shows the
```

1    entirety of the -- and Scottsdale had this information in

2    September, correct, from Crest?

3        A.   I think that's when we received it.  It would have

4    been received, I think, whenever we finally received the

5    digital versions of whatever they supplied the independent

6    adjuster.

7             MS. BROWN:  Next I'm going to offer Exhibit 26.

8             MR. WOLFF:  No objection, Your Honor.

9             THE COURT:  It'll be admitted.

10   BY MS. BROWN:

11       Q.   Before I do that, before I go to 26, I just want to

12   make it easy.  I'm going to have you watch with me and add

13   these up.  So there was a $45,000 charge.  There was a

14   payment for 22,500 and then a $6,000 change order.  And that

15   was on Crest --

16       A.   I know that 6,000 plus 22.5 is 28.5, if that's what

17   you're --

18       Q.   Right.  Gotcha.  So that is -- this was for shrink

19   wrapping the roof, which you understood that to be temporary

20   roof repairs?

21       A.   Yes, ma'am.

22       Q.   Okay.  Next I've got a bill from Capstone.  This

23   was also provided to you back in September with the Skyline

24   estimate; is that right?  This is the environmental

25   inspection.

1      A.    I don't remember if this was part of that package.
2   Something tells me that I got this later; but it may have
3   been a report that I got later, not necessarily this invoice.
4   We can check to see what was included in that packet, that
5   digital package from them.
6      Q.    Okay.  You don't have a dispute that you received
7   this invoice from Capstone?
8      A.    I don't dispute that, no.
9      Q.    Okay.
10      A.    It was invoiced on the 28th of September, though.
11   So if it was -- if it was sent to us in that first digital
12   bundle of, you know, documents, then the timeline doesn't
13   sound right.  I think it would have had to have been
14   created -- I think we received the photos and the estimates
15   from the public adjuster before the 28th.
16      Q.    Okay.
17      A.    I mean, it didn't take them 13 days to convert them
18   back into digital and send to us, right?
19      Q.    Okay.  The total on this bill is $17,287.50,
20   correct?
21      A.    That's what it says, yes, ma'am.
22      Q.    Okay.  Let me go back to Crest now that I've got
23   the other paper I was looking for.  I want to make sure we
24   get our totals so we can add them all up at the end.  So the
25   total for Crest was the 45,000 plus the $6,000 change order

1   plus we looked at the first $2,000 estimate from Crest.  Here
2   we go.  So the total for Crest was 53,000, correct?
3        A.   Yes.
4        Q.   Okay.  Want to make sure.  So far these are the
5   costs that we actually have.
6             MS. BROWN:  Next I'm going to offer Exhibit 23.
7             MR. WOLFF:  No objection.
8             THE COURT:  It'll be admitted.
9   BY MS. BROWN:
10       Q.   Exhibit 23 is a remediation -- is a bill from the
11  remediation company, All Clear?
12       A.   Yes, it is.
13       Q.   And the total on this bill, $491,141.79?
14       A.   Yes.
15       Q.   Okay.  And Scottsdale also had this invoice in
16  September of 2020, correct?
17       A.   I believe so, yes.
18       Q.   Now, to be fair, you heard in the opening, there
19  was a discussion about Mr. Odom entering into sort of a
20  settlement agreement with All Clear?
21       A.   Yes.
22       Q.   Okay.  And so what he's paid All Clear at this
23  point is actually this $330,000 figure; you understand that?
24       A.   Yes, ma'am.
25            MS. BROWN:  I offer Exhibit 62.

```
1              MR. WOLFF:  Only to the extent that it's an
2         estimate and not actual cost, no objection.
3              THE COURT:  Okay.  So admitted.
4              MS. BROWN:  I don't understand the objection.
5              THE COURT:  Said he's agreeing to let you admit it
6         on the premise that it's an estimate; is that correct?
7              MR. WOLFF:  Yes, Your Honor.
8              MS. BROWN:  62?
9              MS. WOLF:  It's okay.
10             MR. WOLFF:  Yeah, she says it's okay.
11             THE COURT:  I understand.  That's fine.  It'll be
12        admitted, then, without any limitation.
13   BY MS. BROWN:
14        Q.   Okay.  This is an invoice for $9,560 for electric
15   work?
16        A.   Yes.  It's dated October 13th, 2020.
17        Q.   Okay.  That's something that was also in your
18   Scottsdale file, correct?
19        A.   Yes.
20             MS. BROWN:  Okay.  Next I'm going to offer
21        Exhibit 65.
22             MS. WOLF:  No objection.
23             THE COURT:  It'll be admitted.
24   BY MS. BROWN:
25        Q.   The next bill I'm going to show you is for
```

1   insulation work.  Now, this bill is for 36,000.  You recall

2   earlier when you were explaining the way the policy limits

3   worked and we talked about that $10,000 code upgrade?

4        A.   Yes, ma'am.

5        Q.   So the insurance policy allowed for some code

6   upgrades up to $10,000?

7        A.   Yes.

8        Q.   Okay.  And so this is where Mr. Odom, on behalf of

9   Eaux Holdings, decided to use that $10,000.  So all that he

10  has sought from Scottsdale on this bill is $10,000.

11       A.   Yes.

12       Q.   Do you understand that?

13       A.   Yeah.  That coverage, to be clear, that pays the

14  difference between what it cost to put it back the way it was

15  and the additional cost above and beyond that to bring it up

16  to the minimum code requirement.

17       Q.   Okay.  So for purposes of this insulation bill --

18       A.   So if this entire bill is for $36,000, for example,

19  and the normal cost to put it back the way it was was

20  $30,000, then the additional amount owed would have been the

21  six.

22       Q.   Okay.  So for purposes of this on chart, I've put

23  the $10,000.  That's the limit on the code upgrade.

24       A.   It is.  That is the code upgrade limit, yes, ma'am.

25            MS. BROWN:  Next I'm going to offer -- hold on.

1        I'm going to offer Exhibit 112.  I'm also going to

2        offer -- hang on.  I'm going to offer 96 and 112.

3           MS. WOLF:  So for Exhibit 96 we have no objection.

4        And Exhibit 112, which is the new one, Your Honor, we

5        raised an objection because it was late.  We understand

6        the judge's ruling on that, that you're going to allow

7        it in; but we want to note the objection for the record.

8           THE COURT:  It'll be admitted.

9    BY MS. BROWN:

10       Q.   So I'm going to start with Exhibit 96, and Page 3

11   of Exhibit 96 is from Poole Roofing.  And we're going to hear

12   from Mr. Poole tomorrow, but this was the estimate for the

13   roof work at 620 Esplanade.  You've seen this document

14   before?

15       A.   I'm not sure if I have.

16       Q.   Okay.

17       A.   When was it received?  When was it sent to us?

18       Q.   Well, I can tell you the estimate was dated October

19   of 2020, broken up into phases.  And the total estimate at

20   that time was $289,545.

21       A.   I see it.

22       Q.   Now I'm going to show you -- Exhibit 112 is dated

23   March 3rd.  This is a brand-new final bill for the roofing,

24   and you see that the total here is a little less than what

25   was originally turned in.  Okay.  You see the total here is

1    less?

2        A.    Yeah, this is less than the other page that you

3    showed me.

4        Q.    And the total for the roof work, $276,887, you see

5    that?

6        A.    Yes, that's what it says.

7        Q.    I'll add that to the list.

8              MS. BROWN:  Next I'm going to offer Exhibit 51.

9              MS. WOLF:  No objection, Your Honor.

10             THE COURT:  I'm sorry, Ms. Wolf.  What'd you say?

11             MS. WOLF:  I said no objection.  I just want to

12       make sure, Somer, that what you're including as

13       attachments to it is about ten pages.

14             THE COURT:  Did you hear?

15             MS. BROWN:  I have an eight-page document as

16       Exhibit 51.

17             MS. WOLF:  I'm sorry.  Did you tell me how many

18       pages it is?

19             MS. BROWN:  Eight.

20             MS. WOLF:  Eight pages.  Okay.  Your Honor, the

21       only objection there is to the extent that it used to

22       show an actual cost; but yes, as far as it's the Encore

23       contract, no objection.

24             THE COURT:  It's admitted.

25    BY MS. BROWN:

 1       **Q.**   Exhibit 51 is the contract that Mr. Odom signed
 2   with Encore Construction for the bulk of the work at 620
 3   Esplanade, and this was provided to Scottsdale as well?
 4       **A.**   I don't recall seeing this document before.  When
 5   was it received?  You know when it was sent to us?
 6       **Q.**   I don't.
 7       **A.**   I can tell you if I --
 8       **Q.**   It was signed December 20th.
 9       **A.**   I wasn't assigned to the claim on December 20th.
10       **Q.**   Well, since the document has been admitted, I'll go
11   ahead and ask you about it.  You see the total sum here,
12   though, is 1.36 million?
13       **A.**   That's what it says.
14       **Q.**   And let me, before I -- I'm going to show you the
15   number that I've put here for Encore and it's less than 1.36.
16   I want to ask you about a replacement cost policy.
17   Replacement cost policy pays for what the insured actually
18   spent or incurred to repair the property, correct?
19       **A.**   The actual amount incurred, yeah.  Yes, ma'am.
20       **Q.**   The actual amount incurred.  And, well, for one
21   thing, the policy doesn't require him to pay out of pocket.
22   You used the word incurred and that's the right word.  It
23   doesn't require him to pay out of pocket and then go get
24   reimbursed.  If he's done the work and incurred the debt,
25   that's sufficient to get him reimbursed?

1    A.   Yeah.  If they incurred the debt, you know, if they

2    owe it, like charged on a credit card or took out a loan,

3    it's legally, I guess, owed, I would consider that to be

4    incurred.

5    Q.   Okay.  And if while Mr. Odom had his building

6    gutted down to the studs and had crews there he decided, for

7    instance, to replace the HVAC system because it was old and

8    he had the building in that condition, that wouldn't be

9    appropriate for him to submit as part of his insurance claim,

10   agreed?

11   A.   Correct.

12   Q.   So if there was something in the Encore contract

13   that wasn't hurricane related and he backed that number out,

14   that would be appropriate?

15   A.   Yeah, it would be appropriate to not include things

16   that weren't part of the hurricane damage.

17   Q.   So I'm representing to you that's why this number

18   is not 1.36, it's 1.33.

19   A.   Okay.

20   Q.   And that would be the appropriate way for Mr. Odom,

21   on behalf of Eaux Holdings, to be reimbursed only for those

22   things that were hurricane related?

23   A.   Well, I feel like you're asking me -- I've never

24   seen or reviewed that estimate at all.  But general practice,

25   we would not pay them for damage that's not related to the

1    hurricane.  That's correct.

2        Q.   And there's nothing wrong with him getting the work

3    done at the same time?

4        A.   Absolutely not.

5        Q.   Okay.

6        A.   It's a good idea to get those things done while

7    everything's apart if you can.

8        Q.   Okay.  All right.  We're rounding this out finally.

9    The last one I have.

10            MS. BROWN:  I'm going to offer Exhibit 61.

11            MS. WOLF:  No objection.

12            THE COURT:  It'll be admitted.

13   BY MS. BROWN:

14        Q.   And this is a bill from Industrial Refrigeration

15   for $1,280.  You see this?

16        A.   I see it.  Yes, it is.

17        Q.   And so I've added that to what the repairs actually

18   cost.  So what I'd like to do -- I've added it up, but I want

19   us to do it together because I want to make sure we agree on

20   the math.

21            MR. WOLFF:  We don't.

22            THE COURT:  What's your objection?

23            MR. WOLFF:  This witness cannot testify as to what

24        it actually cost.  She's representing that's what it

25        cost.  These are numbers.  I'm sure they add up to that

1      amount.  But the challenge is whether or not they

2      incurred those actual costs.  This witness can't testify

3      to that.

4          THE COURT:  I don't think that's what she's asking.

5      She's just going to ask him if they agree on what this

6      adds up to be.

7          MR. WOLFF:  I'll stipulate that her math is good.

8          THE COURT:  Perfect.

9          MR. WOLFF:  I don't stipulate that that's what

10     actually --

11         THE COURT:  I didn't really want to see her tap on

12     the calculator.

13         MS. BROWN:  So I can just reveal the number to you.

14         THE COURT:  So we agree -- you agree to -- that

15     those numbers add up to that amount.

16         MR. WOLFF:  That the numbers she put on that chart

17     equal that amount, yes, Your Honor.

18  BY MS. BROWN:

19     Q.   Okay.  And this number, Mr. Lock, $2,033,893.50, is

20  very close to the policy limits.  It's actually over the

21  policy limits.  It's very close to the policy limits plus the

22  additional coverages available?

23     A.   Well, it included one additional coverage that's on

24  here and the debris removal, assuming that was included in

25  the All Clear.

```
 1        Q.   Okay.  So it's very close to the most that
 2   Scottsdale would ever pay under the policy?
 3        A.   Yes, ma'am.
 4        Q.   Are you familiar with Granger Stuck's work in this
 5   case?
 6        A.   I'm not.
 7        Q.   I'll save those questions for him.  And you are
 8   aware that Scottsdale has now paid almost $1.8 million on
 9   this claim?
10        A.   I'm not aware of what payments were made after mid
11   December 2020 because I was no longer assigned to the claim.
12        Q.   Okay.  Let's look at the payments.
13             MS. BROWN:  I'm going to offer Exhibit 103.
14             MS. WOLF:  No objection.  Ms. Brown, if you're
15        going to do all of the Scottsdale checks, I think we're
16        probably going to have no objection to that.  You want
17        to tell me what the exhibits numbers are?
18             MS. BROWN:  Yes.  That'd be great.  103, 68, 63 --
19             MS. WOLF:  Just a little bit slower.  68, 63.
20             MS. BROWN:  -- 64 and 66.
21             MS. WOLF:  No objection to any of the --
22             THE COURT:  They'll be admitted.
23             MR. WOLFF:  And if there's a summary chart, you're
24        welcome to show that.
25             MS. BROWN:  Okay.  I'll do it.
```

1          MR. WOLFF:  Save some time.

2     BY MS. BROWN:

3          Q.   And so, Mr. Lock, looking at this and having just

4     understood that we've admitted all the checks that support

5     these payments, you would agree that Scottsdale, as of today,

6     has paid Eaux Holdings $1,796,090.51?

7          A.   Yes, ma'am.

8          Q.   That number is less than the number that we just

9     looked at?

10         A.   Yes, it is.

11         Q.   Let's switch gears, shall we, and talk about --

12         THE COURT:  Let me ask you something, Ms. Brown.

13     How much longer do you think you have with this witness?

14         MS. BROWN:  A little while.

15         THE COURT:  Okay.  We're pushing the 4:30, 5:00

16     hour.  It's been a long day for our jurors, being the

17     first day.  I would probably prefer if we stop here, let

18     our jurors go home.  They didn't know they were getting

19     picked.  I'm sure they have some logistical things they

20     probably need to take care of so I want to definitely

21     give them that opportunity.

22         We do thank you all very much.  We're going to call

23     it for today.  We'll pick up in the morning.  I'm going

24     to let the jury go out and then they'll show you how to

25     get out of the building, let you go home.  We'll be back

1     at 9:00 a.m. tomorrow.  All rise for the jury.

2              (Jury exits courtroom.)

3          THE COURT:  Anything else, housekeeping before we

4     adjourn for the day?

5          MR. COX:  No, sir.

6          MR. WOLFF:  No.  I think we actually got a lot of

7     ground covered.

8          THE COURT:  Okay.  Very good, then.  We had a big

9     audience today, didn't we.

10         MS. BROWN:  Half the southwest Louisiana bar

11     association.

12         THE COURT:  Should have had the bench bar

13     conference, I guess, while we were here.  Very good,

14     then.  We'll see y'all in the morning at 9:00 o'clock.

15              (Proceedings recessed for the day.)

16

17

18

19                  * * * * * * *

20

21

22

23

24

25

1

                       **CERTIFICATE**

2

3     I hereby certify this 16th day of May, 2022 that the

4 foregoing is, to the best of my ability and understanding, a

5 true and correct transcript of the proceedings in the

6 above-entitled matter.

7

8                             _Deidre D. Juranka_

9                             Deidre D. Juranka, CRR
                            Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana