```
                 IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF LOUISIANA
                       LAKE CHARLES DIVISION


EAUX HOLDINGS, LLC                *   Docket No. 2:20-cv-1582
                                  *
                                  *
VERSUS                            *   March 8, 2022
                                  *
                                  *
SCOTTSDALE INSURANCE CO.          *   Lafayette, Louisiana

*****************************************************************

            OFFICIAL TRANSCRIPT OF JURY TRIAL DAY 2 OF 4
             BEFORE THE HONORABLE JAMES D. CAIN, JR.,
                   UNITED STATES DISTRICT JUDGE

*****************************************************************

                       A P P E A R A N C E S


FOR THE PLAINTIFF:    SOMER GEORGE BROWN
                      MICHAEL K. COX
                      Cox, Cox, Filo, Camel & Wilson
                      723 Broad Street
                      Lake Charles, Louisiana 70601


FOR THE DEFENDANT:    JOHN POWERS WOLFF, II
                      MARY ANNE WOLF
                      CHELSEA ACOSTA PAYNE
                      FABIAN EDWARDS
                      Keogh, Cox & Wilson
                      P.O. Box 1151
                      Baton Rouge, LA 70821



REPORTED BY:          DEIDRE D. JURANKA, CRR
                      USDC - Western District of LA
                      P.O. Box 13271
                      Lake Charles, LA 70612
```

**I N D E X**

**PAGE**

COURT PROCEEDINGS............................... 117

ADAM LOCK

    PROFFER EXAMINATION BY MS. BROWN............. 128

    DIRECT EXAMINATION BY MS. BROWN.............. 133

    CROSS-EXAMINATION BY MR. WOLFF............... 159

    REDIRECT EXAMINATION BY MS. BROWN........... 192

RICHARD POOLE

    DIRECT EXAMINATION BY MR. COX................ 203

    CROSS-EXAMINATION BY MS. WOLF................ 208

    REDIRECT EXAMINATION BY MR. COX.............. 215

JEFFREY MAJOR

    DIRECT EXAMINATION BY MS. BROWN.............. 216

    TRAVERSAL EXAMINATION BY MR. WOLFF........... 232

    DIRECT EXAMINATION BY MS. BROWN.............. 235

    CROSS-EXAMINATION BY MR. WOLFF............... 277

    REDIRECT EXAMINATION BY MS. BROWN........... 302

**COURT PROCEEDINGS**

1
2          THE COURT:  Anything come before the Court before I
3    bring the jury in?  Are our jurors here?  We had one
4    running a little bit late.  She's here.  Okay.  If
5    there's nothing else --
6          MS. BROWN:  Your Honor, plaintiffs have a couple
7    items.
8          THE COURT:  Sure.
9          MS. BROWN:  We sent an e-mail this morning.
10         THE COURT:  Right.  I probably didn't read it.
11         MS. BROWN:  Probably not.  I would like to revisit,
12   while we still have this witness, the admissibility of
13   the reserves.  As a preliminary matter, the motion in
14   limine on that issue was filed six months after the
15   deadline.  When we reset this trial from November we
16   were expressly told the deadlines were not going to be
17   extended.  I understand you still have to rule on the
18   admissibility regardless of whether it's by motion or
19   objection, but we did not have a full opportunity to
20   respond and do the research on the motion that was
21   presented essentially the night before trial, the last
22   business day before trial.  We've now done that
23   research, provided it to the Court and opposing counsel
24   by e-mail.  I think that the reserve information is --
25   the one case that is cited in the motion in limine

1    excluded the reserve information because it was being

2    used to show the amount in dispute.  I believe the

3    proper admissibility is with a limiting instruction that

4    it is not being offered.  It's not even being offered

5    for that purpose.  It's being offered solely for the

6    purpose of showing motive, showing timing.  And those

7    things the Eastern District Court has found admissible.

8    Now, the Fifth Circuit has not ruled on this issue; but

9    the one federal court to address the issue of allowing

10   admissibility for that limited purposes allowed it in.

11       THE COURT:  I'm not -- you know, listen, as I told

12   you, I'm not worried about -- I am a stickler for the

13   deadlines, but I would have probably deferred it to the

14   merits anyway because one of the things, as y'all are

15   learning from -- with me, I'm not a big proponent of,

16   like, omnibus motions in limine and all this stuff

17   because a lot of this stuff I can't rule on.  I don't

18   want to make a blanket ruling early on because I don't

19   know how you're going to present your case.  I don't

20   know if you're going to lay the proper foundation.  So

21   trial's a fluid thing.

22       On this particular issue, did you get the e-mail,

23   Toni?  I didn't see an e-mail this morning.

24       MR. COX:  E-mailed it about ten minutes ago.  It

25   was Toni's e-mail but apparently --

1    THE COURT:  Here's the thing.  Here's the thing.  I

2    mean, to me the reserve information, I just don't -- I'm

3    still leaning that that's not relevant or admissible for

4    the purposes you want to offer it for because reserves

5    are set for accounting purposes.  It's not really, to

6    me, a function of the claims process as much as it is a

7    company trying to do its bookkeeping.  I know why you

8    want to use it.  You want to look at, "Hey, you put the

9    reserves here.  You only paid us this much.  You knew

10   back here it was this."

11        MS. BROWN:  And he ultimately paid very close to

12   that.

13        MR. COX:  And there's more, Judge.  All we want you

14   to do is read our brief.  They filed a brief six months

15   too late.  We just want you to read our brief.

16        THE COURT:  I think the genesis of their brief was

17   your demonstrative exhibit which I asked y'all a couple

18   weeks ago to exchange so y'all could -- because I didn't

19   want us to be stopping in the middle of opening

20   statements.  Go ahead.

21        MS. BROWN:  To be fair --

22        MR. COX:  -- before the last trial, Judge.  They

23   had it before November.

24        THE COURT:  Look, let's be practical here.  Once

25   the trial was kind of -- I mean, you know, I don't know.

```
1      Let me -- I'll look at it but, I mean, I'm not inclined
2      to change my position on this.  But I'm not going to sit
3      here -- do you have the brief, Toni?
4           MR. COX:  Can you give us your e-mail again?  They
5      gave us your e-mail.  Must be the wrong one.
6           THE COURT:  The only reason I'm even going to look
7      at your brief is because I looked at theirs.  Out of
8      fairness --
9           MR. COX:  That's all we want.
10          THE COURT:  -- out of fairness, I'll look at it.
11     But I'm still in my mind and the practicality of things
12     is that the reserve information -- I think it can be
13     very confusing to a jury to distinguish between a
14     reserve and estimate of the adjuster, because you're
15     trying to blur the lines on what a reserve is, in my
16     view, and what an estimate is.  And I think what you're
17     better off doing is looking at their adjuster's
18     adjustment at the beginning of this incident and then go
19     from there on the payments, not look at when they set
20     the reserves.  Some guy that we don't even know set the
21     reserve.  I guess the witness gave some information to
22     somebody else up the chain of command and he sets the
23     reserve.  I don't know.
24          MR. COX:  Adam Lock recommended the reserve.
25          THE COURT:  I know he recommended it, but doesn't
```

1    mean they always accept his recommendation.  Look, I'm
2    sure there's been a lot of recommendations in these
3    claims by insurance companies that somebody higher up
4    said we're not paying that.
5         MS. BROWN:  Well, they did accept it.  But even if
6    I'm allowed to ask him what he recommended for the
7    reserve and why.
8         THE COURT:  You find the brief?
9         MS. PETROFES:  Still hadn't come through.
10        MR. WYGANT:  I'm trying to send it again, Judge.
11        THE COURT:  Let me ask you this, Ms. Brown.  For
12   what purpose are you trying -- what is the relevance and
13   what is the purpose of putting the company's reserves on
14   this file into evidence?
15        MS. BROWN:  Well, part -- in part, I have to prove
16   that they were arbitrary, capricious, and without
17   probable cause.
18        THE COURT:  What's the reserve got to do with that?
19        MS. BROWN:  That means that I've got to show all
20   the information they knew and what action they took
21   despite knowing it based on the information that Adam
22   Lock had at a point in time.  And he can say otherwise
23   if that's the case; but I have his recommendation, the
24   information that he had at a certain point in time.
25        THE COURT:  Exactly.  That's the information, in my

1    view, you should put in evidence, the information he had

2    to recommend the reserve, not what the reserve was.

3    That's what I keep going back to.  You need to go and

4    say what did you have at this point in time in this

5    claim that you utilized -- I'd let you ask this -- that

6    you utilized in recommending a reserve.  But to put the

7    amount of the reserve in, to me, is very misleading.

8    You disagree.  I understand.  But I think then you're

9    blurring the lines between reserve and what they

10   establish the estimate to be.  Why don't you just ask

11   him for the information that he used to get the -- send

12   up the chain.

13        MS. BROWN:  Well, that's where it goes to -- it's

14   not just that he had the information.  He's admitted he

15   had the information.  But he acted on it which makes it

16   satisfactory proof of something.  I mean, these are the

17   arguments that, of course, the jury is going to decide.

18        THE COURT:  Personally -- you know, look, I'm not

19   trying the case.  You see that four volumes you got

20   sitting on that podium?  That's pretty dadgum convincing

21   to me that you had a lot of information you provided

22   them on the date you gave that to the company.  He had

23   that much information to deal with.  I don't really

24   still see where the reserve -- I think it's going to

25   confuse the jury.  I think -- personally, I think

1    legally reading the stuff, I think it's misleading and

2    it's confusing, where what we're really working on,

3    satisfactory proof of loss, is based on did you provide

4    them information that they could act on in adjusting the

5    claim or making a payment on the claim.  The reserves

6    have nothing to do with that.  That's an internal

7    accounting mechanism for the company.  That's the way I

8    see it.  That's the way the cases see it.  I think

9    that's the way -- I don't think this issue has ever gone

10   to the Fifth Circuit.

11        MS. BROWN:  It has not.

12        THE COURT:  And I don't want -- it may go up there.

13   And if I'm wrong, God bless them, I will do what the

14   Fifth Circuit says; but, you know, right now I don't see

15   it.

16        Did you find the brief?  I'll look at it real

17   quick.

18        MR. COX:  Thank you.

19        MS. BROWN:  And the other thing that is not related

20   to the reserve, while we're waiting, in candor to the

21   Court, based on some discussions yesterday, I didn't

22   expect the Court to look at the four volumes but I did

23   check to make sure.  There is nothing in there that

24   references proof of loss or satisfactory proof of loss.

25        THE COURT:  I doubted there was, to be quite honest

1    with you.  Yes, Mr. Wolff.

2         MR. WOLFF:  We agreed after your ruling that we're

3    not objecting to all --

4         THE COURT:  You-all even offered to let her put it

5    in while he was on the stand yesterday.

6         MR. WOLFF:  Right.  Just so we don't have to step

7    up again, if they offer it, we do object to it for

8    anything other than it being an estimate, not as proof

9    of loss or --

10        THE COURT:  Well, the jury is going to be the ones

11   to decide whether that is satisfactory proof of loss.

12   That's a legal question that I will instruct the jury

13   on, and they're going to decide whether when that was

14   submitted to them did the company have satisfactory

15   proof of loss.

16        MR. WOLFF:  Right, and I think that you ruled in

17   motions in limine that the admissibility of that would

18   be determined upon objection at trial because, as you

19   will see, Mr. Major and Mr. Lock will both agree that

20   that number in there has nothing to do with what

21   happened.  It's not a relevant number.  So we are

22   objecting to it.

23        THE COURT:  I don't know how it's not a relevant

24   number.  I mean, they gave it to the company to act

25   upon, to inform them of the claim and the scope of the

```
 1        claim --
 2             MR. WOLFF:  I understand.
 3             THE COURT:  -- so it is relevant.
 4             MR. WOLFF:  I just want to put in this objection,
 5        if we could note that for the record.  I understand your
 6        ruling.  Because I don't want to get up and waste your
 7        time.
 8             THE COURT:  That's fine.  So your objection for the
 9        record is it's not relevant.
10             MR. WOLFF:  Correct.
11             THE COURT:  Okay.  Overruled.
12             MR. WOLFF:  Thank you.
13             THE COURT:  Give me one moment.  I'm not a speed
14        reader like Toni and them are.  I still am not 100
15        percent convinced.  I don't see that this is the
16        minority opinion.  I see that there's really more of a
17        split about the reserve information.  I'd have to delve
18        into the Eastern District case you cite, the Star
19        Indemnity case, and I don't even know the context of it.
20        But I can tell you the case -- the Shelter case, yeah, I
21        mean, I don't really understand in that case how that's
22        relevant here about bonuses for employees.  To me,
23        that's not relevant here.
24             MR. COX:  Not relevant here.
25             THE COURT:  Just not relevant.
```

1          MR. COX:  Agreed.

2          THE COURT:  Then on your argument that this goes to

3     show when they had notice of the claim, they had notice

4     of the claim before they set the reserves.  They had

5     notice of the claim when you gave them that.  So by

6     showing them the reserve doesn't really give them an

7     accurate date on when they got notice of the claim.

8     That's going to show them when they got notice of the

9     claim, when you submitted satisfactory proof of loss,

10    not them setting the reserves.  I'm sorry.  I don't

11    think this is admissible.  I just don't see the

12    relevance of it.

13         MR. COX:  We respect your ruling.  Thank you, Your

14    Honor.  We do want to proffer.

15         THE COURT:  Okay.  You want to do it now?

16         MR. COX:  Please.

17         THE COURT:  I'm just going to tell you I think this

18    is very limiting, those cases.  I'd have to delve into

19    them.  It'd have to be some unique circumstance because

20    to a great extent I don't even think a lot of this

21    reserve information in a lot of the situations is really

22    even discoverable because it really has no bearing on

23    the actual claim.  I see your point.  I just don't agree

24    with it.

25         MS. BROWN:  We need Mr. Lock.

```
 1          THE COURT:  Come on up, sir.  I'd be more inclined
 2     to buy it if they set the reserves at zero or a hundred
 3     thousand dollars because then that to me would tell me
 4     you gave them all that information and they just ignored
 5     it, which to me then tells me maybe that is relevant.
 6     It's really -- y'all want to put it in.  That to me
 7     would probably be more convincing to me to let you get
 8     into it if they would've set the reserves at a low
 9     amount.  That would've told me they didn't properly
10     adjust the claim, probably.
11          MR. COX:  That's a little bit about what's coming,
12     Your Honor.
13          THE COURT:  Well, they set it --
14          MR. COX:  They recommended it and it did not get
15     set because of some oversight.  That's going to be the
16     testimony, I believe.
17          THE COURT:  How long is this going to take?
18     Because I got a jury in there waiting.
19          MR. COX:  Five minutes.
20          THE COURT:  We'll do it at a break if it was going
21     to take too long.  So this is a proffer?
22          MS. BROWN:  Yes, Your Honor.
23                    ADAM LOCK,
24     after previously being duly cautioned and sworn to tell the
25     truth, the whole truth and nothing but the truth, did testify
```

1    on oath as follows:

2                      **PROFFER EXAMINATION**

3    **BY MS. BROWN:**

4         Q.    Okay.  Mr. Lock, you recall yesterday we were

5    talking about setting reserves?

6         A.    Yes, ma'am.

7         Q.    And you told me that you believed a reserve was the

8    most you would ever pay on a claim?

9         A.    Yeah, it's the most that we think that we could owe

10   on the claim.  Yes, ma'am.

11        Q.    Going to show you what plaintiffs are proffering as

12   Exhibit 105.  You familiar with this document that was

13   produced to us by Scottsdale?

14        A.    I am.

15        Q.    Is this something that you follow in setting

16   reserves?

17        A.    Yes, as a guideline.  Yes, ma'am.

18        Q.    Want to look at the definition that Scottsdale

19   gives to a reserve.  You see I've highlighted it, and what

20   this says is not exactly what you told me.  This says,

21   "Reserves on an individual claim should be set at the

22   ultimate probable loss cost to ensure the individual reserve

23   is adequate to pay the loss."  Goes on to say, "The UPLC,"

24   that's the ultimate probable loss cost, "is an assessment of

25   the most likely exposure on a file based on the facts of the

1    particular claim."  You see that?

2         A.   It does say that, yes, ma'am.

3         Q.   And so at Scottsdale Insurance a reserve is the

4    most likely outcome of the claim, what you believe based on

5    what you know at the time to be the most likely outcome?

6         A.   It depends on other circumstances.  I think on

7    Page 6 it talks about when there's a dispute about the amount

8    of the loss.

9         Q.   Okay.  You also prepared -- to be fair, you do not

10   set the reserves as a desk adjuster?

11        A.   I request authority if it's over my -- so I can set

12   reserves up to a certain amount.  And then if it's over that

13   amount, then it goes to the appropriate level of management

14   for them to approve it.  I technically do key in the numbers

15   into the computer system.

16        Q.   What is the -- what is your threshold of authority

17   on reserves or what was it at that time?

18        A.   I think it was 75,000.

19        Q.   I'm going to show you what plaintiffs are

20   proffering as Exhibit 14.  You recognize this document?

21        A.   I do.

22        Q.   This is the document in which you, Adam Lock, made

23   a recommendation for a reserve on this case, correct?

24        A.   Yes.

25        Q.   Okay.  The date of this document is September 30th

1    of 2020?

2         A.    Yes, ma'am.

3         Q.    The reserve recommendation that you made was the

4    full policy limits plus those additional coverages for a

5    total of 2,035,000?

6         A.    Yes, ma'am.

7         Q.    At that point in time you had the four-volume

8    estimate from Skyline, correct?

9         A.    I had a digital version of that.

10        Q.    Okay.  You had the complete Skyline estimate?

11        A.    Yeah, I had a digital version of their estimate and

12   photos.

13        Q.    Okay.  You had spoken to Monte Jones, the

14   independent adjuster hired by Scottsdale who said he believed

15   the loss was at least 1.5 million?

16        A.    Yes, ma'am.

17        Q.    And then there's another building consultant we

18   haven't talked about yet.  What he told you was that the

19   initial rough order of magnitude is $975,000 not including

20   water mitigation or temporary roofing, correct?

21        A.    Yes, ma'am.

22        Q.    And you anticipated that that rough order of

23   magnitude of $975,000 will increase due to the build-out

24   requirements of the first floor --

25        A.    Yes, ma'am.

1    **Q.**   -- correct?

2    **A.**   Yes.

3    **Q.**   And that is what you -- all of that information

4    that you had on September 30th is what you used to recommend

5    making the full policy limit reserve?

6    **A.**   No, ma'am.

7    **Q.**   So this document is incorrect?

8    **A.**   It's not incorrect.

9    **Q.**   What else did you rely on?

10   **A.**   Well, I relied on the fact that construction

11   material prices had gone up by 400 percent for some types of

12   materials since May.  I knew that there was going to be a lot

13   of people trying to get a lot of work done very soon so that

14   can make prices fluctuate.  I also -- we have a practice, I

15   think as outlined in those reserve best practices, that when

16   we have a dispute about the amount of a claim we will

17   sometimes set the reserve for an amount between where we are

18   and where the insured is.  So based on roughly 975 plus 491

19   rounded up to 1.5, your guy was at 2.5, 2.6, the middle of

20   that is roughly $2 million, which is where that reserve is.

21   **Q.**   And until the reserve is set you can't make a

22   payment, correct?  You can't make a payment above your

23   authority until the reserves is raised?

24   **A.**   Yeah.  No, I can't make a payment above my

25   authority until my authority is given to me.

1     **Q.**   Okay.  And you sent your recommendation for the

2   reserve on September 30th.  We saw that, correct?

3     **A.**   Yes.

4     **Q.**   I want to show you what we're proffering as

5   Exhibit 34.  You told me yesterday Jennifer Vick is your

6   supervisor.  Show you an e-mail from her in December.  What

7   is the CDR?

8     **A.**   That's a claims development report.

9     **Q.**   Okay.  That was a report we just looked at?

10    **A.**   Yes, ma'am.

11    **Q.**   And she said, "It's ready for distribution.  Late

12  sending.  I thought it was sent back in September," correct?

13    **A.**   That's what it says.

14    **Q.**   So your recommendation didn't even get processed

15  until December?

16    **A.**   That's not correct.

17    **Q.**   E-mail says that she thought it was sent back in

18  September?

19    **A.**   She didn't distribute the report to other

20  departments within the company until December.  I don't get

21  approval on the claims development report, you know, unless

22  management signed off on it.

23    **Q.**   And despite the fact that I guess you said the

24  policy limits was in between what you thought was owed and

25  what we thought was owed or what Skyline thought was owed,

1   you still didn't issue a payment of even what you thought was
2   owed or your people, the 1.5 million?
3       A.   We didn't have enough information to yet.
4            MS. BROWN:  That's all we have, Your Honor.
5            THE COURT:  Any questions on this proffer?
6            MR. WOLFF:  No, Your Honor.
7            THE COURT:  All right.  Okay.  I'm going to just
8   tell you, I'm still not convinced.  I mean, appreciate
9   your proffer.  I listened to it.  I still don't see the
10  relevance, how this has anything to do with the bad
11  faith allegations of this claim.  I gave you a fair
12  hearing on it.  Okay.  Let's bring the jury in.
13            (Jury enters courtroom.)
14            THE COURT:  Good morning, ladies and gentlemen.
15  Hope you had a pleasant evening.  We had a few little
16  things we had to take care of.  I think one of you --
17  it's no problem.  Things happen.  I think somebody was
18  running a little bit late.  That's okay.  Any problems?
19  Any issues you need to bring to my attention?  Are you
20  good to go?  Okay.  Ms. Brown.
21            **DIRECT EXAMINATION**
22  BY MS. BROWN:
23      Q.   Mr. Lock, before we get too far, I want to tell you
24  last night -- yesterday afternoon we agreed to some math.
25  Attorneys for Scottsdale stipulated to the math.  I'm going

1    to tell you this number is $2,000 less than the number I put

2    up yesterday.  I'm going to change the exhibit out because

3    Mr. Odom pointed out to us that one of the Crest Roofing

4    invoices for $2,000 was for his other property at 622

5    Esplanade.

6        A.   The one you had sent to us?

7        Q.   Correct.  So just in full disclosure, you would

8    agree with me this number is $2,000 less than the number --

9    the 2,033,000 yesterday is 2,031,000?

10       A.   I will trust your calculator skills.

11       Q.   Okay.  Now, yesterday we talked about the Louisiana

12   law.  You said that you understood your obligation to comply

13   with that 30-day timely payment requirement under the law,

14   correct?

15       A.   Yes, ma'am.

16       Q.   Okay.  We went through all the invoices and I'm not

17   going to do that again, but I do want to ask you about a

18   couple of things.  You remember when we went through these

19   costs you told me that Scottsdale had the temporary roofing,

20   the environmental cleanup, and the mitigation bills back in

21   September?

22       A.   I'd have to see those.  There was something about

23   the environmental that was dated the last day of September,

24   or was that something else?

25       Q.   Okay.  You had them in September or October?

1      A.    Okay.  Yes.

2      Q.    You agree with that?

3      A.    Yeah.

4      Q.    You had the big mitigation bill for 491,000 for

5  sure?

6      A.    Yes.

7      Q.    Okay.  And you had the Crest Roofing bills --

8      A.    Yes, ma'am.

9      Q.    -- the 51,000?

10     Okay.  I want to show you --

11         MS. BROWN:  I'm going to offer Exhibit 20.

12         MS. WOLF:  Which one?

13         MS. BROWN:  20.

14         MS. WOLF:  No objection.

15         THE COURT:  It'll be admitted.

16  BY MS. BROWN:

17     Q.    Now, before we get into Exhibit 20, with regards to

18  the mitigation, the 491,000, Scottsdale hired an outside

19  adjuster just to look at the mitigation bill, correct?

20     A.    That's correct.

21     Q.    Okay.  You didn't have any issue with the temporary

22  roofing?

23     A.    It seemed high; but given the emergency nature of

24  everything, I was going to go with it, yeah.

25     Q.    So those bills that you had in September and

1    October, you sent the restoration bill to your adjuster,

2    Wardlaw.  And I'm going to show you Exhibit 20 now.  This is

3    an e-mail from Alex Braig with Wardlaw Claims.  This is the

4    independent adjusting firm that looked at the mitigation

5    bill, correct?

6        A.    Yes, ma'am.

7        Q.    To you, Adam Lock, regarding his review of the

8    mitigation bill, the $491,000.  Your adjuster recommended a

9    payment of $124,731.98, correct?

10       A.    He's not an adjuster, ma'am.  He's a consultant,

11   like an expert on water mitigation and dry-out procedures and

12   how long things take to dry out, what they should cost.

13       Q.    I thought you told me that they were independent

14   adjusters on the mitigation.

15       A.    There was only one independent adjuster involved

16   and that was Monte Jones.

17       Q.    Then your expert told you that he believed the

18   amount of the mitigation bill was $124,731.98?

19       A.    Yes, ma'am.

20       Q.    He told you that on November 12th of 2020?

21       A.    Yes, ma'am.

22       Q.    And yet when we go and look at the payments that

23   Scottsdale made, which we saw yesterday, the mitigation is

24   this payment, $177,731.98; isn't that right?  That amount is

25   the 124,000 that Alex Braig told you to pay plus the

1    temporary roof, the 53,000.  That equals -- we can do the

2    math.

3         A.    Yeah, I mean, if you want to do the math.  I wasn't

4    involved in the handling of the claim on January 8th.

5         Q.    But you're here on behalf of Scottsdale today?

6         A.    I am.

7         Q.    So we've got the 124,731.98.  That's what Wardlaw

8    told you to pay towards the $491,000 bill?

9         A.    That was their recommendation.

10        Q.    Okay.  Plus you had the 53,000 in temporary

11   roofing.  And so this January payment is the payment for

12   those mitigation and temporary roofing measures that were

13   taken back in September?

14        A.    Yeah.  I mean, based on that, it makes sense that's

15   what the payment would be for.  I mean, it was a 2,000

16   overpayment like you said, though.

17        Q.    We talked yesterday about the Encore contract for

18   $1.3 million that's on this list of costs incurred and the

19   fact that that contract was entered into in December.  You

20   recall that testimony?

21        A.    I recall testimony, but I don't have any firsthand

22   knowledge of that contract.

23        Q.    But again, you're here as Scottsdale and you know

24   Scottsdale had the contract?

25        A.    Yeah.  Just being clear.  Yeah.

1      Q.    Okay.   No payment was made towards the Encore
2    December 2020 contract, $1.3 million, until May of 2021.
3    I've already accounted for these other bills.   This January
4    payment was for the mitigation.   29,000 is not towards 1.3
5    million.   The $1.1 million in May was the payment that was
6    made towards the Encore contract from December, correct?
7      A.    I would be assuming because I wasn't -- like I
8    said, I didn't issue the payment.   But based on normal
9    handling of the claim, I would assume that that's probably --
10     Q.    Okay.   I mean, just based on the way time works --
11     A.    You're asking questions about --
12     Q.    -- you couldn't have paid for it before it was --
13     A.    Yeah.   I wasn't the one that issued it so I
14   couldn't say 100 percent if that's what it was for, if there
15   were other things included in it or not.
16     Q.    So if anything was paid for Encore, it wasn't paid
17   until -- I mean, even if we say -- this March payment may or
18   may not have been towards it, but it wasn't paid till March
19   and May?
20     A.    I don't know.   You're asking me to make
21   assumptions.
22     Q.    The January payment was for mitigation.   We just
23   went through that, correct?
24     A.    The numbers match up, like you said.   Like I said,
25   I'm not the one that issued the payment.

1      **Q.**   I understand.  And you would agree with me that you

2      didn't pay for a debt incurred in December before it was

3      incurred?  You didn't pay for it in September or November?

4      **A.**   I'm sorry?

5      **Q.**   Look at the payments on your screen, please.  The

6      September payment, we looked at that yesterday.  That was a

7      $250,000 advance that your boss said was for mitigation?

8      **A.**   No, ma'am.

9      **Q.**   Your boss said it was for mitigation.

10     **A.**   That's your interpretation of her notes.  I worked

11     with her for five years.  It's an advance towards the

12     ultimate amount that's owed for the claim.

13     **Q.**   Okay.  Show you --

14     **A.**   If it was for mitigation it would have been -- I

15     would have had a calculation that I would have done.  I would

16     have documented how I made that calculation.  It wouldn't be

17     a nice round number like that.  I've done that before where I

18     say, "Oh, I disagree with their mitigation.  I'm going to go

19     ahead and write up my own estimate based on what I know for

20     sure."

21     **Q.**   Okay.

22     **A.**   Then I issue an advance.  You know, that's

23     something that has been done in less complicated claims.  But

24     there would be documentation of a specific amount we were

25     paying.  This is a round number to get money out the door at

1    the request of our insurance public adjuster.

2        Q.   And let's talk about what happened with these

3    payments.  We'll come back to the Encore thing.  These two

4    payments, 250,000 and 218,192.53, that number -- I'm now

5    looking at your claims log at Page 2 from an entry dated

6    10/23.  That number is the number -- that $468,192.53.  You

7    hired a building consultant on behalf of Scottsdale to go out

8    and inspect the property after Monte Jones went, correct?

9        A.   That's correct.

10       Q.   Monte Jones, you said yesterday he was the only

11   adjuster that ever went out to this property on behalf of

12   Scottsdale?

13       A.   Yes, ma'am.

14       Q.   This individual that came up with this number is

15   what you've called a building consultant, correct?

16       A.   Yes, ma'am.

17       Q.   His name is Mr. Collisson?

18       A.   Yes.

19       Q.   Mr. Collisson went out and he gave you an estimate

20   RCV.  That's the replacement cost we talked about?

21       A.   Replacement cost value, yes.

22       Q.   $600,087.78?

23       A.   Yes.

24       Q.   Some depreciation was applied and that's where this

25   $468,000 number comes from, correct?

1    A.    Yeah, the 466,491.

2    Q.    Okay.  The depreciation, again, we can do the math,

3  but it's 22.7 percent?  You want me to do the math or do you

4  know that?

5    A.    I don't know that number off the top of my head.

6  You can...

7    Q.    (Calculator on ELMO screen.)  This cheap calculator

8  doesn't -- so 77.7 percent was paid so that gives us

9  22.3 percent depreciation.

10   A.    Okay.

11   Q.    Did you watch the math?

12   A.    I did.

13   Q.    You agree with the math?

14   A.    I agree that you calculated the percentage of

15  depreciation compared to the replacement cost value

16  mathematically correct, yeah.

17   Q.    And so these two payments, now, in September and

18  November represent the depreciated actual cash value that is

19  being paid towards the building?

20   A.    That's correct.

21   Q.    So once that November payment was made there was

22  actually zero dollars paid towards mitigation?

23   A.    That's correct.

24   Q.    Okay.  Nothing was paid towards mitigation until

25  January?

1    **A.**    Assuming your -- the 177 is mitigation and roofing,

2    then that would be correct.

3    **Q.**    And now coming back to Encore, we've accounted for

4    those payments, two of which pre-existed the Encore contract.

5    So nothing was paid towards the Encore contract until at

6    least March and May of 2021?

7    **A.**    I can't -- you're asking me to assume.  These are

8    payments that were made after my handling of the claim.

9    **Q.**    You don't have any reason to doubt that there were

10   any other payments made?  Are you aware of any other

11   payments?

12   **A.**    No.

13   **Q.**    Before Scottsdale sells a policy of insurance to

14   someone like Mr. Odom they have the ability to go and inspect

15   the property, correct?

16   **A.**    Yes.

17   **Q.**    They have a right to do that before they sell

18   insurance?

19   **A.**    I don't know if -- I don't know if it's a right;

20   but, I mean, a lot of times there is an inspection that's

21   done, you know, either early on when it's first insured or --

22   **Q.**    You don't have any force -- you're not forced to

23   sell insurance to anyone, correct?

24   **A.**    I don't know.

25   **Q.**    Okay.

1          A.    I'm not a salesman.

2          Q.    You're aware that underwriting in this case did not

3     go do an inspection?

4          A.    I am aware of that, yes.

5          Q.    Your insurance policy also allows you to inspect

6     the property that's insured at any time?

7          A.    I believe that's what it says.

8          Q.    Okay.  I want to show you --

9               MS. BROWN:  I'm going to offer Exhibit 24.

10              MR. WOLFF:  We don't agree.  We object.

11              MS. WOLF:  We have an objection, Your Honor.

12              THE COURT:  Okay.

13                        **BENCH CONFERENCE**

14              MS. BROWN:  This is the exhibit we talked about in

15       chambers yesterday.  We made the changes.

16              THE COURT:  Right.

17              MS. BROWN:  They're continuing to object to our

18       classification of there only being two payments.  That's

19       not what this shows.  I've put the payments in front of

20       the jury all morning.

21              THE COURT:  You can use it.  You can cross-examine

22       him about it and have him explain if there's further

23       payments.

24              MR. WOLFF:  I think she just laid a foundation that

25       makes that inaccurate because they were paying the 250

1      and then there was another payment.  This is trying to

2      suggest everything --

3              THE COURT:  She just had an exhibit up there that

4      shows all the different dates of the payments.

5              MS. BROWN:  I'm going to ask him --

6              THE COURT:  I understand what you're saying.  It's

7      a new payment.  This is a total of all those payments.

8              MS. WOLF:  It's just dated 1.7 payment 5/18.

9              THE COURT:  Cross-examine him about it.

10             MR. WOLFF:  Got it.

11                     PROCEEDINGS CONTINUED

12             MS. BROWN:  I'm going to offer Exhibit 24.

13             THE COURT:  It'll be admitted subject to counsel's

14     objection.

15 BY MS. BROWN:

16     Q.    So to help move us along I've summarized what we've

17 talked about yesterday and today.  This is a timeline of

18 everything that you and I have talked about.  September 15th

19 of 2020, four-volume estimate from Eaux's public adjuster,

20 Skyline, in the amount of $2,196,188.  You agree with that?

21     A.    Yes, ma'am.

22     Q.    Scottsdale's field adjuster, Monte Jones, told you

23 on September 22, 2020, he believed the loss was at least

24 1.5 million?

25     A.    Yeah.  Off the cuff, yes, ma'am.

1    **Q.**   Okay.  The only payment that was made within 30

2    days of either of those numbers was the $250,000 advance,

3    correct?

4    **A.**   Yes.

5    **Q.**   And we looked at all the payments.  There's no

6    other payment made within 30 days of either of those numbers,

7    your adjuster or Eaux's adjuster, correct?

8    **A.**   I'm sorry.  Can you say that again.

9    **Q.**   This $250,000 payment is the only payment that was

10   made within 30 days of you receiving the Skyline estimate?

11   **A.**   Yes, ma'am.

12   **Q.**   It's the only payment made within 30 days of Monte

13   Jones going to inspect the property?

14   **A.**   Yes, ma'am.

15   **Q.**   Okay.  And just for clarification, the red line

16   across the top is where the policy limits are.  I didn't tell

17   you that.  Did you understand that's the $2,035,000?

18   **A.**   Yeah.

19   **Q.**   As of January 18th, 2021 -- we went through these

20   yesterday and I changed this number just like I took the

21   2,000 off of this, too.  But we went through the numbers and

22   the cost that Mr. Odom, on behalf of Eaux, had incurred as of

23   January 18th were $2,031,893.50, correct?

24   **A.**   I don't remember.  If that's what -- I'm sorry.

25   Can you say that again.

1    **Q.**   Yes.

2    **A.**   It sounds like you're asking me what they incurred.

3    **Q.**   As of January 18th of 2021, we went through all of

4    these costs, went through them tediously, dates, amounts --

5    **A.**   Oh, yeah.

6    **Q.**   -- that's that number, as of January 18th, 2021,

7    that's the number, correct?

8    **A.**   Yes.

9    **Q.**   Okay.

10   **A.**   That's the number -- can you show the other sheet

11   again?

12   **Q.**   Show them to you.

13   **A.**   Okay.  Yeah.  Throwing me off because there wasn't

14   any dates on this so hard for me to say if this was as of the

15   18th or not.

16   **Q.**   But you recall we went through all of them?  I was

17   trying not to do it again.

18   **A.**   Yeah, we went through them.  Yes, ma'am.

19   **Q.**   Okay.  And as a summary, I understand we went --

20   again, even this morning we looked at all these payments that

21   Scottsdale made.  But as of May 18, 2021 all of Scottsdale's

22   payments combined only equaled $1,796,091, correct?

23   **A.**   Yes.  I assume the math's right.  Yes, ma'am.

24   **Q.**   Okay.  I want to talk about some of Scottsdale's

25   defenses in this case.  This claim started with what you and

1    I agreed yesterday was one of if not the worst natural

2    disaster to hit southwest Louisiana?

3         A.   Yes, ma'am.

4         Q.   You agreed that the property at 620 Esplanade was

5    insured under the Scottsdale policy that we looked at?

6         A.   Yes, ma'am.

7         Q.   And that it was damaged by the hurricane?

8         A.   Yes, ma'am.

9         Q.   Your insured, Mr. Odom, on behalf of Eaux Holdings,

10   hired a public adjuster to help him with the extensive damage

11   to the property insured by Scottsdale at 620 Esplanade,

12   correct?

13        A.   Yes.

14        Q.   And he submitted, in an effort to progress his

15   claim, get Scottsdale's insured property fixed, this

16   four-volume estimate from his public adjuster?

17        A.   Yeah, he gave those to the independent adjuster.

18        Q.   Now, during your handling of the claim, I've read

19   the claims file, you never suspected or accused Mr. Odom of

20   lying about anything, did you?

21        A.   I've never spoken to Mr. Odom.

22        Q.   Within Scottsdale, if you believe that a claim is

23   being pursued fraudulently, there's steps that you take to

24   escalate that to some other unit, a fraud unit, right?

25        A.   Yeah.  If there are indicators of fraud, then we

1   would escalate that to a different unit that handles those
2   investigations.
3       Q.   And you had no indicators of fraud in this case,
4   did you?
5       A.   On what date?
6       Q.   Did you at any time have any indicators of fraud?
7   Because I didn't see in your claims notes where you ever
8   escalated this to a fraud unit.
9       A.   No.  No.  I mean, there's a lot of inflated
10  damages.  That's pretty common with a public adjuster.  I
11  wouldn't -- we would handle it as part of our investigation
12  to determine what the damage was.
13      Q.   Two things about that.  You say it was inflated;
14  but the Skyline estimate was a lot closer to the actual cost
15  than the Grecco estimate, wasn't it?
16      A.   Yeah.
17      Q.   Okay.  And a dispute about scope or cost isn't
18  fraud, correct?
19      A.   A dispute over scope and cost, no, ma'am, it's not
20  fraud.
21      Q.   Okay.  You're aware, aren't you, that Scottsdale's
22  legal team in this case after Mr. Odom, on behalf of Eaux,
23  had to hire lawyers to progress his claim, they've now
24  accused him of that?
25              MR. WOLFF:  Never --

```
1          THE COURT:  Let's come over here.
2                      BENCH CONFERENCE
3          THE COURT:  I'm not -- that's --
4          MR. WOLFF:  I haven't alleged fraud anywhere.
5          THE COURT:  The only place he alleged it was in a
6   motion, I guess in a motion.  But I don't think that's
7   proper, Ms. Brown, to bring that up with this witness
8   what the attorney has said.  It's not evidence of
9   anything.
10         MS. BROWN:  Well, the company has sought to void
11  the policy based on alleged misrepresentations; and
12  they're going to get up and --
13         THE COURT:  Why don't you show him the document.
14         MS. BROWN:  You said yesterday I couldn't.
15         THE COURT:  No.  About what?
16         MS. BROWN:  The document where they tried to void
17  the policy.
18         THE COURT:  I never said that.  That was a
19  pleading.  I want the company document, not some
20  pleading from the lawyer.  Show me something --
21         MS. BROWN:  That's a statement of a party.
22         THE COURT:  No, it's not.  Listen, I'm going to cut
23  through the B.S. with y'all on this.  Okay.  If you've
24  got a document in their claims file where they were
25  doing an investigation for fraud, show it to him.  An
```

1    allegation by the lawyer, we all make that.  You've made

2    an allegation they're in bad faith.  You've got to prove

3    it.  If he's made an allegation in an answer that --

4        MS. BROWN:  He's going to get to ask Mr. Odom about

5    the allegation of bad faith.

6        THE COURT:  Well, great; but he hadn't done it.

7    You're just trying to taint the jury pool right now with

8    that.  Show me some proof.

9        MS. BROWN:  Well, the problem --

10       THE COURT:  Him making an allegation in the

11   pleading is not proof.  It's not evidence.  He didn't

12   have proof.  I denied it.  Hell, I didn't grant it.

13   Move on.

14                    **PROCEEDINGS CONTINUED**

15   BY MS. BROWN:

16       Q.   Mr. Lock, I believe you told me yesterday that once

17   suit was filed you were no longer involved in this claim.  Is

18   that right?

19       A.   That's correct.  After the suit was filed the claim

20   was transferred to another adjuster.

21       Q.   And you're aware suit was filed in December

22   of 2020?

23       A.   Yes, ma'am.

24       Q.   Okay.  And at the time suit was filed the only

25   payments that had been made were the September and the

1    November payments, correct?

2         A.    That's correct.

3         Q.    I want to talk about the time between the November

4    and the December -- the November payment and your being taken

5    off the file.  You recall Skyline Adjusting continued to be

6    involved in the claim after that November payment based on

7    Grecco?

8         A.    Yes, ma'am.

9         Q.    They sent you numerous e-mails in an attempt to

10   continue adjusting the claim.  They disagreed with the Grecco

11   estimate and wanted to continue engaging to get their client

12   more money on the claim, correct?

13        A.    Yes, ma'am.

14        Q.    And you recall that after that November payment the

15   e-mails from Skyline to you went unanswered?

16        A.    Yes, ma'am.

17        Q.    Okay.  And I took your deposition in this case and

18   we talked about that.  We talked about the fact that out of

19   all the claims you've handled in your career you believe that

20   the majority of those claims were handled better than this

21   claim?

22        A.    Yeah.

23        Q.    Okay.

24        A.    Because I didn't end up in a room like this at the

25   end.

1    Q.   Well, you said that before you were in this room,

2    though.

3    A.   Well, I'd never been deposed before we spoke.  Your

4    deposition's the only one I've ever been involved in.

5    Q.   You told me that you did not believe that this was

6    the highest level of claims service that Scottsdale could

7    provide?

8    A.   That's correct.

9    Q.   Okay.  We talked about those e-mails and you said

10   that the normal practice would have been to respond to them?

11   A.   Yes, ma'am.

12   Q.   Okay.  And that didn't happen in this case?

13   A.   No, it did not.

14   Q.   And you told me there were a variety of reasons.

15   You said it was around the holidays.  It was around

16   Thanksgiving.  It was -- as we said in the jury selection, it

17   was a busy year for disasters.

18   A.   Yeah.  I think there was an e-mail that came in the

19   afternoon before Thanksgiving.  So when you talk about the

20   timeframe to respond to it, the afternoon before a four-day

21   holiday weekend, you know, that's days that you're not in the

22   desk working so --

23   Q.   And in fairness, you never respond to that e-mail?

24   A.   I didn't.  That's right.

25   Q.   And when I asked you, you were honest and you said

1    if things that -- could see a lot of improvement and you said

2    specifically the timeliness of things; do you recall that?

3        A.    Yes, ma'am.

4        Q.    And as you and I talked about how this could have

5    been done better because of all the timeliness issues, you

6    told me that if you had had more resources or more of you to

7    go around you would have gotten this handled quickly and

8    efficiently.  You used that phrase twice.  You would've done

9    it quickly and efficiently.  You said there was definitely a

10   shortcoming in this claim.  You remember that?

11       A.    Yes, ma'am.

12       Q.    So you attribute at least in part the bad claims

13   handling in this case to a lack of resources?

14       A.    I would attribute my lack of timeliness to a lack

15   of resources.

16       Q.    Okay.  Are you familiar with the concept of float?

17       A.    In what context?

18       Q.    In an economic context.  So you understand that

19   Scottsdale and its parent company, Nationwide, invests the

20   premiums that they receive when they sell policies and that

21   they make money on those investments and that interest is

22   called the float.  Are you familiar with that concept?

23       A.    I've never heard that expression before; but I know

24   how insurance companies make money off of investments, yes.

25       Q.    So the longer an insurance company holds onto

1    money, the more money it's making on the money, correct?

2         A.   That's -- yeah.  I mean, if you hang onto money

3    that's in an interest bearing account, the longer it's in

4    that account, the more money you're going to have.  From a

5    claims handling standpoint, the longer a claim is open, the

6    more it costs the company.  So there's no benefit to dragging

7    anything out.

8         Q.   But are you familiar with how much money Nationwide

9    made on its investments in 2020 alone?

10        A.   I'm not.

11        Q.   Have you been to the Nationwide website where they

12   actually advertise what their investments are and what their

13   return on those investments are?

14        A.   I don't.  I mean, I've heard those numbers in

15   meetings but I don't remember anything specific.

16        Q.   And those numbers are in the billions, aren't they?

17        A.   I think so, yes.

18             MS. BROWN:  I'm going to offer -- I don't think

19        these are -- we're going to offer Exhibits 113 and 114.

20             THE COURT:  You want a sidebar?

21             MR. WOLFF:  Yeah, please.

22                         **BENCH CONFERENCE**

23             THE COURT:  Before we get to that, on the other

24        issue, I think the proper question, if you want, is

25        simply to ask did this company ever open a fraud

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

```
 1         investigation on this claim and, boom, end of story --
 2              MR. COX:  You asked that, didn't you?
 3              THE COURT:  -- if you ask that.  What I was telling
 4         you is what the lawyers have alleged in some pleading is
 5         not evidence.  That's just Mr. Wolff.  I don't know what
 6         he was doing when he made that claim.  But that's to
 7         clarify that while you've got him on the stand.  If
 8         you've asked that, you've asked it.  He can answer yes
 9         or no.  That's relevant.  All right.
10              MR. WOLFF:  This was never provided.  This is the
11         first I'm hearing about it today.  This is Nationwide.
12         It's not Scottsdale.  And this is --
13              MS. BROWN:  These are from their website.
14              MR. WOLFF:  So what.
15              MR. COX:  Same as you asking about our client's
16         resources --
17              MS. BROWN:  Yeah, I think --
18              MR. COX:  -- what's he making on the building.
19              MR. WOLFF:  I wasn't allowed to --
20              MS. BROWN:  -- he opened the door in opening of --
21              MR. WOLFF:  I was not allowed to get into the
22         details of the investments of Mr. Odom or Eaux
23         Holdings --
24              MS. BROWN:  Well, let me say in opening --
25              THE COURT:  Wait, wait, wait.  DD's going to come
```

1    across this bench in a minute if we don't talk one at a

2    time.  Mr. Wolff, go, your objection.

3         MR. WOLFF:  I was not allowed to get into details

4    of finances of Eaux Holdings.  It was very, very limited

5    because you said it doesn't matter on the claim.

6         THE COURT:  I don't think it's relevant what he has

7    in his bank account.

8         MR. WOLFF:  Same thing here, and he's already given

9    the answer that on a claims handling perspective it

10   costs more to keep it open.  What Nationwide as a parent

11   company made has nothing to do with this claim.  It's

12   designed to prejudice the jury in the sense that, "Oh,

13   well, they make billions of dollars.  They should" --

14        THE COURT:  Here's the thing.

15        MS. BROWN:  May I respond?

16        THE COURT:  You may.  Go ahead.

17        MS. BROWN:  Two things.  I believe in opening he

18   said that Mr. Odom was sitting on gold.  I wrote it

19   down.

20        THE COURT:  He was sitting on gold because he had a

21   long-term government tenant.

22        MS. BROWN:  And he said he has many, many

23   businesses and properties.  He did open that door.  This

24   witness also opened the door by saying if he'd had more

25   resources.  Has nothing to do with prejudicing them.

1    Nationwide could have paid a couple more Adam Locks.  He

2    said if he'd had more of him to go around or more

3    resources he could have handled this claim better.

4         MR. WOLFF:  That point's already been established

5    that it wasn't enough resources.  He admitted it.  What

6    else do we need?

7         THE COURT:  Listen --

8         MR. COX:  We can withdraw those two --

9         THE COURT:  I wasn't going to let this in anyway.

10        MR. COX:  But in fairness, he shouldn't be able to

11   go into how much Mr. Odom was making on --

12        THE COURT:  He's not.

13        MR. COX:  He said in opening he was making 15,000 a

14   month.  I mean, he shouldn't be able to go and --

15        THE COURT:  Opening statements are just what they

16   are.  It's not evidence.  And I'm not going to allow him

17   to ask Mr. Odom how much he's making off the building,

18   all that stuff --

19        MR. COX:  Fair enough.

20        THE COURT:  -- because, again, we're here on a

21   property damage claim.  I don't think there's -- there's

22   no B.I. claim in this thing.

23        MS. BROWN:  No.

24        THE COURT:  So it's purely on property.  It's not

25   going to be relevant.  He probably shouldn't have said

```
 1        it.  You know, you've already got him to admit they got
 2        billions.  Hell, to be honest with you, I was waiting
 3        for you to object to that.
 4              MS. BROWN:  I was, too, Your Honor.
 5              MR. WOLFF:  I was going to.  I didn't get --
 6              THE COURT:  This is just a little bit outside the
 7        scope.
 8              MR. WOLFF:  Thank you.
 9                         PROCEEDINGS CONTINUED
10              THE COURT:  Thank you for your patience, ladies and
11        gentlemen.  Just the nature of it.  It's not TV law.  We
12        don't get the case, the trial, and everything in one
13        hour.
14              MS. BROWN:  I have no further questions for this
15        witness.
16              THE COURT:  Very good.  Mr. Wolff, obviously you
17        have some cross-examination or are you going to take him
18        later on your case in chief?
19              MR. WOLFF:  If I could, I'd like to do it now so we
20        can move this along.
21              THE COURT:  Let him go ahead.  Ladies and
22        gentlemen, y'all okay?  Keep going right now?  Want to
23        make sure.  Anybody needs to go to the restroom, let me
24        know.  If anyone does get to a point where we've gone
25        too far, just raise your hand.  This is not an endurance
```

1    test.  I don't want you to be uncomfortable.

2         Yes, Mr. Wolff, please proceed.  You need that

3    stuff right there?  You want her to remove it to get it

4    out of your way?

5         MR. WOLFF:  I don't need the calculator, but I'll

6    leave that there.

7                    CROSS-EXAMINATION

8    BY MR. WOLFF:

9    Q.   Good morning, Mr. Lock.

10   A.   Morning.

11   Q.   I'm going to try to be brief.  You were the initial

12   desk adjuster on this file involving Eaux Holdings' building

13   at 620 Esplanade?

14   A.   That's correct.

15   Q.   And early on in the process, I think in September,

16   you opened the file?

17   A.   Yeah.  It was initially opened and an independent

18   adjuster assigned.  And then once that process had kind of

19   been handled, you know, by some other folks, then it came to

20   me for handling.

21   Q.   Okay.  Well --

22   A.   For all intents and purposes, I'm the only adjuster

23   that's ever worked the file between that time in August to

24   December, yeah.

25   Q.   To be clear, before any of the lawyers or any of

1    that kind of thing, the storm was August 27th?

2        A.   Yes, sir.

3        Q.   We'll see that Mr. Major, the public adjuster, was

4    hired on the 28th.  And then on the 29th in this --

5            MR. WOLFF:  I'm sorry.  This is Exhibit D-8, the

6        e-mail from Skyline.

7            MR. COX:  I'm sorry.  I didn't hear you.

8            MR. WOLFF:  D-8, e-mail from Skyline.

9            MS. BROWN:  No objection.

10           MR. WOLFF:  Thank you.

11   BY MR. WOLFF:

12       Q.   So on the 29th of August, right there, there was an

13   e-mail from Skyline Adjusters two days after the storm

14   requesting 250,000?

15       A.   Yes.

16       Q.   And then you got on the file, got this, got it

17   valuated initially.  And then I'm going to show you what is

18   marked as D-173 and ask if you -- September 24th of 2020.  Do

19   you recognize this letter?

20       A.   Yes.

21       Q.   And it says -- well, read the highlighted portion.

22       A.   "Please be aware that the company is continuing to

23   investigate in good faith coverage for the claim as well as

24   the final amounts owed for the claim."

25       Q.   And then it also says, the other section?

1      A.    The other highlighted?

2      Q.    Yes, sir.

3      A.    "The company is making this advance payment in good

4   faith reliance upon the claims that you have made, the

5   presentation that you have made to the company in support of

6   that claim, and your request for an advance payment."

7      Q.    And just so that we see, that's your signature on

8   the second page?

9      A.    That is, yes, sir.

10     Q.    So why did you make that advance?

11     A.    Well, it was requested and we had enough

12  information at that time to know that the claim was going to

13  be at least that much so we went ahead and got it out the

14  door so they could get the ball rolling on repairs, or

15  towards the claim anyway.

16     Q.    Okay.  So in the context of this kind of claim,

17  they got the advance you -- after the request you made the

18  payment.  What was the next step in the claims handling

19  process?

20     A.    Figure out what we owe for the repairs.  This

21  was -- the advance was issued, I think like we talked before,

22  after I had a telephone conversation with Monte and after

23  they'd sent us some initial bills.  You know, from that

24  process forward, you know, figure out what we owe, figure out

25  what it's going to take to put that building back the way it

1    was.

2         Q.    So can you explain to the jury what replacement

3    cost value is and what actual cash value is?  I'm going to

4    show you the policy pages, and I think this is your policy.

5              MS. BROWN:  It's plaintiffs 106.

6              MR. WOLFF:  Plaintiffs 106.

7    BY MR. WOLFF:

8         Q.    Can you tell us what that is in the policy?

9         A.    Yeah.  You want me to read it?

10        Q.    Well, explain this language.  I don't want you to

11   interpret it.  What is replacement cost value and what is

12   actual cash value?

13        A.    Replacement cost is where we calculate the cost of

14   repairs without any application of depreciation.  So that's

15   what it costs to put the building back the way it was without

16   applying any kind of depreciation to that figure.

17        Q.    And what is depreciation?

18        A.    Depreciation is, you know, when things aren't worth

19   as much as they used to be because of their age or condition.

20        Q.    Okay.  And so that number, you take the replacement

21   cost value less the depreciation, that gives you the actual

22   cash value?

23        A.    That's correct.

24        Q.    You pay that first?

25        A.    Yeah.  So what the policy says and what we do is

1    that initially we're going to pay the depreciated value or

2    the actual cash value, to use the term in the policy.  We're

3    going to pay that up front.  And then once the repairs are

4    done, you know, we would issue out the additional amounts

5    that were withheld from that initial payment.

6         Q.    Just to be clear, the replacement cost value is the

7    replacement cost for the damages to the building caused by

8    the storm --

9         A.    That's correct.

10        Q.    -- or by some loss?

11        A.    Yeah.  Obviously, yeah, it includes the damages

12   caused by the storm or the covered damage, yeah.

13        Q.    And then you would apply depreciation to that

14   portion of asserted loss?

15        A.    Yeah, but not in a lump amount.  So when we prepare

16   an estimate we use the Xactimate estimating software.  And

17   the way that Nationwide does it is that we only apply

18   depreciation to those items in the building that would

19   normally have to be maintained or kept up with during the

20   life of the building.  So paint, floor coverings, things like

21   that, we apply depreciation to the material cost on those.

22   Some companies apply depreciation way more than that, but

23   that's how Nationwide does it.  We have the computer system

24   set up to only apply depreciation in certain ways because

25   those are the ways that are most beneficial to our customers.

1    Q.   So it's important to know if there are problems
2    with the building in terms of pre-existing leaks, damages,
3    rot, and so forth and so on; is that correct?
4    A.   Yeah.  Yeah.  We need to know the condition -- the
5    age and condition of the building so we can calculate how
6    much those particular parts of the building would have been
7    worth at the time.  It's usually done on -- life expectancy
8    and condition is how it's usually calculated.
9    Q.   This is the portion of that policy that talks about
10   we will not pay for loss caused by or resulting from wear and
11   tear not related to the storm in this case, correct?
12   A.   That's right.  Yeah.  The policy doesn't pay for
13   wear and tear, rust, corrosion.
14   Q.   So you need to know -- if it's an older building,
15   you need to know if there were problems with the building as
16   part of the investigation?
17   A.   Yeah.  Yeah.  I mean, we need to know the condition
18   it was in so that -- we need to know the age and condition so
19   we can calculate that depreciation but also that we can
20   separate out damage that's related to it just being an old
21   building compared to damage that occurred from the storm.
22   Q.   So we've seen this for the last couple of days,
23   this big stack of documents here.  What did you understand
24   this stack of documents to be when you got it from Skyline?
25   A.   Skyline's estimate and their photos.

1    **Q.**   So did that estimate include any depreciation?

2    **A.**   It did not.

3    **Q.**   So Skyline did not produce to you an actual cash

4    value request from any of this here, this estimate that they

5    gave you?

6    **A.**   No.  There's not a way to calculate the actual cash

7    value based on what they sent.

8    **Q.**   Well, okay.  So they sent this big stack of

9    documents.  They knew it was an actual cash value component

10   that they had to address first, and there's nothing in all of

11   this to tell you what actual cash value is?

12   **A.**   That's correct.  There's nothing in those documents

13   that says what the actual cash value is.

14   **Q.**   And Xactimate is a tool that is used to help make

15   that calculation?

16   **A.**   It's a software program, yes.

17   **Q.**   Was there any evidence that Mr. Major had used

18   Xactimate to calculate actual cash value when he submitted

19   all this to you?

20   **A.**   No.  He provided an Xactimate estimate.  The

21   estimate that he used, I recognized the format.  I worked in

22   that system for over ten years.  I recognized the format.  It

23   was created using Xactimate, but they didn't have any actual

24   cash value amounts on there.

25   **Q.**   So they didn't use any effort in the Xactimate

1    presentation here to give you the actual cash value; this is
2    correct?
3         A.   That's correct.
4         Q.   So on this replacement amount, and that was just
5    the building, 2.1?
6         A.   Roughly, I think.
7         Q.   This is the exhibit they made.  I think you've
8    looked at it.  So this public adjuster estimate right there,
9    that 2.196, roughly 2.2, that was just for the building?
10        A.   That's what they said, yes.
11        Q.   Okay.  And then there was also that All Clear
12   mitigation.  We'll talk about that briefly in a moment.  That
13   was heading towards 500,000, 490,000?
14        A.   Yeah, 491, I think.
15        Q.   Then you had the temporary roofing, right?
16        A.   Yes.
17        Q.   So all of that was really close, about 2.75 or 2.8?
18        A.   That's correct.
19        Q.   Why didn't you just give them the policy limits
20   right then and there?
21        A.   I didn't have enough information to know whether
22   that was a good estimate or not.
23        Q.   Why not?
24        A.   Well, I mean, I had his photos.  I had their
25   digital copies of photos we saw the other day where they put

1    them up there and they were sideways.  They weren't labeled.

2    It was hard to tell exactly what it was a picture of.  So I

3    had digital copies of those and I had their line item

4    estimate which, just a cursory look at it, there was a lot of

5    things in there that I couldn't verify from the photos that

6    they provided.

7        Q.    In fact, we're going to talk about that 2.0 number,

8    as to whether that was actually paid.  But according to the

9    number they put to you, the 2 million, you can't verify those

10   today; is that correct or not?

11       A.    I don't have any way of verifying it, no.

12       Q.    So, in any event, if we look at this one, if you

13   add the temporary roofing and the All Clear, it's really

14   about 2.75.  And they're saying it really only came to 2 even

15   by their own numbers.

16       A.    Yeah.  Yeah, that sounds right.

17       Q.    All right.  So 2.75 is a lot more than the 2

18   million they're talking about right now?

19       A.    It is.

20       Q.    And we've seen the payments.  Scottsdale paid 1.75,

21   1.796, correct?

22       A.    Yes, sir.

23       Q.    So when these claims are first presented, I think

24   you said, sometimes you get claims asserted by a public

25   adjuster that are high or inflated?

1      A.    Yeah.  Yeah.  That's pretty common.

2      Q.    And so you need to investigate, and did you do

3   that?

4      A.    We did, yeah.  I mean, I got the -- I hired a

5   building consultant.  I hired somebody who's an expert in

6   construction hoping that they would be able to get either

7   verification on what the public adjuster had provided or, you

8   know, some other number that they could support.

9      Q.    First off, did you talk to Mr. Major or Skyline on

10  the phone at any time in this early part of the process?

11     A.    I don't recall.  It was mostly e-mails, I think.

12     Q.    Okay.  At any time did Mr. Major or anyone with

13  Skyline tell you that they had a conversation with Eaux

14  Holdings, through Mr. Odom, and that they felt -- Skyline

15  felt that this building was subject to heavy depreciation

16  because of its age?

17     A.    They never said it was subject to depreciation.

18  They said it was a great building, in perfect condition, to

19  pay the claim and be done with it.  That was kind of the gist

20  of my communications from them.

21     Q.    We're going to look in a little detail -- I promise

22  I'm going to move this along.  But just to be clear, early on

23  no one told you from the public adjuster side or Mr. Odom or

24  Four-O that they knew there were problems with this building

25  before the storm?

1      A.    No.   They were saying it was a great building in

2   great condition.

3      Q.    And did you have a question as to how that could

4   be?  I mean, did you have a problem or concern?

5      A.    Yeah.  Yeah.  I mean, at one point, I think we may

6   have touched on it, there was this name Four-O and then Eaux

7   Holdings.  At one point they updated the name in the

8   insurance policy.  And so when I see that I want to make sure

9   that any checks that I cut are going to be to the building

10   owner, right, the people on record, you know.  So I went

11   through and I checked the county website and --

12      Q.    Going to stop you.  It's parish here in Louisiana.

13      A.    I'm so sorry.  That is right.  I checked the

14   website with the property records, the parish website, and

15   just to make sure who the owner was, see if there's any liens

16   recorded there.  And they had a couple of pictures on the

17   website and there was cracks in the side of the building, you

18   know, kind of made it look like there was a bunch of issues

19   with the exterior of the building before the storm.

20        So that raised some questions with me, you know, at

21   least for that part of the claim, you know, immediately.

22   Okay.  Well, I know on this estimate they've got this huge

23   number, like, per square foot and it accounted for a big

24   chunk of their estimate.  They've got this huge number per

25   square foot for the exterior walls.  Yeah, I'm seeing some

1  cracks and dings and stuff on these outside walls and

2  windows; but I can't tell if that's enough to warrant

3  replacement of the entire exterior wall system on this

4  building or not because the way I'm seeing it is there's

5  cracks and stuff all over it before.  So that was a big

6  question.  We needed to sort that out, figure out if

7  something could be repaired or if it had to be completely

8  replaced.

9       Q.   So, to be clear, I'm looking at this big stack of

10  documents from Skyline, the public adjuster, he was providing

11  an estimate that included a complete replacement of the

12  outside of all the paneling, the areas where you saw evidence

13  on an official website where there was cracking before the

14  storm?

15       A.   That's correct.

16       Q.   Now, you indicated you hired an expert.  Would that

17  be Grecco?

18       A.   Yes, sir.

19       Q.   And why did you hire Grecco?

20       A.   Grecco's a firm that we've used.  It's on our list

21  of approved vendors.  You know, I send assignments to them.

22  And, you know, I think in my instructions to them I said,

23  "Hey, you know, this is the kind of building that we're

24  dealing with."  You know, we need to make sure that there's

25  somebody involved that has some experience, you know,

```
 1    estimating or in construction for the type of building.  It
 2    was Homeland Security.  They had some additional security
 3    requirements built into their buildout on the interior.
 4         Q.   And so that was Mr. Collisson with Grecco?
 5         A.   Yes, sir.
 6         Q.   And he went out and performed another inspection?
 7         A.   Yes.
 8         Q.   I got ahead of myself.  Monte Jones.  We've heard
 9    that name, Monte Jones.  He went out early.  Were there
10    problems with his ability to inspect in the early phases?
11    Can you tell the jury about that.
12         A.   Yeah.  I mean, so when I talked to him on the phone
13    he said --
14         Q.   I'm sorry.  To whom?
15         A.   Monte Jones.  When I talked to Monte Jones he said,
16    "Hey, I'm out here.  Public adjuster's telling me all of this
17    stuff."  I think a lot of my note that I made was information
18    that he was relaying from the public adjuster.  But anyway,
19    he said, "This is everything that I'm being told about the
20    building.  You know, it's beyond what I can do.  You know, I
21    recommend that you hire a building consultant, construction
22    consultant."
23         Q.   Was there electricity in the building at the time
24    when he went out there?
25         A.   He said that there wasn't.  He wasn't able to do a
```

1    good inspection.

2         Q.   And so you hired Grecco, particularly

3    Mr. Collisson.  And I'll show D-16.  This is a part of the

4    report, the initial report from Mr. Collisson.  Do you recall

5    seeing that in September?

6         A.   I do remember it, yes, sir.

7         Q.   This was an initial report from Mr. Collisson?

8         A.   That's correct.

9         Q.   So it's starting to show that the concerns you had

10   about the age of the building were real?

11        A.   Yeah.

12        Q.   And so now you have to start doing what we'd talked

13   about.  You take an RCV and then start depreciating it and

14   figure out what the actual cash value is?

15        A.   Yeah, but also figuring out what the scope of

16   repairs to be.  You know, if there's a bunch of pre-existing

17   damage there, you know, the insurance policy doesn't pay for

18   a bunch of damage that's from rot, deterioration.  So we need

19   to figure out what was caused by the storm and what was there

20   before so we can do our best to put the building back the way

21   it was.

22        Q.   And can you read into the record what Mr. Collisson

23   said in the highlighted versions there.

24        A.   It says, "The extent of the deterioration would

25   suggest that it has been occurring for a long time.  This is

1    seen from the amount of missing plywood sheathing and rust on

2    the studs."

3         Q.   So you had an understanding there was leaking from

4    the outside of the building into the interior?

5         A.   Yeah.  I think his report says that it was leaking

6    through the caulking between the seems of the concrete panels

7    and getting in.

8         Q.   Before the storm?

9         A.   Yeah.  Occurring for a long time, yes, sir.

10        Q.   And so -- and I apologize.  Again, this is D-16.

11   The date of that is September 27th?

12        A.   Yes.

13        Q.   So you have a concern about the pre-existing -- the

14   amount of pre-existing damage, the amount of depreciation, so

15   you're continuing investigation on that?

16        A.   That's correct.

17        Q.   So I'm going to show you, this is D-31, the Skyline

18   e-mail of November 23rd.  This is November 23rd.  This is

19   from Skyline to you.  Do you recognize that e-mail?

20        A.   I do recognize it.

21        Q.   So that's Skyline talking to you and addressing one

22   of the concerns you had about this pre-existing problem?

23        A.   That's right.

24        Q.   And would you read into the record what Skyline

25   told you.

1      **A.**   The highlighted area?

2      **Q.**   Yes, sir.

3      **A.**   It says, "I understand the building was well

4      maintained pre-storm."

5      **Q.**   Did that appear consistent with what you were

6      seeing?

7      **A.**   No, it's not consistent with what I was seeing.

8      **Q.**   And, also, they note there -- they thank you for

9      update in getting the undisputed issues, and that's the

10     250,000 that you sent over?

11     **A.**   Yeah.  I think by this time I'd also issued a

12     second payment.

13     **Q.**   So it says, "Appreciate you looking into

14     depreciation."  So you were still trying to find out what the

15     number ought to be --

16     **A.**   Yeah.

17     **Q.**   -- in November of -- November 23rd of 2020?

18     **A.**   Yeah.  Yeah.  I wanted to go through the estimate

19     from Mr. Collisson, make sure that he hadn't applied any

20     extra depreciation that we don't do.  He works for a lot of

21     different companies who all do those things differently.  So

22     part of what I wanted to do is make sure that it went with

23     our guidelines, the way we like to pay our customers.

24     **Q.**   All right.  Now I want to show you a portion of

25     your note.  I think it's already introduced.  You know what

1   number?  They're going to get the number so we have it in the

2   record.

3          MS. WOLF:  P-27.

4   BY MR. WOLFF:

5      Q.   P-27.  This is the note.  So we'll go ahead and use

6   theirs so we don't add a bunch of paper.  Can you read the

7   highlighted portion there, please.

8      A.   "Of note, $616,317.41 of the public adjuster's

9   estimate is for exterior wall cladding which is a

10  cementitious panel at $53 per square foot.  This price seems

11  very high.  When I pulled tax record to confirm the owner of

12  the building I noted that there were a few overview pictures

13  in online statement that showed cracking on the exterior

14  cladding prior to this loss.  It's possible that some of the

15  damage to the wall cladding is unrelated."

16     Q.   All right.  So you had to start investigating there

17  to determine what was new, what was old?

18     A.   That's correct.

19     Q.   And you couldn't tell from this big estimate.  They

20  didn't give you what they knew, if anything, about the

21  pre-existing problem?

22     A.   That's correct.

23     Q.   And they had -- in this estimate here they had a

24  number in there that included $261,500 for market conditions

25  if incurred.  What's that?

1        A.      I have no idea.

2        Q.      Just an extra 261,000?

3        A.      That's -- with it being described that way, it

4    certainly looks like a big extra amount they were throwing

5    in.

6        Q.      And so into November you are still trying to get

7    the extent of the pre-existing damage that you knew from your

8    investigation on the website.  Mr. Collisson says there's

9    issues here.  But then Skyline's telling you nope, it was

10   well maintained?

11       A.      That's what they're saying, yes, sir.

12       Q.      Okay.  Have you ever seen this document?  And this

13   is D-61.

14       A.      I've never seen this.

15       Q.      Okay.  I'm not going to ask you all the details,

16   but this was an inspection report relating to that building.

17   When that $2 million investment was made, this is the

18   inspection report.  Did anyone ever tell you that they had an

19   inspection report?

20       A.      No.

21       Q.      Did anyone ever tell you that this inspection

22   report had a number of recommendations relating to major and

23   immediate concerns?

24       A.      No one told me that.

25       Q.      So no one told you that there were problems with

177

the roll roofing, the tar roofing, the tar rock roofing, the
roofing in general?

    A.   No, no one ever told me that.

    Q.   No one ever told you that there were
recommendations for evaluation and repair and replacement by
a licensed contractor for some of the roofing before the
storm?

    A.   Say that again.

    Q.   Before the storm, were you told that there were
recommendations to get this roof fixed?

    A.   No, we weren't made aware of that.

    Q.   Did you know that before today?

    A.   No, sir.

    Q.   Did they tell you that there was a recommendation
for evaluation by a licensed contractor to repair or replace
the exterior siding that you were talking about before the
storm?

    A.   I'm sorry.  Say it again.

    Q.   Did anyone ever tell you that before this storm
there were recommendations made to Eaux Holdings that a
licensed contractor should go out there and evaluate and
repair and replace exterior siding?

    A.   No, they never told us that.

    Q.   I take it, then, they didn't tell you that there
were moisture stains before the hurricane and there were

1    recommendations to evaluate and treat for fungal growth

2    before the storm?

3         A.   They didn't tell us that, no.  I did see evidence

4    of some of that in the pictures, though.

5         Q.   Would that kind of information have been helpful in

6    your evaluation of the claim and timely payment of the claim?

7         A.   Yes.

8         Q.   Why?

9         A.   Well, because we have to do all this work to figure

10   out what was there before the hurricane, what was there after

11   the hurricane, figure out which damage happened first, which

12   damage was overlapping, what the cause of the prior damage

13   was, the cause of -- basically we've got to separate it all

14   out, figure out what's overlapping, figure out what the

15   condition of the building was in.  I mean, there's a whole

16   lot there that would have been helpful to know, I guess,

17   earlier on.

18        Q.   Well, to be clear, there's been talk about the

19   duties of an insurer.  Most certainly an insurer has duties.

20   You would agree that payment of the claim per the contract is

21   a top duty?

22        A.   It is.

23        Q.   To do that, though, you need information, right?

24        A.   That's correct.

25        Q.   And that's supposed to be -- to get fully apprised

1    you need full disclosure?

2         A.    That's correct.

3         Q.    And you can tell now just from what we're seeing

4    here that you did not get full disclosure?

5         A.    Yes, sir.

6         Q.    Did the fact that you had to keep asking and you

7    were getting those answers, did that complicate the claim

8    handling in any way?

9         A.    Yeah.  I mean, it -- when you get information

10   that's conflicting, I mean, you know, you look at a picture

11   that shows these spiderweb looking cracks on the side of a

12   building and then you get somebody else telling you, hey,

13   building was in great shape, you know, there's no issue here,

14   just pay the claim, you know, you feel like you're kind of

15   getting rushed through the process, you know, and you need to

16   stop and say, no, we need to really figure out what's going

17   on here so we can make sure that we pay what the insurance

18   policy owes, which is to put it back the way it was.

19        Q.    So if you had all the information early on you

20   would have been in a position to act earlier?

21        A.    Yeah.

22        Q.    And you never got some of this information during

23   the entire claims handling process?

24        A.    That's correct.

25        Q.    And did it also take time away from the claim

1    handling you had to do when you had to do the calculations
2    and the --
3        A.   Yeah.  You kind of end up chasing your tail a
4    little bit.
5        Q.   And we talked about, in general, the interaction
6    with the public adjuster.  There was some talk about the
7    property.  They needed to take down this exterior cladding.
8    Do you recall that?
9        A.   Yeah.  At one point they sent me an e-mail that
10   said, "Hey, we're going to start ripping the walls off of
11   this thing next week.  You better start making some choices."
12   I mean, that's basically what my interpretation of their
13   e-mail was.
14       Q.   And that was in October?
15       A.   I think, yeah, around the very beginning of
16   October.
17       Q.   So Skyline is representing to you that in October
18   the contractor was ready to go, start tearing down these --
19   the siding and to get going on the project?
20       A.   Yeah, they made it sound like work was going to
21   start the following week.
22            THE COURT:  Mr. Wolff, I'm sorry to interrupt you
23        but a couple of our jurors need a break.  It's 11:00.
24        We need to take a short break.
25            MR. WOLFF:  Sure.

1        THE COURT:  I'm sorry to interrupt your flow here,

2    but I was trying to find a good place to stop you for a

3    few minutes.

4        MR. WOLFF:  I'm just rolling.  I'll get it done as

5    soon as we're ready.

6        THE COURT:  Okay.  We're going to take about a ten

7    minute break.  I'm sorry, ladies and gentlemen.  We'll

8    take a quick restroom break.  All rise for the jury.

9                (Jury exits courtroom.)

10       THE COURT:  Okay.  We'll be at recess for ten

11   minutes.

12                (Recess is taken.)

13       THE COURT:  You've been showing some exhibits to

14   the jury that have not been admitted into evidence, I

15   think.  Isn't that right, Lisa?

16       MS. LACOMBE:  Yes, sir.

17       THE COURT:  You need to get them admitted into

18   evidence before you publish to the jury.  That was an

19   oversight on my part.  I should have stopped you.  I'm a

20   stickler for this.

21       MR. WOLFF:  Yeah, that's my bad.

22       THE COURT:  No, no.  That's okay.

23       MR. WOLFF:  Thank you.

24       THE COURT:  It's my bad.  It's my job to monitor

25   this thing.  They didn't object.  I was just kind of

182

1    letting you go along.  It's no big deal.  It's just a
2    technicality.  All you got to do is let's just get these
3    that you've already shown really quick.
4          MR. WOLFF:  Wait for the jury to do this?
5          THE COURT:  Yeah.  Let's just go ahead -- is there
6    any objections to any of the ones he's shown?  Read them
7    off there.
8          MS. LACOMBE:  D-8.  You offered no objection.
9          MS. BROWN:  No objection.
10          MS. LACOMBE:  D-173 is an e-mail.
11          MR. WOLFF:  No, no.  It's actually -- 173 is the
12    letter to Jade Bentz at Skyline from Adam Lock.
13          MS. LACOMBE:  Is it in e-mail form?
14          MR. WOLFF:  It's a letter.
15          MS. BROWN:  And there's no objection to 173.
16          MS. LACOMBE:  Thank you.  D-16, the report.
17          MR. WOLFF:  D-16, yeah, that's the Collisson
18    report.
19          MS. BROWN:  No objection.
20          MS. LACOMBE:  D-31, an e-mail dated 11/23/20.
21          MS. BROWN:  No objection.
22          MS. LACOMBE:  D-61, a photo and inspection report.
23          MS. BROWN:  I do have an objection to D-61, and
24    that one went up before I --
25          THE COURT:  What is it?

1      MS. BROWN:  It's the inspection, the prepurchase

2   inspection report.  The witness said he never saw it so

3   I don't think he's the right guy to get it in.

4      MR. WOLFF:  I'm not offering it.  I'm going to ask

5   was he advised of these issues and then I'm going to lay

6   the foundation, put it in later.

7      MS. BROWN:  Okay.

8      MR. WOLFF:  I'm not offering it right now.

9      MS. BROWN:  It's not offered.

10      MR. WOLFF:  Well, no.  He can't authenticate it.

11   It's the same --

12      THE COURT:  That's the reason I'm a stickler for

13   let's get the things in evidence before we publish them

14   to the jury --

15      MR. WOLFF:  Okay.

16      THE COURT:  -- you know, because until it's

17   properly foundation laid, relevance established, all

18   those good little things we learn in our codes of

19   evidence are done, I don't want it shown to the jury.

20      MR. WOLFF:  Fair enough.  So that we know, is there

21   an objection other than authenticity on the

22   pre-inspection report?  We're right where we were --

23      MS. BROWN:  I don't know out of context.  I mean,

24   it depends on when and how you use it.

25      THE COURT:  This is why I don't like omnibus

1     motions in limine because these things are very fluid

2     and may not be admissible for one thing but certainly

3     could be admissible for another if the foundation's

4     properly laid.  Why don't we just cross that bridge when

5     we get to it and you make your contemporaneous objection

6     at that time based on how he's presenting it and how

7     he's going to do it.  Court's not mad.  Just want to

8     remind everybody let's get our things in evidence before

9     we show them to the jury because we don't want to show

10    them something that I may ultimately rule is

11    inadmissible and they've seen it.  It's not really fair

12    to them.  It's okay.

13          MR. WOLFF:  Well, same thing with this on the

14    inspection -- I mean, on the estimate.  The inspection

15    report is a fact and it's very pertinent to this.  So I

16    didn't offer the guts of it no more than she offered

17    this, but the fact of it is a different issue.

18          THE COURT:  I think you asking the question have

19    you seen this pre-inspection is a perfectly fine

20    question.  It's a foundational question.  I'm assuming

21    you're building the foundation.

22          MR. WOLFF:  Yes, sir.

23          THE COURT:  The fact that it exists is okay.  The

24    actual document in evidence, showing to the jury, not

25    yet.  We're not there.  It's premature.

```
 1          MR. WOLFF:  That's why I didn't show it to them,
 2     but I will take care of housekeeping as we move along.
 3     I was trying to get it over with.
 4          THE COURT:  Great lesson for all our young
 5     attorneys here on our rules of evidence.  I'm a big
 6     proponent of that.  It's actually a hard class in law
 7     school; but actually, it's very interesting, I think.
 8     Okay.  Let's bring our jury in.
 9                    (Jury enters courtroom.)
10          THE COURT:  You may proceed, Mr. Wolff.
11          MR. WOLFF:  All right.  Your Honor, housekeeping.
12     I should have been keeping up with this.  We move to
13     offer, file and introduce D-8 which is the request for
14     the advance.
15          THE COURT:  Any objection?
16          MS. BROWN:  No objection.
17          THE COURT:  It'll be admitted.
18          MR. WOLFF:  And then D-173 which is the payment of
19     the advance by Mr. Lock.
20          MS. BROWN:  No objection.
21          THE COURT:  It'll be admitted as well.
22          MR. WOLFF:  Thank you.  Then the September 27th
23     initial report from Grecco, Mr. Collisson, on the
24     building.
25          MS. BROWN:  No objection.
```

186

```
 1              MR. WOLFF:  That's D-16.
 2              THE COURT:  It'll be admitted.
 3              MR. WOLFF:  Then one more, the 11/23/2020 e-mail
 4         from Skyline to Mr. Lock about the maintenance; and
 5         that's D-31.
 6              MS. BROWN:  No objection.
 7              THE COURT:  It'll be admitted.  Thank you.
 8              MR. WOLFF:  Sorry about that, folks.  I'm going to
 9         keep moving along here.  And if I recall where I was,
10         here's where I was.
11    BY MR. WOLFF:
12         Q.   So Skyline is telling you they're ready to pull the
13    trigger in October, ready to pull those panelings down,
14    right?
15         A.   Yes, sir.  Yeah.
16         Q.   Okay.
17         A.   They said they were going to start work next week.
18         Q.   And you were thinking about getting an expert to go
19    check out that panel issue, right?
20         A.   Yeah.  There was -- part of me really wanted to
21    talk about repairability and looking at high end of this, do
22    you have to repair or can you replace, do you have to replace
23    or can you repair.  Due to them being so urgently wanting to
24    get repairs started, I --
25         Q.   Elected not to do it?
```

1    A.   Yeah.  I elected to leave it up to the building

2    consultant to figure out.

3    Q.   Did anyone for Eaux Holdings tell you that they'd

4    hired a separate structural engineer to look at these panels

5    and give them a report?

6    A.   No, sir.

7    Q.   Did they tell you that they were looking for that

8    engineer in that report to see if they could get insurance

9    money to pay for it?

10   A.   No, I was never told that.

11   Q.   If there was a report rendered by another engineer,

12   did you ever get it?

13   A.   I never got an engineer report on anything.

14   Q.   So in October they said they were ready to go.  Did

15   they tell you that the contractor, Encore, we've talked about

16   them, was not licensed in Louisiana until November 24th and

17   could not do work?

18   A.   They never told me that, no.

19   Q.   So you were shown this Encore contract, and this is

20   already offered as P-1 -- excuse me, P-51.  You recall them

21   showing you that contract today?  Well --

22   A.   I don't --

23   Q.   -- you have never seen this contract?

24   A.   No.  This does not look familiar to me at all.

25   Q.   Okay.  So you don't know when Scottsdale got this

1    contract from Encore?

2         A.    Correct.

3         Q.    And you don't know what this contract obligated

4    Eaux Holdings to do in terms of payment and when?

5         A.    Correct.  Yeah.  I've never seen it.

6         Q.    If the contract was dated in December, you had

7    already tendered to Eaux Holdings -- I'm going to use the

8    plaintiff's exhibits here.  I promised I wasn't going to use

9    a calculator.  I'm not going to.  But you'd already tendered

10   the 250 and 218,000 by November 23rd?

11        A.    Yeah, 468,192.53.

12        Q.    And part of that was in response to Grecco's report

13   that you got.  Let's see.  Let's get to the date here so I've

14   got this, the right date here.  I'm sorry.  I've gotten

15   disorganized because I moved my things around here.  I have

16   that you received the Collisson report on October 26.

17   Correct?

18        A.    That sounds correct.

19        Q.    And you made the payment within 30 days of that,

20   correct?

21        A.    I believe so, yes, sir.

22        Q.    And that was based on the recommendation that your

23   expert gave you to pay on the actual cash value?

24        A.    That's correct.

25        Q.    And you still had the questions we've talked about.

1    I don't want to go over and over it.  But those maintenance

2    questions were still on deck?

3         A.    Yeah, there were still questions about certain

4    parts of the repairs.

5         Q.    Now, you don't know -- with respect to this

6    contract that we looked at, you don't know when it was

7    received or when payments were required under this

8    construction contract, correct?

9         A.    That's correct.  I've never seen it before.

10        Q.    And the whole notion of replacement value -- we've

11   talked about that there's actual cash value; and that's what

12   you were paying in November, correct?

13        A.    Correct.

14        Q.    And then as the building gets repaired and those

15   repairs are actually happening and completed, then you're

16   obligated to pay as you go along?

17        A.    Yes, once the actual costs are known and incurred.

18        Q.    And do you know when Eaux Holdings submitted those

19   actual costs to Scottsdale?

20        A.    No, I don't.

21        Q.    Do you know if that $1.36 million that they've

22   talked about was an actual expense in terms of actual

23   dollars?

24        A.    I have no way of knowing.

25        Q.    Do you know if the scope of this contract with

1    Encore included non-storm related upgrades?

2         A.   I have no idea.

3         Q.   Did anyone tell you that the goal of Eaux Holdings

4    was to make this building better as a result of these

5    payments?

6         A.   No one told me that.

7         Q.   When you were answering questions about whether the

8    1.36 was timely or not, and I'm trying to figure this out,

9    first, you don't know whether it was actually owed or paid?

10        A.   Right.  I mean, the only thing I know is that you

11   guys were showing me that those payments were made after the

12   claim wasn't assigned to me anymore.

13        Q.   So you cannot tell this jury whether the payments

14   that were made pursuant to this contract by Scottsdale, and

15   we've seen a progress of payments here that moved along, you

16   don't know whether they were timely or not?

17        A.   I don't know that, no.

18        Q.   Okay.  This All Clear $495,000 mitigation, did you

19   have issues with that?

20        A.   Yeah.  It seemed really high.

21        Q.   Can you give us just some examples?

22        A.   I mean, there's a 53-foot cargo trailer on there.

23   I don't know why we have $10,000 for a 53-foot.  I mean,

24   there's transportation fees.  Every single person who worked

25   on that job got somewhere like 20 to $40.  I'm remembering

1    off the top of my head.  If you had it, I could kind of

2    review it.  But there was stuff on there that was -- it was

3    crazy.  It was just twice what I would normally expect to see

4    even in a hurricane emergency kind of situation.

5         Q.   And did anyone with Eaux Holdings or the public

6    adjuster tell you that they thought it was outrageous as

7    well?

8         A.   No.  I mean, what I was told was, "You got the

9    bill.  You need to pay it."  Kind of that's the impression

10   they gave me.

11        Q.   I guess I've got maybe one more question.  At any

12   time during this process were you given the information that

13   you would need to plug into the Xactimate and figure out what

14   a number should be from what Mr. Major gave you?

15        A.   No.

16        Q.   And all of these photos, I think all of this -- I'm

17   sorry.  I'm going to pass one.  All of these, it's mostly all

18   photos?

19        A.   Yeah.  Well, I never received those books.  I

20   received digital copies and it was almost entirely photos.

21        Q.   And could they have been appended to or kind of fed

22   into Xactimate?

23        A.   Oh, yeah.  I mean, that's how claims adjusters do

24   it.  We take the pictures, we load them into the software.

25   There's a place right there in the system where you write a

1    note about what it is.  There's a description and you can

2    say, "This is the east office showing the -- you can see

3    through the roof from here, from inside."  You know, you

4    would plug them into Xactimate, you write a note about what

5    it is, and it prints out in a very nice form.  You can rotate

6    them.  You can edit them.  You can, not edit them, but notate

7    them.  So you can put lines and arrows and circles on stuff.

8    It's the way that claims adjusters do it.

9        Q.   Was that done here?

10       A.   No, it was not.

11       Q.   Thank you, sir.

12            THE COURT:  Redirect.

13                    **REDIRECT EXAMINATION**

14   BY MS. BROWN:

15       Q.   Mr. Lock, I'm going to jump around a little bit

16   because I just want to ask you a few follow-up questions.

17   First of all, you didn't -- Scottsdale didn't have any

18   problem with the condition of the building when it sold a

19   $2 million policy to Eaux Holdings?

20       A.   No.

21       Q.   It accepted premiums from Eaux Holdings for that

22   $2 million policy, didn't it?

23       A.   It did.

24       Q.   Nobody either before or after the storm ever asked

25   if there was an inspection report or to see an inspection

1   report, correct?

2        A.   I wasn't aware of one.

3        Q.   And you did not ask anyone if one had ever been

4   done?

5        A.   Yeah, that's correct.  I didn't because I didn't

6   know it existed.

7        Q.   And just like you didn't know it existed, you also

8   don't know that Mr. Odom did all the repairs in that

9   inspection report?

10       A.   I don't know what he did.

11       Q.   Okay.  You didn't ask?

12       A.   No, ma'am.

13       Q.   Okay.  You said, when Mr. Wolff was questioning

14  you, that you were continuing to investigate the claim; but

15  you admitted to me both in your deposition and today that

16  after the November 22nd payment on the Grecco estimate you

17  did not return communication with Skyline after that?

18       A.   That's correct.  There were e-mails that went

19  unanswered.

20       Q.   And phone calls, correct, that are noted?

21       A.   I believe so, yes.

22       Q.   Okay.  Some discussion also about -- you said that

23  in this estimate, and I'm going to get into it with Jeff

24  Majors today, but that there was some big number that they

25  just threw in there for market conditions, right?  You said

1    you still don't know what that is?

2         A.    The 260,000 contingency?

3         Q.    Correct.  Is that right?  You still don't know what

4    that is?

5         A.    I don't know what that is.

6         Q.    Did you ever ask?

7         A.    I hired a building consultant to review the

8    estimate and prepare his own estimate.

9         Q.    But did you -- in your communications with Skyline

10   before they stopped in November, so between September when

11   you got this and November, did you ever just ask?

12        A.    No, ma'am.

13        Q.    Okay.  Another problem that you say you had with

14   this estimate was that you had no way to calculate the actual

15   cash value; is that right?

16        A.    Not based off of that, no, ma'am.

17        Q.    First of all, Louisiana law does not require an

18   insured to give you the actual cash value, correct?

19        A.    I'm not an attorney.

20        Q.    But you're aware -- you told me yesterday you're

21   familiar with the laws that govern your adjustment of claims

22   in Louisiana.

23        A.    I'm familiar with them but --

24        Q.    Are you aware of any law that requires the insured

25   to give you an actual cash value?

1          A.    No, ma'am, I'm not.

2          Q.    And when you were provided -- you continue to

3     remind me you were provided the electronic copy of this set,

4     correct?

5          A.    That's correct.

6          Q.    You were also provided what's called an ESX file,

7     weren't you?

8          A.    An ESX file from who?

9          Q.    From Skyline.

10         A.    I don't recall receiving an ESX file from them.

11         Q.    Okay.  You're able to ask for ESX files, aren't

12    you?

13         A.    I could, yes.

14         Q.    And just so the jury understands what that is, you

15    talked about Xactimate and what this is printed out is like a

16    PDF; but an ESX is the native format of an Xactimate file,

17    correct?

18         A.    Right.  In other words, it would be comparable

19    to -- like a Word document has its own file format, just like

20    Excel has their own file format, Xactimate has their own file

21    format.

22         Q.    And in that native format you can manipulate the

23    inputs, correct?

24         A.    Yes, but it's not as simple as that.

25         Q.    Okay.  For instance, when Grecco prepared its

1   Xactimate estimate you asked them to send you the ESX file so
2   that you could apply the depreciation, didn't you?
3       A.   So that I could make sure it was applied correctly.
4       Q.   Okay.  You could have done the same thing to the
5   Skyline estimate had you wanted to, correct?
6       A.   No.  I don't believe there was measurements in the
7   Skyline estimate.  I mean, there was no way to get through
8   their estimate because they come through -- every user in
9   Xactimate has their own profile and that's set up directly
10  with Xactware, which is the company that makes the software.
11  So you can't just get any old body's estimate and start
12  working through it.  It has to be set up like an insurance
13  company's profile, not like a contractor's profile.  I've
14  never had any success asking for a public adjuster's ESX file
15  and being able to open it and do anything with it because the
16  two different systems don't jive together.
17      Q.   Okay.  Setting aside that technicality, once you
18  learned what Grecco's 22 and something percent depreciation
19  was, you could get that dollar store calculator like I did
20  this morning and apply depreciation, couldn't you?
21      A.   But that would not be the correct way to apply it.
22      Q.   Okay.  But you could do that math?
23      A.   I can do math, yes, ma'am.
24      Q.   Okay.  While we're talking about depreciation, the
25  137,000 or so between the Grecco RCV and ACV, you never

1      released that depreciation to Eaux Holdings?

2           A.   No.

3           Q.   Scottsdale ultimately paid $1.8 million on this

4      claim or very close to it, correct?  We looked at those

5      numbers.

6           A.   Yes, ma'am.

7           Q.   And you admitted that that number was a lot

8      close -- Skyline was a lot closer than Grecco, right, to

9      what --

10          A.   That 1.8 included the mitigation.

11          Q.   Okay.

12          A.   So -- sorry.  I'm doing math in my head.

13          Q.   It included 177,000 for mitigation.  So let's --

14     Skyline was a lot closer than Grecco?

15          A.   Those numbers -- yeah, those numbers are closer;

16     but if you add it all up, their original numbers with their

17     estimate plus mitigation came up to something like 2.7 or

18     2.8.

19          Q.   Scottsdale didn't get to the right number until

20     five months after Mr. Odom filed suit, correct?

21          A.   I don't know.

22          Q.   You need to look at the payments again?

23          A.   Well, I wasn't handling the claim at that time.  I

24     don't know how they came up with those numbers.

25          Q.   But you know the $1.1 million wasn't paid until May

1    of 2021?

2         A.   I saw that, yes.

3         Q.   And that was after litigation had commenced and a

4    litigation consultant had been hired, correct?

5         A.   Like I said, I wasn't handling the claim at that

6    time.

7         Q.   But you're here as Scottsdale, Mr. Lock, and you

8    know those facts, correct?

9         A.   I know that we issued the payment in May like you

10   showed.

11        Q.   And that was based on Granger Stuck going out and

12   inspecting the property?

13        A.   I don't know that.  I wasn't involved with his

14   being part of the claim.

15        Q.   I want to go back to that $250,000 advance that

16   Jennifer Vick -- we know what she said, it was for

17   mitigation.  You say that's not what it was for.  What was it

18   for?

19        A.   It was for the advance amount that they'd

20   requested.  They'd requested an advance.  We don't issue

21   advances for any specific thing unless we say specifically

22   what it's for.  It's we know that we owe at least this much

23   for the claim, let's go ahead and get it out the door, get it

24   in somebody's hand to help them out and then we'll sort out

25   the final amounts later.

```
 1      Q.   Okay.  And how did you decide on at least 250
 2   instead of the at least 1.5 million that Monte Jones had told
 3   you?
 4      A.   Well, it jived with the amount that they'd
 5   requested.
 6      Q.   Last question.  I know you stated that you were
 7   continuing to investigate the claim and there were a lot of
 8   things you didn't have even though you didn't ask for them.
 9   Louisiana law sets a time within which you have to do those
10   things, right?
11      A.   Yes.
12           MS. BROWN:  That's all the questions I have.
13           THE COURT:  Okay.  You may step down.  I'm sorry.
14      Did you complete your answer?
15           THE WITNESS:  Well, yeah.  I mean, Louisiana, my
16      understanding is they have a law that says that you have
17      to -- can you say that again?  I'm not sure I understood
18      the question correctly.
19           THE COURT:  Please.  Let him clarify.
20           MS. BROWN:  Sure.
21   BY MS. BROWN:
22      Q.   My question was that Louisiana law sets times
23   within which you have to do things on claims.
24      A.   That's correct.
25      Q.   Okay.  That was my question.
```

```
1        A.    Okay.   Thought it sounded different the first time
2   you said it.
3        Q.    It may have not been exactly the same words --
4        A.    Yeah.
5        Q.    -- but that was my question.
6        A.    Okay.
7        Q.    I have nothing further.   Do you?
8        A.    I'm good.
9             THE COURT:   Okay.   You may step down.   Thank you.
10            Ladies and gentlemen, I think your lunch has
11   arrived so we're going to take our lunch break now, let
12   you go eat lunch.   We'll come back at 1:00 o'clock.
13   1:00 o'clock okay or y'all need a little more time?   I'm
14   trying to keep this thing moving.   1:15.   How about
15   that.   All right.   Thank you.   All rise for the jury.
16                  (Jury exits courtroom.)
17            THE COURT:   Anything else?   See y'all at 1:15.
18                  (Recess is taken.)
19            THE COURT:   Anything before we bring the jury in?
20            MR. WOLFF:   I think so, Your Honor.   John Wolff for
21   the defense.   Ms. Brown was asking about the time that
22   would be charged to everybody and getting that sorted
23   out.   I think we got a couple things.   Are the openings
24   going towards the -- it's fine.   I just need to know
25   what the playbook is.
```

```
 1          THE COURT:  Not really.  She added it but -- I
 2   mean, I gave y'all each 25, 30 minutes for opening or
 3   something.  I'm not really going to -- yeah, that's
 4   okay.  What I was really talking about was time with
 5   witnesses and so on like that because if you decide you
 6   want to play a four-hour video deposition, God forbid,
 7   I'm going to tax somebody with that time because those
 8   poor people are going to fall asleep in about 20
 9   minutes.
10          MR. WOLFF:  Understood.
11          THE COURT:  To be honest, I'm trying to discourage
12   that.
13          MS. BROWN:  Only the one playing the video gets
14   tagged with the time.
15          MR. WOLFF:  Yes, unless you have --
16          THE COURT:  Whoever's questioning.  If you then
17   play the other part, then that's your time.  Because
18   y'all had that big ole deposition y'all made me spend
19   two days reading of somebody.  I don't remember who that
20   guy -- who was it?
21          MR. WOLFF:  Moncrieff (sic) for Encore.
22          THE COURT:  Yeah.  I had to read that thing and
23   then I had to rule on all y'all's different objections
24   and stuff.  Then I said, okay, if you're going to play
25   this thing, somebody's going to pay.
```

1      MR. WOLFF:  And on the bar conferences?  Hopefully
2  we've worked out a lot of the kinks.
3      THE COURT:  I'm not taxing y'all.  We're not taxing
4  you on that.  I mean, you got to make your objections
5  and come up and do that.  Look, I'm trying not to be a
6  mean federal judge.  I'm trying to be reasonable.
7      MR. WOLFF:  Right.  Well, we're going to push it
8  along.
9      THE COURT:  I have my moments but, you know.  Hey,
10  listen, I'm trying to let y'all try your case.  That's
11  my goal.  You know, that's always been my goal on both
12  sides, let you try your case.  I'm the referee here, you
13  know.  I'm trying to keep y'all in line.
14      MR. WOLFF:  We need it.
15      THE COURT:  No flagrant fouls, you know.  Anything
16  else?
17      MR. WOLFF:  No, sir.
18      THE COURT:  All right.  Let's bring the jury in,
19  then.
20              (Jury enters courtroom.)
21      THE COURT:  Good afternoon, ladies and gentlemen.
22  Hope you had -- I don't know what they provided.  That
23  is outside my purview.  I hope it was delicious.  Hope
24  it was good.  Okay.  Good.  Everything's -- everybody's
25  doing okay?  I just want to check on y'all.  I want

```
 1           y'all to be comfortable because we do appreciate your
 2           service so we want to take care of you.
 3                  All right.  Plaintiff, call your next witness.
 4                  MR. COX:  Your Honor, we call Ricky Poole.
 5                          RICHARD POOLE,
 6    after being first duly cautioned and sworn to tell the truth,
 7    the whole truth and nothing but the truth, did testify on
 8    oath as follows:
 9                        DIRECT EXAMINATION
10    BY MR. COX:
11        Q.   Would you please state your full name and address.
12        A.   Richard L. Poole, 159 Cripple Creek Road, Lake
13    Charles.
14        Q.   And you go by Ricky Poole, correct?
15        A.   Correct.
16        Q.   Sir, are you the owner of Poole Roofing in Lake
17    Charles?
18        A.   Yes, sir.
19        Q.   How long have you been in business?
20        A.   46 years.
21        Q.   Are you a licensed roofer in the state of
22    Louisiana?
23        A.   Yes, sir.
24        Q.   About how many commercial roofs does your company
25    do a year during that 46-year span?
```

204

1          A.    I'd say on the average ten.

2          Q.    So you may have done about 400 roofs in your

3     career, commercial roofs?

4          A.    Possibly, yes, sir.

5          Q.    And a whole lot more than that residential roofs,

6     correct?

7          A.    Correct.

8          Q.    You were the company and you did the roof on 620

9     Esplanade, the building owned by Eaux Holdings, Joey Odom,

10    correct?

11         A.    Correct.

12         Q.    That was after the storm, you redid the roof?

13         A.    That is correct.

14         Q.    Had you done some work between the time when he

15    purchased the building in January 2018 and the time of

16    Hurricane Laura on August 27, 2020?

17         A.    Correct.

18         Q.    What type of work did you do on that roof in that

19    period before the storm?

20         A.    To the best of my memory, we did a repair --

21         Q.    And --

22         A.    -- in that timeframe.

23         Q.    -- could you describe it a little bit more about

24    what the repair was.

25         A.    I don't remember the exact size, but we capped over

1    the existing roof, removed the existing gravel and capped

2    over an area that was a problem.

3         Q.   So you fixed the problem parts?

4         A.   To the best of my knowledge, yes.

5         Q.   What was the condition, in your opinion, of the

6    roof after you did that work but before the storm?

7         A.   Nothing out of the ordinary.  I mean, more than a

8    routine repair.  You scrape gravel back -- on that existing

9    particular system you remove the gravel until you get to

10   something good or find the problem and make a repair and get

11   into good product and stop there.

12        Q.   So would you say that for a roof of that age -- it

13   was built -- the building was built in 1976.  But for a roof

14   of that age, would you say that the roof was in good

15   condition before Hurricane Laura?

16        A.   Yes, because of the amount of -- normally I will

17   judge -- age has a factor, yes.  Normally I will judge a roof

18   condition to determine whether it's usable or needs to be

19   reroofed as according to the amount of patches, repairs.  I

20   don't ever go into a roof and take one patch and then say,

21   oh, it's time to reroof, try and get as much as we can out of

22   the client.  I was confident at that time that the repair --

23   it was a valid repair.

24        Q.   After the storm Mr. Odom hired you to replace the

25   roof, correct?

1       A.   Correct.

2       Q.   Was that because the roof had been damaged during

3   the storm?

4       A.   Most certainly.

5       Q.   What did he ask you to do, Mr. Poole?

6       A.   Put him in the dry.  You know, put a new roof on.

7       Q.   Did he get more specific than that or did he just

8   say, "I need a new roof"?

9       A.   To the best of my memory, it was just a new roof.

10      Q.   He never asked you, "Mr. Poole, I'd like you to put

11  a better roof on my building than the one I had"?

12      A.   No, sir.

13      Q.   The roof that you put on was a different kind of

14  roof, correct?

15      A.   Correct.

16      Q.   Why is that?

17      A.   Well, time dictates to the different procedures and

18  installation, product changes.  As you said, roof was --

19  existing roof was 40 years old.  Products -- the whole

20  roofing industry changes with environmental issues and they

21  change products.  I felt like I put the roof on that was

22  similar to the same amount of plies.  And the original roof

23  was a rock roof.  To the best of my knowledge, they haven't

24  done a rock roof or aggregate roof in 15, 20 years.  It was a

25  roof I put on that I was comfortable with the product and

1    have had good success with.

2         Q.   You completed the work about May of 2021 on that

3    roof?

4         A.   Somewheres in that, yes, sir.

5         Q.   What's the warranty on the new roof that you put

6    on?

7         A.   The warranty comes from the manufacturer.  They

8    come with a 20-year no dollar limit warranty.

9         Q.   In your opinion, what's the life expectancy of that

10   new roof that you put on?

11        A.   With today's product it's hard to say, and the

12   condition of the weather in the next 20 years is going to

13   dictate a lot of that.  But if you can see '21, '22, any year

14   like that, we feel like we've accomplished.

15             MR. COX:  I'd like to offer 112.

16             MS. WOLF:  It's already admitted.

17             MR. COX:  Oh, it's been admitted.  Sorry.

18   BY MR. COX:

19        Q.   Mr. Poole, can you see this invoice dated

20   March 3rd, 2022?

21        A.   Yes, sir.

22        Q.   That's the invoice that you gave to us, I guess,

23   within the last week, correct?

24        A.   Correct.

25        Q.   And the total amount of the invoice is $276,887.

1    Was that your charge to Eaux Holdings and Mr. Odom to replace
2    the roof after the storm?
3         A.   That is correct.
4         Q.   Thank you, sir.  I don't have any further
5    questions.
6         A.   Thank you.
7                        CROSS-EXAMINATION
8    BY MS. WOLF:
9         Q.   Good afternoon, Mr. Poole.  How are you?  So after
10   Hurricane Laura, I understand that you met with Mr. Odom.
11   And did y'all walk the roof together and assess the damage?
12        A.   I don't think Mr. Odom got on the roof.
13        Q.   But you did?
14        A.   We -- I did personally, yes.
15        Q.   So you assessed the Hurricane Laura damage; is that
16   right?
17        A.   To the best of my ability.  When I got there, by
18   the time I got there, the roof had already been temporary
19   dried in with a TPO or some type of membrane so it was hard
20   to really -- I did more assessing underneath.
21        Q.   Right.  And at some point after you did that
22   assessment of Hurricane Laura damage you then made a
23   recommendation to Mr. Odom about what you thought needed to
24   happen to the roof to put him back to where he was prior to
25   the storm, right?

1          A.    Correct.

2          Q.    And you said that was a roof replacement; is that

3    right?

4          A.    That is correct.

5          Q.    And the owner made that decision and told you to go

6    forward; is that correct?

7          A.    Correct.

8          Q.    And when you were done with the work was Mr. Odom

9    satisfied with your work?

10         A.    To the best of my knowledge.

11         Q.    And he paid for you it, right?

12         A.    Not quite in full, but yes.

13         Q.    We'll look at all the invoices to see exactly what

14   was paid and when, but as of today your understanding is that

15   Mr. Odom is satisfied with the roof?

16         A.    Yes.

17         Q.    And you said that it's a similar roof to the roof

18   that was on there prior to the storm, correct?

19         A.    Yes, ma'am.

20         Q.    I want to go through the payments that were made to

21   Poole Roofing by the plaintiff.  So what this is, in the

22   course of this lawsuit we were provided with proof of the

23   actual payments that were made for this roof work.  So you

24   agree that checks from the owner to the contractor would

25   reflect the actual cost for the work; is that correct?

```
 1          A.    Yes.
 2          Q.    So let's look at --
 3                MS. WOLF:  What I'm going to do is offer, file and
 4          introduce three checks.  These are going to be defense
 5          Exhibits D-75, D-76, and D-60.  These are the three
 6          Poole Roofing checks.
 7                MR. COX:  May I see those, please.  No objection.
 8                THE COURT:  They're admitted.
 9    BY MS. WOLF:
10          Q.    So we'll look at these one at a time.  The first
11    one that we have here is dated -- you can see that it's dated
12    November 11, 2020, correct?
13          A.    Correct.
14          Q.    And that check was for $80,000; is that right?
15          A.    That is correct.
16          Q.    And the next one that we have is D-76.  All right.
17    This one is dated February 3rd, 2021, correct?
18          A.    Yes.
19          Q.    And that -- in this check the plaintiff paid Poole
20    Roofing $60,815, correct?
21          A.    Correct.
22          Q.    And the last one that I have for you, this one is
23    dated May 26th of 2021 and the plaintiff paid Poole Roofing
24    $100,000, correct?
25          A.    Correct.
```

```
 1        Q.   So these three checks -- and I know we're going to
 2   look at the statement in just a minute.  So these three
 3   checks total the $240,815 that plaintiff paid to Poole
 4   Roofing, correct?
 5        A.   If you're correct with the math, yes.
 6        Q.   We'll look and see if I'm correct because it
 7   actually comes from your sheet, but we'll look at that in
 8   just a second.  Let's put that up.  This has already been put
 9   in as exhibit -- plaintiff's Exhibit 112.  Okay.  So there
10   you see the $240,815, correct?
11        A.   Yes.
12        Q.   And it lists those three invoices that we just
13   looked at, right?
14        A.   Yes.
15        Q.   Now, I believe that you just testified that the
16   roof work was done sometime in May of 2021, right?
17        A.   The completion?
18        Q.   Yes.  When was the roof completed?
19        A.   I'm going to assume there.  I'm not exactly sure
20   that timeframe.
21        Q.   Well, I want to see if we can pin it down a little
22   bit.
23        A.   Okay.
24        Q.   That invoice was dated May 4th of 2021.  Do you see
25   that?  You invoiced --
```

212

1      A.   Yes, ma'am.

2      Q.   Do you typically invoice after you've finished with

3  the work?

4      A.   Correct.

5      Q.   So is it a fair assumption that by the time you

6  dated that invoice, May 4th, 2021, you'd completed the work?

7      A.   I'm not going to say that it was completed.  I

8  would probably say the majority of it was completed.

9      Q.   Okay.  Do you know when you completed the last part

10  of the roof work?

11      A.   No, ma'am.

12      Q.   Okay.  Did Mr. Odom ever mention to you anything

13  about him having a replacement cost insurance policy and

14  needing the final payment so he could submit them to his

15  insurance company?

16      A.   Not that I'm aware of.

17      Q.   Okay.  So I think, if I'm understanding this right,

18  you're saying that you were completed with the roof sometime

19  in May of 2021.

20      A.   It could have been.  It could have been a month

21  later, because there was a balance of 36,000.

22      Q.   Okay.  And that leads me to my next question.  So

23  this is -- what we're looking at in P-112 doesn't actually

24  say invoice on it, right?  It's a statement?

25      A.   Oh.  Yes.

1    Q.   Okay.  And do you know why we're just getting this
2    dated May 3rd and trial started yesterday on May 7th -- I
3    mean, March 7th?  Do you know why we're just getting it?
4    A.   I think it was just requested.
5    Q.   Requested by whom?
6    A.   Mr. Cox.
7    Q.   Okay.  So you were -- you invoiced -- you see here
8    that you invoiced for the roof, and I understand that you're
9    saying it wasn't the final amount; but you invoiced on
10   May 4th, 2021, right?
11   A.   Yes, ma'am.
12   Q.   And you looked at the date on that check from D-60,
13   Defense Exhibit 60, and you see the date on there is May 26,
14   right?
15   A.   Yes, ma'am.
16   Q.   So you invoiced on May 4th and three weeks later
17   you were paid for the roof, right?
18   A.   It appears, yes.
19   Q.   Now I want to look at what we've marked --
20   actually, this has already been admitted by plaintiff.  This
21   is plaintiff's Exhibit 96.  Is that going to be too small for
22   you to see?  Can you see it?  Is that all right, Mr. Poole?
23   Can you see that?
24   A.   Yes, ma'am.
25   Q.   So this has been marked as plaintiff's Exhibit 96,

1    and this is Page 4 of that exhibit.  And you note there's no
2    date on this document, right?
3         A.   Not that I can tell.
4         Q.   All right.  And it's called a payment schedule.  Do
5    you see that right here?
6         A.   Yes, ma'am.
7         Q.   All right.  And then it also has the word
8    "estimate" here.  Do you see that?
9         A.   Yes, ma'am.
10        Q.   Here and here?
11        A.   Yes, ma'am.
12        Q.   I've highlighted "total estimate."  You agree that
13   this document that we're looking at in P-96, Page 4, that's
14   just an estimate; is that correct?
15        A.   That is correct.
16        Q.   So it doesn't reflect an actual cost, right?
17        A.   That is correct.
18        Q.   So you agree that the actual cost for this roof
19   replacement was not $289,545, right?
20        A.   That is correct.
21        Q.   And if the insurer -- if this had been submitted to
22   the insurer and the insurer had paid it, the $289,545, the
23   insurer would have overpaid this part of the claim; is that
24   right?
25        A.   That is correct.

215

```
 1              MS. WOLF:  I don't have any further questions.
 2              THE COURT:  Any redirect, Mr. Cox?
 3              MR. COX:  Yes, sir.
 4                      REDIRECT EXAMINATION
 5   BY MR. COX:
 6        Q.   Mr. Poole, part of that same exhibit, when Ms. Wolf
 7   just said there was no date on it, can you read that where it
 8   says "Date:  Monday, October 19, 2020"?
 9        A.   Yes, sir.
10        Q.   That was the estimate that your company provided to
11   do that roof at that time, in October of 2020, correct?
12        A.   Correct.
13        Q.   And that's what you expected that it was going to
14   cost.  That's what you were telling Mr. Odom that it was
15   going to cost.  Correct?
16        A.   That is correct.
17        Q.   And it ended up costing just a little bit less,
18   276,000 and some change, correct?
19        A.   That is correct.
20        Q.   Thank you.
21              THE COURT:  Okay.  You may step down.  Thank you.
22              MS. BROWN:  Plaintiff will call Jeff Major.
23                        JEFFREY MAJOR,
24   after being first duly cautioned and sworn to tell the truth,
25   the whole truth and nothing but the truth, did testify on
```

1    oath as follows:

2                      **DIRECT EXAMINATION**

3    BY MS. BROWN:

4        Q.   Mr. Major, if you will introduce yourself to the

5    jury.

6        A.   Sure.  Hi, guys.  My name's Jeffrey Major.  I'm

7    with Skyline Adjusters.

8        Q.   Okay.  And I can -- I'm sure they can all tell from

9    your accent you're not from around here.  So tell us where

10   you came from.

11       A.   Not from around here.  I'm from New York, but I

12   currently reside in New Jersey.

13       Q.   Okay.  And we've heard testimony from Mr. Lock over

14   the past two days that you were the public adjuster hired by

15   Mr. Odom to help him adjust the claim at 620 Esplanade.

16       A.   That's correct.

17       Q.   Tell us how it is that you came to meet Mr. Odom.

18       A.   So I have a -- during Superstorm Sandy, which was

19   up in the northeast, there was a gentleman who came up.  He

20   was an adjuster, public adjuster, used to be an independent

21   adjuster.  He came up to New Jersey and New York to help with

22   insurance claims.  He's from Lake Charles.  He was -- I think

23   he's from Oberlin originally, lives in Lake Charles,

24   Louisiana.  And prior to -- so I do insurance hurricane work.

25   So we sort of have an idea where a hurricane's hitting and

1    kind have an idea where it's actually going to hit usually

2    before most people do because we track those things.  So I

3    got a call.  Gentleman's name was Mr. Kermit Sonnier and I

4    got a call from him and he basically said, "Y'all come on

5    down to help."  So it was sort of this reciprocal he came up

6    to help, you know, us up there so I was coming down to help

7    people down here with him.

8        Q.   Okay.

9        A.   And then -- well, you asked me how I met Mr. Odom.

10       Q.   Right.

11       A.   Sorry.

12       Q.   I was going to get you back --

13       A.   So -- I was going to give a little bit of my life

14   because it's how I ran into him.  So when I go to a storm --

15   I flew into Houston, rented a car and I drove in.  I drove

16   through, like, flooded streets.  My phone didn't work.  My

17   nav. didn't work.  We didn't have any signals or anything.

18   But when I go to a hurricane area I have -- my first goal is

19   to find a tire place because there's, like, people's roofs

20   laying all over the place and everybody gets flats.  So I

21   don't want to go down to some area I don't really know and be

22   stuck so the very first thing is tires.  And the very second

23   thing is fuel, gas.

24       So it took me maybe -- it took me hours to get in.  I

25   was driving down back roads that were -- I didn't even know

1    where I was.  I saw a Servpro truck, figured it was going to

2    where the area was, so I followed it.  And then I got in and

3    I was trying to communicate with some of the emergency

4    service guys, some of the people I knew, remediation

5    companies, to try to basically find fuel.  That's all I cared

6    about.

7          So I went by the airport.  There was a body shop like

8    garage and there was a guy out there cleaning up.  So I went

9    and talked to him.  I told him my name.  I asked for his

10   contact information.  And then I saw one of the All Clear

11   trucks.  And in my business, like, you know Servpro, Belfor,

12   all the -- like, you just know they have resources.  They're

13   staying somewhere.  So I followed the All Clear truck and

14   they went to a parking lot which turned out to be Mr. Odom's

15   parking lot.  And they had a fuel cell.  So a fuel cell is

16   just this big tank of gas.  So, like, now I've met everything

17   I need.  And I know I'm going to get bit by mosquitos and not

18   have food and no air conditioning, but at least I know I'm

19   there.

20         So when I showed up and I was talking to the guys,

21   there's some emergency group that I knew the guys and they

22   were talking to me.  Then one of the gentlemen introduced me

23   to Mr. Odom.  And this was, like -- the storm went through.

24   This was that morning.  And so -- and then I couldn't get a

25   hold of Mr. Sonnier.  I went by his house, but he was stuck

1    up in Oberlin because trees blocked his area and he wasn't

2    coming down.  And then I talked with Mr. Odom, just more of a

3    hello, how you doing.

4         There was a meeting and the remediation guy, whoever it

5    was, said, you know, "Do you want to listen in?"  So I sort

6    of stood under his carport.  And the ICE people were there,

7    the Homeland Security people, Joey, the emergency service

8    people.  There's a whole group of people that were there.  I

9    sort of listened in on the meeting and that was it.  The next

10   day I got a phone call from my office that said, "Could you

11   swing by Mr. Joey's place?"  And I went by and talked to him

12   about me working on his claim.  That's how I met him.  Sorry

13   it was long.

14        Q.   No, that's good.  I want to back up a little bit.

15   I'll come back to when you were actually heard.  Tell us

16   exactly the term -- public adjusting is a term I think a lot

17   of people around here have gotten familiar with recently, in

18   the past couple years.  If you could explain to the jury what

19   it is that public adjusters do.

20        A.   Sure.  So there's -- an insurance adjuster is

21   somebody who adjusts insurance claims.  It's different from

22   an estimator.  I'm an insurance adjuster.  There's mainly

23   three types of adjusters:  A staff adjuster who works for the

24   insurance company.  Like, he's an employee, gets a salary and

25   gets a paycheck.  An independent adjuster, which is -- he

1      does the same job, basically, but he gets paid by -- he works

2      for multiple insurance companies.  So if you have State Farm

3      and you have a house fire, they're going to send a State Farm

4      adjuster who usually works for State Farm.  If you have a cat

5      claim, a catastrophe claim where there's a bunch of claims,

6      they're going to send out independent adjusters.  His shirt

7      may say State Farm, but he works for some independent company

8      like Monte Jones was in this case.  He was an independent

9      adjuster working for Scottsdale.  And then there's public

10     adjusters.

11         So in sort of like the best scenario, adjusting is just

12     adjusting.  There shouldn't be sides and it shouldn't be like

13     you're an insurance company adjuster or you're a public

14     adjuster.  If the roof blew off, you measure the roof, this

15     is what it is, and you apply the damages to the policy and

16     then you adjust the claim.  It so happens that independent

17     adjusters and staff adjusters only work for insurance

18     companies.  Public adjusters who are licensed by the state,

19     you're licensed, you're bonded, you have to pass tests and do

20     whatever, you're working for homeowners.  And just by

21     default, they're trying to not pay you money and I'm trying

22     to get enough money to fix it.  They're sort of like -- like,

23     we're against each other in a sense.  In a lot of cases we're

24     not because the adjuster and you work it out, but that's the

25     difference.  So there's a staff adjuster, an independent

1    adjuster, and a public adjuster.

2         Q.   And in this case we had all three.  Mr. Lock was

3    the staff adjuster, Mr. Jones was the independent adjuster,

4    and you were the public adjuster?

5         A.   In a sense, correct.

6         Q.   Why do you say that?

7         A.   Because Mr. Lock was an inside desk adjuster.  So

8    when I say staff adjuster and I gave the example of State

9    Farm, that's the guy that actually comes out and adjusts your

10   claim.  He's still a field adjuster.  So Mr. Lock was a desk

11   adjuster.  He wasn't there.  He didn't see it.  He gets -- so

12   what happens is the field adjuster, whether he's a staff

13   adjuster or independent adjuster, reports back to the staff

14   adjuster.  So the decisions, everything that I deal with as a

15   public adjuster, is with the guy in front of me.  It's the

16   field adjuster.  Sometimes it's a staff adjuster.  Sometimes

17   it's an independent adjuster.  In this case there was no

18   staff adjuster adjusting the claim.  There was a field

19   adjuster, and that was Monte Jones.  And Adam was just the

20   inside guy that Monte was reporting to.

21        Q.   And as opposed to just an estimate to repair things

22   at 620 Esplanade, your process includes determining that the

23   particular items of damage were caused by the hurricane?

24        A.   That is correct, yes.

25        Q.   Okay.  And covered by the particular insurance

1    policy?

2        A.    Correct.  So when I gave the example of estimating

3    and adjusting, estimating is its damage, how much is it going

4    to cost to replace, adjusting is what part of --

5            MR. WOLFF:  Your Honor, I'll object.  May we

6        approach?

7                        BENCH CONFERENCE

8            THE COURT:  What's your objection?

9            MR. WOLFF:  He's starting to talk about coverage.

10   That's exactly --

11           MS. WOLF:  It's excluded in the sanction.

12           MR. WOLFF:  Right.  They haven't tendered him.

13   They haven't -- no.  The sanction's very clear.  We're

14       under three --

15           MS. WOLF:  The Judge was saying --

16           THE COURT:  Hold on a second.

17           UNKNOWN SPEAKER:  I can do it.

18           THE COURT:  No, no.  You know what, give me one

19       second.  I don't see anything in that question about

20       coverage.

21           MR. WOLFF:  Of course not.

22           THE COURT:  I mean, give me a second.  Let me read

23       it.  I mean, I don't really see a coverage answer.  He

24       didn't really get very far.

25           MR. WOLFF:  That's because I stopped him.

```
 1                THE COURT:  You're making like --
 2                MR. WOLFF:  He started --
 3                THE COURT:  -- a preemptive strike here?
 4                MR. WOLFF:  Exactly.
 5                MS. WOLF:  This is like in his deposition.  He
 6      can't talk about --
 7                THE COURT:  He hadn't said anything yet.
 8                MR. WOLFF:  He's starting to talk about the policy.
 9                MS. WOLF:  He did say part of his role is to
10      interpret the policy.  He just said that.
11                THE COURT:  That's not what he said.
12                MS. BROWN:  He did not say that.
13                THE COURT:  I just read the transcript on my bench.
14                MS. BROWN:  Absolutely not.
15                THE COURT:  He did not say that.  Yeah.  He didn't
16      say that.  I just read it.  There's nothing in there to
17      that effect.  Maybe you think he's going there --
18                MR. WOLFF:  I do.
19                THE COURT:  -- but he hadn't gotten there yet.
20      Until he gets there, there's nothing for me to rule on.
21                MR. WOLFF:  So he's a fact witness right now and --
22                THE COURT:  They haven't tendered him as an expert.
23                MS. BROWN:  I'm getting him qualified.
24                THE COURT:  You need to go ahead and do that.
25                MS. BROWN:  Well, that's what we're doing.  I've
```

1      got to explain what he does, what the job is.

2            THE COURT:  I need qualifications.  I need --

3            MS. BROWN:  That's where we're going.

4            THE COURT:  -- work experience, all that.  That's

5      what I need.

6            MS. WOLF:  There's already been -- we already

7      submitted this pre and you already ruled that he is a

8      public adjuster.  You need more than that to qualify?

9            MS. BROWN:  Well, I'm going to tender him and you

10     can --

11           MR. WOLFF:  You're just going to tender him as a

12     public adjuster?

13           MS. BROWN:  Yeah.

14           THE COURT:  He can give testimony about public

15     adjusting, adjusting claims.

16           MR. WOLFF:  We're not challenging his role as a

17     public adjuster.

18           THE COURT:  Unless y'all want to stipulate to that,

19     that he's a public adjuster and he's qualified to

20     testify --

21           MS. WOLF:  I don't think we need to --

22           THE COURT:  That's up to her.

23           MS. BROWN:  I'm going to put the evidence on

24     anyway.

25           THE COURT:  Listen, I have many trials where they

225

```
1          sit over there and they'll say -- and they go we
2          stipulate that he's an expert.  They can still do it and
3          you can just say, yeah, great.  We'll skip over this
4          part.
5               MR. WOLFF:  I assume -- and I don't want to judge,
6          but this guy talks and you're --
7               MS. BROWN:  So.
8               MR. WOLFF:  Well, not so because he'll start here
9          and what color is the sky --
10              MS. BROWN:  He's using my time up when he talks.
11              MR. WOLFF:  Yeah.  I understand.  What color is the
12         sky and 15 minutes later it's now from blue to green to
13         gray.
14              MS. BROWN:  He's not gone off topic one question.
15              MR. WOLFF:  But he can't talk about policy
16         interpretation.
17              MS. BROWN:  He has not done that, and I've not
18         asked him --
19              THE COURT:  No.  But what he's trying to tell you,
20         Somer, is that he gets to -- you're throwing the ball up
21         and he's running underneath it --
22              MS. BROWN:  Judge, I have no intention --
23              THE COURT:  -- and he's continuing to run.
24              MS. BROWN:  I have no intention of violating your
25         order, nor does my witness.
```

```
 1            THE COURT:  Listen, if you think he's getting out
 2       of hand, just stand up and make an objection; but I
 3       haven't heard anything --
 4            MR. COX:  I'll also say if he appears to be
 5       violating your order, you can't --
 6            THE COURT:  I mean, look --
 7            MR. COX:  -- can't rely on the judge to intercede.
 8            MR. WOLFF:  Yeah, I'll do that.
 9            THE COURT:  Here's the thing, my order on him is
10       simply to give the opinions and he can testify in an
11       area within his expertise, which is adjusting.  To me
12       public adjuster, field adjuster, whoever's out there,
13       they're all using -- they're really all the same.  It's
14       just who they're working for and how they're -- under
15       whose auspice.
16            MR. WOLFF:  Thank you.
17                     PROCEEDINGS CONTINUED
18  BY MS. BROWN:
19       Q.   Okay.  Mr. Major, I forgot where we were.  You were
20  telling us about public adjusting.  As part of a public
21  adjuster, you're not just determining, like a contractor
22  might, how much it's going to take to fix the building,
23  you're determining what damages were caused by the particular
24  covered peril?
25       A.   That is correct.  And so as an -- when I'm an
```

1    adjuster and I'm wearing the hat of an estimator, instead --

2    like, an estimator will go out and say it's just damaged

3    without a differentiation.  Wearing that hat as an adjuster

4    I'm going out and identifying damages specific to, in this

5    case, this hurricane.  So when I see an old chip, you know, I

6    don't put it in the estimate.  You know when I see

7    anything -- if I see rotted wood, I don't put it in the

8    estimate because it didn't just rot from yesterday or last

9    week.  So I'm making a difference between what is damaged and

10   what's not damaged from this event, this hurricane I'm

11   handling in this case.

12        Q.   Okay.  And public adjusting, you already mentioned,

13   is highly regulated by the Departments of Insurance in each

14   state you work in?

15        A.   That's correct, yes, ma'am.

16             MS. BROWN:  I'm going to offer Exhibit 111, but I'm

17        only going to offer his CV.  I think the whole report is

18        in there.

19             MR. WOLFF:  Just the CV itself, no objection to

20        that.

21             THE COURT:  What's the number?

22             MS. BROWN:  It's Exhibit 111.

23             THE COURT:  It'll be admitted.

24   BY MS. BROWN:

25        Q.   Mr. Major, I don't want to go through your entire

1    CV but I do want to hit some of the highlights.  First,
2    you're the president and CEO of Skyline Adjusting?
3         A.   Yes, ma'am.
4         Q.   And that's the company that you were working for
5    when you were hired to do the adjustment for Eaux Holdings?
6         A.   Yes, ma'am.
7         Q.   Talk about -- tell us a little bit about your
8    educational background.
9         A.   I went to -- graduated high school in 1983 and then
10   I went to computer programming school.  So I went to DeVry
11   University, which I did not graduate.  There were trimesters
12   and during the trimesters I went to Control Data Institute
13   which was like a top computer programming school and that
14   was -- and then since then I've gotten -- gone to Camden
15   County College, some college courses.
16        Q.   And how is it that you got into -- from computer
17   programming into public adjusting?
18        A.   So my father was a builder and I grew up in the
19   construction industry, and on my summer jobs and stuff I
20   worked at restaurants at night and worked for my dad.  And
21   then my dad started writing estimates for an insurance
22   adjuster and then he then started writing estimates for a
23   public adjuster because he knew how much things cost, and
24   then I started doing -- because he knew an adjuster, he new a
25   couple adjusters and a public adjuster, so I started doing

1    construction work and I started doing fire restoration work,
2    insurance damage, restoration work, where I fix the
3    properties.  And then in 1992 Hurricane Andrew hit and my dad
4    said I should go down and work Hurricane Andrew; and that's
5    when I started, basically, like, estimating specifically for
6    insurance claims and adjusting claims.  So 1992 was my basic
7    adjusting start but coming from the construction trade.
8         And then the evolution of programs, like, at the time
9    more -- like, the insurance companies started actually using
10   programs.  And then because I had a programming background, I
11   would write estimates for the insurance company adjusters on
12   their -- actually on Xactimate back in the first versions
13   when it was a DOS program.
14        Q.   Okay.  We're going to come back to Xactimate.  Let
15   me keep going through some of your qualifications first.  You
16   mentioned Hurricane Andrew in 1992 was your first hurricane
17   to write estimates for.
18        A.   That's correct, yes, ma'am.
19        Q.   Since then we see a list.  You've worked every
20   major hurricane?
21        A.   Yes, ma'am.
22        Q.   Okay.  How many states do you currently hold a
23   license as a public adjuster?
24        A.   I believe right now including, like, the U.S.
25   Virgin Islands and territories, I think, like, 47 or 40 --

1    wherever -- I think 47 states.

2        Q.   Okay.  In addition to working as a public adjuster,

3    do you also speak or teach classes on issues related to

4    public adjusting?

5        A.   Well, not just related to public adjusting.  So I

6    teach continued education, so CE's, continued education, and

7    CLE's, which I think are lawyer phrase for education.  I

8    teach on Xactimate, the use of Xactimate.  I teach causation,

9    concurrent causation, like, when different things are

10   happening and how to break them apart.  I teach -- I've

11   taught a couple classes on proofs of losses, like a proof of

12   loss.  I taught classes on or teach classes on valuations and

13   square foot valuations and other insurance related topics and

14   estimating topics.

15       Q.   In addition to teaching those classes, do you also

16   yourself attend continuing education classes?

17       A.   Yes, multiple times a year every year since I

18   started.

19       Q.   Okay.  Just an estimate, over the years how many

20   claims have you worked specifically in Louisiana?

21       A.   I have no idea.  I'm going to say I did a lot --

22   now, when you say claims, so it's a little bit of a loaded

23   question because I wrote -- I worked on a claim for a guy who

24   had 22 properties so it was technically 22 claims.  I wrote

25   all the estimates for the public housing for the Lower Ninth

1    Ward in New Orleans.  I wrote all the estimates for those so

2    there were, like, hundreds of properties.  I adjusted the

3    shops at Canal Place, which is a mall.  I did Jax Brewery.  I

4    did -- I don't know.  I can't even -- it's, like, over a

5    hundred I guess --

6         Q.   Okay.

7         A.   -- in Louisiana.

8         Q.   Have you ever been recognized by a court as an

9    expert in public adjusting?

10        A.   Yes, ma'am.

11        Q.   How many times?

12        A.   Over a dozen.  I've been certified as an expert in

13   state -- county, state, and federal courts in Louisiana, in

14   New York, in New Jersey, on public adjusting, insurance

15   claims adjusting, which is -- they're the same but from a

16   public adjuster's responsibility, as a damages expert, and as

17   a construction damages expert, an expert to differentiate

18   causes of loss and how, like, something -- where the water

19   came from, whether it was part of the storm or not, claims

20   handling, and then construction practices and construction

21   defects.

22             MS. BROWN:  With that qualification, I would tender

23        Mr. Major as an expert in the field of public adjusting.

24             THE COURT:  Traversal?

25             MR. WOLFF:  Just very brief.  Thank you.

1                         TRAVERSAL EXAMINATION

2    BY MR. WOLFF:

3         Q.    Good afternoon, sir.

4         A.    Good afternoon, Mr. Wolff.

5         Q.    So you're aware that in the context of public

6    adjusting in Louisiana there are very specific laws that

7    limit what you can do, correct?

8         A.    Yes, sir.

9         Q.    And that law is under the Insurance Code 1692 that

10   limits you to investigating, appraising, evaluating, and

11   reporting to an insured in relation to that claim?

12        A.    Yes, sir.

13        Q.    And you have a contract that you're required to

14   have in Louisiana, the law requires that, right?

15        A.    Yes, sir.

16             MR. WOLFF:  This is D-65, his contract.

17   BY MR. WOLFF:

18        Q.    And that's the public adjuster contract.  Is that

19   it right there?

20        A.    Yes, sir.

21        Q.    And you charged 475 an hour?

22        A.    Yes, sir.

23        Q.    And that's against a 10 percent contingency?

24        A.    No, sir.

25        Q.    It says the total hourly billable will not exceed

233

1    10 percent of the amount received?

2         A.   That's correct.

3         Q.   So you're capped at 10 percent?

4         A.   Yes, sir.

5         Q.   So if you bill up to that threshold, you could get

6    up to 10 percent or your hourly rate, whichever is less?

7         A.   No, sir, not or the hourly rate.  So I can only

8    charge by the hour.  That's how I charge.  I just charge by

9    the hour.  If it turns out that -- so in this case, if the

10   insurance company, like, just worked with us and settled the

11   claim, I may have put in 60 hours.  Because they didn't, I

12   put in 180 hours, whatever the numbers are.  We have the

13   invoices.  So at a certain point, if my hours add up to so

14   much, I'm capped.  I can't get anymore money.  I'm just stuck

15   with whatever that lower number is.  But in this case, even

16   with the insurance company not paying and all the stuff, I'm

17   nowhere -- I'm probably, like, around half of that.

18        Q.   I appreciate that response, but I thought I was

19   clear.  You get 475 and you can bill --

20             THE COURT:  Mr. Wolff, how is this traversal?

21        We're on his expertise right now.  I think you're really

22        more getting into your cross-examination.

23             MR. WOLFF:  I'll save that, then.

24             THE COURT:  I would save it.

25   BY MR. WOLFF:

234

1      Q.    All right.  And it does say in this contract that

2  you are limited to the same things that the law provides,

3  that you can investigate, appraise and evaluate, and report

4  to the insured, correct?

5      A.    Yes, sir.

6      Q.    Okay.  Have you ever had a problem with your

7  licensing anywhere?

8      A.    With my licensing, no, sir.

9      Q.    Have you ever had any citations or problems with

10  any state?

11      A.    The only thing I had was I wrote an estimate for a

12  lawyer in Pennsylvania and they didn't -- it was their own,

13  like, family's business and they didn't pay me.  So they

14  didn't pay me so I basically hired a lawyer to get my money,

15  and then they said I was adjusting without a license in

16  Pennsylvania.  And I didn't have a public adjuster's license

17  at the time.  All I did was write the estimate.  So the State

18  sent me a letter that said cease and desist, don't adjust

19  claims, which I wasn't doing anyway.

20      Q.    So there was a cease and desist from the State of

21  Pennsylvania?

22      A.    Pennsylvania for adjusting claims.

23      Q.    Thank you, sir.

24      A.    You're welcome.

25            THE COURT:  I have a question.  Are you licensed in

235

1    Louisiana?

2         THE WITNESS:  Yes, sir.

3         MS. BROWN:  I offer him as an expert in public

4    adjusting.

5         THE COURT:  Any objection?

6         MR. WOLFF:  No, Your Honor.

7         THE COURT:  He'll be accepted as an expert in

8    public adjusting.

9                    **DIRECT EXAMINATION**

10   BY MS. BROWN:

11        Q.    Mr. Major, you were telling us -- so we're going to

12   go back to when you were hired by Mr. Odom.  And you told us

13   a little bit about what you saw when you got to Lake Charles;

14   but what was the state of things here, there, I guess?

15        A.    So I don't know where the, like, parish lines are,

16   the county lines are.  All I know is at some point the roads

17   were flooded, there were houses in the road, there was trees

18   down everywhere, power lines down everywhere.  So about -- in

19   driving slow, about two hours out all the way into Lake

20   Charles was destroyed.  Everything was -- like, trees were

21   just snapped in half and laying there.  And I didn't even --

22   I guess the things on bargains, those big plastic things on

23   top, they were corn fields, in trees.  It was a complete

24   disaster everywhere you looked.

25        Q.    We just looked at your contract that Mr. Wolff put

236

1    up and I just want to ask you:  You were hired by Mr. Odom on

2    August the 28th, 2020.  That was the day after the storm?

3        A.   Yes, ma'am.

4        Q.   And that was what you were telling us earlier.  You

5    had attended a meeting when you went to get fuel and then the

6    next day you got a call and he had questions for you?

7        A.   Yes, ma'am.

8        Q.   Okay.  Just to be clear, this contract appears to

9    be by Four-O, LLC and the plaintiff is Eaux Holdings, LLC in

10   this case.  What is your understanding of those two entities?

11       A.   So Mr. Odom, Mr. Joey, had -- he had -- they were

12   both his entities, and what he explained to us was -- and we

13   were trying to find out what the name was written on the

14   policy, but what he told us was that he had changed the name

15   or something happened with partners and he'd changed it to

16   the other entity.  And in, like, I think he said March of

17   that prior -- the March prior to the hurricane that he had

18   his agent change it over.  So we were using -- they were both

19   interchangeable to us.  So Four-O, LLC and Eaux Holdings were

20   both Mr. Joey's companies and either and/or both owned the

21   building.

22       Q.   Okay.  And there was some discussion -- this

23   contract that we looked at is for 620 Esplanade Street; but

24   Mr. Odom, I understand, also owns the neighboring property at

25   622 Esplanade.

237

1      A.    That is correct, yes, ma'am.

2      Q.    And I believe we heard Mr. Wolff say in opening

3   statements that there was -- originally you had said there

4   was nothing you could do to help him; but that wasn't on 620

5   Esplanade, correct?

6      A.    Well, it was on 620 Esplanade but not.  So what

7   happened was as an adjuster we get a call for a claim.  We

8   have to see the policy.  We have to see the property.  We

9   have to -- and see whether we can help somebody because we're

10  not there to not help, we're there to help.  So what happened

11  was Mr. Joey said he reported the loss already.  He had a

12  claim number for us but he didn't have his policy.  So he

13  hired us and Jade, who works in my office, she got all the

14  information.  She was reaching out to the agent to get the

15  policy, to get the declaration page of the policy.  So Jade

16  got ahold of me and she said -- I was in the parking lot.

17  She got ahold of me and said, "I'm looking at the policy."

18  She said, "How big is the building?"

19      And I said, "It's pretty big.  It's two stories, about

20  14,000 square feet."

21      And she said, "Okay.  There's $650,000 worth of

22  insurance on it."

23      So, now, as an adjuster -- we heard them say, like, he

24  set a reserve.  You go out there.  Monte Jones set a reserve.

25  It's my job to know what the loss is.  So you can walk up --

1    like, if somebody bumps into your car, you can get out and

2    look and say it's not a big deal or you get out and look and

3    say it's pretty bad.  So for me, I saw that the roof was

4    blown off, water was running through the entire building.

5    The panels on the outside, not that they had a crack in them,

6    they were gone or they were laying on the ground smashed.

7    Part of the roof was in the parking lot and out in the field

8    across from his place.  So I said you have 14,000 square

9    feet, you got about $25, 25, $30 or so on remediation.  This

10   is how adjusters get to a reserve.  You know.  So you got

11   about 125, $140 worth of damage plus the remediation.  It's a

12   two, two and a half million dollar loss.

13        And then Jade is telling me that they have $650,000

14   worth of insurance.  And plus it was ACV, which is actual

15   cash value only.  You don't get replacement cost.  And then

16   there's a coinsurance penalty.  So I was just, like, this is

17   a problem and I wasn't going to be able to help him with

18   that.

19        Q.    So based on what you believed to be the insurance

20   limits, it wasn't going to be worth it for him to hire you?

21        A.    That's correct.

22        Q.    But that wasn't the policy for 620 Esplanade?

23        A.    In the exact same conversation Jade said to me,

24   "How many square feet?"  And I told her.  She said, "This

25   says, like, 3,000."  And then she said, "It's 622."

1      I said, "No, the address is 620."

2      Then we went -- she was going to call the agent to get

3   the 620, the correct policy.  And then I went to Mr. Joey and

4   I said, "Bad news is you got a really bad policy.  Good news

5   is it's not for that building, it's for a different

6   building."  And there was enough insurance for the other

7   building because it's a much smaller building.

8      And then we went and sent a -- we got the policy from

9   the insurance agent and we sent the loss notice into the

10  insurance who'd reported it.  The agent reported the wrong

11  building.

12     Q.    And when you got the correct policy for 620

13  Esplanade, the Scottsdale policy we've looked at, you felt

14  that you could help with this claim?

15     A.    Absolutely.  Yeah.

16     Q.    Did you also help with the 622 claim, the smaller

17  building and the smaller insurance policy?

18     A.    So the answer is yes.  He had, like, one piece of

19  metal that came off the building so, like, I didn't charge

20  him.  We got ahold of -- because the agent filed a claim,

21  there was actually a claim.  As a matter of fact, the claim

22  number is right on that document up there.  And then I talked

23  to the Scottsdale guy.  I told him there was only one piece

24  of flashing damage, it was under the deductible, that we

25  weren't going to make a claim.  So Scottsdale closed that

1    claim out and we basically resolved that claim.

2        Q.    I want to talk about your work on 620 Esplanade,

3    the building we're here about.

4            MS. BROWN:  I'm going to offer Exhibits 4 through

5        7.

6            MS. WOLF:  What's that?

7            MS. BROWN:  4 through 7, the Skyline estimate.

8            MR. WOLFF:  No objection to the estimate.

9            THE COURT:  It'll be admitted.

10   BY MS. BROWN:

11       Q.    So we're finally going to look in these books that

12   have been sitting up here for two days.  I want for you to

13   talk generally about your inspection, first of all.  I know

14   one question that's possibly burning on some minds in here is

15   we heard multiple times Adam Lock say Monte Jones couldn't do

16   an inspection because there was no light, no electricity.

17   How were you able to do an inspection with no electricity?

18       A.    So it depends on what rooms you're in.  The entire

19   building with the exception of one little area was glass so

20   it was like it was as light as it is in here.  In the front

21   right side of the building the roof blew off, and you'll see

22   in the photos there's little cracks of light.  The metal deck

23   has holes in it so the sunlight was coming in.  Where the

24   windows were busted out it was sunny.  And then in the back a

25   whole section of the roof, like you're just looking up at the

```
 1   sky.  And then the remediation guys had generators, they had
 2   their fuel cells, which they were bringing in fuel for the
 3   generators, and there was lights all over the place.
 4        Q.   And was that the state of things when Mr. Jones was
 5   there on September 15th?
 6        A.   He was there during the daytime, and Mr. Monte
 7   Jones and I walked -- in the very inside of the building
 8   there's, like, a couple closets that don't have lights.  And
 9   I had a big, like, LED light with me and we walked through
10   everything and he could see everything.  It was daytime so
11   you could see.
12        Q.   Okay.  And you're familiar with Exhibits 4 through
13   7.  This is the estimate and photographs and other
14   information we're going to go through that you prepared to
15   submit on behalf of your client, Eaux Holdings, to Scottsdale
16   Insurance?
17        A.   Well, I did them, gave them to Mr. Odom.  He asked
18   me to give them to Scottsdale.  Yes, ma'am.
19        Q.   You prepared them for Eaux Holdings?
20        A.   Yes.
21        Q.   And what was the purpose of putting together this
22   four-volume set?
23        A.   So I'm a little different than most public
24   adjusters.  We only handle a handful of claims.  We don't
25   take more work than we can, like, actually do and handle
```

1    properly.  And we do books for every claim we adjust, and the
2    goal is that -- and I get because we do cat work, we do
3    hurricane work.  I get the guy that's coming out has a lot of
4    claims.  He doesn't know the area he's running around.  I had
5    the benefit of being there longer.  They don't show up for
6    long.  They're there for a couple hours or a few hours.  One
7    of the gentlemen was there for a whole day.  I spent days and
8    nights there.  I slept in my car in the parking lot there and
9    I went through everything.  The goal is that when I give you
10   the document it has everything you need in it.  It has -- and
11   we'll go through it, but it has everything that an adjuster
12   needs.  And by the way, Monte Jones said, "This is fabulous
13   and it's everything I need."
14           MR. WOLFF:  Your Honor --
15      A.   So I'm giving them everything they need --
16           THE COURT:  Mr. --
17           THE WITNESS:  I'm sorry, sir.
18           THE COURT:  Hold on one second.
19           THE WITNESS:  I apologize.
20                       BENCH CONFERENCE
21           THE COURT:  I wanted to reread his answer.  It was
22   quite long.
23           MR. WOLFF:  They all are.  I don't want to object,
24   but that's hearsay ten ways to Tuesday.  There's no
25   applicable exception here.

243

```
 1          MS. BROWN:  Other than he was acting as Scottsdale
 2     when he --
 3          THE COURT:  What do you mean?
 4          MR. WOLFF:  He said, "And Monte Jones said."
 5          MR. COX:  He's Scottsdale.
 6          MR. WOLFF:  He's an independent guy that went out
 7     there.  It's hearsay testimony.  It's not a party
 8     opponent.  It doesn't follow any exceptions.
 9          MS. BROWN:  He was an agent of Scottsdale.  He
10     is/was a party opponent in that context.
11          MR. WOLFF:  No.  He's an independent adjuster.
12          THE COURT:  The objection is that he's referring to
13     what Monte Jones told him as hearsay.
14          MR. WOLFF:  Yes, sir.
15          THE COURT:  Who does Monte Jones work for?
16          MR. WOLFF:  He works for --
17          MS. BROWN:  He worked for Scottsdale.
18          THE COURT:  Let's back up.  Who does he work for?
19          MR. WOLFF:  I don't remember the name of the
20     company.  It wasn't Scottsdale.
21          THE COURT:  But the company was hired by
22     Scottsdale.
23          MR. WOLFF:  The company was hired by Scottsdale.
24          THE COURT:  Then he's an agent for Scottsdale.
25          MR. WOLFF:  He is an agent, but that doesn't make
```

1      it an exception on the hearsay.

2           THE COURT:  I don't know.  He's now talking and

3      representing the company in this claim.  Listen, I'm

4      going to tell you, I've had this issue with some of

5      these other --

6           MR. WOLFF:  I just want to see where we are

7      because --

8           THE COURT:  Well, let me just say this.  The way I

9      look at these adjusters, I don't let the insurance

10     company hide behind the fact they hired some third-party

11     adjusting company because I've had them go, "Well, we

12     can't produce him for a deposition because he didn't

13     work for us."  B.S.  You hired the company.  You're

14     responsible now for that adjuster and you're responsible

15     to produce him for a depo.  They hired him.  They're

16     responsible for him.

17          MR. WOLFF:  We did produce him for a depo.

18          THE COURT:  I know.

19          MR. WOLFF:  He was deposed.

20          THE COURT:  I know.

21          MR. WOLFF:  And they're using this guy to offer

22     testimony of another person.  It's an out-of-court

23     statement.  It's being asserted for the truth and --

24          THE COURT:  The only thing I heard him say so far

25     is that Monte Jones said it's fantastic.

1          MR. WOLFF:  Right, but I don't know --

2          THE COURT:  I guess he's saying your adjusting

3     report was fantastic?

4          MS. BROWN:  Right.

5          MR. WOLFF:  I get that, but I don't know where this

6     guy's going next.  I really don't.  You ask him one

7     question and he ends up over here or here.  You never

8     know.

9          MS. BROWN:  He hasn't ended up anywhere.  I asked

10    him what his intent was in turning the books --

11         MR. WOLFF:  Then he said, "Monte Jones said," and

12    then I stopped him.

13         THE COURT:  He does ramble on, you know.  He needs

14    to -- we're going to be here all dang day if he doesn't

15    start --

16         MS. BROWN:  I know.

17         THE COURT:  Just answering the question and quit

18    rambling.  He does ramble.  I will agree with Mr. Wolff

19    on that.

20         MS. BROWN:  On the next break I'll tell him to

21    tighten it up a little.  I'm trying to keep him --

22         MR. WOLFF:  I don't want to object.  And I really

23    don't care that he said, "Oh, you have fantastic books."

24    But then he's going to say, well, then he said this

25    and --

246

```
 1              MS. BROWN:  He's not --
 2              THE COURT:  We don't know yet on that.
 3              MR. WOLFF:  It may be.  Call me paranoid.
 4              MR. COX:  I'd tell him to tighten it up right now.
 5     Just tell him.
 6              THE COURT:  I'll tell him.
 7                       PROCEEDINGS CONTINUED
 8              THE COURT:  Mr. Major, once a question's proposed
 9      to you, I would ask that you please answer the question,
10      okay, rather than kind of continuing on and elaborating.
11      There may be follow-up questions that allow you to
12      elaborate; but for purposes of the question that
13      counsel's asking you, I'd ask that you answer the
14      question specifically.  Okay.
15              THE WITNESS:  Yes, sir.  I apologize.
16     BY MS. BROWN:
17         Q.   Okay.  We're going to go through what exactly you
18     provided to Scottsdale by way of these books.  The first
19     section -- you have each section in this book labeled,
20     correct --
21         A.   Yes, ma'am.
22         Q.   -- for ease of use?
23     So we do have a section that's entitled overview photos?
24         A.   Yes.
25         Q.   And these were just some exemplary photos of the
```

1    damage to the property, correct?

2         A.   That's correct.

3         Q.   Okay.  The next section is what you have labeled

4    your estimate?

5         A.   Yes, ma'am.

6         Q.   And this estimate, we're not going to go line by

7    line through it; but this is what we've heard referred to as

8    an Xactimate estimate, correct?

9         A.   That is correct.

10        Q.   Tell us a little bit about Xactimate.

11        A.   Okay.  It's an insurance program the insurance

12   companies mainly use to estimate damages.  And it allows you

13   to put in a sketch and it'll -- if you -- let's say you want

14   to put carpet in a room.  It'll automatically calculate the

15   amount of carpet and it'll give you their version of a price

16   that they've assigned to it.  And it allows you to put your

17   own notes in, your own values or your notes to an item, and

18   then you can put your own measurements in.  And it gives you

19   the room measurements, all the values.  And you put the scope

20   in.  It'll show you the sketch.  And you can put photographs

21   in.

22        Q.   And, for instance, just by way of example, one of

23   the rooms that we've seen on Page 4 is the reception area,

24   101 on the first floor?

25        A.   That's correct.

248

1      Q.   And here, this little sketch is a scale drawing

2   with the actual measurements of that room?

3      A.   That's correct, yes, ma'am.

4      Q.   And you measured it and you input those numbers,

5   correct?

6      A.   Yes, ma'am.

7      Q.   Okay.  And there's similar sketches for all the

8   areas.  This was a corridor, a hall area.  Similar sketches

9   for every room in the building?

10      A.   Yes, ma'am.

11      Q.   And to be clear, for every room in the building

12   that had damage?

13      A.   That's correct.

14      Q.   And within each of those rooms, for any that aren't

15   familiar with Xactimate, there is a very specific line item

16   detailed estimate of every piece of damage in the room,

17   correct?

18      A.   That's correct, yes, ma'am.

19      Q.   And these prices, where do these prices come from?

20      A.   So they come from Xactimate.

21      Q.   Okay.  They're the same prices the insurance

22   company would use in this program?

23      A.   Yes.

24      Q.   Okay.  And your estimate ends up having 1,869 line

25   items, correct?

249

1        A.     Yes, ma'am.

2        Q.     And the estimate is -- just the estimate portion of

3    this book is 152 pages?

4        A.     That's correct.

5        Q.     While we're on this page, there was some discussion

6    this morning about this $261,500 market conditions if

7    incurred.  What is that?

8        A.     The price list that the insurance company used and

9    I used in this estimate is a September price list.  It came

10   out before the hurricane so it didn't know what it was going

11   to cost after a hurricane.  And like Mr. Lock said, some

12   material prices went up 400 percent.  So we didn't know what

13   prices were going up.  We knew that not many were going down.

14       Then at the same time Mr. Joey had two contractors that

15   he was trying to get in to see who could do this job in a

16   timely manner.  One was a local -- not local to Lake Charles

17   but was local to Louisiana, and the other one was from

18   Missouri.  And if he hired the Missouri contractor, there was

19   going to be an increase.  Holding aside all the prices that

20   went up because that's what that reflects, there's also an

21   increase because that contractor from Missouri is going to

22   charge to put his people in a house somewhere, you know, put

23   them in hotels and move them back and forth and they charge

24   for that.  So what I did was I put this in here as market

25   conditions and it's under a coverage that says if incurred.

250

1    So I'm just basically saying here's an allowance if it

2    happens.  It's to cover that if it happens.

3         Q.    Okay.  Not expecting Scottsdale to pay that

4    particular line item at that point?

5         A.    No, ma'am.

6         Q.    And the total of that estimate is $2,196,188.79?

7         A.    Yes, ma'am.

8         Q.    We can easily back out the 261,500 if we didn't

9    want to pay it yet, if it hadn't been incurred?

10        A.    Yeah.  There's actually total pages in the estimate

11   that have the total and the if incurred total.  So the math

12   is done, and Xactimate allowed me to do that.

13        Q.    Next section in your book is the incurred to date,

14   and what are these items?

15        A.    They were the actual -- I think it was Crest went

16   out and did a temp roof, and that was actually incurred.  And

17   there's the shrink wrap cost there.  And I believe, if I'm

18   not mistaken, it may have been either just Crest or Ken

19   Seiders also.  So, yeah, so Crest -- it was just whatever

20   was -- at that very time we were printing it, what invoices

21   we had that were incurred.

22        Q.    Okay.  The next volume of the book begins what is

23   labeled photos?

24        A.    Yes, ma'am.

25        Q.    You heard Mr. Lock testify this morning about your

1    photos not being labeled?

2        A.   I did.

3        Q.   Did you hear that?

4        A.   Yes, ma'am.

5        Q.   Is that true?

6        A.   It's un -- not truthful.

7        Q.   There are -- do you know how many photos there are

8    in these books?

9        A.   There's -- I think there's around 1260 or 1200

10   some -- well, there's, like, 10 or 12 photos that are not

11   labeled that are the highlight photos, those review photos.

12       Q.   The ones we looked at in the beginning.

13       A.   But all the ones that are in Xactimate, they're

14   labeled by general photos, then there's a section -- so every

15   single room in there, like we used Room 101, there's photos

16   of Room 101 and they say on there, "First floor, 101."

17       Q.   And those general photos we looked at are also

18   contained in the labeled photos?

19       A.   Yes, ma'am.

20       Q.   And those were done -- I think you said or Mr. Lock

21   said Xactimate allows you to do this with the photos and

22   organized them and label them, and you did that?

23       A.   Yes, ma'am.

24       Q.   And I can literally just flip to any page and

25   you've got these photos?

1    **A.**   Right there it says "First floor, PLG chase, 143,"

2    and that is the room.  And that corresponds to our sketch.

3    **Q.**   Okay.  Not going to go through all 1200 photos

4    either, but I do want to ask you about some of them.  And

5    just to be clear before we get into the photos, the number

6    that we looked at, the $2.1 million total, you said this

7    earlier, but this is estimate is only for storm-related

8    damage?

9    **A.**   That's correct.  We didn't put in -- there was,

10   like, four sheets of plywood that were rotten.  We didn't put

11   in for those.  We didn't put in for any upgrades.  We didn't

12   put in for anything.

13   **Q.**   You did see some things at the property that pre --

14   this was not a perfect building?

15   **A.**   30-year-old building that has dents in it, cracks

16   in it, yeah.

17   **Q.**   And contrary to what Mr. Lock said this morning,

18   you never told him it was a perfect building?

19   **A.**   Not in any way, shape, or form.  What we said to

20   Mr. Lock was it was a well-maintained building, and then what

21   we said to Monte Jones was there's some issues.  I walked him

22   to the old cracks.  I showed him where the old cracks were

23   repaired because they were -- somebody re-caulked the panels

24   and screwed them in so they were okay.  And I showed him all

25   those areas.

1    Q.   Okay.

2    A.   I also showed Louis Collisson.

3    Q.   Okay.   There was some discussion this morning with

4    Mr. Lock about an inspection report when Mr. Odom purchased

5    the property.  He's going to testify, but did you understand

6    that he had done the majority of the repairs that were

7    indicated to be done in that inspection report prior to the

8    storm?

9    A.   Yes.   You can see photos in the report that show a

10   different floor because he'd put a new floor in before the

11   storm, a different ceiling tile, and other things that was

12   under based on the fact that I know it was different and

13   Mr. Odom had told us subsequently they made repairs.

14   Q.   Okay.   I want to go back to the plywood sheathing.

15   There was some indication that there was some rotted plywood

16   and sheathing.  How much did you say you found that was

17   actually pre-existing damage?

18   A.   So in one -- in the upstairs, when you go up the

19   steps you make a right, there's a hallway and there's a

20   conference room on the right.  That outside wall which faced

21   622 Esplanade, that had, like, a whole area that was rotten.

22   That was where the old repairs were done on the outside of

23   the building.  And then upstairs there was a couple little

24   rooms where, like, the glass was that some water was coming

25   through so there was, like, maybe a quarter of a sheet that

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1    had rotten wood and some in a couple areas.

2        Q.   I want to look at a few pictures related to the

3    plywood sheathing and indication that it was rotted prior to

4    the storm.  This is Photograph 134 from your book at Page 67

5    of Volume 2.  Tell us what we're looking at in this picture.

6        A.   That is on the first floor.  It's the RAC

7    conference room, 119.  I can touch this?

8        Q.   You can, I think.

9        A.   So this area here is the plywood that is behind the

10   siding on the outside, and it's all good plywood.  None of

11   it's rotted.

12       Q.   Show you another photograph.  Tell us what we're

13   looking at here.

14       A.   So this is the --

15       Q.   Interrupt you.  I'm sorry.  It's Photograph 449 on

16   Page 225.  Go ahead and tell us what we're looking at here.

17       A.   It's the first floor catwalk and it faces the

18   parking lot.  It's one of the walls that doesn't have windows

19   but -- and by the way, this is -- as much light as you see in

20   there right now, that's just because it's daytime.  That's

21   how we were able to see.  But on this wall there was some

22   rusted studs, metal studs, and there was a little bit of rot,

23   like, maybe a piece of plywood worth of rot; but the rest of

24   it is no issue, no rot.

25       Q.   And those items that you just indicated the little

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1    bit of rot and the rust wasn't included in your estimate?

2        A.    Nowhere in the estimate.  We never claimed it.

3        Q.    The next one I'm going to show you is

4    Photograph 492 on Page 246.  What are we looking at here?

5        A.    This is Office No. 3 and it's the second floor.

6    It's in the back because you can see -- through the window

7    you can see the trees and stuff in the back.  That's the

8    neighboring property.  And below the windows and all the way

9    across is good plywood.

10       Q.    Show you another one.

11            THE COURT:  Hold on one second.  Are y'all doing

12        okay?  You want to keep going a little bit longer before

13        we take an afternoon break?  Want to be sure and check

14        on you.  Okay.  Go ahead, Ms. Brown.

15   BY MS. BROWN:

16       Q.    Show you another.  I'm trying to find a few

17   examples.  I picked a bad one.  This one is Picture 666.  It

18   is the second floor office.  And what are we looking at in

19   this one?

20       A.    It's Office 17.  This is actually -- you see

21   there's one window to the left?  The window to the right

22   completely blew out and was laying in the parking lot, but

23   underneath the windows is the corner of the building and

24   there's no rotted wood.  It's all -- all the plywood's good.

25       Q.    I don't want to look at every sheet of plywood; but

1    there are dozens, if not more, photographs of perfectly good
2    plywood that was behind the Sheetrock in this building?

3         A.   The majority of it was perfectly fine, no problem.

4         Q.   And the implication that all the plywood was rotted
5    before the storm is just false?

6         A.   It's not true.  There was some rot.

7         Q.   Let's move on from plywood and talk about -- there
8    was also some discussion with Mr. Lock about the panels on
9    the outside of his building.  Describe for us briefly what
10   type of exterior this building had prior to Hurricane Laura.

11        A.   So on the plywood was tar paper and then there was
12   a metal aluminum frame that ran all the way around the whole
13   building screwed onto the plywood.  And then there was these,
14   like, ceramic coated cementitious panels.  So it wasn't
15   paneling.  They were made -- there was a company in Glasgow
16   that made them.  And they were sort of like cement and they
17   had a baked on color finish.  And they were ordered and
18   shipped and delivered and put up in a specific size so
19   when -- whoever designed the building, all the stripes you
20   see in all the panels, they're all pre-manufactured panels
21   that wind up getting -- there's no screws from the outside
22   except for where they made repairs because you can't put the
23   panel on any other way.  It's got to be glued to this metal
24   strip, and the metal strip has to have weather proofing, like
25   a weather proofing strip, caulking, then the panels go on,

1    then every crack gets caulked in with, like, a backer rod and

2    a caulk to prevent water from coming in.

3         Q.   Okay.  And you heard this morning Mr. Lock

4    testified that these panels were cracked prior to the storm,

5    and what is your response to that?

6         A.   There definitely was some panels that were cracked

7    prior to the storm.

8         Q.   Okay.  That is not the reason that the panels made

9    it into your estimate, is it?

10        A.   No, ma'am.

11        Q.   Okay.  I want to look at some photographs of the

12   paneling, and let's start with -- in Book 3, Picture 768 is a

13   photo.  Tell us what --

14        A.   So --

15        Q.   -- what we're looking at here.

16        A.   So I just want to note if you look up to the top

17   left it says "exterior panels."  So there's a whole section

18   in these books just for exterior panels, one just for the

19   roof, one just for other things.  So you're looking at --

20   I'll orient you.  The very top up here, that's the first

21   floor of the building and this is the ground.  Obviously

22   that's grass.  This panel here, this was on the building

23   connected to the roof above the second floor and it's laying

24   on the ground.  So it was broken off the building and it's

25   still -- actually, the black down here is part of the roof

258

1   that we're looking at, the upside down part of the roof
2   laying on the ground with the panel attached to it.
3        Q.   Okay.  Show you another one that's in the exterior
4   panel section.  Okay.  This is Photograph 776 on Page 388.
5   What are we looking at?
6        A.   That's another piece of the panel, like, that just
7   smashed and fell off the building or got sucked off or blew
8   off the building.
9        Q.   Photograph 778?
10       A.   778 is another -- a different piece of panel that
11  blew off the building.  And what you'll see right here, that
12  is that aluminum piece I was talking about.  And you can see
13  if you zoom in, I don't know if I can zoom, but if you zoom
14  in there's a hole right here in the aluminum and this is that
15  caulk and the weather stripping.  So that's -- this was --
16  and this over here is another piece of this metal.  So
17  there's a metal like frame screwed onto the building and the
18  panels attached to it.  It all ripped off.  So the screws
19  ripped out of the plywood, the panels ripped off, however
20  they came off.  That's what it is.
21       Q.   I think if you hit that clear button it will erase
22  all your highlighting.
23       A.   I got it.  Thank you.
24       Q.   The next page of photographs we're looking at is
25  Page 406, and just go ahead and tell us what --

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1      A.    The top photograph are pieces -- additional pieces

2 of panel that broke off the building laying in the grass and

3 then the bottom is -- there's, like, an electrical -- when

4 you look at the overview photos of the building the panels

5 continued over, like, a little shed area that the electrical

6 was in.  And the walls just ripped off the building and they

7 had panels on them, too.

8      Q.    One more panel photo.  What are we looking at on

9 Page 407?

10      A.    The top one is another piece of panel looking at

11 the backside of it with the metal attached to it still that

12 ripped out, and the bottom piece is the stamp from the

13 manufacturer from Belgium that made these panels.

14      Q.    So we're not talking about some pre-existing cracks

15 in the exterior paneling?

16      A.    Not at all.  They weren't cleaned.

17      Q.    Okay.  And these panels, the ones that we saw that

18 were off the building in the grass, they couldn't just be

19 reattached to the building?

20      A.    No, ma'am.

21      Q.    And am I correct in my understanding that these

22 panels aren't even manufactured anymore?

23      A.    They are not manufactured anymore.

24      Q.    So it wouldn't even be possible to replace only

25 those that had come off?

1     A.    Not any way, shape, or form.  And you can't attach
2     panels to the wall the way they did back in the '70s.
3     Q.    Okay.  Couple more things in your estimate, I
4     think.  And the estimates, the books that we are looking at
5     today with the labels, the room references, the numbers, this
6     is exactly the form that was provided to Monte Jones and to
7     Scottsdale beginning on September 15th of 2020?
8     A.    That's correct.  We printed multiple copies of the
9     books and had them FedExed down to Mr. Joey, and then we gave
10    a set to Monte Jones.  And then we were -- we told him we
11    were going to mail a set to the insurance company, and then
12    he'd told us that they wanted it electronically so we scanned
13    them all and sent them the books electronically.  And then we
14    gave Louis Collisson from Grecco, we gave him a set of books.
15    Q.    Okay.  In addition to the photographs of the actual
16    damage, you also include pictures that are labeled
17    thermography.  What are these?
18    A.    That's correct.  So we used a FLIR.  It's thermal
19    imaging.  It doesn't tell you what's wet.  It tells you
20    temperature change.  But when there's something that's wet
21    and the ambient temperature is colder it will be colder
22    because the wet is colder.  So these were the thermal images
23    showing what was still wet at the time that a lot of the
24    remediation had been done.  They were still in the process,
25    but there's a whole section of thermal images.

1    Q.   Okay.  I asked you earlier how many photos.  Looks
2    like 1,260 is the last one.  So after those 1200 photos, the
3    next section of your books is called Plans and Details.  What
4    are we going to find in this section?
5    A.   Any question you could possibly have about that
6    building, the type of carpet, the blueprints, the way the
7    building's constructed, the products that are in the
8    building.  There's -- one of the products is Siplast.  It's
9    the roof part.  And it gives the underwriter laboratory's
10   ratings on the fire ratings, gives all the specifications in
11   detail.  It gives the blueprints, the floor plans, the pitch
12   of the roof.  It gives the wall details, how they're built
13   out, how it's constructed.  It gives electrical plans.  It
14   gives the brand and the model number and the amount of ounces
15   of the carpet.
16   Q.   That's what I wanted to look at.  So there are --
17   like you said, there are sketches of the room?
18   A.   So if you go back, that sketch there is what I did
19   in Xactimate.  That is an Xactimate sketch.  So when you saw
20   the little drawings of the rooms, they're these drawings.
21   Q.   This is whole building all put together?
22   A.   Yep.  And then you go into that still, and then
23   here you go into the actual blueprints of the building.  It's
24   all the details, everything you can need that they built the
25   building.

1    Q.   These are the original blueprints?

2    A.   Yes, when the building was built and then there's

3    blueprints from when it was fit out for Homeland Security for

4    GSA.

5    Q.   Okay.  Then we come to this schedule of room

6    finishes, and I think you were explaining this; but I want to

7    zoom in on part of it so you can tell us what this is.

8    A.   So for every single room in the estimate on the

9    left it says 101, 102, and those, and then the room it is and

10   the type of tile it is.  And so, for example, this is in the

11   informant's interview room.  It's a 22-ounce Socrates II

12   carpet made by Patcraft.

13   Q.   And the numbers, for instance, the 103 informant's

14   interview room, that's going to correspond with your

15   estimate?

16   A.   Yes, ma'am, it's going to correspond with the

17   estimate, line items in the estimate to say how much of each

18   room, and also the photographs.  So the photographs are

19   pre-remediation, during remediation, and post-remediation.

20   But they're all labeled, too, per room.

21   Q.   And this is -- just to round out what you said,

22   this is the plans from when the renovations were made for

23   Homeland Security in 2011, correct?

24   A.   Yes, ma'am.

25   Q.   Is there anything else you can think of that

1    Scottsdale would need to adjust this loss other than what you

2    provided in these books?

3         A.   For them to make a payment, not at all.

4         Q.   Were you asked for anything else?

5         A.   I was never asked for anything else.

6         Q.   Do you know if Mr. Odom was asked for anything

7    else?

8         A.   He was not asked for anything else.

9         Q.   And you were involved in all of the discussions

10   with Scottsdale on behalf of Mr. Odom?

11        A.   Yes, ma'am.

12        Q.   Okay.  One issue that we heard Mr. Lock had with

13   your estimate was that it only provided a replacement cost

14   without any depreciation to get to actual cash value.

15   Explain -- it's easy enough in Xactimate to just add the

16   depreciation, correct?

17        A.   Yes.

18        Q.   Why didn't you do it?

19        A.   So just waive your hand if I'm going off because I

20   don't know how to say it.  So Xactimate, Mr. Lock was

21   correct, there's a profile for a contractor and one for an

22   insurance company.  I have the insurance company one.  We use

23   the same exact Xactimate.  The claims I've handled with

24   Scottsdale and the claims I've handled with Nationwide,

25   because they own each other, their depreciation that they use

1    is reasonable.  It's -- they have sort of their own program.

2    When Monte Jones went out there I said, "Here's a flash drive

3    with the ESX."  I offered it to Louis Collisson.  So I said

4    to Monte Jones and I said to Louis Collisson and I said to

5    their next guy that was out there who was really dealing with

6    what it actually cost, "You can depreciate whatever you want.

7    I agree to Nationwide's depreciation because it's realistic."

8    I never have a problem with it.  So I turn around and I say,

9    "Here's the estimate.  Do you want the ESX?"  He puts the

10   ESX -- he can take it, put it in his program, just run

11   depreciation, that's it, and auto calculates everything.

12       Q.   So, for instance, in this case we did the math with

13   Mr. Lock.  Grecco's estimate had a 22.3 percent depreciation

14   applied, and you'd have been fine if he would have applied

15   that to your estimate?

16       A.   Absolutely.

17       Q.   And part of the reason is because under a

18   replacement cost policy, once Mr. Odom had the work done, he

19   was going to get that depreciation back?

20       A.   That's correct.  And what Mr. Lock had said

21   regarding depreciation was it wasn't just a flat rate.  So

22   you could depreciate the panels because they were -- had some

23   cracks in them so you would depreciate them more, but the

24   perfectly good vinyl floor that was in the hallway would take

25   a low depreciation.  But I was fine with whatever

1    Scottsdale's depreciation was.

2        Q.   And that is the way that Scottsdale would account

3    for the things like you said, the panels they think were old,

4    the roof being old; they would just apply heavier

5    depreciation of those items?

6        A.   That's correct.

7        Q.   Okay.  We talked -- I talked with Mr. Lock about

8    the Encore Construction contract for 1.36 million, and when I

9    put the numbers of incurred cost up we only accounted for

10   1.33 million.  And I want to know if you knew why there was

11   that reduction in what's being claimed as part of the

12   insurance claim?

13       A.   Why the reduction in what they were --

14       Q.   In the Encore -- we're not seeking the full Encore

15   contract.  We're seeking --

16       A.   Correct, because Encore did work that wasn't part

17   of the claim so he -- they charged Mr. Odom separately.

18       Q.   Okay.  And, in fact, some of that money that we

19   took out was for the repair of some of that plywood we were

20   talking about that was already rotted?

21       A.   That's correct.  So Encore still did the work and

22   they did some betterments, but he paid separately.

23       Q.   Okay.  We heard that Monte Jones -- Mr. Lock

24   testified that in his notes Monte Jones made a comment about

25   taking the building to the studs.  Does your estimate include

1   taking the building to the studs?

2       A.   Well, in certain areas because the building, when

3   Monte Jones got there, was already to the studs.  The

4   remediation -- there was an environmental guy who moisture

5   mapped everything who went in, said it was wet, and the

6   remediation guys took it out.  And if the remediation guys

7   could dry it without taking it out, then the drywall was

8   still there.  When you look at my photos you'll see some

9   walls that are not to the studs because they were able to be

10  dried, and the ones that couldn't were taken out to the

11  studs.

12      Q.   I want to talk about Scottsdale's inspections of

13  the property.  Were you there on behalf of Eaux Holdings

14  every time someone from on behalf of Scottsdale came to

15  inspect the property?

16      A.   Yes, ma'am.

17      Q.   And did Mr. Odom and Eaux Holdings always

18  accommodate a request for an inspection by Scottsdale?

19      A.   Yeah, with the exception of one time where Wardlaw

20  said, like, "We're there" or "We're going to be there

21  tomorrow," and we just said, "You can't just call us and say

22  you're going to be there tomorrow."  We were down in the

23  area, but we just said you had to make an appointment.  They

24  told us when they wanted to come and we made the appointment.

25      Q.   Wardlaw -- just to refresh everyone's memory,

1    Wardlaw was the company hired to review the mitigation bill?

2         A.   That is correct.

3         Q.   Okay.  So let's start with the first inspection by

4    anyone on behalf of Scottsdale.  That was on September 15th

5    and that was Monte Jones, correct?

6         A.   Yes, ma'am.

7         Q.   At the time that Monte Jones came to the property,

8    we talked about the issue with the electricity, but at that

9    point the remediation work had already been done, correct?

10        A.   Yes.  There was still some equipment in there

11   keeping things like -- it's yes, they dried; but it's

12   Louisiana so -- and it's humid so if you don't keep something

13   running it's just going to get nasty again.  So there was a

14   little bit of equipment in there still.

15        Q.   Okay.  Were you -- did anyone on behalf of

16   Scottsdale see the property in its actually damaged,

17   unmitigated state?

18        A.   If they looked at the photos, yes, but not in

19   person.

20        Q.   Okay.  You heard the testimony and saw Mr. Lock's

21   notes that Monte Jones believed the building was -- needed to

22   be taken to the studs and was going to be at least

23   1.5 million to repair.  Is that consistent with what Monte

24   Jones told you at his inspection?

25             MR. WOLFF:  Your Honor, same objection.

<strong>BENCH CONFERENCE</strong>

1

2 THE COURT:  What's the objection?

3 MR. WOLFF:  Well, the witness is available.  He's

4 been deposed.  They're offering that for an out-of-court

5 statement by this individual for the truth of the matter

6 asserted.  The guy was available to testify.  We took

7 his deposition.  We have that deposition.  He denies he

8 said it.

9 MS. BROWN:  Well, it's not an issue of whether he's

10 available because it's under the statements that are not

11 hearsay section and it clearly says the statement

12 offered against an opposing party made by a person whom

13 the party authorized to make statement on the subject.

14 He was their authorized representative.

15 MR. WOLFF:  Authorized to make statements --

16 MS. BROWN:  Authorized to say things Scottsdale --

17 MR. WOLFF:  He can report, advise, and evaluate but

18 he cannot --

19 MS. BROWN:  Also was made by --

20 MR. COX:  Read the next one.

21 MS. BROWN:  -- made by the party's agent on a

22 matter within the scope of the relationship.

23 THE COURT:  I will say this.  This Monte guy, I

24 don't care that he was hired by a third party, he was --

25 Scottsdale hired him.  He is a representative of

1     Scottsdale on this property adjusting this claim for

2     Scottsdale.  So that whole line -- now, the question on

3     whether or not -- I think he can say it.  Objection's

4     overruled.

5                    **PROCEEDINGS CONTINUED**

6                 THE COURT:  You can answer the question.  The

7     objection's overruled.

8     BY MS. BROWN:

9         Q.   So would you like me to re-ask the question?

10        A.   Yes, please.  I'm sorry.

11        Q.   I was asking you about Mr. Lock's notes where

12    Mr. Jones indicated that he believed the loss was going to be

13    at least $1.5 million.  Was that consistent with the

14    conversations you had with Monte Jones at the inspection?

15        A.   It is.  My contention was the loss was going to be

16    higher and I was asking for a million dollar advance.  He was

17    sort of a little stuck on some of the pricing, but he was

18    definitely -- I thought he was going to get to 2 million, no

19    problem; but he was definitely --

20                THE COURT:  Hey --

21                THE WITNESS:  I'm sorry.

22                THE COURT:  -- answer the question and don't

23    speculate.

24                THE WITNESS:  Yes, sir.

25    ///

270

```
1        A.   Yes, that or more.
2    BY MS. BROWN:
3        Q.   The next time somebody was out at the property was
4    in October and Scottsdale sent a building consultant from
5    Grecco; is that correct?
6        A.   There was another person for Scottsdale at the
7    September 15th meeting.
8        Q.   Okay.  Who was that?
9        A.   He brought a roofer with him.  Monte Jones brought
10   a roofer with him.
11       Q.   Okay.  He was there with Monte Jones?
12       A.   Yes, ma'am.
13       Q.   Okay.  And at that time they couldn't actually get
14   on the roof, right, because it was shrink wrapped?
15       A.   Yes, ma'am.
16       Q.   So the next inspection is in October and that's
17   Louis Collisson with Grecco?
18       A.   Yes, ma'am.
19       Q.   And you were there for his inspection?
20       A.   Yes, ma'am.
21       Q.   How much time did he spend at the property?
22       A.   Like, during the daytime.  It wasn't a long day.
23   It was sort of like a -- probably, maybe, six to seven hours.
24       Q.   Okay.  And you received a copy of his estimate and
25   saw the payments that were made based on that estimate,
```

1    correct?

2         A.    Correct.

3         Q.    And I don't want to go through all the numbers

4    again, but it was about $468,000 ACV payment?

5         A.    That's correct, yes.

6         Q.    Now, after that inspection -- and that payment was

7    November 22nd of 2020?

8         A.    Yes.

9              MS. BROWN:  I want to offer Exhibit 19.  No, I'm

10   not.  That's the wrong number.

11             MS. WOLF:  We have an objection to Exhibit 19.

12             MS. BROWN:  That's the wrong number.

13             THE COURT:  That's the wrong one.

14             MS. WOLF:  I'm sorry.

15             THE COURT:  She changed her mind.

16             MS. BROWN:  Save it.

17             THE COURT:  Ms. Brown.

18             MS. BROWN:  Pardon?

19             THE COURT:  Getting close.  We're going to need to

20        take an afternoon break.  But if you're getting near the

21        end of your direct, I'll let you finish.

22             MS. BROWN:  How do you define near?  I'm not far.

23        I don't want anybody to be uncomfortable if you want to

24        take a quick break.

25             THE COURT:  No, I'm just saying 20 minutes, 10

```
1    minutes.
2          MS. BROWN:  Yes.
3          THE COURT:  I want to find the natural break but
4    also feel like we need to take an afternoon break.
5          MS. BROWN:  I think 20 max.
6          THE COURT:  Ladies and gentlemen, how you doing?
7    Okay.  We're going to take a break.  They run the show.
8    All rise for the jury.
9               (Jury exits courtroom.)
10         THE COURT:  Anything else at this moment,
11   housekeeping?
12         MR. COX:  No, Your Honor.
13         THE COURT:  Everybody take their little quick
14   break.
15              (Recess is taken.)
16         THE COURT:  Before we bring in the jury, going to
17   remind everybody you're on the clock and you're using a
18   lot of your time.  You haven't even finished two
19   witnesses.  Realize your time is clicking so you're
20   going to be limited on cross-examination because when
21   you're up there cross-examining somebody your clock's
22   running.  I'm telling you, I think you need to move this
23   thing along.  Plus, I'll tell you, I think the jury is
24   falling asleep.  I saw one of them falling asleep back
25   there.  So I would suggest let's get rolling.
```

1           MS. BROWN:  I'm trying.

2           THE COURT:  Giving you a little tip.  My

3      observation.  Take it for what it's worth.  Let's get

4      our jury.  We're going to finish by Friday.  This case

5      is going to be over.

6                (Jury enters courtroom.)

7           THE COURT:  Okay.  You may go ahead.

8   BY MS. BROWN:

9      Q.   Going to ask you this.  We talked about you being

10  present for the Grecco inspection?

11     A.   Yes, ma'am.

12     Q.   And had you had experience with Grecco prior to

13  this claim?

14     A.   Yes, ma'am.

15     Q.   What is Grecco's role in the adjustment of an

16  insurance claim, typically?

17     A.   They serve as building consultants to the field or

18  staff adjuster.

19     Q.   Okay.  Did you consider their estimate to grossly

20  under value the damages in this case?

21     A.   Yes, ma'am.

22     Q.   Is that what you expected when you knew Grecco was

23  going to be involved?

24     A.   Hundred percent, yes, ma'am.

25     Q.   The last person to come to the property on behalf

1    of Scottsdale was a gentleman by the name of Granger Stuck
2    with J.S. Held?
3        A.   Yes.
4        Q.   You were there for that inspection as well?
5        A.   Yes, ma'am.
6        Q.   And that one took place in 2021 after litigation
7    had been filed, correct?
8        A.   Yes, ma'am.
9        Q.   And at that point, when Mr. Stuck came to the
10   property, I anticipate we're going to hear from him this
11   week, not only had the remediation been done, but the
12   construction, the rebuild, was substantially complete at that
13   point?
14       A.   Substantially, yes.  Correct.
15            MS. BROWN:  I'm going to offer Exhibits 33 and 50.
16            MS. WOLF:  Say again which exhibits.
17            MS. BROWN:  33 and 50.
18            MS. WOLF:  No objection to 33.  I'm sorry.  What
19       was the other number?
20            MS. BROWN:  50.
21            MS. WOLF:  No objection to 50.
22            THE COURT:  They'll be admitted.
23   BY MS. BROWN:
24       Q.   Mr. Major, I don't want to spend a lot of time with
25   this; but after the Grecco estimate was received in November

1    and the payment was made, November 22nd of 2020, Skyline

2    continued to attempt to communicate with Scottsdale and in

3    particular Mr. Lock about this claim, correct?

4          A.   Yes.

5          Q.   And about -- specifically about the issues that

6    you-all had with the amount of the Grecco estimate?

7          A.   Not just the amount, the missing scope and other

8    things, yes.

9          Q.   And to be fair, getting a low estimate from an

10   insurance company or their consultant or adjuster is not

11   unusual; it's part of the adjustment process?

12         A.   That's correct.

13         Q.   And so we have an e-mail here at Bates No. SIC1724

14   from November 23rd, immediately after the payment, already

15   raising issues.  There doesn't appear to be consideration

16   given to the actual cost on the roof.  There's another e-mail

17   in the same exhibit the next day from November 24th of 2020

18   following up with several bullet pointed issues, and we don't

19   need to get into the details of them.  But this is just to

20   show you were continuing to try to engage with Scottsdale

21   after November 22nd, 2020?

22         A.   That's correct.

23         Q.   Okay.  And this is all the way -- this is the last

24   part of Exhibit 50.  December 24th, 2020, "Been over a month

25   since we've heard anything from you."  Again, this is just

1    Skyline trying to continue adjusting the claim?

2         A.    That's correct.

3         Q.    And Exhibit 33 is yet another e-mail in that

4    timeframe from December 22nd again raising issues and

5    providing information to Scottsdale to try to get them to

6    continue adjusting the claim?

7         A.    That's correct, in addition to multiple phone

8    calls.

9         Q.    Correct.  And I think what you told me, correct me

10   if I'm wrong, is that there were at least 16 e-mails total in

11   addition to phone calls that went unanswered between November

12   22nd and at least February of 2021?

13        A.    That's correct.  Completely zero response.

14        Q.    Okay.  Did you feel that Scottsdale was even still

15   adjusting the claim at that point?

16        A.    We were questioning that.

17        Q.    You're familiar with the costs that Mr. Odom has

18   incurred to date?

19        A.    Yes, ma'am.

20        Q.    You're also familiar with, we mentioned Mr. Stuck,

21   with his estimate and opinions that he's rendered in this

22   case?

23        A.    Yes, ma'am.

24        Q.    You understand that even Mr. Stuck, who is

25   Scottsdale's guy, believes that there is some scope that's

277

1    not yet been paid by Scottsdale related to the windows?

2         A.    That's correct.

3         Q.    Okay.  And even Mr. Stuck believes that that's at

4    least $159,000, according to what he has -- reports he's

5    issued in this case?

6         A.    Correct.

7         Q.    So these costs, the $2,031,893.50, don't include

8    159,000 that even Scottsdale agrees still needs to be paid?

9         A.    That's correct.

10        Q.    Mr. Major, you heard yesterday and today references

11   to this claim as being complex.  Do you consider this to have

12   been a complex claim?

13        A.    No, ma'am.

14        Q.    That's all the questions I have.

15        A.    Thank you.

16             MR. WOLFF:  They're going to get early dinner.

17             THE COURT:  All right.  Mr. Wolff,

18   cross-examination.

19             MR. WOLFF:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21   BY MR. WOLFF:

22        Q.    Only because it's fresh in my mind.  The windows

23   you're saying are outstanding, want to make sure I'm

24   understanding you right.  You're saying the windows,

25   something related to this claim that remains outstanding?

1      A.   Yes, sir.

2      Q.   Okay.  And were the windows all damaged from the

3   storm?

4      A.   It's a window system.  It's a ribbon system.  There

5   were certain windows that were blown out, certain windows

6   that were smashed, certain windows that were cracked; but the

7   framing of the window system, the components are not made

8   anymore --

9      Q.   And --

10      A.   -- so the window system still needs to be replaced,

11   which Scottsdale agrees to.

12      Q.   Just so it's clear, you're telling the jury that

13   Mr. Stuck's analysis does not include the window system?

14      A.   No, I'm not telling the jury that, sir.

15   Mr. Stuck's analysis concludes that the window system is

16   damaged and needs to be replaced.  It just has not been done

17   yet.

18      Q.   But he's included that in his estimate?

19      A.   There's two numbers.  There's one with and one

20   without.  Yes.

21      Q.   Okay.  We'll let Mr. Stuck -- do you know

22   Mr. Stuck?  Have you met him before?

23      A.   Only at the -- Mr. Odom's, Mr. Joey's place when he

24   showed up.

25      Q.   Do you know what kind of work he does, Mr. Stuck?

1      **A.**   I mean, other than what he's doing here, I don't

2    know what else he does.

3      **Q.**   So you haven't -- you don't know his qualifications

4    one way or another, do you?

5      **A.**   No, I don't.

6      **Q.**   Okay.  We can talk about that later.  So when you

7    first got out there, and you explained that, you don't need

8    to explain it again, you looked at -- there was two

9    buildings, one at 622 which was Mr. Odom -- I guess Eaux

10   Holdings or Four-O, whichever one, the new office building he

11   had, and then this building we've been talking about at 620,

12   right?

13     **A.**   No, sir.  I looked at 620 initially.

14     **Q.**   They're right next to each other?

15     **A.**   Yes, sir.

16     **Q.**   And the new office building he has had very little

17   damage, new, very little damage?

18     **A.**   Yes, sir.

19     **Q.**   All right.  And then the bigger building we've been

20   talking about, it had the damage and we've looked at it all,

21   right?

22     **A.**   Yes, sir.

23     **Q.**   And I just want to be clear because I got a little

24   bit confused.  When you were out there you looked at that

25   older building, the one we've been talking about, and you

 1   realized it had a high depreciation?

 2       A.   No, sir.

 3       Q.   You did not?  Is that what you're saying?

 4       A.   I think you have it a little bit confused.  If you

 5   want, I can explain it, or I can answer your questions.

 6       Q.   Let me rephrase because maybe I asked a bad

 7   question.  Did you think that that building from 1976 had

 8   depreciation to it?

 9       A.   Oh, yes, sir.

10       Q.   Okay.  And you did not estimate the level of that

11   depreciation, did you?

12       A.   I did not do a calculation for that, no, sir.

13       Q.   You did think that it had a high depreciation

14   because of its age?

15       A.   No, sir.

16       Q.   Do you want to explain that?

17       A.   Yes, sir.

18       Q.   Okay.

19       A.   So the building itself, and as Mr. Lock said, it's

20   not one global number.  So something that's in the building

21   that's new, like he installed a new floor, that has a low

22   depreciation, not just because of its age, because of its

23   condition.

24       Q.   Sure.

25       A.   The panels on the building and the roof would have

1    a higher depreciation.  And in my assessment, initial

2    assessment, knowing that the policy that I was looking at for

3    622 but not knowing it at the time, it had $650,000 worth of

4    coverage and 80 percent coinsurance which means it had a very

5    high deduction.  So there would be depreciation which is

6    normal in everything.  This carpet right in front of you has

7    some stains on it.  It's not new.  It would depreciate a

8    certain amount.  And then there would be a deduction for a

9    coinsurance penalty if this 14,000-square foot building only

10   had $650,000 worth of damage on it.

11        Q.   Right, but --

12        A.   Coverage.  I'm sorry.

13        Q.   We heard Mr. Poole come say he'd come to patch up

14   that roof and he did what he could with that roof; but that

15   was an old roof, right?

16        A.   It was an old roof, yes, sir.

17        Q.   Okay.  And did you ask Mr. Odom about the

18   inspection report?

19        A.   I didn't even know it existed, sir, at the time of

20   the claim.

21        Q.   When did you first hear about the inspection

22   report?

23        A.   Just sometime within the litigation.

24        Q.   Like, recently?

25        A.   Not recently.  I think we were -- could have been

1    months ago.

2        Q.   So where I'm having a little disconnect, we got

3    that well into the litigation, was the first we saw it.  I

4    think that's the first time you saw it.  Is that fair?

5        A.   I would assume during the litigation, yes, sir.

6        Q.   And you knew that Scottsdale was wanting to know

7    the extent of the depreciation; they were asking you?

8        A.   Not at all.  No, sir.  Hundred percent not true.

9        Q.   Well --

10       A.   I agreed with Monte Jones who was Scottsdale's

11   representative --

12       Q.   Well --

13       A.   -- I'll agree to any of its depreciation.  It

14   didn't matter.  I agree to Scottsdale or Nationwide's

15   depreciation all the time.

16       Q.   Okay.  We looked at this earlier today.  I'm sure

17   you were in the courtroom.  This is D-31.  We'll get it up --

18   can someone put this up for me?  Thank you.  This is in -- so

19   this is November 23rd --

20       A.   Yes, sir.

21       Q.   -- 2020.  "Thank you for the update in getting

22   undisputed amount.  Appreciate you looking into the

23   depreciation."  So Scottsdale was still asking in November

24   what is the depreciation.  And you say, I say you, your

25   office, "The insured is doing the work, and from what I

1    understand the building was well maintained pre-storm."

2         A.    You're 100 percent not correct, sir.  Scottsdale

3    was not asking us what -- you're taking a specific sentence

4    totally out of context.  Grecco gave an estimate directly to

5    Scottsdale, to Adam Lock.  Adam Lock told us that he didn't

6    agree with Grecco's depreciation.  Adam Lock said that he was

7    going to request from Grecco his ESX file so he can put it

8    into his Xactimate and push his button that calculated

9    depreciation.  Adam Lock told us that he didn't like Grecco's

10   depreciation.  He was going to adjust it for us --

11        Q.    Yeah and --

12        A.    -- and we said okay.

13        Q.    Maybe we're not arguing here.  They were looking

14   into depreciation in November, yes, no?

15        A.    They were doing whatever they were doing.

16        Q.    So this big stack over there, you said your

17   estimate --

18        A.    Yes, sir.

19        Q.    -- you said that that was an estimate only, right?

20        A.    An estimate what?

21        Q.    An estimate only.

22        A.    No, it's not an estimate only.  It's got the plans.

23   It's got the photographs.  It's got the details.  It's got

24   incurred invoices in it.

25        Q.    Fair enough.  The amounts that were asserted, the

1    2.1 million, that was an estimate only?

2         A.   No, sir.  In it were actual invoices from

3    contractors.  So the contractor did work, he gave us an

4    invoice, we put it in the incurred section, and then I wrote

5    a line-by-line using the insurance company's valuation, and

6    then I put a number in there that said "if incurred," which

7    was that 265.

8         Q.   We can get into that in a bit.

9              MR. WOLFF:  D-77, it's Skyline's 242-1.

10             MS. BROWN:  No objection.

11             THE COURT:  It'll be admitted.

12             MR. WOLFF:  Thank you, Your Honor.

13   BY MR. WOLFF:

14        Q.   So this is from your files.  This is after

15   Mr. Stuck asked you about what the claim and your office

16   responds back, "It is and was only an estimate.  The true

17   cost is only actually realized when the repairs and/or

18   replacement is complete."  Is that what your office said?

19        A.   That's exactly what it said, yes, sir.

20        Q.   Okay.  So that $2.1 million estimate was for the

21   building only?  The one that you submitted, the big stack,

22   the 2.1 million was for the estimate for the building repair

23   only, correct?

24        A.   Yes, for -- yes, emergency services but related to

25   the building, yes, sir, not --

285

1      **Q.**   And then you would have to add to that, because I

2    want to get apples and apples.  I just want to have apples to

3    apples.

4      **A.**   Sure.

5      **Q.**   So we've seen this a number of times.  So Eaux's

6    public adjuster, that's you, right?

7      **A.**   Yes, sir.

8      **Q.**   So yours was really 2.2.  Can you give me 3,000

9    plus dollars to make it 2.2 for ease?

10     **A.**   It was not, but you can use any number you like.

11     **Q.**   You tell me.

12     **A.**   My estimate was 1.9 with a $265,000.  If you want

13   to add them together and round it up, totally fine by me.

14     **Q.**   Okay.  You submitted that which included a

15   contingency, and Mr. Lock said he didn't know what it was,

16   but 2.2.  But that didn't include the All Clear 490 something

17   thousand, right?

18     **A.**   That's correct.

19     **Q.**   And so that also didn't include the temporary

20   roofing, right?

21     **A.**   You're incorrect, sir.  It included the invoices to

22   date for the temporary roofing.

23     **Q.**   Did it include the permanent roofing?

24     **A.**   Not the -- well, it included -- so --

25     **Q.**   Crest?  It included the Crest temporary roofing?

286

1          A.    Yes, sir.

2          Q.    But not the Poole Roofing?

3          A.    It included the roofing scope using Xactimate

4     pricing, using the insurance company's pricing database.  It

5     was the scope.  And then the actual cost is what Mr. Ricky

6     Poole estimated that ultimately did.  Then there was an

7     adjustment in his pricing.

8          Q.    So this at a minimum would be 2.6, roughly, when

9     you add on the All Clear?

10         A.    Yeah, in that range.  So, like, 2.4 or 2.35 plus

11    the contingency which comes to around 2.6.  Yes, sir.

12         Q.    To make apples to apples, 2.6 is what you're saying

13    that your original estimate was all-in.  And then -- and we

14    don't agree with this number.  We think it's substantially

15    less.  But the 2 million is what the actual costs were,

16    correct?

17         A.    No, because work isn't done and no to what you said

18    earlier because the All Clear invoice was not what it was.

19    So they gave us their invoice, then it ultimately was 330.

20    So I know that their invoice was something, but it got

21    adjusted.  But you're saying that I made a claim for it or it

22    was my number.  It was not my number and it was not my total.

23         Q.    And if I said that or inferred that, I apologize,

24    or implied that.  All-in, if the company -- insurance

25    company's looking at it, you got your 2.2 plus the All Clear,

1    they'd be looking at 2.6 on this billing, right?

2        A.   That would be correct, yes.

3        Q.   And this number here, we're talking apples to

4    apples.  This number here all-in -- again, I don't agree.  I

5    think they actually paid -- you're talking about actual cost.

6    But what was actually paid to get the work that's done, that

7    includes the mitigation, this $2 million figure, it includes

8    the repair work, all of that, correct?

9        A.   Yes, sir.

10       Q.   So all-in, apples to apples, you were 600 grand --

11   if you take it all-in, there's a 600 grand difference, right?

12       A.   No, sir.

13       Q.   2 million and 2.6 --

14       A.   You're just picking a number that's not the number.

15   So they've spent 2 million to date, and Scottsdale's guy

16   agrees that there's another -- it's not -- he has a number in

17   his estimate.  The work, it wasn't funded.  The windows

18   weren't done at the time.  Let me finish.  So the builder has

19   to remobilize.  The builder's charging to go back down and do

20   the windows.  That work is still yet to be done.  That has to

21   be added to this number.  So that's about -- and I could pull

22   it up or you could pull it up.  You have the information.

23   It's a number that -- or it's in Mr. Stuck's breakdown, and

24   he took the number that the builder -- that Encore was

25   charging and he agrees to fix the windows; but what he

1    disagreed with was that they had to come back down and the
2    charges they were charging to come back down and supervise
3    it.  But it's not -- it's in addition to the $2 million.
4        Q.   So the $2 million, have you seen checks?  Have you
5    seen actual payments of $2 million?
6        A.   I believe you guys have it in a file.
7        Q.   Do you know what they are, the actual out-of-pocket
8    checks?
9        A.   Yeah.  They put it up on the screen for last day
10   yesterday.
11       Q.   The Encore contract that they've shown, the 1.36,
12   you know about the contract?
13       A.   Yes, sir.
14       Q.   You didn't follow the work, right?
15       A.   Say that again.
16       Q.   You didn't follow or supervise the work?  You
17   weren't involved in the negotiation of the contract?
18       A.   I did follow the work.  I did -- I've been spending
19   time there.  I've been through all phases of construction.
20   And I didn't have anything to do with the contract, the
21   signing of the contract, the writing of the contract; but I
22   followed the work completely through.
23       Q.   Then you can tell the jury that Encore actually has
24   been paid 932,000 and not 1.36 -- 1.3 something million?
25       A.   I don't have the checks.  It's whatever was on the

1    sheet.

2        Q.    That's what I'm getting at.  You don't know.

3    You're taking at face value that the 1.36 is what's actually

4    been paid?

5        A.    No.  I know that it's what's incurred.  It's what

6    the cost is.  I believe and I sort of --

7        Q.    I don't want you to guess.  If you know, you know.

8    That's fine.  But I think you already --

9        A.    I do know there is a component that hasn't been

10   paid and it's accruing interest.  I don't know the dollar

11   amount.

12       Q.    Okay.  We can let someone else deal with that, but

13   back to your estimate then.  Let me pull this off.  The

14   numbers you submitted all-in were high, right?

15       A.    They were pretty close.  They can be, like, within

16   10, 15 percent of the actual number; but yeah, they're pretty

17   close.

18       Q.    I appreciate the response, and we can talk about

19   how close it is; but your number, your estimate, was high?

20       A.    Higher than what it cost to replace, no.  My

21   estimate at 1.9 was lower than what it cost.

22       Q.    What you submitted to Scottsdale that included the

23   contingency and the 2.2, that's a high number, right?  It's

24   higher than what it actually cost even according to these

25   figures?

290

1        A.    No, it's the scope.  So what it is, I go in and I
2   measure, I write down what's missing, how many square feet of
3   drywall is missing, and I use their pricing.  I used your
4   produce list.  I used the insurance company's program and the
5   insurance company's price list that they wanted to use and
6   agreed to their depreciation.  They just didn't pay.
7        Q.    And we can look into that.  And we talked about
8   this and the judge suggested I deal with this on my cross,
9   and I'm doing it now.  You sent a notification in this case
10  with your contract, and we looked at that contract before.
11  That's D-65 that has your hourly rate of 475.  It's capped at
12  the 10 percent.  But you actually sent notice that you have
13  an interest in this claim, right?
14       A.    Yes, sir.
15       Q.    Now, I was a little confused because you said that
16  you used Xactimate and that you didn't include pre-existing
17  issues.  Is that what I understood you to say?
18       A.    We did not put the plywood --
19       Q.    How many --
20       A.    -- exterior.
21       Q.    I heard you say it was four pieces of plywood.  Did
22  I mishear you?
23       A.    No, you did not mishear me.  There was plywood
24  replaced for two different reasons, neither of the two
25  reasons were in the claim.

1      **Q.**   So how many pieces of plywood had to be replaced?

2      **A.**   For the rot, like, maybe five or six pieces of

3      plywood.

4      **Q.**   Do you know why Encore would have charged $20,000

5      for that?

6      **A.**   They didn't charge $20,000 for that.  What Encore

7      did was two things.  Where the perimeter of the windows were,

8      because it was receiving a new track system, they just

9      replaced the plywood all the way along the ribbons; and it

10     wasn't charged or wasn't claimed to the insurance company.

11     **Q.**   So where, if anywhere, in this big stack of

12     documents did you outline what was pre-existing damage?

13     **A.**   We excluded them.  And when Monte Jones went there

14     I showed him what was in the estimate, I showed him what was

15     not.  I showed Monte Jones -- with the exception of one item,

16     I showed him all the things that we were leaving out and the

17     things that we were putting in.  I walked him to the

18     pre-existing and the screws from the outside in the panels.

19     I walked him around to where the water was coming in.  I

20     showed him that it was dry.  I showed him the thermal image

21     photos.  I showed him everything, and he knew we were not

22     claiming it.

23     **Q.**   So I appreciate that, but did you --

24     **A.**   I did the same thing with Mr. Grecco.  Sorry.

25     **Q.**   I appreciate that.  Did you outline in your big

1    document there what you were excluding?

2         A.   Did we say we're not putting in the rot, no.  We

3    didn't claim it.

4         Q.   What about --

5         A.   We didn't put the fence in either because there was

6    no coverage.  We didn't put the other -- you know, things

7    that were not part of the claim we didn't put in.

8         Q.   So you did not -- you did not specifically outline

9    we are excluding broken exterior or bad caulk, the trimming,

10   and the other issues that are outlined in the inspection

11   report?  Did you do that?

12        A.   I don't know.  I'm trying to follow you.  If you're

13   saying did we outline that we didn't -- did we outline the

14   things we didn't put in the estimate?

15        Q.   Right.  Because you had, I think, estimated at 54 a

16   square for the external paneling?

17        A.   No.  If you look at the file notes from the -- from

18   Scottsdale or Nationwide, they thought we claimed the value;

19   and then later in the file notes it says it turns out that's

20   not it.  It's more accurate what he's claiming.  If you only

21   read one file note out of context, somebody that doesn't know

22   what it costs or what the panel is is saying that he thinks

23   my number's high; but then they realized it was not.

24        Q.   What was your number?

25        A.   I have to look at the estimate.  I can tell you.

1    If you give me book No. 1, I can open it and go right to the

2    panel number.

3        Q.   I'll let your counsel do that.  Did you make any

4    attempt to compare what was in the building inspection done

5    before this storm with the pre-existing that you say

6    excluded?

7        A.   Since litigation, yes, sir.  Since litigation

8    started.  So not prior to it because I didn't see the report.

9    Once I saw the report, I went through it and looked at it and

10    it's really clear.

11        Q.   You know, we -- are you aware that we asked about

12    what maintenance had been done on this building after

13    purchase and up to the time of the storm?

14        A.   I'm not aware.  Nobody asked me.

15        Q.   You weren't aware, then, that we were told that

16    there were no invoices to show any maintenance?

17        A.   Well, so in the photo of the report from 2018 it

18    shows, like, a ceramic tile floor.  In there is a vinyl plank

19    floor that's like a wood artificial floor.

20        Q.   Yeah, but --

21        A.   If there's not an invoice, it doesn't mean it's

22    still not a new floor.

23        Q.   No, no, no.  We're talking about maintenance that

24    addressed -- have you seen these -- well, we don't have --

25    can we turn this on.  This is again at D-61, the inspection

1    report.  You see these major concerns?  I know you didn't get

2    this at the time you were submitting your estimate.  Have

3    you -- you've looked at that, right?

4        A.   Yes, sir.

5        Q.   Did you get from Mr. Odom any invoices to show what

6    work was done to fix these issues?

7        A.   I did not ask for invoices.  I have not seen

8    invoices.

9        Q.   Well, we did and we were told there were none.  Why

10   didn't you ask for any invoices?

11       A.   It's totally moot.  It's a lawyer argument for

12   litigation, not related to a claim.  And when I looked at the

13   photo, if you look at Granger Stuck's cover photo, it shows

14   the different roof.  That's not the roof in that -- in the

15   photos you have right there.  So No. 16 and 17 of what you

16   just had up was talking about the rolled roofing --

17       Q.   Right.

18       A.   -- and the gaps in the rolled roofing, that whole

19   area that's in your photos was replaced.  And Mr. Poole,

20   Mr. Ricky, said today he's the one that replaced it.

21       Q.   Well, there weren't any invoices produced.  We know

22   he went up there and did some work around the roof, and he

23   said he put it in as good a condition as he thought he could.

24   Right.  But you don't know what that -- it certainly wasn't a

25   new roof at that point, right?

1    A.   That's correct.  It's not a new roof right now.
2    It's a year old or whatever.  It's -- you know.
3    Q.   I give you touche on that.  Was that other roof,
4    did it have a warranty?
5    A.   Excuse me.
6    Q.   Did the old roof have a warranty?
7    A.   I don't know.  But from what you're telling me, if
8    Ricky Poole but it on and he fixed it without charging
9    Mr. Odom, sounds like a warranty to me.  But I don't know.
10   You're telling me that --
11   Q.   I don't know.
12   A.   We all know that the roof was fixed because it's in
13   the photographs.  The before, old roof is in there.  The new
14   roof is in there.
15   Q.   So the short answer is you don't know whether there
16   was a warranty on the old roof?
17   A.   I don't know other than what you're telling me now.
18   Q.   I don't know either because we asked for invoices
19   and we didn't get any.  And you didn't see invoices with
20   respect to repairing the seams on the outside of the
21   building, repairing the window issues that were noted in the
22   inspection report, working on the exterior doors?  You don't
23   know if any of that was done, do you?
24   A.   That is correct, except the difference of what it
25   is in the photo and what it is -- what it was in real life

1    when I showed up.

2         Q.   And you're aware that Mr. Odom selected Encore to

3    do this work, correct?

4         A.   Yes, sir.

5         Q.   Had you seen Encore before this?

6         A.   Yes, sir.

7         Q.   How?

8         A.   They were on a job in North Carolina and they --

9    the building owners or the management company or it was a

10   condominium association, somebody brought them in and they

11   were one of the bidders.  I think there was two or three

12   bidders and they got the job.  That's how we knew them.

13        Q.   Did you recommend Encore?

14        A.   No, sir.

15        Q.   How did Encore get hooked up with Mr. Odom

16   through --

17        A.   I don't know how they originally got hooked up; but

18   Mr. Odom asked me if I knew them and I said, "Absolutely.

19   They're good guys."

20        Q.   They do good work?

21        A.   They do really nice work, yeah.

22        Q.   As far as you know, that building was repaired well

23   by Encore, it met the GSA requirements, and it was good work?

24        A.   Are you telling me or asking me?

25        Q.   Is that your opinion?

1          A.    Yeah, they did a good job.

2          Q.    Okay.  Thank you.  And it's true that Encore was

3    not licensed to work as a contractor in Louisiana until

4    November 24th, correct?

5          A.    Yes.  They told Mr. Odom that when we first met.

6    And the other guy that was -- the other contractor that was

7    bidding was licensed; but because of the lead times and

8    everything, they probably had, I don't know, I'm going to say

9    150 hours worth of preconstruction work to do the

10   calculations to figure out what had to be done to have GSA

11   pick.  Because that old color that I showed you on that

12   chart, some of those things, that exact carpet's not made

13   anymore.  It's a different name.  So before they even could

14   order the carpet they had to get the specs, go to GSA and say

15   pick one of these.  So they were doing a lot of work while

16   they were in the process of getting their contractor's

17   license to physically do work.  So they were doing pre-con

18   work.

19         Q.    Okay.  Just like a public adjuster, contractors are

20   licensed by the State of Louisiana, right?

21         A.    Yes, sir.

22         Q.    Before they can bid, before they can quote, before

23   they can do the construction work, they have to be licensed?

24         A.    I don't know the law --

25         Q.    Okay.

1     A.    -- regarding builders.

2     Q.    Fair enough.  I'm not asking you anything other

3    than whether or not they were licensed before November 24th.

4    And I think you also volunteered for me that Mr. Odom was

5    aware that they weren't licensed until that time, correct?

6     A.    He was aware that they were getting their license

7    to be able to do this job, and I believe that there was some

8    work.  And I don't know the whole specifics.  I'm just

9    recalling that at some point work that was up to $50,000 for

10   emergency work or something didn't have to be.  I don't know.

11   All I know is that they were working on the selections and

12   everything and they were doing preconstruction work.

13    Q.    And then, as they were licensed, they began work.

14   And that was a process that went on for, what, six or seven

15   months, right?

16    A.    The physical work, I don't believe so.

17    Q.    Well, when was substantial completion?

18    A.    I'm not sure of the date.  There was a very, very

19   initial schedule.  So what happened and why --

20    Q.    That's not what -- all I asked you was when was the

21   date of substantial completion on this building?

22    A.    I don't know.

23    Q.    Okay.  You handled a number of other claims for

24   Mr. Odom, correct?

25    A.    Yes, sir.

```
 1        Q.   That's on other properties?
 2        A.   Yes, sir.
 3        Q.   And you've worked for the Cox firm, correct?
 4        A.   In what context?
 5        Q.   You've been hired by the Cox firm on other cases,
 6   or no?
 7        A.   For -- I work --
 8        Q.   Public adjuster.
 9        A.   No, sir.  Not as public adjuster, no, sir.
10        Q.   Okay.  Now, there was a point in time in October, I
11   believe, that Encore and you were involved in getting an
12   engineering group to come in and look at the exterior panels?
13        A.   No, sir.
14        Q.   Did they ever generate a report, any engineering
15   company generate a report?
16        A.   I just said no, I didn't -- my answer was no.  I
17   don't know that -- I had nothing to do with bringing an
18   engineer in.
19        Q.   Do you know if an engineer came in to look at the
20   cladding, the exterior, and give opinions?
21        A.   I think there was an eaves guy.  There was some --
22   like, the company that sells the exterior products, they were
23   in there.  And I know that Encore was spending a lot of time
24   trying to find out because the window flashing, the window
25   trim comes and hangs over the panel so you couldn't put a
```

1    thicker paneling because it would stick out further than
2    where the water would go and the water would go behind the
3    panels.  So what happened was he had a design professional,
4    but I think -- I don't know who it was, and they were trying
5    to figure out what products were out there that you can put
6    on the building that wouldn't adversely affect the building.
7         Q.   Do you know -- I'm sorry.
8         A.   And I know that somebody was like -- there was
9    somebody there doing -- trying to identify the thickness of
10   everything and all the details to see what program -- what
11   product they can put on.  And I think the same thing with the
12   windows.  So the window frames were torn out and damaged and
13   the window trim where the glass is, the metal that goes
14   around it that was in one of the pictures that was smashed,
15   it's shaped like a Z and it goes under the panels; and how
16   it's screwed on is under the panel so the panel has to come
17   off to get to it.  So somebody was trying to figure those
18   details out to find out how they can do that.  I don't know
19   that they were an engineer or not or if they were just trying
20   to figure out a product.
21        Q.   I'm not sure if I got an answer, but was a report
22   issued?
23        A.   Not that I know of.
24        Q.   So you're saying you did not get a report from an
25   engineering company on the exterior?

1      A.   I did not get a report.  To my knowledge, I did not

2   get a report from an engineering company on the exterior.  I

3   was very clear from day one the panels blew off.  We knew

4   what panel it was.  We researched it.  They don't manufacture

5   them anymore.  And we made the argument that

6   indemnification -- or that you can't fix it.  They don't make

7   them anymore.  So we made the argument and we said here's the

8   cost to replace them.

9      Q.   And so, again, so that I'm clear, and I don't want

10   to spend a lot of time other than you're saying you did not

11   see an engineering report and had you seen an engineering

12   report that related to this building that is something you

13   should have sent to Scottsdale, correct?

14      A.   When you say an engineering report related to the

15   building, I included engineering drawings --

16      Q.   Sir --

17      A.   -- related to building the building.  It was in the

18   book.

19      Q.   And I appreciate that.  If you'd focus on my

20   question, we'd all get out of here.

21      A.   I'm just --

22      Q.   If there was an engineering -- I'll take

23   responsibility.  I need to be more clear.  If there was an

24   engineering report that was generated after your big

25   estimate --

1      A.   Yes.

2      Q.   -- and it related to the building, is that

3  something you should send to Scottsdale?

4      A.   Yes, sir.

5      Q.   Okay.  Thank you.  Just one second.  Thank you,

6  sir.  I got clearance to let you go.

7           THE COURT:  Redirect, Ms. Brown.

8                    REDIRECT EXAMINATION

9  BY MS. BROWN:

10     Q.   Just have a couple follow-up questions, Mr. Major.

11 Mr. Wolff spent some time asking you about whether you've

12 seen actual payments for these costs.  You understand these

13 to be the costs that Mr. Odom has incurred and owes?

14     A.   That is correct.

15     Q.   Some of them have been paid, some of them have not?

16     A.   Yes, ma'am.

17     Q.   In your experience -- well, you heard Mr. Lock

18 testify yesterday and he agreed that under the replacement

19 cost policy incurred is enough?

20     A.   That's correct, yes, ma'am.

21     Q.   And that's your experience as well; they don't have

22 to actually come out of pocket and pay and then get the money

23 from insurance?

24     A.   That's correct.  Traditionally they need the money

25 from the insurance company to be able to pay.

1      **Q.**   Correct.  One other thing.  Mr. Wolff was trying to
2  get you to agree to some things on this chart.  And the fact
3  of the matter is even if you add -- even if you add the full
4  All Clear estimate, the full bill, excuse me, the full
5  491,000, which is not what it was ultimately to your
6  estimate, your estimate at 2.5, 2.6, whatever they want to
7  call it, is still closer to what has actually been incurred
8  than their initial payment?
9      **A.**   That's correct, by multiples.
10     **Q.**   Than Grecco's estimate?
11     **A.**   That's correct.
12     **Q.**   And even by Mr. Stuck -- it's not closer than
13 Mr. Stuck's estimate, but his finally starts to get them
14 closer?
15     **A.**   Right, but Mr. Stuck didn't write an estimate.  He
16 took Encore's actual cost and said, "Oh, I'm going to adjust
17 these things."  So it's not an estimate.
18     **Q.**   All right.  That's all I have.
19     **A.**   Thank you.
20          THE COURT:  Okay.  You may step down.
21          MR. COX:  We've got one more witness, Your Honor.
22 If I could, I'd like to get about a five minute break.
23          THE COURT:  Sure.  Let me ask you this.  How long
24     is this witness going to take?
25          MR. COX:  On direct, I would say 20 minutes.

304

1    Lawyer minutes, that might be 30.

2         THE COURT:  I don't trust the lawyers to give me

3    estimates on time, although I am one.  I'm just -- I'm

4    trying to -- let me ask the jury.  Ladies and gentlemen,

5    how many of you are spending the night, if you don't

6    mind me asking?  Two.  The rest of you are traveling

7    back and forth?  Are you having to work, sir, at night?

8    God bless you.  He's one of our firemen.  Do you have to

9    work tonight?  I'm just trying to decide if we should go

10   ahead and call it right now.  Some people are traveling.

11   I don't know if you think it's only going to take 20, 30

12   minutes, we can take another witness and keep this thing

13   moving.

14        MR. COX:  I think the cross will take longer that

15   that, I would imagine.

16        MR. WOLFF:  I don't know who it is.

17        THE COURT:  We don't know who it is.  That's a

18   great question.  Who is it?

19        MR. COX:  It's Joey Odom.

20        THE COURT:  Oh.  Yeah, that's probably going to

21   take awhile, huh, Mr. Wolff?

22        MR. WOLFF:  Not super long but longer than

23   comfortable for the jury, I'm certain.

24        THE COURT:  What would the jury like to do?  I'm

25   going to ask y'all.  Would y'all like -- here's the

1       thing.  It's already ten after and I really don't want
2       to keep people past 5:00 o'clock.  Now, if we get to the
3       end of the week, we may stay late to wrap this thing up.
4       But I don't want to press anybody.  The weather's been a
5       little hairy today, I think.
6            MR. COX:  He's our last witness, Your Honor.  And I
7       think I'd prefer to call him tomorrow morning and get it
8       done quickly, let everyone go for the day.
9            THE COURT:  Okay.  Let's do that, then.  I want to
10      keep it moving because we don't want to waste your time.
11      But since this is probably going to be their last
12      witness and the defense will start their case, we're
13      moving along quite well, which I'm glad to hear.  We
14      have to keep our jurors first and foremost.  You know,
15      they're -- some of them are traveling as far as
16      DeRidder, Leesville.  We have to respect that.  So if we
17      can give them a little extra time today, I think that
18      will be good.  So we'll call it for today.  Thank you
19      all very much.  We'll start back up at 9:00 tomorrow
20      morning.  Okay.
21                    (Jury exits courtroom.)
22           THE COURT:  Okay.  All right.  Y'all can be seated.
23      Anything else for today?
24           MR. COX:  No, Your Honor.
25           THE COURT:  Okay.  Stand at recess.

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1          (Proceedings recessed for the day.)

2

3

4                    *  *  *  *  *  *  *

5

6

7                       **CERTIFICATE**

8

9      I hereby certify this 16th day of May, 2022 that the

10    foregoing is, to the best of my ability and understanding, a

11    true and correct transcript of the proceedings in the

12    above-entitled matter.

13

14                                    *Deidre D. Juranka*
                                     Deidre D. Juranka, CRR
15                                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25