```
                 IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF LOUISIANA
                      LAKE CHARLES DIVISION


EAUX HOLDINGS, LLC                *  Docket No. 2:20-cv-1582
                                  *
                                  *
VERSUS                            *  March 9, 2022
                                  *
                                  *
SCOTTSDALE INSURANCE CO.          *  Lafayette, Louisiana

*******************************************************************

              OFFICIAL TRANSCRIPT OF JURY TRIAL DAY 3 OF 4
                BEFORE THE HONORABLE JAMES D. CAIN, JR.,
                     UNITED STATES DISTRICT JUDGE

*******************************************************************

                       A P P E A R A N C E S


FOR THE PLAINTIFF:    SOMER GEORGE BROWN
                      MICHAEL K. COX
                      Cox, Cox, Filo, Camel & Wilson
                      723 Broad Street
                      Lake Charles, Louisiana 70601


FOR THE DEFENDANT:    JOHN POWERS WOLFF, II
                      MARY ANNE WOLF
                      CHELSEA ACOSTA PAYNE
                      FABIAN EDWARDS
                      Keogh, Cox & Wilson
                      P.O. Box 1151
                      Baton Rouge, LA 70821



REPORTED BY:          DEIDRE D. JURANKA, CRR
                      USDC - Western District of LA
                      P.O. Box 13271
                      Lake Charles, LA 70612
```

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

**I N D E X**

**PAGE**

**COURT PROCEEDINGS**................................ 309

**JOSEPH NEIL ODOM**

    DIRECT EXAMINATION BY MR. COX................ 309

    CROSS-EXAMINATION BY MR. WOLFF.............. 353

    REDIRECT EXAMINATION BY MR. COX............. 435

**GRANGER ALLEN STUCK**

    DIRECT EXAMINATION BY MS. WOLF.............. 450

309

1          COURT PROCEEDINGS

2          THE COURT:  Before we bring the jury in, anything

3     we need to discuss, any housekeeping?

4          MR. COX:  No, Your Honor.

5          THE COURT:  Very good.  Then we'll bring the jury

6     in.  Mr. Cox, is this your last witness?

7          MR. COX:  Yes, sir.

8          THE COURT:  Mr. Wolff, you'll be ready to call a

9     witness?

10         MR. WOLFF:  Yes, Your Honor.

11         THE COURT:  Okay.  Great.

12              (Jury enters courtroom.)

13         THE COURT:  Okay.  Good morning, ladies and

14    gentlemen.  I hope everyone had a good evening, safe

15    travels.  They have coffee for y'all in there in the

16    morning?  Very good.  Lisa, I shouldn't even ask.

17    They're ahead of me always.  I have a great staff.

18         Okay.  Mr. Cox, you may call your next witness.

19         MR. COX:  Thank you, Your Honor.  I call Joey Odom

20    to the stand.

21              JOSEPH NEIL ODOM,

22    after being first duly cautioned and sworn to tell the truth,

23    the whole truth and nothing but the truth, did testify on

24    oath as follows:

25              DIRECT EXAMINATION

BY MR. COX:

1

2      Q.    Morning, Joey.

3      A.    Good morning.

4      Q.    What's your full name?

5      A.    Joseph Neil Odom.

6      Q.    And you're from Lake Charles?

7      A.    Yes, sir.

8      Q.    Are you married?

9      A.    Yes, sir.

10     Q.    Who's your wife?  She's here, correct?

11     A.    Lydia Leblanc Odom.  I've been married for over 36

12     years.

13     Q.    Do y'all have any children?

14     A.    Yes, sir.

15     Q.    How many?

16     A.    I have two.  Daniel's 35.  Blake is 27.

17     Q.    What's your age?

18     A.    61.

19     Q.    Can you tell the jury a little bit about your

20     background, your work experience, and your education?

21     A.    Yes, sir.  I grew up in Vicksburg, Mississippi.  I

22     started working with my dad at 13, construction, digging

23     ditches, footings.  I realized my highlight of the day was

24     lunch.  That was tough.  So my mom worked for the recreation

25     department so I got into recreation about age 14, keeping

1    score, umpiring, working on weekends and nights.  Always had

2    various jobs through the recreation department up until I

3    graduated high school and I went off to college.  Had various

4    jobs there.  Worked for the intramural departments in

5    colleges.  At one point, when I came back home, my parents

6    moved to Monroe, which is actually where I was born.  When I

7    was going to school I had a summer job that I actually worked

8    on for the City of West Monroe on the back of a garbage

9    truck, which was pretty interesting.

10          I always worked, until I graduated, various jobs,

11    usually with universities and umpiring and doing things on

12    the weekend, hosting tournaments, which ultimately became my

13    profession and how I make a living today.  During that time I

14    became involved with United States Slow Pitch Softball

15    Association which is now Specialty Sports Association.  This

16    is my 40th year with them.  I found that's a place where I

17    could achieve what I love to do.  I don't consider it work.

18    It's fun to get up every day and do what I do.  I feel very

19    fortunate.

20          Then I got a job working for the parish -- the

21    Recreation Park Commission for the Parish of East Baton Rouge

22    where I was accepted down there.  They're a top recreation

23    department in the country, win national awards.  So I was

24    very fortunate to have ten years with them.  The experience I

25    got there catapulted me into a position.  The City of

1    Carencro offered me the director of recreation.  I was there

2    very briefly when the mayor of Lake Charles contacted me and

3    said, "Hey, we want you to come grow our recreation

4    department, particularly with the weekend events."  They'd

5    built a complex.  So I went there.

6         At that same year USSSA, which is acronym for United

7    States Specialty Sports Association, I was able to -- lost my

8    train of thought.  That's where I started with them, doing

9    USSSA.  Then that year that I started with the city we

10   introduced baseball into the association.  Slow pitch

11   softball was kind of going down so we had to do something.

12   It was kind of to generate revenue.  Low and behold, it

13   became the largest baseball association in the country after

14   about three years.  So I was working for the city and I was

15   doing this.  USSSA stuff was always on the side, weekends,

16   and evenings.  And I was overloaded so I quit the public

17   sector at that point, when I was working for Lake Charles,

18   and went into the private sector.  It was a big jump, had

19   benefits, vehicle.  It was pretty good pay.  So I was very

20   nervous, but I look back and it was a good move.  And from

21   there, I have been doing this since.

22        When I was with the BREC I became a -- through the

23   National Recreation and Park Association, I was involved with

24   LRPA, Louisiana Recreation and Park Association.  I've been

25   with them for about 37 years, and I became certified through

1    the NRPA.  I have continuing education, ten hours a year

2    continuing education.  I've kept that up this entire time.

3    Since I left the city, this is what I've been doing.  My real

4    job is the weekend events and the sports part of the

5    administration of USSSA.

6        Q.    You said you went to college.  Did you get a

7    degree?

8        A.    Oh, yes, sir.  I graduated in -- well, I met Lydia

9    in college at Northeast Louisiana University and got married

10   in 1985, before I got my degree.  The next year, going to

11   night class and continuing work, I was able to -- I got my

12   degree, bachelor of science.

13       Q.    In addition to all the things you've done with

14   recreation and softball, you've also dabbled in real estate,

15   correct?

16       A.    Yes, sir.

17       Q.    When did you start doing that?

18       A.    Well, I realized when -- I bought my first house in

19   West Monroe, Louisiana, Lydia and I did, for $17,000, was my

20   first house, little 900 square foot house.  When I got the

21   job in Baton Rouge I got a house down there for 35,000 and

22   then when I sold my house -- no, it was 55,000.  When I sold

23   my house in West Monroe I sold it for 35,000.  I was like,

24   man, that's a pretty good deal.  That kind of intrigued me to

25   continue doing that.  I bought little pieces of property here

314

1  and there and I found out that property is usually a pretty
2  good investment, land.  So I started what I --
3  unintentionally, but that's when I got into it.
4       Q.   One of the things that you did, you formed LLC's to
5  do your property deals, correct?
6       A.   Yes, sir.
7       Q.   Something your attorney told you is smart?
8       A.   Absolutely.
9       Q.   One -- two of the LLC's that you -- do you own
10  Four-O, LLC?
11       A.   Yes, sir.
12       Q.   Do you own Eaux Holdings, LLC?
13       A.   Yes, sir.
14       Q.   And you're the only owner of both of those,
15  correct?
16       A.   Yes, sir.
17       Q.   And those are the companies that we've talked
18  about.  Eaux Holdings is the company that owns the building
19  at 620 Esplanade that is the subject of this case; is that
20  correct?
21       A.   You said Eaux Holdings?
22       Q.   Yes.
23       A.   Yes, sir.
24            MR. COX:  Exhibit 115, I'd like to offer, a
25       photograph of the building.

```
1              MR. WOLFF:  No objection.
2              THE COURT:  It'll be admitted.
3    BY MR. COX:
4         Q.   Joey, this is what the building looked like before
5    Hurricane Laura, correct?
6         A.   Yes, sir.
7         Q.   About 14,000 square feet?
8         A.   Yes, sir.
9         Q.   And it housed the Department of Homeland Security,
10   ICE, on the bottom floor, correct?
11        A.   Yes, sir.
12        Q.   What'd you purchase that building for?
13        A.   $2 million.
14        Q.   And when did you purchase it?
15        A.   January of 2018.
16        Q.   How much money did you have to borrow to purchase
17   it?
18        A.   100 percent of it, $2 million.
19        Q.   Did you say January 2018?
20        A.   Yes, sir.
21        Q.   Okay.  So about two and a half years before
22   Hurricane Laura hit Lake Charles?
23        A.   Yes, sir.
24        Q.   How'd this stack up with the real estate
25   investments that you'd made before that time?
```

1      A.   It was nerve-racking.  I knew Fred Book, who owned

2  that building.  I actually -- my first office when I moved

3  out of my house, moved my office out of my house to get a

4  real office, was in this building.  I had a little corner

5  office downstairs.  Fred had it sectioned up.  So I got to

6  know Fred.  And through him, then I bought a piece of

7  property next to him.  And he saw me out there one day

8  looking at the property with, I think, a surveyor or

9  engineer, somebody, and he asked me what I was doing and

10  said, "Hey, why don't you look at this."  And I considered

11  moving into that building.  Anyway, I ended up buying the

12  building.  I made a commitment to Fred that I would.  It was

13  very nerve-racking to put my signature on $2 million, but

14  Fred talked me through it.  He's getting up there in age and

15  he said, "It's a good investment and it can be good towards

16  your family's retirement, you know.  I mean, when you get to

17  that point, it's a good income."

18      Q.   Had you ever made an investment that big?

19      A.   Never.

20      Q.   Did you get insurance on the building?

21      A.   Yes, sir.

22      Q.   With whom?

23      A.   Scottsdale.

24      Q.   After you got insurance, did you pay your premiums

25  on time?

1       **A.**   Yes, sir.

2       **Q.**   Did you pay the full premium on time?

3       **A.**   I believe I paid the full premium every single time

4    and I don't believe I was ever late.

5       **Q.**   Why'd you do that?  Why'd you pay the premiums on

6    time?

7       **A.**   Because to protect that $2 million investment.  No

8    way I could handle repairs or devastation like this if I

9    didn't have it.

10      **Q.**   We all know Hurricane Laura hit Lake Charles

11   August 27th, 2020.  What did you do to prepare for this

12   storm?

13      **A.**   I watched it right up, like everybody did, to see,

14   oh, it's not coming here, not coming here.  They say it's

15   coming here so it's not.  Well, they got it right.  It did

16   come to our area, and I sent my family ahead of me to

17   Arkansas.  My son and myself stayed back to just batten down

18   the hatches, so they say, turn the gas off, put any lawn

19   chairs inside, any patio furniture, and just got the best I

20   could get it ready for high winds.  And then we evacuated, as

21   my family, my grandkids, my daughter-in-law, my son, my wife,

22   to Arkansas.

23      **Q.**   When did you come back to Lake Charles?

24      **A.**   I came back the next day, as soon as I thought it

25   was safe to come back.

1      Q.   Did anyone come with you?

2      A.   Sir?

3      Q.   Did anyone come with you back to Lake Charles?

4      A.   Yes, sir, my son came back with me.

5      Q.   Why'd you come back so early?

6      A.   I was concerned about my property and my house, all

7  my properties.

8      Q.   Including the building at 620 Esplanade?

9      A.   Yes, sir.

10     Q.   And you were concerned.  You wanted to look at it.

11  Anything else?

12     A.   I wanted to get back and be able to do what I could

13  to see what the damage was and try to see if I needed to do

14  anything else to protect my property.

15     Q.   When you got back to Lake Charles did you have any

16  trouble getting around town?

17     A.   Yes, sir.

18     Q.   What kind of stuff did you see when you got back to

19  town?

20     A.   Well, starting when I came back from just south of

21  Monroe I started seeing the devastation; and it was

22  surprising it was that far north.  I called my family and I

23  told them, "Hey, don't come back this way.  Electricity's

24  out.  Nobody's open."  So I told them -- they were going to

25  Lafayette to my -- to her sister's house, is where they ended

1  up going after they realized it hit Lake Charles, to her

2  sister's house.  I told them to go around through Natchez and

3  that way, go around all this.  When I got back, more I come

4  down 165, it was getting worse and worse.

5       **Q.**   When you hit Lake Charles were the streets open and

6  accessible?

7       **A.**   (Shakes head side to side.)

8       **Q.**   Were power lines down?

9       **A.**   (Nods head up and down.)

10      **Q.**   Did you see a bunch of buildings that were damaged?

11      **A.**   (Nods head up and down.)

12           MR. COX:  I'd like to offer Exhibits 90 and 93, the

13      photos of Lake Charles damages.

14           MR. WOLFF:  I think we already dealt with that,

15      Your Honor, to know.

16           THE COURT:  Which one is it?

17           MR. COX:  It's the one with the photos of Lake

18      Charles, downed power lines, etc.

19           THE COURT:  We didn't deal with it.  We talked

20      about it.

21           MR. WOLFF:  Right.  He's already testified.  The

22      building is what's relevant here.  Everybody knows it

23      was devastated.

24           THE COURT:  That's why I'm going to let him show it

25      because I think everybody knows.  I'm going to overrule

1        your objection.

2                MR. COX:  Thank you, Your Honor.

3                THE COURT:  It's for demonstrative purposes,

4        really.

5    BY MR. COX:

6        Q.   Joey, the photos up here show a bunch of things.

7    They show the Calcasieu Marine building.  You saw that with

8    the windows blown out, correct?

9        A.   Yes, sir.

10       Q.   You saw a riverboat crashed into Interstate 10

11   bridge --

12       A.   Yes, sir.

13       Q.   -- downed power lines, trees on houses, roofs blown

14   off, devastation to some homes, correct?

15       A.   Yes, sir.  When I -- once I hit 20 off of 160,

16   whew.

17       Q.   Let's talk about your building at 620 Esplanade.

18   We've already put into evidence Exhibits 70 to 81.  I'm going

19   to show you photographs of your building after the storm.

20   There's been some testimony about what was damaged.  When you

21   got back, just tell the jury briefly the condition of the

22   building, what you saw.

23       A.   I walked up to the building.  There was -- ICE was

24   there, Homeland Security.  They were securing their stuff.

25   They have a lot of confidential stuff.  There was water

1    immediately when you walk into the lobby.  The lobby had

2    water standing in it.  Saw busted out windows.  As I entered

3    I see the roof falling in, a lot of water inside.  When I

4    went in and went upstairs I saw the -- clearly saw the sky

5    through the top floor.  It was kind of numbing.  Like, I

6    think it was like a dream; but it was -- I don't even know

7    how to describe it.  Shock, I guess.

8         Q.    The roof was gaping holes and open and rainwater

9    was coming into the building?

10        A.    Yes, sir, in several places.

11        Q.    Did you do anything in response to that to try to

12   get a temporary roof on?

13        A.    Immediately Crest Roof found me.  They were in the

14   area, and I negotiated with them and they immediately started

15   putting a temp roof on.

16        Q.    Did you also try to do something to secure the rest

17   of the building and dry the place out as best you could?

18        A.    Yes, sir.  I contracted with All Clear Restoration

19   and they told me what they would do.  You know, I found Jeff,

20   was one of the first people, and he was very helpful in

21   giving me suggestions on what I may need to do.  And I

22   contracted with All Clear to close in all the windows, dry it

23   out, pull out any Sheetrock after they did the moisture map.

24   And so yes, sir, that's what I did.

25        Q.    So in the days and weeks that followed Hurricane

1    Laura there was more rain in Lake Charles, especially when
2    Delta came in, correct?

3         A.   Yes, sir.

4         Q.   And Delta, it rained over 20 inches in a day.  Did
5    that temporary roof that Crest put on do a perfect job?

6         A.   No, sir.

7         Q.   What did you do to protect your building, if
8    anything, because there was still some water coming through
9    the roof?

10        A.   Well, it's a flat roof so the challenge was you
11   couldn't just cover the roof up because then everything --
12   the water would sit on the roof.  So you had to tie it into
13   the drain somehow, which was the challenge.  There was so
14   much water it was finding its way in.  My son and I with some
15   of his buddies -- he, my son, actually came up with the idea
16   to build these vats out of PVC and Visquine.  First we
17   started with buckets, just Tupperware buckets, I say the big
18   buckets, the husky buckets, anything we could find to catch
19   it because it was dripping.  Then it start raining.  You
20   could tell the water was backing up somehow or getting in
21   more because it was coming in.  We built these vats.  Went to
22   Home Depot and I bought a bunch of sump pumps and hoses and
23   fans.  And we put the fans out because, I mean, we'd already
24   got it -- was getting it cleared up downstairs.  I didn't
25   want to have to go through that again, which I think would

323

1    have been another huge additional cost for me.  And we hooked

2    the vats up with the sump pumps to eventually go out the

3    window.  And we -- actually, when it was raining at night, we

4    spent the night there to make sure -- I'd get up every hour

5    and go check it, make sure everything's working.

6              MR. COX:  Like to offer Exhibits 82 through 86, the

7         PVC vats.

8              MS. WOLF:  No objection.

9              THE COURT:  It'll be admitted.

10   BY MR. COX:

11        Q.   Mr. Odom, were these the giant containers that you

12   and your son built to collect the rainwater that was still

13   coming through the temporary roof and pump it out the

14   building?

15        A.   Yes, sir.

16        Q.   Okay.  And you have buckets in the photos, too.

17   Are those the buckets that you guys used throughout the

18   building to collect the rainwater?

19        A.   Yes, sir.

20        Q.   And you did this sometimes around the clock?

21        A.   Yes, sir.

22        Q.   There's been some talk about Jeff Major and Skyline

23   Adjusters, and he said he how got over there.  The next --

24   the day after the storm you hired Mr. Major as your public

25   adjuster, correct?

1      A.   Yes, sir.

2      Q.   And you signed a contract with him?

3      A.   Yes, sir.

4      Q.   And the contract, which they've already gone over,

5    was for an hourly rate but no more than 10 percent of what

6    you collected in insurance, correct?

7      A.   Yes, sir.

8      Q.   So when you hired Mr. Major and Skyline you knew

9    that you might be giving up as much as 10 percent of what

10   insurance paid you?

11     A.   Yes, sir.

12     Q.   Why'd you think you needed a public adjuster?

13     A.   I didn't even know what a public adjuster was.

14   I've never -- I don't recall ever hearing of one.  But

15   talking to Jeff, he explained the situation, what they would

16   do for me.  I didn't feel like it's what I needed, exactly

17   what I needed.  Real estate is what I do and this type of

18   stuff kind of on the side is residual, but there's no way I

19   could have fought the insurance company to get what I needed

20   to get.

21     Q.   Did he tell you -- did he tell you about proof of

22   loss?

23     A.   Yes, sir.

24     Q.   Did you think you could do that on your own?

25     A.   No, sir.

1      Q.    You saw those volumes of -- his four-volume book
2   with the first 152 Page 1800 entry estimate of repairs.  Is
3   that better than you would have been able to do on your own?
4      A.    Yes, sir.
5      Q.    Homeland Security, did they -- I mean, the building
6   was uninhabitable afterward, correct?
7      A.    Yes, sir.
8      Q.    Did they suspend their lease with you?
9      A.    They did suspend it.
10     Q.    Until when?
11     A.    I think they gave me 140 days, maybe 160, I don't
12   quite remember that number, to get it back in shape and for
13   them to accept it or they would cancel the lease.
14     Q.    Did Homeland have expectations and even legal
15   expectations about the condition of the building being in a
16   certain condition for them to continue with your lease?
17     A.    Yes, sir.  They actually send their own people in,
18   I don't know, the environmental people where they test the
19   air and for mold.  And they came several times through the
20   process and would give us an update on where we were, and we
21   successfully passed their tests.
22     Q.    Those same conditions applied, though, didn't they,
23   before the storm hit Lake Charles?  You still had the same
24   conditions in the contract with Homeland; the building had to
25   be in a certain condition?

1      **A.**    Correct.  They come by on a regular basis to check

2    it out and walk the building, look at it, the entire

3    building, and say, hey, here's your notice you need to --

4    whatever they think needs to be done to it to be in a safe

5    condition that people can inhabit; and they would do that

6    periodically.

7      **Q.**    When you bought the building there was an

8    inspection report and someone had gone out, inspected it, and

9    pointed out that there were some things that needed to be

10   repaired and maintained on the building, correct?

11     **A.**    Yes, sir.

12     **Q.**    Did you -- between the time that you bought it and

13   the two and a half years later when Hurricane Laura hit, did

14   you do those things, or some or all of those things, on the

15   list to get the building in good condition?

16     **A.**    Yes, sir.

17     **Q.**    Tell us some of the things that you did.

18     **A.**    There was -- like, one of the exit doors in the

19   back, there was water coming in there, just rain, which ended

20   up being what -- there was an awning that they had tried to

21   attach to it that wasn't very good.  It was coming in.  So I

22   took that opportunity.  I did the whole north end of the

23   building.  They just re, I'm not sure the proper term,

24   caulked it and that satisfactorily took care of it.

25     The roof drains, sometimes they would, I guess, just --

327

1    that's a plumbing issue.  I didn't realize plumbers worked on

2    roofs, but that's the situation.  They're actually the ones

3    that come in and set the drains.  There's a special drain and

4    those would leak.  And Poole Roofing came in when I'd found

5    one leak and I said, "Look, just do them all and get them" --

6        Q.   And he testified yesterday about -- Mr. Poole

7    testified about the work that he did on the roof before

8    Hurricane Laura to get the roof in good condition?

9        A.   Yes, sir.  And there was one section in the lobby

10   area, some skylights and stuff, they redid that entire area.

11       Q.   Did you replace any carpets or floors in the

12   building?

13       A.   We replaced flooring in the lobby.  We did the

14   ceiling tile in there.  We upgraded it, cleaned it up,

15   painted it.  Did some other stuff on the second level, just a

16   lot of cosmetic stuff for that.

17       Q.   Mr. Poole testified that he did the work to the

18   roof before the storm.  Mr. Wolff pointed out, on behalf of

19   Scottsdale, that there was no invoice for it.  You're sure

20   Mr. Poole did the work?

21       A.   Yes, sir.

22       Q.   Why no invoice?

23       A.   Sometimes -- like, I know Ryan, his son.  His son

24   would come by and do some things.  I mean, they're big time.

25   And I say big time, way bigger than anything that I have.

1    They did the roof, but they do some big projects.  So I'm

2    guessing it was just so small that they come by, ten guys

3    show up, they'd get up there and knock it out in a couple

4    hours.  Ryan grew up with my son.  So I never asked for

5    anything free, but they did that.  Some of the things they

6    did after that part of it they did, the roof part they did, I

7    did pay some for that.

8         Q.   How about the other things that he did do the

9    building; why no invoices, the other maintenance that you did

10   before the storm?

11        A.   Well, a lot of it I did on my own.  I tell you,

12   that building, from the time I got it to pre-hurricane, it

13   was a much better building.  I did -- I was constantly doing

14   things, anything that would come up, particularly leaks.  I

15   know what water damage can do so I was -- anything that

16   happened there, I was always on top of it.  Did a lot myself

17   and got little odds and ends.  Friends would come help me

18   just that I knew in certain trades.

19        Q.   For a commercial building like this, Mr. Wolff

20   pointed out that you testified that Homeland Security's like

21   a gold tenant that's about as good a tenant as you can get.

22        A.   I found out in the real estate world, being in it,

23   that, yes, sir, they are.

24        Q.   And before this storm was their lease coming up for

25   renewal?

 1          A.   We were in the middle of negotiations for a new
 2     lease when Laura hit.
 3          Q.   Did you do anything -- or what'd you do to have the
 4     greatest chance of getting them to come back and renew the
 5     lease?
 6          A.   Well, it seemed like the negotiations had stalled,
 7     which if I were them I would have stalled it, too, not
 8     knowing what was happening.  So my goal ultimately when I
 9     signed the Encore contract --
10          Q.   Back up.  I'm not talking about after the storm.
11          A.   Okay.
12          Q.   I'm talking about before the storm.
13          A.   Before the storm, I mean --
14          Q.   Was it important to have the building in good
15     condition to entice them to re-up the lease?
16          A.   Yes, sir.
17          Q.   So at that point the storm hits and they suspend
18     the lease, correct?
19          A.   Yes, sir.
20          Q.   Did you want them to come back as a tenant and
21     re-up the lease?
22          A.   Absolutely.
23          Q.   And what did you need to do to make that happen?
24          A.   I needed to meet their deadline they gave me.
25          Q.   By repairing the building by a certain date?

1    A.    To get it into acceptable -- they have some high

2  standards.  And that was my goal, is to get -- once I decided

3  to go that route -- I could have left it.  I guess I would

4  have been sitting there with a torn up building, no insurance

5  at this point.  So my goal was to get it ready for them to

6  move back in.

7    Q.    You submitted the Skyline estimate, and there's

8  already been testimony, to Monte Jones, Scottsdale's

9  independent adjuster, agent, that came out there physically

10  on September 15th, correct?

11    A.    Yes, sir.

12    Q.    And am I correct that the only payment that

13  Scottsdale made within 30 days, which we've established is

14  the deadline under Louisiana law, was the $250,000?

15         THE COURT:  Hold on one second.  He's got an

16    objection.  Come to sidebar.

17              BENCH CONFERENCE

18         THE COURT:  What's your objection?

19         MR. WOLFF:  It's multiple level.  It's --

20         THE COURT:  Let's get everybody here because DD's

21    fussing at me about not being able to hear.

22         MR. WOLFF:  It's a multiple level objection.  He is

23    asking this witness to talk about legal conclusions.

24    There's no foundation in terms of the law establishes

25    it's 30 days from the day he came out.

331

1          THE COURT:  He can ask how long it took to get the
2    payment.
3          MR. WOLFF:  Certainly he can do that, but he
4    cannot --
5          MR. COX:  I'll rephrase the question.
6          MR. WOLFF:  He can't include that the law
7    establishes this 30 days.  He can say, "When did he come
8    out," and "When did you pay it?"  That's factual
9    predicate.  I've got no problem with that.  It's adding
10   the legal texture into it.
11         THE COURT:  Then you can ask him was that more than
12   30 days.  Just leave the legal aspect --
13         MR. COX:  Sure.
14         THE COURT:  I would ask, "Is that more than 30
15   days?"  Here again --
16         MR. WOLFF:  That's fine.
17         THE COURT:  I understand what you're saying.  You
18   don't want the preface of the legal statutory --
19         MR. WOLFF:  That's right.
20         MR. COX:  No problem.
21         MR. WOLFF:  -- satisfactory proof of loss so we've
22   got a whole -- but the time -- so we're going to
23   sustain -- or you're going to sustain?
24         THE COURT:  I'm going to sustain and ask him to
25   rephrase the question.

```
 1              MR. WOLFF:  Can I have you announce that to the
 2       jury, because I come up here looking like I'm
 3       interrupting things.
 4              THE COURT:  Absolutely.  I think I, in the past,
 5       have said sustained or overruled.
 6              MR. WOLFF:  I've got some overrules.  I just want
 7       to hear one sustain so I've got some juice.
 8              THE COURT:  Everybody likes to win.
 9                        PROCEEDINGS CONTINUED
10              THE COURT:  The objection is sustained.  Mr. Cox, I
11       would ask that you rephrase the question.
12              MR. COX:  Thank you, Your Honor.
13  BY MR. COX:
14       Q.  Mr. Odom, was this $250,000 payment the only
15  payment you got from Scottsdale Insurance Company within 30
16  days of when you gave them that four-volume detailed
17  estimate?
18       A.  Yes, sir.
19       Q.  All of the other Scottsdale payments were after 30
20  days, weren't they?
21       A.  Yes, sir.
22       Q.  What was your reaction to the $250,000 payment?
23       A.  Scared to death.
24       Q.  Why?
25       A.  When I'm looking at at least a $2 million, as they
```

1    say, at least a $1.5 million repair, that did not even come

2    close to what I'd already put my signature on and committed

3    to getting the building repaired.

4         Q.   Were you concerned about the building and your

5    business?

6         A.   I was in fear I was about to go bankrupt.

7         Q.   In September you got a bill for $491,000 from All

8    Clear, didn't you?

9         A.   Yes, sir.

10        Q.   $51,000 bill from Crest Exteriors for the temp

11   roof, correct?

12        A.   Yes, sir.

13        Q.   A $9500 or so bill from Jacques Bourgeois, correct?

14        A.   Yes, sir.

15        Q.   And you submitted all those things to Scottsdale in

16   September, correct?

17        A.   Yes, sir.

18        Q.   Was that payment enough to cover all that?

19        A.   No, sir.

20        Q.   You also had to fix your building.  You had to hire

21   someone to repair the building, didn't you?

22        A.   Yes, sir.

23        Q.   Did Scottsdale Insurance Company fund the repairs

24   of the building?

25        A.   No, sir.

1      Q.    What was your expectation -- when you paid the

2  premiums for this policy what was your expectation that

3  Scottsdale would do for you if your building suffered some

4  catastrophic damage?

5      A.    I was expecting it to be like any other insurance

6  claim that I've had in my life, is that they come in,

7  evaluate it, send you a check to get started on your repairs

8  and in a reasonable amount of time.

9      Q.    Did it surprise you that you were going to have to

10  fund the construction?

11      A.    It did surprise me.

12      Q.    So you hired us in November, November 11th, right?

13      A.    Yes, sir.

14      Q.    The only payment that Scottsdale had made before

15  that time was how much?

16      A.    250,000.

17      Q.    Why'd you hire an attorney?

18      A.    I didn't have, I feel like, any other option.  I

19  wasn't sure how to -- and I was still questioning -- I mean,

20  I'm a half a million dollars into it by my signature.  Like,

21  I can't turn back now.  I've got to go forward.  I can't just

22  pay -- have a torn up building and have a half a million plus

23  dollars that I have to pay and just say oh, well, I'll just

24  leave it.  Plus I owed a million still on the --

25      Q.    You signed your name to a contract to repair the

335

1   building with Encore Construction Company on December 23rd,

2   correct?

3       A.   Yes, sir.

4       Q.   $1.36 million contract?

5       A.   (Nods head up and down.)

6       Q.   And you hadn't received any of that money from

7   Scottsdale yet, correct?

8       A.   Correct.

9       Q.   Were you reluctant to sign that contract?

10      A.   It was hard.  It was extremely challenging for me

11  to put my signature on another contract committing over a

12  million dollars that I did not have.

13      Q.   We heard yesterday that the last communication with

14  your public adjuster from Scottsdale was before Thanksgiving

15  and that there were 18 e-mails that went unanswered and a

16  bunch of phone calls.  What'd you think Scottsdale was doing

17  on the claim at this point, after November?

18      A.   What I heard everybody else, that they were slow --

19  everybody was slow playing it, seeing how long it could last

20  and hold out, keep their money.  I know a lot of contractors

21  that were in the area that ended up leaving because people

22  weren't getting insurance money, but I expected it to -- I

23  guess that's it.

24      Q.   Were you concerned that your expected renewal of

25  the lease with Homeland wouldn't happen?

1      **A.**   Yes, sir.  I had no other reason -- I mean, they

2  gave me a deadline.  It's the deadline.

3      **Q.**   Was it your -- was it ever your goal -- other than

4  the air conditioner, the HVAC that you put in, was it your

5  goal to upgrade this building after the storm?

6      **A.**   No, sir.

7      **Q.**   In your claim to the insurance company did you

8  include -- did you expect the insurance company -- did you

9  expect Scottsdale to pay for any of the upgrades like the

10  HVAC that you upgraded?  Did you expect them to pay for those

11  upgrades?

12      **A.**   No, sir, not their responsibility.

13      **Q.**   There was a $1.36 million Encore contract; but

14  there were some additional charges from Encore above that,

15  correct?

16      **A.**   Yes, sir.

17      **Q.**   Do you remember the total of it?

18      **A.**   Not off the top of my head, no, sir.

19      **Q.**   Those additional amounts were change orders for

20  things that weren't related to the storm?

21      **A.**   Yes, sir.

22      **Q.**   Let's go through the bills that you had on this

23  job.  Crest Exterior, $51,000, that was for the temporary

24  roofing, correct?

25      **A.**   Yes, sir.

1      Q.    Did you pay it?

2      A.    Yes, sir.

3      Q.    That was incurred right up front in September,

4   correct?

5      A.    Yes, sir.

6      Q.    Capstone, what is that?

7      A.    That's an environmental guy that came in and did

8   the moisture mapping to see what -- how much Sheetrock needed

9   to be taken out or what sections of the Sheetrock that were

10  wet that were not able to be dried.  I guess there's a

11  standard that you can dry it up to a certain amount.  And he

12  did the entire building.

13     Q.    And that was right up front in September, correct?

14     A.    I paid 5,000 down.  I think the remaining balance I

15  paid later.

16     Q.    Okay.

17     A.    But it was incurred.  My signature's on it so I'm

18  paying it or doing everything I can to pay it.

19     Q.    But you eventually paid the full amount?

20     A.    Oh, yes, sir.

21     Q.    All Clear Restoration, there was a lot of testimony

22  about that.  You thought that bill was excessive, 491,000,

23  didn't you?

24     A.    I was thinking I'm in the wrong business.  Yes,

25  sir, I thought --

338

1      **Q.**   But eventually, the testimony was, you were able to

2   negotiate that down to $330,639, correct?

3      **A.**   Yes, sir.

4      **Q.**   Did you pay all that?

5      **A.**   Yes, sir, I did.

6      **Q.**   Jacques Bourgeois Electric, that was for some

7   electric work right up front where he came in, looked at the

8   electrical and all that right after the storm, correct?

9      **A.**   Yes, sir.

10     **Q.**   Did you pay that yet?

11     **A.**   I have not.

12     **Q.**   Do you owe it?

13     **A.**   I do owe it.

14     **Q.**   And you incurred it right after the storm, correct?

15     **A.**   Yes, sir.

16     **Q.**   Martin Insulation, $10,000, that was an upgrade.

17   It was a $36,000 bill, correct?

18     **A.**   Correct.

19     **Q.**   But 10,000 of it, as you understand it, was covered

20   under that construction upgrades --

21     **A.**   Yes.

22     **Q.**   -- in the contract and that's why we're only

23   putting 10,000 of the 36?

24     **A.**   Yes, sir.

25     **Q.**   Did you pay that?

339

1      A.   I did pay that.

2      Q.   Mr. Poole testified yesterday that that was his

3   final bill, $276,000?

4      A.   Yes, sir.

5      Q.   But the fact is -- how much of it have you paid; do

6   you know?

7      A.   I think all but about 30,000.

8      Q.   36,000 is, I think, what he says on his invoice.

9   Do you legally owe Mr. Poole?

10      A.   Yes, sir.

11      Q.   Does he expect to be paid?

12      A.   Thinks he does.

13      Q.   Do you expect to pay him?

14      A.   Yes, sir.

15      Q.   Encore Construction, that number's a little

16   different than the 1.36 million.  It's a little lower.  Do

17   you know why it's a little lower?

18      A.   Because there's things in there that are my

19   responsibility, not the insurance responsibility.

20      Q.   And all the things -- you went through that bill

21   line by line.  All the things that weren't related to the

22   storm you took out?

23      A.   Yes, sir.

24      Q.   Did they charge interest on the job?

25      A.   They are charging interest now.

1      Q.   And what's the total that you owe in interest to
2   date as of February?
3      A.   I think it's $17,000.
4      Q.   That Encore bill, there's been testimony it hasn't
5   been paid in full.  I think 900 something thousand has.  Are
6   they just going to let you not pay the rest or do you legally
7   owe it?
8      A.   I legally owe it.
9      Q.   And you signed a contract, a binding contract to
10  pay it, didn't you?
11     A.   Yes, sir.
12     Q.   Industrial Refrigeration, that was for some repairs
13  of the -- that wasn't the whole HVAC system, correct?
14     A.   No, sir.
15     Q.   What was it?
16     A.   The outside units, something had hit the coils and
17  they had to come in -- well, they came in, just checked
18  everything.  That type of system, they had to re-get it, make
19  sure it was viable.  It's got fluids and different things in
20  it.  But this outside unit was broken, busted.  They just had
21  to repair that.  So it was to make sure that everything was
22  in condition to start back up.
23     Q.   Have you paid it?
24     A.   Yes, sir.
25     Q.   So all of these bills on this page you either paid

1  in full or you legally owe them?

2      **A.**   Yes, sir.

3      **Q.**   And the work's been done?

4      **A.**   Yes, sir.

5      **Q.**   There was some testimony about some windows that

6  still need to be repaired.  That's not on here.  It's not a

7  cost that you've incurred yet, true?

8      **A.**   Correct.  Yes, sir.

9      **Q.**   Scottsdale's expert Granger Stuck is going to say

10 the windows need to be repaired and it's about 160,000.  Is

11 that something you intend to do?

12     **A.**   Yes, sir.

13     **Q.**   So looking at that total, and they've said the math

14 is right, $2,031,000, if Scottsdale says that the cost of the

15 job has only been $1.79 million, true or false?

16     **A.**   Can you ask that again.

17     **Q.**   If Scottsdale says that the total cost of the job

18 to you is only $1.79 million, true or false?

19     **A.**   False.

20     **Q.**   That's the actual cost to you so far, correct?

21     **A.**   So far, yes, sir.

22     **Q.**   You've gone through all the bills on that sheet,

23 haven't you?

24     **A.**   Yes, sir.

25     **Q.**   And I have them here, but I'm going to flip through

1    them.  Crest Exterior, two pages, and the total of that was

2    51,000, correct?

3         A.   Yes, sir.

4         Q.   And without putting them up there, that was also

5    true for Capstone, the amount was correct?

6         A.   Yes, sir.

7         Q.   That was the bill?

8         A.   (Nods head up and down.)

9         Q.   For All Clear, we talked about it, it was 491,000

10   but you ended up only paying 330, correct?

11        A.   Yes, sir.

12        Q.   Jacques Bourgeois, that bill was accurate, correct?

13        A.   Yes.

14        Q.   Martin Insulation, we talked about only 10,000 of

15   it's covered, correct?

16        A.   Yes, sir.

17        Q.   Poole Roofing, he testified to what his total bill

18   was yesterday, 276,000 and some change --

19        A.   Yes, sir.

20        Q.   -- correct?

21        Encore, we talked about you took the whole contract

22   number and you subtracted out anything that wasn't related to

23   hurricane damage and you did that in detail, correct?

24        A.   Yes, sir.

25        Q.   And then you added in the interest?

1      A.   Yes, sir.

2      Q.   And then Industrial Refrigeration, we just talked

3   about that.  That was the correct amount?

4      A.   Yes, sir.

5      Q.   The building was completed about August of 2021?

6      A.   I believe that's about when.

7      Q.   Have you had to borrow any money to fund the

8   construction?

9      A.   Yes, sir.

10      Q.   How much have you had to borrow?

11      A.   About 160,000.

12      Q.   And you still owe All Clear -- I'm sorry.  That's

13   wrong.  You don't owe All Clear.  You paid them in full.

14      A.   (Nods head up and down.)

15      Q.   You still owe Encore?

16      A.   Still owe Encore.

17      Q.   You still owe Ricky Poole some money?

18      A.   Yes, sir.

19      Q.   And you still owe Jacques Bourgeois some money?

20      A.   Yes, sir.

21      Q.   And you still have to pay for the over $150,000 in

22   window repairs that haven't been done yet?

23      A.   Yes, sir.

24      Q.   And you've paid out all the money you got from

25   Scottsdale, haven't you?

1      A.   Yes, sir.

2      Q.   Thank you, sir.  I don't have any other questions.

3      A.   I have -- I made a comment, a statement, used a

4  word when talking about the roof and when Ricky repaired it.

5  I used the word entire.  He did not repair the entire roof.

6  He looked at it, the entire roof, and he patched the areas

7  and repaired the areas that needed repaired over the entire

8  roof.  So I just wanted the clarification on that, that I

9  didn't misstate that.

10     Q.   Thank you.

11          MR. WOLFF:  Possible for a quick break?

12          THE COURT:  Sure.  Absolutely.  We'll take a ten

13     minute break.  Is that okay?  Thank you.  All rise for

14     the jury.

15               (Jury exits courtroom.)

16          THE COURT:  Mr. Cox, the clerk is asking me have

17     you admitted those, all those invoices, or have they

18     already been admitted.

19          MR. COX:  They've already been admitted.

20          THE COURT:  Very good.

21                 (Recess is taken.)

22          THE COURT:  You ready, Mr. Wolff.

23          MR. WOLFF:  Yes, Your Honor.

24          MR. COX:  Your Honor, I have a couple of

25     housekeeping things, if I may.

1          THE COURT:  Sure.

2          MR. COX:  Exhibits 1 and 2, there's no objection to

3     them.  We've been told by your clerk that they have not

4     been admitted.

5          THE COURT:  Okay.

6          MR. WOLFF:  No problem.

7          THE COURT:  Okay.  You want to put them in now, in

8     front of the jury?

9          MR. COX:  We'll put them in now.  We referred to

10    them through witnesses and stuff.

11         THE COURT:  All right.

12         MR. COX:  And then I just referred with Mr. Odom to

13    Exhibits 52 through 58.  We have the Encore contract in,

14    but there are additional bills that we just discussed

15    that I would offer.

16         THE COURT:  Okay.  Any objection, Mr. Wolff?

17         MS. WOLF:  I think we just need to review them.  I

18    wasn't aware.  Do they have exhibit numbers on them?

19         MR. COX:  Those are the exhibit numbers.

20         Finally, while she's doing that, Your Honor, I

21    wanted to reiterate we had a discussion off the record

22    the other day about Mr. Odom's finances and the amount

23    of money he makes on this job, so I don't have to get up

24    and object --

25         MR. WOLFF:  That door is wide open to send a truck

346

1     through.  He's saying he had a loan that he had to pull

2     out.  He talked about it.  He said it was gold.  I think

3     he's opened -- I wasn't going to spend big time on it,

4     but he's pled about how nerve-racking --

5           THE COURT:  Explain to me this.  What is the

6     relevance of the amount of money he has in his checking

7     account?

8           MR. WOLFF:  I don't intend to do that.

9           THE COURT:  What do you intend to do?

10          MR. WOLFF:  I don't intend to do much more than to

11    talk about the gold that he's already raised.  The whole

12    notion of the loan that he took out, that's news.  We

13    don't have that.  That wasn't disclosed.  I don't know

14    anything about it.  He really has opened up his

15    finances.  I can tell you, I looked at his finances in

16    January and February.  He had hundreds and hundreds of

17    thousands of dollars in that account.  I wasn't going to

18    go there, but now he's talking about --

19          THE COURT:  How do you know the money in his bank

20    account isn't from the loan?

21          MR. WOLFF:  Now, I can get there.  I don't want to

22    go there.

23          THE COURT:  Then don't.

24          MR. WOLFF:  Well, he already has; and he needs to

25    not go there if he doesn't want me doing it.  In other

347

1    words, I don't want to hear in closing that he had to

2    take a loan out and all of that.

3         THE COURT:  Well, we've already heard that.

4         MR. WOLFF:  Well, if he's going to say it in

5    closing, then I need to address it.  I mean, golly.  I

6    wasn't going there.  I didn't make this an issue.

7         THE COURT:  I guess what I'm trying to understand,

8    Mr. Wolff, is what's the relevance here.  I understand a

9    lot of people did not have money waiting on their

10   insurance and people had to take out loans.  That's the

11   facts.  It happens a lot.

12        MR. WOLFF:  Facts.  If you go in Eaux Holdings'

13   account, there's all kinds of property.  He took out a

14   loan.

15        THE COURT:  So?  I mean, just because I have a

16   couple hundred grand in my bank account --

17        MR. WOLFF:  Several hundred grand.

18        THE COURT:  -- and I go -- my house was damaged and

19   I was waiting on my insurance company, I'm not obligated

20   to pull my own personal money out of my bank account to

21   fund my repairs when I got insurance I'm waiting on.  I

22   guess I don't understand the relevance of his financial

23   situation.  I think a loan is very relevant, if he

24   really had to pull out a loan.

25        MR. WOLFF:  Why is that relevant for the --

1    THE COURT:  Because he wasn't getting his insurance

2    money and he had to make repairs.

3         MR. WOLFF:  So?

4         THE COURT:  I guess I don't understand what your

5    point is about his personal finances.  Why don't you

6    expound to me -- rather than us talking in hypotheticals

7    and generalities, tell me specifically and I'll tell you

8    if I'll let you ask it, what specifically do you want to

9    ask Mr. Odom about his finances, and I might let you do

10   it.

11        MR. WOLFF:  I did not want to ask anything.

12        THE COURT:  Well, you're telling me now you do.

13        MR. WOLFF:  I did not until he asked about the

14   loan.

15        THE COURT:  Okay.  He's asked about the loan.  What

16   do you want to ask specifically?  Since that was asked,

17   it was brought up, tell me specifically what do you want

18   to ask him about his personal finances in response.

19        MR. WOLFF:  I really don't want to get into detail

20   with him.

21        THE COURT:  If you're going to get into details

22   with him on the stand, you've got to tell me or I'm not

23   going to let you do it.

24        MR. WOLFF:  I didn't phrase it properly.  I don't

25   want to get into detail with him on the stand about the

1    finances.  But the point is Eaux Holdings holds a number

2    of properties and from time to time he gets loans.  What

3    we're saying is they had plenty of money along the way

4    as monies became due to pay all of that, and I'll lay

5    that out.  I did not anticipate.  And if I'm on notice

6    now that they're saying, oh, we had to get a loan and

7    make that a big deal in closing, I have to --

8         THE COURT:  I never heard the amount of the loan.

9         MR. WOLFF:  I think he said 140,000, 160.

10        THE COURT:  160?  Okay.  $160,000 loan.  What do

11   you want to ask him about it?

12        MR. WOLFF:  That he has other properties in there,

13   that that account funds any number of things that he

14   has, ordinary bills, and from time to time he gets loans

15   in the ordinary course of his business.  I can stop at

16   that but --

17        THE COURT:  I think what you need to ask him is

18   this:  Did you take this loan out in response to the

19   hurricane?  He can say yes or no.

20        MR. WOLFF:  On what property?

21        THE COURT:  Then you can ask him:  Do you have

22   multiple properties?  Did you spend any of this money on

23   any of your other properties?  I think that's fair game.

24   You can ask him that, and he'll say yes or no.  I mean,

25   you did bring up the loan; and I think he has the right

1    to ask him specifically.  What I'm not really interested

2    in hearing about and I don't think the jury's

3    interested, and that's my job to set the parameters

4    here, keep everybody in their lane of travel, but I

5    don't think asking him beyond about the loan -- I'll let

6    you ask about the loan a little bit; but getting into

7    all his other personal finances, absolutely not.  I

8    don't think there's any relevance to that whatsoever.

9         MR. WOLFF:  That wasn't my plan.  I wasn't going

10   with any of this until the loan thing came.  We didn't

11   even know about it.  That was on the stand news for us.

12        THE COURT:  You know, it's probably like one of

13   those things I tell people every once in a while, you

14   know, when they're taking a deposition and they

15   complain.  Hey, you ask the right questions, you get the

16   right answers.  I don't know.  I wasn't at his

17   deposition.  I don't know if anybody asked him about it

18   or not.

19        MR. WOLFF:  I asked him all kinds of stuff and was

20   told no, no, no.  We've asked for all this.  I mean,

21   it's water under the bridge.  But is this an issue that

22   goes to the jury about he had to take out a loan?

23        THE COURT:  No, it's not going on the verdict form.

24   I can promise you that.

25        MR. WOLFF:  Okay.  Well, look, here's what --

1    THE COURT:  I think it went to the fact that he had

2    to -- he didn't have his insurance money that he needed

3    to repair his building and he's got a duty to mitigate

4    his losses under the policy and he was trying -- to me,

5    that's probably the way I look at it.  He was trying to

6    mitigate.  I mean, I didn't go take out a loan while I

7    waited on my insurance company, fortunately; but, you

8    know, they paid me pretty timely.  But I know a lot of

9    people who had to do that.  Happens.  Didn't have the

10   money in their bank account to fund it.

11        MR. WOLFF:  I understand.

12        MR. COX:  Your Honor, Ms. Wolf has agreed to admit

13   52 through 58.

14        THE COURT:  Okay.  So here's where we are.  Let's

15   make sure we're all on the same page.  You can certainly

16   ask Mr. Odom about this loan and some more details about

17   the loan and what he used the funds for.  You can ask

18   him when we got the loan.  I think that door was opened,

19   and I think you're well within your cross-examination to

20   explore this loan with him and everything that went

21   along with that.  Is that fair enough?

22        MR. WOLFF:  Why would I want to do that, really.

23        THE COURT:  You don't have to.  I'm just giving you

24   the opportunity.

25        MR. WOLFF:  I understand.

1       THE COURT:  That's your call.  You're asking me
2   about it.  I'm just telling you what I'll let you do.
3       MR. WOLFF:  Excuse me.
4       THE COURT:  I guess I'm still confused why we're
5   having this discussion, then.
6       MR. WOLFF:  I didn't bring it up, Your Honor.
7       THE COURT:  Okay.  Well, my bad, then.  I thought
8   you did bring it up.
9       MR. WOLFF:  No, they brought up the loan.
10      THE COURT:  No, no.  I know that.  But now you're
11  asking me.  I want us to be on the same page.
12      MR. WOLFF:  No, no.  I was --
13      THE COURT:  He brought up the loan.  I got it.  You
14  want to ask him questions about the loan.  Ask him.
15  I'll tell you do it.
16      MR. WOLFF:  I understand.
17      THE COURT:  But when you use the term personal
18  finances --
19      MR. WOLFF:  I'm not going into that.
20      THE COURT:  Okay.  Good.  I wanted to be sure.  All
21  right.  Mr. Odom, you can retake the stand.  Are we
22  ready to bring in the jury?  Let's bring the jury in.
23              (Jury enters courtroom.)
24      THE COURT:  Ladies and gentlemen.  Mr. Wolff, you
25  can proceed with your cross-examination.

1        MR. WOLFF:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3    BY MR. WOLFF:

4        **Q.**  Good morning, Mr. Odom.

5        **A.**  Good morning.

6        **Q.**  So we've got some background.  I don't want to go

7    through all of this.  We're talking about 620 Esplanade.

8    This is the building that is what we've been talking about,

9    correct?

10       **A.**  Yes, sir.

11       **Q.**  And I think there's a little confusion there.

12   There's a Four-O and then Eaux Holdings, and Eaux Holdings is

13   the actual owner?

14       **A.**  Eaux Holdings is the owner of 620 Esplanade.

15       **Q.**  Okay.  Early on you kind of thought it was Four-O

16   and then realized that there was a tax thing, a 1031 exchange

17   or transfer, and it actually was owned by Eaux Holdings?

18       **A.**  That did not happen.  And then I, being

19   inexperienced, just didn't realize what had happened.  And I

20   was thinking it was back in Four-O when the 1031 didn't

21   happen and I just didn't know any better.

22       **Q.**  And your counsel talked about you dabble in real

23   estate.  You have a number of real estate properties,

24   correct?

25       **A.**  (Nods head up and down.)

1       **Q.**   And you have -- some of them are investment
2   properties?
3       **A.**   Yes, sir.
4       **Q.**   And then you also have your building for your
5   office next-door at 622 Esplanade?
6       **A.**   Yes, sir.
7       **Q.**   Okay.  And you have about ten different LLC's at
8   your end; is that right, ten different companies?
9       **A.**   Yes, sir.
10      **Q.**   And we looked at some documents, talked about it
11  today.  You bought this in 2018 for $2 million.  The GSA was
12  in there with the Department of Homeland Security.  That was
13  a tenant in there.  And right before the storm, just so it'll
14  be clear, the second floor had no tenants in it; is that
15  correct?
16      **A.**   That's correct.
17      **Q.**   It hadn't been built out for any tenants, right?
18      **A.**   It was -- when you say -- it was built out already.
19      **Q.**   The second floor was?
20      **A.**   Yes, sir.
21      **Q.**   So it wasn't already trimmed back ready to
22  build-out when someone came in?
23      **A.**   No, sir.
24      **Q.**   It was move-in ready?
25      **A.**   It was move-in ready, yes, sir.

1       Q.   If that's what they wanted?

2       A.   If that's what they wanted.  Now, if they had any

3  special requests, we'd adjust that; but it was built out.

4       Q.   As of the time right before the storm you had no

5  takers on that second floor?

6       A.   That is correct.

7       Q.   So as the hurricane struck -- and we heard about

8  Mr. Major.  He was there the day after.  You talked with him.

9  He had his contract ready, and we've looked at it.  You

10  signed it the day after the hurricane, right?

11      A.   Yes, sir.

12      Q.   Okay.  Had you submitted the claim yet, or do you

13  know?

14      A.   Not on that building, no, sir.

15      Q.   Okay.  And so the process of the claim began.

16  Mr. Major put together that stack.  We saw that.  And then

17  you've heard the testimony that he asked Scottsdale to

18  advance 250,000, right?

19      A.   Yes, sir.

20      Q.   And Scottsdale did that right after, right?

21      A.   Yes, sir.

22      Q.   And then there were -- there was an investigation

23  as to the property and what the actual cash value was versus

24  the replacement?

25      A.   I don't know the details of that.

1      Q.   All right.  This was an old building, though,
2  right?
3      A.   It was more than a year old.  What do you determine
4  old?  It was a very good building, very well built building.
5      Q.   It was built in 1976, right?
6      A.   I was built in 1960.  I'm old.
7      Q.   So when you met with Mr. Major at this first
8  meeting he explained that there was some confusion about what
9  building.  He looked at your other policy and goes, "Oh, this
10  isn't going to help you at all," as I understood his
11  testimony.  Is that what you understood, that there was
12  confusion as to the policy that they were looking at?
13      A.   Yeah, we got him the wrong policy.
14      Q.   Okay.  And did you-all talk about this building,
15  about the condition of it before the storm?
16      A.   Jeff and I?
17      Q.   Yes, sir.
18      A.   I did not meet Jeff until after the storm.
19      Q.   I can see why things are confused.  The day after
20  the storm did you and Mr. Major talk about the condition of
21  the building before the storm?
22      A.   No, sir.
23      Q.   Did you provide him with that inspection report on
24  this big investment you had?
25      A.   No, sir.  I've never in any of my insurance claims

1   ever been asked for an inspection report at all.  It was only

2   obtained after I found out y'all were looking for it.  When

3   y'all requested it and I went to the bank, they couldn't find

4   it.  And I asked them to dig a little more and they found it

5   in some e-mail.  The loan officer had left the bank.  They

6   were able to go back and get his e-mails and they found it

7   that way.

8        Q.   But this was the biggest investment, I think you

9   said, you ever made; and you did not have the inspection

10  report.  You did not give -- I think my question was:  You

11  did not give the inspection report to Mr. Major, right?

12       A.   No, sir.

13       Q.   And you did not give that inspection report to

14  Scottsdale, did you?

15       A.   I did not have it to give.

16       Q.   You did not get it for us until after we had to

17  issue a subpoena to the bank, right?

18       A.   It wasn't asked of me before that.  When it was

19  asked of me is when I started trying to find it.

20       Q.   So do you know whether the case management order

21  requires production of appraisals and other information on

22  the property?

23       A.   I'm not familiar with those technical details.  As

24  I say, I've never done it before on any other insurance

25  claims that I've had.  And I know most of the people that --

1    the people I know didn't produce one for any of their claims.

2    So I don't think that's normal.  Just my opinion.

3         Q.   Did you provide any other information to Mr. Major

4    about the work and maintenance you did on the property before

5    the storm?

6         A.   Most of my records -- anything I did was verbal.

7    We -- seven days before the hurricane hit we accepted our new

8    office.  Seven days after I got in my new building or in the

9    process of moving from my other office into that building the

10   hurricane hit.  We had records scattered, water damage.  And

11   just through the process, we took all of Homeland Security's

12   property out of their building and put it into my warehouse

13   next-door with all of my stuff.  I just didn't have --

14   couldn't find it.

15        Q.   So you did or did not -- you had verbal discussions

16   with Mr. Major --

17        A.   I said anything that I had would have been verbal.

18        Q.   Okay.  So what, if anything, did you tell Mr. Major

19   about what you did before the storm?

20        A.   I don't recall that conversation.

21        Q.   Do you know if that conversation ever occurred?

22        A.   We walked the property.  Mr. Major made me feel

23   somewhat comfortable being in the situation that we were in.

24   I felt really good that if I had any hope of getting this

25   building back up -- I had two choices, let it sit or move

1  forward.  And I'm not one just to sit around and take a
2  chance.  Okay.  It's totalled.  I'll take the paycheck and go
3  home.  I thought it was important to the community to get
4  this building back up.  It would have been an eyesore if I'd
5  have made the decision right then not to do anything.  I
6  wanted to contribute to the recovery, not make it worse.
7      Q.   And you also wanted to keep that tenant, right?
8      A.   Without the tenant the building is -- I mean, it's
9  an office building, a rental property, yes, sir, I wanted to
10  keep.
11      Q.   And I think you were talking about the arrangement
12  you had with the GSA.  I think you may have mentioned you had
13  140 days.  Can you tell us about that.
14      A.   Well, I had 140 days to get them to accept it to
15  move back in, or whatever that number is.  I don't recall.
16  Somewhere in that range.
17      Q.   I wasn't going to go there yet, but we're here.  I
18  apologize because I organized -- do you have an understanding
19  as to whether it could have been longer than that?
20      A.   Sir?
21      Q.   Well, I'm going to show you.
22           MR. WOLFF:  This is D-10, the tolling agreement.
23           MR. COX:  No objection.
24           MR. WOLFF:  Thank you.  This is the agreement
25      that -- excuse me.

360

```
1              THE COURT:  Put it up on the board.
2              MR. COX:  May I see that real quick?
3              THE COURT:  Take it off the board.
4    BY MR. WOLFF:
5        Q.   I just want to be clear on this.  So September 4th
6    you signed an agreement with GSA.  Because everyone in Lake
7    Charles had all these problems and was devastation
8    everywhere, everybody needed time to get work done.  And this
9    was an agreement with the GSA to toll it or hold it open so
10   you could keep that tenant online, right?
11       A.   This right here?
12       Q.   Yes, this tolling agreement.
13       A.   You mind if I read it?
14       Q.   Oh, sure.  I'm really looking at the backside, but
15   you tell me when you're ready.
16       A.   Okay.  Let's look at the backside.
17       Q.   Yeah.  It's really a small point I'm trying to
18   make.  You had 270 days?
19       A.   I was off a little bit.
20       Q.   Just a little bit.
21       A.   Wasn't in the range.  I was wrong.
22       Q.   That's okay.  I just wanted the jury to understand
23   that everyone knew this was a process.  It was going to take
24   time to rebuild.  The Government knew and everyone was
25   working to get this done.  And you had made the decision
```

1    early on that you wanted to keep that tenant in there because

2    that's the value of that building because that's where the

3    income was coming from, right?

4         A.   Yes, sir.

5         Q.   And the second floor wasn't producing anything so

6    if you didn't have that first floor tenant you'd have a note

7    and no money coming in?

8         A.   That's correct.

9         Q.   All right.  So you'd made the decision to work with

10   the GSA.  And the Government then came in and was saying,

11   okay, now that we've got to work on this, they wanted some

12   changes to that space, right?

13        A.   I don't recall that.

14        Q.   Well, I mean, they were coming in picking the kind

15   of insulation they wanted.  They wanted soundproof jail

16   cells.  They had different color schemes.  They had a whole

17   set of things that had to go through the government process

18   of, okay, yes, we can do that.  I mean, the Government stuff

19   they had to do, they needed to approve the plans for the work

20   on that first floor for their space, right?

21        A.   My understanding of that process is that GSA does

22   have a materials -- there's a list somewhere out there, a

23   website, that contractors use and they go through there and

24   find items that are already approved by GSA.  If not, then

25   they have to prove why they want to do it different.  And

1    that process normally was, hey, we've got this tile, this

2    carpet, had to be a certain weight, go on your website, we

3    got one similar, is it okay, yes.  It wasn't -- I say a

4    process.  It was a process by definition, but it wasn't a

5    lengthy process because they have their -- and everything

6    that they're picking, I mean, that's just the replacement of

7    what was there.

8         Q.   Just so that I'm clear, they did or did not ask for

9    upgrades as to the jail cell and the insulation and how they

10   wanted the build-out of that first floor?

11        A.   We did not build anything out.  There was

12   nothing --

13        Q.   Well, it went to studs, right?  I mean, we heard

14   that.

15        A.   Studs?

16        Q.   And then what was added on that?  Do you know the

17   details --

18        A.   Some of it.  Not all of it went to studs.

19        Q.   Okay.  Do you know the details of what the

20   Government wanted in terms of upgrades?

21        A.   I don't.  They have specs of, like, when you walk

22   into the lobby and go into their little lobby, their area,

23   they have, I call it, bombproof walls.  Somebody doesn't come

24   in and, if they do, it minimizes the damage to the people

25   inside.  All we did was make sure that it went back like it

363

1    was.  I don't know any different.  Now, if it did, I don't

2    recall any knowledge of that.  We were just making sure that

3    we met -- that everything was okay with them when we did it.

4    They did ask us, "Hey, make sure, you know, y'all do this."

5    And it was.  It was as-is and we just built it back like it

6    was.

7        Q.   Well, for example, they wanted upgrades in the

8    HVAC, the heating, ventilation, air conditioning system?

9        A.   I do not recall that and don't think that happened.

10       Q.   All right.  So do you recall visiting with the GSA

11   about the build-out and the plans?

12       A.   I do recall the meetings.  You know, they came on

13   sight immediately.  I say immediately.  Pretty quick.  They

14   had a lot to do.  But I do recall meeting with them.

15       Q.   And do you recall communicating with them and

16   telling them that your goal was to make this a much better

17   space?

18       A.   No, sir, I do not recall that.

19       Q.   Are you denying that you said that?

20       A.   I am not denying I said that.  I said I don't

21   recall it.  If you have something to show me where I may

22   have, I'll be glad to look at it.

23       Q.   I asked you this question in deposition.  You said,

24   "Absolutely not.  I didn't tell them that."  Right?

25       A.   I don't recall that.

1    **Q.**   Did you read your deposition before today?

2    **A.**   Hundred and something page, you know, I have.

3    **Q.**   Okay.

4    **A.**   And I may have been mistaken then, may be mistaken

5    now.

6          MR. WOLFF:  Exhibit D-39, any objection?

7          MR. COX:  No objection.

8          THE COURT:  It'll be admitted.

9          MR. WOLFF:  D-39.  And to the extent I didn't do

10   this, because I know housekeeping is important, I move

11   to offer, file and introduce D-10.

12         THE COURT:  Any objection to D-10, Mr. Cox?

13         MR. COX:  That?

14         THE COURT:  No, the previous one.

15         MR. COX:  No objection.

16         MR. WOLFF:  And I would offer, file and introduce

17   D-39?

18         THE COURT:  It'll be admitted as well.

19   BY MR. WOLFF:

20   **Q.**   That's an e-mail from you to the Government, right?

21   **A.**   It appears to be, yes, sir.

22   **Q.**   And you told them, "My goal is to make this a much

23   better space"?

24   **A.**   Yes, sir.

25   **Q.**   Okay.  And that was your goal, correct?

1      **A.**   And my goal along those lines is -- they did not

2    require any HVAC improvements.  I chose to improve the HVAC

3    system and put in this -- they call it a VFR or some fancy

4    name for it to where each room is individually controlled.

5    So by betterment, when I did that for them, while we had

6    everything down to the studs -- and that was at my expense.

7    So the intent of that was solely on me.  I did do that.  It

8    was not part of the insurance claim.

9              MR. WOLFF:  Okay.  D-51?

10             MR. COX:  No objection.

11             THE COURT:  It'll be admitted.

12   BY MR. WOLFF:

13     **Q.**   Okay.  So this is about just exactly what you're

14   talking about.  You were going to get bonus points for

15   upgrading that HVAC, correct?

16     **A.**   According to bonus points, I think in a world where

17   we're trying to be more environmentally safe, I think this is

18   one of the things when I was talking to Evan and individuals

19   that by doing this there's actually benefits for your

20   building.  And when individuals can control their own

21   environment in their office, warm, cold, that's -- I think

22   they like that.  My goal in my world where I work, customer

23   service, one hundred percent.  It's about the customer.

24   These were my customers and I want to do everything that I

25   can.  And the slang bonus points is just something that --

1    I'm not sure where the points go.

2        Q.    Understood.

3            MR. WOLFF:  Okay.  This is inspection report, D-61?

4            MR. COX:  No objection.

5    BY MR. WOLFF:

6        Q.    We've talked about this.

7            MR. WOLFF:  Oh.  Offer, file and introduce the

8        inspection report.

9            THE COURT:  Any objection?

10            MR. COX:  No objection.

11            THE COURT:  All right.  Admitted.

12    BY MR. WOLFF:

13        Q.    So this is that inspection report we've been kind

14    of just looking at but just now introducing.  This is the

15    inspection report that went with your $2 million loan in '18,

16    correct?

17        A.    I believe it appears to be.

18        Q.    Right.  And that's the confusion there we talked

19    about.  Four-O, LLC was going to buy it and then you were

20    going to do a 1031 exchange and that never happened so the

21    real owner is Eaux, right?

22        A.    Sir?

23        Q.    The real owner is Eaux Holdings --

24        A.    Yes, sir --

25        Q.    -- correct?

1       A.    -- of 620 Esplanade.

2       Q.    Okay.  And we had looked at, and I'll just put this

3    up there, there was a summary on the second page of minor

4    issues and then major issues.  Then we talked about them in

5    some detail.  There was the roof, there was the exterior

6    doors, exterior siding, the windows, moisture stains, and

7    there they were talking about fungal growth and elevator,

8    second floor.  They're itemized there.  And we'd asked for

9    any maintenance records that you had; do you recall that?

10      A.    Yes, sir, I do.

11      Q.    And you don't have any maintenance records?

12      A.    I could not obtain any, find any.

13      Q.    I think you told us that most of it was done as

14   favors.

15      A.    No, that's not completely accurate.  I did pay for

16   a lot of it.

17      Q.    So wait.  Just to be clear, we asked, if you'd have

18   paid for something, it would have been out of your Eaux

19   Holdings account.  We established that before, right?

20      A.    Not necessarily.

21      Q.    Where would it --

22      A.    It could have been out of Four-O, again, yeah.

23      Q.    Okay.  Out of Four-O or Eaux Holdings.  You have

24   checks at the bank.  You could prove -- if you did some

25   maintenance, you could get those records, right?

1      A.   Yes, sir.

2      Q.   And we asked for those, right?

3      A.   Yes, sir.

4      Q.   And the answer we got was there were no checks at

5   all relating to any maintenance that you did in response to

6   this inspection report, no checks?

7      A.   The biggest one -- I apologize.

8      Q.   Can we answer the question.  Then you can explain.

9      A.   What's the question?

10      Q.   There's no checks.  You got no evidence of making

11   any payments at all for any of these repairs that you've been

12   talking about, including Poole Roofing, right?

13      A.   I could not find any.

14      Q.   Well, you went to the bank.  You looked at your

15   account.  You looked at Four-O.  You looked at Eaux Holdings.

16   That's where they'd be.  And they weren't there, right,

17   because you didn't write any checks?

18      A.   Jody Guidry, Guidry Contractors, was one of the

19   groups that did some stuff; and I told you about Guidry.  I

20   told that to you, that they did some stuff.  So stuff was

21   through there, where I paid them, and it was they actually

22   had the sub do stuff.

23      Q.   I didn't get any of the -- the answer I got and

24   your counsel responded, and I respect -- when they tell me

25   something I'm going to respect that's what it is.  They said

1    there were none.

2        A.    Well, I apologize if I misinterpreted or didn't do

3    it.  I no means to deceive anybody.  I don't do anything that

4    I'm scared to admit.  I did throw some trash out the other

5    day because I didn't want my wife seeing a Little Debbie

6    cake.  That should not have been done.  That weighs on me.

7    But in this case I paid some people cash.  I don't know the

8    complete answer.  I do know that the work was done.  You can

9    see the pictures of the roof where one picture is not, the

10   other picture there is where Ricky did the work.  The entire

11   north end of the building was done by Colonial Glass as a

12   subcontractor to Jody Guidry.  The backdoor was repaired

13   where it was leaking.

14       One thing I've learned through this, I will start

15   keeping better records.

16       Q.    And I appreciate that and I don't mean to drill

17   down; but we've been asking, asking, and asking.  And you

18   were in a deposition.  We attached an exhibit to the

19   deposition.  You were under oath in the deposition, right?

20   You knew this was serious business.  I mean, you're saying

21   2 million plus and all sorts of things.  This is a serious

22   matter, right?

23       A.    Yes, sir.

24       Q.    And we were asking -- after we found this

25   inspection report that had the issues, we were asking what

1    did you do before to fix these problems and asking for any
2    records.
3         "Well, I looked through my things and I don't know.  I
4    can't find it."
5         I said, "Look at the checks.  It would be Four-O or
6    Eaux."
7         You said, "That's right."  You said you would go --
8         A.   Or cash.
9         Q.   We talked about the checks.  Cash, just hearing
10   about that now.  But with respect to evidence of payment,
11   evidence of payment to fix things before that were problems,
12   you were going to look at the bank accounts for Eaux Holdings
13   and Four-O and find any checks that went to maintenance.
14   That's all you had to do.  And the answer we got back, and I
15   can show the e-mail but Somer will confirm, that there were
16   none, right?
17        A.   I don't recall that.  This is what I know.  The
18   repairs were done.  Maybe I did not get the checks to you.  I
19   don't recall not doing that.  I would not have intentionally
20   done that.  My goal is to get this stuff cleared up so I can
21   get back to my life and I would have not done anything that
22   would have delayed that, which my life includes still
23   hurricane stuff.
24        MR. WOLFF:  Somer, can we get confirmation that
25        this question was asked of the witness and that --

1       MS. BROWN:  Your Honor, I don't think it's
2   appropriate for him to ask me.
3       THE COURT:  Yeah, that's not appropriate.
4   BY MR. WOLFF:
5       Q.   All right.  You were asked in the deposition.  You
6   could not find any evidence, written evidence, of any
7   maintenance, correct?
8       A.   If that's what the record shows.
9       Q.   You don't have any records so the record shows
10  there is no --
11      A.   You said in deposition I said that.  If the record
12  says I said it --
13      Q.   Okay.  You're not aware of any -- and this is
14  taking way longer than we need to take.  I apologize if I'm
15  confusing this.  You don't have any records of payment to
16  anyone?  That might have been cash, might have been friends?
17      A.   I cannot -- right now I don't have access to
18  research that.  Again, I would not have done anything to
19  delay this or deceive anybody.  I know the work was done.  I
20  did some.  Friends did some.  Paid buddies cash to come over
21  and the work was done.
22      Q.   And you're not disputing that what's in this
23  inspection report that we've looked at, this was an accurate
24  representation of the condition of the property?  You're not
25  disputing that, right?

1     **A.**   That was two and a half years ago.

2     **Q.**   Right.

3     **A.**   I don't recall.  I don't recall.

4     **Q.**   You're not disputing what's in the report, is what

5     I'm asking.

6     **A.**   Oh, I've never -- no, sir.

7     **Q.**   Okay.  Thank you.

8     **A.**   I've never looked at that.  I mean, I looked at it,

9     I'm sure, upon purchase but that was it.  I knew what I

10    needed to do and I started doing it.

11    **Q.**   Did you keep records to separate what were your

12    upgrades that you wanted versus what was covered by

13    insurance?

14    **A.**   I worked with the contractor to do that.

15    **Q.**   And do you know -- do you have those records to

16    show what was separated?

17    **A.**   I'm sure they exist.  I don't have them with me,

18    no, sir.

19    **Q.**   So you can't offer testimony on that, correct?

20    **A.**   I don't understand that statement.

21    **Q.**   You can't tell the jury now what the work that

22    Encore billed you for was storm related versus upgrades?

23    **A.**   The big one was the HVAC system.

24    **Q.**   Okay.  Anything else?

25    **A.**   Off the top of my head, I don't recall.  The

1    insulation to the ceiling.  No, that was separate.  I paid

2    for that separate.  35,000 that I paid to get more insulation

3    because you have to have an R -- different R rating now than

4    when the building was built.  10,000 of that which was

5    covered by the policy.  I funded the other 25,000.

6         Q.   You funded with your own money?

7         A.   Yes, sir.

8         Q.   So you had to have extra money to fund any of the

9    upgrades that you wanted to make this building better?

10        A.   For that one --

11        Q.   Yeah.

12        A.   -- I did.

13        Q.   And that's -- you got, you talked about, the small

14   business loan you talked about with Mr. Cox?  You took out a

15   loan?

16        A.   Sir?

17        Q.   You took out a loan with the Small Business

18   Administration?

19        A.   No, sir, I did not take a loan out with the Small

20   Business Administration.

21        Q.   Did you take out a loan with somebody?

22        A.   I did.

23        Q.   When was that?

24        A.   A few weeks ago.

25        Q.   Few weeks ago?

1        A.    Yes, sir.

2        Q.    With whom?

3        A.    Lakeside Bank.  It was to pay, at the time, the

4   latest Encore bill that I had.

5        Q.    Which one was that?

6        A.    The most recent one.

7        Q.    And we'll be able to look at this; but you owed

8   Encore monies for work that they did that was not insurance

9   work, right?

10        A.    I do owe them for work that's not insurance work.

11        Q.    And you weren't able to provide us with a detailed

12   outline of this is insurance work and this is betterment

13   work?  You couldn't do that, right?

14        A.    Not sitting up here.  I'm not that sharp.

15        Q.    You don't have it anywhere that you know of, a

16   breakdown like that?

17        A.    I don't recall.

18        Q.    You haven't seen it in this trial, have you?

19        A.    I don't recall it.  No, sir.

20        Q.    All right.  So you understood that Scottsdale had

21   questions about the condition of the building and what was

22   storm related and what was pre-existing, right?

23        A.    I was made aware of it by Mr. Lock yesterday.  I

24   mean, I --

25        Q.    And you knew that your coverage was designed to

1    replace your loss when you made repairs, right?

2          A.    Ask that again.

3          Q.    I'll start over.  You bought the insurance policy.

4    You bought it to replace -- replacement cost value coverage

5    that required you to actually make repairs and do those

6    before you get paid, right?

7          A.    I was not familiar with that exactly.

8          Q.    You understand that now?

9          A.    I understand what you're saying, that I shouldn't

10   get anything until I've done the repairs, is what I'm

11   hearing.  I've never had an insurance company do that to me.

12         Q.    Well, for example, the windows, you haven't made

13   those repairs?

14         A.    That's correct.

15         Q.    And so there's no bill to pay.  You may have

16   intentions to repair them, but you've not undertaken to make

17   those repairs?

18         A.    No, sir.  We did not ask for the full amount.  We

19   asked for what was -- we saw it would be $2 million.

20   Mr. Major asked for 250.  Got that.  He said let's -- even

21   your insurance adjuster said it's a minimum of 1.5 million.

22   So even if I'd have got the million, that's only 66 percent

23   of what you say -- and that would have been enough to really

24   help me out, get me going.  And y'all just shut down.

25         Q.    Well, there's still money left on the policy,

```
 1   right?

 2        A.   Yes, sir.

 3        Q.   Okay.  And so if there's more work to do that's

 4   storm related, if that's what it is and you do it, there's

 5   money on that policy, right?

 6        A.   I don't know the details.  I think there's still

 7   outstanding stuff that I've done that I'm owed.  Let me take

 8   that back.  I'm not sure at this point.

 9        Q.   So we have a dispute over whether the payments were

10   enough on certain things and whether it's too high, too low.

11   We're disputing that.  But if there's other work that hasn't

12   been done and you're going to do it, then you have monies

13   left on your policy?

14        A.   It's not that easy for me because I don't have the

15   confidence that I'll get it.  Here's the fact of the matter.

16   I didn't get my money in a timely manner to where I felt

17   secure about moving forward.  I was going out on a limb

18   getting it done because I knew I had to do it with very

19   little help from the insurance company.

20        Q.   Well, the building's up.  The tenant's in.  You've

21   got a 15-year lease with an option to go for 17 years, right?

22        A.   Yes, sir.

23        Q.   There's an escalation clause so that the rent goes

24   up?

25        A.   Yes, sir.
```

1      **Q.**   And your counsel talked about that's a gold tenant?

2      **A.**   In the real estate world, someone told me that one

3   time, so I'm using that from the real estate world, because

4   they're secure, they pay on time, and they honor their

5   contract.

6      **Q.**   And you're getting 15,000 a month?

7      **A.**   It's about 13, 14,000.  Yeah, roughly.  Round it

8   up, 15,000.

9      **Q.**   15,000?

10     **A.**   Yes, sir.

11     **Q.**   And --

12     **A.**   And my note on the building is about 13,000.

13     **Q.**   Okay.  So we got lost because I think the question

14   I asked is:  If there's work you're going to do in terms of

15   the repair work, if the windows haven't already been

16   accounted for, you can submit that, right?  Let me rephrase.

17     **A.**   I think it's been submitted and actually --

18     **Q.**   They haven't done the work.  They left.  I

19   apologize.  Encore left.  They're not in the state anymore,

20   are they?

21     **A.**   No, Encore's still helping me.  They come back and

22   do a few things.

23     **Q.**   Okay.

24     **A.**   As far as our substantial completion, it's done.

25   Little odds and ends, carpet, some ceiling tile; but, you

1    know, that's punch list stuff.

2         Q.   So the building's substantially complete?

3         A.   Yes, sir.

4         Q.   And have they final invoiced you?

5         A.   No, sir.

6         Q.   Why not?

7         A.   They know I can't pay it.  I think they're working

8    with me.  In fact, I know they're working with me.

9         Q.   So there's other invoices that haven't been

10   submitted?

11        A.   I don't recall the exact number where we are.  I

12   know what the final is, and those are exact numbers of what

13   I've incurred.  I don't -- they did not ask for anything in

14   advance when they started.  So as I pay it, stuff that I've

15   done, out of courtesy, I think, or just sheer compassion.

16        Q.   So on the windows, work hasn't started to replace

17   the window system, is what you're saying?

18        A.   There's been preliminary work done, inspections.

19   We've had some window people come out and look at it.  So

20   when you're talking about work, no nails have been driven

21   yet.

22        Q.   So there's no invoice?  Nothing's due on windows,

23   right?

24        A.   No, sir.

25        Q.   Is what I'm saying correct?

1      **A.**   Sir?

2      **Q.**   There's nothing due on the windows right now?

3      **A.**   As far as the replacement of all the window system?

4      **Q.**   Right.

5      **A.**   I don't believe there is.  I don't recall any.

6      **Q.**   I want to show you P-12 -- 112 that's already

7  admitted.  It's the Poole invoice.  Show you that real quick.

8  So this is dated last week.

9      **A.**   Okay.

10     **Q.**   And Mr. Poole had been paid all along.  When you

11 got this you realized there was an outstanding balance of

12 36,000?

13     **A.**   When I got this?

14     **Q.**   Yes.

15     **A.**   I knew there was an outstanding balance.

16     **Q.**   Well, so what's a bit confusing, we see the

17 balances here and this is dated in March.  Had you been given

18 an invoice before March?

19     **A.**   The relationship with Ricky and I is -- I mean,

20 Ricky's a good ole guy.  Our community is pretty tight-knit.

21 He knew I was having trouble.  In fact, the very first

22 invoice he sent me he says, "Hey, if you can't pay this, let

23 me know.  I understand your -- the insurance company is not

24 cooperating."  So the relationship that we have, until he

25 comes to me -- but I did not -- I knew there was an

1    outstanding balance.  But knowing Ricky, I'm speculating, I

2    don't know if I can speculate up here, but I'm speculating he

3    just didn't do it knowing my situation.

4        Q.   And so you did not have this final invoice until --

5        A.   I don't recall.

6        Q.   -- a couple days ago?

7        A.   I knew I owed it.

8        Q.   Okay.  So you understood that there were questions

9    about the condition of the building before -- do you need a

10   break?

11       A.   No, sir.

12       Q.   Okay.  And this has been introduced as the

13   Collisson report, D-16, if we can put that up.  And we saw

14   that yesterday when Mr. Collisson -- I'm sorry, when we were

15   talking to both Mr. Collisson and Mr. Major.  Do you recall

16   this?

17       A.   I'm sorry, Mr. Wolff.  I barely heard any of that.

18       Q.   I apologize.  That's my problem.

19       A.   My hearing aids' battery went out.

20       Q.   I understand.  Do you recall seeing this when we

21   talked about it with Mr. Lock and Mr. Major, about the Grecco

22   report and the questions they had about the pre-existing

23   damages?

24       A.   In this trial?

25       Q.   Yes.  Do you recall that?

1      A.   I was here.

2      Q.   Okay.  Thank you.  And I want to just take a quick

3  look at some of the pictures, and best way to do it is take

4  this off of here.  Had you seen these photographs before?  I

5  think this was in the first floor exterior, the wall

6  deterioration that was there before the hurricane.

7      A.   I don't know.  Oh, in the gym.  I was not aware of

8  that because that's a repair from the outside.  That's one of

9  the areas where they -- prior to me buying it, it was behind

10  the panels.  The panels were removed.

11      Q.   And they found damage?

12      A.   Sir?

13      Q.   And they found damage?  Just trying to show that

14  there was damage behind those panels that had not been fixed

15  before the hurricane, right?

16      A.   I see the stains.  I don't know how much damage.

17  We'd have to look at the report.  Stains don't necessarily

18  mean damage.  It just means there was water at one point.  It

19  was stained, and we repaired any --

20      Q.   So this is -- if you look at the ladies room, you

21  can see when they pulled out the exterior and it showed that

22  it's rotted all the way through?

23      A.   Absolutely.  I believe there was four sheets of

24  plywood like that in the entire building that we replaced and

25  charged to the insurance.  Anything else that we did was not

1     charged to the insurance.  Total of four sheets of plywood on

2     a 15,000-square foot building.

3          Q.   And here's this as well, another hole?

4          A.   That's probably a sheet of plywood there.

5          Q.   Excuse me?

6          A.   That's probably a sheet of plywood.

7          Q.   Okay.  And --

8          A.   You have -- you don't have to understand, I guess,

9     but --

10         Q.   Well --

11         A.   -- you have Sheetrock on one side, the exterior

12    panel on the other.  You can't see that unless you start

13    tearing out every piece of Sheetrock and looking at it, which

14    Hurricane Laura allowed us to do that.  And we fixed it when

15    we saw it and we charged the insurance company.

16         Q.   And here's another one.  I think this is --

17         A.   I take that back.  I've been misstating.

18         Q.   I'm sorry.  Misstating what?

19         A.   Any damage like that we repaired.

20         Q.   Well, Mr. --

21         A.   I've been saying it's four sheets, but there was

22    four sheets of plywood that was charged to the insurance

23    company.

24         Q.   That's what Mr. Major said.

25         A.   That's what I believe.

1      **Q.**   Well, I think -- so that we don't get confused, I
2   think he said, "He didn't charge four sheets.  Everything
3   else he did charge."
4      **A.**   I don't think that's accurate.  I'm not sure of the
5   numbers.  Here's my point.  If it was rotted obviously before
6   the hurricane, it did not go on the insurance bill.  It's
7   that plain and simple.  I would not do that.  I think they
8   call that fraud, and I'm not here to commit insurance fraud.
9      **Q.**   No one's saying you're here to commit fraud.  Just
10   trying to understand the extent of the pre-existing damage.
11   Right.  And that's what these are showing.  So we have that
12   clearly had rotted out.  We have this here where the hole on
13   this side of the wall here, all of these one, two, three,
14   four, five all rotted out.
15      **A.**   That's not -- I don't believe that's rot.  Can you
16   show me where it documents that's rot --
17      **Q.**   So --
18      **A.**   -- as opposed to just past water stains where the
19   exterior has been repaired and they just -- if it was water
20   stains, there's no reason to repair it.  If it's rot, repair
21   it.
22      **Q.**   I mean, the jury can look at it if they want to.
23   They can ask for this exhibit.  It's rotted all the way
24   through.  You can see it.
25      **A.**   Which one?

1    Q.   Right here, sir.  One, two --

2    A.   Oh, okay.

3    Q.   -- three, four, five.  You can see --

4    A.   I was looking at the top.  I was looking at the top

5  one.

6    Q.   You see it over here.  That's six just on the

7  office one looking south.  That's all rotted out.

8    A.   Right.  And that was all dry, meaning there was not

9  any ongoing rot.  The exterior had been repaired or the roof,

10  wherever it was coming from.  I know what water does to a

11  building.  So it was either a previous repair by Mr. Book,

12  and in order to do that I believe you have to -- it's just

13  not as easy as pulling a sheet of plywood off.  There's a

14  system that's over that.

15    Q.   Cladding.  Talked about that.  What I'm trying to

16  say, there's damage that was there that did not get fixed.

17  That's what we're getting to.  And it's well more than four

18  sheets of plywood.  It's all around the building.

19    A.   That was not made aware to me.  There's nobody --

20  people could not have seen that.  If somebody says, "Hey, you

21  need to go in there and do that," I would have.

22    Q.   Okay.  But it did not get fixed because you didn't

23  know about it, is what you're telling us.  I'm just trying to

24  show here that there is evidence that there was ongoing rot

25  from leaking on the outside of that exterior you had, like

385

1    they talked about in the inspection report.  Water leaked

2    into the building before the hurricane and was rotting the

3    walls.

4         A.    That's not an accurate statement.

5         Q.    Well, these are rotted through.

6         A.    No.  You used the term "ongoing rot."  If there's

7    no moisture there, it's not ongoing; and there was no

8    moisture there.

9         Q.    How do you know?

10        A.    The moisture map.  I saw Jeff Major test it with

11   his tools, and he would be better at describing all that.

12   I'm kind of shooting from the hip here.

13        Q.    I don't want you shooting from the hip.  Really,

14   I'm not trying to argue with you.  I thought this was --

15        A.    Well, I'm not arguing --

16        Q.    I'm not saying --

17        A.    -- just pointing out inaccurate statements.  And we

18   saw it.  We fixed it at my expense.

19        Q.    Okay.  All I'm trying to say, at D-16, when we had

20   the structural engineer Mr. Collisson go out, he took

21   pictures and showed there was evidence of ongoing problems,

22   right?

23        A.    If that's what his report said.  That's not -- it

24   wasn't ongoing.

25        Q.    All right.  You understand from the inspection

1  report that one of the concerns was that the exterior was

2  leaking.  I'll show this to you.  Don't want you to have to

3  play a guessing game.  Exterior siding, the wood panels have

4  gaps at seams, cracks, damaged areas, evidence of possible

5  moisture intrusion.  Recommend evaluating by licensed

6  contractor and repair and replace.  Right?

7      A.   And we did areas that were obviously -- best way to

8  tell if it's leaking, I'd go over there every time it rained

9  and walked the building.  I was on top of it.  Find an area

10  that's leaking.  I contacted a contractor.  Depends on who

11  was available at the time.  They come out.  They fix it.  I

12  did not tear an entire wall out or entire exterior wall out

13  to see what it did.  If I stopped the water and everything's

14  okay, I was okay with that.

15      Q.   Okay.  You know --

16          MR. WOLFF:  Excuse me.  D-47?

17          MS. BROWN:  Can we see it?

18          MR. COX:  Can I see it?  No objection.

19          MR. WOLFF:  Offer, file, and introduce.

20          THE COURT:  It'll be admitted.

21  BY MR. WOLFF:

22      Q.   Okay.  I asked you about whether you were trying to

23  get things fixed to make this a better space.  And then I

24  asked Mr. Major yesterday was there an engineering report

25  about the exterior, the cladding, and he said, "No, I don't

1   know anything about that."  You remember that testimony?

2        A.   Yes, sir.

3        Q.   Okay.  And he said that if there been an

4   engineering report he should have sent it to Scottsdale.  You

5   remember that testimony, too?

6        A.   I don't recall that exact statement.

7        Q.   Doesn't matter whether --

8        A.   Right.

9        Q.   -- you or I remember it.  It's whether the jury

10  does.

11       A.   Right.

12       Q.   Okay.  So here we'll see down at the bottom, this

13  is Evan that's with Encore, right?

14       A.   Evan, yes, sir.

15       Q.   "I've attached an engineering scope of work higher

16  than what he originally told me.  I think we can talk him

17  down.  The RFP" -- I'm saying that's request for proposal --

18  "I sent them shows all the bad parts of the building.  So

19  once they see there is a lot of good plywood and framing on

20  the building, I think the price will go down."  And then the

21  question is asked up there, "Do you think this engineering

22  report will help our cause to get the insurance company to

23  pay for siding replacement?"  You see that?

24       A.   The highlighted area?

25       Q.   Yes, sir.

1      A.   Yes, sir.

2      Q.   You're on that e-mail?

3      A.   Yes, sir.

4      Q.   And so is Mr. Major?

5      A.   Yes, sir.

6      Q.   And he was the one working for you and working with

7    the insurance company?

8      A.   He who?

9      Q.   I'm sorry.  Jeffrey Major.

10     A.   Yes, sir.

11     Q.   And that report was not provided to the insurance

12   company, right?

13     A.   I don't recall.  I think just what it's saying is

14   how do we tackle this.  I'm assuming that was an Encore

15   higher invoice.

16     Q.   Well --

17     A.   Even looks like he's in there trying to, hey, let's

18   see how we can get by as cheap as we can, not cheap, let's

19   make sure we take care of business but don't overdo it.

20          MR. WOLFF:  So D-44 on the list.

21          MR. COX:  No problem.  No objection.

22   BY MR. WOLFF:

23     Q.   This is an e-mail and it's a number of pages, but

24   this is an e-mail from you.  I'm sorry.  It starts with Evan

25   to you, and this is in late September.  You have an

1  engineering team -- "Good morning, Joey.  How did the meeting
2  go with your engineering team?"  So you had an engineering
3  team outside of Encore?
4      A.   I do not recall that.  I did not have an
5  engineering team.  The only thing that we called an
6  engineer -- that I contacted an engineer, somebody local, was
7  to determine what direction we would go with the roof.  We'd
8  talked about a pitched roof.  We talked about a flat roof.
9  It was all seeing if there was one -- a less expensive option
10  since I wasn't confident that I would get paid for it, but
11  even a better option.  How can we improve this building while
12  we're at this point.  But I never hired an engineering
13  group --
14      Q.   Well --
15      A.   -- outside of that, that I contacted.  Never even
16  got an invoice from them because they --
17      Q.   So Encore, that's Aden (sic) Monheiser, right?
18      A.   Yes, sir.
19      Q.   He's writing to you.  "How did the meeting go?  Was
20  he able -- was the engineering team able to produce a detail
21  for your exterior siding issue?"  Right.  And then you write
22  back later that day, two hours later, you say, "We are still
23  waiting on the engineer."  You see that?
24      A.   Yes, sir.  The roof ties into the side.  Again, the
25  only thing I can -- I'm speculating and I'm not -- I have no

1    reason to -- I have no reason to hide anything.  Give me some
2    more detail.  If you say, hey, here's the engineering group
3    specifics, I don't recall anything else.
4        Q.    These are your e-mails, sir.  It's not anything we
5    would have.  You say, "Is an engineer interested in taking on
6    exterior wall cladding?"  Mr. Monheiser writes you at 10:34
7    that same day and then you come back five minutes later,
8    "This is what I -- this is what I like communicating.  My
9    plate is full and it's hard for me to keep up.  I don't want
10   to hold up the process.  I like the idea of the STO rep
11   doing."  What is that?
12       A.    That's -- I think that's slang, STO.  I think
13   that's --
14       Q.    STO?  I'm sorry.  I didn't mean to interrupt.
15       A.    I think it's STO.  You can tell my typing.  That
16   first was supposed to be "This is what I like communicate"
17   but "why I like."  I got my typos.  No, that's a type of
18   siding.
19       Q.    Yeah, that's what we're all talking about.  There
20   was an engineer, apparently an engineering team.  They were
21   going to get a report.  You're going, "I think our engineer
22   may be getting an architect to look at that design for that
23   exterior cladding, too."  Right?
24       A.    I'm not aware -- I haven't seen anything in there
25   where it said we actually got a report.  There may have been

1    communication with them but -- I'm trying really hard to jog

2    my memory, but there's no engineer outside of the one that I

3    got personally to come in and talk about the roof.  And then

4    I know they were talking to different people, different

5    siding groups, about what's our best option to do it

6    efficiently and effectively with what we had.

7        Q.    And do you recall BECI, an engineering group, that

8    actually issued a scope of work for that exterior cladding?

9        A.    BECI?

10       Q.    BECI.

11       A.    It sounds familiar.

12       Q.    And you don't recall whether you-all got a report?

13       A.    I don't recall that, no, sir.

14       Q.    Now, we talked about the work out there.  You were

15   working with the GSA coordinating, getting that lined up.

16   Encore was out there doing some preliminary things.  Right?

17       A.    Yes, sir.

18       Q.    And Encore was not licensed to do work as a

19   contractor until November 19th; isn't that right?

20       A.    That's my understanding.  I think the records

21   are --

22       Q.    Okay.

23       A.    Nobody's disputed that.

24       Q.    You've seen that the actual license didn't issue

25   until that time, correct?

1     A.   Yes.

2          MR. WOLFF:  And I'll offer D-64 which is the

3     certified copy of the board letter.

4          MR. COX:  What board letter?

5          MR. WOLFF:  The contractor board.

6          MR. COX:  No objection.

7          THE COURT:  It'll be admitted.

8     BY MR. WOLFF:

9     Q.   It's a certified copy.  Now, we asked to get this

10    to confirm.  It says Encore holds a commercial license which

11    was issued on November 19th, 2020.

12    A.   Okay.

13    Q.   And you understand that Encore couldn't have done

14    any work before then, right?

15    A.   No construction work.  I think there's some

16    hurricane provisions that they can do some stuff, and he's

17    very aware of that.  They're very reputable.  He's not going

18    to jeopardize his livelihood and part of his business to lose

19    it over getting it started.  I would not have signed a

20    contract -- I didn't sign a contract before that date anyway

21    and would not have because I could not commit over another

22    million dollars after already half a million that I

23    committed.

24    Q.   Well --

25    A.   That would have put me at $2 million.  Just what

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

 1    I'd already paid for and the new contract put me at

 2    2 million.

 3         Q.   Well, the question was, sir, he couldn't have

 4    started the repair work before November 19th.  Encore

 5    couldn't even have started it.  So you couldn't have incurred

 6    any bills, wouldn't have been owing anything, replacement

 7    wouldn't have even started until after November 19th, 2020,

 8    right?

 9         A.   Technicality, they could not have.

10         Q.   It's a legal requirement.

11         A.   Well, it's technical.  Yeah, technical.  I'm not

12    dismissing that.  I'm sorry.  Maybe that's the wrong word.

13    Correct.  By law, I guess, they could not have started except

14    for there's any hurricane disaster provisions.  I can't quote

15    those.

16         Q.   Right.  But in terms of the big repair work, that

17    couldn't even have begun.  And then it was after that that

18    you signed the Encore -- well, first off, you told me before

19    you didn't realize he wasn't -- Encore wasn't licensed,

20    correct?

21         A.   I didn't recall it at the time when you asked me.

22         Q.   Okay.  You do recall it now?

23         A.   Yes, sir.

24         Q.   Okay.  Mr. Major recalled telling you that?

25         A.   Yes, sir.  And the fact of the -- if I may say that

 1    if I didn't have the money it wouldn't have started.  It was
 2    that early.  I waited till the midnight hour to sign that
 3    contract.
 4        Q.    Okay.
 5        A.    Knowing the amount of time I needed to get GSA in
 6    the building, which 240, whatever that number was that we
 7    had, I got it approved and accepted with five hours left on
 8    my deadline.  So I -- and we were the first federal building
 9    to get back open in the area.  So I think we did a pretty
10    good job doing what we did, managing what we had.
11        Q.    Okay.  That's an important point.  Lake Charles is
12    devastated.  We realize there's a dispute and a fight between
13    Eaux Holdings and Scottsdale, but you hit it right there.
14    You and that building got up and going before most anyone
15    else.
16        A.    Because Encore's good.
17        Q.    Okay.
18        A.    And if I would have got the money in a timely
19    manner, I would have looked at another option.  I was not
20    given that opportunity because I didn't have the money so I
21    wasn't spending money that I didn't have.  Trust me, I would
22    not have got the money -- if you look at all my
23    distributions, every time that I got a check from the
24    insurance company --
25             THE COURT:  Hold on, Mr. Odom.

1          MR. WOLFF:  I'm going to ask the witness be a

2     little more responsive.  I'm asking --

3          THE COURT:  You're objecting to the responsiveness

4     of the answer.

5          MR. WOLFF:  Yes, Your Honor, I am.

6          THE WITNESS:  I apologize.

7          THE COURT:  That's okay.  Simply answer his

8     question and then you'll be given the opportunity to

9     explain your answer, but I think you've gone a little

10    bit beyond explanation right there.

11         MR. WOLFF:  Thank you, Your Honor.  This is the

12    Encore contract, D-124.

13         MR. COX:  No objection.

14  BY MR. WOLFF:

15    Q.   And just so that the jury understands, there's a

16  couple things I want to show you here.  The time of

17  performance is set forth in this contract.  It started on

18  November 24th, 2020.  You see that?

19    A.   I see a highlighted area in here that says

20  commitments occurred on November 24th, 2020.

21    Q.   Right.  And even though you signed it December 20,

22  the work had already started November 24th, right?

23    A.   I'm not sure of the details.

24    Q.   That's what it says here.

25    A.   I think that's because we had a trust.  We'd built

396

```
 1    a trust.  He knew that I would honor it regardless and do my
 2    best --
 3              THE WITNESS:  Oh, I'm sorry.
 4              THE COURT:  I mean, you can explain your answer,
 5        Mr. Odom.
 6              THE WITNESS:  Okay.
 7        A.   And that was it.  We had a trust.  You know, we
 8    lived through this and were down there and we got to know
 9    each other.
10    BY MR. WOLFF:
11        Q.   It's a contract, right?
12        A.   Trusted him.  He trusted me.  And --
13        Q.   It's a contract, right?
14        A.   It is a contract.
15        Q.   And that's your signature?
16        A.   Did we break the contract?
17        Q.   Excuse me?
18        A.   Did I break the contract?
19        Q.   I have no idea.
20        A.   Okay.
21        Q.   This is between you, Eaux Holdings, and the
22    contractor, Encore?
23        A.   Yes, sir.
24        Q.   Is that your signature?
25        A.   Yes, sir, it is.
```

1      Q.   Okay.  So by this contract you set a 1.36 subject
2  to additions or deductions, right?
3      A.   I'm not sure where you're reading from.
4      Q.   Work subject to additions and deductions?
5      A.   Okay.  Yes, sir.
6      Q.   And the first payment was 100,000 within seven days
7  after the contract, right?
8      A.   Payment -- yes, sir, that's what it says.
9      Q.   And Scottsdale had already given you by that
10 time -- this is D-161.  Scottsdale had already given you by
11 that time 468,000?
12     A.   Yes, sir.  At that point that didn't even cover
13 what I --
14     Q.   Sir, please.  At that time --
15     A.   I'm just trying to state my situation.
16     Q.   And I apologize.
17     A.   I'm sorry.
18     Q.   I'm just trying to get us out and move on so they
19 can come back and --
20     A.   Their lunchtime, the jury's lunchtime.
21     Q.   Yeah.  Okay.  So you had 468 from Scottsdale by
22 that time.  And then a few days -- so this was December 27th.
23 You would have owed a hundred.  You'd already been paid 468.
24 And then a week or so after that you got another 177 from
25 Scottsdale, right, January 8?

1      A.   Yes, sir.

2      Q.   So I don't have a calculator, but looks like it's

3   over 600,000?

4      A.   That's late.

5      Q.   Is that right?  I should have Somer's calculator

6   here.  Yeah, so that's 650, roughly.

7      A.   Well, the total now is 1.8.  I'm sorry.

8      Q.   It's in process.  You didn't owe.  They hadn't done

9   the work.  You didn't owe more than a hundred thousand at

10  that point in time, on December 27th.  You didn't owe -- on

11  this contract you didn't owe more than a hundred thousand?

12     A.   Yes, sir.

13     Q.   And then --

14     A.   I understand what you're saying.

15     Q.   Right.  And there were three phases of this, and we

16  can go through it with Mr. Stuck and I think it'll be more

17  time effective; but you didn't owe money until they issue a

18  payment demand pursuant to this contract, and that's when you

19  would owe it?

20     A.   Payment demand --

21     Q.   Under the phasing of the contract.

22     A.   I wasn't finished.  Payment demand to who?

23     Q.   To you, to Eaux Holdings.

24     A.   Invoice -- the contract was a hundred thousand by

25  contract.

1    **Q.**   Right.  And then there were phases of this contract
2    that you would pay as they completed the work, right?
3    **A.**   If it says phases.
4    **Q.**   And Scottsdale paid you before the work was
5    completed, because you said the final completion was in
6    August --
7    **A.**   I don't --
8    **Q.**   -- substantial completion?
9    **A.**   I don't recall that.
10   **Q.**   I thought you told us that's when it was.
11   **A.**   I may have.
12   **Q.**   The punch list items after that.  All right.  Then
13   in May, before you owed the money to Encore, you were given a
14   million one, another million one, so that totaled 1.78, 79
15   million?
16   **A.**   Encore was working --
17   **Q.**   Is that correct?  That's my question.
18   **A.**   Encore was working with me, and once they invoice
19   interest starts.
20   **Q.**   Okay.
21   **A.**   My guess is that even that hundred thousand that I
22   paid up front didn't cover what it needed to cover.
23           THE COURT:  He can explain his answer, Mr. Wolff.
24           MR. WOLFF:  I just need an answer first, if I
25   could.

1              THE COURT:  He's answering your question.

2         **A.**    Pertinent information that, I mean, these people

3    were working with us, working with --

4    BY MR. WOLFF:

5         **Q.**    So --

6         **A.**    I -- still the devastation that we had -- I'm

7    sorry.  I got emotional a second, not from that but I

8    envisioned the hurricane, when I drove in and what I'm

9    working with and trying to repair.  And people came down to

10   help us.  They were working with us.  They weren't fighting

11   us.  They were working very well with us and considerate.

12             MR. WOLFF:  Shall we take a break; or what do you

13        want to do, Your Honor?

14             THE COURT:  Sure.  Have you got -- we can go ahead

15        and take our lunch break if you would prefer.  Is this a

16        good stopping point?

17             MR. WOLFF:  It's fine.

18             THE COURT:  I'm assuming you got some more you need

19        to do.

20             MR. WOLFF:  I do and I'll move through as --

21             THE COURT:  No, no.  No one's trying to rush you.

22        If you told me you got another 10, 15 minutes, I'll let

23        you finish.  But if you got more than that, we'll go

24        ahead and take our break.

25             MR. WOLFF:  I can't guarantee 10 or 15 minutes, but

 1          I will work --
 2              THE COURT:  I appreciate that.  And I'm sure
 3      Mr. Cox will have some redirect.  So, Lisa, is our
 4      jury's lunch --
 5              MS. LACOMBE:  All laid out.
 6              THE COURT:  Okay.  Your lunch is here so great.
 7      Great time.  We'll take our lunch break.  We'll come
 8      back at -- what time y'all want to come back, 1:00 or
 9      1:15?  1:15 in case you have to go -- okay.  We'll come
10      back at 1:15.  All rise for the jury.
11                      (Jury exits courtroom.)
12              THE COURT:  Anything we need to discuss before the
13      break?
14              MR. COX:  No, sir.
15              THE COURT:  Very good, then.
16                      (Recess is taken.)
17              THE COURT:  Before I bring the jury in, let's -- do
18      we have a couple issues we need to discuss?
19              MR. WOLFF:  Just one on this witness.  I've alerted
20      Ms. Brown.  I'd like to address that with you.
21              THE COURT:  All right.  Lay it on me.
22              MR. WOLFF:  Okay.  So in the deposition of the
23      30(b)(6) I asked Mr. Odom about the maintenance records
24      and he said he couldn't really recall but he'd go check.
25      And I have put a placeholder in there.  And I said,

1     "Look, I'm going to attach as Exhibit 4 a blank piece of
2     paper that's the maintenance records and you'll please
3     go check and if you have any" --
4          THE COURT:  You'll attach them as Exhibit 4.
5     You'll supplement.  Is that what you were doing?
6          MR. WOLFF:  Right.  Right.
7          THE COURT:  Okay.  I got it.
8          MR. WOLFF:  And so we followed up with Ms. Brown.
9     And I think on November 2nd she writes back, "On the
10    Exhibit 4 maintenance or repair records, including
11    invoices and/or checks," she says, "none to our
12    knowledge."
13         THE COURT:  Okay.
14         MR. WOLFF:  So I'm relying on that.
15         THE COURT:  I would.
16         MR. WOLFF:  I did.  That's where we are.  I would
17    just like to say that -- however we want to put it in
18    there, that --
19         THE COURT:  Let me ask you this.  So you still
20    didn't get any maintenance records, is what you're
21    telling me.
22         MR. WOLFF:  Right.  There aren't any.
23         MS. BROWN:  Correct.
24         THE COURT:  There aren't any.  So what are we
25    doing?

 1           MR. WOLFF:  So he's up here acting like he never

 2      did anything.  He said, "Well, I'll have to check my

 3      records."  He said in the deposition that he would go

 4      check his records, and then he goes --

 5           THE COURT:  I don't remember what he said a minute

 6      ago about that.  Did he say he didn't check or he did

 7      check?

 8           MR. WOLFF:  He'd have to check.  That doesn't do

 9      me --

10           THE COURT:  I think this is more -- Mr. Wolff, I

11      think this is more impeachment, that, you know, you

12      asked him the question.  Confront him with his

13      deposition testimony and say, "Well, in your deposition

14      you said this.  Now you're saying today you never

15      checked."  I mean, that's what, to me, this is all

16      about.  It goes to his credibility.

17           MS. BROWN:  May I also say, though, I don't think

18      that my e-mail is evidence, my statement --

19           MR. WOLFF:  Oh, I don't --

20           THE COURT:  I didn't take that at all.

21           MS. BROWN:  He showed me the e-mail.

22           THE COURT:  I guess I'm trying to understand what

23      you're asking me.

24           MR. WOLFF:  I'm asking just that if they can talk

25      with their witness however they want, just say, "You

1    were instructed to do it.  You did it.  You reported

2    back you didn't have any," and just basically get a

3    stipulation to that effect.  Or I can impeach him.

4         THE COURT:  No.  What I think -- unless you want to

5    stipulate.  Y'all can stipulate to whatever.  Y'all can

6    stipulate that the moon has got people running around

7    with green wings.  I don't care.

8         MS. BROWN:  I think he's already asked the witness.

9    I don't know what we would stipulate to.  I don't really

10   understand what --

11        THE COURT:  I don't think you're going to get a

12   stipulation out of Ms. Brown.  That's what I take right

13   there.  Is that a pretty accurate assessment of the

14   situation?

15        MS. BROWN:  I might stipulate to some things but

16   probably not that.

17        THE COURT:  Here's what I suggest, Mr. Wolff.  I

18   hear where you're coming from.  So what I think -- I'm

19   not telling you how to do your case.  You're an

20   experienced trial attorney.  I would confront him with

21   his deposition testimony on it, ask the question, show

22   him his depo, you said this, now today you're saying

23   this, where are we at on it.  That's only thing I think

24   you can do with it.  It goes to credibility.  The jury's

25   going to weigh his credibility at the end of the day on

405

1    all this.

2         MR. WOLFF:  I understand.

3         THE COURT:  I don't think the e-mail -- she's not

4    going to stipulate.  It is what it is.

5         MR. WOLFF:  Is what it is.  I got it.

6         THE COURT:  I think you need to ask him and get it

7    on the record.

8         While we don't have the jury in here, I want a

9    preview of what the heck you're talking about, Mr. Cox,

10   about this other witness, what you were bringing up to

11   me as we were leaving.  And, you know, maybe my blood

12   sugar was low.  I wasn't in the mood for it at the time.

13        MR. COX:  He's a real estate appraiser.

14        THE COURT:  What's his name?

15        MR. COX:  Mr. Duplantis.

16        THE COURT:  Okay.  There was no -- I looked.  There

17   was no motions pretrial on him that I recall.

18        MS. BROWN:  The reason is because at the time we

19   also had a real estate expert.  This is before we

20   dismissed the 1973 claim.  They were relative to that

21   claim.

22        MR. COX:  Correct.  And his opinion is the property

23   is now worth more but that none of that is relevant to

24   what was owed to fix the building.

25        THE COURT:  That's a good point.  What say you,

1          Mr. Wolff?

2              MR. WOLFF:  I'm going to let --

3              THE COURT:  And I'll tell you why.  I'll give you a

4      little heads up on my mindset on this.  I had hurricane

5      damage.  Okay.  I got a new roof on my house.  I got a

6      new brick wall.  I got a new paint job.  To me, my house

7      is worth more today, too, than it was before the storm;

8      but I certainly don't understand how any of that would

9      be relevant to the behavior or actions of my insurance

10     company in paying my claim.

11             MS. PAYNE:  Your Honor --

12             THE COURT:  The end result of me getting my repairs

13     increased the value of my home.

14             MS. PAYNE:  And plaintiffs have made the theme of

15     their case that this was a huge investment, it's an

16     investment property, and that we haven't --

17             THE COURT:  2 million bucks is a huge investment.

18             MS. PAYNE:  -- and that we haven't paid the

19     replacement cost value and that there's still work left

20     to do.  The value of the building, they put this at

21     issue, the investment.  I mean, that's what they keep

22     saying to the jury, that it was a huge investment.  So

23     the value of the building is relevant and it's relevant

24     to whether --

25             THE COURT:  To what?

1          MS. PAYNE:  -- Scottsdale has paid the replacement

2     cost value because they say there's still work left to

3     be done, you know, that there's still money owed under

4     the policy.  But the building is done.  It's fixed.

5     It's worth more now than it was worth before, and we've

6     paid the replacement cost value.

7          THE COURT:  I'm thinking.  Mr. Cox.

8          MR. COX:  We stipulate it's a big investment, Your

9     Honor --

10          THE COURT:  I mean, I get it.

11          MR. COX:  -- but the value --

12          THE COURT:  I'm going to be honest with you, this

13     whole comment about it was a big investment, it was.  It

14     was a $2 million investment.  My home's a big

15     investment.  And I think I take that testimony as more

16     just background, contextual, that this was a big

17     investment for Mr. Odom.  I don't think it really went

18     to the heart of anything.

19          MS. PAYNE:  But in their opening statements and in

20     the testimony, it's a big investment, they expect the

21     investment to be protected.  The investment's protected.

22     The goal was to make it a better space.  And he, in

23     fact, did make it a better space.  And the value of the

24     building is relevant to whether Scottsdale paid

25     replacement cost value, because they're still disputing

1    that and saying that work isn't done.  He's going to say

2    the condition of the building now, and it's in a way

3    better spot than it was pre-storm.

4        THE COURT:  I'll be honest with you, I'm still not

5    really seeing the relevance of this, what it has to do

6    with whether or not money is still owed to the insured

7    in this case, whether or not any of the payments were

8    late and constitute bad faith under the Statute 1892.

9    So what if the building's worth more money.

10       MS. PAYNE:  But the replacement cost value is at

11   issue here.  And they say that there's work that still

12   needs to be done, and we want to show the condition of

13   the building and the value of the building because we

14   say the work is done.

15       THE COURT:  I'll be quite honest with you, I really

16   have not heard much evidence about details about what

17   work's left to be done, how much this work is to be

18   done, how much it's going to cost.  I haven't heard any

19   of that testimony.  I really haven't.  Maybe I missed

20   it, but I haven't heard it.  I don't know what the

21   jury's going to do because I haven't heard any of that

22   evidence.  So that's why I'm kind of a little befuddled

23   by this whole argument about the building being worth

24   more and the replacement cost.

25       I'll tell you another thing.  Y'all get ready for

1    this in my charge conference.  I'm taking out all those

2    charges on actual cash value and replacement cost

3    because, you know why, I haven't heard any evidence

4    before this jury for them to consider or delineate out

5    actual cash value from replacement cost value.  There's

6    no evidence for this jury to be able to delineate any of

7    that.

8         MR. WOLFF:  I don't agree, Your Honor.

9         THE COURT:  Maybe you're going to put some on, but

10   I haven't heard one piece of evidence.

11        MR. COX:  Well, we had --

12        THE COURT:  I've heard y'all talk about it.  I've

13   heard y'all go replacement cost, actual cash value; but

14   no one has sat here and go this, this, this, this.  I

15   haven't seen -- it hasn't been delineated out for them

16   to be -- because they have to be able to distinguish

17   between the actual cash value that's been paid and the

18   replacement cost, and I don't think anybody's done that

19   yet.

20        MR. WOLFF:  The policy is in and that does it.

21        THE COURT:  That just says what's supposed to be

22   done.  What I'm telling you is I haven't heard any

23   evidence about where we are on all that.

24        MR. WOLFF:  In applying this particular claim, is

25   that what you're talking about, that is --

410

1          THE COURT:  Here's the thing.  Y'all paid him
2     1.7 million bucks.
3          MR. WOLFF:  Correct, 1.8.
4          THE COURT:  1.8.  Round up.  Whatever.  Is it
5     actual cash value you paid?  Is it replacement cost
6     value?  What is it?
7          MR. WOLFF:  It's replacement cost value.
8          THE COURT:  Okay.  Y'all agree to that?
9          MR. COX:  The policy says they owe actual cash
10    value first, then replacement cost.
11         THE COURT:  That's my point.  Y'all got all these
12    charges on this; but no one has delineated which
13    payments have been made, actual cash value payments or
14    replacement cost payments.  Where are we at?
15         MR. WOLFF:  Collisson --
16         THE COURT:  Right now the jury ain't going to hear
17    any of that.
18         MR. WOLFF:  We have evidence in the record through
19    Lock and through Major that Collisson with Grecco came
20    in and set an actual cash value.  They don't agree with
21    it but those are the two payments, the 250 and -- I
22    don't have the chart right here.  That represented
23    actual cash value.  That evidence is in the record.  And
24    where you reach that is you take the replacement cost
25    value less depreciation and then you get actual cash

1    value, and that is in the record.

2        THE COURT:  That's my thing.  I haven't seen any of

3    that evidence about the depreciation.  I don't know how

4    this jury is going to go back there in this room and

5    deliberate over what is really owed, if anything, maybe

6    they'll decide nothing's owed, and how they're to

7    categorize it.  I haven't seen the evidence.  We were

8    talking about this during the break, were we not, Toni,

9    trying to figure out.

10       MR. WOLFF:  It's Collisson's report and

11   recommendation and it's in the claim notes, how it was

12   calculated.  So that evidence is in there.  There was a

13   replacement cost value set by Grecco and then

14   depreciation was applied and he recommended an actual

15   cash value payment and that was made.

16       THE COURT:  Okay.  Actual cash has been paid.  Why

17   am I charging on replacement cost?  Have they been paid

18   replacement cost?  Are you saying you're owed

19   replacement cost?  I have not heard any evidence that

20   you still owe me this and it'll be replacement cost.  I

21   haven't heard that.

22       MR. COX:  Scottsdale has never broken down what

23   their payments are, whether they're ACV payments or RCV

24   payments; but there has been a lot of testimony about

25   what is owed under the policy --

412

1          THE COURT:  Exactly.

2          MR. COX:  -- ACV first then RCV.  But they've just

3      never said what the payments were.

4          MS. BROWN:  Your Honor, I think to the extent we

5      have the costs incurred, those are all replacement cost

6      numbers.  The only remaining ACV number that needs to be

7      paid is the windows.  The rest is the replacement cost,

8      and it's going to be over the policy limits.

9          THE COURT:  I'm going to honest.  Look, I'm just

10     going to tell you.  I hate to be like this; but if I

11     don't understand it, they certainly don't understand it.

12     I'm telling y'all this from both sides.  I really don't

13     understand either one of y'all's case to a great extent.

14     I don't know where they're going.  It's not my job to

15     figure out where they're going.  I'm just telling you

16     it's not clear on how these payments are categorized and

17     where we are.  I really don't see it.  And I'm trying --

18     it's my job when I charge the jury is to charge them on

19     the law based on the evidence that's been presented

20     during the trial.  And we were talking about -- because

21     y'all had sections upon sections of charges about actual

22     cash value, replacement cost.  And I'm not reading the

23     policy.  I'll tell you that.  I'm not reading the policy

24     in my charges but -- I'm not doing it.

25         MR. WOLFF:  Of course not.

413

1        THE COURT:  There was a bunch of charges you got

2    whole sections of the policy in there.  I'm not doing

3    that.  I'm sitting there going right now I don't hear

4    any evidence, really, that's definitive on any of this

5    so I can charge the jury on it.

6        MR. WOLFF:  Well, Your Honor, so the contract is

7    the law between the parties --

8        THE COURT:  It is.

9        MR. WOLFF:  -- and the contract calls for payment

10   of actual cash value.  And then if you move to repair,

11   then it needs to be paid as those repairs are made.  So

12   that's the law there.  There is evidence in the record

13   that there was an actual cash value calculated by

14   Collisson.  It's in the claims notes.  It's in the

15   testimony.  It's been established.

16       THE COURT:  You calculated an actual cash value;

17   but the problem is what we're here to talk about and

18   what the charges are asking is for me to charge the jury

19   in the damage section about actual cash value,

20   replacement cost, what they all mean.  You may have

21   something in there that they calculated it that way; but

22   how are the payments being made, how are they

23   categorized.

24       MR. WOLFF:  So the actual cash value was paid early

25   on.

414

```
1          THE COURT:  How much?  The 250?  Is that it?
2          MR. WOLFF:  250 and 218, and that total is whatever
3     that is.  $468,192.53 actual cash value of the damages.
4     They don't agree with that.  That's for the jury to
5     decide.  I think we're headed for very clear error if
6     the policy isn't applied and they just do a replacement
7     cost.  They got -- if the actual cash value tender was
8     insufficient, then the jury decides that.  But we're
9     moving along.  We can't be responsible for repairs until
10    they're made and owed.  And the evidence is going to
11    show that as they moved along, and that's what Mr. Stuck
12    is going to do, we were paying.
13         THE COURT:  I'll give a charge on the definition of
14    actual cash value and replacement cost value, but I'm
15    not -- y'all had five pages on this and I'm not reading
16    them five pages.  I'm going to give them a simple
17    straightforward --
18         MR. COX:  That's all we want, Judge, a very simple
19    definition of each.
20         THE COURT:  But I'm going to be honest, there's no
21    way for me -- y'all can object and take it to the Fifth
22    Circuit.  I don't care.  There's no way that I can put
23    on the verdict form under -- if they decide some money's
24    owed, whether -- it's just going to be a line.  I mean,
25    we're not getting into that on the verdict form.
```

1    There's no way.  There's been no evidence to delineate
2    that out for them.  You agree?
3        MR. WOLFF:  Do not.  We'll --
4        THE COURT:  I'm sorry.  There's been no evidence
5    breaking that down, and I don't know how you expect the
6    jury to be able to break it down when they haven't been
7    given the evidence to break it out.
8        MR. WOLFF:  They have.  It's in the claims notes.
9    It's in evidence.  It calculates it by dollar and cent.
10   It's a precise calculation.  We'll get that.  I mean,
11   we'd do that in the charge conference.  We'll have that
12   ready for you.  That calculation is in there.
13       THE COURT:  I'm not going to complicate this
14   verdict form.  I'm telling you right now it's going to
15   be simple, it's going to be straightforward, and it's
16   going to be easy for them to either yes or no on some of
17   this.  But I don't see it.  I haven't seen the evidence
18   where it's been itemized out for them where they can
19   delineate it.
20       MR. WOLFF:  It's in there.  We'll have it
21   highlighted and show it.
22       THE COURT:  Y'all are some very good trial lawyers.
23   I'm anxious to hear your closing arguments because I
24   think y'all got some really -- y'all got to do some
25   explaining to this jury because -- I'm just giving you a

1   little heads up because I'm sitting up here going I

2   don't even understand where y'all -- both sides.  I

3   don't understand where either side is, really, on some

4   of this.  I think it's really been not very clear.  Like

5   I said, if I don't understand it, y'all all losing.

6        MR. WOLFF:  Well, we haven't put our case on yet.

7        THE COURT:  No, you haven't.  I'll give you that.

8   I'm just trying to tell you, though.

9        MR. WOLFF:  I will say it's a two-step process.

10  The actual cash value, which I will represent to you it

11  is calculated, it is in the record, there was testimony.

12  Then the question becomes if they move forward with

13  repairs, are we paying timely as they make those.  And

14  the evidence is going to be yes, absolutely.

15       THE COURT:  We'll see.

16       MR. WOLFF:  We're going to put on our case.  Can

17  we --

18       THE COURT:  Enlighten me.  That's great.  I'm

19  waiting.

20       MS. BROWN:  Your Honor, I would suggest that this

21  conversation we're having here is exactly why

22  Mr. Duplantis' testimony is not only irrelevant but also

23  potentially confusing and misleading to the jury.

24  Market value is not one of the values they're going to

25  be asked to --

 1          THE COURT:  Yeah, I'm still trying -- we got
 2     sidetracked.  That's my fault.
 3          MR. WOLFF:  If we can, there was a time to file
 4     this motion.  It was a long, long time ago.  We're
 5     prepping right now and they dropped this on us, and this
 6     is the kind of -- I don't want to say trial by ambush,
 7     but they had every opportunity to make this objection
 8     and they didn't make it until today.  And this is --
 9          THE COURT:  Well --
10          MR. WOLFF:  -- Chelsea's first witness ever.  She's
11     got him ready.  He's flown in from Texas or come in from
12     Texas.
13          THE COURT:  If I don't allow it, she can proffer it
14     and she still gets to do it.
15          MS. BROWN:  To be clear, it's not a *Daubert*
16     challenge --
17          THE COURT:  It's a relevance challenge.
18          MS. BROWN:  -- and it wasn't ripe until the
19     evidence was in.
20          MR. WOLFF:  The evidence isn't in yet.  We haven't
21     put our case on yet so can we --
22          THE COURT:  Yeah, I'm going to let you put your
23     case on and I'll decide when you get time.  You're going
24     to set it up, I guess, or lay the foundation for it.
25     I'm not ruling on it right now.  I'm trying to

1        understand a little bit better, you know, why it is

2        relevant.  I'm still kind of mystified by why it's

3        relevant.

4             MR. WOLFF:  Is there a memo that was filed?

5             MS. BROWN:  It wasn't --

6             THE COURT:  I haven't read it.  I'll be fair to

7        both sides.  I don't want to see it because this is an

8        evidentiary issue.  It's relevance.  It's straight out

9        of the hornbook almost.  Okay.  I've just got to decide

10       whether or not it's relevant to the case based on how

11       the case has been presented.  Yeah, there's been some

12       statements it's a big investment; but that alone does

13       not set up -- that to me was more background, contextual

14       kind of testimony than it was evidentiary testimony.

15            MS. PAYNE:  Your Honor, if plaintiffs get

16       contextual testimony to set their stage, we ask for the

17       same thing in context of this big investment, where is

18       it now, how is Mr. Odom doing now, since all we've heard

19       this whole trial is how big his investment is, how bad

20       it was for him, how this was terrible.  Where is he at

21       now is in a better spot.  That's what we want to show.

22            MR. WOLFF:  The building as-is is worth way more

23       than it was and there is a substantial --

24            THE COURT:  See, I think that's very prejudicial in

25       some regards because just because the building's worth

1    more has nothing to do with whether or not you owe him
2    more money or you owe him penalties and bad faith.  So
3    what.  My house is worth more now after I made all my
4    repairs.  I just don't see the relevance in it other
5    than you want to prejudice the jury against him.  I
6    mean, to me it's very prejudicial to say it's worth more
7    now, he's got a better building.  Yeah, he's got a
8    better building.  He made a repair to it.  He got a new
9    roof on it.  That's why I use my house.  I had a
10   20-year-old roof.  I got now a one-year-old roof.  It's
11   worth more.  Doesn't have anything to do with my
12   insurance claim.
13        MR. WOLFF:  Well, can we -- we hear where you are.
14   We'll revisit after we put on evidence and see if --
15        THE COURT:  Yeah.  If you can -- look, I'm not
16   totally ruling yet.  I'm just telling you where I'm kind
17   of leaning.  If you're going to set it up, I'm going to
18   need some foundation for it, is all I'm saying.  On the
19   thing -- I'll have to mull over this replacement cost
20   thing a little bit more.  I'm just telling you, it's not
21   clean.
22        MR. WOLFF:  It may not.  Clear as mud.
23        THE COURT:  I want to see what y'all put in
24   evidence on that.  I mean, it must have been put in
25   evidence with a lot of other things.  I don't remember

 1    much testimony on it, to be honest with you.  I remember

 2    it being mentioned, oh, there's actual cash value and

 3    there's replacement; but what I'm saying is I've never

 4    seen testimony about we made this payment, they made the

 5    repairs, now we owe them the replacement cost now.  I

 6    haven't heard that kind of testimony.  That's the

 7    problem I'm seeing.

 8         MR. WOLFF:  So, Your Honor, in the activity log

 9    which is D-2 which is in evidence --

10         THE COURT:  Let me see D-2 there.

11         MR. WOLFF:  Y'all may put in another number.  I'm

12    looking at ours.  What's y'all's number?

13         MS. WOLF:  The plaintiff put it in.  Use the

14    plaintiff's number.

15         THE COURT:  Can you put it on my screen there,

16    Lisa?

17         MR. WOLFF:  I can put this up if you want to see

18    that.

19         THE COURT:  Okay.

20         MR. WOLFF:  They say it was too low.  That's what

21    the plaintiff filed.

22         THE COURT:  So what are y'all claiming they owe?

23         MS. BROWN:  So, Your Honor --

24         THE COURT:  Are you claiming they owe replacement

25    cost now?

1          MS. BROWN:  Correct.

2          THE COURT:  All those numbers --

3          MS. BROWN:  Those are all actual invoices for work

4     that have been incurred and/or paid.  They are more than

5     what has been paid, and then they also owe for the

6     windows which they're --

7          THE COURT:  I'm sure that's in dispute.  I've heard

8     testimony the windows are in big time dispute.

9          MS. BROWN:  Right, and they're going to have

10    somebody here to talk about that.  But that is -- we --

11         THE COURT:  Only reason I'm asking this question is

12    me and my staff are trying to get our arms around how

13    we're going to charge the jury on it, and that's the

14    only reason I'm asking these elementary questions.  I'm

15    really just trying to get my arms around it.

16         MR. WOLFF:  So the actual cash value is the first

17    step in the process.  So we tender an amount.  They're

18    going to say it's too low, I'm sure; but I don't think

19    they have evidence that --

20         THE COURT:  I understand what actual cash value

21    versus -- I get that.  What I am struggling with is what

22    is the jury trying to decide in terms of dollars and

23    cents.

24         MR. WOLFF:  If our payments as the repairs moved

25    along were late or timely and sufficient -- or

1          insufficient or sufficient.  Those are the issues.

2                  MS. BROWN:  Well --

3                  MR. WOLFF:  Because we didn't owe replacement cost

4          until replacement started, and as replacement started we

5          were paying.  So our position is as replacement was

6          ongoing we were paying money to ensure that they got

7          paid in accordance with the contract.

8                  THE COURT:  Here's the way I have it right now.

9          Y'all paid 1.7 some odd million dollars property damage.

10         Is that actual cash value or is that replacement?

11                 MR. WOLFF:  That's replacement cost.

12                 THE COURT:  Replacement cost.  So there's

13         2.1 million left on the policy, right?

14                 MR. WOLFF:  There's 200,000.

15                 THE COURT:  200,000.  The policy limits are 2.1 is

16         what I mean.  So what is that?  Is that replacement?

17         They owe you an additional 200 something thousand in

18         replacement cost?

19                 MS. BROWN:  Correct, because the replacement costs

20         incurred are --

21                 MR. WOLFF:  So we don't believe those costs

22         incurred, and that's what our witnesses are going to

23         talk about.  That 1.36 million is a number in a contract

24         that was never realized because the actual cost --

25                 THE COURT:  I think that's the reason I haven't

423

1     done -- I think my jury verdict form is going to be

2     correct then because I have that number on there and

3     basically, I'm paraphrasing, we're going to ask the jury

4     to decide if any additional amounts are owed over and

5     above that number.  That's right.  And keep it simple.

6          MR. WOLFF:  Look, I don't know.  We'll need to look

7     at it.  If you can give us a copy.

8          THE COURT:  I've been working on this for three

9     days.  I'll be honest with you, I can't tell you if this

10    is even -- there's some cases out there on it, but I

11    don't know how many of them ever really went to trial on

12    this stuff.  I don't know.  I'm sure it has.  Maybe

13    you've tried this issue before.  I don't know.

14         MR. WOLFF:  Yeah.  Well, they normally get settled,

15    yes.

16         THE COURT:  That's the problem.  They do.  And so

17    we're kind of blazing some new ground here, you know.

18         MR. WOLFF:  Yeah.

19         THE COURT:  What is it with me and new ground,

20    Mr. Wolff?

21         MR. WOLFF:  I have a knack for that.

22         THE COURT:  Me, too.

23         MR. WOLFF:  I had this issue with Judge Milazzo and

24    that was a big fight and ended up getting resolved; but

25    I think it's very important that we get this right here,

1    and I know you agree.

2        THE COURT:  Look, I want it right.  I don't want an

3    error, but I also have to think about the charges

4    contain only those items that have been presented at

5    trial.  We don't just put things in our charges when

6    there's been no evidence of it.  We all can agree on

7    that.

8        MR. WOLFF:  I've got actual cash value.  They may

9    say --

10       THE COURT:  Look, Toni, Mary, we need a very

11   succinct definition of actual cash value and a succinct

12   of replacement cost and we need that somewhere in our

13   charges.  We'll figure something out.  We'll kind of

14   find -- we'll get it done.

15       MR. WOLFF:  And it may be -- I don't know what you

16   have.  It may be in the lump.  I've just got to see what

17   you have there.  But I think it's got to be charged.

18   They've got to be charged with actual cash value and

19   replacement cost value.  And then the question is was it

20   sufficient and timely.

21       THE COURT:  I think my verdict form's correct.  I'm

22   just trying to get the charge right.

23       MR. WOLFF:  Right.

24       THE COURT:  I don't think either way you probably

25   won't like my verdict form, but it is what it is.

425

```
 1           MR. WOLFF:  Right.
 2           THE COURT:  But, you know, I guess at the end of
 3      the day it only matters what I think because I'm the one
 4      that has to decide.  Really only matters what I think.
 5           MR. COX:  We had a bunch of lawyers look at the
 6      verdict form.  It's tricky.
 7           THE COURT:  It is very tricky.  It's very tricky.
 8      Anyway.  All right.  Let's proceed.  You're still on
 9      cross-examination, Mr. Odom, if you would come retake
10      the stand.  I'm sorry that we delayed, but I needed to
11      vet this out a little bit so I can be thinking all this
12      through.  You can go get the jury.
13                (Jury enters courtroom.)
14           THE COURT:  Sorry for the delay.  We had to have a
15      little discussion before I brought you back in.  You may
16      be seated.  Thank you for your patience.  I hope your
17      lunch was okay.  Very good.  And again, I apologize for
18      the delay.  That was totally my fault.  I had some
19      questions.  I'm trying to work out logistics, really,
20      which help y'all because we're trying to speed things
21      along.  Okay.  So don't be upset with them about our
22      late start here.
23           Okay.  Mr. Wolff, please proceed.
24           MR. WOLFF:  Thank you.
25   BY MR. WOLFF:
```

426

```
 1        Q.   All right.  Mr. Odom, I'm going to talk about All
 2   Clear for a minute.  I think we all have agreement that we
 3   disagreed with the excessive nature of that remediation bill
 4   of 490,000 plus dollars, correct?
 5        A.   Yes, sir.
 6        Q.   Thank you.  And that was disputed and then settled.
 7   You paid --
 8            MR. WOLFF:  And I apologize because this is the
 9        best copy I've got.  This is D-95, the release that
10        you-all provided.
11   BY MR. WOLFF:
12        Q.   This is a release of claims by All Clear.  You
13   recall that?
14        A.   Yes, sir.
15        Q.   I'll be candid with you, I can't hardly read it.
16   We've got a sum in there, but that's your signature there?
17        A.   Yes, sir.
18        Q.   And you settled the claim of 491.  It settled for
19   how much?
20        A.   I can't --
21        Q.   I think it's -- is that the number there, $212,039
22   right there?
23        A.   I see it.  There's another number down lower.  Can
24   we see what that is?
25        Q.   Okay.  Yeah.  I was going to say, I think you'd
```

427

1    already paid a hundred.  So this is --

2        A.   That's what it is.  I paid them a hundred before

3    this.

4        Q.   Okay.  And you have no further liability.  They're

5    gone.  They've settled with you.

6            MR. COX:  I'd like to object, Your Honor.

7            THE COURT:  Okay.

8            MR. COX:  There's another number on there.

9            MR. WOLFF:  May we approach?

10           THE COURT:  Yes, sir.

11                      BENCH CONFERENCE

12           THE COURT:  I saw --

13           MR. COX:  It's hard to read.

14           THE COURT:  Yeah, I saw it.

15           MR. COX:  He does have additional obligation to pay

16   18,000 and some change in the contract.  It's hard to

17   read.  I'm sorry.  I had to blow it up.

18           MR. WOLFF:  So it's another 18,000.  Okay.

19           MS. BROWN:  330 is the number --

20           MR. WOLFF:  Can we just agree it's 330 total?

21           MR. COX:  Yes.

22           MR. WOLFF:  Perfect.  Thanks, Judge.

23                     PROCEEDINGS CONTINUED

24   BY MR. WOLFF:

25       Q.   That worked well.  So none of us can read it, but

428

1    we're advised that the total you were obligated to pay and is

2    done is 330 and the All Clear bill of 496 is done.

3         A.    (Nods head up and down.)

4         Q.    Yes?

5         A.    Oh.  Yes, sir.

6              MR. COX:  Excuse me, Mr. Wolff.  $330,639.

7              MR. WOLFF:  Yes, sir.  Thank you.

8    BY MR. WOLFF:

9         Q.    All right.  So what I would like to walk through

10   here quickly, this is D-161.  You-all have seen this.  It's

11   probably in evidence, I believe.  That's the list of the

12   payments and the dates.  You recall those?  What I'm going to

13   do to help is show the first check of 250,000.  You see that?

14   Yes?

15        A.    Sir?

16        Q.    Do you see that check there?

17        A.    Yes, sir.

18        Q.    And then --

19             MR. WOLFF:  I'm sorry, that's SIC189.

20             MR. COX:  No objection.

21             THE COURT:  It'll be admitted.

22             MR. WOLFF:  Thank you.  And then the next check and

23   that is SIC190.

24             MR. COX:  No objection.

25             MR. WOLFF:  Thank you.  These are just the checks.

429

```
 1          Can we just agree no objection on the checks?
 2               MR. COX:  No objection on these checks.
 3               MR. WOLFF:  Thank you.
 4     BY MR. WOLFF:
 5          Q.   And that was for 218,192.53.  And then the next one
 6     was 177,731.  You see those?
 7          A.   Yes, sir.
 8          Q.   These dates are attached with them and match with
 9     the chart.  And then the next one is -- I'm going to show
10     you, while they're getting that, the last one dated May
11     of '21 and that's $1,120,726.49.  You see that?
12          A.   Yes, sir.
13          Q.   Okay.
14               MR. WOLFF:  And what is the number on this one?
15               MS. PAYNE:  D-7.
16               MR. WOLFF:  So that's D-7.
17               MR. COX:  No objection.
18               THE COURT:  It'll be admitted.
19               MR. WOLFF:  Thank you.  Then the one for, yes, the
20          29,000?
21               MS. PAYNE:  D-6.
22     BY MR. WOLFF:
23          Q.   D-6, right?
24          A.   Yes, sir.
25          Q.   Okay.
```

430

```
 1              MR. COX:  No objection.
 2              THE COURT:  It'll be admitted.
 3    BY MR. WOLFF:
 4        Q.   That all totals up with the dates and totals of
 5    1,796,091, correct?
 6        A.   Yes, sir.
 7        Q.   All right.  Thank you.
 8              MR. WOLFF:  And I want to also -- this is a little
 9         bit of housekeeping here so we have our record.  This is
10         D-139 which is this check and invoice for the early work
11         in November.
12              MR. COX:  I'm sorry.  Can I look at that?  This is
13         payment for Mr. Odom?
14              MR. WOLFF:  It's the preconstruction work.  Yeah.
15         Right.  Exactly.
16              MR. COX:  No objection.
17              MR. WOLFF:  So -- thank you.
18    BY MR. WOLFF:
19        Q.   This is D-139 which is an invoice from Encore for
20    preconstruction work of 24,927.  You see that?
21        A.   Yes, sir.
22        Q.   And then your payment through Four-O to match that
23    invoice, correct?
24        A.   Yes, sir.
25        Q.   That's before you cleared up the Eaux Holdings.
```

1  We'll stipulate that's for Eaux Holdings.  All right.  And

2  then we've looked at this contract at D-124, and I just want

3  to be clear that there were staggered payments.  There were

4  progress payments, right?  The first one was due seven days

5  after the contract.  That's where we left off.  100,000?

6      A.   And that's -- I need to correct that.  That first

7  payment is not a progress payment.

8      Q.   I'm sorry.  It says -- okay.  It says initial

9  payment.

10      A.   Correct.

11      Q.   Thank you.

12      A.   More of a deposit.  We negotiated that on what

13  he -- he worked with me on what I felt like I could afford at

14  the time and paid.

15      Q.   But this is the contract.  That's what you go by,

16  right?

17      A.   That is the contract.

18      Q.   And so a hundred thousand within seven days and

19  then a copy of the check at D-142.  I'm just going to put

20  this in, and there's the hundred thousand dollar payment that

21  was made.  It's still Four-O but, again, Eaux Holdings.  All

22  right.  And then the progress payment under this contract is

23  250,000 will be made by the contractor within 30 days after

24  the initial payment, correct?

25      A.   I do see that.

432

```
 1        Q.   And that was -- there's your check in February for
 2   that amount, correct?
 3        A.   Yes, sir.
 4        Q.   All right.  And then the final payment is approval
 5   by -- of the work and receipt of depreciation held by the
 6   insurance company.  You see that?
 7        A.   I do see that, yes, sir.
 8        Q.   Okay.  And you paid an additional $500,000 on
 9   June 3rd of 2021, correct?
10             MR. COX:  I think this says 550.
11             MR. WOLFF:  That's what I said.
12        A.   I think you said 500.
13   BY MR. WOLFF:
14        Q.   550,000.  I'm sorry.  Right?
15        A.   Yes, sir.
16        Q.   And the work that Encore did you agreed was
17   satisfactory?
18        A.   Yes, sir.
19        Q.   And it met the inspection of the GSA?
20        A.   Yes, sir.
21        Q.   You were very pleased with the final product from
22   Encore?
23        A.   Yes, sir.
24        Q.   And so as of that time the building was released
25   for occupancy by the GSA to Department of Homeland Security,
```

433

1    right?

2        A.    The first floor was, not the building.

3        Q.    Right.  But the second floor, you didn't have an

4    occupant to go in there, right?

5        A.    You asked the question was the building accepted by

6    GSA.  It was not.

7        Q.    Of course.  They're not --

8        A.    Their space was accepted.

9        Q.    Okay.  That's the only space they were looking at?

10       A.    That's correct.

11       Q.    And you -- except for punch list items, you agreed

12   that Encore had done a good job and you're waiting for a

13   build-out on the second floor if and when you get a tenant,

14   correct?

15       A.    That's not correct.

16       Q.    That's not correct?  You're not happy with the

17   work?

18       A.    No, I'm very happy with the work.  I'll use them

19   again.  They'll be my very first phone call after Jeff Major

20   if this happens again.  You keep referring to the second

21   floor as build-out.  It was built out.  I mean, it wasn't

22   waiting to be built out.

23       Q.    Okay.  But now it's ready to go for any tenant

24   that, when it comes in, you can build it out however you want

25   or however they want, right?

434

1      A.   We can do some remodeling.  I mean, it's built out,
2    I guess.  Right now it's built out.
3      Q.   Yeah, that's what I -- Okay.  Thank you, sir.  Hold
4    on.
5           MR. WOLFF:  Housekeeping for me and the Court.
6           D-162 I think is the summary chart.  If I didn't put it
7           in, I apologize; but I want to make sure that we get all
8           our evidence.  So that's the one -- oh, no, I didn't do
9           that.  Thank you.  So we went through the payments to
10          Encore.  This is D-162.  We looked at them.  Would like
11          to offer, file, and introduce D-162.
12          MR. COX:  Just the same -- this one that's on the
13          screen?
14          MR. WOLFF:  Yes, sir.
15          MR. COX:  No objection.
16          THE COURT:  It'll be admitted.
17          MR. WOLFF:  Thank you.
18   BY MR. WOLFF:
19     Q.   And these are all the payments that you've made to
20   Encore?
21     A.   I believe that is accurate.
22     Q.   Okay.
23          MR. WOLFF:  And so if I didn't offer, file and
24          introduce, I do want to offer, file and introduce D-139,
25          142, 144, and 149.  Those are the checks from Four-O to

435

```
1          Encore.  It's all been -- I just want -- we okay?
2               THE COURT:  Yeah, we're fine.
3               MR. WOLFF:  They're admitted?
4               THE COURT:  Yeah, they're admitted.  Double check
5       for me.  Lisa really knows better than I.
6               MS. LACOMBE:  I have one question, Judge.
7               THE COURT:  Yes, ma'am.
8               MS. LACOMBE:  As to SIC190, what was that referring
9       to?
10              MS. WOLF:  I believe Mr. Wolff was referring to
11      Bates numbers that are on the documents.
12              MS. LACOMBE:  Okay.  Wasn't an exhibit labeled 1 --
13              MS. WOLF:  D-5.
14              MS. LACOMBE:  Perfect.  Thank you so much.
15              THE COURT:  I think we're good, Mr. Wolff.
16              MS. LACOMBE:  We're good, Judge.
17              THE COURT:  We're good.
18              MR. WOLFF:  Okay.  Thank you very much, sir.
19      Appreciate your time.
20              THE COURT:  Redirect.
21              MR. COX:  Thank you, Your Honor.
22                         REDIRECT EXAMINATION
23      BY MR. COX:
24         Q.   Mr. Odom, Mr. Wolff suggested that at times you
25      needed to pay for certain work before Scottsdale owed it
```

1      under their policy.  Was that your understanding of the

2      policy that Scottsdale sold you, of how it worked?

3          A.   No, sir.

4          Q.   How did you understand it worked?

5          A.   I understood that they would pay the actual value.

6      Is that correct?  I get confused with the terminology, I

7      guess.  But it was my understanding the actual value minus

8      depreciation, that they would pay me that.

9          Q.   And then later --

10         A.   And then later, once I did the work, I submit

11     invoices and they pay me the balance.

12         Q.   They pay you back the depreciation?

13         A.   The depreciation.

14         Q.   So your understanding is that he's flipping it

15     upside down.  He's saying pay first then get paid, but your

16     understanding is --

17              THE COURT:  Hold on a second, Mr. Cox.

18              MR. WOLFF:  This is very, very leading and calling

19          for interpretation of the contract.  That's not for this

20          witness.

21              MR. COX:  I'll withdraw the question, Your Honor.

22     BY MR. COX:

23         Q.   When Scottsdale sold you the policy was there

24     anything in that policy that said you had to submit

25     maintenance records on the building?

```
 1        A.    No, sir.
 2        Q.    Anything in the policy that you had to submit
 3   repair records on the building?
 4        A.    No, sir.
 5        Q.    Anything in the policy that said you had to submit
 6   to Scottsdale invoices for repairs?
 7        A.    No, sir.
 8        Q.    Anything that said you had to submit inspection
 9   reports that had been done on the building before you bought
10   it?
11        A.    No, sir.
12        Q.    Was it your understanding that your premium was
13   based on the amount of the coverage --
14        A.    That's --
15        Q.    -- 2 million coverage?
16        A.    Yes, sir.
17        Q.    Did Scottsdale ever inspect your building before
18   they sold you the policy and charged you the premium?
19        A.    No, sir, not that I'm aware of.
20        Q.    So we went over it.  The policy gives them the
21   right to inspect the building any time they want after they
22   sell you the policy and when it's enforced.  Did Scottsdale
23   ever -- at any time between the time you first purchased the
24   policy and the time of Hurricane Laura, did they ever inspect
25   your building?
```

438

1      **A.**   No, sir.

2      **Q.**   Did they ever decrease your premium based on the

3   condition of the building?

4      **A.**   No, sir.

5      **Q.**   Did they ever increase the premium based on the

6   condition of the building?

7      **A.**   No, sir.

8      **Q.**   Mr. Wolff asked you a lot of questions about the

9   upgrade that you did to the HVAC system, the air conditioning

10  in the building?

11     **A.**   Yes, sir.

12     **Q.**   You chose to do that after the storm, correct?

13     **A.**   Yes, sir.

14     **Q.**   Did you ever seek to have Scottsdale Insurance

15  Company pay for that upgrade or did you pay for it yourself?

16     **A.**   I paid for it myself.

17     **Q.**   Mr. Wolff said that there's nothing in the record

18  to show that the rotten plywood that Encore replaced wasn't

19  included in the insurance claim.  You heard that, right?

20     **A.**   Yes, sir.

21     **Q.**   You testified that the rotten plywood was excluded

22  from the insurance claim, didn't you?

23     **A.**   Yes, sir.

24     **Q.**   I'm going to show you a document that has been

25  entered into evidence in this case, Document 52.  It's tough

439

```
1    to read.  We're going to see if we can blow it up.  Let's see
2    if that's the -- we might have the wrong one up there.  I
3    still can't read it.  I'm going to need better eyes.
4              THE COURT:  What are you trying to read, Mr. Cox,
5         the highlighted part?
6              MR. COX:  I'm trying to read the highlight.
7              THE COURT:  I can read it.  Can y'all read it,
8         ladies and gentlemen?  They can read it.
9              MR. COX:  Sorry.  I've got the wrong one up there.
10             MS. BROWN:  It's Exhibit 56.
11             MR. COX:  I've been holding off on glasses for
12        about a year.
13             THE COURT:  Better stop holding off.
14   BY MR. COX:
15        Q.   Mr. Odom, can you read that?  Can you read the
16   highlighted portion?
17        A.   Yes, sir.
18        Q.   This is a bill from Encore.  It's called -- do you
19   know what a reverse change order is?
20        A.   I'm familiar with it.
21        Q.   A change order is something where they increase the
22   cost, correct?
23        A.   Yes, sir.
24        Q.   And what would a reverse change order be?
25        A.   Decrease.
```

1        **Q.**    And basically take it out of the insurance claim?

2        **A.**    Out of insurance.

3        **Q.**    Can you read what the highlighted portion says?

4        **A.**    "Includes demo."  And I'm not --

5        **Q.**    I think it says replacement.

6        **A.**    "Replacement of exterior plywood that was not

7 damaged by the storm, changing out plywood that was called

8 out by engineer to be changed or was rotted.  This amount was

9 included in original contract amount but was not damaged by

10 the storm."

11        **Q.**    At the bottom right, that's $19,074, correct?

12        **A.**    Yes, sir.

13        **Q.**    Is it your understanding that that bill was

14 excluded, was taken out of your insurance claim, because it

15 wasn't related to the hurricane damage?

16        **A.**    Yes, sir.  Correct.

17        **Q.**    The same was true on all of the Items 52 through 58

18 that were introduced into evidence.  You've looked at those,

19 right?

20        **A.**    Yes, sir.

21        **Q.**    Here's another one.  I don't know if you can read

22 it.  Can you read the highlighted part?

23        **A.**    "Price for glue-down on LVT that wasn't present

24 before the storm.  The price is included in original contract

25 but not included in insurance scope of work."

1    **Q.**    Another one that was just excluded from the

2    insurance claim because it wasn't something caused by the

3    storm, correct?

4    **A.**    Yes, sir.

5    **Q.**    And that was true for a number of these.  Next one,

6    "Doors were not damaged by the storm, therefore were not

7    included in the insurance scope of work"?

8    **A.**    Yes, sir.

9    **Q.**    "Water fountains were not damaged by the storm;

10   therefore, replacement is not part of the insurance scope"?

11   **A.**    Correct.  Yes, sir.

12   **Q.**    "Sound insulation for the second floor between the

13   offices.  There was no insulation between the rooms on the

14   second floor before the storm, therefore is not in the

15   insurance scope of work"?

16   **A.**    Yes, sir.  Correct.

17   **Q.**    "Installed closed cell foam on exterior walls where

18   there was bat insulation before the storm."  And that was

19   deducted as well, correct?

20   **A.**    Yes, sir.

21   **Q.**    And what we did was we went through and added all

22   those up with you, correct?

23   **A.**    Yes, sir.

24   **Q.**    And that's how we went from the 1.36 million -- we

25   subtracted all those amounts, and I've got it summarized on

```
 1    this page which I'd like to show you the amounts.
 2              MR. COX:  Your Honor, rather than show them the
 3         summary because it can get a little confusing, we'll
 4         stipulate that the number's 42,000.
 5              MS. WOLF:  $42,044.
 6              MR. COX:  $42,044 that was deducted from the 1.36
 7         million.
 8              MS. WOLF:  Just want to make sure everyone knows we
 9         agree on this.
10              THE COURT:  Very good.
11    BY MR. COX:
12         Q.   Mr. Odom, once we got to that figure, did you add
13    something back in to the Encore bill at the end to get to the
14    final number?
15         A.   I believe the interest that I'm accruing daily.
16         Q.   And that was the 17,000 that you testified about
17    earlier, correct?
18         A.   Yes, sir.
19         Q.   Show you again, Mr. Odom, the payments that
20    Scottsdale has made.  Mr. Wolff just went through these with
21    you, correct?
22         A.   Yes, sir.
23         Q.   The payment on September 23rd, 2020, that was made
24    just seven days after the Scottsdale -- after the Skyline
25    estimate, correct?
```

1          A.   Yes, sir.

2          Q.   The next payment was made on November 23rd, 2020.

3     That was not within 30 days of the Skyline estimate, was it?

4          A.   No, sir.

5          Q.   You would agree with my math -- well, let's go to

6     the next one.  The 177,000 that was paid on January 8th,

7     2021, we talked about that.  That was two numbers.  That's

8     for mitigation and the -- what's the people who did the temp

9     roof?

10         A.   BJW.  Oh.  Crest.

11         Q.   Crest Exteriors.  Crest Exteriors plus part of the

12    mitigation work done by All Clear.  And the part we're

13    talking about is the number that was given by Wardlaw,

14    Scottsdale's expert, correct?

15         A.   Yes, sir.

16         Q.   That's the 177?

17         A.   Yes, sir.

18         Q.   Am I right that you submitted that -- well,

19    Mr. Adam Lock testified on behalf of Scottsdale that he got

20    it sometime in October.  You heard that?

21         A.   Yes, sir.

22              MR. WOLFF:  It's leading, Your Honor.

23              THE COURT:  I'm sorry?

24              MR. WOLFF:  Leading objection.

25              THE COURT:  Sustained.  I mean, technically you are

1          leading him.  Try to rephrase it.

2     BY MR. COX:

3          Q.    Assuming that Scottsdale got it sometime in

4     October, was that payment made within 30 days of the last day

5     of October, October 31st?

6          A.    No, sir.

7          Q.    That would have been 69 days after that, correct?

8          A.    Close.

9          Q.    And, in fact, Wardlaw's expert gave them the number

10    on November 12th.  It wouldn't have been within 30 days of

11    even when Wardlaw's expert gave him the number, would it?

12         A.    No, sir.

13         Q.    The next payment was 29,440.  You remember what

14    that payment was for?

15         A.    It was kind of odd, but I do.  It was Industrial

16    Refrigeration, BJW, and BJW was about 18.

17         Q.    Correct.

18         A.    I don't remember the other one.

19         Q.    Bourgeois Electric?

20         A.    Bourgeois Electric, 10,000, right at.  Puts it up

21    there.

22         Q.    All that work was done in September, correct?

23         A.    Yes, sir.

24         Q.    When did you submit those bills?

25         A.    September.

1      **Q.**   That payment in March, way, way after 30 days,

2   correct?

3      **A.**   Yes, sir.

4      **Q.**   The last one, when did you sign that contract for

5   1.36 million with --

6      **A.**   Right before Christmas.  December 20th, I believe.

7      **Q.**   23rd?

8      **A.**   23rd.

9      **Q.**   This payment's May 18, 2021.  If I told you that's

10  168 days -- no, I'm sorry, 146 days over 30 days, correct?

11     **A.**   Yes, sir.

12     **Q.**   All of these bills after the 250, they're well

13  after Skyline's estimate, correct?

14     **A.**   Yes, sir.

15     **Q.**   Not within 30 days?

16     **A.**   No, sir, not close.

17     **Q.**   Thank you, sir.  I don't have any other questions.

18     **A.**   You're welcome.

19          THE COURT:  Mr. Odom, you may step down.

20          THE WITNESS:  Thank you.

21          MS. BROWN:  Your Honor, plaintiffs are about

22      prepared to rest; but I do have three exhibits that I've

23      been alerted I did not actually offer --

24          THE COURT:  Okay.

25          MS. BROWN:  -- that have been shown.  Exhibit 3A is

1          the listing of actual costs to repair.

2               MS. WOLF:  We had an objection.

3               THE COURT:  I'm sorry?

4               MS. BROWN:  It was the summary evidence.

5               MS. WOLF:  Can I look at it again?

6               MS. BROWN:  Sure.

7               MS. WOLF:  Yes, no objection with that.

8               MS. BROWN:  So I offer Exhibit 3A without

9          objection.

10              THE COURT:  It'll be admitted.

11              MS. BROWN:  The next one is Exhibit 69 which is the

12         summary of the payments.

13              MR. WOLFF:  No objection.  That's our --

14              THE COURT:  Mr. Wolff, you got to let Ms. Wolf look

15         at that.

16              MR. WOLFF:  I think it's off by 49 cents.  We'll

17         fix it.  It's off by 49 cents.

18              MS. WOLF:  It's off by 49 cents, but we might as

19         well match on something.  Can y'all fix yours?

20              MR. WOLFF:  We have that total in there.

21              MS. WOLF:  We don't have an objection to you --

22              MS. BROWN:  Okay.  I will rerun the math and submit

23         to the clerk the correct math, but I don't know if it's

24         wrong or not wrong.

25              MR. COX:  We'll chop off 51 cents.

1        MS. BROWN:  Yeah, we can make it an even --

2        MR. WOLFF:  We'll fix it.

3        THE COURT:  Listen, here's what let's do.  Put it

4    in evidence.  Y'all are stipulating it's off 51 cents.

5    Okay.  Ladies and gentlemen, the parties have stipulated

6    that that exhibit is off 51 cents.  So you can accept

7    that because they have agreed.  That'll speed things

8    along.  How about that.

9        MS. BROWN:  Thank you, Judge.  Exhibit 69 with the

10   stipulation.  And Exhibit 99 is just the summary of

11   what's left on the policy.

12       MR. WOLFF:  Technically that's wrong because the

13   policy limits are 2 million plus the --

14       MS. BROWN:  Right.  Adam Lock testified to this

15   exhibit.  I just forgot to offer it.

16       MS. WOLF:  Okay.  If he's testified --

17       MR. WOLFF:  But he said the policy limit is 2

18   million plus 10,000 for upgrades, code upgrades, plus 25

19   for debris removal.  So we're fine with that.

20       THE COURT:  Okay.  What's the number on that one?

21       MR. WOLFF:  Well --

22       MS. BROWN:  This one is Exhibit 99.

23       THE COURT:  Wait.  Hold on.  One at a time.  DD's

24   going to fuss at me if I let y'all talk over each other.

25   Mr. Wolff, what's the issue?

448

1        MR. WOLFF:  It's the total amounts recoverable

2    under that policy are 2 million under the policy limits

3    plus 10,000 for debris removal plus 25,000 -- no, I'm

4    sorry, 25,000 for debris removal plus 10,000 for code

5    upgrades.

6        THE COURT:  Right.  I remember.

7        MR. WOLFF:  So, as Adam Lock said, it's technically

8    not a $2,035,000 policy limit.

9        MR. COX:  We'll stipulate that's correct.

10       THE COURT:  I think the jury saw an exhibit on that

11   earlier in the trial anyway kind of breaking that out.

12   I think they can sort that out.  It'll be admitted

13   subject to Mr. Wolff's clarification.

14       MR. WOLFF:  Thank you, Your Honor.

15       MS. BROWN:  So the three exhibits are 3A, 69, and

16   99.  99 is a summary of remaining policy.

17       THE COURT:  Okay.  Is that it?

18       MS. BROWN:  With that, plaintiff rests.

19       THE COURT:  Okay.  The plaintiffs have rested their

20   case, ladies and gentlemen, so they've completed their

21   presentation of evidence.  So at this point we will turn

22   now to Mr. Wolff and his client, Scottsdale, and they

23   can now put on any evidence in defense.  At this time,

24   if you are prepared to call your next witness or --

25       MS. WOLF:  We're going to call a witness live.

```
1              THE COURT:  Y'all strategizing?
2              MR. WOLFF:  Well, procedurally.
3              THE COURT:  Do you need a minute?
4              MR. WOLFF:  Actually, if we could, just a quick
5      second.
6              THE COURT:  Go ahead.  Confer.
7              MR. WOLFF:  We're ready to proceed, Your Honor.
8              THE COURT:  Okay.  I'm going to ask the inevitable
9      question, not holding you to it.  How long do you think
10     you're going to need for this witness on direct?
11     Ballpark it.  I'm not going to hold you to it.
12             MS. WOLF:  It's going to be over an hour.
13             THE COURT:  Okay.  The reason I'm asking, in about
14     30 minutes we're going to take our afternoon break
15     because, you know, staff needs to go to the restroom,
16     the jury.  I just want to know.  So we get about 30
17     minutes from now, find a good breaking point.  I don't
18     want to break your flow.
19             MS. WOLF:  You won't break my flow, and I want to
20     break then too.
21             THE COURT:  Very good, then.  We're all on the same
22     page.
23             MS. WOLF:  Scottsdale calls Mr. Granger Stuck.
24             THE COURT:  Okay.  Come on up.
25                        GRANGER ALLEN STUCK,
```

1    after being first duly cautioned and sworn to tell the truth,

2    the whole truth and nothing but the truth, did testify on

3    oath as follows:

### DIRECT EXAMINATION

5    BY MS. WOLF:

6        Q.   Good afternoon.  Would you please state your full

7    name for the record.

8        A.   Granger Allen Stuck, S-T-U-C-K.

9        Q.   Where do you live?

10       A.   I live in Sammamish, Washington, which is a suburb

11   of Seattle, Washington.

12       Q.   Who is your employer?

13       A.   J.S. Held, LLC.

14       Q.   What does J.S. Held do?  What does that company do?

15       A.   We're a construction consulting firm.

16       Q.   And what is your position with that company?

17       A.   I'm an executive managing director.  I manage files

18   and projects and clients for our company.

19       Q.   How long have you been with the firm?

20       A.   Coming up on 13 years.

21       Q.   Why don't you explain for the jury what you do at

22   J.S. Held.

23       A.   Sure.  So I work on claims, some insurance related,

24   some noninsurance related, any time there's a claim issue or

25   dispute.  It can be cost related, can be schedule related, or

1    both.

2            MS. BROWN:  Your Honor, I don't know if this helps

3        and I hate to interrupt, but we do stipulate to his

4        expertise.

5            MS. WOLF:  I appreciate that.  It'll move it

6        faster.  I do need to present it, but I appreciate that.

7            THE COURT:  Maybe you can give us the abbreviated

8        version.

9            MS. WOLF:  I'll give the abbreviated version, but I

10        still need the background for the jury.

11            THE COURT:  I understand.  You certainly have every

12        right to --

13            MS. WOLF:  Thank you very much.

14            THE COURT:  -- bring out his qualifications.

15    BY MS. WOLF:

16        Q.    So what is your area of expertise?

17        A.    General construction consulting, cost estimating,

18    schedule delay analysis, reviewing contracts, reviewing

19    construction documentation.

20        Q.    All in the context of the construction industry,

21    right?

22        A.    Yes.

23        Q.    And, in fact, that's what you were hired to do in

24    this case, right, was to look through a lot of the

25    construction documents because this is essentially a rebuild

452

1  of a property that's been damaged by a hurricane, correct?

2      A.   Yes, and do an inspection.

3      Q.   Have you done that kind of work before, hurricane

4  related specifically?

5      A.   Yes.

6      Q.   How many times?

7      A.   Oh, probably in the hundreds, I would guess.

8      Q.   So, in other words, more than a hundred times

9  you've provided a cost analysis for a building, a commercial

10 building in this case, that's been damaged by a hurricane?

11     A.   Yes.

12     Q.   And what about -- other than hurricanes, do you do

13 other types of buildings damaged by things other than

14 hurricanes?

15     A.   Yes.  It can be construction related damage,

16 earthquakes, wildfires, what in the industry is called a cat

17 or catastrophe, any of those types of situations.

18     Q.   Do you work in claims all across the United States?

19     A.   Across the United States and some international

20 work.  Done work in New Zealand, some work in Thailand, some

21 work in South Korea, Australia.

22     Q.   In this case, you were hired by Scottsdale in April

23 of 2021; is that correct?

24     A.   That's correct.

25     Q.   So just briefly, why don't you explain why you were

1    retained by Scottsdale in April of 2021.

2        A.    At that time it was my understanding there were

3    some disputed issues in relation to repairs on the building.

4    So I was asked to come in and do my own independent

5    assessment to see what I thought the damage cost was.

6        Q.    So at the point when you were retained in April

7    of 2021 you understood that there was a dispute between Eaux

8    Holdings and Scottsdale as to the total amount of the claim?

9        A.    Yes.

10        Q.    And I guess we just need to make sure we understand

11    because I'm probably going to say the words "the claim" a lot

12    because I've been around you and I've heard you say "the

13    claim."  So why don't we explain to the jury what do we mean

14    when we say Eaux Holdings' claim.  What does that mean?

15        A.    What I consider to be the claim is the request for

16    the cost of the damages.  So the building owner, what we call

17    the insured, is saying, "I need this many dollars to repair

18    my building."

19        Q.    Did you have an understanding in April of 2021,

20    when you were called in, that a certain amount had already

21    been paid for what they call the undisputed portion?

22        A.    I didn't know that right when they first called me.

23    I found that out later.

24        Q.    So you understand that you're being offered here

25    today for this -- to help this jury as an expert witness to

1    help them to make decisions they have to make in this case?
2    You understand that?
3        A.   I do.
4        Q.   And so let's -- I'm going to just talk briefly
5    before we go through your analysis as to exactly what
6    opinions we're going to offer to this jury that you're going
7    to provide to them.  So, number one, you said that you were
8    asked to value the claim, right, to actually determine the
9    dollar amount of Eaux Holdings' claim based on your
10   independent analysis?
11       A.   Correct.
12       Q.   So you did that?
13       A.   I did.
14       Q.   And I know that you provided Scottsdale with that
15   number in May of 2021; is that right?
16       A.   That's correct.  I think it was May 13th of 2021.
17       Q.   So you completed your analysis and gave it to
18   Scottsdale on May 13, 2021?
19       A.   Correct.
20       Q.   And that number was about $1.8 million?
21       A.   Correct.  Just under, I believe.
22       Q.   Yeah.  For the record, and the jury's seen this,
23   but it's $1,797,091.  That was your determination of the
24   total value of Eaux Holdings' claim for repaired damage to
25   its building, correct?

1      **A.**   Based on the documentation I had at that time, yes.

2      **Q.**   And again, you said that was your independent

3   analysis?

4      **A.**   Correct.

5      **Q.**   And then you were called in again.  Actually, I

6   want to just stop for a minute right there.  In April

7   of 2021, we've already heard that the work was substantially

8   complete by that time, right?

9      **A.**   Correct.

10      **Q.**   So does that impact -- are you presenting an

11   estimate to Scottsdale, or what are you doing?  What are you

12   basing your number on?

13      **A.**   At that time I was -- it was mostly based on

14   estimated cost, not actual cost, because that was the data I

15   had.

16      **Q.**   And we'll go through -- I'll show the jury your

17   spreadsheet, your analysis that you did, and you can explain

18   it then.  I'm just trying to give an overview right now.  And

19   do you understand that Scottsdale paid Eaux Holdings the

20   amount that you said the claim was worth after you gave your

21   number to Scottsdale?  Is that your understanding?

22      **A.**   My understanding, made a payment based on that

23   because of previous payments.

24      **Q.**   Okay.  Got it.  So then later you understood that

25   the parties had still not reached agreement and were in

456

1    litigation, in trial this week; and you were hired to do
2    another analysis, a second review, correct?
3         A.   Correct.
4         Q.   And that review was done in August of 2021, right?
5         A.   Correct.
6         Q.   And by that time you had more information?
7         A.   Correct.
8         Q.   That's correct.  Because we had done discovery.  We
9    had issued subpoenas.  We'd gotten records from Encore, from
10   the contractor.  Right?
11        A.   Correct.
12        Q.   And that's the world you work in, is construction
13   documents?
14        A.   Yes.
15        Q.   So what we got from Encore through a subpoena was
16   things like, not just the contract that Encore entered into
17   with Eaux Holdings, but all of their supporting
18   documentation, in other words, the contractor's records,
19   right?
20        A.   Correct, the cost reports, checks, actual invoices.
21   Sorry.  When I say a cost report, it's a report that the
22   contractor keeps to show how much money they're actually
23   spending.  We got documents like those.
24        Q.   Right.  So the subcontracts because any general
25   contractor, to do the work, is going to hire subcontractors

1    and suppliers, right?

2        A.   Correct.

3        Q.   So all that documentation is there and that

4    documentation shows you exactly what the cost of the work is?

5        A.   Correct.

6        Q.   So that gets you more from an estimate.  Now you're

7    looking at actual cost, right?

8        A.   Yes.

9        Q.   So you've looked at all of that record.  And we

10   just talked about the way I've always heard it called and

11   contractors will use the term job cost detail report.  Is

12   that a phrase that's familiar to you?

13       A.   That's what it's referred to in the construction

14   industry, yes.

15       Q.   What is that?

16       A.   It's an accounting record, again, that the

17   contractor keeps to show what actual cost they've spent to

18   subcontractors, to their own people, any expenses they've

19   had.  Again, a contractor wants to track their costs so they

20   know how much they've spent.  So it's a report that reflects

21   that.

22       Q.   Because I know that that was one of the documents

23   that was important to your analysis, I just want to stop a

24   minute and make sure that we've explained that.  So if you

25   say to a contractor, "How much did this job cost you," to the

1    contractor, contractors know to the penny how much a job

2    costs, right?

3        A.    They sure should.

4        Q.    Because they've got to tell their surety, their

5    bond company.  Their partners want to divvy up the profits.

6    The bond company wants to know did you make a profit or loss.

7    So contractors know exactly how much they pay for a job,

8    right?

9        A.    Yes.

10       Q.    And what you do in your work is -- it's like a

11   forensic analysis once you get these records?

12       A.    Yeah, that's what we would call it.

13       Q.    So you can see beyond just a contract or beyond

14   just an invoice or beyond just an estimate.  You put all the

15   records together and you can tell how much a job costs.

16   Right?

17       A.    Correct.

18       Q.    And that's what you did in this case, right?

19       A.    On my second analysis, yes.

20       Q.    So you've done two.  Would you categorize your

21   analysis -- because you've reviewed this claim twice now?

22       A.    Yes.

23       Q.    Once in May and once in August?

24       A.    Yes.

25       Q.    And you had information in May and then you got

1    more information in August, right?

2        A.   Correct.

3        Q.   And both times you did what you call a forensic

4    analysis?

5        A.   Yes.

6        Q.   Don't just take things at face value, numbers on

7    pages, you actually dig behind them and find out how much did

8    this cost?

9        A.   You have to know what the numbers mean.  You have

10   to know what they relate to, what repair work was done that

11   reflect those numbers.  So what we refer to as the scope of

12   work, you have to understand that to know what the numbers

13   mean.

14       Q.   So actual cost is something I think we've talked

15   about over the last three days versus an estimate.  That's

16   one thing.  And the other thing is, what's shocking maybe to

17   all of us in this room, is seeing big bills like the All

18   Clear bill for $491,000, which again, there's some agreement

19   between plaintiff and Scottsdale that that was a high number,

20   right?

21       A.   Correct.

22       Q.   It was an unreasonable number, right?

23       A.   We thought so.

24       Q.   Neither Eaux Holdings nor Scottsdale should pay

25   that number, right?

1    A.   Correct.

2    Q.   So it might be an actual cost that All Clear was

3    charging; but it wasn't a reasonable cost, right?

4    A.   Yeah, I wouldn't actually call it a cost until

5    whatever's paid.  So the cost is 330,000, as we're hearing

6    now.

7    Q.   Right.  And we're going to get into the analysis,

8    but I want to -- I hope I'm staying with the big picture

9    first to show what it is that you're doing and how it is that

10   you're doing it.  So let's just talk about that number when

11   you did your second review in August of 2021.  That number

12   was 1.6 million, right?

13   A.   Correct, and change.  I don't know the exact but

14   1.6 and change.

15   Q.   $1,620,118, right?

16   A.   Yes.

17   Q.   So it went down?

18   A.   It did.

19   Q.   We're going to talk about why.  But again, you did

20   your forensic analysis twice based on the information that

21   was provided and it was a lot of information, right?

22   A.   Yes.

23   Q.   Okay.  So is it your opinion in this matter that

24   Scottsdale at this point has paid all amounts owed to Eaux

25   Holdings for repair and replacement of damage to Hurricane

1    Laura?

2        A.    Actually, I think they've overpaid.

3        Q.    You think they've overpaid by $200,000, right,

4    about?

5        A.    Yeah.  I mean, for example, the May analysis

6    included the value of the window replacement which we now

7    know was not done.

8        Q.    We'll talk about -- I want to go line item by line

9    item because I know it's a lot for me to follow.  And I have

10   it in a chart so we'll get to details when we see the chart.

11   I want to go ahead, then, and tell the jury what all your

12   opinions are that, as an expert, you're telling them so they

13   can listen to the basis and see whether or not they believe

14   your analysis.  So one of them is that you believe Scottsdale

15   at this point has not only paid all that it owes but they've

16   actually overpaid by $200,000, right --

17       A.    Correct.

18       Q.    -- one of your opinions that you're going to try to

19   explain to the jury how you got there?

20       The other is that you were asked to look at the Skyline

21   damage estimate that's the four-volume set, right --

22       A.    Correct.

23       Q.    -- that was shown here?

24       And you, in fact, did review it, right?

25       A.    I did.

1      **Q.**   So we've already determined it's an Xactimate

2    analysis that was done in September of 2020.  It was

3    $2.1 million.  And, of course, now, they've explained the

4    actual four-volumes has a lot of photos of damage and some

5    other things in it.  But you've reviewed all of that, right?

6      **A.**   Correct.

7      **Q.**   At the time that you came to meet Skyline and Jeff

8    Major, that was in April of 2021.  And we've already said

9    that by that point the work was almost done, right?

10     **A.**   Correct.

11     **Q.**   So what was the relevance to you of the Skyline

12   estimate if it was an estimate and now the work's almost

13   done.  Did you use it?

14     **A.**   No.  I reviewed it because before going down there

15   I wanted to try to understand the status of the disputes, I

16   guess.

17     **Q.**   Okay.

18     **A.**   But once I got down there and saw the status of the

19   work and it was almost complete, that's when I was looking --

20   didn't quite get but was looking for more cost related data.

21     **Q.**   So it's fair to say that in April of 2021 when you

22   got the Skyline estimate it wasn't relevant because now we're

23   going to switch to actual cost, right?

24     **A.**   Yes.

25     **Q.**   But I asked you to look and Scottsdale's asked you

1    to look at that Skyline estimate for trial this week, right,

2    so that you would be able to explain some things about it?

3        A.   Yes.

4        Q.   And you have a couple of opinions about that

5    Skyline estimate.  One is I asked you is it inflated, and

6    what's your opinion?

7        A.   I believe it is.

8        Q.   All right.  And the second one I asked you was

9    whether or not it complied with industry standards for a

10   damage estimate in an insurance claim, and do you have an

11   opinion about whether or not it complies with industry

12   standards?

13       A.   I don't believe it does.

14       Q.   And why not?

15       A.   There's a few things.  One we've talked about.  It

16   doesn't include ACV value, which normally it would.

17       Q.   Can I just stop you right there?

18       A.   Sure.

19       Q.   I was definitely instructed not to just keep

20   throwing out RCV and ACV.  Actual cash value, right?

21       A.   Yes.

22       Q.   It doesn't have actual cash value, and I believe

23   that Mr. Major's admitted to that.  Right?

24       A.   Yes.

25       Q.   That's not a secret.  You can just look at it, if

1    you know how to look at those things, and tell it doesn't
2    give an actual cash value?
3           A.    Correct.
4           Q.    So I promised to try to keep it big picture first.
5    I wanted to tell the jury what your opinions are so that they
6    can listen and see whether or not you've convinced them of
7    your opinion.  So that's the overview.  Let's back up and go
8    through your qualifications.  Can you just start with college
9    and tell us if you have a college degree, what it's in, where
10   it's from.
11          A.    I do have an engineering degree from Penn State
12   University.
13          Q.    It's engineering, you said?
14          A.    It is.
15          Q.    And work history.  I think you said you've been at
16   J.S. Held for a number of years, right?
17          A.    Coming up on 13 years.  My first 21 years were in
18   the general contracting construction industry, so building
19   large commercial projects around the country.  I spent time
20   in different major cities all around the country building
21   projects.
22          Q.    I may have asked you this.  How many, I think I
23   did, total years of experience you have in the construction
24   industry and with cost estimating?
25          A.    About -- I mean, cost estimating's been a part of

```
1   every element I've been in in construction.  So about 33 and
2   a half years.
3        Q.   Okay.  Do you have any type of certifications or
4   professional licenses, anything that you do continuing
5   education for?
6        A.   I teach continuing education courses, but I don't
7   have any certifications myself.
8        Q.   And in what area do you teach continuing education?
9        A.   Estimating and schedule delay analysis.
10       Q.   And do you have a resume that you keep current?
11       A.   I do.
12            MS. WOLF:  I have it here today.  This is going to
13       be Exhibit D-105.
14            MS. BROWN:  No objection.
15            THE COURT:  It'll be admitted.
16   BY MS. WOLF:
17       Q.   We're not going to go through it because I think --
18   so what we have here -- okay.  So what I'm looking at is a
19   six-page resume or curriculum vitae.  And this is your
20   current version, right?
21       A.   Correct.
22       Q.   What I'd like to do is -- I'm not going to go
23   through everything, just have you tell us that's what it is.
24            MS. WOLF:  I'd like to offer, file and introduce
25       Exhibit D-105.  Did I say that already?
```

1        THE COURT:  She already said she didn't object.

2        MS. BROWN:  I didn't object.

3        MS. WOLF:  I'm sorry.  I was on autopilot.

4        THE COURT:  That's all right.  It's been admitted.

5        MS. WOLF:  Great.

6   BY MS. WOLF:

7        Q.   So can you, to the extent you haven't already done

8   so, tell us just a snapshot version of what's in your resume.

9        A.   Well, starting from when I started in the

10  construction industry, I worked kind of in standard -- what

11  I'll call standard roles in construction, a project engineer,

12  project manager in charge of projects, as I said, anywhere

13  from Los Angeles to Denver, in the D.C. area.  I eventually

14  became a superintendent which is working out in the field,

15  much more trade-related rather than paperwork-related.  I

16  then continued on a track as a project executive or

17  construction executive in charge of larger projects,

18  continued to do that for the 21 years.  18 of those years

19  were with one company and then I spent another three years

20  with another company after that before coming to J.S. Held.

21        Q.   How much of your work is done for insurance

22  companies, just in general?  Are you able to give a

23  percentage?

24        A.   It's not a hundred percent.  It's more than

25  50 percent.  75, 80 percent, maybe, is insurance-related.

467

1      Q.    Who are your other clients other than insurance

2    companies?

3      A.    Well, we talked earlier about independent

4    adjusters.  Sometimes we're hired by independent adjusters

5    but also hired by insurance carriers like Scottsdale or

6    Liberty Insurance or State Farm or FM Global, most of the

7    larger insurance companies.

8      Q.    So I want to make sure we're clear.  You're not an

9    independent adjuster, right?

10     A.    We are sometimes -- we never work -- we work with

11   independent adjusters.  We're recommended by independent

12   adjusters.  When I say work for, we're never paid by the

13   independent adjuster.

14     Q.    You're not an independent adjuster?

15     A.    No, I am not.

16     Q.    That's what I want to make clear because we've

17   talked about in this case Monte Jones was an independent

18   adjuster.  You're not an adjuster, not a desk adjuster, not a

19   field adjuster.  You're in the world of a construction

20   consultant or construction expert, right?

21     A.    That's correct.  Maybe I misstated that.  We

22   work -- someone like a Monte Jones may recommend hiring us on

23   a project.

24     Q.    I don't think you misstated.  I just want to make

25   sure that I'm not asking a question that gets an answer that

1    might be misleading.  So as part of your work and experience

2    do you review construction contracts?  I think we've already

3    covered that.

4        A.   Yes.

5        Q.   So that's something that's very familiar with you,

6    reading construction contracts?

7        A.   Yes.

8        Q.   And in this case there was some discussion about

9    whether this was a complex claim and there's been discussion

10   about the complexity of the claim.  I just wanted to ask you

11   because I know you've already said you've done stuff all over

12   the world and earthquakes.  What we're talking about here is

13   a $2 million two-story office building.  I think it's about

14   15,000 square feet, something like that?

15       A.   Correct.

16       Q.   And it had some specialty construction in that the

17   first floor was a government tenant that we've heard a little

18   bit about.  They had some special requirements.  I don't

19   think anybody's necessarily defined what all that was; but it

20   was a government office on the first floor, right?

21       A.   Correct.

22       Q.   There was a jail there?

23       A.   Yeah, jail, holding cells.

24       Q.   I've heard about maybe bullet proof something on

25   the glass.  So that's what we mean when we talk about

1    specialty construction?

2         A.   Yes.

3         Q.   So it's something that required a construction

4    expert more so than just a field adjuster, right?

5         A.   Yes.

6         Q.   Did I say that right?  Okay.  So we've touched on

7    the construction records and I want to just make sure that

8    we've emphasized that construction records are something that

9    you review in your line of work all the time, right?

10        A.   Yes.

11        Q.   So you get contractor's records and you go through

12   those and that's when you talked about your forensic

13   analysis, right?

14        A.   Yes.

15        Q.   And you're familiar with Xactimate?  Do you know

16   how to read the Skyline estimate?

17        A.   Yes.

18        Q.   And you -- I'm pretty sure this is clear.  I just

19   want to make sure that you know how to review and prepare,

20   whether it's estimates or cost evaluations, in the context of

21   hurricane damaged buildings, right?

22        A.   Yes.

23             MS. WOLF:  So, Your Honor, at this point I'd like

24        to tender Granger Stuck as an expert in construction and

25        that would include cost estimating, the repair scope for

470

```
 1          damaged buildings, insurance claims, reviewing for
 2          insurance claim purposes, review and analysis of
 3          construction contract documents --
 4               THE COURT:  Why don't you make it a little more
 5          succinct.  That's a lot.
 6               MS. WOLF:  Okay.  That's it.  I just want to make
 7          sure I don't get an objection later to any part of that.
 8          That's what I'm tendering as an expert, construction
 9          expert.
10               THE COURT:  Any objection?
11               MS. BROWN:  No objection.
12               THE COURT:  Okay.  He's accepted.
13               MS. WOLF:  Thank you.
14     BY MS. WOLF:
15          Q.   All right.  I want to start with -- well, that was
16     the start.  Now I'm going to move to the next part of it
17     which is to talk about your initial assignment and
18     involvement.  We've already said that was April of 2021,
19     right?
20          A.   Yes.
21          Q.   You were hired by Scottsdale, right --
22          A.   Yes.
23          Q.   -- as a construction expert in this matter?
24          And you met with Skyline, or how did you come to meet
25     Skyline?
```

1    **A.**   I just talked to them on the phone.

2    **Q.**   Okay.  So you were put in touch with each other?

3    **A.**   Yes.

4    **Q.**   All right.  What I want to show you -- well, why

5    don't you explain that meeting.  How did it go?  You made a

6    site visit?  Explain all of that.

7    **A.**   So when I first got the call from Scottsdale, as I

8    said, I was made aware that there were some disputes on it

9    and they wanted me to go down, do an inspection, and do an

10   independent assessment of what I thought the repair cost

11   would be for the damage related to Hurricane Laura.

12   **Q.**   So you made that site inspection on what date?

13   **A.**   I believe April 19th.

14   **Q.**   And did you -- so you went down.  You had the

15   Skyline estimate and the Grecco estimate?  You received

16   those?

17   **A.**   Yes.

18   **Q.**   And so tell us about the site inspection on

19   April 19th.  Who was there and what did you do?

20   **A.**   I met with Mr. Major and Ms. Bentz from Skyline.  I

21   walked the site with Mr. Major.  We walked the first floor,

22   walked the second floor, walked the exterior, and walked the

23   roof.  Little bit of a safety issue on the roof on the ladder

24   we had to climb over, but we made it without any damage.  And

25   then I was really just trying to assess what work had been

1     done, which was substantially complete at that time, so try

2     and understand what they've done and then try and understand,

3     now that the work is done, what is the cost related to that

4     as opposed to the estimate.

5          Q.   And did you ask them what is the claim?

6          A.   Yes.

7          Q.   All right.  And so I think you said, I want to make

8     sure it's clear on the record, that on April 19, 2021, when

9     you went, the building, the whole building itself, the work

10    was reaching or had reached substantial completion?  Do you

11    know exactly?

12         A.   It was reaching substantial completion.

13         Q.   So it was almost done?

14         A.   Yes.

15         Q.   And let me show you -- so you asked what is the

16    claim; and what were you provided with, if anything?  What

17    were you told?

18         A.   We sat down to meet after our job site walk.  I was

19    asking, "I have the estimate.  But now that the work's going

20    on, what is the claim?  What is the basis for the claim?"

21    And we started discussing what that was with the Encore

22    contract and some of the other invoicing that had happened on

23    the job, and I started handwriting down notes and values to

24    try to understand what the claim value was at that time.

25         Q.   So there wasn't anything in writing?  You were

1    having to generate it right there at the site meeting?

2         A.    Correct.

3         Q.    And again, we're talking at this point about actual

4    cost, right?

5         A.    Yes.

6         Q.    Let me show you what I believe is already

7    introduced and admitted as D-77.

8              MS. WOLF:  I'm looking for anybody to tell me it's

9         already in.  It's in.  Okay.

10             MS. BROWN:  I have it as in.

11             MS. WOLF:  It's a plaintiff's exhibit.

12             MR. WOLFF:  She's the one that might have to say

13        it.

14             MS. LACOMBE:  I have it.

15             MS. WOLF:  Okay.  So this is already in.

16   BY MS. WOLF:

17        Q.    I might be the only one that has trouble seeing it.

18   Can y'all see it?  Mr. Granger, can you see it?

19        A.    I can.

20        Q.    All right.  So what we're looking at here is a

21   May 6th e-mail.  This is from Ms. Bentz at Skyline Adjusters,

22   right, to you?

23        A.    Yes.

24        Q.    Actually, because I think this goes backwards,

25   let's make it -- have it make sense by starting here.  Let's

1    do that.  All right.  So this is on May 5th, 2021.  You send

2    an e-mail to Jade.  And she is with Skyline Adjusters,

3    correct?

4        A.   Correct.

5        Q.   I'm going to read just the highlighted part.  "From

6    my end, I'm working on my comparative analysis comparing

7    Skyline data, Grecco data," and I think you mean and our

8    independent data.  "However, I know I said this before but

9    I'm struggling to line things up for comparison because we

10   don't have a consolidated claim for all claimed scope.  Is

11   that available yet?"

12       So you were asking -- you were telling Skyline that you

13   needed more information to be able to do your analysis,

14   correct?

15       A.   Correct.  When we -- we had the Skyline estimate.

16   We had the Grecco estimate.  They obviously didn't line up.

17   So if you want to try to compare them, it's apples and

18   oranges.  It's always helpful for everybody in the claim, in

19   my opinion, that if you can line things up to make it apples

20   to apples it's much easier to understand.  Even though the

21   numbers may not agree, at least they align.  So that's what I

22   was asking for to try to do my comparative analysis with

23   because the data I had to date couldn't align.

24       Q.   And that analysis that you're doing, that's part of

25   the process.  If you've got two estimates and one's up here

```
 1   and one's down here, you have to do your comparative
 2   analysis.  And like you just said, you have to be comparing
 3   the same thing, apples to apples.  Right?
 4        A.   Correct.  Again, what we call scope of work.  You
 5   want to be comparing similar scope of work.
 6        Q.   So what is the scope?  Because before you can even
 7   talk about if somebody's cost is too high you have to make
 8   sure that you're both on the same page as to what is the
 9   hurricane related scope, right?
10        A.   Correct.
11        Q.   Is that going to be one of the first things you do
12   with any estimate, is to make sure that there's agreement as
13   to what was caused by the hurricane?
14        A.   Yeah.  There may not always be agreement, but you
15   always want to find the scope before you price the scope.
16   The scope drives the numbers.
17        Q.   Then you say, "I'll have to piece together what I
18   think is the claim based on our discussion at the site."  And
19   that's what you were just discussing.  You got to the site
20   and asked them what the claim was, and they just started
21   verbally telling you what that was?
22        A.   Correct.
23        Q.   Because there's nothing in writing at that point?
24        A.   Correct.
25        Q.   And subsequent info.  And then Ms. Jade says,
```

1    "Encore contract, window estimate, roofing estimate,

2    invoices, et cetera."  So the same data -- a lot of the same

3    data that you told us is what you rely on to determine the

4    actual cost of something, that's what's referred to here in

5    this e-mail?

6         A.   Yes.

7         Q.   So then the answer is, on May 6th from Ms. Jade at

8    Skyline, she says, "Good evening, Granger.  Per the below,

9    please see attached a workbook that should assist with the

10   consolidated claim.  Please note this is for discussion and

11   to help summarize where we see the components and their

12   values."  I'm going to skip down.  It says, "It is and was

13   only an estimate.  However, the scope was used as a detailed

14   guide to damages which Encore ultimately repaired under their

15   contract.  The true cost is only actually realized when the

16   repairs and/or replacement is complete."  So I read all that

17   correctly?

18        A.   Yes.  The only -- the highlighted part that says

19   "It is and was only an estimate," I believe that's referring

20   to the Skyline estimate.

21        Q.   Okay.  And so at this point Skyline sent you what's

22   called a workbook, and we're going to look at that in a

23   minute.  It looks like a spreadsheet, right?

24        A.   Correct.

25        Q.   And they prepared that for you on May 6th per your

1    request?

2         A.   Yes.

3         Q.   So what was -- if you can identify, like, a few of

4    the big items.  Or what was the difference that you saw

5    initially between the Skyline estimate and the Grecco

6    estimate?  Was it a lot of little things, a couple of big

7    things?  What was the --

8         A.   There was a few major things.

9         Q.   And what was that?

10        A.   So it was the cost of the roofing repairs, it was

11   the cost of the exterior panel replacement, and it was the

12   cost of the window replacement.

13        Q.   So it was sort of three big ticket items that had

14   to be, what, further investigated to determine exactly what

15   the cost was going to be?

16        A.   Well, more so what the scope was going to be --

17        Q.   The scope?

18        A.   -- that they drove, yeah.

19        Q.   And so it might be good because we're going to talk

20   about the wall cladding and we've already talked about the

21   window system, and you said those are kind of the big ticket

22   items.  The wall cladding, we're talking about anywhere from

23   300,000 to almost $450,000, right?

24        A.   Correct.

25        Q.   But like you said, before you even talk about

478

1   what's the cost and is it reasonable was the question whether

2   or not all of the wall cladding had to be replaced or whether

3   just damaged portions had to be replaced?

4       A.   That was one of the things I had to do in my

5   independent assessment, was go down and determine whether I

6   thought that needed to be replaced, whether I thought the

7   windows needed to be replaced.

8       Q.   And that's one of the things that Scottsdale asked

9   you to investigate, tell us whether or not in your expert

10  opinion all of the wall cladding on that building needs to

11  come off and be replaced or whether or not it can be done --

12  whether or not the owner can be put back where they were by

13  just replacing the damage.  That was something you were

14  tasked with making a determination on?

15      A.   Yes.

16      Q.   And what was your answer?

17      A.   For the wall panels, when I went down and saw it,

18  walked the job, I determined that I believe the entire

19  exterior wall panel system needed to be replaced.  We get

20  into issues where, again, putting a building owner back where

21  they were, if you try to just repair some panels, the colors

22  may not match, you may notice repairs.  When I looked at it,

23  it just didn't -- I didn't think that was replacement in

24  kind, as we say in the industry.

25      Q.   Okay.

1     **A.**   So my opinion was that it had to be replaced with a

2     full exterior wall panel system.  So I agreed with replacing

3     the exterior wall panels.

4     **Q.**   So you agreed, and I believe the Skyline estimate

5     had in it -- or maybe you tell me.  Did it have in it full

6     replacement of the wall cladding?

7     **A.**   It did.

8     **Q.**   And we can go ahead and cut to the chase on this.

9     How much money did Skyline have in their estimate for

10    replacement of the wall cladding?

11    **A.**   430,000, somewhere in that range.  Over 400,000.

12    **Q.**   So you agreed with the scope.  "Yes, I agree with

13    you.  All of this wall cladding needs to come off."  Right?

14    **A.**   Yes.

15    **Q.**   But then you didn't agree with the price?

16    **A.**   Correct.

17    **Q.**   And again, I'm going to save the actual numbers for

18    when we get to the chart because I think it'll be easier.

19    That was one of the things in the Skyline estimate.  The

20    actual cost of that wall cladding was about $300,000, right?

21    **A.**   When we got the actual cost data, yes, it was about

22    300,000.

23    **Q.**   So in the Skyline estimate it's $430,000, you said?

24    **A.**   Approximately.

25    **Q.**   And the actual cost of it was 300,000?

480

1          A.    Correct.

2          Q.    So am I correct in saying that if an insurance

3    company were just to pay an estimate they would be overpaying

4    claims?

5          A.    Correct.

6          Q.    I want to just -- because I think it helps to

7    understand what we're talking about with this wall and window

8    system.  This is a commercial building so we're not talking

9    about windows like you have on your home, right?

10         A.    No.

11         Q.    So the decision about whether or not -- this is one

12   of the photos you took when you went there in April of 2021,

13   right?  Actually --

14         A.    I can't tell if that's my photo specifically or

15   not.

16              MS. WOLF:  This is D -- I'm sorry.  This is

17         Mr. Stuck's photos and it's at D -- I think it's 114,

18         D-114.  And the only photo I'm going to show is the

19         first one, 784, so that's the only one we need to mark

20         as to put in as an exhibit.  We don't need to put all of

21         them.

22              MS. BROWN:  No objection.

23              THE COURT:  It'll be admitted.

24   BY MS. WOLF:

25         Q.    This is just to be able to explain this.  So what

1    we're looking at there is the wall cladding, right?

2        A.    Correct.

3        Q.    Is it the light colored beige stuff?

4        A.    No, it's the darker -- well, it's a combination of

5    two different colors; but the darker is almost like a wood

6    grain kind of wall panel system like on the corner and --

7        Q.    Let me -- is it this right here?  All of this is

8    what we're talking about with the wall cladding?

9        A.    Yes.

10       Q.    And then is it on this side of the building, too,

11   and all around here?

12       A.    Can't tell on the other side if that's installed

13   yet or not at this time.  They were in the process of

14   installing it.  Actually, if you look above where your pen is

15   right above that little carport roof, no, to your -- going

16   backwards to your --

17       Q.    Here?

18       A.    No, the other way.

19       Q.    Other way.  Here?

20       A.    Thank you.  You can see where part of it is

21   installed below that window.  See where it kind of stair

22   steps on there?

23       Q.    Okay.  Okay.  I got you.

24       A.    It's in the process of being installed.

25       Q.    All right.  So the decision here was whether or not

1    all the wall cladding needed to be replaced, and then this is

2    the window system that we've been talking about for two and a

3    half days.  Is it called a ribbon window system?

4        A.   Yeah, because they're ribbons of windows around the

5    building.

6        Q.   Right.  So I'm -- on the window system you had to

7    make a similar decision, whether or not to fix the stuff that

8    was broken, smashed, damaged.  And it wasn't just glass.

9    There were some mullions and stuff that were scraped.  You

10   had to decide whether or not to make this -- put this owner

11   back where they were pre-storm, whether or not the entire

12   window system needed to come out and be replaced or whether

13   or not the damage alone could be done, right?

14       A.   Correct.

15       Q.   You were tasked with making that decision so that

16   Scottsdale would know what to pay, right?

17       A.   Correct.

18       Q.   And again, it was Scottsdale that hired you and

19   asked you to make that decision, right?

20       A.   Yes.

21       Q.   And what was your decision on the windows?

22       A.   That they also should be replaced in their entirety

23   based on the manner of installation, I think Mr. Major's

24   talked about, but also, again, the color.  The color matching

25   is -- you know, windows age.  They sit there.  If you try to

1    just replace one, it's not going to match the rest.  So my

2    opinion was that it needed to be replaced in its entirety.

3         Q.   Right.  So your opinion was all the wall cladding

4    needs to be replaced and the ribbon window system needs to be

5    replaced?

6         A.   Correct.

7         Q.   And the window system we're talking about is about

8    $160,000, right?

9         A.   My value of it was.

10        Q.   Your value?

11        A.   Yeah.  Their value was slightly higher.

12        Q.   Skyline also had full replacement in the estimate?

13        A.   Skyline had replacement, but by that time I was

14   reviewing the estimate that Encore had put together for

15   window replacement.

16        Q.   So we have that -- I have that coming up.  I want

17   to make sure that we keep those two things clear.  I just

18   wanted to explain what we were talking about what the wall

19   cladding and the window system.

20        A.   Yes.

21        Q.   And the roof, we've heard from Mr. Poole that roof

22   was replaced.  When you got the records what you had as the

23   actual cost was $240,000, right?

24        A.   Correct.

25        Q.   And you didn't know that there was this additional

484

1    what we now know is -- because we just got it right before

2    trial, an additional, I think it was $36,000.  You were here,

3    though, for trial, right, so you've heard the testimony?

4        A.   Yes.

5        Q.   So we now know that Poole Roofing has at least said

6    that there is an additional amount owed.  Of course, you

7    didn't have any of that when you did your analysis, right?

8        A.   No.  I knew there was an estimate that I saw, but

9    the actual cost was the 240,000.

10       Q.   Okay.  All right.  So what I want to do now --

11           MS. WOLF:  Your Honor, can I ask you a question?

12           THE COURT:  Sure.

13           MS. WOLF:  Are we close to when you wanted to take

14       a break?  Because I'm about to launch into something

15       else.  I don't need a break, but I wanted to ask you

16       because this is a good stopping point.

17           THE COURT:  I understand.  I'm concerned about the

18       jury.  We need to take a little afternoon break.  Let's

19       take about a ten minute break or so, make it 15,

20       everybody go to the restroom, stretch your legs.  All

21       rise for the jury.

22                    (Jury exits courtroom.)

23           THE COURT:  Okay.  Anything else?

24           MR. COX:  No, Your Honor.

25           THE COURT:  Ms. Wolf, just out of curiosity, so I

485

 1    can plan our afternoon, how long you think you have left

 2    with him?

 3         MS. WOLF:  Since y'all seem to all be helping me

 4    out, I feel like I need to move faster.  It's going to

 5    be -- I think it's going to be another hour.

 6         THE COURT:  Another hour.  All right.  Just wanted

 7    to know.  Okay.

 8                        (Recess is taken.)

 9         THE COURT:  So what I'm going to hand out to you

10    here so you can read them and weep, here's the jury

11    charges.  At the conclusion of our day we shall have our

12    charge conference.  So I want to hand that out to you,

13    let you at least be previewing.

14         MR. WOLFF:  That's what I was actually looking at,

15    was the verdict form.  You still working on that?

16         THE COURT:  No.  You should have gotten it.

17    Where's the verdict form?  We'll get you a verdict form.

18    Should have been in there.  I thought it was in there,

19    well, separate sheet.  We'll bring the jury in as soon

20    as she gets that for you.  I think for right now we left

21    your numbers on there.  We'll take those out, obviously,

22    after the charge conference.  I left them in there for

23    references right now.  You know, you'll have defendant's

24    Charge 23.  That'll come out, those little -- because

25    the jury will be allowed to take the charges with them

1      into the jury room.  So we don't want to have any

2      reference that this was plaintiff's charge or this was

3      defendant's charge because they're not.  They're the

4      Court's charges.  Go ahead and bring the jury in.

5      She'll just hand it to you when she comes in.

6                  (Jury enters courtroom.)

7            THE COURT:  Ms. Wolf, you may proceed.

8            MS. WOLF:  Thank you.  What I want to put up now

9      and offer is labeled D-104A.

10           MS. BROWN:  No objection.

11           THE COURT:  It'll be admitted.

12   BY MS. WOLF:

13      Q.   Mr. Stuck, you recall that we just looked at that

14   e-mail from May 5th and May 6th where Skyline sent you what

15   they called, I believe, in the e-mail a workbook and you said

16   it was this spreadsheet.  Is this the spreadsheet that was

17   the attachment to that e-mail?

18      A.   Yes, ma'am.

19      Q.   So we look up in the top right and we see the date

20   on it, May 6th, 2021, right?

21      A.   Yes.

22      Q.   And let me confirm with you.  This was prepared by

23   Skyline and given to you, correct?

24      A.   I got it from Skyline.  I believe they prepared it.

25   I didn't physically see anybody typing it, but it came from

1  them.

2      Q.   And this was at your request when you asked them to

3  put something in writing or they said they would to help you

4  out --

5      A.   Correct.

6      Q.   -- so that you could both know what the claim was

7  at that point, right?

8      A.   Correct.

9      Q.   And notice that Skyline wrote on it "for discussion

10  only."  You see that at the top right there?

11      A.   Yes, I do.

12      Q.   Does that mean that the claim yet had not been

13  fully formulated, they were still working on it?

14      A.   That usually is an indication of a preliminary

15  document, not finalized.

16      Q.   So everything that's in all of the cells on this

17  page was put here by Skyline; you didn't prepare any of this,

18  right?

19      A.   That's correct.

20      Q.   And there's no total at the bottom.  We see the

21  amounts in the columns where Skyline is telling you what they

22  believe the claim to be; but they didn't total it, right?

23      A.   That's correct.

24      Q.   And what we see -- for example, we talked about the

25  Encore contract, $1.36 million.  You see that right there?

1        A.   I do.

2        Q.   So at this point nowhere in here is the Skyline

3    estimate.  This is now going to be based on -- most of it's

4    on actual cost or what they're asserting to be actual cost;

5    is that right?

6        A.   Correct.  You can -- actually, if you look, there's

7    a column there called "actual/budget" what they consider to

8    be actual and what is still a budget.

9        Q.   Okay.  I see that.  So this column right here,

10   "actual/budget"?

11       A.   Correct.

12       Q.   And we see that second line.  I just wanted to

13   point this out because it was something that we just talked

14   about earlier today when Mr. Odom, I believe, was on the

15   stand and that's that $42,044 in what was called Encore

16   change orders, right?

17       A.   Correct.  It's a deduct.

18       Q.   Right.  That's the way Encore -- you attended

19   Encore's deposition, right?

20       A.   I did.

21       Q.   And so you not only got their documents that we

22   received through a subpoena but you also were present when

23   the Encore representative, Evan Monheiser, was deposed over

24   two days, right?

25       A.   Yes.

1    **Q.**   And you were able to confirm and you heard that the
2    way Encore tracks what they labeled here as upgrades and
3    unrelated, meaning unrelated to the hurricane, he said he had
4    to come up with a way to do it and he did it through this
5    deduct change order system, right?
6        **A.**   Yeah.  They weren't true change orders because they
7    weren't changing the contract.  Those items were still
8    included in his contract, but he was coming up with a way to
9    value those --
10       **Q.**   Right.
11       **A.**   -- I guess for them to put in the claim.
12       **Q.**   So they could show that they were tracking
13   something that was non-hurricane related, right?
14       **A.**   Correct.
15       **Q.**   And you recall also that Mr. Monheiser said that he
16   wasn't charged with tracking them, this was just whatever he
17   tracked off the top of his head, right?
18       **A.**   Yes.  I think he said he had difficulty keeping
19   track of those things and tracked the ones he could.
20       **Q.**   But I believe, if I'm not mistaken, that you too
21   carried that same $42,044.  You accepted that number as being
22   the non-hurricane related with respect to these items, and
23   you too have that same number in your column of numbers.
24   Right?
25       **A.**   After I reviewed them and understood them, yes, I

1    accepted them.

2        Q.   So part of your possess is you see what somebody's

3    claiming, you review it, and if it backs up, if there's

4    supporting documentation for it after you do your forensic

5    analysis, then you accept that as, yeah, that's reasonable

6    based on the back-ups so I'll accept that number, right?

7        A.   Yeah, or we don't.  Until that point it's just a

8    number on a sheet.  So we have to understand, again, what the

9    number means and substantiate it to be able to say yes, we

10   agree with it, or no, we don't agree with it.

11       Q.   So what I want to do next is move to your analysis.

12           MS. WOLFF:  So this document that we're going to

13       look at is defendant's Exhibit D-34 and this is a

14       spreadsheet that was attached to Mr. Stuck's report.

15           MS. BROWN:  I don't have an objection to it.  It's

16       fine.

17   BY MS. WOLF:

18       Q.   All right.  So first, Mr. Stuck, this is -- is this

19   your work-product?

20       A.   Yes, it is.

21       Q.   I'm sorry.  Can you see it?

22       A.   It's a little blurry.

23           THE COURT:  You can zoom in on this thing,

24       Ms. Wolf.

25           MS. WOLF:  I want to see if it would do better if

1      we pull it up.  Is that too cumbersome?  Okay.  We're

2      going to switch to having her computer connect.  Go back

3      to the other one.

4           THE COURT:  I find paper always works better.

5  BY MS. WOLF:

6      Q.   All right.  So this is your work-product, right,

7  Mr. Stuck?

8      A.   Correct.

9      Q.   And did you take the document that we just looked

10  at that you got from Skyline and use that to create this

11  spreadsheet?

12      A.   I did.

13      Q.   And so what I want to do is look at a few things.

14  For example, here it says "Skyline as claimed."  Is this

15  section right here what you got from the May 6 spreadsheet?

16      A.   Not exactly.  Some of those line items at the top

17  were consolidated into Skyline's entire contract via 1.36 and

18  I just broke them out into different trades so that I could

19  analyze them separately.

20      Q.   So you're getting into details now.  I need to do

21  big picture first --

22      A.   I'm sorry.

23      Q.   -- so that I don't get confused.  I just want to

24  make sure this box right here, am I correct in saying that

25  this contains your taking what was in the Skyline May 6

 1    spreadsheet and putting it here?

 2         A.    Yes, it does.

 3         Q.    And then we look next to it, because I'm seeing the

 4    colors, the pinkish orange here.  And the "J.S. Held as

 5    reviewed" is in this section over here, right?

 6         A.    That's correct.

 7         Q.    So what you're saying is that the -- you started

 8    breaking up some of the rows into their trades, right?

 9         A.    For us to properly analyze it, yes.

10         Q.    Let me just stay big picture for a second because

11    what I'm seeing now is a total down here of $2,443,971 and

12    you have at the top of that column "Skyline claim."  You see

13    that?

14         A.    Yes.

15         Q.    That column of numbers, is that the same numbers

16    that you got from the May 6 spreadsheet, so you just totalled

17    them?

18         A.    Yes.

19         Q.    So if Skyline had totalled what's on the May 6

20    spreadsheet it would have come to $2,443,971?

21         A.    Correct.

22         Q.    As of May 2021 that was the claim, $2.4 million?

23         A.    Yes.

24         Q.    And you did your analysis.  We'll talk about that

25    in just a second.  And the number you got, J.S. Held reviewed

1    amount, is in this column and that's the $1,797,091, right?

2        A.    Correct.

3        Q.    And your understanding is that that number is the

4    one that Scottsdale paid from?

5        A.    That's the basis for that final payment, yes.

6        Q.    We've seen here today and probably yesterday that

7    chart that shows that that is, in fact, the amount paid?

8        A.    Correct.

9        Q.    Minus, I think, a $1,000 deductible, right?

10       A.    Could be.  I don't know.  Yes.

11       Q.    Okay.  So if the difference is a thousand

12   dollars -- this is the number you gave to Scottsdale; but if

13   it's different by a thousand dollars, that could be the

14   deductible, right?

15       A.    Yeah, it could be.

16       Q.    So you told us that you started breaking up the

17   Encore $1.36 million contract, and I just want to understand

18   that.  So you saw that contract and it does, in fact, say

19   $1.36 million on Page 1, right?

20       A.    That's correct.

21       Q.    And you took it, though, and you didn't just put in

22   a lump sum of 1.36 million.  You started breaking it up by

23   trades.  So why don't you explain that.  I see general

24   requirements, you know, wood, thermal.  So, in other words,

25   you start taking the construction contract and breaking it up

494

1    into the subcategories?

2        A.   Correct, so we can analyze the values of specific

3    types of work.

4        Q.   And that's a standard type of thing in the

5    industry.  General requirements or general conditions is

6    something that you hear in construction, right?

7        A.   Yes.

8        Q.   And what -- I think what that means, and you can

9    tell us, is everything that's not the labor and materials or

10   supplies, all the other costs of the job --

11       A.   Yeah.

12       Q.   -- called general conditions or general

13   requirements?

14       A.   Yeah, non-production type work.  So it's not people

15   swinging a hammer.  It's a project manager, an office

16   trailer, officer paper or copier, those types of things you

17   need to support a project that aren't actually production

18   related.

19       Q.   And the reason why I'm just spending a little time

20   on this detail is that goes back to that job cost detail

21   report, right?

22       A.   Yes.

23       Q.   That's the report that tells you every single cost

24   to the penny that's associated with the job, right?

25       A.   Yes.

1    **Q.**   So it's cell phones, it's the pro rata, the

2    superintendent and the superintendent's truck, it's

3    insurance, it's every single thing; every penny that it takes

4    to do that job goes in that job cost detail report, right?

5    **A.**   Yes, with one exception.  If they make a profit on

6    the job, usually profit's not a cost.  So you don't see the

7    cost of profit.

8    **Q.**   Right.  So you can just get a contractor's job cost

9    detail report when they're done and add the overhead and

10   profit and you have the cost of the job, right --

11   **A.**   Yes.

12   **Q.**   -- to the owner?

13   That's the cost of the job to the owner, is the

14   contractor's actual cost plus whatever overhead and profit

15   they made?

16   **A.**   Correct.

17   **Q.**   20 percent in the industry, is that -- what's the

18   standard in the industry?

19   **A.**   It depends on the type of work.  Larger projects

20   tend to have lower percentages.  They might be more like a 10

21   percent overhead, 5 percent profit.  Smaller jobs, those

22   numbers will increase a bit.

23   **Q.**   What'd you use when you did your analysis?

24   **A.**   For general conditions, overhead, profit, and tax,

25   I did 30 percent total.

496

1      Q.   And is 30 percent, is that a generous number,
2   straight on industry standard number?  Where do you put that
3   in the range of things?
4      A.   I thought it was fair to generous.
5      Q.   Fair to generous.  Which makes sense if you're in a
6   hurricane hit area because you know that the supply of
7   contractors is going to be pretty tight, right?
8      A.   Yes.
9      Q.   That means their prices are going up just on
10  overhead and profit, right?
11     A.   Yes.
12     Q.   And you took that into account?
13     A.   Yes.  Some of that cost is in their job cost report
14  already.
15     Q.   Right, meaning that all the cost of materials that
16  go up are in the job cost report --
17     A.   Yes.
18     Q.   -- but now we're talking overhead and profit?
19     A.   Yes.
20     Q.   Okay.  There's something on here that caught my
21  eye, before I move off of it, so I don't have to come back,
22  but the cost to repair masonry crack in jail, work pending,
23  cost will be realized, range is 2 to 7,000.  I realize that's
24  not a big number.  And you included that cost, right, because
25  there was a crack there?  So you made the assumption that

1    that was associated with hurricane damage?

2        A.    Right.  Because their claim amount was a range, I

3    included the high end of the amount for their claim, the

4    7,000, but I allowed 5,000 for the repair of the damage.

5        Q.    And did you later -- after you came up with this

6    number of 1.8 million, did you later find out through a

7    document that that crack in the jail was there before

8    Hurricane Laura?

9        A.    Correct.

10       Q.    And you found that out when you looked at that

11   report that we've all looked at before that we've seen in

12   court which is the 2018 inspection report, right?

13       A.    That's correct.

14       Q.    You didn't have this when you did your May 2021

15   analysis, right?

16       A.    I did not.

17       Q.    And I believe Mr. Major testified he didn't have it

18   either, right?

19       A.    Correct.

20       Q.    And he's included it in the claim here on this --

21   in his claim that he gave you on May 6, right?

22       A.    Yes.

23       Q.    But if we look at that report, again, that's the

24   2018 report, and if you look at this item, I believe it's 12,

25   holding cells, the block wall has a large crack, recommend

1    evaluating and repairing, see that?

2        A.    Yes.

3        Q.    So when you got this report, the second time you

4    reviewed this claim and I gave you more documents, this

5    document was in it.  You read through it and caught that and

6    you took it out of your claim, right?

7        A.    Correct.

8        Q.    So that's right part of the process.  It's part of

9    what you're doing.  You gather documents.  You get as much

10   data and information as you can.  You look at what's

11   hurricane related so you can determine the scope.   Right?

12       A.    Correct.

13       Q.    Then you apply the cost?

14       A.    Correct, for hurricane related damage.

15       Q.    That's why there are going to be changes in your

16   number from the May 2021 to the August 2021 analysis that you

17   did.  If I give you more data and you learn something new,

18   you're going to either add or subtract, right?

19       A.    The more information we get, the better analysis we

20   can do.

21       Q.    Is knowing about pre-existing conditions in your

22   business that you do, is that something that you would

23   typically ask for and want to know?

24       A.    Yes.

25       Q.    And why?

1      **A.**   Could be several reasons.  One is if you are --

2   similar to this, you want to know if there's pre-existing

3   damage that wasn't related to the hurricane that you can

4   account for that in your estimate.  But two, for a -- usually

5   for depreciation values, to understand when things were

6   replaced, what maintenance work was done, so you can properly

7   depreciate materials.

8      **Q.**   Okay.  We're going to talk about depreciation a

9   little bit later because your number -- you didn't do an

10  actual cash value, right?

11     **A.**   I did not.

12     **Q.**   And why?  Why not?

13     **A.**   I was just looking at the replacement cost value.

14     **Q.**   And why is that?

15     **A.**   Because that was the cost that was done at the

16  time.

17     **Q.**   Right.  So you don't need to do an estimate.  You

18  don't need to get actual cash value because by the time you

19  came in the work -- as the owner had told you and, in fact,

20  was true, the work was almost done, right?

21     **A.**   Correct.

22     **Q.**   So that's why you did a replacement cost value

23  analysis only?

24     **A.**   Correct.

25     **Q.**   Again, in your world and your industry where you're

1   doing estimates for repairs, do you consider it something

2   that you would do to put in your analysis if there were

3   pre-existing?  Do you make notes of that in your work?

4        A.   Yeah, we try to make notes about everything to make

5   sure everybody can understand what is or isn't included in

6   our estimate.

7        Q.   So do you put something called assumptions?

8        A.   We call it clarifications and assumptions and it's

9   just a listing.  Again, you know, estimates are numbers on a

10  page; but you want to understand what those numbers mean.  If

11  I can give an example?

12       Q.   Yeah.

13       A.   Is that okay?

14       Q.   Sure.

15       A.   If I was estimating the cost of this room and I

16  didn't include the lights, if I didn't put a note, nobody

17  would know that.  So we put a note saying excludes lights.

18       Q.   Right.  So if you see something, if you're told

19  something, if you know something from looking at maintenance

20  records that you've already done that work, this was

21  pre-existing or the owner told me it was, you make the note

22  of it so that the people who get the information know, okay,

23  that's been done already.  I don't have to question that.

24  Right?

25       A.   Right.  It's just to clearly communicate what is

```
 1    and isn't included in the estimate.
 2         Q.    Does that help the claim process along if you put
 3    that kind of detail in your analysis?
 4         A.    Yes.
 5         Q.    And is it standard in the industry to see those
 6    assumptions that are made?
 7         A.    Yes.  If estimates are done properly, it is.
 8         Q.    Okay.  So what I did -- what I'd like to show
 9    you -- because this spreadsheet is a bit cumbersome, I would
10    like to put in just an abbreviated version of it.
11              MS. WOLF:  So since counsel has no objection, I'd
12         like to move to admit Exhibit D-174.
13              THE COURT:  No objection?
14              MS. BROWN:  No objection.
15              THE COURT:  It'll be admitted.
16    BY MS. WOLF:
17         Q.    So what I want to have you do to confirm,
18    Mr. Stuck, is -- we just looked at your spreadsheet, and what
19    this document is is an abbreviated version of it that has the
20    repair work.  And we've seen a similar document like this in
21    court already.  It's the breakdown of the work and on the
22    right-hand side is your analysis that adds up to that
23    $1.8 million, right?
24         A.    Correct.
25         Q.    And you agree that that's a fair and accurate
```

1    representation of the May 13, 2021 spreadsheet that's been

2    admitted as D-34?

3        A.   Correct.

4        Q.   Now we have to, I guess, note a couple of things.

5    So, first of all, this is your May 2021 analysis that you

6    did.  And obviously some of the numbers have been changed

7    this week so they're not going to be exactly up to date or

8    accurate.  I think you were in court and heard that the Crest

9    Roofing is actually $2,000 less now.  Right?

10       A.   I think there was $2,000 for another building that

11   was inadvertently included here.

12       Q.   Right.  So this was prepared before then --

13       A.   Correct.

14       Q.   -- I mean before, I think, at least today or

15   yesterday.  So the numbers haven't changed, but you see that

16   a lot of the numbers are similar to the numbers that --

17   there's no dispute between Eaux Holdings and Scottsdale over

18   the numbers.  You'd accepted the Crest Roofing, right, at 53;

19   but now we know it's 2,000 less, right?

20       A.   Correct.

21       Q.   I believe there was no dispute over the Capstone

22   Environmental, right?  That number was okay?

23       A.   That's correct.

24       Q.   The Jacques Electric, that number was fine, no

25   dispute there?

1        A.    Correct.

2        Q.    The Martin Insulation, the 10,000, that was fine,

3   accepted?

4        A.    Yes.

5        Q.    Industrial Refrigeration, $1280, that one was okay?

6        A.    Correct.

7        Q.    Now, the All Clear, I think we've talked about that

8   enough.  You did an independent assessment, your company did,

9   of the mitigation?

10       A.    We did.  So at the time, in May of 2021, the claim

11  was still the 491,000 All Clear invoice.  Had a lot of

12  detailed backup.  So we did our own analysis of it and came

13  up with a different value.

14       Q.    Okay.  And the value you came up with was $330,639,

15  right?

16       A.    Yeah.  There's a small detail in there of a

17  duplication of the RJW Disposal.

18       Q.    Why don't we go ahead and deal with that now

19  because I know this is a lot of numbers that keep moving.

20  But there was actually $18,600 in there that was duplicated

21  for debris approval, right?

22       A.    Correct.

23       Q.    So when you made your recommendation or

24  determination that $330,639 was okay you didn't realize at

25  the time there was 18,600 already in there for debris

504

1    removal?

2        A.    That's correct.

3        Q.    So when the jury sees your number change the next

4    time, you didn't make a mistake other than the fact that you

5    didn't find or didn't know that there was that duplication,

6    right?

7        A.    That's correct.

8        Q.    So that number's going to go down a little bit.

9    And then at the time -- tell us about Poole Roofing.  It said

10   $130,794 and says estimate.  First of all, why is that an

11   estimate?

12       A.    So at the time we didn't have any of the actual

13   payments made to Poole, the costs.  So we had a Poole

14   estimate for the repair work, and it seemed high to us.  So

15   we did our own independent estimate.  My analysis included my

16   independent estimate of the roofing.

17       Q.    So that's a J.S. Held independent analysis of the

18   roofing and thought it should cost $130,794, right?

19       A.    Correct.

20       Q.    But it didn't.  You saw later that the actual cost

21   was $240,000.  So we'll see in your August you go ahead and

22   change it to the 240,000, right?

23       A.    That's correct.

24       Q.    You want to explain?  You still thought it was

25   exorbitant but -- how do you make that decision of, "Well, I

505

1    came up with 130 but they're telling me the actual cost was

2    240"?

3        A.   Well, I mean, cost is cost whether it's higher or

4    lower than what we thought, right.  So if we have data that

5    shows that's how much they paid for the work and we've seen

6    the work, which I saw the roof out there, then that's what we

7    decided the cost was.

8        Q.   And then we see here the cracked wall, $5,000,

9    which you included because you saw it in the Skyline numbers;

10   but then we're going to see that you took it out in August.

11   And then we got to talk about the Encore building repairs

12   because you didn't put $1.36 million in that column, did you?

13       A.   No, I did not.

14       Q.   And we got to talk about the window.  I think we

15   may have discussed the window, but we probably should do that

16   one first.  So you included windows in your May assessment

17   because you agree.  You determined that yes, the ribbon

18   window system all needs to come out to put the owner back

19   where they were pre-storm, right?

20       A.   Correct.  Just to be clear, that's replacement of

21   the windows, not repair.

22       Q.   Replacement.  But what was actually done -- and

23   again, you saw Encore's records and you heard Encore's

24   deposition.  I want to make sure that nobody thinks they had

25   cracked windows out there.  All of the cracked glass, chipped

1    glass, all of that Encore replaced, right?

2        A.   That's correct.

3        Q.   And you heard them say that they actually fixed the

4    mullions, the center pieces that were scratched and damaged.

5    They did that, right?

6        A.   Correct.

7        Q.   And then they did resealing and reglazing of all

8    the glass, right?

9        A.   Yes.

10       Q.   So that's all been paid for, but the owner was

11   still saying that they might -- he might do the window

12   replacement?

13       A.   Correct.

14       Q.   When you were out there they were still saying, "We

15   might do a window replacement," right?

16       A.   That's correct.

17       Q.   Is that why you included it, because you heard him

18   say, "We're going to do it"?

19       A.   No.   When he said, "We're going to do it," that's

20   when I realized that's potential claim scope.   So I had to

21   analyze and decide if I thought -- if I agreed with that

22   scope or not.   Once I went out there and looked, for the

23   reasons I mentioned earlier, I did decide they should replace

24   them.

25       Q.   Okay.   And you knew that this policy, this

1    insurance policy, was a replacement cost policy, right?

2        A.   I'd been told that, yes.

3        Q.   Which means that the owner gets that full amount,

4    the full depreciation once the work is done.  But if the

5    work's not done, they don't get that last part, right?  They

6    don't get the depreciation?

7        A.   That's my understanding.

8        Q.   They don't get full replacement cost?

9    But here were you thinking, because you're at the end of

10   the work and they say they're going to do it, "I'm just going

11   to include it as a total replacement cost in my numbers"?

12       A.   Correct.

13       Q.   All right.  But you understand that if the owner

14   doesn't do the work they don't get the replacement cost of

15   the windows?

16       A.   Yes.

17       Q.   All right.  Now we have to talk about the Encore

18   building repairs.  That's where you'd shown us on your

19   spreadsheet that you broke out -- where Skyline put

20   1.36 million, Encore contract, you actually started breaking

21   it out into what are the standard components of building

22   contracts, right?

23       A.   Correct, by trade.

24       Q.   By trade.  So rather than me say it and you say

25   yes, why don't you tell the jury.  So what does that mean

1    when you break them up into the different categories?

2        A.   When you take a contract like Encore's 1.36 million

3    that includes everything, again, I'll use this room as an

4    example, it includes the lights, the ceiling, the wall

5    panels, the woodwork, the carpet.  All those pieces are all

6    in that number.  But to really analyze -- you know, for us to

7    analyze the damage later to the carpet versus the wood versus

8    the ceiling we need to break that out and understand what

9    those costs are.  So we used the data we got from them to

10   break that into those different trade pieces so that we can

11   look at it and say, okay, they're saying the carpet is worth

12   X, and we agree or disagree with that, they say the ceiling

13   is worth X, we agree or disagree.  When it's just one big

14   lump sum number you can't -- I won't say you can't do it.

15   It's very, very difficult.  It's not a proper way to do it.

16       Q.   So if you could briefly maybe tell us why -- now,

17   again, I'm going to say 1.36 million; but we both --

18   Scottsdale and the plaintiffs agree that there was the

19   $42,044 worth of change orders that the owner was not

20   counting in their claim so I don't want to confuse anything.

21   I might just say 1.36 million just for expediency; but both

22   sides agree that there was some amount that was deducted out,

23   about 42,000.  Right?

24       A.   That's correct.

25       Q.   So the rest of it, you got a number that's a little

1   over a million or 1.1 million.  So why don't you explain it.
2   Do you recall what you took out, what you didn't agree with?
3        A.   Yeah, there were some other elements when we did
4   our analysis.  For example, they had -- their contract
5   included a $50,000 what they call contingency.  Contingency's
6   just what contingency means.  It's kind of a what-if fund.
7   It's not specific to any scope.  It's also not cost.  You
8   don't -- it's not a cost.  You're not going to go buy a
9   contingency.  So we took that out because it didn't seem like
10  a cost element to us.
11       I had a disagreement on the amount of general conditions
12  and general requirements that they had in relation to the
13  repair work.  So I adjusted that to a number I thought was
14  more relevant.
15       Q.   That's the 30 percent you're talking about, right?
16       A.   Yeah.  I think they were at 46 or 48 percent, and I
17  thought 30 percent was more relevant.
18       Q.   So is that one of the things you do, is look at
19  numbers that are just way out of whack or not reasonable and
20  put them more at a reasonable amount?
21       A.   Yes.
22       Q.   Anything else big that we need to talk about?
23       A.   There was some pre-existing condition work that
24  we'd known before we had that report that we made some
25  adjustments for.

510

1          Q.   All right.  So with all of that, that's how you

2     came up with your $1.8 million number.  And again, that's the

3     number that Scottsdale paid from.  Right?

4          A.   Correct.

5          Q.   So now I want to move to your August assessment.  I

6     just want to make sure that I get this for the jury.  So that

7     number that you came up with in May, that was your

8     determination that that was the sum total of all the costs

9     that it would take to put Eaux Holdings back where they were

10    before the storm and under the insurance policy, right?

11         A.   Correct.

12         Q.   So let's move on to the August review.  Again, the

13    case didn't resolve.  There was still a dispute between the

14    parties.  So you were asked to do it again, right?

15         A.   I was.

16         Q.   But that -- the next time, that's when you got

17    to -- oh.  I'm sorry.  That's when you got to -- we got the

18    Encore documents through subpoena.  We got more Skyline

19    documents that we gave you.  And you attended Encore's

20    deposition.  Right?

21         A.   Correct.

22              MS. WOLF:  So this is what I'd like to offer, file

23         and introduce as Exhibit D-106 and this is Attachment 12

24         to his report.  That would be the August one.

25              MS. BROWN:  No objection.

511

```
 1            THE COURT:  It'll be admitted.
 2   BY MS. WOLF:
 3       Q.    All right.  So this is your work-product, right?
 4       A.    It is.
 5       Q.    This is the analysis that you did in -- I'll zoom
 6   in when we get to a part that you have to look at.  So this
 7   is the analysis that you did in August 2021 timeframe?
 8       A.    Correct.
 9       Q.    And the number here, let's look where the tally is.
10   I see $1,620,108 -- I'm sorry, $1,620,118, right?
11       A.    Can't see what you're doing.
12       Q.    I'll just lower it.  We're going to move to a chart
13   in just a minute.  I just want to make sure we see that's
14   where this came from.  That's the number there, right?
15       A.    That's the bottom number, yes.
16       Q.    And it's the same thing, the Skyline as claimed --
17   Skyline as claimed section and then you have the J.S. Held as
18   reviewed section, right?
19       A.    Yeah.  I can't remember what the total on the
20   Skyline as claimed was at this point.
21       Q.    Let's see.
22       A.    Still the same.
23       Q.    So still 2.4 million.  So we see Skyline's claim
24   value here and we see your assessment over here, right?
25       A.    Correct.
```

1        Q.    So this side is Skyline, this side is yours, right?

2        A.    Yes.

3        Q.    And you put notes in here that reflect what you

4    didn't agree with and why you made the changes, correct?

5        A.    Well, yeah.  We also put notes in there about this

6    is -- at this point we have job cost data so we have real

7    cost data --

8        Q.    Okay.

9        A.    -- so I include notes in there also about what cost

10   items from Encore's job cost report are included in each line

11   item.

12       Q.    So that's what I want to move to.  So we can get

13   away from this tiny spreadsheet.

14       A.    Thank you.

15       Q.    Yes.  I want to get to the same thing that --

16             MS. WOLF:  (Hands document to counsel.)

17             MS. BROWN:  No objection.

18             MS. WOLF:  I'm going to mark this one as D-175.

19             THE COURT:  You're offering it?

20             MS. WOLF:  Offer, file and introduce D -- I'm

21         sorry.

22             THE COURT:  That's fine.  It'll be admitted, I

23         heard her, without objection.

24   BY MS. WOLF:

25       Q.    All right.  Mr. Stuck, you agree that what we have

1    up here that we just introduced as D-175 is -- comes from

2    that D-106 that we just looked at, your August 2021

3    work-product; and again, it's the breakdown of the repair

4    work and what you determined to be the actual cost, right?

5         A.   I do.

6         Q.   And this comes from your analysis and this is your

7    number?

8         A.   That's correct.

9         Q.   And that's where we get the $1.6 million?

10        A.   Correct.

11        Q.   I want to make sure that we address whatever's

12   changed.  So the temporary roofing is still the same.  The

13   Capstone Environmental is still the same.  The electrical's

14   still the same.  The Martin Insulation is still the same.

15   Mechanical work.  Now, that's that All Clear number that

16   dropped; but you've already explained why?

17        A.   Correct.

18        Q.   You found a duplication?

19        A.   Yes.

20        Q.   So you adjusted for it and took out the double

21   charging of debris removal?

22        A.   Right.  It was $18,600.

23        Q.   And Poole Roofing, by this time you got the checks?

24        A.   Correct.

25        Q.   Checks and invoices, those are things that prompt

1    you to think, okay, this is an actual cost?

2        A.    Correct.

3        Q.    We haven't really talked about that; but you see

4    things in construction called proposals, estimates, quotes,

5    budgets.  You see that all the time, right?

6        A.    Yes.

7        Q.    How do those compare to something that says invoice

8    or here's a check?  How do those compare?

9        A.    They only relate to before the work is done.  Once

10   the work is performed, then it's costs.  So we're always

11   looking for checks in this case, actual cost data, to show,

12   okay, they estimated, proposed, whatever they did, but now

13   here's what it cost.

14       Q.    Right.  So somebody might submit an estimate, could

15   be high, right?

16       A.    Or low, yeah.

17       Q.    And somebody could submit a quote; but until it

18   actually becomes an invoice or a check, that's how you know

19   what's actually been paid, right?

20       A.    Correct.

21       Q.    And sometimes you get things that say budget.  What

22   is -- in your world, if somebody says here's a budget for

23   something, "I think it could cost this," do you treat that

24   and say, "Okay, I'll accept that number"?  What do you do

25   with that, when somebody says here's a budget?

1      A.   If the work has been done, I don't accept it
2  because it should be cost.  If the work has not been done,
3  I'll go do my due diligence to try to validate that number.
4  If they've given me quantities and unit prices to validate
5  it, I will.  But if not, I have to go develop those and see
6  if the number's right or wrong.

7      Q.   So this is still back to the concept of a number on
8  a page is just a number on a page.  You need to have backup
9  and supporting documentation to show the reasonable actual
10 cost for this work, right?

11     A.   Correct.

12     Q.   So here what changed -- another number that changed
13 is the Encore building repairs.  So instead of 1.36 million
14 you have $976,136.  So can you explain how you determined
15 that number.  Because it's different from your May analysis,
16 right?  It dropped.

17     A.   That's correct.

18     Q.   So why don't you explain how you got that number of
19 $976,136.

20     A.   So at this time we had the job cost reports that
21 showed the cost they'd spent, that Encore had spent.  So we
22 used that as a cost basis.  I distributed it to the different
23 line items like I talked about and then I added on that
24 30 percent overhead, profit, general conditions cost that
25 wouldn't show up in a cost report.  I added that on top.  And

1  then, similar to before, there are the deducts of

2  non-hurricane damage items that were taken out of the value.

3       MS. WOLF:  So what I have is what we've marked as

4      Exhibit D-155.  That's what he's just referring to.

5       MS. BROWN:  No objection.

6       THE COURT:  It'll be admitted.

7  BY MS. WOLF:

8      Q.  So I think I've talked about this maybe more than

9  people wanted to hear, but this is called a job cost by job

10  and vendor summary.  I refer to it as job cost detail report.

11  What do you call it?

12      A.  I call it detailed job cost report.

13      Q.  Okay.  And this is the thing we told you -- we told

14  about where -- you told about where the contractor tracks

15  every penny that's spent on a job, right?

16      A.  Correct.

17      Q.  And so when we subpoenaed Encore's documents you

18  saw this document which is a standard construction industry

19  document.  And when you saw that you knew that this meant,

20  oh, I see what the job cost, right?

21      A.  Yes.

22      Q.  And then what did you do with this number?  Tell us

23  how you got to your $976,000 number.

24      A.  So I distributed each of those amongst their

25  specific trade, you know, the acoustical specialty -- if you

1 look at the third one, Associated Waterproofing is the
2 company that did the exterior panels that we talked about.  I
3 also looked for the -- tried to understand what-all is
4 included in some of the non-defined items like the paychecks
5 line item.  You see the line item for paychecks for 45,000?
6 I think in Mr. Monheiser's testimony he said that's their
7 payroll system where they pay their employees.  So we
8 understood that those costs were in there as well.

9   Q. Let me stop you for just a minute and point out a
10 couple things.  I see Associated Waterproofing for $299,900.
11 Is that the exterior wall cladding?

12   A. Yes.

13   Q. And so that's that number you talked about earlier
14 when I asked you how did -- you agreed with Skyline's scope
15 that all the wall cladding needed to be replaced, but you did
16 not agree with their price?

17   A. That's correct.

18   Q. Their price was $430,000, right?

19   A. Correct.

20   Q. And the actual cost was $300,000, correct?

21   A. Correct.  So we used this as a basis for our
22 analysis since that's the cost.

23   Q. Right.

24   A. Added the non-cost items onto it like general
25 conditions, overhead, profit, and came up with our value.

1     **Q.**   And this is in June 18, 2021, is when this shows
2  that it was run?
3     **A.**   That's correct.
4     **Q.**   We know that the job was finished sometime around
5  April 2021.  Seems like everybody's testified to that.
6  Right?
7     **A.**   Substantially complete, yes.
8     **Q.**   Substantially complete.  Okay.  In reviewing
9  Encore's documents and sitting through their depo you heard
10 and saw that Encore -- Mr. Monheiser for Encore said the only
11 work remaining was the window system and some second floor
12 tinted finish work, if they were going to do it?  You heard
13 that --
14    **A.**   Yes.
15    **Q.**   -- and saw that?
16       So the window system we've talked about already.  That
17 was something the owner wanted to do even though the windows
18 were repaired.  And more than that, wasn't just broken glass,
19 but the owner had said that he wanted to replace the window
20 system.  Right?
21    **A.**   Correct.
22    **Q.**   And you actually saw the document.  There was a
23 document that we talked about.  The engineer, BECI, who did a
24 proposal, was hired by Encore to handle the windows and the
25 wall cladding, right?

 1        A.    The design of those, yes.

 2        Q.    So it wasn't just a simple thing.  They actually

 3    hired an engineer to go out and study this and do a proposal,

 4    right?

 5        A.    Yes.

 6        Q.    You saw the proposal?

 7            MS. WOLF:  This is D-117.  I don't know if this has

 8        been admitted yet.  I don't think it has.

 9            MS. BROWN:  No objection.

10    BY MS. WOLF:

11        Q.    So I just want to show you this as a reminder.  So

12    that was the -- you remember seeing this, that BECI was

13    hired?  This was actually before Encore could start work

14    because they weren't licensed then yet.  Right?

15        A.    Yes.

16        Q.    So BECI actually provided this proposal to Encore.

17    And we see that under the scope, the proposed services, it

18    included removal and replacement of the exterior cladding,

19    removal and replacement of damaged windows, removal and

20    replacement of the sealant at the windows.  So this is

21    showing us that that proposal at this time wasn't to do the

22    whole window system, it was to fix everything that was

23    broken?

24        A.    That's correct.

25        Q.    All right.  So it's your understanding that all

520

1    that work was done, right?

2        A.   Yes.

3        Q.   I'm going to look at -- well, you came up with that

4    number of $976,000 for the Encore work.  Didn't accept the

5    $1.36 million contract.  Right?

6        A.   Correct.

7        Q.   And the 976,000, that doesn't have that $42,000 in

8    non-hurricane related stuff in it, right?

9        A.   Correct.

10       Q.   So after all of your analysis two times, one in May

11   and one in August of 2021, and getting all those records and

12   looking at everything, you determined that the actual cost of

13   that work and the actual cost to the owner was $976,000,

14   right?

15       A.   Correct.

16       Q.   Because Encore didn't finish all the work in that

17   contract.  They just didn't do it, right?  They didn't do the

18   second floor tenant space?

19       A.   Right.

20       Q.   And the second floor tenant space, just to be

21   clear, if Encore was going to do that, that was not hurricane

22   related.  That's if they got a tenant, a tenant was going to

23   come in and maybe move the kitchen around or move some walls.

24   So that tenant finish-out for a new tenant wouldn't be

25   hurricane related, right?

1        A.    That's correct.

2        Q.    But you knew that Encore had some budget or

3   contingency in its contract to do that work should the owner

4   want to do it, right?

5        A.    Yeah.  I don't think we can tell the value of it,

6   but I think their scope had some of those items in it.

7        Q.    Right.  As a matter of fact, Encore couldn't say

8   the value of it either, right?  You sat in their deposition.

9   When asked they didn't know.

10       A.    That's correct.

11       Q.    They said, "I haven't done my subtractions yet.  I

12  don't know.  And I don't know if the owner's going to do it."

13  Right?

14       A.    Correct.

15       Q.    So that wouldn't be related at all to a Scottsdale

16  claim because that's not hurricane related, right?

17       A.    That's correct.

18       Q.    So now I want to look at -- the Encore contract has

19  already been introduced as exhibit -- plaintiff's Exhibit 28.

20  I know it's plaintiff's 28.  Well, it's also in as

21  Exhibit D-124.  So you saw this Encore contract that's eight

22  pages?

23       A.    I did.

24       Q.    And this is the one where we see -- under

25  Section 3, contract sum, you see the $1,360,000, right?

1    A.   Yes.

2    Q.   And we've seen the payments.  And what I wanted to

3    do is I took just the section we're talking about and

4    excerpted.

5         MS. WOLF:  So this is going to be D -- I'm going to

6         offer, file and introduce 176.

7         THE COURT:  Oh, I'm sorry.  Yes, it'll be admitted.

8    BY MS. WOLF:

9    Q.   And so this is that section, but I got tired of

10   flipping the page to read it so I put it all on one page.

11   Right, Mr. Stuck?

12   A.   Correct.

13   Q.   That comes from the contract.  So it's Section 3,

14   contract sum, and I've highlighted the pertinent parts that I

15   want to ask you about.  Section 3.1, "Owner shall pay

16   contractor for performance of the work subject to additions

17   and deductions," right --

18   A.   Yes.

19   Q.   -- "the sum of $1,360,000," right?

20   A.   Correct.

21   Q.   You say this is not a $1.36 million contract; is

22   that right?

23   A.   I believe the 1.36 is a budget --

24   Q.   It's a budget.

25   A.   -- based on additions and deductions.

1      Q.   So looking at this contract, that's the way it

2   reads.  It's a 1.36 million subject to deductions, if there

3   are any?

4      A.   Yes.

5      Q.   And then we tied that to and heard that Encore said

6   in deposition that "I haven't figured out what the deductions

7   are," right?

8      A.   Correct.

9      Q.   And so then we go to the "Owner shall pay an

10   initial payment of $100,000 within seven days of contract,"

11   right?

12      A.   Yes.

13      Q.   And we've already seen, it's already been admitted

14   as D-142, that the initial payment of $100,000 was made,

15   right?

16      A.   Yes.

17      Q.   And then the next part of the contract says that

18   after the initial payment, okay, then a progress payment is

19   due, $250,000, 30 days after the initial payment.  You see

20   that?

21      A.   I do.

22      Q.   And we already know that that payment was made,

23   right?

24      A.   Yes.

25      Q.   That's already been admitted.  All right.  And then

524

1    the next one -- it only calls for three payments, right --

2        A.   Yes.

3        Q.   -- an initial, a progress, and a final?

4    That's what this contract says, right?

5        A.   Yes.

6        Q.   So the final payment shall be due within 30 days of

7    the last of the following to occur, and I highlighted -- now,

8    all of them have to occur.  Final written approval.  Don't

9    worry about that next part.  That's a lien release

10   requirement.  You have to have lien releases before you can

11   release all your money.  Manufacturer warranties.  But the

12   fourth one says, "Owner has received total payments for

13   depreciation held by the insurance company."  You see that?

14       A.   Yes.

15       Q.   So that means that Eaux Holdings did not owe Encore

16   the final payment until Scottsdale released the depreciation,

17   right?

18       A.   Correct.

19       Q.   That's what it says.  We've already seen -- well,

20   let's look at this.  Scottsdale paid -- this has already been

21   admitted as D-7, I believe.  So this is -- I don't know if

22   you can see that, Mr. Stuck; but I think it's already been

23   established May 18, 2021, Scottsdale issues the check for

24   $1.1 million, right?

25       A.   Yes.

1    Q.   That's on May 18th.  And on June 3rd, 2021, just a

2    short while later, plaintiff pays Encore $550,000, right?

3    A.   Yes, the final payment.

4    Q.   All right.  And then, of course, don't forget, they

5    had that preliminary work, that check that's already been

6    offered from the owner to Encore that's for that $24,000 for

7    work they did before they could start work, right?

8    A.   Yeah, the preconstruction work.

9    Q.   That's all that preliminary work they did with

10   hiring ADG.  I don't know if that's been mentioned before.

11   But all that HVAC remodel work that they wanted to do, they

12   hired an engineer for that, ADG.  All of that work, the BECI

13   work, the plans and specs and proposals for all of that prep

14   work happened before Encore became licensed.  So they were

15   doing all that work then, right?

16   A.   Yeah.  I think some of it continued after they were

17   licensed.

18   Q.   Right.  And I think this is D-162 which has already

19   been admitted.  So this is the plaintiff, Eaux Holdings'

20   payments to Encore with the dates and it totals 924,000 and

21   some.  And I just want to see.  This is a way to check how

22   close you were, right?

23   A.   Yes.

24   Q.   See if you got a good grade in your August

25   assessment.  Let's see how good you did.  So there it is.

1   That's the number you came up with when you got all their job
2   cost detail reports and all the documents that Encore gave us
3   in a subpoena, right?
4        A.   Yes.
5        Q.   That's how close you were, about $50,000.  That's
6   not too bad, huh?
7        A.   Yeah.  I was a little high.
8        Q.   Yeah, you were generous.  So I'm going to shift.
9   We've talked about your analysis twice of all the documents
10  that we got from Encore, from Skyline, from the plaintiff,
11  having to do with the rebuild of Eaux Holdings' property.
12  We've looked at all that.  Now I want to shift a minute to
13  your work that you did in looking at Eaux Holdings' claimed
14  amount, and let me start with -- want to go back before your
15  May 2021 because, remember, May 6 you get from Skyline that
16  number 2.44 million as the claim.
17       A.   Correct.
18       Q.   You said, "What is the claim?"  They gave you that
19  spreadsheet and it added up to 2.44 million, right?
20       A.   Correct.
21       Q.   Before that, probably, I guess, before you were
22  involved, there was a February 2021 requirement for what we
23  call initial discovery responses in this case.
24            MS. WOLF:  And this is -- we've got it on our list
25       as D-160 which is initial -- plaintiff's initial

 1    disclosures.

 2         MS. BROWN:  Judge, I think we have an objection to

 3    this.

 4         MR. COX:  Yeah.  We need to approach.

 5                     **BENCH CONFERENCE**

 6         MS. BROWN:  For the same reason I couldn't put in

 7    documents that the lawyer from Scottsdale submitted, she

 8    shouldn't be allowed to put in things that I submitted.

 9         THE COURT:  This is -- is this, like, an

10    entrepreneurial article or something?

11         MS. WOLF:  It was what they said --

12         MS. BROWN:  The CMO doesn't allow for this to be

13    admitted.

14         THE COURT:  Yeah.

15         MS. BROWN:  This is another pleading.

16         MS. WOLF:  You had asked at the summary judgment

17    hearing to have each of us put down what is the claim,

18    and this is what it was.  Where I'm going with this is

19    that the claim has been different numbers.  It's not

20    what they've shown but different numbers.  It started

21    out --

22         THE COURT:  Here's the thing.  I'm not letting you

23    put pleadings in.  It's not evidence.  This is

24    pleadings.  The answer, yeah.  The petition, yeah.

25    That's the answer of your client and the answer of the

528

| | |
|---|---|
| 1 | petition.  But this stuff with the CMO, that's all for |
| 2 | y'all to go to mediation to settle.  Why don't you just |
| 3 | ask if he's seen different numbers.  You don't need to |
| 4 | put the pleading in. |
| 5 | MS. WOLF:  I mean, I'm thinking. |
| 6 | THE COURT:  This is an exhibit, I guess you're |
| 7 | telling me, to a summary judgment motion filed? |
| 8 | MS. WOLF:  No, no, no.  It was -- we were trying to |
| 9 | get to what the claim was -- |
| 10 | MS. BROWN:  You asked for summary evidence from us. |
| 11 | MS. WOLF:  -- and so they're going to be able to |
| 12 | present to the jury that the claim has been consistent. |
| 13 | THE COURT:  I don't remember asking for this. |
| 14 | MS. WOLF:  You did.  It was one that we filed.  And |
| 15 | you actually said to us, "I don't understand why both |
| 16 | sides can't just put down what your claim is and tell me |
| 17 | how far off you are."  So we both put our claim number |
| 18 | down. |
| 19 | MS. BROWN:  This wasn't submitted as part of the |
| 20 | claim.  This was submitted to the Court -- |
| 21 | THE COURT:  To me because I was trying to -- |
| 22 | MS. BROWN:  -- for part of a summary judgment. |
| 23 | THE COURT:  Yeah, you're going to need a different |
| 24 | format for that.  That's for my purposes. |
| 25 | How much longer you got?  Because we got about 20 |

1      minutes before 5:00.  Trying to gauge here what I'm
2      going to do.
3            MS. WOLF:  Could be finished in 20 minutes.
4            THE COURT:  How much cross you got of this guy?
5      We're not going to keep them past 5:00.
6            MS. BROWN:  If she's going to 5:00, doesn't matter;
7      but not much.
8            THE COURT:  Some of these are people driving two
9      and a half hours.
10            MS. BROWN:  I have just a handful of questions.
11            THE COURT:  I'm going to call it after this.
12            MS. WOLF:  I don't know how much longer.
13            THE COURT:  You try to finish and I'll see where we
14      are.
15                    **PROCEEDINGS CONTINUED**
16            THE COURT:  I'm trying to gauge the timing here for
17      y'all.
18  BY MS. WOLF:
19      Q.   All right.  So what I wanted to ask you about,
20  Mr. Stuck, is we saw in court that -- you saw.  You've been
21  here.  So you've seen that plaintiff's claim is something
22  just a little bit higher than $2 million, right?
23      A.   Correct.
24      Q.   And you would agree that back in May of '21, when
25  Skyline provided you with their claim data, that added up to

1    $2.44 million, right?

2        A.    Correct.

3        Q.    So what you've seen in court this week is about

4    $400,000 less than what they provided to you in May of 2021,

5    right?

6        A.    Yes.

7        Q.    Let's talk about the Skyline estimate itself.  You

8    reviewed it, and I think we've already talked about one of

9    the things I asked you to do was review it to determine if

10   there was any scope or cost in there that were unreasonable.

11   You've already talked about the exterior cladding.  We've

12   talked about the comparison of the actual cost versus what

13   was in the Skyline estimate.  Right?

14       A.    Correct.  The term we used before was inflated.

15       Q.    Right.  So do you have any other examples from your

16   analysis -- because you did review the Xactimate estimate

17   that Skyline did, right?

18       A.    Yes.

19       Q.    And can you give any other example -- you found

20   that it was inflated; is that right?

21       A.    Portions of it.

22       Q.    Does that mean that if -- when Skyline gave that

23   estimate to Scottsdale, the insurance company, did you see

24   that there was a reasonable basis for the insurance company

25   to dispute that estimate?

1      A.    Yes.

2      Q.    And can you give the jury some other examples of

3  things that you saw in that estimate.  We've -- it's already

4  been mentioned, the $261,000 contingency.  You've already

5  mentioned what a contingency is.  It's something that you

6  would include in a claim.

7      A.    Correct.

8      Q.    And you've mentioned the 5 or $7,000, I can't

9  remember how much it was, for the crack in the jail, right?

10      A.    Correct.

11      Q.    And mentioned the wall cladding?

12      A.    Correct.

13      Q.    Can you give any other examples of things that you

14  found in that Skyline estimate that would indicate that it

15  wasn't reasonable?

16      A.    Another one that stuck out was the electrical scope

17  of repairs.  The Skyline estimate had individual outlets and

18  switches but then had these very large lump sum numbers that

19  were just done on a square footage basis.  He just said, hey,

20  there's 15,000 square feet in the building and it'll be X

21  dollars a square foot.  So he had over, I think, 300,

22  $330,000 in electrical work that in the Encore cost the

23  electrical work ended up costing about 110,000, I believe the

24  number was.  I don't remember the exact numbers, but roughly

25  three times what it ended up costing.

532

 1      Now, just to be clear, we don't expect estimates to be
 2 perfect.  You're not going to nail it, but it should be
 3 within reason.
 4      Q.   So the Skyline estimate had over $300,000 worth of
 5 electrical work, but the electrical work actually got done
 6 for the hundred thousand dollar range?
 7      A.   Yeah, I think just over a hundred thousand dollars.
 8      Q.   So just to show that, because I do want to show
 9 that you tied this stuff to --
10           MS. WOLF:  I'm sorry.  This is D-155.
11 BY MS. WOLF:
12      Q.   I see on here Jacques Bourgeois Electric for
13 89,000, right?
14      A.   Correct.
15      Q.   Is that the electrical scope?
16      A.   There was that but then, if you remember, there was
17 one -- it was electrical work that was done outside of the
18 Encore contract.  So I believe I added that to get to the
19 roughly hundred thousand.
20      Q.   I understand.  I just wanted to be able to show the
21 jury where you're getting some of these numbers from.  So
22 when you looked at the Skyline estimate, could you tell from
23 looking at it clearly whether pre-Hurricane Laura damage was
24 or was not included in there?  Was that something that you
25 could pick up that estimate and say, "Okay.  I'm going to

1 review this estimate and, yes or no, it looks like

2 pre-existing stuff has been removed"?

3   A. That was not clear.

4   Q. And I think you've already testified that you

5 believe it's standard for that kind of information to be

6 included in an estimate --

7   A. Correct.

8   Q. -- for just this reason, so that there's -- it

9 moves the process along and you can tell that things are

10 being done kind of in a meticulous fashion so you can make

11 sure the claim is right and it can get paid promptly, right?

12   A. That's correct.

13   Q. And I believe I asked this, but let me just make

14 sure.  After reviewing the Skyline estimate did you form an

15 opinion as to whether that Skyline estimate provided

16 Scottsdale with sufficient information to determine the claim

17 value?

18   A. I decided it did not.

19   Q. There would not be enough information in there to

20 know what the claim was?

21   A. Correct.  It's not -- the scope's not defined.

22 There's just not enough detail to really know.

23   Q. And as you said, it's inflated, right?

24   A. Yes.

25   Q. Let's talk about -- go back to this idea that the

1    Skyline estimate did not include an actual cash value, which

2    was something that the insurance company needed in order

3    to -- because that's what the policy was going to pay at the

4    time.  You understood that, right?

5        A.   Yes.

6        Q.   And you do this kind of work.  So when you go in in

7    a hurricane or any kind of catastrophe and you're providing a

8    number to an insurance company and it's a replacement cost

9    policy, which means it pays actual cash value first, do you

10   provide the actual cash value?

11       A.   We ask that question of our clients, if they need

12   that actual cash value based on the policy.  If they say yes,

13   then we calculate it.  If they don't for some reason, if it's

14   not required by the policy, then we don't.  But we ask the

15   question to know.  In this case, if we asked the question,

16   they would have said yes.

17       Q.   Right.  And so if it's required that means they

18   need that information in order to determine what the value of

19   that claim is so they can pay it at that time, right?

20       A.   Correct.

21       Q.   And that's standard in the industry, if it's -- if

22   it's that kind of policy and you need the actual cash value

23   to pay, it's standard in the industry to provide it, right?

24       A.   Yes.

25       Q.   You have heard in trial this week this idea of

1    "We'll just take the 22 percent," if that's what the number
2    was that Grecco -- in other words, 22 percent depreciation.
3    So you've got your replacement cost value which is going to
4    get you the higher number if you do the work, actual cash
5    value, meaning they've taken depreciation.  I believe it was
6    said and assuming it's true that Grecco had a 22 percent
7    depreciation number.  Can you just take that and apply it to
8    the Skyline estimate?
9        A.   No.
10       Q.   And can you explain that.  Why not?
11       A.   Well, depreciation -- I'm going to call it
12   depreciation.  That's easier than actual cash value.  It's
13   depreciation.  There's two -- really two things that provide
14   depreciation information.  One is the age of something.  So
15   if you have a 2010 car, that's going to be depreciated more
16   than a 2019 car.  Just time, right.  But then it's what it
17   is.  Again, I'll use the courtroom as example.  Carpet is
18   going to wear out quicker than lights.  So you're going to
19   replace this carpet in maybe ten years but the lights in 30
20   years because they last longer.  So you need to know what
21   they call the useful life of something is.  So my point is
22   you have to go through each individual element because things
23   are depreciated differently.  So you have to look at carpet
24   and paint and woodwork and ceiling tile and light fixtures
25   and all those different things.  So whatever number that

1  results in, 22 whatever, is a build-up of all those

2  individual pieces.

3      Q.   So it's just an average.  It's just a conglomerate

4  number, and you can't do it that way?

5      A.   Right.  We only get to that number once you've done

6  all the individual pieces.

7      Q.   So why don't we go back, then, and see if we can

8  just explain.  If Skyline had done the actual cash value,

9  Xactimate has that ability, correct?

10     A.   Correct.

11     Q.   And so can you explain maybe just briefly the

12  process.  Is it room by room and then component by component?

13     A.   It's component by component based on the age of

14  that component.  For example, if they'd put new flooring in

15  two years ago on the first floor but ten years ago on the

16  second floor, you have to do those separately.  They have a

17  different age so they're going to depreciate differently.

18  Material by material, I'll call it.  That's probably easier.

19  You have to do it material by material.  You have to know how

20  old it is and you have to have some basis for its useful

21  life, how long it can last.

22     Q.   So that's some work that has to get done because

23  it's room by room, right?

24     A.   Yes.

25     Q.   And then in a room it's every single thing that's

1    attached to that room; and so you have to find out how old it

2    is, right?

3         A.   Correct.  The items that are damaged by the

4    hurricane that are in the estimate, yes.

5         Q.   So if it's ceiling, if it's electrical, whatever it

6    is, you have to know how old was it and then what was the

7    useful life and all of that gets input into Xactimate; then

8    once that's done, it gives you the actual cash value?

9         A.   Correct.

10        Q.   And that could -- Skyline can do that, right?  They

11   could have done it?

12        A.   I'm sure they can.

13        Q.   Did you reach an opinion that -- about the Skyline

14   estimate, the fact that it didn't have actual cash value, and

15   I believe you said this earlier when we started off, did you

16   reach an opinion about whether or not that Skyline estimate

17   complied with industry standards when it didn't involve or

18   calculate an actual cash value?

19        A.   I did.  My opinion was I was surprised that it

20   didn't have the depreciation, ACV value in it.  Normally we

21   would see ACV values in those estimates.

22        Q.   Is it your opinion that that Skyline estimate

23   failed to meet industry standards?

24        A.   Yes.

25        Q.   Because it lacked the actual cash value?

1      A.    Yes.

2      Q.    Typically at the end of -- when construction's

3   complete you'll see some documents.  I know you looked for

4   documents like that in the Encore records, right --

5      A.    Yes.

6      Q.    -- substantial completion?

7         One of the documents that was noted was an inspection

8   report by the fire marshal.  This is something we got through

9   a Freedom of Information Act request, just something we

10  routinely do for stuff like this to get documents.  You've

11  seen that fire marshal inspection report from the records.

12  It's called a fire marshal -- I can actually show it to you

13  if you want.

14            MS. WOLF:  This is going to be D-96.

15            MS. BROWN:  No objection.

16  BY MS. WOLF:

17     Q.    I know it's going to be hard to read.  The writing

18  on it's pretty light.

19            THE COURT:  You offering that?

20            MS. WOLF:  Yes.

21            THE COURT:  You said no objection?

22            MS. BROWN:  No objection.

23            THE COURT:  Okay.  It's admitted.

24  BY MS. WOLF:

25     Q.    What we see up here is "Lake Charles Inspection

1    Report."  This is for 620 Esplanade in Lake Charles, right?

2         A.   Yes.

3         Q.   And this is documents that you'll typically see

4    when you get construction records, any kind of close-out or

5    inspection records, right?

6         A.   Yeah.  Usually the fire department's the final one

7    because they want to make sure life safety systems are in

8    place.

9         Q.   If you can read that very light writing, that's

10   May 24, 2021, right?

11        A.   Correct.

12        Q.   And that's very close to what almost, I think, all

13   the testimony lines up.  You were there in April.  It was

14   reaching substantial completion.  So would it be fair to say

15   that on or about May 24, 2021 the work was completed --

16        A.   Yes.

17        Q.   -- based on this certificate and all the other

18   stuff that you've heard from Encore and from the owner and

19   from Skyline?

20        A.   Yes.

21        Q.   So I want to just summarize some of this

22   information.  So you've already said that -- have you told us

23   the date that you actually provided your claim analysis, your

24   May claim analysis to Scottsdale?

25        A.   I did.  It was May 13th of 2021.

540

1      **Q.**   So Mr. Stuck provided his claim analysis to

2   Scottsdale on May 13, 2021?

3      **A.**   Correct.

4      **Q.**   All right.  And then we've seen -- you've seen that

5   check, the last check that came from Scottsdale to Eaux

6   Holdings that was on May 18.  Do you remember that?

7      **A.**   Yes.

8      **Q.**   So Scottsdale paid Eaux Holdings on -- that was on

9   May 18, 2021, right?

10     **A.**   Yes.

11     **Q.**   And then we just saw from that document, the fire

12   marshal inspection, that the work reached completion on or

13   about that was May 24th, 2021?

14     **A.**   Yes.

15     **Q.**   All right.

16     **A.**   You have to pull your sheet up.

17     **Q.**   Okay.  Thank you.  So those dates are correct?

18     **A.**   Yes.

19          MS. WOLF:  Like to move to admit this as

20     Exhibit D-177.

21          THE COURT:  Any objection?

22          MS. BROWN:  No objection.

23          THE COURT:  Be admitted.

24   BY MS. WOLF:

25     **Q.**   So I want to just summarize some of the things that

1    you've told us.  You determined a claim value -- this was the

2    second time, in August of 2021.  You determined a claim value

3    of $1.6 million, right?

4        A.   That's correct.

5        Q.   And Scottsdale to date has paid almost

6    $1.8 million, right?

7        A.   Correct.

8        Q.   So it is your opinion that Scottsdale has paid more

9    than the claim value at this point, right?

10       A.   That's correct.

11       Q.   And given that depreciation is not due until the

12   work is complete and Scottsdale's payment came on May 18th

13   before the work was complete, you would agree that Scottsdale

14   actually paid before it was fully due under the policy,

15   right?

16       A.   Yes.

17            MS. WOLF:  I am going to tender the witness.

18            THE COURT:  Ladies and gentlemen, we're going to

19       stop for today.  I want you to hang tight two seconds.

20       I want to see Mr. Wolff and Mr. Cox very quickly because

21       I'm trying to get us a timeline.

22                 (Off the record discussion.)

23            THE COURT:  Getting the game plan, road map.

24       Originally -- good news.  Originally I told you this

25       trial would take probably into Friday.  Remember?  I

1    have good news.  We're going to finish this trial

2    tomorrow.  So you'll get this case tomorrow for your

3    deliberations.  I wanted to let you know that so you can

4    make plans.  If you're in a hotel, you might want to

5    check out tomorrow when you leave.  So that's what I was

6    trying to get from them because I want y'all to have a

7    road map.  You know, it's high school basketball season.

8    I don't know if any of your schools are in the top 20.

9    Go to some ball games or something.  I wanted you to be

10   aware.  So that will be the plan.  9:00 o'clock.  I

11   think we will wrap this thing up, get it to you sometime

12   during -- I'm maybe anticipating by mid morning, right

13   around lunchtime you'll probably get the case for your

14   deliberations.  I'm not rushing you, not rushing the

15   lawyers; but I just wanted you to be able to make the

16   necessary arrangements and kind of know.  You deserve

17   that.  Okay.  So we'll be adjourned till 9:00 in the

18   morning.

19                    (Jury exits courtroom.)

20               (Proceedings recessed for the day.)

21

22

23                    *  *  *  *  *  *  *

24

25

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1                           **CERTIFICATE**

2

3        I hereby certify this 16th day of May, 2022 that the

4    foregoing is, to the best of my ability and understanding, a

5    true and correct transcript of the proceedings in the

6    above-entitled matter.

7

8                                    *Deidre D. Juranka*
                                    Deidre D. Juranka, CRR
9                                   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana