IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

EAUX HOLDINGS, LLC         *   Docket No. 2:20-cv-1582
                             *
                             *
VERSUS                    *   March 10, 2022
                             *
                             *
SCOTTSDALE INSURANCE CO.   *   Lafayette, Louisiana

*****************************************************************

OFFICIAL TRANSCRIPT OF JURY TRIAL DAY 4 OF 4
BEFORE THE HONORABLE JAMES D. CAIN, JR.,
UNITED STATES DISTRICT JUDGE

*****************************************************************

**A P P E A R A N C E S**

FOR THE PLAINTIFF:    SOMER GEORGE BROWN
                       MICHAEL K. COX
                       Cox, Cox, Filo, Camel & Wilson
                       723 Broad Street
                       Lake Charles, Louisiana 70601

FOR THE DEFENDANT:    JOHN POWERS WOLFF, II
                       MARY ANNE WOLF
                       CHELSEA ACOSTA PAYNE
                       FABIAN EDWARDS
                       Keogh, Cox & Wilson
                       P.O. Box 1151
                       Baton Rouge, LA 70821

REPORTED BY:          DEIDRE D. JURANKA, CRR
                       USDC - Western District of LA
                       P.O. Box 13271
                       Lake Charles, LA 70612

**I N D E X**

PAGE

COURT PROCEEDINGS................................ 546

GRANGER ALLEN STUCK

    CROSS-EXAMINATION BY MS. BROWN.............. 569

    REDIRECT EXAMINATION BY MS. WOLF............ 585

STEPHEN DUPLANTIS

    DIRECT EXAMINATION BY MS. PAYNE............. 594

    CROSS-EXAMINATION BY MR. COX................ 602

    REDIRECT EXAMINATION BY MS. PAYNE........... 606

EVAN MONHEISER

    DIRECT EXAMINATION BY MR. COX............... 616

    CROSS-EXAMINATION BY MS. WOLF............... 619

    REDIRECT EXAMINATION BY MR. COX............. 658

JEFFREY MAJOR

    DIRECT EXAMINATION BY MS. BROWN............. 662

    CROSS-EXAMINATION BY MS. WOLF............... 669

CLOSING ARGUMENTS

    BY MS. BROWN................................ 679

    BY MR. WOLFF................................ 702

    BY MS. BROWN................................ 721

JURY INSTRUCTIONS............................... 725

**COURT PROCEEDINGS**

1

2     THE COURT:  Okay.  Before I bring the jury in,

3     let's do a little housekeeping.  I'm going to be

4     shocked, but does anyone have any objections to my jury

5     charges?

6         MR. WYGANT:  Yes, Your Honor.

7         THE COURT:  Okay.  I'll let you go first.

8         MR. WYGANT:  Your Honor --

9         THE COURT:  Y'all know I'm just kidding y'all.  If

10    we can't laugh sometimes at all this, then what's the

11    point.  Go ahead.

12        MR. WYGANT:  Thank you, Your Honor.

13        THE COURT:  Identify yourself, though, for the

14    record.

15        MR. WYGANT:  Roy Wygant for the plaintiff.

16        THE COURT:  Thank you.

17        MR. WYGANT:  Starting at Page 8.

18        THE COURT:  Hold on one second.  Is this going to

19    be a problem since your computer's not up, Toni?  I

20    guess you don't need to.  We're just hearing objections.

21    You got it.  Making notes.  Okay.  Go ahead.  I'm sorry.

22    I'm not saying I'm going to make any.  I'm not making

23    any changes, so.

24        MR. WYGANT:  So on Page 8, the third paragraph

25    down, the instruction that starts with the quote

```
 1          "Satisfactory proof of loss," plaintiff is objecting.
 2              THE COURT:  Mine don't have the right page numbers.
 3      I can't see very good so they print me out one with
 4      super big type and then my page numbers are off.  I got
 5      to get with you.  Page 8 where you're at?
 6              MR. WYGANT:  Yes, Your Honor.  It's just a single
 7      sentence that reads, "Satisfactory proof of loss is that
 8      which is sufficient to fully apprise the insurer of the
 9      insurance claim including the extent of the damages
10      sought."  And for the record, our objection is to the
11      language that says "including the extent of the damages
12      sought" because under Louisiana Bag, quote, an insurer
13      cannot stonewall an insured simply because the insured
14      is unable to prove the exact extent of his damages.
15      Where the exact extent of damages is unclear, an insurer
16      must tender the reasonable amount which is due.  That is
17      our objection to that.
18              THE COURT:  Okay.  Your objection's noted but it's
19      overruled.
20              MR. WYGANT:  Thank you, Your Honor.  So on Page 9
21      there's an instruction that starts with "Eaux Holdings"
22      and it has three numbered little paragraphs underneath.
23      The last one reads, "The insurer acted in a manner that
24      was arbitrary and capricious."  And we're objecting
25      because it should read, "arbitrary, capricious, or
```

1     without probable cause," to track the language of the

2     statute.

3          THE COURT:  I might not disagree with you on that

4     one.

5          MR. WOLFF:  I'm sorry.  Where?

6          THE COURT:  On Page 9 where I have one, two, and

7     three, Mr. Wolff, that last one says, "the insurer acted

8     in a manner that was arbitrary and capricious," they say

9     it should also have "and without probable cause" because

10    that's what the statute says.

11         MR. WYGANT:  I believe it reads "arbitrary,

12    capricious, or without probable cause."

13         THE COURT:  I'll agree with you.  Y'all make -- you

14    need this back?  Their computer's down.  Here, Mary,

15    take yours back.  You got one?  All right.  What's next?

16    We'll make that change.

17         MR. WYGANT:  Thank you, Your Honor.  So, again,

18    this is still my Page 9 but it's two paragraphs down

19    from that one and starts, "The insured has the burden of

20    proving," and it's the last sentence that reads, "An

21    insured does not act arbitrarily or capriciously when

22    its refusal to pay a claim is based on a genuine dispute

23    over coverage or the amount of loss."  And we're

24    objecting under *French v. Allstate* and *Grilletta*, and

25    both of those are Fifth Circuit cases, and also

549

1    *Louisiana Bag.*  An insured can still be assessed

2    penalties on amounts that were disputed in good faith.

3    That's our objection.

4      THE COURT:  I think this is an accurate statement

5    of the law, though.

6      MR. WYGANT:  Thank you, Your Honor.

7      THE COURT:  Thank you.  Your objections are noted.

8      MR. WOLFF:  Can we do the verdict form after this,

9    Your Honor?

10      THE COURT:  What's that?

11      MR. WOLFF:  We're going to talk about the verdict

12    form after this?

13      THE COURT:  Did you have any objections to my

14    verdict form?

15      MR. WYGANT:  No, Your Honor.

16      THE COURT:  I'll hear the defendant's objections

17    now.

18      MR. WOLFF:  You want to start with the jury

19    charges?

20      THE COURT:  Yeah, let's start with jury charges.

21      MR. WOLFF:  Thank you.  Just for the record -- and

22    we've had off the record discussions and I want to

23    formalize the objections.  On Page 8, I've realized that

24    you've taken from the statute where it says "An insurer

25    shall make a written offer to settle."

1          THE COURT:  Straight from the statute.

2          MR. WOLFF:  Right.  But the portion of the statute

3     under 1892 is all encompassed within your second

4     paragraph.  We believe the addition of the other

5     paragraph will confuse the issue and will prejudice our

6     position because it unduly emphasizes the --

7          THE COURT:  What's the other paragraph you're

8     talking about?  Because most of that -- that statute is

9     quite long and some of that's not applicable to this

10    case and it refers to different types of policies.  I

11    took out all that that was not specifically directed at

12    this fact here in the policy at issue.

13         MR. WOLFF:  And I understand, Your Honor; but if

14    you -- when looking at the second paragraph it says,

15    "Failure to make such payment within 30 days after

16    satisfactory written proof and demand thereof or," and

17    then you can just read the first paragraph again and

18    that's what happens, "failure to make a written offer to

19    settle any property damage claim within 30 days of

20    satisfactory proof of loss."  And so it's repeating the

21    same thing.

22         THE COURT:  You know what, you know me, Mr. Wolff.

23    I'm a textualist and a constitutionalist.  The

24    Legislature wrote it this way.  I didn't write it.  I'm

25    pulling it right out of the Legislature's statute.  Take

1    it up with them at the next session.  Tell them to fix

2    it.  I think they need to fix all these, personally.  I

3    think they are kind of worded -- a lot of verbiage.

4           MR. WOLFF:  I understand.  I'm just --

5           THE COURT:  No, you have every right.  You're doing

6    the right thing.  Make your objections for the record.

7           MR. WOLFF:  Then on Page 8, satisfactory proof of

8    loss, the entire paragraphs that were inserted in

9    plaintiff's jury charge -- proposed Jury Charge No. 1

10   where it begins with satisfactory proof of loss is a

11   flexible requirement; and that would extend throughout

12   Page 8.  And our objection here is that it's going to

13   create confusion because what it is from the plaintiff's

14   charge is a collection of instances where bad faith

15   could be seen in any number of cases that they've just

16   thrown together and put in, essentially, a proof of loss

17   salad here where it could be but -- you know, we believe

18   it could confuse the jury.  And you really need, in our

19   view, to limit it to the facts of the case at hand.  And

20   here, this is the *Maloney Cinque* case.  I don't think

21   anyone disagrees with that.  We specifically note that

22   the "Se-via" or *Sevier* case that they cite isn't

23   applicable.  The same with the *J.R.A. Essex* case that

24   was --

25          THE COURT:  I don't think it's really an issue

1    about the facts of those cases.  What we're pulling out

2    of those cases is the law, and I find that the law in

3    those cases as cited here are applicable to the facts of

4    this case.  I stand by the charge.  I mean, it is a

5    flexible requirement.  The caselaw's very clear on that

6    so that's why that's in there.  And I think to not be

7    more explicit with the jury on what satisfactory proof

8    of loss means is going to just invoke questions from the

9    jury and more confusion.  So I think the charge,

10   actually, is less confusing.

11        MR. WOLFF:  And I appreciate that.  If I could

12   just --

13        THE COURT:  Go ahead.

14        MR. WOLFF:  -- for the rest of our -- they also

15   cited *Aghighi*.  That's a residential case.  This is

16   clearly not what we're dealing with here.  We've got a

17   complex commercial claim dealing with specialty

18   construction.  And the *Norcold* case, that's really for

19   vehicles, satisfactory proof of loss.

20        And with respect to the building at issue, the

21   testimony is that the estimates that were submitted were

22   not, were not the actual, true costs.  I mean, even

23   Skyline is going to admit that those weren't the true

24   costs.  All of the specifications, detailed information

25   about the building that it needed -- that we needed to

1    evaluate the claim needed to be in there and it's not.

2    So I don't think they've met the statutory burden to --

3    in these facts to get where they want to go.  So I've

4    noted my objection.  I appreciate your response.

5            THE COURT:  Okay.

6            MR. WOLFF:  Oh.  So I have requested --

7            THE COURT:  So that's your objections on the -- as

8    to what's in the jury charges.

9            MR. WOLFF:  Thank you, sir.

10           THE COURT:  Now, what's next?

11           MR. WOLFF:  What's not --

12           THE COURT:  What I didn't put in?

13           MR. WOLFF:  What you didn't put in.

14           THE COURT:  Go ahead.  I know where you're going

15   with this, but go ahead.

16           MR. WOLFF:  I do need to get this on the record.

17           THE COURT:  Absolutely.  That's why we're here.

18   You got to put it on the record.

19           MR. WOLFF:  So we had requested the charge on

20   material misrepresentation or concealment, and that's in

21   the policy.  It's a condition of the policy.  And it

22   says if an insured misrepresents any aspect of the claim

23   or fails to disclose information that is material to the

24   claim, then they're not entitled to additional coverage.

25   And I appreciate you said you don't see any evidence of

1    that, but I'll respectfully suggest that the only way

2    you can get there is by making a credibility

3    determination and taking inferences from the witness and

4    giving a favorable inference to the plaintiff and

5    essentially pulling that away from the jury and

6    directing the verdict on that issue.

7         Now, why do I say that?  We have established a

8    number of credibility issues that you conceded, and the

9    question is are they material or not.  I really would

10    like to take this in two phases, what'd the insured say

11    and then what did the public adjuster say.

12         THE COURT:  Here's what I want you to do.  You're

13    making an argument almost on a motion.  What I want you

14    to do is make a specific objection to the jury charges

15    or what I did not include.

16         MR. WOLFF:  I am.

17         THE COURT:  I know, but you're going on and on

18    about credibility.  What's your objection?  What did I

19    not include?  Let's get that on the record.

20         MR. WOLFF:  You did not include a jury charge on

21    material misrepresentation.

22         THE COURT:  Correct.  I did not.

23         MR. WOLFF:  Right.  So I'm outlining why --

24         THE COURT:  Okay.  Go ahead.

25         MR. WOLFF:  It's not going to be long.  All right.

1    So we have presented evidence that Mr. Odom did not

2    disclose information that related to the pre-existing

3    condition of the building when required to do so, that

4    that was concealed.  We also maintain that he testified

5    that he was motivated by insurance monies and was

6    working to get insurance to make his building better.

7    He did not disclose that they had engineering when --

8    engineering reports and recommendations regarding the

9    wall cladding when that is clearly material, as is the

10   issue of whether there was full disclosure on the extent

11   of the buildings because -- and they've made this an

12   issue why it's material.  They're saying we're late in

13   payments and because we're late -- we're late in

14   payments because of that delay.  So it becomes material

15   and they put it at issue.

16        We have other misrepresentations.  Those aren't --

17        THE COURT:  You don't need to get into those.

18   You've made your objection that you want material -- you

19   don't need to recite to me the testimony and all the

20   facts.  I sat here and listened to the whole case.

21        MR. WOLFF:  All right.  So my objection is noted,

22   then.

23        THE COURT:  Let me just respond to you why I didn't

24   include it.  The stuff that you're claiming they

25   withheld are the material misrepresentation or

1   concealment.  The problem I have with it, none of that

2   was requested by Scottsdale Insurance during the period

3   of time of this claim.  From the date of the hurricane

4   through every payment they never once requested, "Give

5   us a pre-inspection report if you have one.  Give us an

6   engineering report if you have one."  All of this you're

7   talking about came after litigation was instigated by

8   your firm on behalf of Scottsdale.  This is all

9   litigation driven.

10       So all of the payments that Scottsdale made and the

11   time they made them had nothing to do with this because

12   they didn't ask for it.  They never opened a fraud

13   investigation.  They never once -- not when person from

14   Scottsdale said anybody has misrepresented anything

15   except the lawyers.  And so I don't think there's been

16   one piece of evidence that he misrepresented anything

17   that materially affected your payments, when you made

18   them, in the time that you made them.  All of what

19   you're talking about occurred after litigation started

20   and during your discovery and you vetting out all the

21   discovery, but you don't have any witnesses.  You don't

22   have any substantive evidence of fraud,

23   misrepresentation, or concealment.  All I have is,

24   "Well, he didn't turn it over in discovery in time."

25   Not part of the case.

```
1              MR. WOLFF:  May I offer a very brief response, Your
2    Honor?
3              THE COURT:  Yeah.
4              MR. WOLFF:  So we're not claiming fraud.  I want
5    that to be clear.  I will submit that yes, we did ask
6    for conditions of the building.  What form we didn't --
7              THE COURT:  You already made the payments,
8    Mr. Wolff.  By the time you asked for that payments had
9    been made.
10             MR. WOLFF:  We'd been asking about that all along
11   and continued to --
12             THE COURT:  Not Scottsdale.
13             MR. WOLFF:  Yes, Your Honor, Mr. Lock had.
14             THE COURT:  You had a witness from Scottsdale up
15   here.  I never heard y'all say, "Did you ask for a
16   pre-inspection report?"  Your expert said he wanted it.
17   But no one from Scottsdale during the claims handling
18   process, from the date of the hurricane until May or
19   whenever lawsuit was filed, no one, there's been no
20   evidence that any of that information was requested of
21   him as he was repairing his building and y'all were
22   making payments to him.  No one has testified to that,
23   and I haven't seen one document or e-mail to that
24   effect.
25             MR. WOLFF:  I respectfully disagree.  I'll let the
```

1      record establish we were looking for the information in
2      whatever form.  So we understand where we are.
3              THE COURT:  Okay.
4              MR. WOLFF:  I do have --
5              THE COURT:  Verdict form?
6              MR. WOLFF:  Yes, Your Honor.
7              THE COURT:  Go ahead.
8              MR. WYGANT:  Judge, I spotted --
9              THE COURT:  You're winning.  I'll tell you, you're
10     ahead.
11             MS. BROWN:  There's actually just one confusing --
12             MR. WYGANT:  Sorry I missed it.
13             THE COURT:  No, no.  Sit down.  Let him finish and
14     I'll come back to you.
15             MR. WYGANT:  Thank you, Your Honor.
16             THE COURT:  I'm still on Mr. Wolff.
17             MR. WOLFF:  All right.  So we're fine with it up
18     until No. 5, and here's the problem I have with it.  I
19     was thinking about it and figuring how to wrestle with
20     it.  Got the payments and that's all fine, but what
21     if -- and I'll just take the May 18 for 1,100,000.
22             THE COURT:  Okay.
23             MR. WOLFF:  What if the jury is back there and they
24     say, well, 50,000 of that was late.  They don't have an
25     option to say what amount.  You know, "Of that 1.1, we

1      find that 50,000 is late but a million of it is fine."
2      So --
3          THE COURT:  Mr. Wolff, the problem is the payment
4      was $1,120,726.
5          MR. WOLFF:  No doubt.
6          THE COURT:  You're trying now -- you're trying to,
7      to me, invoke the impossible.  Unless you want to get up
8      here while you've still got the evidence and you want to
9      break that payment out, you're going to have to put on
10     evidence of which portion of that payment was timely,
11     then.  If not, it was a lump sum payment.
12         MR. WOLFF:  So -- right, but what if some of it's
13     timely under replacement cost value and they argue that
14     some of it's late.
15         THE COURT:  I think you better put on some evidence
16     that it was timely, then.
17         MR. WOLFF:  It's not my burden.  It's their burden.
18     May I just --
19         THE COURT:  Y'all made the payment like that, not
20     me.
21         MR. WOLFF:  It is what it is.
22         THE COURT:  Scottsdale could have sat back and said
23     we're going to pay part and we're going to pay this.
24     Y'all made it one lump sum payment.
25         MR. WOLFF:  Understood, but I think if we add --

1          THE COURT:  What do you want me to do?

2          MR. WOLFF:  I have an answer.

3          THE COURT:  You want me to ask the jury to break

4     that payment up, but there's no evidence for the jury to

5     consider to break that payment up into isolated

6     incidences.  There's no evidence of that.  You're asking

7     me to ask this jury to do something that is impossible

8     and there has been no evidence to that effect.

9          MR. WOLFF:  I think it's very possible to add a few

10    words and fix my concern, if you have yes, if timely,

11    answer no and state what amount is untimely.

12         THE COURT:  There's no evidence of that for the

13    jury to be able to consider that.  So I hear your

14    objection.  It's noted for the record, but it's

15    rejected.

16         MR. WOLFF:  All right, Your Honor.

17         MR. WYGANT:  Real quickly, Judge.  I'm sorry I

18    didn't bring it up before.  It's on the verdict sheet,

19    the last page, Question 5.  When it has the section here

20    with each line for payments and dates, above that it

21    has, like, the little -- the words above it explain what

22    the columns are and the last one has timeliness, yes or

23    no.  So, for instance, if the jury thought the November

24    payment was timely, they might see timeliness, yes; but

25    if you look --

 1          THE COURT:  But you got to understand, if you read
 2     Question 5, I explain how to answer the verdict form.
 3          MR. WYGANT:  I agree with you.
 4          THE COURT:  What do you want me to add to the
 5     column?
 6          MR. WYGANT:  I don't want you to add anything.  I
 7     think if you take away timeliness in front of
 8     parentheses yes or no, then -- because you explain.  I'm
 9     just saying that if they think that's timely and put
10     yes, yes actually means untimely.  So if you just take
11     timeliness off of that, that cures it, I believe.
12          MS. BROWN:  It's just the use of the word
13     timeliness in the column is actually the opposite of
14     what the instructions say.  The instructions say "say
15     yes if untimely," but then using the word timeliness.
16     If you just take the word timeliness out, they already
17     know what to put there.  You've already told them, "If
18     timely, put yes."
19          THE COURT:  Mr. Wolff.
20          MR. WOLFF:  This is the whole point.  The burden's
21     now shifted to us and --
22          THE COURT:  I don't think the burden's shifted.
23     I'm asking about the form, their point about the word
24     timeliness.
25          MR. WOLFF:  I disagree.  And I apologize.  I also

1    meant to note that I object to the satisfactory proof of

2    loss and arbitrary and capricious being lumped together.

3         THE COURT:  I took that out.

4         MR. WOLFF:  No, lumped together in No. 5.  I'm just

5    noting that.

6         THE COURT:  Well, I broke it out for you as you

7    requested in 3 and 4.  I didn't need to break it out

8    again because Question 5 has nothing to do with that.

9    Now they've had to answer yes to two questions,

10   satisfactory proof of loss and was it arbitrary and

11   capricious.  Then they go to Question 5 and they decide

12   which payments, if any, were subject to that if they

13   answer yes to two questions.  I don't want to break it

14   out again because you're asking me to be way too

15   repetitive.  I hear your thing on the timeliness, but I

16   think the way I have it is correct.

17        MR. WOLFF:  So, Your Honor --

18        THE COURT:  Not breaking it out.

19        MR. WOLFF:  I'm just noting for the record.  That's

20   all.

21        THE COURT:  You've noted it.

22        MR. WOLFF:  So I do need to make one last plea

23   because the burden on the plaintiff is to show that

24   there was satisfactory proof of loss --

25        THE COURT:  Correct.

1    MR. WOLFF:  -- and that the payment was untimely --

2    THE COURT:  Yes.

3    MR. WOLFF:  -- and, if so, what amount of that

4    payment.

5    THE COURT:  I think you are micromanaging it and

6    getting into the weeds on this.  You made these payments

7    as -- your client made these payments.  The jury has no

8    evidence, I'm going to tell you again, to be able to

9    break out each of these payments and say, "Well, out of

10   the 218, we find 18 was untimely, we find 20" -- you

11   didn't break it out.  It's not itemized.  Your client

12   didn't even itemize these payments out when they sent

13   them so there's no way for the jury to do it.  I'm not

14   doing that.  That's so confusing, and there's no

15   evidence for them to consider on that point.

16   MR. WOLFF:  So --

17   THE COURT:  That's overruled.  I don't want to talk

18   about it anymore.  Y'all are wearing on my patience on

19   this verdict form.

20   MS. BROWN:  May I show you what I -- I really

21   think --

22   THE COURT:  I'm fine with you making your

23   objections, but I'm tired of the arguments.  I'm not

24   changing it.

25   MR. WOLFF:  I understand, Your Honor.

1          MS. BROWN:  I want to make sure we don't have an

2     inconsistent verdict.  You instructed them correctly,

3     "If untimely and arbitrary and capricious, answer yes."

4     But then I think the word timeliness here is confusing

5     because timeliness, yes and untimely, yes are the

6     opposite.  So all my suggestion was to just do that

7     because you've already instructed them.  We're telling

8     them untimely is yes but --

9          THE COURT:  The reason I did it this way is that

10     they can make an untimely payment but not be arbitrary

11     and capricious.

12          MS. BROWN:  Right.  The instruction --

13          THE COURT:  That's why the two questions prior to

14     this say that.

15          MS. BROWN:  I agree the instruction is correct.  I

16     just think that you putting the word timeliness above

17     that column can just cause --

18          THE COURT:  You know what we could do, and I

19     thought about -- wait a second, Ms. Wolf.  I thought

20     about doing this; but, you know, I'm telling you, I've

21     been through this with juries.  You've got to keep it

22     very simple or we're going to get a gajillion questions

23     from them.  I thought about putting untimely and

24     timeliness on there; but then, I'm telling you, if you

25     keep it consistent, yes or no, yes or no, I'm telling

1    you, it's going to work better.  Ms. Wolf, what say you
2    on this?
3         MS. WOLF:  I want a second to think about it
4    because I agree with what she's saying.  I think you're
5    asking them the question -- have you read it all the way
6    through to get to what he's talking about?
7         THE COURT:  I really don't have a problem taking it
8    off if both sides want me to take it off.
9         MS. WOLF:  I know.  I --
10        THE COURT:  I'm not trying to write Shakespeare
11   here.  I'm just trying to get the jury an instruction.
12        MS. WOLF:  I apologize.  I wasn't on task to do
13   this, but when she said it I looked at it and thought
14   she was right.
15        THE COURT:  I tend to agree with her, but at the
16   same time I've been on Mr. Wolff about the form.  I'm
17   trying to give you -- Mr. Wolff, you know I'm not upset
18   with you.
19        MR. WOLFF:  No, I just --
20        THE COURT:  I'm just kind of -- I've heard the same
21   story, you know, last night and today.  I get it.  You
22   made your --
23        MR. WOLFF:  I didn't raise that -- today is the
24   first day --
25        THE COURT:  I know.  I just want you to know I

1    respect you.  I'm not upset.  I get a little riled.  I

2    get going.  I guess that's too much coffee this morning.

3         MR. WOLFF:  I just don't want to hear them say,

4    well, if this portion's untimely you should put yes.

5         THE COURT:  I'm going to tell you right now --

6    Mr. Cox --

7         MR. COX:  Yes, sir.

8         THE COURT:  -- let's clear this up because there's

9    no evidence.  I'm not changing it.  But what I hear him

10   saying is he doesn't want you to get up here during

11   closing argument and say, "Well, they made this payment

12   of $218,000.  Now 50,000 of it was untimely."  I don't

13   think they're going to do that.  I think they're going

14   to say the whole thing was untimely.

15        MR. COX:  Your correct, Your Honor.

16        THE COURT:  I doubt he's going to lower --

17        MS. BROWN:  We can agree none of it was timely.

18        MR. COX:  Ms. Brown is going to do the closing and

19   she's going to suggest that all the answers be yes.

20        THE COURT:  Of course she is.

21        MS. BROWN:  I think we have good news.  We have an

22   agreement on something.

23        MR. WOLFF:  That's fine, yeah.

24        MS. BROWN:  We'll take the word timeliness --

25        THE COURT:  We'll take the word timeliness out.

1          MS. BROWN:  Leave yes or no.

2          MS. WOLF:  Scottsdale agrees to take out timeliness

3     in front of yes or no.

4          THE COURT:  All right.  Mr. Wolff, go ahead.

5          MR. WOLFF:  I think with the agreement that

6     plaintiff's counsel is not going to argue that as to --

7     and I'm going to pick the million dollars.  We're saying

8     it's all untimely.  But they're not going to say, whoop,

9     they missed a bill for $50 so you got to say no.  As

10    long as they're not doing that, we're good.

11         THE COURT:  I can't imagine they would do that.

12         MR. COX:  He's correct, and we're not doing that.

13         THE COURT:  I wouldn't do that.

14         MR. WOLFF:  Thank you, Your Honor.

15         THE COURT:  You're quite welcome.  Okay.  Y'all

16    going to make that change on the verdict form.  And then

17    on the charges, remember I agreed with counsel for the

18    plaintiff there on that one.  We need to add without

19    probable cause.  So we'll make those two changes and

20    we'll give y'all all a new copy.

21         MR. COX:  Thank you, Your Honor.

22         THE COURT:  What I would suggest you do, because

23    I'm going to do it right now, throw away your old copy.

24    Let's all throw away the old one.

25         MR. COX:  And nothing changed on the jury verdict

```
 1        form?
 2             THE COURT:  Yes, we're taking the word timeliness
 3        off.
 4             MR. COX:  So we can throw those away, too.
 5             THE COURT:  Throw those away as well.  Okay.  I
 6        think we had -- you can come on up.  I guess you were
 7        going to -- you're on cross-examination at this point,
 8        right?
 9             MS. BROWN:  I think so.  You tendered him, Mary
10        Ann?
11             THE COURT:  Yes.
12             MS. WOLF:  Yes, I did.
13             THE COURT:  You're still under oath.  Okay.  We're
14        going to bring the jury in now.
15             Mr. Wolff, y'all know these jury charges and this
16        verdict form is going to be all over the place.
17             MR. WOLFF:  I do know that.
18             THE COURT:  That's why I wanted them right, because
19        this is going to get circulated like there's no
20        tomorrow.
21             MR. WOLFF:  Very aware.
22             THE COURT:  We're blazing new ground, I guess, huh.
23                  (Jury enters courtroom.)
24             THE COURT:  Good morning, ladies and gentlemen.  We
25        did start on time.  I had to deal with some issues that
```

1    we're going to address with y'all shortly but with the

2    attorneys.  Good morning.  Hope y'all had a good evening

3    and are refreshed.  And hopefully -- I think we're going

4    to maybe wrap it up today.  So I commend the attorneys.

5    They've done a good job on both sides of trying to move

6    it along, and so we all appreciate that very much.

7         Okay.  I think, Ms. Brown, you have the witness at

8    this time.

9         MS. BROWN:  Thank you.

10                    **GRANGER ALLEN STUCK**,

11   after previously being duly cautioned and sworn to tell the

12   truth, the whole truth and nothing but the truth, did testify

13   on oath as follows:

14                     **CROSS-EXAMINATION**

15   BY MS. BROWN:

16        Q.   Mr. Stuck, you testified yesterday that costs are

17   costs -- I wrote it down -- costs are costs regardless of

18   whether we agree.  You recall that?

19        A.   Can you say it again, please.

20        Q.   You said that the costs are the costs; regardless

21   of whether anyone agrees with them, they are what they are.

22        A.   There's a scope that relates to the cost, but yes.

23        Q.   And you agree that once the costs are known the

24   policy requires paying those amounts?

25        A.   I don't know what the policy says.  I'm not a

1  policy expert.

2      Q.   Okay.  I don't want to put your charts back up.

3  I'm going to try to hurry us along so we can finish today,

4  but I want to ask you a few things.  You recall the numbers

5  in your chart, I'm sure.

6      A.   Not the exact numbers but roughly.

7      Q.   You recall that the number you had for Ricky Poole

8  was actually $36,000 less than the bill that we saw and

9  Mr. Poole testified was owed?

10     A.   Well, rephrase that a little bit.  I had a number

11  of 240,000.  I think we saw a statement that showed more, but

12  I don't think we saw an invoice or any checks.

13          MR. WOLFF:  What exhibit do you have?

14          MS. BROWN:  112.

15  BY MS. BROWN:

16     Q.   You were in the courtroom when Mr. Poole testified

17  about his final bill and total amount was $276,887?

18     A.   I was.

19     Q.   That's not the number you put in your summary?

20     A.   No.  There was no cost data for that last invoice

21  listing there.

22     Q.   Okay.  The same is true for the amount that you

23  allocated to Encore; it was about $350,000 less than the

24  contract, wasn't it?

25     A.   Again, I know my number was, I think, 976,000.

1      **Q.**   And we've heard a lot of testimony this week that
2   the Encore contract, what Mr. Odom owes Encore for the
3   hurricane work, is $1.33 million.  You were in the courtroom
4   for that testimony, correct?
5      **A.**   No.  I was in the courtroom, but that's not what
6   was said.
7      **Q.**   Okay.
8      **A.**   You want me to clarify that?
9      **Q.**   No.  The Encore contract --
10         MR. WOLFF:  Your Honor, he has an opportunity to
11      explain.
12         THE COURT:  I agree.  If he needs -- he can explain
13      his answer.
14      **A.**   So sorry.  I think what we said or what was said
15   was there are items in that Encore contract value that are
16   not related to hurricane damage, that those had to be
17   deducted out.
18   BY MS. BROWN:
19      **Q.**   Okay.  And we went through that process and the
20   non-hurricane related items off of the 1.36 million resulted
21   in a remainder owed to Encore of $1.33 million.
22      **A.**   That's what was said.  That's not what I think.
23      **Q.**   Okay.  What you think is actually based on not the
24   contract but on Encore's costs, right?
25      **A.**   Correct, because I believe the contract -- the

1    number in the contract's a budget and that's based on the

2    cost that they actually spent.

3        Q.    You understand the difference between a fixed price

4    contract and a cost plus contract?

5        A.    Yes, ma'am.

6        Q.    The calculation you did would be if this were a

7    cost plus contract, correct?

8        A.    No.  I did it in the terms of the contract,

9    Encore's contract, which is neither of the two contracts that

10   you mentioned, in my opinion.

11       Q.    Okay.  Scottsdale also had the right, if they had

12   chosen to do so, to perform the work themselves, correct,

13   with their own contractor?

14       A.    I don't -- if they had that right, I don't know.  I

15   don't know what Scottsdale had the right to do.  I'm a

16   construction consultant, not a -- if that's part of the

17   policy, that's not part of my expertise.

18       Q.    Okay.  I just want to ask you to read part of the

19   policy.

20           MS. WOLF:  Your Honor, I have an objection to that.

21           THE COURT:  Is it something -- just state it right

22       there.

23           MS. WOLF:  Yes.  He's already stated what his

24       expertise is.  It's construction.  He said that he

25       doesn't do the insurance policy interpretation.  I think

1      it's inappropriate for him to try to interpret the

2      policy for the jury.

3              THE COURT:  I'm not sure she's asking him to

4      interpret the policy.  Are you?

5              MS. BROWN:  I'm not at all.

6              THE COURT:  Let's see where it goes.  I'll allow it

7      right now.  I mean, he's not going to give a policy --

8      I'm assuming you have a specific question.

9              MS. BROWN:  I do.

10  BY MS. BROWN:

11      Q.   Under the loss payment provision in this policy --

12  you see where I'm reading, the highlighted area?

13      A.   I do.

14      Q.   It says, "In the event of loss or damage covered by

15  this coverage form, at our option we will either," several

16  items.  One of those is "repair, rebuild, or replace the

17  property with other property of like kind and quality."

18      A.   That's what it says.

19      Q.   To your knowledge, Scottsdale didn't invoke --

20              THE COURT:  What's your objection?

21              MS. WOLF:  I'm waiting.

22              THE COURT:  Oh.  You can sit down.

23              MS. WOLF:  He read an excerpt out of a policy that

24      he hasn't read.

25              THE COURT:  He just read it.

574

```
1              MS. WOLF:  I'm waiting to see if --
2              THE WITNESS:  Can I --
3              THE COURT:  Hey.  He just read it for the first
4         time, I'm assuming.  So what's the question?
5    BY MS. BROWN:
6         Q.   To your knowledge, did Scottsdale invoke its right
7    to repair, rebuild, or replace the property?
8              THE COURT:  Okay.
9              MS. WOLF:  I'm renewing the objection, Your Honor.
10        He hasn't read that policy.  He's not a policy expert.
11             THE COURT:  I don't think that was the question
12        anyway, whether he read it.  The question is whether or
13        not Scottsdale did that, right?
14             MS. BROWN:  Whether he's aware if they did that.
15             THE COURT:  I don't think he's -- he's not really
16        here -- he was hired as a litigation consultant.  I
17        would assume he has no knowledge of that.  Correct,
18        Ms. Wolf?
19             MS. WOLF:  That's correct, and I just want to make
20        sure that -- that's completely outside of what he's
21        being presented here in court for.
22             THE COURT:  I'm going to sustain the objection.  He
23        doesn't -- it's not really his area.
24             MS. BROWN:  Thank you, Your Honor.
25    BY MS. BROWN:
```

1     **Q.**   Your final number also allocated zero dollars for
2     the windows; you recall that?
3        **A.**   For the window replacement.  It included the
4     dollars for the window repairs.
5        **Q.**   Correct.  You originally agreed that 159,000 should
6     be paid towards the windows and then you took that out in
7     your final report?
8        **A.**   Correct, because the work wasn't done.
9        **Q.**   Right.  Under an ACV policy the work doesn't have
10    to be done to get paid the actual cash value portion of the
11    damages, correct?
12       **A.**   Again, I can't interpret the policy.  I don't know
13    what the policy says.
14       **Q.**   Let me ask you about something that was attached to
15    your report.
16            MS. BROWN:  I'm going to offer plaintiff's
17       Exhibit 25.
18            MS. WOLF:  His expert report?
19            MS. BROWN:  No, something that was attached to his
20       report, plaintiff's Exhibit 25.
21            MS. WOLF:  I think I do have an objection to it.
22       Yeah, I do as hearsay.
23                    **BENCH CONFERENCE**
24            THE COURT:  What is Exhibit No. 25?
25            MS. BROWN:  This is, I guess, sort of a treatise

1    that was attached to his report.  He's an expert.  I can
2    ask him about what he relied on.
3        THE COURT:  You can ask him about hearsay because
4    hearsay -- you know, experts can rely on hearsay
5    information.
6        MS. WOLF:  But --
7        THE COURT:  Hold on one second.  The question is
8    whether or not -- he can rely on it as a basis of his
9    opinion.  Doesn't mean it's admissible, though.
10        MS. BROWN:  Also, just so you know what it is, it's
11    a report from -- one, it was attached to his report.
12    Two, it's a treatise or an article written by the
13    president of his company --
14        MS. WOLF:  Right.
15        MS. BROWN:  -- J.S. Held, their litigation
16    consultant.
17        THE COURT:  What's your objection?  He relied on
18    it.
19        MS. WOLF:  He relied on one -- I don't know what he
20    relied on.
21        THE COURT:  You better know.  He's your expert.
22        MS. WOLF:  I'm going to break that down.  So he
23    does a report and this was stated in there, one part of
24    the context.  The rest of this, Your Honor, I would --
25    are you only putting in this?

1    MS. BROWN:  Yes.

2    MS. WOLF:  Okay.  Well, I hadn't seen it.

3    MS. BROWN:  I didn't want to argue too much in

4 front of the jury, but he testified yesterday about how

5 an RCV policy works and then gets up here today and says

6 he doesn't know --

7    THE COURT:  Why don't you confront him with it?

8    MS. WOLF:  He didn't testify --

9    THE COURT:  He did.  He did say --

10    MS. BROWN:  Yes, he did.

11    THE COURT:  -- he knew about -- he said his whole

12 report's --

13    MS. WOLF:  He knows --

14    THE COURT:  -- he said his whole report's an RCV

15 report.

16    MS. WOLF:  Let me explain.  He's told by the

17 insurance company that this is a replacement cost

18 policy.  That doesn't mean he's interpreting what --

19    THE COURT:  No, he's not; but he knows what it is.

20 He just said he didn't know.

21    MS. WOLF:  Okay.  First of all, let me just say

22 that when you said the exhibit number I thought you were

23 attaching the entire thing, because I did have a problem

24 with just putting the whole --

25    MS. BROWN:  Oh, yeah.  No, I don't want to do that.

```
 1          MS. WOLF:  -- CLE or whatever this was that we
 2     didn't even write.  Let me see what you --
 3          THE COURT:  You attach it to a report, it becomes
 4     fair game.
 5          MS. WOLF:  Well, for what it was stated for in the
 6     report.  I'm not disagreeing with you, but I thought you
 7     were going to put this whole thing in.
 8          THE COURT:  No, no.  Give her that.
 9          MS. WOLF:  So I don't have a problem with asking
10     about this, but we understand he didn't write this.
11          THE COURT:  Of course not.  He's relying on it.
12     That's underlying --
13          MS. WOLF:  Again, I was assuming this whole thing
14     was going in and I hadn't seen that one particular
15     excerpt.
16                        PROCEEDINGS CONTINUED
17          THE COURT:  Objection's overruled.
18          MS. BROWN:  And so I'll offer plaintiff's
19     Exhibit 25.
20          THE COURT:  It'll be admitted.
21     BY MS. BROWN:
22     Q.   Now, I was just asking you about how the actual
23     cash value works on a policy; and you said that you didn't
24     know anything about that.
25     A.   I know how to calculate actual cash value
```

579

1    depreciation.  How it relates to what they do with it in the
2    policy, that's not my area of expertise.
3         Q.    You understand that the replacement cost, the RCV,
4    is what's paid after costs are incurred?
5         A.    Yes.
6         Q.    And you understand that an ACV payment is made up
7    front?
8         A.    I don't know the timeliness of it but --
9         Q.    I'm not asking you about timeliness.  You
10   understand that if there is covered damage an actual cash
11   value payment is due?
12        A.    Yes.
13        Q.    So it would be improper to allocate zero dollars
14   for windows that you agree need to be replaced?
15        A.    In this situation, yes, not in all situations.
16        Q.    Now I want to ask you about plaintiff's Exhibit 25,
17   and this is an excerpt from something you attached to your
18   report.  Are you familiar with this?  I'll zoom out.  It's an
19   article written by the president of your company, Mr. Held.
20        A.    It was a joint article he wrote with counsel, not
21   just by him.
22        Q.    Okay.  So it was written with him and a lawyer?
23        A.    Yes.
24        Q.    Okay.  And you relied on this in forming your
25   opinions in this case?

1      **A.**   Not this piece you have on the screen.

2      **Q.**   Okay.  Well, let me ask you about this piece since

3    you attached it to your report.

4      **A.**   Well, okay.

5           THE COURT:  Sir, you attached it to your report.

6      She can ask you about it.

7           THE WITNESS:  Okay.

8    BY MS. BROWN:

9      **Q.**   Like you just finally agreed, under a replacement

10   cost policy the insurer is often obligated to make an up

11   front payment prior to replacement based on the estimated

12   actual cash value.  That's what's in this report?

13     **A.**   Yeah.  It says often.  You know, has to be based on

14   each specific policy, I'm sure.

15     **Q.**   And the fact is under a policy like that, if

16   Mr. Odom had wanted this building to rot to the ground,

17   Scottsdale still owed him actual cash value, didn't they?

18     **A.**   Again, I haven't looked at the policy; but if it

19   follows this language, then they would.

20     **Q.**   Okay.  And I want to ask you about something else

21   in here.  It's true, isn't it, that a replacement cost policy

22   like the one at issue here -- and you're familiar with at

23   least the fact this is a replacement cost policy?

24     **A.**   Yes.

25     **Q.**   In a replacement cost policy like this one, if the

1    work is done, the policy results in a benefit to the insured

2    of what Mr. Held calls betterment, right?  The policy allows

3    the property to be made better?

4        A.    Do you mind if I read this?

5        Q.    No.

6        A.    So, again, that's -- he's not quoting a specific

7    policy.  That's a general statement that insurers have

8    created property policies that may do that.

9        Q.    Okay.  And under a replacement cost policy like the

10   one here -- let me give you an example.  I have a 20-year-old

11   roof on my house and a hurricane hits.  I'm going to be paid

12   up front under a policy like this for the value of my

13   20-year-old roof, right?

14       A.    If that's -- yeah.  If you get the depreciated

15   value, yes.

16       Q.    Okay.  When I put the brand-new roof on my house

17   I'm going to get the depreciation back, right?

18       A.    You're going to -- you should get the balance of

19   what the cost was versus what you got before.

20       Q.    Okay.  So I'm going to get a brand-new roof on my

21   house, right?

22       A.    Yes.

23       Q.    And insurance will have paid for it?

24       A.    Assuming that's -- yes, if the policy pays for it.

25       Q.    Because that's what I bought when I bought that

1    insurance policy, when I bought a replacement cost policy.

2        A.   Yeah.  We're talking hypotheticals here, so.

3        Q.   Of course.  My roof is not an issue in this case.

4        A.   Okay.

5        Q.   And the increased value of my home in that

6    hypothetical, because I have a new roof, it's worth more.

7    Has nothing to do with what the insurance company owed me

8    under the policy, does it?

9        A.   One is I don't know if the house is worth more like

10   you just said.  I'm not a real estate appraiser.  I don't

11   know if it's worth more or not.

12       Q.   Okay.  Assuming -- let's keep going with the

13   hypothetical.  Assuming that a house with a brand-new roof is

14   worth more than a house with a 20-year-old roof, that doesn't

15   have anything to do with what's owed under the replacement

16   cost policy, does it?

17       A.   I'm sorry.  Can you say it again, please.

18       Q.   Sure.  If you assume that my house with the

19   brand-new roof is worth more than my house was with the

20   20-year-old roof, the fact that the market value is different

21   has nothing to do with what the insurance company owed me

22   under my replacement cost policy?

23       A.   I don't think I can determine that.

24       Q.   Okay.  You talked about industry standards, and I

25   just have a couple questions for you about that.  You would

1    agree with me that it's industry standard to follow the law

2    in the state where you sell insurance policies?

3         A.    I'm not a lawyer, but I would think that makes

4    sense.

5         Q.    You would also agree with me that it's industry

6    standard for insurers to comply with their own insurance

7    policies?

8         A.    If all the terms of the policies are followed, yes.

9         Q.    So they don't have to do right unless they

10   determine that the insured has done right?

11             MS. WOLF:  Your Honor.

12             THE COURT:  Yes, ma'am.

13             MS. WOLF:  I think he's already stated this is

14        getting outside of his area.

15             THE COURT:  These are just basic, I think,

16        background questions.  If he knows, he know.  I think he

17        can answer this.

18        A.    I guess what I'm saying is there -- I'm assuming in

19   insurance policies there are a lot of terms and conditions

20   for both sides and those terms and conditions have to be

21   followed.

22   BY MS. BROWN:

23        Q.    I want to ask you about one more thing you

24   testified about.  You testified that you looked at a fire

25   marshal report.  Did I understand that?

584

1    A.    Yes.

2    Q.    And you testified that based on your review of that

3    report you believed that construction was complete on the

4    entire building at 620 Esplanade in April or May of 2021?

5    A.    I said substantially complete.

6    Q.    That's not consistent with the Encore records which

7    you also testified that you reviewed?

8    A.    Which specific records?

9    Q.    You said you reviewed the entire construction file

10   from Encore.  The building was not substantially complete in

11   April or May of 2021?

12   A.    No, that's -- I mean, all the testimony I've heard,

13   it was -- Mr. Major said it was substantially complete when I

14   did my inspection in April.  The inspection report you're

15   noting says the end of May.  The final payment for the Encore

16   contract was paid in, I think, early June.

17   Q.    Let me ask you about that.  Encore has not been

18   paid in full, have they?

19   A.    I believe they have.

20   Q.    You said you looked at this fire marshal report;

21   but the fact is, and I apologize that it's so horrible to

22   read, this fire marshal report relates specifically to the

23   Department of Homeland Security in Suite 101 and is limited

24   to one story of 620 Esplanade?

25   A.    It does say that.

1      Q.   Okay.  The first floor was done in May of 2021?

2      A.   Correct.

3      Q.   The entire building was not?

4      A.   Well, the entire building had to be -- some

5   portions of it had to be done to allow occupancy.  The fire

6   department would not let that building be occupied if all

7   portions of the building weren't done.  So, for example, we

8   know the second floor tenant fit-out wasn't; but that's not

9   required for occupancy.

10     Q.   I don't have anything else, Mr. Stuck.

11          THE COURT:  Any redirect?

12          MS. WOLF:  Yes, Your Honor.

13                      REDIRECT EXAMINATION

14  BY MS. WOLF:

15     Q.   Good morning.

16     A.   Good morning.

17     Q.   I just want to make sure that I understood what you

18  were just saying about the fire marshal report that we looked

19  at yesterday and you just looked at today that had that

20  May 24th date on it.  Can you explain -- you're saying that

21  the fire marshal -- even though it says on there that's

22  Suite 101 and Homeland Security, the Homeland Security first

23  floor portion, can you explain what you said about why that

24  would -- what that would have to do with the rest of the

25  building and how that tells you that the whole building would

586

1    likely be finished at least for occupancy?

2        A.    Yeah.  In my experience, a fire marshal's not going

3    to give a certificate of occupancy for a building if the

4    entire building's not safe.

5        Q.    Okay.  So I want to touch on a couple of things

6    having to do with -- I guess let me start with the windows.

7    You said that you agreed and said, and I think we went

8    through all of this yesterday, that between your May and your

9    August reports, your analysis that you did, you did, in fact,

10   have full window replacement in the May portion of your

11   claim, right?

12       A.    Correct.

13       Q.    But you took it out when we got to the August,

14   right?

15       A.    Correct.

16       Q.    And what was the reason for that?

17       A.    Well, at the time I did it in May, when all the

18   work was substantially complete but not all complete, it was

19   my understanding the windows were going to be replaced.  And

20   at the time in August, when we got all the cost data and

21   invoicing, the windows had not been replaced.  I think as we

22   sit here today they're still not replaced.  So I removed the

23   cost because the work wasn't done.

24       Q.    But I want to make sure, and I think we were pretty

25   clear on this yesterday, that there's not any damaged windows

587

1    remaining in Eaux Holdings' building, right?

2        A.   No.   Correct.   The specific damaged windows and

3    mullions were fixed, repaired.

4        Q.   You actually looked at the contract and looked at

5    the BEC -- that engineer's contract and they included fixing,

6    replacing, repairing any of the damaged glass, right?

7        A.   They did.

8        Q.   Any damaged or broken glass plus any of the

9    mullions, meaning that if in the hurricane the part that's

10   not the glass was damaged or scraped, Encore fixed all that?

11       A.   Yeah.   The mullions or the window frames, yes.

12       Q.   Right.   And we actually looked at a picture of that

13   to explain.   And then the sealant and the caulking was also

14   done, right?

15       A.   Correct.

16       Q.   So as of when the project was completed in about

17   May of 2021 the windows were completely repaired, right?

18       A.   Correct.

19       Q.   And then you also said that -- I believe you said

20   that part of the rationale you gave for the replacement was

21   that when you're doing that window ribbon system and you're

22   doing the wall cladding system it makes sense to replace both

23   of them together because it's an installation issue?

24       A.   Correct, for the waterproofing, flashing issues.

25   The system's tied together to make sure water doesn't get in

588

```
1    the building between the windows and the wall panel system.
2         Q.   So the wall cladding system's all been done,
3    correct?
4         A.   It has.
5         Q.   And it doesn't make sense to then go back and tear
6    out the ribbon window system when you've already done the
7    wall cladding, right?
8         A.   Yeah.  You'd be damaging work you just installed to
9    go do that.
10        Q.   So the rationale now is, for taking it out, they
11   didn't do it and it doesn't even make any sense to do it and
12   the windows have all been fixed, repaired, and re-glazed,
13   right?
14        A.   Correct.
15        Q.   And that's been paid for?  That was included in the
16   Scottsdale payment that was made, right, the window
17   replacement, because that's what Encore did?
18        A.   Yeah.  Yes.
19        Q.   All right.  There was a question about the Encore
20   contract, what -- it states in the contract that it's a
21   $1.36 million contract.  And you've said that you don't agree
22   with that, right, that's a budget number?
23        A.   Correct.
24        Q.   And you looked at the cost data and that's where
25   you came up with your $976,000 number, right?
```

1      **A.**    Yeah.  I looked at it.  That's where I came up with

2   my number.  The other way to look at it was the three

3   payments for the contract that were made by Eaux Holdings to

4   Encore.

5      **Q.**    Okay.  So let's just look at that.  This is

6   Exhibit D-175.  It's already been admitted.  So this was your

7   August assessment, right, where it's now at about

8   1.6 million?

9      **A.**    Correct.

10     **Q.**    And here we see the Encore building repairs.

11  That's the number that you determined, 976,000, right, 136

12  dollars?

13     **A.**    Based on their actual cost, yes.

14     **Q.**    So that was -- that number you determined by

15  looking at actual costs.  And then we looked at the actual

16  payments and that's when we saw that it was very close --

17  that number that we got to was very close to the -- it was

18  924,000, right?

19     **A.**    Correct.

20     **Q.**    So you were within $50,000 of what the actual

21  payments were.  And we went through each one of those checks

22  and it added up to 924,000, right?

23     **A.**    Correct.

24     **Q.**    And it matched what the contract said, which is

25  three payments, an initial payment, a progress payment, and a

1    final payment?

2        A.   Correct.  Yeah.  I think the final payment was the

3    550,000.

4        Q.   And then further you said that any other work that

5    may be done was not hurricane related.  Were you in court and

6    you heard Mr. Odom testify that he does owe some money for

7    noninsurance work?  Did you hear him say that?

8        A.   I did.

9        Q.   And did you hear him say, "I cannot itemize

10   insurance versus noninsurance items"?  Did you hear him say

11   that?

12       A.   Yes.

13       Q.   And you determined from the Encore documents and

14   the Encore deposition where the only remaining work, if any,

15   was to second floor tenant finish, right?

16       A.   Correct.

17       Q.   And what that meant was if a tenant comes onboard

18   and the owner wanted to finish out, meaning rearrange the

19   kitchen or the walls for that tenant, then that work may have

20   been done by Encore, right?

21       A.   Correct.

22       Q.   But that's not hurricane related?

23       A.   No, it's not.

24       Q.   So you wouldn't include that in your assessment,

25   right?

1       A.   No, I wouldn't.

2       Q.   Have you seen anything in court this week that

3   changes that $1.6 million number that you determined?

4       A.   No, I have not.

5       Q.   You were asked about the Poole Roofing statement

6   that we saw, right?

7       A.   Yes.

8       Q.   And as you noted, that was a statement that -- you

9   saw that just this week in court, right?  You'd not seen that

10  in any of the documents that you got before, right?

11      A.   That's correct.  I think it's dated last week or

12  something.

13      Q.   Okay.  So, again, you base your assessment on the

14  actual supporting documents that substantiate a claim,

15  correct?

16      A.   The actual cost, yes.

17      Q.   If there's no document presented, no invoice or

18  document presented to show you that there's a cost, then you

19  can't include it in your number, right?

20      A.   Correct.  I wouldn't include it in my number.

21      Q.   You recall hearing from Mr. Poole that he didn't

22  have an explanation as to why that additional statement

23  showing $36,000 owed on the roof work would have just been

24  presented right before trial?

25      A.   I thought I did hear him say it was just requested.

1   **Q.**   He said that?

2   **A.**   I believe so.

3   **Q.**   Okay.  But other than that, you haven't seen

4   anything in the records to suggest that an additional 36,000

5   was owed on the roof, right?

6   **A.**   No, I haven't.

7   **Q.**   Want to make sure that I clear something up.  What

8   we just looked at was -- this has already been exhibited --

9   entered as D-175.  So we were talking about the $1.6 million

10  number.  And that was your August 2021 assessment, right?

11  **A.**   That's correct.

12  **Q.**   And that was based on new information; but I want

13  to make sure that I don't confuse anything here because your

14  May estimate that's already been entered as D-174, that was

15  your number that was almost $1.8 million, right?

16  **A.**   That's correct.

17  **Q.**   And if we look at -- so it was $1,797,091.  If we

18  look at what's been entered as Exhibit D-161, I don't know if

19  you can do this, so what we're looking at here is the total

20  payments -- actually, let me switch that.  We're looking at

21  the total payments by Scottsdale here, $1,796,091, right?

22  **A.**   Correct.

23  **Q.**   And then we're looking at your number that you

24  determined in May, $1,797,091.  So they're off by a thousand

25  dollars, right?

593

1      **A.**   Yes.

2      **Q.**   Do you understand that to be the deductible?

3   You're aware that there was a deductible on the policy of a

4   thousand dollars?

5      **A.**   I was told that.  I haven't looked at it, but

6   that's my understanding.

7      **Q.**   All right.  So it's your understanding that

8   Scottsdale paid the amount that you told them was the amount

9   of this claim, they paid that in May of 2021, right?

10     **A.**   Based on my independent assessment, yes.

11     **Q.**   And, in fact, they paid it -- you'd told us that

12  you provided it to them on, I believe it was, May 13, 2021 --

13     **A.**   That's correct.

14     **Q.**   -- after you met on-site on April 19th, got the

15  information, that spreadsheet from Skyline?

16     **A.**   On May 6th.

17     **Q.**   On May 6th.  You did your analysis.  You sent it to

18  them on May 13th.  And then on May 18th, within days, they

19  sent that check.  Right?

20     **A.**   Correct.

21     **Q.**   I don't have any further questions.  Thank you.

22          THE COURT:  You may step down.  Mr. Wolff, who's

23       your next witness.  Oh.  Come on up.

24          MS. PAYNE:  Scottsdale calls Stephen Duplantis.

25          THE COURT:  You may proceed.

1              **STEPHEN DUPLANTIS**,

2    after being first duly cautioned and sworn to tell the truth,

3    the whole truth and nothing but the truth, did testify on

4    oath as follows:

5              **DIRECT EXAMINATION**

6    BY MS. PAYNE:

7        **Q.**   Good morning.

8        **A.**   Good morning.

9        **Q.**   Can you introduce yourself to the jury, please.

10       **A.**   Name's Stephen Duplantis, real estate appraiser

11   working for Newmark from Houston, Texas.

12       **Q.**   And why are you here today?  What have you done in

13   this case?

14       **A.**   I was hired to provide market value of the subject

15   property pre-storm and then post-storm.

16       **Q.**   Okay.  And before we get into your opinions, we're

17   going to go through some of your qualifications for your

18   expertise today.  Can you give me a brief educational

19   background.

20           MR. COX:  Excuse me, Your Honor.  Just to save

21       time, and I know she's going to ask some questions, but

22       we'll stipulate to his expertise.

23           THE COURT:  Certainly.  Please go ahead.

24           MS. PAYNE:  We will just make it brief.

25   BY MS. PAYNE:

1      Q.    Are you licensed in Louisiana as an appraiser?

2      A.    Yes.  I've been licensed in the state of Louisiana

3   since early 1990.  And before then, before licenses were

4   available, I was appraising in Louisiana in 1985.

5      Q.    So you've appraised properties in Louisiana for

6   many years and you have experience with appraisals in

7   Louisiana?

8      A.    Yes.  I've opened two offices in New Orleans and

9   been active as an appraiser in the state of Louisiana for

10  basically my entire career for the last 40 years.

11         MS. PAYNE:  We would like to tender Mr. Duplantis

12      as an expert in commercial real estate valuation.

13         THE COURT:  Sure.

14         MR. COX:  No objection.

15         THE COURT:  I have one question for you.  She did

16      ask you.  What's your educational background?

17         THE WITNESS:  I graduated from Texas A&M in 1983

18      and then passed all the courses relevant to achieving my

19      MAI designation in the five years, then approved

20      instructor for the Appraisal Institute.

21         THE COURT:  Thank you very much.  He'll be accepted

22      as an expert.  And, I'm sorry, you're tendering him in

23      what area?

24         MS. PAYNE:  Commercial real estate valuation.

25         THE COURT:  Commercial real estate valuation.

```
 1          Okay.  He's so accepted.  Thank you.
 2              THE WITNESS:  Thank you.
 3    BY MS. PAYNE:
 4        Q.   Mr. Duplantis, can you explain the purpose of an
 5    appraisal.
 6        A.   The purpose of appraisal, first you identify the
 7    subject property and the scope of the assignment.  And the
 8    purpose of the appraisal is to estimate market value.  In
 9    this case it's called the leased fee value because the
10    property is subject to leases.  So you go through the
11    different steps and estimate the value of the property.
12        Q.   And you prepared two appraisals in this case?
13        A.   Yes, based on the scope of the assignment.  I was
14    requested to estimate a value of the property pre-storm in
15    August of 2020, and then I did a valuation post-storm as of
16    July 21st, 2021.
17        Q.   And what were your conclusions of the value of the
18    property pre-Hurricane Laura?
19        A.   Estimated market value of the property of
20    $2,270,000.
21        Q.   Okay.  And what were your conclusions of the value
22    of the property post-Hurricane Laura?
23        A.   As of July of 2021, my value is $2,930,000.
24        Q.   And so that's an increase of about $660,000?
25        A.   It is.
```

597

1      **Q.**   And we'll get into that a little bit more, but I
2      understand you did an inspection on the property.  Is that
3      correct?
4      **A.**   I did.  I inspected the property as of July
5      of 2021.
6      **Q.**   Okay.  And can you tell me a little bit about the
7      property and how your inspection went.
8      **A.**   Yes.  The property is located in south Lake
9      Charles.  It's on the south side of Esplanade Street about a
10     half a block off Common Street.  Give you some more
11     landmarks.  It's in between McNeese State and the airport in
12     Lake Charles.  Property is a nice building, nice investment
13     grade building, and typically be owner occupied or occupied
14     by local tenants or sometimes national tenants such as the
15     tenant that's in the property.  It's a two-story office
16     building typical in the market, typical of what I've seen in
17     Lake Charles what I've appraised in the past.  It has
18     adequate parking, good access off Esplanade, good exposure to
19     Common Street.
20          The building was well done and had a nice appearance
21     upon my inspection.  The first floor was complete, occupied
22     by the government tenant.  And the second floor had been
23     relatively completed with some what they call tenant
24     improvement to be finished out.  Tenant improvement is
25     described as office walls, carpet, maybe a small kitchenette

1    or something to that effect.  It also had a small common
2    lobby area with stairwells and elevator, restrooms, providing
3    access to the first and second floor.

4        Q.    Okay.  And for your appraisal, what approach did
5    you use to come up with your numbers?

6        A.    In the appraisal process there's three approaches
7    to value you consider, the cost approach, the sales
8    comparison, and the income.  The cost approach is easily
9    understood but in this case not as relevant because it's a
10   lease fee property.  Cost approach is simply what does it
11   cost to build it less depreciation plus land value, and
12   that's typically an indication of value under a fee simple
13   scenario.

14        Since we're doing lease fee, then I had the sales
15   comparison and the income approach.  Under the sales
16   comparison what you look for is what other properties have
17   sold within that market or submarket.  And if you don't have
18   properties in that specific market, you expand to other
19   similar communities such as Lafayette or Baton Rouge, is what
20   we did.  We identified three comparable properties, office
21   buildings, similar owner user investment grade type
22   properties in those communities, and did a comparison of
23   those properties to that of the subject property.

24        The other approach is called the income approach.  It's
25   what most investors would look at.  This is called an

```
 1    investment grade property, especially by the tenant that's in
 2    it.  And investors are potential purchasers, when
 3    establishing the value, of how much money can that property
 4    generate and produce a reasonable return based on the
 5    investment.  So we develop those rates of return by looking
 6    at the comparable sales and what people have bought in the
 7    market but then we look at the income approach looking at the
 8    income it can generate, income it is generating, and look at
 9    appropriate expenses associated with that and arrive at a net
10    operating income; and that's prior to debt service or
11    depreciation or any interest payments.  And so once you have
12    that number, you can capitalize that or it's a multiple of
13    that to create a value for the property.
14         Q.   And using that income approach, what was the value
15    of the property the day before Hurricane Laura?
16         A.   I relied on both approaches but the primary
17    emphasis on the income approach, again, because it had a
18    government lease in there occupying the entire first floor.
19    So pre-hurricane, that indicated a value of approximately
20    $2,270,000.
21         Q.   Okay.  And you used that same approach when you did
22    an appraisal post-hurricane; is that correct?
23         A.   That is correct.  After -- on the post appraisal,
24    again, I did an inspection of the property.  It was in good
25    condition, similar to comparable properties in the market.
```

1    It was in a condition that was reasonable to provide a lease

2    or was in a leasable condition.  So it was ready to be leased

3    in the market.  With that said, the space that was leased on

4    the first floor had an extension of the lease for an

5    additional 15 years at a rate $3 or almost $4 a square foot

6    higher than the previous rate so that generated quite a bit

7    of value.  Also in the investment world, when you get a

8    tenant that signs a 15-year plus lease, a government tenant,

9    it's considered a pretty safe investment and that creates

10   quite a bit of value.

11        So the property being in good condition, good quality,

12   similar to market parameters, then the market improving and

13   then with a long-term lease, that indicated that the value

14   had gone up on this property after the storm, being more

15   demand in the market which is proven by the studies in the

16   appraisal report.  It created a higher value so the building

17   is worth approximately $600,000 higher.

18        **Q.**   Okay.

19             MS. PAYNE:  D-102.

20             MR. COX:  You can show them.  Thank you.  No

21        objection.

22             THE COURT:  It'll be admitted.

23   BY MS. PAYNE:

24        **Q.**   Is this some of the photographs that you took of

25   this property?

1        A.    It is.

2        Q.    Okay.  And so I'm going to flip to the next one.

3    And again, your inspection occurred in July of 2021?

4        A.    It did.

5        Q.    Okay.  So this is what the property looks like now?

6        A.    Yes.

7        Q.    Well, as of July 2021?

8        A.    As of July 2021.

9        Q.    As a part of your analysis -- you've probably heard

10   we've talked about this inspection report from 2018.  Did you

11   review that report --

12       A.    I did.

13       Q.    -- before you prepared your report?

14       Okay.  This is already admitted into evidence, D-61.  So

15   you reviewed these pictures from 2018?

16       A.    Yes, that's correct.

17       Q.    And this is Page 4 of that report.  These are other

18   pictures of the property in 2018?

19       A.    Yes, that's correct.

20       Q.    And so you'd mentioned, as far as the property, it

21   was in good leasing condition and the components of the

22   building were new; is that correct?

23       A.    The components I looked at, yes, they looked

24   relatively new.

25       Q.    Looking at these pictures as well, we can see that

1    the building is in much better shape today than it was

2    pre-storm; is that correct?

3         A.   It was.

4         Q.   And again, you'd talked about reviewing that GSA

5    lease.  And as a part of that lease, what kind of components

6    were required under that lease, high quality components?

7         A.   It was.  It was a detailed -- it's pretty

8    intimidating when you go through a government lease and the

9    requirements they had from literally making sure you had

10   proper paint, floor covering, insulation, window coverings.

11   It was detailed in that government lease what had to be done.

12   So yes.  I assume that they met those qualifications or the

13   Government wouldn't have signed the lease.

14        Q.   Okay.

15             MS. PAYNE:  And I'd like to offer and introduce the

16   Duplantis CV, D-103.

17             MR. COX:  No objection.

18             THE COURT:  It'll be admitted.

19             MS. PAYNE:  I tender the witness.

20             THE COURT:  Any cross-examination?

21             MR. COX:  Yes, Your Honor.

22             THE COURT:  Okay.

23                     **CROSS-EXAMINATION**

24   BY MR. COX:

25        Q.   Mr. Duplantis, am I correct that Scottsdale

1    Insurance Company paid you $20,000 for your opinion in this
2    case?
3              THE COURT:  Got an objection?
4              MS. PAYNE:  Yes.  Can we sidebar?
5              THE COURT:  Sure.
6                        **BENCH CONFERENCE**
7              THE COURT:  Yes, ma'am.
8              MS. PAYNE:  Your Honor, his original scope included
9         countering their prior real estate expert so $20,000 is
10        not comparative to what he's testifying here today.
11             THE COURT:  Yeah.  But the thing is, an expert,
12        he's allowed to ask what he's been paid or what he's
13        charged.  It goes to his credibility for the jury.
14             MS. PAYNE:  But we're not allowed to say that he
15        was originally hired to dispute an expert for a claim
16        that they dropped --
17             THE COURT:  It doesn't matter.
18             MS. PAYNE:  -- so it makes it look like he was paid
19        $20,000 to do this when he was paid 20,000 to --
20             THE COURT:  You can ask him, "You were hired to
21        rebut another expert?"  You can ask these questions.  I
22        mean, that's --
23             MS. PAYNE:  An expert that's no longer being
24        produced?  I just want to make --
25             THE COURT:  I understand that.  That's their call.

604

1       But you did a good job, by the way.

2           MS. PAYNE:  Thank you.

3           THE COURT:  You did a good job.

4           MR. COX:  Thought so, too.

5           THE COURT:  But that's actually fair.

6           MS. PAYNE:  So I'm okay?  I can say that now since

7       he's going to bring up the $20,000, that he was

8       originally hired --

9           THE COURT:  You can bring it up on redirect, yeah.

10          MS. PAYNE:  Okay.  I just wanted to make sure.

11          THE COURT:  No, no.  You're good.

12                          **PROCEEDINGS CONTINUED**

13          THE COURT:  All right.

14      BY MR. COX:

15      Q.   I'll repeat the question, Mr. Duplantis.  Am I

16      right that Scottsdale Insurance Company paid you $20,000 for

17      your opinion in this case?

18      A.   You're not correct.  Scottsdale paid Newmark Knight

19      Frank at the time 20,000, not me.  I'm on a fixed salary.

20      And also, part of the scope of assignment was to do a review

21      of an appraisal report provided by one of your experts and so

22      I did a review of that report.  I reviewed a Valbridge

23      report, and I provided values as of pre- and post-storm.  So

24      no, you're not correct.

25      Q.   Am I at least right that Scottsdale Insurance paid

605

1  $20,000 for the work in this case by you or your company?

2       A.   You're correct about that.

3       Q.   Thank you, sir.  Ms. Brown asked Mr. Stuck if a

4  roof blew off a house, just a residential house, and the roof

5  was, let's say, 40 years old and the homeowner puts a

6  brand-new roof through insurance, they put a brand-new roof

7  on the home, she asked Mr. Stuck if the home would be worth

8  more with a brand-new roof than a 40-year-old roof.  What's

9  your opinion about that?

10      A.   Could be.

11      Q.   You don't think that a roof that's a brand-new roof

12  is going to make a house worth more than a house with a

13  40-year-old roof?

14      A.   Well, there's a bunch of parameters that come in

15  determining value.  First you'd have to understand the

16  neighborhood, the market, the demand for other single family

17  homes in that area, what condition was the 40-year-old roof

18  on the house had been, had it been repaired over the years,

19  had it had overlays.  So there's a bunch of conditions if you

20  want to create a hypothetical, but it may or may not have.

21      Q.   Even if it does make the house worth more, though,

22  you would agree that doesn't in any way affect whether an

23  insurance company has to pay for the roof on the house,

24  correct?

25      A.   I can't comment on what insurance has to pay for.

1    **Q.**   Thank you, sir.  No other questions.

2    **A.**   Thank you.

3         THE COURT:  Redirect?

4         MS. PAYNE:  Very brief.

5                    **REDIRECT EXAMINATION**

6    **BY MS. PAYNE:**

7    **Q.**   Mr. Duplantis, I think you already covered this

8    before when counsel was talking about how much you were paid

9    or your company was paid in this case.  Originally your scope

10   included review of an expert that plaintiff didn't call here

11   at trial; is that correct?

12   **A.**   That is correct.

13   **Q.**   So the scope of your assignment here at court is

14   not what you were originally hired for?

15   **A.**   Correct.

16        MS. PAYNE:  That's all the questions I have.

17        THE COURT:  You may step down.  Thank you, sir.

18   Mr. Wolff.

19        MR. WOLFF:  If I may, our goal is to rest; but I

20   need a few minutes.

21        THE COURT:  We'll do this.  Why don't we take a

22   quick 15 minute break.  Y'all assess where you are.

23   I'll let the jury go have a quick break, go to the

24   restroom, get a cup of coffee.  All right.

25                 (Jury exits courtroom.)

1    THE COURT:  Okay.  You can step down.  We'll be at

2    recess for, let's say, 15 minutes.  By the way,

3    Mr. Wolff, she did an excellent job.

4    MR. WOLFF:  Thank you, Your Honor.

5    THE COURT:  You did good.

6    (Recess is taken.)

7    THE COURT:  Mr. Wolff, any more witnesses?

8    MR. WOLFF:  No, Your Honor.  And I think the

9    exhibits are in order so we're going to rest.

10   THE COURT:  Okay.  We'll do that in just a second.

11   I'll let you do that formally in front of the jury.  But

12   here's the question I have for y'all.  Are y'all ready

13   to do closing arguments?

14   MR. COX:  We have rebuttal, Your Honor.

15   THE COURT:  Oh, you have a rebuttal witness?

16   MS. BROWN:  Yes, brief.  And I do also have a

17   directed verdict motion.

18   MR. COX:  Have they rested --

19   MS. BROWN:  Yes.

20   MR. COX:  -- for the directed verdict?

21   MS. BROWN:  Yes.

22   MR. WOLFF:  No, I haven't rested.

23   MS. BROWN:  I thought you just said you rested.

24   THE COURT:  He'll have to do that in a minute.

25   MS. BROWN:  Can I ask you before the jury comes in,

1    I assume you want me to make the directed verdict motion
2    as a sidebar?
3          THE COURT:  Yes.
4          MR. WOLFF:  Do we want to do that now?  I don't
5    have a problem doing that.
6          THE COURT:  Here's what we'll do.  You're resting,
7    Mr. Wolff?  We'll do it again formally.
8          MR. WOLFF:  I will rest.  But if we're going to do
9    directed verdicts now --
10         MR. COX:  I'd rather do it after you rest.
11         THE COURT:  All right.  Let's just wait a second.
12    We'll do it at a sidebar real quick.  Well, gosh dang
13    it, that's always very difficult.  Let's bring the jury
14    in, and we might just go to sidebar and do it very
15    quickly.  I'm assuming it's a very quick brief.
16         MS. BROWN:  Yes, Your Honor.  You've actually
17    already made the argument.
18         MR. COX:  15 seconds at the most.
19         THE COURT:  You know what the ruling's going to be,
20    so.  All right.  You can bring the jury in.
21                    (Jury enters courtroom.)
22         THE COURT:  Very good.  Please have a seat.  All
23    right.  Mr. Wolff, what's next?
24         MR. WOLFF:  We did our housekeeping, and defendant
25    rests.

1       THE COURT:  Okay.  Very good.  Ladies and

2   gentlemen, the defendants have rested their defense of

3   the case.  Now the plaintiff may have rebuttal.  Do

4   y'all have any rebuttal witnesses?

5       MS. BROWN:  We do.  Before that, we have a motion

6   to take up with you.

7       THE COURT:  They have a rebuttal witness.  I've

8   been told that it's not going to take long.  And then

9   we'll probably look at how we're going to do -- we'll do

10  closing arguments.  So we're on track.  Okay.  If I

11  could see counsel over here.

12                    **BENCH CONFERENCE**

13      THE COURT:  So DD doesn't fuss at me, please speak

14  into the thing.  What do you have?

15      MS. BROWN:  I want to re-urge the arguments that

16  were made this morning in the charge conference, but we

17  move for a directed verdict on the defenses related to

18  misrepresentation.

19      THE COURT:  Okay.  Like I said, I don't think

20  there's any evidence of that out there.  They didn't

21  even make, really, an affirmative defense of that, I

22  don't think.

23      MS. BROWN:  They did.

24      MR. WOLFF:  I did.

25      THE COURT:  Did you?

1      MS. BROWN:  They asserted the defense.  So I just,

2      to avoid any error, because you suggested that you were

3      essentially directing a verdict, I just wanted to --

4          THE COURT:  What do you want to say, Mr. Wolff, on

5      the record?

6          MR. WOLFF:  Well, you've made this motion moot

7      because you're not going to allow it to the jury.

8          THE COURT:  That's kind of my point.  I think it is

9      moot because I'm not -- as I said earlier during our

10     objections to the charges, I have not seen, really, any

11     evidence of that.  But I guess technically, since you're

12     making a motion, I mean, I guess I think it's moot; but

13     I don't know if I can just do that.  I think I have to

14     rule on it since she's made the motion.

15         MR. WOLFF:  This is where we are and I think --

16         MS. BROWN:  I think you can deny it as moot, I

17     mean, if that's what you choose to do.

18         MR. WOLFF:  What I think -- what I was going to

19     argue is that I have put in prima facie proof of that

20     affirmative defense.  I've alleged it timely.  I think

21     that to resolve those issues it requires an inherent

22     credibility assessment.  I think that the trier of fact

23     is allowed to look at the record as a whole and draw

24     inferences on a directed verdict.  Those inferences

25     cannot go in favor of the plaintiff in this instance.

1      And so, therefore, I think it gets to the jury.

2          However, you have already ruled that you believe

3      the issue is moot.  You have not allowed the jury charge

4      on the subject.  You're going to rule on, when asked,

5      and said you'd deny it as moot.

6          THE COURT:  Yeah.  I'm going to deny it as moot

7      because, as I said earlier, I haven't seen any evidence

8      during the -- of any misrepresentation that I think goes

9      to the jury.

10         MS. BROWN:  Okay.  I just want to make sure --

11         THE COURT:  That's why I'm not going to charge them

12     on it because --

13         MS. BROWN:  -- needed to do.

14         THE COURT:  Yeah, as I said earlier.

15         MS. BROWN:  Okay.

16         MR. WOLFF:  Thank you, Your Honor.

17                    **PROCEEDINGS CONTINUED**

18         THE COURT:  Okay.  Mr. Cox, do you have a rebuttal

19     witness or witnesses?

20         MR. COX:  Yes, sir, Your Honor.

21         THE COURT:  Call your first rebuttal witness.

22         MR. COX:  We call Evan Monheiser of Encore

23     Construction.

24         MR. WOLFF:  May I approach, Your Honor?

25         THE COURT:  Yeah.  Come up here, Mr. Cox, before

1    you go.  Sorry, ladies and gentlemen.

2                          **BENCH CONFERENCE**

3         THE COURT:  Who's going to argue this because I got

4    to get you near my mic.  Mr. Cox, Mr. Wolff.

5         MR. WOLFF:  I'm objecting.  We asked that Monheiser

6    be produced at trial.  They said he is unavailable, not

7    producing him at trial.  So we were going to use a

8    deposition.  In an effort to move this case along, we

9    did not use that deposition.  This is pure surprise.  If

10   he was available, and he's obviously available to

11   plaintiff because he's flown in, he was on their

12   will-call list, why wasn't he in the case in chief?

13   This is unfair and prejudicial.  And it's gamesmanship,

14   quite honestly, because if he was going to testify and

15   he's available we should have had a right -- and they're

16   doing it in rebuttal and this is unfair surprise.

17        THE COURT:  The problem is they don't have to

18   disclose rebuttal witnesses because they don't know what

19   you're going to put on.  And I don't know logistics of

20   him being here live or not in the case in chief, but

21   apparently they've heard your case and got him here for

22   rebuttal.  What's the deal?

23        MR. COX:  The reason he's rebutting is because of

24   Granger Stuck's testimony.  It's very limited.  I've got

25   about five questions, Your Honor, and it just has to do

1      with the price of their contract which Mr. Stuck

2      misrepresented.

3          MS. WOLF:  Mr. Stuck didn't misrepresent anything.

4      He interpreted documents.  He's --

5          THE COURT:  Well, that's it, then.  I guess they're

6      disputing his interpretation of the documents.

7          MS. WOLF:  I've got his deposition ready, but I'm

8      going to need some time after --

9          THE COURT:  No.  It's a rebuttal witness.  He's

10     going to be limited to -- it has to be in rebuttal to

11     something you put in evidence.  He's telling me it's

12     five questions.

13         MS. BROWN:  Likewise, cross-examination is limited

14     to the scope of that.

15         THE COURT:  Scope of that.  This is rebuttal.  I

16     mean, it's a technical thing.  I understand your

17     position, but the thing is you don't have to disclose

18     rebuttal witnesses.  The reason you don't disclose them

19     is because you don't know who they're going to be until

20     you put your case on.  So they don't know who they're

21     going to call in rebuttal.

22         MR. WOLFF:  That's not the issue.  The issue is

23     making him available, and they told us he was not

24     available.

25         MS. BROWN:  He wasn't.

1          MR. COX:  He's not a party and he's not --

2          MR. WOLFF:  Did you-all fly him in?

3          MR. COX:  Absolutely.

4          MS. BROWN:  He got here at midnight last night.

5          THE COURT:  That's their call.  They're in the

6     case.  They heard something your guy said and they

7     wanted to spend the money to fly the guy in.  He's

8     willing to do it, you know.  They couldn't subpoena him

9     so they got him here voluntarily.

10         MR. WOLFF:  So they had him as a will-call witness

11    on the case in chief.  They said, "We cannot get him

12    here."  So we're left with a deposition.  In an effort

13    to trim this down, we did exactly that.  And now he is

14    suddenly available.

15         THE COURT:  As a rebuttal witness.

16         MR. WOLFF:  I understand what you're saying, but

17    that is unfair prejudice and surprise because they could

18    use his deposition if they wanted to.

19         THE COURT:  It's not really unfair prejudice or

20    surprise because it's a rebuttal witness and no one has

21    to disclose a rebuttal witness.  No one knows who the

22    rebuttal witness would be.

23         MR. WOLFF:  He's a will-call witness.  They told us

24    he's unavailable.  Now he's suddenly available.

25         THE COURT:  He's available as a rebuttal --

1      MS. WOLF:  May I just say, Your Honor, that when

2   this trial was set for November I contacted

3   Mr. Monheiser and asked him if he was still in the state

4   and doing work.  Then I would be allowed to subpoena

5   him.  And he had Ms. Brown intervene and they both told

6   me he is not available, he's no longer in the state.

7      THE COURT:  Probably wasn't.

8      MR. COX:  That's what we said.  He's not available

9   for a subpoena in the state.

10      THE COURT:  He's not.  They got him.  They

11   convinced him to come voluntarily as a rebuttal witness.

12   What am I supposed to do?  They're entitled to call a

13   rebuttal witnesses.

14      MR. WOLFF:  If it's a will-call they have to --

15      THE COURT:  I don't think there's any rule about

16   whether they had him on the will-call or not.  They

17   chose not to call him.  You chose not --

18      MR. WOLFF:  Because he wasn't available.  Why --

19      THE COURT:  I hear what you're saying.

20      MR. WOLFF:  You made your ruling.

21      THE COURT:  I know.  I understand your point.  But

22   really and truly, you know, he's rebuttal.

23      MS. WOLF:  Judge, can I have ten minutes after they

24   ask the questions to pull the deposition?  I've got them

25   tabbed and highlighted.  I didn't think --

1          MS. BROWN:  Questions I don't think were covered in
2     the deposition.  Doesn't say anything about Granger
3     Stuck.
4          MS. WOLF:  I think they are covered.
5          THE COURT:  I'll give you five.
6          MS. WOLF:  Okay.  Thank you.
7          THE COURT:  We've got to get this thing moving.
8          MR. COX:  Thank you, Your Honor.
9          THE COURT:  It's a rebuttal witness.
10                   PROCEEDINGS CONTINUED
11          THE COURT:  All right.  Mr. Cox, call your witness.
12          MR. COX:  Thank you, Your Honor.  I'll get
13     Mr. Monheiser.
14                      EVAN MONHEISER,
15     after being first duly cautioned and sworn to tell the truth,
16     the whole truth and nothing but the truth, did testify on
17     oath as follows:
18                    DIRECT EXAMINATION
19     BY MR. COX:
20     Q.    Sir, please state your name.
21     A.    Evan Monheiser.
22     Q.    What's your job, Mr. Monheiser?
23     A.    I'm a project manager for Encore.
24     Q.    Were you the project manager for the hurricane
25     repair work that was done to the building at 620 Esplanade

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

1   owned by Eaux Holdings?

2       A.   Yes.

3       Q.   Other than the windows being replaced, when did

4   Encore finish repairing the hurricane damage to the building?

5       A.   I don't know the exact date, but right around mid

6   August.

7       Q.   If Scottsdale Insurance Company's expert testified

8   that Encore substantially completed the construction of the

9   building in April of 2021, was that testimony inaccurate?

10      A.   Yes.

11          MS. WOLF:  Your Honor.

12          THE COURT:  Yeah.

13          MS. WOLF:  The objection to that was misstatement

14      of what Mr. Stuck said.  He didn't say April.

15          THE COURT:  I think he said May.

16          MS. WOLF:  Late May.

17   BY MR. COX:

18      Q.   If he said May, would that be inaccurate?

19      A.   Yes.

20      Q.   What were Encore's total charges to Eaux for the

21   repairs just for hurricane damages?

22      A.   About 1,335,000 and some change.

23      Q.   What was the original amount of the contract with

24   Eaux?

25      A.   1.36 million.

1      **Q.**   How much did Encore charge in total for hurricane

2   and non-hurricane related items on this job?

3      **A.**   Upwards of 1.4.  It's beyond 1.4 with additional

4   items.

5      **Q.**   Were you careful to separate the work that Encore

6   did that was related to hurricane damage from work that was

7   relate -- not related to the hurricane damage?

8      **A.**   Yes.

9      **Q.**   Scottsdale's expert testified, I think this

10   morning, that Encore's total charges on this job for

11   hurricane related work were $976,000.  Is that testimony true

12   or false?

13      **A.**   False.

14      **Q.**   Scottsdale's expert testified that Encore has been

15   paid in full for this job for the hurricane related work.  Is

16   that true or false?

17      **A.**   False.

18      **Q.**   How much does Eaux Holdings still owe Encore for

19   hurricane related work?

20      **A.**   North of $350,000.

21      **Q.**   Thank you, sir.  I don't have any other questions.

22          THE COURT:  Ms. Wolf, take your five minutes.

23      Ladies and gentlemen, I'm going to give her a few

24      minutes to get her stuff straight.  So if y'all would

25      just be patient.  You got a couple minutes left if you

```
 1        need it.
 2             MS. WOLF:  We're going to do it this way.  I might
 3        have to call in for help.
 4             THE COURT:  That's okay.
 5             MS. WOLF:  I need some more exhibits.  We'll just
 6        get started.
 7             THE COURT:  That's all right.
 8                        CROSS-EXAMINATION
 9   BY MS. WOLF:
10        Q.   Good morning.  We met by video deposition.  Do you
11   remember that, Mr. Monheiser?
12        A.   Yes.
13        Q.   That was back in August, August 5th and 6th of
14   2021, right?
15        A.   Yes.
16        Q.   So do you recall that this trial was set for last
17   November?  Do you recall me either calling or sending you an
18   e-mail and asking if I could issue a subpoena or if you were
19   still going to be in Louisiana so I could bring you to trial?
20        A.   I remember the conversation.
21        Q.   Right.
22             MR. COX:  Objection, Your Honor.
23             THE COURT:  Sustained.  Beyond the scope.  I
24        mean -- no.  You know what, I think that's a fair
25        question.  I retract that.  You can ask it.
```

BY MS. WOLF:

    Q.   Do you recall that I did try to contact you to see if you were still working in Louisiana --

    A.   Yes.

    Q.   -- back -- I'm sorry.  I'll finish asking the question so we can get it on the record so that everybody knows what I'm trying to ask.  Okay.  And I understand that you know where I'm going with it, but let's just keep it that way so that I can get my question out.

    A.   Okay.

    Q.   So you recall that when this case was set for trial last November 2021 either -- I can't remember if I e-mailed or called you and asked if you were still working in the state of Louisiana, right?

    A.   Correct.

    Q.   Do you understand that I did that because I could only issue a subpoena to bring you to trial if you were within this region?  I couldn't reach you in Missouri or Kansas.  You understood that?

    A.   Yes.

    Q.   And you told me that you were no longer doing any work in Louisiana?

    A.   Correct.

    Q.   And, therefore, I couldn't issue a subpoena if you weren't going to be here?

```
 1        A.    Correct.
 2        Q.    Okay.  You also recall that you gave a deposition
 3   over two days, right --
 4        A.    Correct.
 5        Q.    -- last August?
 6        Thank you.  You recall that in that deposition I did ask
 7   you about your contract.  And this document that I'm going to
 8   put up here for you --
 9             MR. COX:  What exhibit is that?
10             MS. WOLF:  It's D-176.  It's been admitted.
11   BY MS. WOLF:
12        Q.    Do you recognize this contract section from your
13   construction contract with the plaintiff?  It's an excerpt
14   from it.  If you don't recognize it, I can get the entire
15   document to show you where it came from.
16        A.    Yeah, it looks similar to what --
17        Q.    You do recognize it?
18        A.    Yes.
19        Q.    Okay.  Because I'm going to ask you questions just
20   about this section.  And this is a section from your contract
21   with Eaux Holdings, right?
22        A.    Correct.
23        Q.    And it's Section 3, the contract sum, correct?
24        A.    Correct.
25        Q.    And you see in your contract here -- hold on just
```

622

1    one second.  All right.  You see it says "Owners shall pay

2    contractor for performance of the work, subject to additions

3    and deductions by change order, the total sum of

4    $1.36 million"?

5         A.   Correct.

6         Q.   And then the next part, 3.2, calls for an initial

7    payment of a hundred thousand dollars; you see that?

8         A.   Uh-huh.

9         Q.   And the next section calls for a progress payment

10   of 250,000; you see that?

11        A.   Correct.

12        Q.   And you see the final section, the final payment is

13   due 30 days after the owner has received total payments for

14   depreciation held by the insurance company; do you see that?

15        A.   Correct.

16        Q.   Let's go and look at the payments that your company

17   received.  Now, just to make sure that we're on the same

18   page, I do know that Encore was paid on November 4th

19   approximately $25,000 and that was for work that Encore had

20   done before it got its license.  That was some preliminary

21   work, hiring BECI engineers and ADG and trying to get things

22   ready for once you got your license, right?

23        A.   Correct.

24        Q.   So we'll set that one aside and I want to go back

25   to the contract.  It does only call for three payments in

623

1    your contract, right, initial, progress, and final payment,

2    right?  Do you need to see the whole contract?  Because this

3    was just an excerpt and, if you need to to be sure, I can

4    hand you the whole contract.

5         A.   It states three payments.

6         Q.   All right.  So Encore was paid the initial payment

7    of a hundred thousand dollars, right?  This has already been

8    admitted as Exhibit D-142.  Is that right?

9         A.   Correct.

10        Q.   Encore was paid the progress payment of $250,000 on

11   February 3rd, right?

12        A.   Correct.

13        Q.   And Encore was, in fact, paid the final payment on

14   June 3rd of $550,000, right?

15        A.   Correct.

16        Q.   And that date of June 3rd, 2021, were you aware

17   that Eaux Holdings received payment from the insurance

18   company of $1.1 million on May 18th, 2021?

19        A.   I don't recollect the exact date, but I know that

20   there was payment made.

21        Q.   So at the time, back when you were at the property

22   in the May 2021 timeframe, May and June, were you aware --

23   did Mr. Odom tell you, "I've gotten my payment from the

24   insurance company of $1.1 million"?

25        A.   Correct.

624

1      **Q.**   And then shortly thereafter you got this final

2   payment under your contract, right?

3      **A.**   Correct.

4      **Q.**   Recall when I asked you in your deposition what the

5   status of the work was.  Didn't you tell me that the status

6   was that you were pretty much done with everything except for

7   the windows and second floor tenant finish, right?

8      **A.**   Yes.

9      **Q.**   So, again, I took your deposition in early August

10   of 2021, right?

11      **A.**   Correct.

12      **Q.**   And I asked you, I asked you more than one question

13   about it throughout the deposition, what is the status of the

14   work and what remains.  Do you remember me asking you that?

15      **A.**   I don't exactly remember but roughly, yes.

16      **Q.**   Right.  And every time you said the window system.

17   Let's talk about the window system.  You said two things, the

18   window system and second floor tenant finish, right?

19      **A.**   Correct.

20      **Q.**   Let's talk about the window system because I know

21   that Encore hired BECI even before you were licensed so that

22   you could get ready for what you knew was part of your

23   project.  And I know you haven't been in court, but the jury

24   has seen the outside pictures of the building and they know

25   that it's a window system.  I think it's called a ribbon

625

1     window system?

2         A.    Yes, a horizontal ribbon window system.

3         Q.    Okay.  And then it's those wall panels, the

4     exterior cement wall panels, right?

5         A.    Correct.

6         Q.    So that was a big part of your job to figure out

7     how to fix that, right, because it was a lot of hurricane

8     damage?

9         A.    Correct.

10        Q.    And I remember you telling me for pages, and I

11    think that's why your deposition took two days, because you

12    very thoroughly explained what a difficult process that was

13    for you, right?

14        A.    Yes.

15        Q.    And y'all had hired an engineering firm to help you

16    figure out a solution, right?

17        A.    Correct.

18        Q.    So what the owner chose to do or what you did

19    successfully was replace all of the exterior wall panels --

20        A.    Correct.

21        Q.    -- correct, but you didn't -- you fixed the

22    windows.  Let me make sure we got this right.  Any window

23    that was broken, chipped, cracked, smashed through, that

24    Encore repaired?

25        A.    There's more to windows than just the glass.

626

1      **Q.**   You're right.  So I just want to break the window

2   component down.  I can -- I think it's the glass.  I just

3   want to make you confirm that, yes, there's no broken glass

4   out there.  Encore fixed all of that, right?

5      **A.**   Correct.

6      **Q.**   And then you talked about the mullion system, the

7   part around the windows, and you said that you got some

8   replacement parts and you explained that there was some parts

9   missing on the inside; remember that?

10     **A.**   Yep.

11     **Q.**   And you remember me asking you whether or not it

12  was hurricane damage and you said I don't know?

13     **A.**   We never got replacement parts for the windows.

14     **Q.**   Do you remember telling me that part of the

15  difficulty was that there were some parts missing on the

16  inside of the building?

17     **A.**   Yes.

18     **Q.**   And I asked you was that hurricane damage or was it

19  something that was just from before the hurricane and you

20  said you didn't know, right?

21     **A.**   I don't recollect saying that.

22     **Q.**   Okay.  What -- so tell me, there were missing parts

23  inside the windows?

24     **A.**   Yes, there were missing parts but also parts were

25  bent to where we couldn't bend them back.

627

1      **Q.**   So if there were some parts on the inside of the
2  building that were missing, would you have known whether or
3  not that was hurricane damage or something that was missing
4  from before?
5      **A.**   I wouldn't know exactly.
6      **Q.**   All right.  Do you remember you telling me that it
7  really wasn't your job to track insurance versus
8  non-insurance because your client was Eaux Holdings, right?
9      **A.**   Correct.
10     **Q.**   And you told me that somebody said to you, "Hey,
11 you need to track whatever things on this building that
12 you're doing that are not insurance related," correct?
13     **A.**   Right, changes that we made.
14     **Q.**   Right.  And you said what that change order was,
15 and the jury's heard about the change orders.  We've all
16 explained because I think it took a while for me to
17 understand what you were doing.  But you did explain it was a
18 change order system that you kept, right?  Remember that?
19     **A.**   We do it in our system.
20     **Q.**   What's that?
21     **A.**   It's how we do it in our system.
22     **Q.**   Yeah.  You had to come up with a way to track the
23 things that were not hurricane related?
24     **A.**   Correct.
25     **Q.**   And you told me, "I did this off the top of my head

1   because it's really not my job to track insurance versus non-
2   insurance"?
3        A.   I just took numbers from what the subs gave me and
4   divided that by what's insurance related and what's not by
5   the square foot price.
6        Q.   And the jury's heard about the $42,044 worth of
7   things that y'all deducted from your contract that were
8   non-hurricane related.  Do you remember that number off the
9   top of your head?
10       A.   Roughly, yes.
11       Q.   Right.  About nine change orders.  Okay.  So back
12  to the window system.  So the way it ended was Encore did
13  replace, let me just break it down, all the broken glass and
14  chips and cracks, right?
15       A.   Correct.
16       Q.   I thought you told me in the deposition that as far
17  as any scratched or dented mullions on the outside that you
18  did, to the best that you could, get parts and fix all that?
19       A.   We didn't -- it's hard to explain, but we had to
20  makeshift something to make it look halfway normal.
21       Q.   Right.  I remember you telling me that it was quite
22  a headache for you.
23       A.   Yes.
24       Q.   You spent a lot of hours on that?
25       A.   Yes.

1    **Q.**   And the BECI report included sealant and -- I can't

2    think of the word.  In other words, there was sealant that

3    was involved between the glass, right, and y'all included

4    that?

5    **A.**   Yes.  I asked for to -- ways to repair or replace

6    the windows and one of those was a sealant.

7    **Q.**   All right.  And then I think I thought of the other

8    word.  Is it called glazing?

9    **A.**   Yes.  Sorry.  Sealant is the wet glazing.  Sealant

10   and glazing are the same thing.

11   **Q.**   I think the point I'm trying to make is that you,

12   Encore, hired an engineering firm to help figure out a

13   solution for that problem of the damaged window system and

14   the damaged paneling?

15                   MR. COX:  Excuse me, Your Honor.  May we approach?

16                   THE COURT:  Yes.

17                              **BENCH CONFERENCE**

18                   THE COURT:  All right.  Mr. Cox, what's your

19            objection, if there is one here?

20                   MR. COX:  There's an objection, Your Honor.  Under

21            Rule 611 of the Code of Evidence the cross-examination

22            is limited to the scope of the direct examination, and

23            talking about this whole engineering contract is outside

24            of that scope.  Now, if it has to do with his charges,

25            fair game because I talked about that --

1          THE COURT:  611?

2          MR. COX:  -- but it's going far afield from it.  I

3      just want to make sure we're not here for 16 hours.

4      That's how long his deposition took when we got into

5      these kind of issues.

6          THE COURT:  You read faster than me.

7          MS. WOLF:  No, I'm good; but that's where I'm

8      going.  Sorry if it's taking long, but it's a lot of

9      stuff.  It's going to that.  It's going to what his

10     charges are.  The punch line is that it's not hurricane

11     related.  And I certainly don't want this jury to walk

12     out of here thinking this man who hired an engineering

13     report to fix the windows left Mr. Odom with damaged

14     windows.

15         THE COURT:  I'm going to give her a little leeway.

16     I mean, he did talk about -- you did ask him did he

17     segregate out the cost --

18         MR. COX:  Right.

19         THE COURT:  -- and he said he did.  I'm assuming

20     this is what your questions are about, did he really

21     segregate out the cost.  I don't really know what the

22     damn engineering firm has to do with it, though.  If you

23     want to focus -- that was really the subject of his

24     direct, was simply did he segregate out these costs and

25     when was the substantial completion done.  That was the

1    rebuttal testimony for your expert saying it was done in

2    May.  He says no, August.  Your guy says that he got

3    paid fully.  He came back to say no, he wasn't.  I don't

4    want --

5         MS. WOLF:  Okay.  So I do understand it --

6         THE COURT:  You're getting into the weeds about

7    metal around windows.

8         MS. WOLF:  I got it, but let me just make sure I've

9    really got it because we've talked about -- without this

10   witness here, I used the windows, for example, as the

11   basis for what Mr. Stuck said.  So I guess what I'm

12   saying is I don't want to be shut out since he's here

13   and --

14        THE COURT:  You're not -- he's here as a rebuttal

15   witness.  This does not mean you get to come up here now

16   and do a full thing on him --

17        MS. WOLF:  I understand.

18        THE COURT:  -- like he's a witness in the case in

19   chief by one party.  It's limited to the rebuttal

20   testimony.

21        MS. WOLF:  But it goes to the contract, right?

22   What you're saying is his contract is 1.36 million and

23   even more than that.  What I'm trying to say is no,

24   Mr. Stuck was right in relying on it because all that's

25   been shown is that what was --

632

1        THE COURT:  Yeah, I think that's fair game.  I
2   think you need to not beat around the bush to get there.
3        MR. WOLFF:  It's a big door.
4        THE COURT:  It's not a big door because I'm making
5   the door small.
6        MS. WOLF:  Okay.  Well --
7        THE COURT:  I think you can get there a lot quicker
8   and more precisely than all this other stuff.
9        MS. WOLF:  Oh, yeah, I could if I knew this was
10  going to be happening today.
11       THE COURT:  Unfortunately, that's the nature of
12  rebuttal witnesses.  I mean, that's why they're rebuttal
13  witnesses.  Hey, listen, these criminal defense lawyers,
14  I admire them because they don't get to do all these
15  depositions.  They have to come in here and shoot from
16  the hip, and they got people's lives on the line.  I got
17  confidence in you.
18       MS. WOLF:  I'm listening to what y'all are saying.
19  I'm trying to fit that into the way I think.  I mean,
20  I'm not --
21       THE COURT:  You're a very detailed person.  I
22  admire that.  You are.  That's a good quality, but it
23  makes it very difficult.  I understand.
24       MS. WOLF:  Trying to think of where the line is
25  drawn because --

633

1          THE COURT:  He's right.  Listen, focus --
2          MS. WOLF:  -- ask him about the work he did as it
3    relates to the contract about --
4          THE COURT:  No.  He was here about substantial
5    completion and payments.
6          MR. WOLFF:  And the scope of the contract.
7          MS. WOLF:  But what the jury's hearing is that
8    there was work left to be done, and I asked him and he's
9    already confirmed that what he told me was the truth.
10    It was windows and second floor.  So I've got to find
11    out if that is hurricane related or not.
12          THE COURT:  Well, ask him that.  You can ask him
13    that question without spending ten minutes on, well,
14    there's metal cladding and all this.  Just ask him
15    about -- you can get there quick.
16          MR. COX:  And I didn't ask any questions about the
17    work after August.
18          MR. WOLFF:  That doesn't matter.  He said
19    there's --
20          MS. WOLF:  I'm talking about the work between --
21          MR. WOLFF:  -- money left from the 9/24 that has
22    been paid to the 1.36.
23          THE COURT:  Ask him was work left to be done.
24          MS. WOLF:  I did.
25          THE COURT:  I didn't really hear that.

634

```
 1              MS. WOLF:  I thought I did.
 2              THE COURT:  I think you're doing fine.  You're
 3       doing a great job.  I'm not trying to be critical.  I
 4       know you're trying to -- I would do it, too.  I would
 5       try to go as far as I can.  I think you got to narrow it
 6       down a little bit.
 7              MS. WOLF:  Yeah, I just -- okay.
 8              THE COURT:  It's hard.  I know.  Nature of
 9       litigation.  It's fluid.
10              MS. WOLF:  All right.
11              MR. WOLFF:  You got to put on your case in the
12       scope of what they're saying.  I appreciate the
13       latitude, but they're going to have to -- let me talk
14       with her a little bit.
15              THE COURT:  Yeah, go ahead.
16              MR. COX:  Thank you, Your Honor.
17              THE COURT:  You want a -- come here.
18              MS. WOLF:  What I heard was latitude a little bit
19       and then walk, wrap it up.  That's what I heard.
20              THE COURT:  I wrote down the areas that he asked
21       about.  He asked about project manager, when the
22       building was finished, total charges -- this is my
23       scribble so don't rely on it -- the original cost of the
24       contract; total for both hurricane and non-hurricane,
25       there was an amount; separation out of the work; you
```

1    know, and then paid in full; true or false, is this 350

2    still owed.  Those are the areas of his inquiry.

3         MS. WOLF:  Okay.

                    **PROCEEDINGS CONTINUED**

5    BY MS. WOLF:

6         **Q.**    All right.  So, Mr. Monheiser, I want to regroup

7    for a minute.  I think I asked you the question of in August

8    of 2021 when I asked you what work remained you told me

9    replacement of the window system and second floor tenant

10   finish space, right?

11        **A.**    Correct.

12        **Q.**    All right.  And let's focus on the second floor

13   tenant finish, and what that meant was that if the owner got

14   a tenant for the second floor then you were on task -- Encore

15   was on task to do that work to finish out the tenant space,

16   right?

17        **A.**    Correct.

18        **Q.**    And prior to Hurricane Laura the plaintiff did not

19   have a second floor tenant, right?

20        **A.**    Correct.

21        **Q.**    And so what second floor tenant finish-out means is

22   if a specific tenant moves in and wants the kitchen or the

23   walls or the carpet or something different, that's what

24   tenant finish means, right?

25        **A.**    Correct.

636

1    **Q.**   And so that's not Hurricane Laura related?

2    **A.**   But there were items in there that were related.

3    **Q.**   Okay.  And at that time, though, by August, all of

4    the Hurricane Laura stuff, what you told me, had been

5    completed and all you were waiting to do was see if a tenant

6    might come in and want to change something?

7    **A.**   The windows and if the tenant wanted to change

8    something.

9    **Q.**   I need to separate out the windows.  I don't want

10   to talk about windows for a second.  I want to set that

11   aside.  I just want to talk about the second floor tenant

12   finish.  Okay.  So I want to make sure if I'm understanding

13   you that in August when I talked to you any work that was

14   remaining related to that was not hurricane related because

15   it was going to -- the owner was going to have a new tenant

16   come in, right, and you were going to have to move some

17   things around?

18   **A.**   Correct, if they selected that.

19   **Q.**   If they selected that.  All right.  So -- and you

20   agreed that work -- you told me that work was included in the

21   $1.36 million contract, that tenant finish work that was

22   non-hurricane related was included in --

23   **A.**   I would have no way of knowing that because I

24   wouldn't -- there could be new blueprints.

25   **Q.**   So you don't know whether or not the tenant finish

1  work was, in fact, included in your $1.36 million contract
2  amount?
3      A.   If there was a new tenant, I couldn't give you a
4  price on it, if they wanted to redo the second floor.
5      Q.   Right.
6      A.   To return the building to the way that it was
7  pre-hurricane is included in the 1.36 million.
8      Q.   Okay.  So all of the hurricane related work was
9  included in the $1.36 million contract?
10      A.   Right.
11      Q.   And some non-hurricane related work was included in
12  the $1.36 million contract?
13      A.   Correct.
14      Q.   And some of the non-hurricane related work was the
15  $42,000 in change orders that we talked about?
16      A.   Correct.
17      Q.   But there was additional work that was
18  non-hurricane related that was related to the second floor
19  tenant finish in the $1.36 million contract?
20      A.   No.  No, because I wouldn't know what they would
21  want so it's hard to price that in.  We put it back the way
22  that it was pre-hurricane and added simple items.
23      Q.   Okay.  I remember asking you -- I remember asking
24  you a question.  We were talking about the tenant finish and
25  that's what I thought, because I thought how strange to

638

1   include something in your contract when you didn't know how

2   much it was going to be.  And I said, "This is outside

3   Encore's original contract scope.  The 1.36 million didn't

4   include actually finishing out the second tenant space for a

5   particular tenant, or did it?"  And your answer was it did.

6       A.   The first part that you asked, you said for the --

7   for a second floor tenant.  I mean, if they wanted to move

8   in, they could move in.

9       Q.   Okay.  So when I asked you this question in August

10  I said, "Does the $1.36 million amount include this

11  non-hurricane related tenant finish space?"  And you said,

12  "It did.  It's just that there wasn't any tenant up there."

13  You want me to show you the deposition?

14      A.   Well, again, to finish the second floor, a tenant

15  can move in; but if somebody had to come in and change things

16  around, then there would obviously be additional cost because

17  I wouldn't want to know what they --

18           MS. WOLF:  Your Honor, can I just grab the

19      transcript, please?

20           THE COURT:  Sure.

21           MS. WOLF:  What I need is -- Your Honor, does the

22      jury see this or just --

23           THE COURT:  Yeah, the jury can see it when you put

24      it on the ELMO because you're --

25           MS. WOLF:  I was going to --

639

```
 1              THE COURT:  He'll have a monitor.  I mean, you've
 2        asked him a question.  I'm assuming you have something
 3        from his deposition --
 4              MS. WOLF:  Yes.
 5              THE COURT:  -- that is different.  Okay.
 6              MS. WOLF:  I didn't know if you wanted me to
 7        actually hand him this copy.
 8              THE COURT:  He can look at it on the thing, and the
 9        jurors can see it too.
10   BY MS. WOLF:
11        Q.   If you need me to bring this copy to you --
12              THE COURT:  Can you see it on the screen, sir?
13              THE WITNESS:  Yeah.
14              MR. WOLFF:  The page number, read that out, and the
15        date.
16   BY MS. WOLF:
17        Q.   Yeah.  I'm not sure I'm making it too small.  All
18   right.  So what I'm looking at here --
19              THE COURT:  What page are you on?
20              MS. WOLF:  Let me do this.  It's Encore Day 1,
21        August 5, 2021, and we're going to go to Page 103.
22   BY MS. WOLF:
23        Q.   And we'll pick it up right here because I will tell
24   you that I, too, had the same question you just said.  How
25   would I know what to put in my 1.36 million if I don't even
```

 1   know who the tenant's going to be and what they might want.
 2   That's why I said, "Okay.  So let me clarify.  This is
 3   outside of Encore's original contract scope.  The
 4   1.36 million didn't include actually finishing out the second
 5   tenant phase for a particular tenant, or did it?"
 6        You see your answer?  "It did.  It's just there was no
 7   tenant up there to begin with."
 8        I say, "Okay.  Right."
 9        Answer:  "So, again, giving a generalized number to it,
10   yeah.  You know, usually whenever you have a tenant there's a
11   specific tenant finish unless it's an emergency."
12        I say, "Okay.  So now I'm a little confused.  Let me
13   see.  Did you have an amount of money in the 1.36 million to
14   do walls and finish out scope for the second floor?"
15        What was your answer?
16        A.   "Yes."
17        Q.   And then -- so I'm still confused because I'm
18   trying to figure out how a contractor would want to know what
19   to put in a $1.36 million contract for work that you don't
20   know the scope of.  So I think we're on the same page on
21   that.  I'm trying to figure out how you did that.  And I
22   said, "Okay.  And was that -- was it set aside as an
23   allowance or a contingency or what?"
24        And then you said, "It was set, I mean" -- then you
25   start talking about this and we can go on for a while.  Do

1    you want to read it?  I guess we'll read it.  It says, "It
2    was set, I mean, in the -- you know, hanging up Sheetrock,
3    insulation, all those things, those were -- those were
4    finishes."
5            THE COURT:  Counsel, come see me.
6                    **BENCH CONFERENCE**
7            THE COURT:  You have to ask him a question and he's
8    got to give you an answer.
9            MS. WOLF:  Okay.
10           THE COURT:  And if he gives you an inconsistent
11   answer, you can go to that deposition.  But you can't
12   stand up there and read the man's deposition.
13           MS. WOLF:  I understand.
14           THE COURT:  You understand?
15           MS. WOLF:  Yeah.  I'm doing it on the fly, though,
16   trying to --
17           THE COURT:  Look, I'm sorry, but here's my thing.
18   You can't read his deposition to him.  You got to ask
19   him a question.  If he gives you an inconsistent answer,
20   confront him with his depo.
21           MS. WOLF:  He has given me an inconsistent answer
22   with what he said, and I've got to find it in parts in
23   his deposition where I asked him about it.  He has said
24   that -- he just now said that the 1.36 million did not
25   include --

642

```
 1              UNIDENTIFIED SPEAKER:  Excuse me.
 2              THE COURT:  Wait.  Let her finish.
 3              UNIDENTIFIED SPEAKER:  They can hear.
 4              THE COURT:  No, they can't hear.  Trust me.  I've
 5         been worried about that when I took the bench, and they
 6         swear to me that that muffles it out.
 7              MR. COX:  It's that white noise.
 8              MS. WOLF:  I asked him whether or not -- here in
 9         this courtroom I asked him whether or not the
10         1.36 million included second floor tenant finish --
11              THE COURT:  I just saw it, yeah, in the deposition.
12              MS. WOLF:  -- and he said yes.  That's not what his
13         deposition says, but it's in parts and pieces and he
14         kind of stumbles all over the place.
15              THE COURT:  You're going to have to break it up in
16         parts and pieces.  You can't sit there and read ten
17         pages of his deposition to him.
18              MS. WOLF:  Okay.
19              THE COURT:  I mean, you can't.  I'm not going to
20         allow that.  I mean, he's on the stand.  Ask him
21         questions about it.  Okay.
22              MS. WOLF:  All right.
23                    PROCEEDINGS CONTINUED
24    BY MS. WOLF:
25         Q.   Mr. Monheiser, let me step away from this
```

```
 1    deposition for just a minute and ask you a different
 2    question.  You've testified here today that how much is
 3    remaining on that -- how much you say is remaining on that
 4    $1.36 million contract related to hurricane damage.  Let me
 5    start with how much is left on the $1.36 million contract
 6    that's owed by Eaux Holdings.  What's the amount?
 7         A.   350,000 plus.
 8         Q.   There's $350,000 owed out of the $1.36 million,
 9    right?
10         A.   Yep.
11         Q.   You're saying there's $350,000 owed; is that
12    correct?
13         A.   There's more -- there's -- because we did
14    additional items so --
15         Q.   Okay.  So break that down.  You did additional
16    items.  So it's you start -- you're saying you started with
17    $1.36 million, right?
18         A.   Correct.
19         Q.   And there's $350,000 owed, right?
20         A.   Correct.
21         Q.   And then did you say but there's more than $350,000
22    owed?
23         A.   It's around.  I don't know the exact number, but
24    it's around north of probably 350,000.
25         Q.   Did you bring a document to court today to show the
```

644

```
 1    exact amount that's left on the Encore contract?
 2         A.   There's --
 3         Q.   No.  My question was:  Did you bring a document to
 4    court today to show us how much remains that Eaux Holdings
 5    owes Encore for that $1.36 million contract?
 6         A.   No.
 7         Q.   Why not?
 8         A.   Everybody -- you guys have that.
 9         Q.   What's that?
10         A.   You guys have that in the folder that I provided.
11              THE COURT:  Maybe speak into the mic a little bit.
12              THE WITNESS:  Oh, I'm sorry.
13              THE COURT:  Pull it up to you a little bit better.
14              THE WITNESS:  I'm sorry.
15         A.   You guys have that in the folder that you've
16    provided.
17    BY MS. WOLF:
18         Q.   Okay.  Let me back up a minute.  Did you fly in or
19    drive in for trial today?
20         A.   I flew.
21         Q.   Okay.  And were you aware when you came here that
22    the question to be answered today is how much money remains
23    on the $1.36 million contract?  Were you aware that was the
24    question?
25         A.   Around, yes.
```

1       **Q.**   Did you know that that's what this jury has to
2   answer?
3       **A.**   Yes.
4       **Q.**   How much remains on the $1.36 million contract,
5   that's what they need to answer, right?
6       **A.**   Yes.
7       **Q.**   And you knew that before you came here?
8       **A.**   Yes.
9       **Q.**   And you didn't bring the piece of paper to show us
10  how much remains?
11      **A.**   I assumed that everybody would have it in their
12  Dropbox link that I provided.
13      **Q.**   Okay.  Well, we're not doing Dropbox links today.
14  What we have is what's already been admitted into evidence,
15  and we haven't seen it.  But you didn't bring it today,
16  right?  And so the amount is about $350,000 --
17      **A.**   Yeah.
18      **Q.**   -- right?
19      So has Encore been paid anything more than the four
20  checks that we've looked at?  Have you gotten more than --
21          THE COURT:  Those have been admitted, right?
22          MS. WOLF:  Yes.  I'm sorry.  This is D-162.
23  BY MS. WOLF:
24      **Q.**   So this is what we have.  Those are the four checks
25  that Eaux Holdings wrote to Encore, and they add up to

```
1    $924,927.50.  Right?

2         A.    Correct.

3         Q.    And is that how much Eaux Holdings has paid Encore

4    to date?

5         A.    No.

6         Q.    You're saying that you received another payment

7    after June 3rd, 2021?

8         A.    Yes.

9         Q.    Did you bring that payment to court today?

10        A.    I did not have that check copy.

11        Q.    Okay.  So you didn't bring an invoice and you

12   didn't bring a check to show more money is owed or any

13   payments have been made?

14        A.    I did not.

15        Q.    Do you have an itemized bill that would break out

16   or a pay application, or however you do it, to show exactly

17   what that work was associated with the remaining amount so

18   that we could look at it and determine whether it was

19   hurricane or non-hurricane?

20        A.    I don't have it with me.

21        Q.    Okay.  You didn't bring it.  And it's true that

22   some of the $1.36 million contract, in fact, had work that

23   was non-hurricane related in it, right?

24        A.    Correct.

25        Q.    And I want to see if I understand your testimony
```

1   now.  I want to go back to this because I think you agreed

2   with me that when I asked you in August of 2021 what work

3   remained to be done, that was in that August timeframe, you

4   said the window system and you said second floor tenant

5   finish space, right?

6       A.   Correct.

7       Q.   And the second floor tenant finish space, some of

8   that, at least some of it, was non-hurricane related,

9   correct?

10      A.   Correct.

11      Q.   And you're not able to say how much?

12      A.   On the second floor?

13      Q.   Yes.

14      A.   Not specifically how much, but change orders

15  reflect the additionals.

16      Q.   What change orders are you referring to?

17      A.   The ones that you guys have that you were talking

18  about earlier.  The 44,000.  Again, it was split between the

19  first and second floor.

20      Q.   So now you're talking about, I think, the nine

21  change orders that we've already talked about here in trial

22  that add up to $42,044, right?

23      A.   Yes.

24      Q.   And so what I'm talking about is the second floor

25  tenant finish space that was not related to the hurricane.

1    That's if a tenant moves in, we have to move some things

2    around, then you are going to do that work, right?

3         A.    Correct.

4         Q.    And that was -- some of that was in the

5    $1.36 million contract?

6         A.    I say a portion of it.  Again, I wouldn't

7    necessarily know unless -- the exact amount unless they

8    specifically asked for specific items.

9         Q.    Okay.  So you're saying there's 350,000 that's

10   still owed.  Am I correct in saying that you can't tell us

11   how much of that $350,000 is hurricane related versus

12   non-hurricane related?

13        A.    Probably, but I couldn't tell you exact number.

14        Q.    You can't tell us a number.  Okay.  I want to show

15   you that contract that we looked at.  You see how it has that

16   language in it -- and this was admitted as D-176.  You see

17   how it has that language in it that says subject to additions

18   and deductions?

19        A.    Yes.

20        Q.    Right there, you see that?

21        A.    Yes.

22        Q.    All right.  Do you recall in your deposition in

23   August I asked you, "Do you know if there are going to be

24   other pay applications after this one goes out," and you said

25   to me, "Yeah.  I mean, there would be -- I would want to.

1    There would be some additions and subtractions depending on

2    the second floor tenant finish, if he selects to do so, or

3    whenever the windows get put in"?  Do you remember saying

4    that to me?

5        **A.**    Yeah.

6        **Q.**    All right.  And so you used that word, there would

7    be some additions or subtractions, right?

8        **A.**    Correct.

9        **Q.**    So you couldn't tell me whether there was going to

10   be an additional pay application because you didn't know yet.

11   You didn't know about those deductions that you might have to

12   make, right?  That's what you said.

13       **A.**    So on that date there was -- there had already been

14   another invoice sent in.

15       **Q.**    What I was asking you was did you know that there

16   was going -- if there was going to be another pay

17   application, and you told me, "I don't know.  It depends on

18   whether or not -- I don't have the information because I have

19   to do some additions and subtractions."

20       **A.**    I believe you asked me how much because, again,

21   there would definitely be another payment application to get

22   to the amount owed.

23       **Q.**    So my question was, "So Encore still has this pay

24   application to submit to the owner and then a final, or do

25   you know if there's going to be other pay applications after

1    this one goes out?  And do you remember telling me, "So yes.

2    I mean, I would want to.  There would be some additions or

3    subtractions depending on the second floor tenant finish, if

4    he selects to do so, or whenever the windows get put in"?

5        **A.**   Yeah, so stating that I have to send in another

6    invoice.

7        **Q.**   Can you just hold on a minute because I want to

8    make sure that I'm asking the question.  You used those words

9    additions and subtractions, right?  I asked you a question

10   about whether you're going to send another pay application.

11   And for the jury can we explain, a pay application is sort of

12   like an invoice?

13       **A.**   It's an invoice.

14       **Q.**   It's an invoice.  Okay.  So I'm asking are you

15   going to send another one; and you use those words, there

16   would be some additions and subtractions.

17       **A.**   That was after confirming that I'm going to send

18   another one.  It was after.  Maybe you were speaking after

19   that.  So would there be two additional invoices?

20       **Q.**   So -- okay.  And I appreciate you explaining but my

21   question is really simple, I think.  I was asking you a

22   question about whether --

23           THE COURT:  Why don't you do this.  Ask him the

24       question today.  Don't read the deposition to him.  Ask

25       him a question.  Let him answer it.  You're reading the

| | |
|---|---|
| 1 | deposition.  I've warned you. |
| 2 | BY MS. WOLF: |
| 3 | Q.    So at the time when I was asking you this question |
| 4 | in August -- so I'm going to go back to that timeframe.  I |
| 5 | don't want to know about today.  I want to know back then. |
| 6 | If I asked you then whether or not you were going to submit |
| 7 | another invoice, would you -- |
| 8 | A.    Yes. |
| 9 | Q.    -- would you have to determine that amount of |
| 10 | whether it was going to be another invoice based on additions |
| 11 | and subtractions? |
| 12 | A.    I wouldn't have to.  I can -- at that point he'd be |
| 13 | paid in full and we can actually do change orders for |
| 14 | additional amounts. |
| 15 | Q.    I didn't -- I don't think I'm following what |
| 16 | you're -- if you're answering my question.  What I want to |
| 17 | know is:  In order for you to determine in August -- you got |
| 18 | to go back to the August timeframe.  In order for you to |
| 19 | determine whether or not there was still an invoice owed, do |
| 20 | you recall saying it depends, I have to go back and look and |
| 21 | do some -- |
| 22 | A.    There would be an additional invoice. |
| 23 | Q.    Okay.  You're not -- I don't think you're listening |
| 24 | to my question.  At the time you told me, "I didn't know how |
| 25 | much it would be because I'd have to go do some additions and |

652

1    subtractions," right?

2        A.    Again, it depends on the context of what we were

3    discussing before that.  I don't...

4        Q.    All right.  Let's go back to the August timeframe,

5    and I asked you a question about the remaining work.  I was

6    asking questions about the remaining work as of June 10th,

7    2021, and at this point you had told me there was about

8    200,000 remaining on the contract.  Do you recall that?

9        A.    Right.

10       Q.    And I said, "In that time, from June 10th to

11   today," and that was in August, "the last two months, what

12   percentage of that 200,000 remaining on Encore's contract is

13   done?"  Do you recall what you told me the answer was?  What

14   is the answer to that question?

15       A.    I don't recall.

16       Q.    All right.  Do you want to see your deposition?

17   Would that help you to remember what your answer was back

18   then?

19       A.    Sure.

20       Q.    So what we're going to look at is --

21            THE COURT:  Now you can put it on the screen if you

22   want.

23            MS. WOLF:  Okay.

24            THE COURT:  He can see it, they can see it, and you

25   can see it.

1    BY MS. WOLF:

2       Q.   All right.  So let's -- want to make sure I'm not

3    confused at this point.  So we are at the second day of

4    Encore's deposition.  This one's on August 6, 2021.  Right?

5    You saw that?

6       A.   Yes.

7       Q.   All right.  And so I asked you this question.

8    There was a pay application dated June 10, 2021.  That's what

9    we were looking at.

10      Question:  "Yes.  If you look at Encore 75, the pay

11   application dated June 10, 2021, the balance to finish this

12   project" -- okay.  Oh, okay -- "is $195,758.50, correct?"

13      And your answer was:  "That's what it looks like."

14      Right?  That's what you said?

15      A.   Yes.

16      Q.   So my question, "So as of June 10 the remaining

17   work was just under $200,000.  And in that time, from

18   June 10th to today, the last two months, what percentage of

19   that 200,000 remaining has Encore done?"

20      You see your answer?  And you say, "I'm not 100 percent

21   sure.  I'd have to go over this to be able to answer that.

22   I'm not 100 percent sure.  I know because there is work that

23   hasn't been completed and some of the window items as well,

24   so additions or subtractions.  So I wouldn't -- I'm not 100

25   percent sure at this moment."

654

1      My question is:  You see where you said additions and
2   subtractions?
3      A.   Correct.
4      Q.   Right.  And that's the same language that's tracked
5   in your contract, right?  It says the owner shall pay
6   contractor for performance of the work subject to additions
7   and deductions, right?
8      A.   Yeah.  I wasn't quoting from that.  I was more
9   speaking to receiving invoices from subcontractors.
10     Q.   Every time I asked you the question in August you
11  said you didn't know how much the invoice was going to be
12  because it depended and you still had to do your additions
13  and deductions.  You remember saying that?
14     A.   I said subtractions, again, due to the amounts that
15  the subcontractors were invoicing me.
16     Q.   I asked you again numerous times in that deposition
17  how much work remained, how much was owed on the invoice.
18  And when I asked you, do you recall at least three to four
19  times telling me, "I don't know exactly what the final
20  invoice will be because there's work in that that we didn't
21  do and I wouldn't know those exact numbers"?  Do you remember
22  telling me that?
23     A.   Yes.
24     Q.   All right.  So you're saying your total contract
25  was $1.36 million, right?

 1          A.   Correct.

 2          Q.   And you're also stating that you did not bring an

 3     invoice to court today to show exactly how much you say

 4     remains on that contract, right?

 5          A.   Correct.

 6          Q.   And am I correct in saying that even if there's an

 7     amount left on that $1.36 million contract, you can't tell us

 8     how much of it was hurricane related and non-hurricane

 9     related?

10          A.   I do not.

11          Q.   Thank you.  I have no further questions.

12               MR. WOLFF:  Can we approach?

13               THE COURT:  Sure.

14                         **BENCH CONFERENCE**

15               MR. WOLFF:  I move to strike the witness.  He's

16          come up and said there's 300 something left.  He says

17          there's an invoice.  It has not been produced.  It was

18          not put in evidence.  He cannot talk about it any

19          further.  Oral discussion about what's due is not

20          enforceable in Louisiana.  It's got to be corroborated.

21          They missed a chance to corroborate it if they wanted

22          to.  Case in chief is over.  That invoice, we'd be able

23          to cross-examine with those documents.  Him just sitting

24          up there, he can't remember what's related, what's not

25          related.  There's no rehabilitation here.  That invoice

1    is crucial.  It's not in.  He needs to go out.

2         MR. COX:  Invoices are in, Your Honor.  The

3    contract is in and we've shown all -- every one of the

4    change orders that he made deducting from the 1.36.

5    They're all in evidence.

6         MR. WOLFF:  That's the 42,000.

7         MR. COX:  Yes.

8         MS. WOLF:  The invoices are not in, Your Honor.

9    The invoices are not in evidence.

10        MR. WOLFF:  There's no invoice to go above the 924

11   on the building.  There are nine change orders that

12   relate to 42,000 which are out of the scope.  We all

13   agree to that.  How you get from 924 to 1.36?  There is

14   no invoice.  There is no paper.  He is just talking off

15   the cuff.  He needs to be stricken and thrown out of

16   here.

17        THE COURT:  I think you did a very good job

18   cross-examining.  I think you attacked his credibility

19   pretty good with that because he couldn't segregate out

20   the cost.  I think you did pretty good.  I'm not

21   striking him.  It's a rebuttal witness.  I'm not

22   striking him.

23        MS. WOLF:  They didn't put in the invoice.

24        THE COURT:  I know.  That's on them, man.  You did

25   a good job beating up on him about it, too.  I mean, you

1        can hammer him some more in closing arguments.

2               MR. WOLFF:  We will.

3               THE COURT:  I know you will.  You did a good job,

4        Ms. Wolf.  Ms. Wolf, come see.

5               MS. WOLF:  I'm going back to mediation and

6        arbitration.

7               THE COURT:  No, you're not.  Come here.

8               MS. WOLF:  Never again.

9               THE COURT:  Listen, you did a good job.

10              MR. COX:  I feel like giving you a hug.

11              THE COURT:  Listen, your hands were tied a little

12       bit here.  I get it.  But I want you to know you did a

13       good job and don't be frustrated.

14              MS. WOLF:  Can I just say that I was going to call

15       him and she said, "I might fly him in."  She didn't --

16              THE COURT:  Listen, it's rebuttal.  It's rebuttal.

17       You did a good job.

18              MS. BROWN:  It's denied, right?

19              THE COURT:  Yes.

20                        PROCEEDINGS CONTINUED

21              THE COURT:  Okay.  Mr. Cox.

22              MR. COX:  Yes, sir.  One second, Your Honor,

23       please.

24              THE COURT:  Ladies and gentlemen, we're going to

25       finish this witness.  We're going to take our lunch

658

 1          break.  Do you have any -- one more rebuttal witness?
 2          He's going to be --
 3               MS. BROWN:  Very short.
 4               THE COURT:  -- very short.  Then we'll have closing
 5          arguments.  Still on track.

                         **REDIRECT EXAMINATION**
 7     BY MR. COX:
 8          Q.    Mr. Monheiser, you didn't bring the records with
 9     you today, correct?
10          A.    Correct.
11          Q.    But Scottsdale deposed you for 16 hours, didn't
12     they?
13          A.    Correct.
14          Q.    And during that 16 hours of testimony you supplied
15     every document that Encore had on this project, which was a
16     lot of documents, wasn't it?
17          A.    Correct.
18          Q.    And you were asked about what was deducted from the
19     $1.36 million contract, correct?
20          A.    Correct.
21          Q.    And it added up to $42,000, correct?
22          A.    Around there, yes.
23          Q.    Those were the items that you went through and
24     determined were not for hurricane related work, correct?
25          A.    Correct.

1          Q.    Is that why you subtracted them?

2          A.    Correct.

3          Q.    And those were all of these things --

4                MR. WOLFF:   What document?

5                MR. COX:   55 through -- I'm sorry.   52 through 58,

6          I think.

7                MR. WOLFF:   We stipulate there's 42,000 that was

8          excluded.   That's in evidence.

9                MR. COX:   That's good.   Thank you.

10   BY MR. COX:

11         Q.    But the way you got to the 42,000 was by

12   subtracting all of these things that I'm showing you that you

13   thought were unrelated, correct?

14         A.    Correct.

15         Q.    And those items added up to $42,000?

16         A.    Correct.

17         Q.    Was it your attempt to subtract everything that was

18   unrelated to the hurricane damage from the $1.36 million?

19         A.    Yes.

20         Q.    And then now there's still a balance that Mr. Odom

21   and Eaux Holdings owe you, owe Encore Construction Company,

22   for the remainder of the work that was done to repair this

23   building from the hurricane damage, correct?

24         A.    Yes.

25         Q.    And that's the amount that you said was 350,000

1     plus some?

2          A.   Yes.

3          Q.   But we could do the math ourselves with the

4     documents we have, couldn't we?

5          A.   Yes.

6          Q.   And so when you were asked about a final payment,

7     there was a last payment to Encore, correct?

8          A.   Correct.

9          Q.   Has the final payment been made?

10         A.   No.

11         Q.   And that's the amount that's still owing that we're

12    talking about in excess of $350,000?

13         A.   Around there, yes.

14         Q.   Thank you, sir.  I don't have any other questions.

15              THE COURT:  You may step down, sir.  Okay.  Their

16         lunch is there so we're going to break for lunch.  We'll

17         come back at around 1:15 or so.  Okay.

18                   (Jury exits courtroom.)

19              THE COURT:  Okay.  I understand you have one more

20         rebuttal witness.  Who?

21              MR. COX:  Jeffrey Major.

22              THE COURT:  Okay.  You're going to call him on

23         rebuttal.  Y'all will cross-examine him.  So what I'm

24         trying to tell you is during your lunch hour, get you

25         some lunch, but be prepared.  As soon as that's done

```
 1        we're going to go right into closing arguments.  So take
 2        this time to kind of get yourself mentally prepared, I
 3        guess.  I don't know.
 4             MS. BROWN:  And how much time are we going to have
 5        for closing?
 6             THE COURT:  Let me ask you that question.  I limit
 7        openings a lot because it's really just a road map.  I'm
 8        open to -- you know, don't ask me for two hours.  You're
 9        not getting it.  But I'm open to --
10             MR. WOLFF:  30 minutes?
11             THE COURT:  I was -- how much time do you need?  I
12        was thinking 30, 45 minutes.
13             MR. COX:  30 to 35 minutes.
14             MS. BROWN:  Says the guy not giving the closing
15        argument.  Mike would like me to do it in 35 minutes.
16             THE COURT:  Ms. Brown, how much time do you need?
17        Don't let Mr. Cox speak for you.  That's fine.  Anywhere
18        from 30, 45.  Y'all keep it in there.  We're good.  I'm
19        not trying to --
20             MS. BROWN:  I might go over 45.
21             THE COURT:  I wasn't going to -- you know, we're
22        not going to be here for two hours each, you know.  Some
23        attorneys I know, if I give them two hours, they'll use
24        all two hours talking about nonsense.  Is that good
25        enough, Mr. Wolff?  You okay with that?
```

```
1              MR. WOLFF:  (Nods head up and down.)
2              THE COURT:  Very good.  See you after lunch and
3         knock this out.
4                        (Recess is taken.)
5              THE COURT:  Good afternoon.  Okay.  Any
6         housekeeping before I bring the jury in, Mr. Wolff,
7         Mr. Cox, Ms. Brown, Ms. Wolf, anyone?  Good.  None.  Go
8         get our jury.  Thank you.
9                        (Jury enters courtroom.)
10             THE COURT:  Okay.  You can be seated.  Ladies and
11        gentlemen, I hope you had a good lunch.  I hope we have
12        treated you well.  I hope.  It's our intention to
13        definitely take care of you.
14             Okay.  Mr. Cox, Ms. Brown --
15             MS. BROWN:  Yes, sir.
16             THE COURT:  -- you have one more rebuttal witness,
17        I believe.
18             MS. BROWN:  One more, Mr. Jeff Major.
19             THE COURT:  Mr. Major, come on up.  Since you're in
20        on rebuttal, we're going to swear you in again.
21                             JEFFREY MAJOR,
22        after being first duly cautioned and sworn to tell the truth,
23        the whole truth and nothing but the truth, did testify on
24        oath as follows:
25                             DIRECT EXAMINATION
```

1   BY MS. BROWN:

2       Q.   Mr. Major, you've been in the courtroom this week

3   for all the testimony and evidence?

4       A.   Yes, ma'am.

5       Q.   I want to ask you about three things.  You were

6   here today when Mr. Monheiser was being questioned about the

7   second floor build-out?

8       A.   Yes.

9       Q.   And it's true, isn't it, that the second floor

10  before the hurricane was built out in that it had drywall,

11  carpet?  It was fully functional before the hurricane?

12      A.   Yes.  If a tenant wanted to come in, they could

13  just go in, move their desks in, and rent.

14      Q.   And the additional allowance that would be added or

15  deducted from the Encore contract was if someone came in and

16  wanted some specific things done to the second floor?

17      A.   Yes.  Encore was doing exactly what was there.  If

18  there was drywall, drywall, carpet, carpet.  But if somebody

19  wanted to come in and say, "Instead of carpet, I want

20  hardwood flooring," they would have made a change order for

21  it.

22      Q.   And that did not happen?

23      A.   Did not happen.

24      Q.   Encore put it back to pre-loss condition?

25      A.   That's correct.

664

1      Q.   I want to show you a picture that is in Mr. Stuck's

2   report.  And I'm not going to make this an exhibit, but I'll

3   show it to you.

4            THE COURT:  Has that been admitted?

5            MS. BROWN:  It's not.  Just for --

6            THE COURT:  Demonstrative?

7            MS. BROWN:  Yeah, just a picture of the building.

8   BY MS. BROWN:

9      Q.   You see this aerial photograph of 620 Esplanade

10  before the storm?

11     A.   Yes, ma'am.

12     Q.   And this is like a Google image or something that

13  somebody found of the building before the storm?

14     A.   Yes, ma'am.

15     Q.   And this was in Mr. Stuck's report?

16     A.   Yes.

17     Q.   Can you tell me why -- and it's not a great

18  picture, but we can at least see part of the roof is a dark

19  color and part of the roof is a light color.  Can you tell me

20  why?

21     A.   Yes.  This whole section that's dark was the roof.

22  And then the white area all the way around this roof and this

23  entire upper roof, that's all the repairs that Mr. Ricky

24  Poole did.  So it's in a newer overcoating like Mr. Ricky

25  Poole said he put on.

1      Q.   Okay.  Those were the repairs that were set forth

2   in the inspection report when Mr. Odom bought the building?

3      A.   Correct.  If you look at the inspection report

4   photos, they were all black and stuff; and this is the repair

5   to it.

6      Q.   One more photograph, and this is in evidence.  This

7   is a picture of the building now.  You heard the testimony

8   throughout the week about some engineering report and whether

9   or not it had been given to Scottsdale.  Are you aware of an

10  engineering report?

11     A.   I am now.

12     Q.   Okay.  Had you had a copy of that engineering

13  report before?

14     A.   No, ma'am.

15     Q.   And tell the jury what the engineering report

16  addresses.

17     A.   What it addresses is the old panels on the building

18  were these panels like I explained earlier and they don't

19  make them anymore so they were putting new panels on, and it

20  was how to install the new panel and how to address the

21  flashings and stuff around the panel.  It was just a cheaper

22  panel system, but somebody had to design it.

23     Q.   Why did Mr. Odom and Eaux Holdings go with a

24  cheaper panel system?

25     A.   Well, the insurance company didn't give them any

1   money.

2       Q.   Okay.  You also heard testimony about the windows

3   not having been replaced.

4           MS. WOLF:  Your Honor, we have an objection.

5           THE COURT:  Come over here.

6                     **BENCH CONFERENCE**

7           MR. WOLFF:  Your Honor ruled on this.  They did not

8       plead nor -- per your ruling on Document 133, the Court

9       has reviewed Eaux's complaint and determined there are

10      no allegations that Scottsdale might be liable to Eaux

11      for allegedly being forced to make lesser repairs or a

12      lesser roof.  In other words, Eaux has not alleged in

13      its complaint it was forced to make repairs not of like

14      kind and quality.

15          THE COURT:  Okay.  So what's the objection?

16          MR. WOLFF:  They were forced to put in lesser

17      siding.

18          THE COURT:  I'll be honest, what I think -- you can

19      correct me.  What I'm thinking this testimony to be is

20      more addressing about this engineering report.  Y'all

21      made a big deal that there's this engineering report,

22      and I'm thinking what you're seeing is it was really the

23      design of this new panel system --

24          MS. BROWN:  That's exactly right.

25          THE COURT:  -- and that was it.

```
 1            MS. BROWN:  And I'm done.
 2            THE COURT:  That's it.
 3            MR. WOLFF:  Well, then I move to strike that
 4      gratuitous comment that the insurance company didn't pay
 5      so they were forced --
 6            THE COURT:  I will so grant that.  He shouldn't
 7      have said that.  I will do it.
 8                      PROCEEDINGS CONTINUED
 9            THE COURT:  Ladies and gentlemen, the Court's going
10      to instruct you to disregard the comment made by the
11      witness when he referred to the insurance company paid
12      no money for that.  You are to disregard that comment.
13      Okay.
14            All right.  You may proceed.
15      BY MS. BROWN:
16      Q.    Last thing I want to ask you about is there's been
17      some testimony in the past couple days about the window
18      system that Granger Stuck agreed was $159,000 but that was
19      not accounted for in his final accounting.
20      A.    Yes, ma'am.
21      Q.    Okay.  Why has that window -- have those windows
22      been replaced?
23      A.    They have not.
24      Q.    Okay.  Can you use this picture to explain to the
25      jury where the window were.
```

1     **A.**   Yes.  So Mr. Stuck has agreed to replace all the

2  windows on the building that are there, but not in his

3  numbers and not done is if you -- I'm just going to show you

4  right now.  There were ten windows all the way along here

5  that are not there at all.  If you go back -- there you go.

6     **Q.**   I was going to say, I don't know if we can see them

7  in this picture.

8     **A.**   So this whole row down here, ten windows --

9          MR. WOLFF:  Excuse me.  Can you pull the language

10     out, whatever that writing is?

11          MS. BROWN:  Sure.

12          THE COURT:  Maybe zoom in a little bit on it.

13          MR. WOLFF:  Thank you.

14     **A.**   And if you put the two pictures together, this

15  entire row down here, they're bullet proof.  There's more

16  glass there than there is here on those screens in front of

17  you.  They were taken out and never put back.  They're not in

18  Mr. Stuck's estimate and haven't been replaced.  If you put

19  the other photo up, they're gone.  There was windows all over

20  this whole thing, each one just like these, coated and bullet

21  proof.

22  BY MS. BROWN:

23     **Q.**   Okay.

24     **A.**   Weren't repaired.

25     **Q.**   That's all the questions I have.

1          THE COURT:  Okay.  Cross-examination.

2          MS. WOLF:  Just briefly.

3                    **CROSS-EXAMINATION**

4    BY MS. WOLF:

5          Q.   Good afternoon, Mr. Major.

6          A.   Good afternoon.

7          Q.   Just a couple of things.  Did you say that -- we

8    were talking about the engineering report, and you know that

9    to be the BECI report?

10         A.   Whatever one you guys put up there, yes, ma'am.

11         Q.   And did you say that in this trial is the first

12   time you saw it or knew about it?

13         A.   Yes, ma'am.

14         Q.   Okay.  And then you -- I think you then testified

15   as to what was in it --

16         A.   Yes, ma'am.

17         Q.   -- is that right?

18         And how did you come to know what was in the BECI

19   proposal for services if you hadn't seen it before?

20         A.   I didn't read the report, but I recall that -- what

21   I testified earlier was that the builder had a design

22   professional and I just assumed it was that BECI that you're

23   talking about, and that was -- during the time of

24   construction they were trying to figure out an alternate for

25   the panel system that was there.  They didn't have -- they

1    didn't have it.  They couldn't put it on.  They didn't make

2    it anymore.  So that's what I recall.

3        Q.    Okay.  And what did you say the BECI or the

4    engineering proposal or design included?

5        A.    They were working on the design of -- they were

6    trying to identify a window repair methodology --

7        Q.    Right.

8        A.    -- because the pieces that hold the windows in,

9    when you saw the pictures, you look in those books, the

10   pictures of the glass smashed out and the frames bent, they

11   don't make the pieces anymore.  So you couldn't buy the

12   pieces to put the windows back together.  So there was the

13   window system, and the window system and the wall panels are

14   integral to themselves.  So there used to be the panel there

15   and a little drip edge that went over, and now the panels are

16   wider so they had to adjust and modify the drip edge to go

17   over that.  So they had a design professional that worked

18   with them, and they even searched to find the pieces of the

19   windows and they didn't make them.

20       Q.    Okay.  So that was a little bit more detail than I

21   needed.  I just want to make sure I understand.  We now know

22   it to be the BECI proposal.  That's the engineer that you

23   knew about, but you didn't know their name?

24       A.    That's correct.  And I didn't know that they were

25   an engineer, just that it was a design professional.

671

1      Q.   Sure.  And you understood that that work was
2  related to the exterior wall cladding, right?
3      A.   It's all integral.
4      Q.   That's what I'm trying to figure out.  What did you
5  just say that that proposal -- the engineer's proposal, what
6  was their scope of work?
7      A.   I don't know what their contract says.  I never saw
8  their contract.
9      Q.   Okay.
10      A.   But I know of one design professional, and in this
11  testimony it was said that there's one engineer; and I'm just
12  assuming they're one and the same.  And I know when the
13  construction was going on that Encore had a design
14  professional.  It was a woman.  I don't remember what her
15  name was --
16      Q.   Okay.
17      A.   -- but that she was working with them to identify
18  the way that they could get this building back together.
19      Q.   Understood.  And are you aware or not aware that
20  that design proposal did include addressing the removal and
21  replacement of damaged windows and the perimeter sealant on
22  the windows?  Are you aware of that?
23      A.   They're all exactly what I'm talking about, and I
24  don't know the --
25      Q.   First answer my question.  I just want to make sure

1    I'm clear on what you're saying that scope of work was, the
2    scope of work for who we now know is BECI.  Do we agree that
3    it involved the exterior wall cladding?
4        A.   I don't know what BECI's contract says.  I never
5    read the contract.
6        Q.   Okay.  What was the engineer -- the design firm
7    that you're saying did exterior design work, what was their
8    scope?
9        A.   So I know that Encore was working with a design
10   professional --
11       Q.   Right.
12       A.   -- number one, to see if they manufactured or any
13   company made an extruded aluminum piece that they could use
14   to put the windows back together.
15       Q.   What I'm trying to find out is --
16       A.   They also -- I'm trying to answer the question.
17       Q.   I know, but let me stick with the big picture
18   first.
19       A.   Sure.
20       Q.   Is it your understanding that their scope included
21   both the exterior wall cladding and addressing the window
22   system?
23       A.   It's the same.  I'm sorry.
24       Q.   Is that a yes?
25       A.   I know you don't -- I know it's -- the windows and

1    the panels are integral to each other and the flashing of the

2    roof.  It's all one system.

3        Q.   Yeah, I actually said that earlier --

4        A.   Yep.

5        Q.   -- when I was speaking to this jury with another

6    witness.  We made that point.  So I just want to know if

7    you're saying that you understand that that design

8    professional's scope did include the exterior wall cladding

9    and the window system?

10       A.   I didn't read their contract.  I don't know.

11       Q.   So you don't know?

12       A.   I believe that Encore had a design professional

13   helping them with the details for that.

14       Q.   Very good.  So the window system, you've heard the

15   testimony that it's not that there's anything broken or

16   damaged left out there, right?  All of the glass has been

17   fixed.  You heard what Mr. Monheiser said, that work's been

18   done, right?

19       A.   I know for a fact what you just said is not true.

20       Q.   But Mr. Monheiser --

21       A.   There's ten missing windows that were there --

22       Q.   Okay.

23       A.   -- broken --

24            THE COURT:  Let him finish.

25       A.   The broken windows, the glass, the piece of glass

 1    is broken; but where it goes in that used to be the building

 2    held it together is just a spray painted piece of metal glued

 3    to the wall.  That's not fixed.  And the scratches that

 4    Mr. Wolff was saying was all fixed is not fixed.  You can go

 5    to that building now.  It's all torn up.  All the metals are

 6    torn up around the windows.  It's not repaired.  Mr. Stuck

 7    agreed to replace all the windows, but he doesn't have the

 8    ten windows.  They're gone.  They've never been put back.

 9    BY MS. WOLF:

10        Q.   Right.  When I saw that what I understood is that

11    you're saying that the building repairs on that wall wasn't

12    put back to the way it was before.  Something different has

13    been done.  Right?

14        A.   The piece -- the panels that were there, they don't

15    make them anymore.  You can never put them back on.  They

16    don't make them anymore.  They chose a cheaper panel system

17    because that's all they can get.

18        Q.   Okay.  The panel system that you're talking about

19    was the panel system that was decided by this engineer,

20    recommended by the engineering firm, the designer that you've

21    talked about, right?

22        A.   I don't know who recommended it.

23        Q.   You don't know who.  And you understand that the

24    owner selected it and approved it, right?

25        A.   Yes, ma'am.

675

1      Q.   All right.  And did I hear your testimony in this
2   court that you thought Encore did a good job?
3      A.   They did do a good job, yes, ma'am.
4      Q.   Okay.
5      A.   To my standards, they did a good job.
6      Q.   Okay.  You heard, I believe, Mr. Odom testify that
7   he thought that Encore did a good job?
8      A.   I did hear that, yes, ma'am.
9      Q.   I do not have any further questions.
10         THE COURT:  Very good.  Thank you.
11         MS. BROWN:  I have nothing else.
12         THE COURT:  You may step down.  Any more rebuttal?
13         MS. BROWN:  No, sir.  Plaintiff rests.
14         THE COURT:  With that, ladies and gentlemen, that
15      concludes the taking of evidence.  And so at this point
16      what we'll do is we'll have closing arguments where the
17      parties will -- yes, Mr. Wolff.
18         MR. WOLFF:  I have a motion, Your Honor.
19         THE COURT:  Oh, yes.  Okay.  We're going to go into
20      closing arguments.  I want you to stay seated right
21      here.  Y'all good?  All right.  Over here.
22                      **BENCH CONFERENCE**
23         THE COURT:  Okay.  Mr. Wolff, what you got?
24         MR. WOLFF:  Okay.  We're moving for directed
25      verdict on the satisfaction of the contract amount.  We

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

676

1    filed that motion for partial summary judgment in

2    final -- excuse me, at Record Document 41.  And we

3    looked at that a moment ago and you had ruled that

4    lesser repairs is not going to be an issue, and you had

5    noted exactly what's going on here.  You say Eaux does

6    not cite any -- you note that they don't produce

7    invoices, canceled checks, or credit card statements to

8    support the expenses beyond what we've shown today; and

9    you did not accept the declarations that were offered.

10        And where we are today is Mr. Stuck did an estimate

11   and we paid that estimate -- excuse me, actual cost.

12   And he did a later assessment based on new documents in

13   August and showed that we actually paid too much.  We

14   don't care.  But what I do care about is this record has

15   nothing to support the payments beyond the 924,000 made

16   to Encore.  And Mr. Moncrieff coming up here with his

17   backpack, no documents, can't remember what the costs

18   were, doesn't have precise figures, doesn't have any

19   invoices, this is insufficient as a matter of law to get

20   to the jury.  They have to put on some invoices.  He

21   could not -- he said even if they had invoices he

22   couldn't separate out what was pre-storm or betterment

23   or what have you.  He didn't know.  So they don't have

24   any evidence, and the only evidence that is in is that

25   the checks were paid by Mr. Odom on the three phases of

677

1    that contract and we paid Mr. Odom for Eaux Holdings

2    more than that.  So they have no evidence beyond the

3    924.

4         THE COURT:  Okay.  Who wants to respond?

5         MR. COX:  Your Honor, I completely disagree.  The

6    evidence, we have painstakingly gone through all of the

7    bills we've put in.  Everything to total our amount is

8    in.  There have been bills presented on the Encore.  It

9    was a $1.36 million contract, and we showed every change

10   order reducing it to the amount that's on there with the

11   $17,000 interest.  We have put on the bills of

12   everything that's on that list.  And I know they don't

13   want to call a contract an invoice.  They want to call

14   things that have only been paid out of pocket, but

15   that's contrary to the law.  The law is it's actually

16   spent when it's incurred.  And we have proven that it's

17   been incurred, that the work has been done, and that

18   Eaux Holdings is legally liable for those bills.

19        MR. WOLFF:  He offered no documents to show that

20   there was any further work beyond the 924 that was paid.

21   He says there was some.  He didn't produce it.

22        THE COURT:  Well, here's the thing, testimony's

23   evidence too.  And so, you know, there's been enough

24   testimony, I believe, to let it go to a jury.  I think

25   he did have him put on those invoices showing he

1    deducted it.  So I think there's enough here for it to

2    go to a jury.  Motion will be denied.

3                    **PROCEEDINGS CONTINUED**

4         THE COURT:  Okay.  Ladies and gentlemen, we will

5    now have our closing arguments.  Plaintiff will go

6    first, then the defendants, and then --

7         You do you have an opportunity, if you reserve some

8    of your time, for rebuttal.

9         MS. BROWN:  I would like to do that.

10        THE COURT:  Okay.  Please proceed, Ms. Brown.

11        MS. BROWN:  Thank you.

12        THE COURT:  Mr. Wolff, why don't you go take a

13   gander at that real quick.

14        MR. WOLFF:  Can we put it so I can see the jury?

15   That's going to block the view entirely.

16        THE COURT:  Well, you know, maybe just -- is that

17   better Mr. --

18        MR. WOLFF:  I can't see the jury.

19        THE COURT:  Okay.  Let's do this, Ms. Brown.  Could

20   you maybe go that way with it?  We've got a lot of room

21   in this courtroom.  I tell you what, leave it right

22   there.  Mr. Wolff, why don't you go sit in one of the

23   chairs back there.

24        MR. WOLFF:  I have all my notes here.  Please.

25   I've got everything --

1    THE COURT:  I mean, it's her closing arguments.

2    I'm not going to make her put her exhibits in the back

3    of the courtroom.

4    MR. WOLFF:  I understand, but are they going to be

5    up the whole time?

6    THE COURT:  Well, I don't know.  Ms. Brown?

7    MR. COX:  Somer, why don't we put them on the

8    ground.

9    THE COURT:  Yeah, put them on the ground.  That's a

10   good idea.  Can y'all see them okay?  Everybody on the

11   back row okay?

12   MR. WOLFF:  Thank you, Your Honor.

13   THE COURT:  No problem.

14                    **CLOSING ARGUMENTS**

15   MS. BROWN:  Good afternoon, ladies and gentlemen.

16   Thank you again for being here.  I thank you on behalf

17   of Joey and Lydia, first of all.  They appreciate your

18   time this week.  I thank you on behalf of my firm and on

19   behalf of the people of southwest Louisiana because you

20   are going to be, as we told you, the first jury to

21   decide the issues relative to Hurricane Laura.  This is

22   a very important case.  I'm sure you've seen this week

23   there's been people in and out of the courtroom

24   watching.  People are waiting.  They want to know what

25   you, the jury, are going to say about the issues in this

1    case.

2         While it's a very important case, it is not a very

3    complicated case, despite Scottsdale's best efforts to

4    make it something it's not.  This case started with

5    Hurricane Laura.  I know we all remember it, but the

6    evidence in this courtroom reminded us of how

7    devastating it was.  I know I myself went right back

8    there with Mr. Odom when he testified about the first

9    time he came back to Lake Charles after the storm.  You

10   saw the photos, although you probably didn't need to.

11   What was most striking about that testimony was probably

12   the objection from Scottsdale's attorneys.  They didn't

13   want you to see the photos.  They didn't want you to

14   remember because they want to take advantage of the fact

15   that maybe you've grown numb.  Maybe like they waited

16   Joey Odom out, maybe they've waited out the southwest

17   Louisiana jurors too.

18        You didn't forget.  You won't forget.  Just like

19   Joey Odom won't forget when he drove home through the

20   hurricane with his son.  What he found when he returned

21   to 620 Esplanade was devastation.  This is just a

22   handful of the literally thousands of photos of the

23   damage to his property, to his retirement investment.

24   But what Mr. Odom did when he got to 620 Esplanade was

25   what people in southwest Louisiana do.  He and his son,

681

1      his wife, figured out a way to take care of this
2      property.  And you saw the efforts Mr. Odom went to to
3      protect his investment.  And I'll be honest with you,
4      these photographs, since the first time I saw them, have
5      always been my favorite photographs.  And I couldn't
6      even tell you how this system works, honestly; but they
7      figured it out.  That's what people in southwest
8      Louisiana do.
9           Scottsdale, since the very beginning of this claim,
10     has tried to flip the script on Mr. Odom on what is
11     supposed to happen on Louisiana law and on their
12     insurance policy.  They want to make this case about
13     what Mr. Odom didn't do when what we're here to talk
14     about is what Scottsdale didn't do.  Scottsdale has
15     tried to put obligations on Mr. Odom that simply do not
16     exist.  Like Mr. Odom -- like most people, Mr. Odom had
17     a policy of insurance to protect his largest investment,
18     the property at 620 Esplanade.
19          Now, as an aside, Scottsdale also wants to flip the
20     script and make you think that Joey Odom is some savvy,
21     sophisticated real estate mogul.  The truth is that Joey
22     Odom, like most people, is trying to live the American
23     dream.  His story literally started on the back of a
24     garbage truck.  You heard him testify about that job
25     while he put himself through school.  He married the

1       love of his life.  His first house, 900 square feet,
2       $17,000.  Not much of a tycoon, but he figured out a way
3       to make his passion for sports his career.  He took a
4       chance, bought this property because he was told it was
5       going to be a great investment and he could possibly
6       make a retirement for himself.  You heard him say this
7       entire purchase, this $2 million purchase, was 100
8       percent financed.
9               On August 27th of 2020 Joey Odom's American dream
10      threatened to turn into a nightmare, and it was a
11      nightmare that he couldn't wake up from.  He told you
12      how he slept at 620 Esplanade so he could continue
13      helping to empty those buckets.  He immediately started
14      getting people out to the property.  He met with Skyline
15      Adjusters the very next day after the storm, on
16      August 28th.  He got a temporary roof on the property.
17      He continued to mitigation the water damage.  He hired
18      All Clear.  He had environmental readings done.  He did
19      everything he could to protect this investment.
20              He also did everything required of him by the
21      Scottsdale Insurance policy.  Now, his first duty, we
22      talked about this back in the voir dire, in the jury
23      selection, was to pay his premium.  And we heard Adam
24      Lock agree what would happen if he did not pay his
25      premium on time.  Scottsdale's policy says, "We may

1     cancel this policy ten days before the effective date of

2     cancellation if we cancel for nonpayment of premium."

3     So he's got ten days to pay.  It's not ten days to pay

4     14 percent of it or 27 percent.  It's 14 days to pay the

5     premium, and there's no question he did that.  And that

6     premium was based on the amount of insurance that

7     Scottsdale sold him.  Make no mistake about it.  This

8     insurance policy is a product that Scottsdale sold him

9     in exchange for the premium.  He did his part.  He paid

10    his premium, and we know that because if he hadn't we

11    wouldn't be here.

12        And the policy that he bought, Mr. Lock explained

13    to us, had limits of $2 million for the building and

14    then it had 10,000 additional dollars available for the

15    increased cost of construction, $25,000 available for

16    debris removal.  So you've heard us saying this week

17    there was $2,035,000 in coverage available for 620

18    Esplanade as a result of this storm.

19        You'll recall that Adam Lock and I went through

20    what Scottsdale required of Joey Odom under the policy,

21    and there is no question that he complied with every

22    single one of the duties in the policy beginning with

23    paying his premium.  The next one we talked about was

24    notification of the police.  That doesn't apply.

25        "Give us prompt notice of the loss or damage."  The

1    property loss notes from the claims file show that this

2    loss was reported to Scottsdale on August 30th, within

3    days of Hurricane Laura.

4         No. 3, "As soon as possible, give us a description

5    of how, when, and where the loss or damage occurred."

6    Again, August 30th Scottsdale was fully aware that this

7    claim was being made as a result of Hurricane Laura.

8         No. 4, we just talked about this, "Take all

9    reasonable steps to protect the property from further

10   damage."  Mr. Odom did everything he could.  He couldn't

11   think of another thing to do to keep this property from

12   falling apart.

13        Next, I don't have five highlighted but it says to

14   "Give us a complete inventory of the damaged and

15   undamaged property."  So we talked about these four

16   volumes of information from Skyline.  We're going to

17   talk about them a little more, but he complied with his

18   obligation at Paragraph 5.

19        No. 6, "Permit inspection of the property."

20   Mr. Lock agreed any time Scottsdale wanted to go to the

21   property they were accommodated.  There's been no

22   question about that.

23        No. 7, Mr. Lock testified and you'll be instructed

24   by the judge about the law in this case, but Louisiana

25   law doesn't require a signed sworn proof of loss so that

685

1    doesn't apply.  But even if it did, one was never

2    requested of him.

3        Finally, No. 8, "Cooperate with us in the

4    investigation or settlement of the claim."  And again,

5    you heard the testimony and you now know yourselves that

6    Mr. Odom cooperated with Scottsdale every step of the

7    way.  There's been some implication that he didn't give

8    them information.  I challenge Mr. Wolff to show you in

9    the claims file where anyone from Scottsdale, not a

10   lawyer in litigation but anyone from Scottsdale

11   Insurance Company ever asked Joey Odom for a single

12   thing that he didn't provide.  It's not there, ladies

13   and gentlemen.

14       So what we know that Eaux Holdings did, paid its

15   premium, notified of the loss, protected the property,

16   mitigated its damages, detailed proof of loss, showed

17   the property to Scottsdale, and cooperated every step of

18   the way.  So we know now Mr. Odom upheld his end of the

19   bargain.  The question that you're here to determine,

20   ladies and gentlemen, is whether Scottsdale did.

21       Louisiana law -- you will be instructed by the

22   Court that Louisiana law requires that all insurers pay

23   the amount of any claim due any insured within 30 days

24   after receipt of satisfactory proof of loss.  The

25   failure to do so when such failure is arbitrary,

1    capricious, and without probable cause, shall subject

2    the insurer to a penalty.  And again, the Court is going

3    to instruct you on this law; but I want to just talk to

4    you guys in English because that's a lot of lawyer

5    words.

6        You've heard this term proof of loss.  You're going

7    to hear about satisfactory proof of loss.  The Court is

8    going to instruct you that in Louisiana, just like

9    Mr. Lock agreed on the stand, proof of loss is a

10   flexible requirement.  Doesn't take a specific form.

11   That's why that signed sworn proof of loss language

12   doesn't apply in this case.  All that is required is

13   that the insurance company have enough information to

14   act on the claim.  That's it.  If they have that,

15   they've received satisfactory proof of loss.  It can

16   come in the form of an estimate.  It can come in the

17   form of the insurance company's own adjuster coming out

18   to the property.  Both of those things occurred on

19   September 15th, 2020.  So you will have to determine

20   whether the proof of loss provided to Scottsdale was

21   satisfactory, whether it was sufficient to apprise

22   Scottsdale of the facts of this claim.

23       And you have heard, I'm sure you can probably

24   recite, this is a four-volume set.  It's 152-page

25   estimate, 1800 line Items, 1200 photographs labeled in

1    meticulous detail which room they're in.  It's

2    blueprints.  It's specifications and materials.  It's

3    literally everything anyone would need to adjust a

4    claim.  Scottsdale didn't ask for another thing from

5    Mr. Odom, and I would venture to say it's more than most

6    people gave their insurance companies.  That was because

7    Joey Odom knew he was out of his league.  He hired

8    professionals to help him present this claim so that he

9    could get it paid promptly.  Unfortunately, that's not

10   what happened.  Skyline's estimate totaled

11   $2,196,188.79.

12        And I'll tell you, ladies and gentlemen, this

13   satisfactory proof of loss question that's on this

14   verdict sheet -- and we're going to talk about this,

15   too, because this, ladies and gentlemen, is -- this is

16   what you're going to do when you go back to the

17   deliberation room.  You're going to answer these

18   questions.  So I'm going to go through it with you.

19   This question is very important because this question is

20   going to set the standard.  Whatever you say about

21   whether or not this is satisfactory proof of loss is

22   going to tell the insurance companies what they should

23   expect from people in southwest Louisiana the next time

24   a hurricane hits.  This must be satisfactory.  Not only

25   is it more than the average person gives, it's more than

688

1      is required by Louisiana law and it's more than is

2      required by the Scottsdale Insurance policy.

3           Scottsdale tried to imply that Mr. Odom or Skyline

4      should have given them more things that they didn't ask

5      for, inspection reports, maintenance records, things

6      that were never asked for by Scottsdale, also things

7      that the policy doesn't require that be maintained,

8      doesn't require be produced, things that have nothing to

9      do with the fact that a category four hurricane hit

10     southwest Louisiana and destroyed 620 Esplanade.

11          Another reason this has to be satisfactory proof of

12     loss is because Jeff Major is the only adjuster to do an

13     estimate in this case.  Mr. Lock was very clear, when I

14     asked him about the other consultants and experts they

15     sent out to the property, to say that they were not

16     adjusters.  They were not insurance adjusters.  So the

17     only adjuster to do an estimate in this case was Jeff

18     Major.  Not only that, the only people that you heard

19     testimony from in this courtroom that actually saw the

20     property in its damaged condition was Joey Odom, Jeff

21     Major, and Evan Monheiser.  Nobody from Scottsdale

22     testified and nobody from Scottsdale other than Monte

23     Jones saw the property when it was damaged.  The one

24     adjuster that did see the property when it was damaged

25     for Scottsdale was Monte Jones, and you remember what he

1    said.  He said, "I think it's at least 1.5 million."  He
2    said it needs to be taken to the studs and that it would
3    be cheaper to rebuild it and repair it.  Then he
4    disappeared.
5         Now, this proof of loss, once you decide Scottsdale
6    had proof of loss, that's what triggers the 30-day time
7    limit that you've continued to hear about things, was
8    this paid within 30 days, was this done within 30 days.
9    You know, at the beginning of this trial I remember
10   Judge Cain saying something about once human hands touch
11   a thing God's creation becomes imperfect, and I couldn't
12   agree more.  And that's true of proof of loss.  This is
13   not perfection.  Louisiana law doesn't require
14   perfection.  Scottsdale's policy doesn't require
15   perfection.  Once the insurer knows it owes something,
16   any part of the claim, even if it disputes other parts
17   of the claim, it must pay the undisputed portion within
18   30 days.
19        As I mentioned before, Scottsdale wants to take
20   advantage of the passage of time.  Just like they didn't
21   want you to see the photographs, they want you to have
22   hindsight bias.  They want you to sort of look at what
23   they did with rose colored glasses and say, "Well, they
24   eventually paid him $1.7 million."  They want you to
25   excuse them from complying with Louisiana law because

1      they've waited Joey out, they've waited the people of

2      southwest Louisiana out; and they're hoping that excuses

3      them breaching their contract and the law.  But you have

4      the chance today to tell insurance companies that

5      delaying paying claims in southwest Louisiana is not

6      okay.  Our community, our juries, are not going to be

7      tricked into looking back through rose colored glasses

8      and excusing violations of our laws.

9           If they're going to do business in southwest

10     Louisiana, if they're going to sell $2 million insurance

11     policies in our community, they need to comply with our

12     laws.  And that law is going to ask you to determine

13     whether, first, they paid within 30 days of knowing an

14     undisputed amount and then, second, whether their

15     failure to do so was, and this is some more lawyer

16     words, arbitrary, capricious, or without probable cause.

17     All that means is that they have a good excuse for not

18     paying a certain amount.  They have to have a good

19     excuse for their delay.  And regardless what Scottsdale

20     may think, the fact that they make billions on

21     investments by delaying claims isn't a good excuse.

22           Again, doesn't mean they have to pay the entire

23     claim.  It means if there's a part of it that they have

24     a legitimate dispute about they can maintain that

25     dispute and pay the rest.  For instance, we have certain

691

1    things that we know Joey Odom owed back in September,

2    the temporary roofing, the shrink wrap on the roof and

3    the temporary roofing.  He incurred that in September,

4    $51,000, no dispute.  Capstone Environmental, 17,000,

5    incurred that in September, no dispute.  All Clear, the

6    work was done in September.  Even if we say it was

7    billed in October, it wasn't paid within 30 days.  All

8    of these items are the actual cost to repair.  And that

9    number, ladies and gentlemen, is very close to the

10   number that Jeff Major on September 15th, 2020 told

11   Scottsdale it was going to cost to fix the property.

12        You've heard some discussion about RCV policies and

13   ACV policies and what that means.  You heard Mr. Stuck

14   today.  He said the actual cash value, the actual cash

15   value of the damage to this property, is owed to

16   Mr. Odom even if he lets the property rot to the ground.

17   Mr. Stuck agreed with that.  Joey Odom isn't required to

18   do repairs at all.  He's only required to do the repairs

19   if he wants to get his depreciation back.  In this case

20   he did do the repairs, and now we have a number that we

21   know that he's incurred that he owes people for the work

22   that has been done.

23        Scottsdale wants, again, to flip the script.  They

24   want Joey Odom to pay for all of this and then they'll

25   figure out which parts of it they want to reimburse,

1    just like Granger Stuck went through Encore's bills and
2    subcontractor invoices and all this stuff and said,
3    "Well, I know that their contract is 1.3 million, but I
4    think it only really cost Encore," whatever he said,
5    900,000.  That's not what Joey Odom owes Encore.  He had
6    a contract.  He owes them $1.335 million.  You all saw
7    the change orders.  They took, again, meticulous efforts
8    to back out things that weren't hurricane related, and
9    everyone agreed it's fine to have non-hurricane work
10   done when you've got a contractor.  If your building's
11   down to the studs and you want to add some new
12   insulation, there's no problem with that.  Insurance
13   policy doesn't require you to do only the work under the
14   policy.  It just doesn't pay you for the other work.
15   And Adam Lock agreed that that was fine.
16        So we know that Eaux Holdings incurred
17   $2,031,893.50 to do the work that's been done to date.
18   We also know, first of all, that's only about $3200 away
19   from the full policy limits with all the extra coverage.
20   We also know they weren't paid for the windows, which is
21   159,000.  So very easily we get above the policy limits
22   here.  What's remaining on those policy limits and what
23   is owed to Joey Odom is $238,909.49.  And we know that
24   Mr. Odom has been underpaid.
25        When you look at these payments, keep talking about

1        how Scottsdale wanted to flip the script, and you can

2        see if these payments had been done in the other order,

3        if the big payment had been done first, we probably

4        wouldn't be here.  If Scottsdale would have either kept

5        Monte Jones on the job, maybe sent Mr. Stuck out to work

6        with Monte Jones, they'd have made the right payment

7        first and then Mr. Odom would have gone back with

8        supplements, get his depreciation back.  That's the way

9        insurance is supposed to work.  They're not supposed to

10       wait him out, trickle money out, wait to see if he gets

11       a lawyer, and then only after litigation is months in

12       make a payment before they come here so that they can

13       tell the jury, "Oh, we've paid very close to the policy

14       limits."  That's not the way the law works and it's not

15       the way the policy works.

16            Now, you're going to be asked on the verdict

17       sheet -- going to stay over here and read from mine but

18       I have a copy there for you to look at.  First question:

19       "Did you find by a preponderance of the evidence that

20       Scottsdale Insurance owes Eaux Holdings additional

21       monies, additional payments in excess of the amount

22       that's been paid for the property damage?"  And again,

23       ladies and gentlemen, the answer is yes.  It's very easy

24       to look at what has been paid and what has been incurred

25       and see that those numbers are different.  We're capped

694

1       by the policy limit in this case so what is owed is the

2       rest of the policy limits.  So number one is a yes.

3            No. 2, the number is $238,909.49.

4            The next question you'll be asked is whether you

5       find by a preponderance of the evidence -- and I should

6       have stopped on No. 1.  That's another lawyer word.

7       Preponderance of the evidence means, and the Court will

8       instruct you on this, it means more likely than not.

9       Lawyers always try to use examples; but someone said one

10      to me today that I was like, "I'm going to try that."

11      So it means if you have scales and there's one extra

12      grain of sand -- I think she said grain of rice.

13      There's one extra grain of rice on this scale.  It's

14      going to tip it ever so slightly.  This isn't like

15      criminal court.  It's not like a TV drama.  They don't

16      have to proof beyond a reasonable doubt.  You just have

17      to believe that it's more likely than not that Joey Odom

18      is owed this money, and here I would venture that the

19      evidence is much more than that.

20           So on Question No. 3:  "Do you find by

21      preponderance of the evidence that the payments were

22      made beyond 30 days of satisfactory proof of loss," the

23      answer is going to be yes.  And we're going to go

24      through each one but I want to go in order.  Then if the

25      payments weren't timely you have to find that they were

695

1         arbitrary, capricious, and without probable cause.
2         Again, did they have a good reason?  The answer to that
3         is you will say -- you will say yes, it was arbitrary,
4         capricious, and without probable cause.
5              So what I want to talk about, then, is the second
6         page of the verdict form.  That's the page where you're
7         going to have to decide each and every payment and
8         whether it was timely and arbitrary and capricious.  So
9         the $250,000 advance, we agree it was within 30 days.
10        It was within 30 days of the storm, 30 days of the
11        estimate, 30 days of Monte Jones.  That payment is fine.
12        It's insufficient, but it was timely.  Now, you did hear
13        some testimony, while we're talking about it, that,
14        well, Skyline only asked for $250,000.  The claims file
15        makes very clear that that was an initial request to
16        just get the ball rolling.  Then Skyline made clear to
17        Monte Jones on September 15th that they wanted at least
18        a million dollars so that Mr. Odom could get to work
19        getting the building fixed.  So the 9/23 payment is not
20        on your verdict form.
21             So let's talk about the November 23rd, 2020
22        payment.  This payment is late for several reasons.
23        One, it is more than 30 days after proof of loss.  It is
24        more than 30 days after the Skyline estimate.  It is
25        more than 30 days after Monte Jones' own inspection of

696

1      the property.  At this point this payment is also

2      improper because it does not even cover, even if you add

3      these two payments together, does not even cover the

4      mitigation bill.  It certainly doesn't cover the

5      mitigation and the temporary roofing and the

6      environmental and the electric that had all been

7      incurred by this time.  And you'll remember there was

8      some testimony that this advance was for mitigation but

9      then it wasn't for mitigation anymore in November, it

10     was for the building.  So if that's the position

11     Scottsdale's taking, what that means is on November 23rd

12     zero dollars was paid towards the mitigation when the

13     mitigation was over 500,000 at that point in time.  So

14     the November 23rd, 2020 payment is clearly a yes.  The

15     question, and just I meant to read the question to you,

16     is you have to determine which payments you find relate

17     an arbitrary and capricious.  So you're going to answer

18     was this payment late and without cause.  So that answer

19     is yes for 11/23 of 2020.

20          Now, the next payment is January 8th of 2021; and

21     Adam Lock explained that this was the mitigation

22     payment.  They were going to make the mitigation payment

23     and pay for the temporary roof in January, again more

24     than 30 days from Skyline, more than 30 days from Monte

25     Jones, well more than 30 days after those bills were

1    actually incurred.  Again, at this point we're not

2    talking about estimates, we're talking about bills that

3    Mr. Odom owes.  This payment is interesting because in

4    the claims file, you'll recall I asked Mr. Lock, they

5    sent the mitigation bill -- they thought the mitigation

6    bill was high so they sent it to an expert to look at

7    it.  That expert told Scottsdale on November 12th,

8    November 12th, that they should make a payment of

9    $124,000 towards mitigation.  That payment is part of

10   this 177.  The other part is the 53,000 for the

11   temporary roof.  So this payment is more than 30 days

12   from the day their mitigation expert told them to make a

13   payment.  And then on top of that the payment is still

14   insufficient, does not cover the costs that had been

15   incurred at that time and it certainly didn't cover the

16   actual cash value of the damage to the property.

17       The March 17th payment, we heard Mr. Odom testify

18   that that was for debris removal, emergency electric,

19   and air conditioning.  Again, that's things that he

20   incurred in September and October.  Those were the

21   mitigation efforts.  That bill, more than 30 days, more

22   than 30 days from Skyline, from Monte Jones, from being

23   incurred.  There's no way that that bill is timely

24   either so you're going to answer yes to that.

25       And finally, the $1.1 million.  One thing I want to

1    say about Mr. Stuck, I do believe if he had been hired
2    at the beginning, Scottsdale had been trying to actually
3    settle this claim, we probably wouldn't be here.
4    Mr. Stuck spent one day at the property, same as Monte
5    Jones.  He realized that Skyline's scope of work was
6    correct.  He realized that money was owed, real money,
7    not $250,000.  This payment should have been made back
8    in October.  That should have been the actual cash value
9    payment.  They should have flipped the script back the
10   other way, the way it's supposed to be under the policy,
11   you get the big payment first.  But instead, this
12   payment was late.  It was more than 30 days from
13   Skyline, from Monte Jones, from the Grecco inspection
14   which occurred in between there, from the date of the
15   Encore contract, and from the date work started.  It was
16   late.
17        All of these payments were late.  They had no good
18   reason.  The only reason you heard anybody give for why
19   the payments were late was Adam Lock who told us, and he
20   told me in his deposition and he testified again here
21   this week, that he thought the timeliness was a problem
22   in this case.  He agreed that was an issue, that the
23   claim should have been handled better.  And he said, "If
24   I had had more resources or there had been more of me."
25   Then he told us how Nationwide makes billions of dollars

1    on its investments.  They could have bought another Adam
2    Lock with that money if that's truly the reason, if the
3    reason wasn't truly to just hold onto that money so they
4    could make those billions.
5         And so Scottsdale, while they required Mr. Odom to
6    comply with all of his obligations under the policy,
7    they complied with none of theirs.  They made no written
8    offer to settle within 30 days of receiving proof of
9    loss.  They didn't pay the mitigation cost within 30
10   days of getting them, the temporary roofing.  They
11   didn't pay Monte Jones' estimate of 1.5 million.  They
12   didn't pay the Skyline estimate.  They didn't even pay
13   Wardlaw's mitigation estimate within 30 days.  And they
14   didn't pay the policy limits once the actual cost to
15   Eaux Holdings exceeded the policy limits.
16        Ladies and gentlemen, I do truly believe this to be
17   a David and Goliath story.  Joey Odom is no real estate
18   mogul.  Joey Odom was trying to make something for
19   himself and his family.  He fully financed this
20   $2 million building, and they want you to believe that
21   he's some real estate tycoon when they're sitting there
22   holding money from him that he can't repair his property
23   and making billions of dollars doing it.  Every step of
24   the way they have flipped the script on Joey.  They have
25   flipped Louisiana law on its head.  They have flipped

1    the policy on its head.  It is time for us now and you,

2    ladies and gentlemen, to flip it back.  It's time for

3    you to write the end of this story, to right the wrong,

4    and to be the first jury, the first eight people in

5    southwest Louisiana, to get to decide what we are going

6    to require from Scottsdale Insurance and other

7    companies.  It's not about what Mr. Odom did or didn't

8    do.  Mr. Odom did everything that he could and

9    everything that was required of him by the law and by

10   the policy.  So let Scottsdale and anyone else who is

11   listening know what the people of southwest Louisiana

12   expect, that we are southwest Louisiana strong and if

13   they want to come to southwest Louisiana and sell

14   insurance policies in our community they're going to be

15   ready to comply with our laws.  Thank you.

16                      **BENCH CONFERENCE**

17        MR. WOLFF:  I'm asking for a limiting instruction.

18   We filed this -- I know you hate the omnibus motion; but

19   I counted six, eight, ten times "send a message," "send

20   a message."  This jury is here to decide this case.

21   They're not here to be the fountain of the flow.  It is

22   about this case and that's prejudicial.  This is why I

23   filed that motion.  I was assured, "Oh, we wouldn't do

24   that."  And you responded they know not to do that and

25   here we are.

 1          THE COURT:  I don't really recall the motion.  It
 2    was so much filed in this case.
 3          MR. WOLFF:  I know.
 4          THE COURT:  What motion are you referring to?
 5          MR. WOLFF:  The reptile, the send a message, you're
 6    the conscience of the community.  If that's what you're
 7    ruling is going to be, then I need -- the Fifth Circuit
 8    says we can't.
 9          THE COURT:  So what do you want me to tell them?
10          MR. WOLFF:  "You've heard argument.  It's argument
11    only.  You are here to decide this case and not send a
12    message as to anything else.  You're here for this
13    case."
14          MS. BROWN:  I don't think it crossed that line.
15          THE COURT:  I mean, the jury charges say they're to
16    only hear this case.  I mean, I'll give a very limited
17    one, you know, "You got to focus on this case.  It's
18    just argument."
19          MR. WOLFF:  Not here to send a message, south
20    Louisiana strong.
21          THE COURT:  That's okay.
22          MR. WOLFF:  That's okay?
23          THE COURT:  Yeah, that's perfectly okay.  That's
24    been something that's been going on.
25          MS. BROWN:  It's a thing.

 1          THE COURT:  That's not anything -- I don't mind
 2      that one.  But I'll give you the message because --
 3          MR. WOLFF:  Okay.
 4                    **PROCEEDINGS CONTINUED**
 5          THE COURT:  Ladies and gentlemen, closing arguments
 6      are just that.  They're arguments.  They're not
 7      evidence.  I want to just remind you that comments by
 8      counsel both on the defense side and the plaintiff side
 9      are to be taken as that, as arguments.  So comments such
10      as "send a message" and these type of things are not to
11      be considered by you.  You are to decide this case, and
12      I will instruct you on the law and facts of this case
13      only.  Okay.  You may proceed.
14          MR. WOLFF:  Thank you, Your Honor.  And thank you
15      all.  Appreciate your attention.  We tried to move this
16      along.  We've cut some witnesses out, and we want to let
17      you get back to your lives.  But we do appreciate it.
18      It's an important case for Eaux Holdings.  It's an
19      important case for Scottsdale.
20          And you heard the argument, but Scottsdale did
21      issue a policy.  It provided coverage.  It was there to
22      respond.  We have a dispute, and the goal of Scottsdale
23      is to make it right and to get its insured in this case,
24      Eaux Holdings, back to where it was or better if they
25      have replacement cost coverage.  And would've seen the

1    end result is better.  Property's worth way more.
2    That's good.  That's what the policy's about.  But the
3    problem is the process.
4         You all know that it was devastation.  No one's
5    denying that.  And people had to get back on their feet.
6    And you heard Mr. Odom say, "Look, we got back faster
7    than most people."  And that's good.  But Jeff Major
8    flew in, had his contract, which is fine.  He signed up
9    Mr. Odom for Eaux Holdings, submitted this big, big
10   claim, not a claim, it's an estimate, and got it to
11   Mr. Lock.  And what was Mr. Lock to do.  He is to
12   evaluate this loss and start the process of paying under
13   the policy per the policy.
14        And that policy, you're going to see -- you saw
15   this right there, that verdict form.  You're going to
16   see that.  But you're also going to, I believe, get the
17   jury instruction.
18        THE COURT:  They will get the charges.
19        MR. WOLFF:  This is all that matters about the law.
20   The judge is going to tell you what the law is and then
21   it's out of everybody's hands and into yours.  So got to
22   follow this, and we'll talk about what's in here.  Not
23   what I say the law is, it's what the judge says.  And
24   the words in here have meaning, and if you have
25   questions follow these words.

1          So one of the things that you're going to see in

2     these jury instructions, they're going to tell you about

3     policies and repair cost value, replacement cost value

4     rather, and actual cash value.  Those are two different

5     things.  There's an actual cash value that is paid.  And

6     then once you say, "I'm going to repair," then the

7     carrier, the insurance company, and the insured move

8     forward and pay and get the insured at least back to

9     where they were or better.

10         So Mr. Lock is in this process.  And he told you

11    that he was working hard to deal with what they call cat

12    loss, catastrophic loss, which it was, and he received

13    this estimate.  And they asked, "Can you send $250,000?"

14    And you saw the evidence where he replied and said,

15    "Look, here's the 250 you asked for."  So then he begins

16    a process.  And what does he do, he hires an independent

17    adjuster.

18         Well, you all know.  You saw the pictures.  And by

19    the way, we're not trying to hide from those pictures.

20    Those are what they are.  You all saw what it was.

21    Every house, every building, pretty much, needed

22    independent adjusters to look at it, needed somebody to

23    come look.  There was somebody out there quick.  Monte

24    Jones went out there.  And what did he see, he saw a

25    building.  It was a -- what they call -- Mr. Stuck

705

1   talked about it.  It was a complex special construction

2   issue because we had the Department of Homeland Security

3   in there.  There were special requirements.  And

4   Mr. Jones went out there and looked and said, "This is

5   outside of what I can do.  This is complicated."  Went

6   back to the company and said, "We need more expertise."

7       And so as part of that process Scottsdale hired

8   Grecco.  Why did they hire Grecco.  It's one of the

9   vendors, they call them, that they can use for specialty

10   construction; and this guy had the experience with

11   government security or government buildings and lease.

12   So he went out and he realized that there were some

13   problems with the building.  The building was old and

14   there was obvious rot in some places, and the question

15   was in determining actual cash value you have to figure

16   out what the depreciation is.  And what is depreciation.

17   It's going to be in the information the judge provides

18   you, but it accounts for the age of the building and the

19   other issues.  And so Mr. Lock was looking to Grecco to

20   help get through this process, get to the issue of what

21   is the actual cash value.

22       And you're going to see here -- I'm going to put

23   this up, and this is important because we can talk all

24   day with our words but those words don't matter.  What

25   matters is satisfactory proof of loss, as the judge will

1    tell you.  This is what the judge is going to give you.
2    Satisfactory proof of loss is that which is sufficient
3    to fully apprise the insurer of the insured's claim,
4    including the extent of the damages.  And to figure out
5    the extent of the damages you need to know what's before
6    and what's after.  And you'll -- you can read down here;
7    but it can come in many ways, as the Court will tell
8    you.  And it could come in an estimate; but it didn't
9    because that estimate, it's big and there's a lot of
10   footsteps but not a lot of mileage because what
11   Mr. Major needed to do -- all they needed to do was say,
12   "Here's what I think the actual cash value is," because
13   the repairs hadn't started.  All he had to do is say,
14   "Here's my calculation here."  But what did he say on
15   the stand.  He said, "I leave that to Scottsdale
16   Nationwide," is what he said, and asked them to do that.
17         And so in this case we show you a couple of things.
18   As part of this satisfactory proof of loss portion,
19   Mr. Collisson went out there.  I don't need to repeat.
20   I showed you the pictures.  He saw the issues.  There
21   were questions.  So Mr. Collisson provided the report
22   and gave an ACV number right there, the 468,192.53, and
23   said, "We're continuing to evaluate this claim."  And on
24   November 23rd, this is Jade Bentz but that's with
25   Skyline.  Skyline writes back, "Thank you for the update

1    and getting" -- yeah, "and getting the undisputed
2    issues."  So they acknowledge that the undisputed issues
3    were resolved there, but that doesn't end the claim.  I
4    mean, that process continues.  And what's important
5    there is that this was a complex claim.
6         And I don't want to spend a lot of time here.
7    We've talked about this engineering report that wasn't
8    given to us.  Why is that important.  What do we need
9    that engineering report for.  They're here today to tell
10   you, "This was a simple issue.  They didn't need
11   expertise.  Monte Jones walked out there and that's all
12   you need."  In a case like this, to be fully apprised,
13   you've got to know what the issues are, particularly
14   when there's evidence that there are other problems that
15   are not storm related.  So here's -- this is what
16   Collisson writes back and he says, "There's a need to
17   know the extent of the deterioration and would suggest
18   it's been ongoing for a long period of time."  So we
19   just need to know what it is and then, two, we've got
20   issues about the windows, the cladding, and those things
21   as well.
22        And I just don't understand some of Mr. Major's
23   testimony on this.  He's telling us -- you know, should
24   know everything.  He says he didn't know about this
25   engineering report that was in October.  "Do you think

1      this engineering report will help us get the insurance
2      company to pay for the siding replacement?"  He tells
3      you -- they've attached the scope of work, and you'll
4      see that Mr. Major's on there.  By the way, Ms. Brown
5      said no one asked Mr. Odom, Eaux Holdings, for anything.
6      We couldn't talk to Eaux Holdings.  We had to talk to
7      Mr. Major.  And Mr. Major knew about this engineering
8      work.  And it's not a minor thing.  The outside of that
9      building was a major component of this entire building.
10     The window system was a major component.  They have
11     design professionals come in.  They had an engineering
12     team, as you heard.  And why wasn't that provided to us.
13         I mean, Mr. Lock told you we're not here to save
14     money.  How do you save money by not paying a claim?
15     You're getting pulled into court, sued for penalties.  I
16     mean, he said the longer a file's open the more it
17     costs.  The goal for everybody is to get an insurance
18     claim paid as soon as possible, paid with the
19     information that you need to make a payment.
20         So they decide they want to move in a replacement
21     mode.  So now we're out of actual cash value and we're
22     moving to the replacement cost, which is good.  So what
23     happens next.  Well, we don't have that report.  They
24     say, "Oh, we're ready to pull the trigger and get
25     going," in September.  Well, that wasn't true.  I mean,

1    Encore could not even start until November.  It wasn't

2    even licensed in Louisiana to pick up a hammer and work

3    on a project like this.  So it starts and this

4    contract -- and we're going to have to talk about this a

5    little more, but this contract had three payments that

6    were due.  And I'll -- just the excerpt, we'll look at

7    the thing there.  There's three payments.  There's a

8    first one that's due in December when it was signed for

9    a hundred thousand.  And then 30 days after that, 250.

10   So that's 350 that had to be paid.  That had already

11   been tendered well before then.  And then there's one

12   other payment.

13        This is a contract.  I mean, Mr. Odom talked about,

14   "Well, we had a deal.  He's helping me out."  This is a

15   contract.  Encore agreed to accept three payments, and

16   then the final payment wasn't due till way down the

17   line.  We're going to talk about that, but Scottsdale

18   was moving along to help with this process.  But there's

19   a problem because what is the actual number.  The

20   estimate that we got, and we'll look at it, but that

21   number wasn't it.  He admitted that number kept going

22   down.  We'll look at it briefly.  And we didn't get any

23   other numbers.  So it gets to we've got to get this

24   done, what is the number.

25        So Scottsdale asked Mr. Granger Stuck, who is a

1    construction expert -- you can look at the CV.  He

2    handles giant projects all over the world.  And he came

3    down with a goal.  It's not how can we cheat Eaux

4    Holdings out of money.  It's what can we do to get this

5    payment made and made right.  And so, to let you know

6    where we were with this, he goes down to -- I mean, he

7    goes over to Eaux Holdings and meets with Skyline.  And

8    after he walked the building, they had a meeting and it

9    was all verbal.  And then he writes Skyline.  He says,

10    "Just us here from my end, I'm working on comparative

11    analysis comparing Skyline data, Grecco data, and our

12    independent data.  However, I know I said this before,

13    but I'm struggling to line up the comparison because we

14    don't have a consolidated claim and for all claim

15    scope."  You've heard the term scope.  What is scope.

16    What is hurricane related and what needs to be repaired

17    or replaced.  That's essentially what that is.  And then

18    price, you know you take that scope and the price.  He

19    goes, "Without that, I'll have to piece this together

20    for what I think is the claim based on our discussions

21    at the site and subsequent info, the Encore contract,

22    the window estimate, the roofing estimate, et cetera."

23    And so as part of this process he's waiting and he

24    gets from Skyline, dear Mr. Granger or good evening,

25    Mr. Granger, "Per the below, see attached a workbook."

1    Now, this isn't that book there.  This is a whole new

2    set of data that hasn't been supplied, which is fine.

3    He gets it then.  "Please note that this is for

4    discussion and to help to summarize where we see the

5    components and their values.  The Skyline estimate" --

6    and that's that big thing they gave us.  "The Skyline

7    estimate was proffered to document the initial scope of

8    the loss and to estimate RCV and the subsequent ACV for

9    funding repairs while the claim was adjusted.  It is and

10   only was an estimate.  However, the scope was used as a

11   detailed guide to the damages which Encore ultimately

12   repaired under the contract.  The true cost" -- and

13   that's really what it comes to, "The true cost is only

14   actually realized when the repairs and/or replacement is

15   complete."  The true cost.

16       And so Mr. Stuck did a detailed analysis, and he

17   walked through with the data that he got in May and went

18   through item by item by item.  I don't need to go

19   through all of these, but he did agree -- he said,

20   "Look, I think the windows need to be covered."  I think

21   the building, the wall, he agreed with the scope.  And

22   then he went through and analyzed the cost of all those

23   in terms of what was actually submitted and what actual

24   costs were incurred and that number came to 1,797,091.

25   And then you saw Mary Ann put that up there.  He

1    provided that claim analysis on May 13th.  Scottsdale

2    then paid Eaux Holdings five days later.  That's the

3    million dollars plus.  And that was actually before the

4    substantial completion was provided.

5        So he then was asked, after the August data was

6    in -- and that was the guy that flew in, didn't have any

7    records.  But he got the actual cost from the August

8    data and it turned out, after he got the actual records,

9    that the claim amount was 1.6 million.  But Scottsdale

10   already paid 1.79, and that's fine.  Not asking to say

11   anything other than as we got data it became -- how do

12   we put it?  We were able to find what the true costs

13   were.

14       I mean, if you think about it, the first data they

15   gave us -- and let's look at this.  Can you all see this

16   okay?  All right.  So if you look at the Skyline, you

17   see that Skyline is -- and I'm going to put this here.

18   Okay.  That's a little better.  To start off with,

19   Skyline sent its estimate.  That's the stack.  That was

20   2.196, essentially 2.2.  Then that All Clear bill of

21   491,000 which everybody agreed was over the top.  They

22   had the Poole and then the Bourgeois, and that came to

23   2.9 million.  All right.  And then in May you take all

24   of these and look at the Skyline estimate.  It's

25   dropping.  So all-in -- and we're talking apples to

713

1    apples.  All-in now is 2.4.  And then today they're
2    saying, well, no, it's 2.58.  How do I make the yellow
3    dot go away?  I shouldn't be touching it.  I'll live
4    with the dot.  Okay.  So those are the estimates, but
5    then the actual repair costs tell a different story.
6         And we're going to have -- the big question is why
7    does Mr. Stuck say that the Encore building repairs, the
8    actual costs, were 976 when Encore say it's
9    1.36 million?  How is that?  We've got to figure that
10   out.  Well, what's going on here is there's a
11   construction contract.  And you've seen that.  That's
12   got the contract sum.  And I think it's best because I
13   want to focus on the one page.  All right.  I'll just
14   use this.  There were three payments.  There's initial
15   payment.  We've looked at this.  The second payment 30
16   days later.  And then the third payment, it's within 30
17   days of those items.  Now, Mr. Stuck provided detailed
18   analysis of all the costs.  He looked at everything and
19   he -- and all of the evidence -- he looked at all of the
20   evidence and he showed you that when it got down to it
21   the real cost, the Eaux Holdings' payments, were
22   actually -- the actual charges for Encore are
23   $924,927.50.  That's what was actually paid.  There are
24   no invoices to support 1.36 million.  There is no
25   reasonable explanation to support 1.36 million.

714

1     This guy that flew in today with his knapsack, and

2     he's coming to federal court knowing -- he's flying in

3     from Missouri or wherever knowing that he's got to come

4     down and say, "We're still owed 300,000, maybe 350." No

5     documents, nothing. A contract -- you heard Mr. Stuck.

6     A contractor needs to be aware to the penny what a job

7     is costing them. That's not unreasonable to expect

8     that. He should know specifically where the scope of

9     the job is. Where are they? He couldn't tell us that.

10     He had a number. He couldn't say what that number was.

11     He couldn't say what part of that number was hurricane

12     related and what part was not. And that's their burden.

13     The burden is to prove what it is. And if they have it,

14     please give us to us. And if more money's owed, then it

15     needs to be paid.

16     But as we stand right now, that building's up, it's

17     going. It's occupied by the Department of Homeland

18     Security on the first floor. That's a 15-year lease,

19     maybe 17. It's a serious cash flow coming in. It's

20     worth a lot, lot more. They have repaired the windows.

21     They say they may replace it, but they haven't. And if

22     they want to, they could; and it will be paid for

23     because it is in the scope of Mr. Stuck's May analysis

24     when he went out there.

25     Just so you know, so that I'm clear, because --

715

1    and, look, you-all, how you can tolerate hearing about

2    all these numbers I don't know.  I really don't.  But we

3    appreciate your time and attention here.

4         You'll see here, look, I put the dot right there so

5    it works out.  The Encore window system replacement,

6    it's in the 1.7.  So they got -- in the 1.797 they have

7    the window system replacement.  They just haven't done

8    it.  So that was released.  And you know what, that's

9    why in part that claim was overpaid; but it's in there.

10    I don't know that they'll ever replace it.  It's

11    working.

12         Then they have the second floor.  Evan Moncrieff

13    said it's built out.  It was vacant before.  It's vacant

14    now.  Nothing's changed.  They have the option to build

15    it out further, but that's not storm related.  It wasn't

16    occupied before.  If they want to do that, that's fine.

17    They should, and that will help enhance that retirement

18    project.

19         But we still have to come back to the 1.36, where

20    does that come from, as opposed to what was actually

21    paid and what was -- we have the -- we have an invoice,

22    I'll show you real quick, for the pre-storm work before

23    they were licensed.  And then they have the three

24    payments.  The initial payment, here we go.  There's the

25    initial payment, the hundred thousand.  There's the

1    hundred thousand.  It's due within -- due at the time.

2    And then there's the next second payment, progress

3    payment for 250, that was due 30 days after that.  There

4    it was.  It was paid.  And then that contract only calls

5    for one more payment, the final payment.  It says final

6    payment.  And that's when the owner has received the

7    depreciation, which he did.  And that was paid on 6/3.

8    Actually, it was paid -- as we showed you earlier, Eaux

9    Holdings was paid that one, over a million dollars, in

10   May.  So it wasn't even owed yet.  You know, repair work

11   on a construction project is only good repair work after

12   it's been approved, released.  In this case we have the

13   specialty issues with the Government and the GSA having

14   to approve it.  It was paid before it was owed.  Excuse

15   me.  Scottsdale paid the money before it was actually

16   owed.  Fine.  We're moving this thing along, and that's

17   a good thing.

18        But how are we getting to the 1.36 million when

19   there's only 924 that has been paid?  Where is that

20   other money coming from?

21        "Sir, do you have any invoices to support that?"

22        "No."

23        "Did you do a final one?"

24        "No."

25        "How much is it?"

1          "I don't know, but I think I did.  I did."

2          We can't -- he's got to prove what it is, and it

3     doesn't -- he doesn't have a good explanation other than

4     he said there was more.

5          And this contract was subject to -- it could go

6     increases or it could do subject to additions or

7     deductions.  And, look, we're going to hear about these

8     change orders.  You'll see all those change orders.

9     Look, we don't dispute there was $42,000 of change

10    orders.  That's P-52 to 57.  That's not a dispute, but

11    that doesn't account for 400,000 or whatever the

12    difference is of 924 and 1.36.  So this is not relevant.

13         What we do know is we have some checks.  These are

14    the checks issued to Encore.  There's three of them.

15    Actually, there's four.  And one was for the early work

16    that we saw, the 24,000.  And then we have the 100,000.

17    Here we go, the 100,000.  And then the 250,000 for the

18    progress payment.  And then the 500,000.  And, look, I

19    think I left that over there; but I'm not going to bore

20    you with that.  You can ask for those checks.  And if

21    you want to decide what the actual amount was, ask for

22    the checks.  You won't find any more than these.  Three

23    payments were due.  Three were made.

24         Are there any invoices?  All you'll get is 42,000.

25    There's not going to be 1.36 million.  Where is the

1    other -- where's the charges for the work above the 924?
2    It's not there.  It's not in evidence.  And that is not
3    sufficient to say, "Look, you owe 1.36 million."
4        All right.  So we have to deal with this whole
5    notion of did Scottsdale have the satisfactory proof of
6    loss and when did it get it.  And as we pointed out,
7    that continued as a long process.  I say long.  Mr. Odom
8    acknowledged, agreed that they were back up much more
9    quickly than most people.  And that's good.  That's
10   fine.  But in the entire part of that process he
11   required engineering reports.  They didn't even know
12   what they were going to do and they were still working
13   on it.  And as we move through, Mr. Stuck came in.  He
14   did that analysis.  He worked with the insured and with
15   Scottsdale and it got paid.
16       So you have this verdict form.  It says, "Do you
17   find by a preponderance of the evidence that Scottsdale
18   owes for monies in excess of 1.796?"  Have them prove
19   what actual cost -- not the contract, what actual cost
20   above the 1.796.  If you find that, and y'all are going
21   to have to find that, if you do, what additional
22   amounts.  We suggest, as we've shown, that it was
23   actually overpaid.  And that's fine.  And I'll also tell
24   you that it was paid under replacement cost.  It put him
25   back, as we said, not only as he was but way better,

1    $600,000 better.  So we'll suggest that the answer here
2    is no.
3         "Do you find additional amount?"  You don't go
4    there because you go from if you say no, go to question
5    three.
6         "Do you find that the payments were made beyond 30
7    days of satisfactory proof of loss?"  Y'all need to make
8    that decision.  Look at the charges and make your
9    decision there.
10        And "Do you find that, if there was satisfactory
11   proof of loss, that there was no" -- I'm not going to
12   use the words because this is what the judge says.
13   Arbitrary and capricious.  You have to show that the
14   company was arbitrary and capricious in not paying which
15   means that it acted without reasonable or probable
16   cause, justification, or excuse.  "An insured does not
17   act arbitrarily when its refusal is based on a genuine
18   dispute," we've seen that dispute, "over the coverage or
19   the amount of loss."  Well, there's certainly coverage;
20   but the amount of loss is what is in dispute.  You can
21   see from the days that we've been here.  And then the
22   Court will tell you the standard requires an assessment
23   of the reasonableness of the defendant insurer's conduct
24   and, when there's substantial reasonable and legitimate
25   questions, failure to pay is not arbitrary and

1      capricious even if it's within that -- failure to pay

2      within that time is not arbitrary and capricious if

3      there's a substantial reasonable and legitimate

4      question, which we have shown.

5              Now, the judge will instruct you this is about this

6      case.  Everyone in Lake Charles -- you all know what you

7      went through.  Louisiana goes through this often.  But

8      this is about deciding this case.  And you will then be

9      asked do you find that within arbitrary and -- within

10     the 30 days, was there failure to pay within 30 days,

11     arbitrary, capricious, without probable cause.  You have

12     to answer that.  We suggest there's a big dispute here

13     and it needed to be decided by you.  So we suggest no.

14     And then you've got to look at these payments and see if

15     you think any of them are untimely or if they're timely.

16             So where we end up is, fortunately -- and I have

17     one final thing and I'm going to be finished.  We're

18     almost to the finish line.  I think there will be a

19     rebuttal after this.  Ms. Brown will get to get the last

20     word because that's the way it goes.  I'm sure you know

21     that if I had another chance to get up I'd offer some

22     more, but y'all need to get home.

23             So this is what it looked like before.  This is

24     what it looks like now.  You heard Mr. Duplantis.  You

25     heard Mr. Odom.  He's sitting on an awesome building.

1    He's got his retirement.  He's making the 15,000 a month

2    for next 15 to 17 years.  He's got room for another

3    tenant.  He's back on his feet and God bless him for

4    that.  And we thank you very much for your time and

5    attention and be well.

6         THE COURT:  Any rebuttal?

7         MS. BROWN:  One more chance.  Ladies and gentlemen,

8    I promise I'll be brief.  Mr. Wolff started by reminding

9    you about Mr. Odom's testimony that he got back on his

10   feet.  He got back on his feet not because of Scottsdale

11   but despite Scottsdale.  He got back on his feet because

12   he took a chance.  He signed a contract.  First he hired

13   attorneys after hiring a public adjuster.  After

14   Scottsdale wouldn't do the right thing still, he hired

15   attorneys.  After that he took a chance and signed his

16   name.  You heard him.  Signed his name on a $1.3 million

17   contract that he couldn't pay.  He hadn't received that

18   money, but he took a chance.  He believed that we could

19   help him, that eventually Scottsdale would do the right

20   thing and now, hopefully, that you'll help him do the

21   right thing.  So he got back on his feet because of who

22   he is despite what Scottsdale did.

23        Now, Mr. Wolff made some comment about the proof of

24   loss, oh, it's so big, as if Nationwide didn't know what

25   to do with it.  They keep talking about how there was no

722

1     depreciation taken, no depreciation taken.  You heard

2     about Xactimate.  And the fact is, ladies and gentlemen,

3     depreciation is a click of a button.  Nationwide

4     knows -- Scottsdale knows --

5          THE COURT:  Ms. Brown.

6          MS. BROWN:  Scottsdale.

7          THE COURT:  Scottsdale.

8          MS. BROWN:  Sorry.  Scottsdale knows perfectly well

9     how to apply depreciation.  In fact, there were

10    conversations between Skyline and Monte Jones about how

11    to do it.  And the fact is, they could have applied

12    50 percent depreciation.  They still would have been

13    making a payment much more than what they did.

14         So Mr. Wolff got up here and asked you what is the

15    number, what are the numbers.  I want to show you

16    something that you saw in the evidence.  Let's look at

17    what the numbers are.  So the Skyline estimate, that

18    number was 2.1 million.  Monte Jones' estimate, at least

19    1.5.  The only timely payment, 250.  Now we know the

20    actual cost, over $2 million.  And we know the total

21    that Scottsdale has paid to date, 1.8 million.

22         Now, Scottsdale hired Granger Stuck to come in long

23    after litigation had commenced.  They said they found

24    out the true cost in May of 2021.  First of all, that's

25    not how insurance works.  They don't get to wait and

1    wait and wait until Mr. Odom incurs all of these

2    expenses, pays out of pocket, signs a contract with an

3    interest provision.  That's not how the insurance policy

4    works.  They should have paid him enough to get started

5    and then they pay the rest later.  They don't get the

6    benefit of delaying and then coming in saying oh, now we

7    know the actual cost.  But even now we know the actual

8    cost.  They're right at the policy limits and more than

9    the policy limits when you add the windows.

10        One thing about Granger Stuck I will say.  He

11    showed you how they got a payment issued in five days.

12    You know what that tells me, they could have done it a

13    long time ago.  They could have done it on time way back

14    in September but they chose not to.  They were waiting

15    to see how much Joey had in him, how long they could

16    stand and try to outlast him.  Well, guess what, they

17    didn't, ladies and gentlemen.

18        And this amount, this amount that was actually

19    spent, they want to go through the Encore bills and show

20    you all kinds of things.  And, you know, Mr. Wolff said

21    the words in this charge that the Court is going to give

22    you are important.  Some of the words he didn't read to

23    you are these words, and they're words you know.  The

24    amount actually spent includes amounts already paid by

25    Eaux as well as amounts Eaux has legally agreed to pay

1    for work that has been completed.  Eaux Holdings owes
2    Encore the money on the contract.  Eaux Holdings owes
3    all that money.  They owe the entire $2,031,893.50.  And
4    you heard testimony.  There are numbers that aren't even
5    in there.  The numbers for the buckets and the sump
6    pumps, that's not in there.  There's plenty of other
7    numbers he didn't claim.  Yet they want to come in here
8    and act like Mr. Odom is trying to get one over on
9    Scottsdale.
10        I challenged him, and you'll recall I challenged
11   him, to show you where Scottsdale asked for the
12   engineering report.  What he told you was, "We couldn't
13   talk to Joey Odom.  We could only talk to Skyline."
14   Guess what, they didn't ask Skyline for it either.  They
15   didn't ask anybody for anything that wasn't provided to
16   them.
17        In addition to Mr. Stuck coming in after the fact,
18   they also hired Mr. Duplantis.  And, quite frankly, his
19   testimony was just ridiculous.  But they hired him, paid
20   him $20,000 or his company $20,000, to come in and tell
21   you that Joey Odom got a better building after all this.
22   Well, no kidding, I mean.  He wouldn't agree on the
23   stand, though, that if your 40-year-old roof blew off
24   and you got a new roof that your house would be worth
25   more.  It makes no sense.  It's just another attempt by

1    Scottsdale to confuse the issues.  What the building is
2    worth if Mr. Odom could sell it, if he wanted to sell
3    it, none of that matters to what Scottsdale was supposed
4    to do.  They want to draw your attention away from what
5    they were supposed to do.
6        I agree with one thing Mr. Wolff said.  Words are
7    important.  The words in this charge are important.  The
8    words in that insurance policy that Scottsdale didn't
9    comply with, those words are important too.  The words
10   in the Louisiana statute that Scottsdale didn't follow,
11   those words are important.  Ladies and gentlemen, the
12   most important words that are going to be in this
13   courtroom this week are the ones you're going to write
14   on the verdict sheet.  We thank you for your time.

15                    **JURY INSTRUCTIONS**

16        THE COURT:  Okay.  Ladies and gentlemen, it's going
17   to take me about 25 minutes or so to instruct you on the
18   law.  You've been sitting there for a little while.  Any
19   of you need a quick five-minute break before I venture
20   into that or are you good?  I don't want anybody to be
21   uncomfortable.  Y'all okay?  You sure?  Okay.  Not an
22   endurance test.  Okay.  All right.
23        Ladies and gentlemen, it is my duty and
24   responsibility to instruct you on the law you are to
25   apply in this case.  The law contained in these

726

1    instructions is the only law you may follow.  It is your

2    duty to follow what I instruct you the law is regardless

3    of any opinion that you might have as to what the law

4    ought to be.

5         If I give you -- if I've given you the impression

6    during the trial that I favor either party, you must

7    disregard that impression.  If I've given you an

8    impression during this trial that I have an opinion

9    about the facts of this case, you must disregard that

10   impression.  You are the sole judges of the facts of the

11   case.  Other than my instructions to you on the law, you

12   should disregard anything I may have said or done during

13   the trial in arriving at your verdict.  You should

14   consider all of the instructions about the law as a

15   whole and regard each instruction in light of the others

16   without isolating a particular statement or paragraph.

17        The testimony of witnesses and other exhibits

18   introduced by the parties constitute the evidence.  The

19   statements of counsel are not evidence.  They are only

20   arguments.  It is important for you to distinguish

21   between the arguments of counsel and the evidence which

22   those arguments rest.  What the lawyers say or do is not

23   evidence.  You may, however, consider their arguments in

24   light of the evidence that has been admitted and

25   determine whether -- and determine whether the evidence

1    admitted in this trial supports those arguments.

2         You must determine the facts from all testimony

3    that you've heard and the other evidence submitted.  You

4    are the judges of the facts, but in finding those facts

5    you must apply the law as I instruct you.  You're

6    required by law to decide the case in a fair, impartial,

7    and unbiased manner based entirely on the law and on the

8    evidence presented to you in the courtroom.  You may not

9    be influenced by passion, prejudice, or sympathy you

10   might have for the plaintiff or the defendant in

11   arriving at your verdict.

12        The plaintiff, Eaux Holdings, LLC, has the burden

13   of proving its case by a preponderance of the evidence.

14   To establish by a preponderance of the evidence means to

15   prove something is more likely so than not so.  If you

16   find that the plaintiff, Eaux Holdings, has failed to

17   prove any element of its claim by a preponderance of the

18   evidence, then you may not -- then it may not recover on

19   that claim.  The fact that a person brought a lawsuit

20   and is in court seeking damages creates no inference

21   that the person is entitled to a judgment.  Anyone may

22   make a claim and file a lawsuit.  The act of making a

23   claim in a lawsuit by itself does not in any way tend to

24   establish that the claim -- establish that claim and it

25   is not evidence.

1       A stipulation is something that the attorneys agree

2   is accurate.  When there is no dispute about certain

3   testimony, the attorneys may agree or stipulate to that

4   testimony.  Stipulated testimony must be considered in

5   the same way as if that testimony had been received here

6   in court.  A stipulation is an agreement.  When there is

7   no dispute about certain facts, the attorneys may agree

8   or stipulate to those facts.  You must accept a

9   stipulated fact as evidence and treat the fact as having

10  been proven here in court.

11      When testimony or an exhibit is admitted for a

12  limited purpose, you may consider that testimony or

13  exhibit only for the specific limited purpose for which

14  it was admitted.  The evidence you are to consider

15  consists of the testimony of the witnesses, the

16  documents and exhibits submitted into evidence, and any

17  fair inferences and reasonable conclusions you can draw

18  from the facts and circumstances that have been proven.

19  Generally speaking, there are two types of evidence.

20  One is direct evidence such as testimony of an

21  eyewitness.  The other is indirect evidence or

22  circumstantial evidence.  Circumstantial evidence is

23  evidence that proves a fact from which you can logically

24  conclude other facts exist.  As a general rule, the law

25  makes no distinction between direct and circumstantial

1    evidence but simply requires that you find the facts
2    from a preponderance of all the evidence, both direct
3    and circumstantial.
4         You alone are to determine the questions of
5    credibility or truthfulness of witnesses.  In weighing
6    the testimony of the witnesses you may consider the
7    witness's manner and demeanor on the witness stand.  You
8    may consider any feelings or interest they have in the
9    case or any prejudice or bias about the case that he or
10   she may have and the consistency or inconsistency of his
11   or her testimony considered in light of the
12   circumstances.  Has the witness been contracted by other
13   credible evidence.  Has he or she made statements at
14   other times and places contrary to those statements made
15   here on the witness stand.  You must give the testimony
16   of each witness the credibility you think it deserves.
17   Even though a witness may be a party to the action and
18   therefore interested in its outcome, the testimony may
19   be accepted if it is not contracted by direct evidence
20   or by any inference that may be drawn from the evidence
21   if you believe the testimony.
22        You may not decide this case by counting the number
23   of witnesses who have testified on the opposing sides.
24   Witness testimony is weighed.  Witnesses are not
25   counted.  The test is not the relative number of

1    witnesses but the relative convincing force of the

2    evidence.  The testimony of a single witness is

3    sufficient to prove any fact even if the greater number

4    of witnesses testified to the contrary if after

5    considering all of the other evidence you believe that

6    witness.

7         When knowledge of a technical subject matter may be

8    helpful to the jury a person who has special training or

9    experience in that technical field is permitted to state

10   his or her opinion on those technical matters.  However,

11   you are not required to accept that opinion.  As with

12   any other witness, it is up to you to decide whether to

13   rely on it.  Certain charts and summaries have been

14   shown to you solely to explain or summarize the facts

15   disclosed by the books, records, and other documents

16   that are in evidence.  These charts and summaries are

17   not evidence or proof of any facts.  You should

18   determine the facts from the evidence.

19        In determining the weight to give to testimony of a

20   witness, consider whether there was evidence that at

21   some other time the witness said or did something or

22   failed to say or do something that was different from

23   the testimony given at trial.  A simple mistake by a

24   witness does not necessarily mean that the witness did

25   not tell the truth as he or she remembers it.  People

1     may forget some things or remember other things

2     inaccurately.  If a witness made a misstatement,

3     consider whether that misstatement was an intentional

4     falsehood or simply an innocent mistake.  The

5     significance of that may depend on whether it has to do

6     with an important fact or with only an unimportant

7     detail.

8          Do not let bias, prejudice, or sympathy play any

9     part in your deliberations.  A limited liability company

10    and all other persons are equal before the law and must

11    be treated as equals in a court of justice.

12         An insurance policy is a contract -- an insurance

13    policy is a contract that is the law between the

14    parties.  An insurance policy is construed like any

15    other contract according to the parties' intent as

16    expressed in the words of the policy.  Every insurance

17    contract shall be construed according to the entirety of

18    its terms and conditions as set forth in the policy and

19    as amplified, extended, or modified by any rider,

20    endorsement, or application attached to or made part of

21    the policy.  Insurance companies are free to limit

22    coverage in any manner they desire as long as the

23    limitations of liability do not conflict with the

24    statutory law or public policy.  An insurance policy

25    should not be interpreted in an unreasonable or strained

manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by the terms or so as to achieve an absurd conclusion.

The Scottsdale policy extends coverage only to covered property damaged by a covered cause of loss. Under the policy the building is a covered property inclusive of completed additions, fixtures, permanently installed machinery and equipment.  However, the cost for excavation, grading, back-filling the foundation of the building below the lowest basement floor or surface of the ground, the land on which the building is located, underground pipes, flues or drains, fences are not covered property under the policy.  The policy defines a covered cause of loss as direct physical loss unless the loss is excluded or limited in this policy.

An incurred cost is a cost that the insured actually paid or that the insured is legally obligated to pay.  An insured must have a valid substantive claim for which insurance coverage is due as a prerequisite to recover -- to the recovery of any penalties.  An insurer shall pay the amount of any claim due any insured within 30 days after receipt of satisfactory proofs of loss from the insured or any party in interest.  An insurer shall make a written offer to settle any property claim within 30 days after receipt of satisfactory proofs of

1    loss of that claim.  Failure to make such payment within

2    30 days after receipt of such satisfactory written

3    proofs and demand therefor or failure to make a written

4    offer to settle any property damage claim within 30 days

5    after receipt of satisfactory proofs of loss of that

6    claim when such failure is found to be arbitrary,

7    capricious, or without probable cause shall subject the

8    insurer to a penalty.

9         Satisfactory proof of loss is that which is

10   sufficient to fully apprise the insurer of the insured's

11   claim, including the extent of the damages sought.

12   Satisfactory proof of loss is a flexible requirement to

13   advise the insurer of the facts of the claim and it is

14   not required to be in any formal style.  As long as the

15   insurer receives sufficient information to act on the

16   claim, the manner in which it obtains the information is

17   immaterial.  Satisfactory proof of loss can be satisfied

18   by the insurer receiving an estimate of the cost of

19   repair or the insurer's independent adjuster after a

20   personal inspection of the insured's property.  The

21   insurer's receipt of satisfactory proof of loss triggers

22   the running of the applicable statutory time limits

23   under Louisiana's insurance penalty statute.

24        Eaux Holdings has the burden of proving that the

25   insurer received satisfactory proof of loss as a

734

1    predicate to a showing that the insurer was arbitrary,

2    capricious, or without probable cause.  An insurer has a

3    right and a duty to review damage estimates to verify

4    the scope and cost of work, especially on large and/or

5    complex property damage claims.  Eaux Holdings, who

6    claims penalties for alleged untimely payment of

7    insurance proceeds, has the burden of proving as to each

8    payment the following elements by preponderance of the

9    evidence.  One, the insurer received satisfactory proof

10    of loss; two, the insurer did not pay within the

11    required time; and three, the insurer acted in a manner

12    that was arbitrary, capricious, or without probable

13    cause.

14        The duties of good faith and fair dealing imposed

15    on insurers by Louisiana Revised Statute 22:1892 are

16    continuing duties that do not end during litigation.

17    The insured has the burden of proving that the insurer

18    acted in bad faith.  Under the law, arbitrary and

19    capricious means a refusal to pay without reasonable or

20    probable cause, justification, or excuse.  An insured

21    does not act arbitrary/capricious when its refusal to

22    pay a claim is based on a genuine dispute over coverage

23    or the amount of the loss.  This standard requires an

24    assessment of the reasonableness of the defendant

25    insurer's conduct.  And when there are substantial

1    reasonable and legitimate questions as to the extent of

2    an insurer's liability or an insured's loss, failure to

3    pay within the statutory time period is not arbitrary,

4    capricious, or without probable cause.

5        In the event of loss or damage to covered property,

6    the Scottsdale policy obligated Eaux Holdings, LLC, to

7    provide prompt notice of the loss or damage.  You may

8    only assess damages as they relate to and/or were caused

9    by Hurricane Laura.  The Scottsdale policy provides in

10   pertinent part the following:  Replacement cost.

11       Replacement cost without deduction for depreciation

12   replaces actual cash value and the valuation loss

13   condition of this coverage form.  Upon proof of actual

14   repair and/or replacement, the insured may then recover

15   replacement cost or RCV.  Actual cash value is the

16   reproduction cost less depreciation.  Stated another

17   way, it is the cost of duplicating the damaged property

18   with materials of like kind and quality less allowances

19   for existing physical deterioration and depreciation.

20       You may award damages on either an actual cash

21   value basis or you may award damages on a replacement

22   cost basis if the loss was actually repaired or replaced

23   and if the cost to repair or replace the property

24   exceeded the actual cash value.  The touchstone for

25   determining actual cash value is to put the insured in

1    exactly the same position as he or she was right before

2    the loss.  An award of actual cash value should provide

3    the insured with neither economic gain nor loss.

4         An award of replacement cost value is designed to

5    place the insured in a better position than before the

6    loss because the insured contracted for the right to

7    replace the old, depreciated property with brand-new

8    property of like kind and quality less any applicable

9    deduction and any prior payments.  To calculate damages

10   on a replacement cost basis, Scottsdale is required to

11   pay the lesser of the policy limits or the amount

12   actually spent that is necessary to repair the damaged

13   property.  The amount actually spent includes amounts

14   already paid by Eaux Holdings, LLC, as well as amounts

15   Eaux Holdings has legally agreed to pay for work that

16   has already been completed.

17        It is now your duty to deliberate and to consult

18   with one another in an effort to reach a verdict.  Each

19   of you must decide the case for yourself but only after

20   an impartial consideration of the evidence with your

21   fellow jurors.  During your deliberations do not

22   hesitate to reexamine your own opinions and change your

23   mind if you are convinced that you are wrong, but do not

24   give up your honest beliefs because the other jurors

25   think differently or just to finish the case.  Remember,

```
 1        at all times you are the judges of the facts.
 2              You have been allowed to take notes during this
 3        trial, and any notes that you took during the trial are
 4        only aids to memory.  If your memory differs from your
 5        notes, you should rely on your memory and not your
 6        notes.  The notes are not evidence.  If you did not take
 7        notes, rely on your independent recollection of the
 8        evidence and do not be unduly influenced by the notes of
 9        other jurors.  Notes are not entitled to any greater
10        weight than the recollection or impression of each juror
11        about the testimony.
12              When you go to the jury room to deliberate you may
13        take with you a copy of this charge, the exhibits that I
14        have admitted into evidence, and your notes.  You must
15        select a jury foreperson to guide you in your
16        deliberations and speak for you here in the courtroom.
17        Your verdict must be unanimous.  After you have reached
18        a unanimous verdict, your jury foreperson must fill out
19        the answers to the written questions on the verdict form
20        and sign and date it.  At that point you give it to the
21        court security officer.
22              After you have concluded your service, I will
23        discharge the jury.  And you are not required to talk
24        with anyone without this case, if you so choose.
25              If you need to communicate with me during your
```

738

1    deliberations, the jury foreperson should write the

2    inquiry and give it to the court security officer.

3    After consulting with the attorneys, I will respond to

4    you in writing or by meeting with you here in the

5    courtroom.  Keep in mind, however, that you must never

6    disclose to anyone, not even to me, your numerical

7    division on any question.

8         At this time you may now retire to the jury room to

9    begin your deliberations.  The clerk is going to provide

10   you with the verdict form, the jury charges, and

11   question forms if you have any questions for the Court.

12   All rise for the jury.

13                   (Jury exits courtroom.)

14        THE COURT:  Anything else?

15        MR. COX:  No, Your Honor.

16        THE COURT:  All right.  We wait.

17                   (Recess is taken.)

18        THE COURT:  Okay.  We have a question from the

19   jury.  Here's the question:  "We need clarification on a

20   statement on Page 2, additional amount owed as

21   determined in Question 2."  So that refers to the

22   verdict form on Page 2.  They have a question about

23   that.  I think maybe there's some confusion, maybe, that

24   if they determine that an amount was owed in Question 2,

25   what to do with it here.  So my inclination is I could

739

1        just write them an answer on here basically saying if

2        you determine an amount was owed under Question 2 you

3        have to determine now whether there's an applicable --

4        whether you have to answer Question 5 as to that.

5                MR. WOLFF:  Are they on Question 2 or are they on

6        Page 2 where they populate that line?

7                THE COURT:  They're on Page 2 where we have the

8        payments listed out.

9                MR. WOLFF:  Right.

10               THE COURT:  The question, I'll read it to you

11       again, is:  "We need clarification on a statement on

12       Page 2 --

13               MR. WOLFF:  Okay.

14               THE COURT:  -- additional amount owed as determined

15       in Question 2."  I think what they're confused about, is

16       what I take, is that if they determine an amount -- an

17       additional amount was owed on --

18               MR. WOLFF:  Page 1 --

19               THE COURT:  -- Page 1 --

20               MR. WOLFF:  -- Question --

21               THE COURT:  -- Question 2, now they're on to

22       Question 5, I think.  I'm guessing.

23               MS. BROWN:  We had that same confusion yesterday

24       just because it's a different -- it doesn't have a date

25       and amount.

1      THE COURT:  Well, the reason I did it that way is
2   we didn't know if there would be an amount.
3      MS. BROWN:  Right.
4      THE COURT:  They might have said no to Question 1
5   and we're done and then -- you know, there was no other
6   way to do it.  I wouldn't put an amount that we don't
7   know that they would even award.
8      MS. BROWN:  No, I agree.  You did it right.  I
9   think your proposed response to that question is the
10  right answer.
11     MR. WOLFF:  Just so we're understanding, wouldn't
12  it automatically populate -- if there's an amount on
13  Page 1 Question 2, would that automatically populate
14  into that blank?
15     MS. BROWN:  Well, that blank is supposed to be a
16  yes or no.
17     THE COURT:  I'm going honest with you, I'll just
18  tell y'all, originally my version of the verdict form I
19  had a blank here for them to put in the amount; but then
20  I thought that would be confusing because maybe they
21  would think they had to award something again.  So I
22  just was referring --
23     MR. WOLFF:  I think that's where they're thinking,
24  or they don't know.  So I think the answer is if you
25  found an amount in Question 2 on Page 1 that amount

1      should be applied at the point where they are now?

2           MS. BROWN:  No.  What it's asking is not the

3      amount.  It's asking a yes or no question about that

4      amount.

5           THE COURT:  No, I know.  But I think, Ms. Brown,

6      Mr. Wolff is correct.

7           MR. WOLFF:  So you get the yes, noes, and then

8      you'll take what additional amount, if any, do you find

9      and you would take that number, whatever it is, and

10     populate --

11          THE COURT:  Question 5 with it on that -- see, I

12     didn't put a line there.  I didn't want the jury having

13     to write in numbers twice.  You see what I'm saying?

14     They might -- that would really be confusing.

15          MR. WOLFF:  So why do -- I can see where the

16     confusion came.  So if we know that they have an

17     additional amount, then does it matter?  Do we need this

18     line, really, going forward?

19          THE COURT:  What do you mean?  They have to answer

20     yes or no whether -- if they've determined there was a

21     payment owed on Question 2, Page 1, they have to now

22     determine --

23          MR. WOLFF:  Oh, I see what you're saying.

24          THE COURT:  Now that they're on Page 5, they're

25     trying to determine whether or not it's timely or not.

742

1      But I guess my verbiage has got them a little confused.

2      I don't know.

3            MR. WOLFF:  So the question is if there is an

4      additional amount owed above zero in your response to

5      Question No. 2 --

6            THE COURT:  They have to now determine whether or

7      not -- they have to answer Question 5 as to that amount.

8            MR. WOLFF:  Timely or not.

9            THE COURT:  Right.  They need to answer Question 5.

10           MR. WOLFF:  So do you want to get the exact

11     language so we all agree and just send it back?

12           THE COURT:  That's why we're here.

13           MR. WOLFF:  Okay.

14           THE COURT:  So what can we agree to?  I think the

15     way I would like to handle it is to basically say, "If

16     you determined that an amount was owed on Question 2,

17     Page 1, then you have to answer Question 5 on Page 2 as

18     to that amount.  You've got to just answer the

19     question."  I don't think I want to say any more than

20     that.  They can read Question 5.

21           MR. WOLFF:  I'm okay with that.

22           MS. BROWN:  I think that's correct.

23           MR. WOLFF:  Well, it's got to be above zero, right?

24           MS. BROWN:  If they find an amount.

25           MR. WOLFF:  Oh, an amount.

1      THE COURT:  I'm just saying -- well, yeah, it's got

2   to be above zero, I mean, whatever that is.  So I'm

3   going to basically -- I'm going to write it out.  Let me

4   write this out before I write it on the sheet for them.

5   I have -- we have a form that we give the foreman.

6   State court, you know, you get them on pieces of paper

7   sometimes.  We're big time.  We got our own form on it,

8   and I got to sign it.  All right.  How about this:  "If

9   you determine an amount is owed in response to

10  Question 2 on Page 1, then you must answer Question 5 on

11  Page 2 as to that amount."

12      MR. WOLFF:  If any.

13      THE COURT:  I mean, that question -- they need to

14  answer the question on Page 2.

15      MR. COX:  With a yes or a no.

16      THE COURT:  Right.  They've got to answer

17  Question 5 on Page 2 as to any amount.  You follow what

18  I'm saying?

19      MR. WOLFF:  We're fine with that, Judge.

20      MR. COX:  Right.

21      THE COURT:  I don't need to restate Question 5.

22  Question 5 tells them they've got to determine whether

23  it was timely, it was arbitrary, capricious.  So there's

24  no need for me to do that.  They just need to read

25  Question 5 on Page 2 if they determine an amount is

1    owed.  I'm just going to do --

2         MR. COX:  Your Honor, why it was confusing to me,

3    and I brought it up yesterday, when I read it, it says

4    additional amount as determined in Question 2.  And when

5    I filled it out initially I just took the same number

6    that I put in Question 2 and put it right there, not a

7    yes or a no.

8         THE COURT:  But, you see, that would have been

9    wrong because Question 5 is asking is a penalty owed on

10   any amount.

11        MR. COX:  I agree, but I misunderstood it and found

12   it ambiguous.  That's why I brought it up yesterday.

13        THE COURT:  Mr. Cox, you found my verdict form

14   ambiguous?

15        MR. COX:  That's why I brought it up.

16        THE COURT:  All right.  Let me write this out for

17   them.  Go give it to them.

18                   (Recess is taken.)

19        THE COURT:  All right.  We have another question.

20   Okay.  Here's the question.  I already know the answer

21   to it, but here's the question:  "May we see the bar

22   graph chart from the plaintiff's evidence, the four-

23   volume set from Skyline, and Mr. Stuck's estimate?"  So

24   they're asking for three things.  They want the bar

25   graph chart from the plaintiff.  I think that was

745

1     admitted into evidence.  They want the four-volume set

2     of the Skyline estimate, and then they want Mr. Stuck's

3     estimate.

4          MS. WOLF:  So on Mr. Stuck's, remember, he did two,

5     one in May and one in August.  Should we -- what we can

6     do is pull every exhibit that I would consider to be a

7     Stuck estimate and --

8          THE COURT:  Well, no.  What we're talking about

9     here is what was put in evidence.  Mr. Stuck's estimate,

10    did you put it into evidence?

11         MS. WOLF:  Yes.

12         THE COURT:  I can only let the jury see what has

13    actually been put into evidence.

14         MS. WOLF:  Right.  Yeah.  I'm going to pull what

15    that is.  He did two.

16         THE COURT:  I would like to know the exhibit

17    numbers.

18         MR. WOLFF:  We're going to get it and show it to

19    you.

20         THE COURT:  Yeah.  Sure.

21              (Off the record discussion.)

22         MS. LACOMBE:  Ms. Wolf, could it be the D-104A

23    graph and D-34 spreadsheet to Mr. Stuck's report?

24         MS. WOLF:  Two spreadsheets and then the two

25    summary charts that just summarize the report.

746

1    MS. BROWN:  I don't think the summary chart is the
2    same.
3              (Off the record discussion.)
4    MS. WOLF:  So here's what I have, are these.  I
5    would ask, if you can, to look at D-106, see if I offer,
6    filed and introduced.
7    MS. LACOMBE:  I have D-106, Attachment 12 to report
8    - August.
9    MS. WOLF:  I meant to put this in and I thought I
10   did.
11   THE COURT:  She did.  I think she's saying --
12   MS. LACOMBE:  You did, D-106, and it was admitted,
13   on 3/9.
14   MS. WOLF:  So there's two.  That's what I was
15   asking.  He did -- I assume they want both of them, but
16   the one that they paid on is this May one and that's --
17   then because it's small I did this blow-up which is
18   this --
19   THE COURT:  And that's his estimate that you're
20   referring to?
21   MS. BROWN:  These are not estimates.  This is
22   summary evidence that she made.
23   MS. WOLF:  He confirmed that this was --
24   MR. WOLFF:  Your bar chart is summary evidence.
25   MS. BROWN:  They asked for my bar chart.

1          THE COURT:  Here's what they asked for.  They

2     asked --

3                    (All speaking at once.)

4          THE COURT:  Whoa.  Whoa.  Whoa.

5          MR. WOLFF:  Judge first.

6          THE COURT:  I got that.  I've already seen that.

7     What they asked for specifically, and that's what we're

8     going to give them:  Bar graph chart from plaintiff's

9     evidence, the four-volume set from Skyline, and

10    Mr. Stuck's estimate.

11         MS. WOLF:  He did two.

12         THE COURT:  Okay.  We'll give them both.  That's

13    what they want.  They didn't ask for any charts or

14    summary things from Mr. Stuck.  They asked for his

15    estimates or estimate.  But if he did two, I think we

16    give them both.  Okay.  Let me look.  Okay.  Give

17    them -- send that in.

18                    (Recess is taken.)

19         THE COURT:  Okay.  We have a verdict, it's my

20    understanding, so I'll bring the jury in.  Before you

21    bring them in, I will tell both counsel that y'all did

22    an excellent job, both sides.  I commend you all on

23    being very prepared and putting on a very good case.

24         I would also tell you that I will go talk to the

25    jurors after we're done.  I always typically do that to

748

1      thank them.  I don't get into their verdict; but I do
2      ask them, you know, what did you like about the case,
3      what did you not like, what -- and I'll be happy to
4      share that with you.  I always found that feedback is
5      always good, helps you down the road.  But I will reach
6      out to you over the next few days after I get a chance
7      to talk to them.  Well, I'll talk to them today.  Sounds
8      good.  Okay.  Bring in the jury.
9                    (Jury enters courtroom.)
10          THE COURT:  Okay.  You have the verdict?
11          JURY FOREPERSON:  I do.
12          THE COURT:  If you wouldn't mind handing it to the
13     clerk here.  You can be seated.  Thank you.  Okay.  Hold
14     on one second, ladies and gentlemen.  Let me see counsel
15     for a second.
16                    **BENCH CONFERENCE**
17          THE COURT:  Okay.  I read this verdict, but I see a
18     potential issue.  On Question 5 on Page 2 they didn't
19     answer yes or no.  They put in an amount.
20          MR. COX:  As I thought they might.
21          THE COURT:  I take that as a yes.
22          MR. WOLFF:  We've got to get an answer.
23          THE COURT:  So my theory is we should send them
24     back because I don't think they correctly have filled
25     out the form.

 1          MR. COX:  I would agree with that, Your Honor, and

 2     ask them to answer it as a yes or no.

 3          THE COURT:  I think they have to answer yes or no.

 4          MR. WOLFF:  I agree.

 5                    **COURT PROCEEDINGS**

 6          THE COURT:  Ladies and gentlemen, I'm going to have

 7     to ask you to go back into the jury room.  I did try to

 8     answer your question earlier as to Question 5, an

 9     additional amount owed as determined in Question 2.  The

10     answer requires a yes or no answer.  Okay.  I need you

11     to retire back to the jury room and give me a yes or no

12     answer on Question 5 as to the additional amount owed as

13     determined in Question 2.  Do you understand?  Okay.  I

14     was just going to send them back with this one, or do

15     y'all want them to do a complete new one?

16          MR. WOLFF:  That one.

17          MR. COX:  That one's fine, Your Honor.

18          THE COURT:  Okay.  Yes or no.  Thank you.

19                    (Jury exits courtroom.)

20          THE COURT:  I think that's the best resolution

21     because I don't want to take that as a yes or no.  The

22     question was very specific.  You need to answer it yes

23     or no.  So we'll give them a few minutes and see how it

24     goes.

25          MR. COX:  Thank you, Judge.

1      THE COURT:  We can be at ease, recess for a minute.

2                        (Recess is taken.)

3      THE COURT:  You can bring them back in.

4                        (Jury enters courtroom.)

5      THE COURT:  Okay.  Thank you, ladies and gentlemen.

6   You can give the verdict form back to the court security

7   officer.  Thank you very much.  Okay.  Verdict form is

8   in the proper order.  The clerk will read the verdict.

9      MS. LACOMBE:  "In the matter of Eaux Holdings, LLC

10  versus Scottsdale Insurance Company, Docket

11  No. 2:20-cv-1582, the jury finds:

12      No. 1.  Do you find by a preponderance of the

13  evidence that Scottsdale Insurance Company owes Eaux

14  Holdings, LLC, additional payments in excess of

15  $1,796,091 for property damage under the insurance

16  policy for damages caused by Hurricane Laura?

17      The answer:  Yes.

18      If your answer is yes, go to Question 2.

19      No. 2.  What additional amount do you find by a

20  preponderance of the evidence, if any, does Scottsdale

21  Insurance Company owe to Eaux Holdings, LLC, for

22  property damage caused by Hurricane Laura?

23      The amount written::  $238,909.49.

24      Question No. 3.  Do you find by a preponderance of

25  the evidence if any of Scottsdale Insurance Company's

1      payments to Eaux Holdings, LLC, for property damage were

2      made beyond 30 days of Scottsdale receiving satisfactory

3      proof of loss?

4           The answer:  Yes.

5           If your answer is yes, go to Question 4.

6           No. 4.  Do you find by a preponderance of the

7      evidence if Scottsdale's failure to pay within 30 days

8      was arbitrary, capricious, or without probable cause?

9           The answer:  Yes.

10          If your answer is yes go -- to Questions 3 and 4,

11     please answer Question 5.  Otherwise, please sign, date,

12     and return this form.

13          No. 5.  Which payments do you find by a

14     preponderance of the evidence were not paid within 30

15     days of Scottsdale receiving satisfactory proof of loss

16     and that such failure was arbitrary, capricious, or

17     without probable cause?  If untimely and arbitrary,

18     capricious, or without probable cause, answer yes.  If

19     timely, answer no.

20          Date 11/23/2020, the answer:  Yes.

21          Date 01/08/2021, the answer:  Yes.

22          Date 03/17/2021, the answer:  Yes.

23          Date 05/18/2021, the answer:  Yes.

24          Is additional amount owed as determined in

25     Question 2?  Yes.

1      The jury foreperson has signed and dated this

2  verdict form and returned it to the Court.

3      THE COURT:  Okay.  All right.  Ladies and

4  gentlemen, thank you very much for your service.  Your

5  service as a jury is over.  Again, I think the lawyers,

6  the community, and the Court thank you.  I would ask if

7  you would retire to the jury room for just a few

8  minutes.  I would like to come speak to you for a moment

9  and then I will let you go home.  I promise you I will

10 be very quick and be in there in just a minute.  Okay.

11 All rise for the jury.

12            (Jury exits courtroom.)

13     THE COURT:  All right.  We have the verdict.  Based

14 on this verdict, the Court will determine the penalties

15 and attorney's fees under the Statute 22, what is it,

16 1892.  Any other business at this time to come before

17 the Court?

18     MR. COX:  Your Honor, how would you like to handle

19 the attorney fee and cost portion of this?

20     THE COURT:  What I would probably -- you know, I

21 think the attorney's fees is reasonable attorney's fees

22 under the statute.  The penalty is pretty ironclad.  I

23 think we can all agree on that.  It is what it is.  If

24 the parties would like an opportunity to brief it, I'm

25 certainly open to that.

1          MR. WOLFF:  You know, they have a 20 percent
2     contract amount for the fees.  We may be able to work
3     out an agreement on the reasonableness.  I'll have to
4     confer.  And then the costs --
5          THE COURT:  I'll be quite honest with you, I mean,
6     on a penalty and attorney's fees like this, I probably
7     wouldn't have given a third.  If they had a third, it's
8     on a penalty.  20 percent's pretty reasonable to me.
9     But I'm certainly willing to let y'all work it out.  I'm
10     just giving you a heads up that's what the Court will
11     probably do.
12          MR. WOLFF:  I understand.  Then the costs will be
13     the costs.  We need to look at those.  Long story short,
14     before we go into any more briefing, let's see if we can
15     work it out by a joint --
16          MR. COX:  That's fine.
17          THE COURT:  Yeah, that's fine.  I'll give y'all --
18     what y'all want, about ten days?
19          MR. COX:  That's fine, Your Honor.
20          THE COURT:  All right.  Very good, then.  Thank
21     y'all again.  Court's adjourned.
22               (Proceedings adjourned.)
23
24               *  *  *  *  *  *  *
25

1                           CERTIFICATE

2

3        I hereby certify this 16th day of May, 2022 that the

4    foregoing is, to the best of my ability and understanding, a

5    true and correct transcript of the proceedings in the

6    above-entitled matter.

7

8                                    *Deidre D. Juranka*
                                     Deidre D. Juranka, CRR
9                                    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana